UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JEREMY LOCKHART,

     Petitioner,

v.

                          Case No: 00-6150-CIV-DIMITROULEAS
                          MAGISTRATE JUDGE SORRENTINO

MICHAEL W. MOORE,

     Respondent.

_____/

## RESPONSE TO ORDER TO SHOW CAUSE

|  | EXHIBIT |
|---|---|
| INITIAL BRIEF | 1 |
| ANSWER BRIEF | 2 |
| DIRECT APPEAL MANDATE | 3 |
| PETITION FOR WRIT OF HABEAS CORPUS FILED IN FOURTH DISTRICT ALLEGING INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL | 4 |
| ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS | 5 |
| ORDER FROM FLORIDA SUPREME COURT DISMISSING PETITION FOR LACK OF JURISDICTION | 6 |
| MOTION FOR POST CONVICTION RELIEF | 7 |
| STATE'S RESPONSE TO MOTION FOR POST CONVICTION RELIEF | 8 |
| ORDER DENYING MOTION FOR POST CONVICTION RELIEF | 8A |
| NOTICE OF APPEAL FROM ORDER DENYING MOTION FOR POST CONVICTION RELIEF | 9 |



MANDATE                                                          10

NOTICE TO INVOKE FLORIDA SUPREME COURT'S
JURISDICTION                                                     11

FLORIDA SUPREME COURT'S ORDER DISMISSING
FOR LACK OF JURISDICTION                                         12

TRIAL TRANSCRIPT                                                 13

**Exhibit 1**

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

JEREMY LOCKHART,                              )
                                             )
        Appellant,                           )
                                             )
vs.                                          )      Case No. 95-3410
                                             )
                                             )
STATE OF FLORIDA,                            )
                                             )
        Appellee.                            )
_____    )

## INITIAL BRIEF OF APPELLANT

On Appeal from the Circuit Court of the Seventeenth Judicial
Circuit of Florida, In and For Broward County
[Criminal Division].

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

JUN 2 4 1996

CRIMINAL OFFICE
WEST PALM BEACH

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building/6th Floor
421 3rd Street
West Palm Beach, Florida 33401
(407) 355-7600

JOSEPH R. CHLOUPEK
Assistant Public Defender
Florida Bar No. 434590

Brief Due
July 11. 1996

'     Counsel for Jeremy Lockhart

## CERTIFICATE OF INTERESTED PERSONS

Counsel for defendant/Appellant, JEREMY LOCKHART and certifies that the

following persons have or may have an interest in the outcome of this case.

Craig Blinderman
(Assistant State Attorney)

Patrick Brown
(Victim)

Joseph R. Chloupek, Assistant Public Defender
Office of Public Defender, Fifteenth Judicial Circuit
Richard L. Jorandby, Public Defender
(Appellate Counsel for Appellant)

Robert Godwin,
(Assistant Public Defender)

Jeremy Lockhart
(Appellant)

Georginia-Jimenez-Orosa
Office of the Attorney General, State of Florida
(Counsel for Appellee)

Joe Patner
(Assistant State Attorney)

Mark Spieser
(Circuit Court Judge)

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

### ARGUMENT

### POINT I

THE TRIAL COURT'S INCOMPLETE INSTRUCTION ON
SELF-DEFENSE ENTITLES APPELLANT TO A NEW
TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

### POINT II

TESTIMONY IMPLYING APPELLANT'S COMMISSION OF
AN UNCHARGED CRIMINAL OFFENSE ENTITLES
APPELLANT TO A NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . .  13

### POINT III

THE TRIAL COURT'S ABSENCE DURING A JURY
QUESTION CONSTITUTES REVERSIBLE ERROR. . . . . . . . . . . .  14

### POINT IV

REFERENCES TO EVIDENCE PROVIDED BY NON-
TESTIFYING WITNESSES CONSTITUTED ERROR
BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

# AUTHORITIES CITED

CASES                                                                      PAGE

Bell v. State, 595 So. 2d 232, 234 (Fla. 3d DCA 1992)
    review denied 604 So. 2d 488
    (Fla. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Blair v. State, 667 So. 2d 834, 840
    (Fla. 4th DCA 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Brown v. State, 538 So. 2d 833, 834-836
    (Fla. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Caruso v. State , 645 So. 2d 389, 395 (Fla. 1995)
    citing Conley v. State, 620 So. 2d 180, 183
    (Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Cox v. State, 561 So. 2d 1116, 1117
    (Fla. 4th DCA 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Hager v. State, 439 So. 2d 996
    (Fla. 4th DCA 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Huhn v. State, 511 So. 2d 583, 588-589
    (Fla. 4th DCA 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jackson v. State, 636 So. 2d 99, 100
    (Fla. 3d DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

McDaniels v. State, 583 So. 2d 349
    (Fla. 4th DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mense v. State, 570 So. 2d 1390, 1392
    (Fla. 3d DCA 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rigdon v. State,621 So. 2d 475, 478
    (Fla. 4th DCA 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Savage v. State, 588 So. 2d 975, 979 (Fla. 1991)
    certiorari denied 503 U.S. 942, 112 S.Ct. 1493,
    117 L. Ed. 2d 634 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Scott v. State, 559 So. 2d 269, 273
    (Fla. 4th DCA 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Smith v. State, 410 So. 2d 579, 580-581 (Fla. 4th DCA 1982)
    review denied 419 So. 2d 1200
    (Fla. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

State v. DiGuilio, 491 So. 2d 1129
    (Fla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

<u>State v. Smith</u>, 573 So. 2d 306, 318
    (Fla. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Trotman v. State</u>, 652 So. 2d 506, 507
    (Fla. 3d DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## PRELIMINARY STATEMENT

Appellant was the Defendant and Appellee was the Prosecution in the Criminal Division of the Circuit Court of the Seventeenth Judicial Circuit of Florida, in and for Broward County. In the brief the parties will be referred to as they appear before this Honorable Court.

The symbol "R" will denote Record on Appeal.

The symbol "SR" will denote Supplemental Record on Appeal.

## STATEMENT OF THE CASE AND FACTS

Appellant was indicted for second degree murder in the shooting death of Patrick Brown (R 665). He was found guilty of a lesser-included offense of manslaughter with a firearm after a jury trial (R 629, 702). Appellant was sentenced to thirty years imprisonment, including a 15 year mandatory minimum term of incarceration, as a habitual violent felony offender (R 661, 703-705, 712). Notice of Appeal was filed on September 18, 1995 (R 715).

John Hospodavis, a Fort Lauderdale police officer, responded to Appellant's apartment concerning a report of a shooting on June 25, 1994 (R 304-305, 464). Hospadavis found Patrick Brown lying faced down in the apartment; Brown had suffered four gunshot wounds, two to the chest and two to the buttocks (R 306, 422, 426). Hospodavis spoke with various alleged eye-witnesses on the scene, who identified Appellant as a suspect in Brown's shooting (R 315). A defense hearsay objection to this testimony was overruled by the trial court (R 314). Hospodavis put out a "BOLO" bulletin for Appellant, who was not on the scene at the time Hospodavis arrived (R 315). In speaking with April Reece, Appellant's sister, Hospodavis saw no visible injuries to Reece (R 316).

Cheryl Grant lived across the hall from Appellant (R 320). Grant was able to specifically recall events on June 25, 1994 because it was her birthday (R 321). Around 4:00 p.m., Grant heard five "steady" gunshot-like sounds coming from Appellant's apartment (R 321-322). Later, Grant saw "someone" leaving the area with a firearm, saying "I'm tired of him messing with me" and "I am going to get him" or similar words (R 323-325).

Darren Walker was staying with his brother in an apartment near Appellant's residence in June, 1994 (R 327). On June 25, 1994, Walker was involved in card game with Appellant, Patrick Brown, and other men in Appellant's apartment (R 328-329). The card players split two six packs of beer during the day (R 330). Walker recalled two "young females" arriving during the card game; these women began arguing with Patrick Brown (R 331-332). Appellant's sister, April Reece, was the "most outspoken" of the two women

2

arguing with Brown (R 332). According to Walker, April Reece eventually gained possession of a bottle, while the second woman, April Williams, picked up a knife (R 333). Since Walker was attempting to avoid involvement in this incident, he did not "pay attention" to Appellant's initial actions involving the women (R 334). Walker did hear Appellant tell both women to leave his apartment; however, Patrick Brown later allowed the women to reenter the apartment, which Appellant had locked (R 334-335).

Thereafter, April Reece and April Williams again began arguing amongst themselves and Patrick Brown concerning their "relationships" (R 335, 347). As Walker left Appellant's apartment, April Reece hit Patrick Brown on the forehead with a bottle (R 336, 349). Brown fell back onto a nearby couch, then got up, appearing "dazed" (R 337-338). At that time, April Williams asked Brown if he was going to let April Reece "do [him] like that" (R 338). After a "slight delay," Brown and Reece began a mutual wrestling match (R 339). As a result, both Reece and Brown fell over a couch in the apartment; at that time Walker saw no punches between the parties (R 340, 350). As Walker left the area, he heard four to five "quick pows," which Walker interpreted as gunshots (R 341, 350). As Walker was leaving, he heard Appellant say "I don't want this shit in my house" (R 342).

On cross-examination, Walker admitted that Appellant and Patrick Brown appeared to be "good friends" during the card game, and that "trouble" began between them only after the arrival of April Reece and April Williams (R 344-345). Walker admitted that Appellant had told both women to leave, as Appellant "wanted no trouble in his house" (R 345-346).

Charles Forbes lived next door to Appellant on June 25, 1994; around 4:00 p.m., he heard four to five "firecracker noises" from within Appellant's apartment, "one after the other" (R 353). Stepping outside, Forbes saw numerous people, including a man holding a gun while muttering "I'm tired of this shit" (R 354).

Michael Walley, a Fort Lauderdale detective, was assigned the investigation into Patrick Brown's death on June 25, 1994 (R 365-367). Walley went to the scene of the

3

shooting, speaking with April Reece, who displayed no injuries, bruises, or bleeding (R 368). On June 27, 1994, Appellant turned himself in to police, then gave a taped statement to Walley (R 369-370). Although defense counsel waived transcription of Appellant's taped statement, which was played for the jury, a subsequent order by this Court supplementing the record with Appellant's statement to Walley was issued (R 376-378). Nonetheless, Walley testified extensively concerning the contents of Appellant's taped statement.

According to Walley, Appellant began crying while relating how Appellant shot his "best friend," Patrick Brown (R 379). Appellant told Walley that he threw both the gun and its "clip" into a lake; additionally, Appellant threw the clothing he wore on June 25, 1994 into a dumpster (R. 380-381; SR. 15). In his statement, Appellant told Walley that Patrick Brown and Appellant were playing cards on June 25, 1994 when Appellant's sister, April Reece, and April Williams came to Appellant's apartment, then began arguing with Brown, who had been "seeing" both women simultaneously (R. 385-388 SR. 6-8). Appellant claimed that he and Patrick Brown were "close," but that Brown had a "problem" with April Reece and April Williams; Appellant had counseled Brown to "be honest" with Appellant's sister concerning his feelings for April Williams, who bore Brown a child (R. 385-388, SR, 7-8). Once inside Appellant's apartment, April Reece grabbed a bottle, while April Williams grabbed the knife; in response, Appellant threw both women out of the apartment (SR. 9). Patrick Brown went outside to speak with the women, then reentered Appellant's apartment, allowing the women back inside (SR 9-10). After Appellant informed his sister that Patrick Brown planned on staying with April Williams, Ms. Reece reacted by hitting Patrick Brown on the forehead with the glass bottle (SR. 10-11). At that point, Brown and Reece began wrestling (R 391-392, 397). According to Appellant, he initially planned to be "neutral" during this fight, since his sister had "gotten [her] first licks," entitling Patrick Brown to "[get] his lick back" (R. 393; SR. 11). However, when Patrick Brown began kicking April Reece numerous times in the kidney and crouch, Appellant began pulling Brown off of his

4

sister (R. 394-395; SR. 12). When Patrick Brown punched Appellant once in response, Appellant pulled out his weapon, an automatic pistol, pulling the trigger once, firing multiple shots (R. 397, 399; SR. 17, 22). Appellant claimed that Brown was kicking April Reece at the precise moment Appellant shot Brown (SR 22).

Although Appellant took police to the place where Appellant said he discarded the weapon, no gun was ever found (R 403). Appellant told Walley that he did not immediately turn himself in to police because Appellant wanted to speak with his parents first (R 403). Appellant told Walley that he felt that Patrick Brown was trying to start a fight with April Reece, since Brown was "known for fighting" (R 404-405). According to Walley, Appellant told him that Appellant did not call police on the day of shooting because Appellant "knew [he] was going to jail" (R 412).

Joshua Perper, a forensic pathologist, conducted an autopsy on Patrick Brown (R 418, 421-422). Brown was five feet nine inches tall, and weighed 147 pounds (R 422). Brown had a laceration on his forehead, and four gunshot wounds, two in the front and two in back (R 422, 425-426). Perper found only one of Brown's wounds fatal (R 426). On cross-examination, Perper admitted not being able to state the order in which Brown's bullet wounds were inflicted (R 430). Perper admitted that Brown's wounds were "consistent" with Brown being "spun around" by the first two shots, which itself would cause the last two shots to enter Brown's back (R 439).

Robert Knutten, a crime scene technician with the Fort Lauderdale police department, found six .22 caliber empty shell casings in Appellant's apartment (R 447-449). Knutten also found a knife underneath a love seat in the apartment (R 454).

Appellant, who testified on his own behalf at trial, was 24 years old, married with one child, and two prior felony convictions (R 462-464, 490). Appellant and his family lived in the apartment where Patrick Brown was shot (R 464). On June 25, 1994, Appellant's wife left the apartment in the morning; as a result, Appellant, his daughter, and Patrick Brown

5

remained (R 465). After Appellant's wife returned, taking the couple's daughter, Appellant invited various neighbors, including Darren Walker, to play cards with Appellant and Patrick Brown (R 466-467). Appellant and Brown were "best friends" (R 466). April Reece, Appellant's "baby sister," had been Patrick Brown's girlfriend (R 466-467). April Williams was also a girlfriend of Patrick Brown, and had bore Brown a child (R 467). April Reece was initially unaware of Patrick Brown's relationship with April Williams (R 467).

On the afternoon of June 25, 1994, April Williams stopped by Appellant's apartment, leaving her baby with Patrick Brown (R 468). After Appellant's sister arrived, then left the apartment, Appellant told Brown to "choose" between the two women (R 468-469). Subsequently, April Williams returned, then began speaking with Patrick Brown; shortly thereafter, April Reece reentered the apartment, then began arguing with April Williams (R 470, 472). Appellant heard a "loud" argument between the women, one of whom had a bottle and one a knife (R 472-473). In response, Appellant "put out" both women and Patrick Brown outside Appellant's apartment (R 473). Appellant explained that he had "prior problems" with his landlord concerning "loudness" in the apartment; as a result, Appellant wished to avoid any further conflict between the parties (R 474). Appellant heard the two women threaten Patrick Brown with their weapons unless he "chose" one of them (R 474). Since Appellant didn't want Patrick Brown to be hurt, he allowed Brown to reenter the apartment (R 475). Brown then unlocked the apartment door, allowing the two women inside Appellant's premises (R 475). Although Appellant was able to convince April Williams to give him her knife, April Reece kept her bottle, then berated Patrick Brown for "two timing" her with April Williams (R 476). Eventually, Reece struck Brown on the forehead with the bottle (R 477).

Appellant responded by attempting to disarm April Reece; at that time, Patrick Brown grabbed Reece, then "body slammed" her to the ground (R 477). Brown then began "punching at [Reece] in some kind of way," pounding Reece's head on the floor (R 478, 482).

6

According to Appellant, five to six weeks prior to the shooting, he saw Brown strike April Reece in the head with a baseball bat during a fight between the parties (R 479-480). Additionally, Appellant had previously saw Brown punch Reece in the jaw at a nightclub after Brown told Reece he did not want to see her "out" (R 481). Keeping in mind these memories of prior violence by Patrick Brown, Appellant began pulling Brown off April Reece (R 482). When Brown punched Appellant in the jaw, then tried to kick Appellant, Appellant shot Brown, who at that time was trying to kick April Reece in the crouch (R 483-485). Appellant testified that he kept this weapon in his home because his neighborhood had "lots of violent crime" (R 484-492). Since Appellant's weapon was an "automatic" pistol, the weapon fired multiple shots, although Appellant pulled the trigger only once (R 485). According to Appellant, Patrick Brown was "spun around" by the initial shots fired (R 486). Appellant claimed that he shot Brown to protect April Reece, not out of "ill will" or "hatred" towards Patrick Brown (R 486-487). After the shooting, Appellant travelled to Dade County to tell his grandparents about the shooting (R 487). Two days later, Appellant turned himself in to police (R 488).

On cross-examination, the prosecutor asked Appellant if his weapon was "an automatic" or semiautomatic in its firing mechanism (R 495). The prosecutor then said "[it's] an automatic, the type that is illegal in the United States, correct?" (R 495). Defense counsel objected, then moved for a mistrial, arguing that the prosecutor's question implied that Appellant was guilty on an uncharged crime (illegal possession of a firearm) (R 496). Although the trial court sustained this objection, the defense's motion for mistrial was denied (R 497). Thereafter, defense counsel also objected to the prosecutor's question to Appellant concerning whether Appellant had a permit for his firearm (R 498-499). This objection was overruled by the trial court (R 499). Nonetheless, a curative instruction was given to Appellant's jury, informing the jury that the prosecutor's question was not evidence concerning the legality of Appellant's ownership of his firearm (R 500-501). Appellant

7

admitted not having a permit for his gun, which he had purchased "on the streets" (R 501-502). Although Appellant denied going to Miami after the shooting to avoid jail, he admitted giving exactly that explanation to Detective Walley during Appellant's taped statement (R 509-510). Appellant admitted discarding his firearm after the shooting (R 510).    When appellant finished testifying, defense counsel renewed his motions for mistrial concerning questions about Appellant's "illegal" possession of a firearm, which implied Appellant's guilt to an uncharged crime (R 512-513). This motion was again denied by the trial court (R 513).

During the charge conference, the trial court denied defense counsel's request that the Court's instruction to the jury on self-defense include an instruction on the effect of Patrick Brown's reputation for violence on Appellant's self-defense claim (R 524-526). Defense counsel pointed out that Appellant did testify to two specific acts of violence involving Patrick Brown and April Reece which Appellant had witnessed prior to the shooting (R 525-526). This request was denied by the trial court (R 526). Thereafter, in instructing, then reinstructing, Appellant's jury, the trial court failed to include any instruction concerning Patrick Brown's reputation for violence (R 586-589, 609, 620-622).

During deliberations, the jury initially requested reinstruction concerning second degree murder and manslaughter (R 609). Subsequently, while the trial court was outside the jury's presence the jury propounded a question concerning "the difference between second degree murder with a firearm and manslaughter with a firearm" (R 624). According to the trial court's bailiff, "about five, ten minutes later [the jury] rang the buzzer and said that they had a verdict" (R 624). Although defense counsel asked the trial court to respond to the jury's second question, the trial court refused to do so after one of the jurors informed the court that after this second question, the jurors had deliberated thirty to forty five minutes without having their second question answered, then came to a verdict; according to this juror, the other jurors no longer needed a response from the Court to their second question (R 626-628) Thereafter, the trial court accepted the jury's verdict of guilty to the lesser-

8

included offense of manslaughter with a firearm (R 629). This appeal follows.

## SUMMARY OF ARGUMENTS

POINT I: The trial court erred in denying defense counsel's motion to instruct Appellant's jury on the issue of self-defense concerning the reputation for violence of Patrick Brown. A criminal defendant is entitled to a theory of defense jury instruction where any evidence supports the theory. In this case, Appellant was allowed to testify that he was aware of two prior incidents of violence involving Patrick Brown and April Reece prior to June 25, 1994. As a result, Appellant was entitled to the instruction he sought. Wherefore, this cause must be reversed and remanded with directions.

POINT II: The trial court erred in admitting into evidence testimony concerning Appellant's failure to have a license for his possession of the gun he used to shoot Patrick Brown. This evidence was not relevant to prove any material issue at trial below. Since testimony concerning uncharged criminal acts is generally inadmissible, the trial court's ruling below was error. Wherefore, this cause must be reversed and remanded with directions.

POINT III: The trial court erred in failing to be present when Appellant's jury had a question concerning the definitions of second degree murder with a firearm and manslaughter with a firearm. The presence of a trial judge during all stages of a criminal trial is necessary, and cannot be waived when a jury wishes to communicate with the Court during deliberations. Here, the trial court's failure to be present when the jury propounded a question during deliberations constitutes reversible error. Wherefore, this cause must be reversed and remanded with directions.

POINT IV:    During the testimony of officer Hospodavis, the State elicited Hospodavis' admission that he spoke with certain non-testifying witnesses, who provided him with information that ultimately led to the arrest of Appellant. However, while a police officer may testify as to what he did pursuant to information received from others, it is improper to allow the officer to testify as to the information itself, since this constitutes hearsay whose probative value is, as a matter of law, outweighed by the danger of unfair

10

prejudice. As a result, Appellant's conviction and sentence must be reversed and remanded with directions to grant him a new trial.

## ARGUMENT

### POINT I

#### THE TRIAL COURT'S INCOMPLETE INSTRUCTION ON SELF-DEFENSE ENTITLES APPELLANT TO A NEW TRIAL.

During the charge conference, defense counsel requested that the trial court's instruction to Appellant's jury on the issue of self-defense include a reference to Patrick Brown's reputation for violence; defense counsel cited Appellant's trial testimony concerning two specific acts of violence by Brown towards April Reece prior to June 25, 1994 (R 524-526). The trial court denied this motion, then failed to include the requested instruction during its charge to the jury below (R 526, 586-589, 609, 622-626). This was error.

Generally speaking, a criminal defendant is entitled to an instruction embodying his theory of defense where any evidence supports the instruction, Savage v. State, 588 So. 2d 975, 979 (Fla. 1991) certiorari denied 503 U.S. 942, 112 S.Ct. 1493, 117 L. Ed. 2d 634 (1992); O'Hara v. State, 642 So. 2d 592, 594 (Fla. 4th DCA 1994). In this case, substantive rules of law allow Appellant to introduce into evidence testimony concerning his knowledge of prior specific acts of violence by Patrick Brown, to show the reasonableness of Appellant's apprehension of Brown in support of Appellant's self-defense claim, see e.g. State v. Smith, 573 So. 2d 306, 318 (Fla. 1991); Smith v. State, 410 So. 2d 579, 580-581 (Fla. 4th DCA 1982) review denied 419 So. 2d 1200 (Fla. 1982); Hager v. State, 439 So. 2d 996 (Fla. 4th DCA 1983). Below, Appellant testified that he was aware of two incidents of violence by Patrick Brown towards April Reece prior to June, 1994 (R 479-481). As a result, Appellant would be entitled to the instruction he sought concerning Brown's reputation for violence, as part of the trial court's general instruction to the jury on self-defense, McDaniels v. State, 583 So. 2d 349 (Fla. 4th DCA 1991).

As a consequence, Appellant's conviction and sentence must be reversed and remanded with directions to grant him a new trial.

12

## POINT II

### TESTIMONY IMPLYING APPELLANT'S COMMISSION OF AN UNCHARGED CRIMINAL OFFENSE ENTITLES APPELLANT TO A NEW TRIAL.

During cross-examination of Appellant, the trial prosecutor propounded questions to Appellant concerning the "illegality" of Appellant's possession of an "automatic pistol," the same weapon Appellant used to shoot Patrick Brown; additionally, the prosecutor questioned Appellant about his lack of a permit for this weapon (R 495, 501-502). Defense counsel's objection to this testimony as irrelevant was sustained, but the defense's motion for mistrial was denied by the trial court (R 496-497, 499). This was error.

Testimony concerning uncharged crimes unrelated to the charged offense is generally inadmissible, since such testimony tends to predispose the jury of finding a criminal defendant guilty, Cox v. State, 561 So. 2d 1116, 1117 (Fla. 4th DCA 1990). In this case, testimony concerning the alleged illegality of Appellant's possession of the weapon used to shoot Patrick Brown, as well as evidence concerning Appellant's lack of a permit for the weapon, was absolutely irrelevant to any material issue at trial, and the minimal probative value of this evidence was grossly outweighed by its prejudicial effect, see generally Blair v. State, 667 So. 2d 834, 840 (Fla. 4th DCA 1996); Huhn v. State, 511 So. 2d 583, 588-589 (Fla. 4th DCA 1987); Rigdon v. State,621 So. 2d 475, 478 (Fla. 4th DCA 1993); Scott v. State, 559 So. 2d 269, 273 (Fla. 4th DCA 1990).   Moreover, given the ultimate importance of Appellant's credibility concerning his self-defense explanation to the jury's deliberations below, this error cannot be considered harmless, see generally State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986).

Therefore, Appellant's conviction and sentence must be reversed and remanded with directions to grant him a new trial.

13

## POINT III

### THE TRIAL COURT'S ABSENCE DURING A JURY QUESTION CONSTITUTES REVERSIBLE ERROR.

During deliberations, the jury propounded a question concerning "the difference between second degree murder with a firearm and manslaughter with a firearm" (R 624). According to a colloquy between the trial court, defense counsel, and the court's bailiff, it was established that the Court was absent during this question; however, the jury subsequently arrived at a verdict thirty to forty five minutes after propounding the question (R 625-628). In response to a subsequent question by the trial court, one of the jurors indicated that the jury no longer required a response to its question concerning second degree murder and manslaughter (R 627-628). As a result, the trial court denied defense counsel's request to answer the jury's question before accepting a verdict, and overruled the defense's motion for mistrial (R 625-628). This was error.

In providing a criminal defendant with a fair trial, the presence of a trial judge during all stages in the proceedings is essential, Brown v. State, 538 So. 2d 833, 834-836 (Fla. 1989). In this case, given the fact that the jury propounded two separate questions to the trial court concerning the definitions of second degree murder and manslaughter, fundamental fairness to Appellant required the trial court to answer the jury's question before accepting the verdict below, since a "reasonable possibility" existed that the trial court's erroneous failure to be present during the jury's question effected the jury's verdict see generally State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986); compare Jackson v. State, 636 So. 2d 99, 100 (Fla. 3d DCA 1994) (reversal required where judge, who was absent from courtroom when note was received from jury, directed bailiff to transmit to that jury "innocuous response" to the jury's question).

Thus, Appellant's conviction and sentence must be reversed and remanded with directions to grant Appellant a new trial.

14

**Exhibit 2**

IN THE DISTRICT COURT OF THE STATE OF FLORIDA

FOURTH DISTRICT

CASE NO. 95-3410

**JEREMY LOCKHART,**

Appellant,

v.

**STATE OF FLORIDA,**

Appellee.



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AN APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA
CRIMINAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**ANSWER BRIEF OF APPELLEE**</u>

**ROBERT A. BUTTERWORTH**
Attorney General
Tallahassee, Florida

**JAMES J. CARNEY**
Assistant Attorney General
Florida Bar No. 475246
1655 Palm Beach Lakes Blvd.
West Palm Beach, FL 33401
Telephone (407) 688-7759

Counsel for Appellee

JEREMY LOCKHART V. STATE
CASE NO. 95-3410

### CERTIFICATE OF INTERESTED PERSONS

Counsel for the State of Florida agrees with Appellant's certificate, with the following additions.

Carney, James J., Assistant Attorney General

i

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS                          i

TABLE OF CONTENTS                                         ii

TABLE OF AUTHORITIES                                     iii

PRELIMINARY STATEMENT                                     1

STATEMENT OF THE CASE AND FACTS                           2

SUMMARY OF THE ARGUMENT                                   3

ARGUMENT                                                  4

ISSUE I

WHETHER TRIAL COURT ABUSED ITS DISCRETION IN
DENYING THE INSTRUCTION ON REPUTATION FOR VIOLENCE
WHEN THERE WAS NO TESTIMONY ON THE VICTIM'S
REPUTATION FOR VIOLENCE?
HABITUAL OFFENDER?

ISSUE II                                                  6

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN
DENYING APPELLANT'S MOTION FOR MISTRIAL?

ISSUE III                                                 9

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY
NOT ANSWERING THE JURY'S QUESTION?

ISSUE IV                                                 11

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION
IN ALLOWING THE OFFICE TO TESTIFY THAT HE
DEVELOPED A SUSPECT AFTER TALKING TO WITNESSES?
CONCLUSION                                               13

CERTIFICATE OF SERVICE                                   13

## TABLE OF AUTHORITIES

### CASES

<u>Brown v. State</u>, 538 So. 2d 833 (Fla. 1989) . . . . . . . . . 9

<u>Gore v. State</u>, 475 So. 2d 1205 (Fla. 1985), <u>cert.</u> <u>denied</u>, 475 U.S.
          1031, 106 S. Ct. 1240, 89 L. Ed. 2d 348 (1986) . 7

<u>Hager v. State</u>, 439 So. 2d 996 (Fla. 4th DCA 1983) . . . . . 4

<u>Hand v. State</u>, 188 So. 2d 364 (Fla. 1st DCA 1967), <u>quashed on other</u>
          <u>grounds</u>, 199 So. 2d 100 (Fla. 1967) . . . . . . 7

<u>Harmon v. State</u>, 527 So. 2d 182 (Fla. 1988) . . . . . . . . 8

<u>Mellins v. State</u>, 395 So. 2d 1207 (Fla. 4th DCA), <u>rev. denied</u>, 402
          So. 2d 613 (Fla. 1981) . . . . . . . . . . . . . 7

<u>Michaels v. State</u>, 429 So. 2d 338 (Fla. 2d DCA 1983), <u>approved in</u>
          <u>part</u>, 454 So. 2d 560 (Fla. 1984) . . . . . . . . 4

<u>Rhoades v. State</u>, 638 So. 2d 920 (Fla. 1994) . . . . . . . . 7

<u>Thomas v. State</u>, 563 So. 2d 207 (Fla. 4th DCA 1990) . . . . 12

<u>Trotman v. State</u>, 652 So. 2d 506 (Fla. 3d DCA 1995) . . . . 11

<u>Wisiniki v. State</u>, 508 So. 2d 504 (Fla. 4th DCA), <u>rev. denied</u>, 518
          So. 2d 1278 (Fla. 1987) . . . . . . . . . . . . 5

### MISCELLANEOUS

§90.405, <u>Fla. Stat.</u> (1995) (distinguishing between specific act
          evidence and reputation evidence) . . . . . . . 4

Erhardt <u>Florida Evidence</u> § 405.1 (1996)(In order to prove
          reputation, it is necessary to lay the foundation that
          the witness aware of the persons reputation in the
          community.) . . . . . . . . . . . . . . . . . . 4

Fla. Standard Jury Inst. (Crim) p. 43 . . . . . . . . . . . 4

iii

## PRELIMINARY STATEMENT

Jeremy Lockhart was the defendant below and will be referred to as "Appellant." The State will be referred to as "Appellee." References to the record will be preceded by "R." References to any supplemental record will be preceded by "SR." All emphasis is added unless otherwise noted.

## STATEMENT OF THE CASE AND FACTS

Appellee generally agrees with Appellant's statement of the case and facts, with the following additions, exceptions, and corrections.

In his opening statement Appellant indicated that there a dispute as to whether the gun was an automatic (R 298).

Officer Hospodavis testified that Appellant's sister had no visible injuries (R 316). She did not complain of injuries (R 316).

Charles Forbes testified that he saw Appellant come out of the apartment holding a pistol (R 354, 355). Appellant was stating "I'm tired of this shit," "like he was out of his mind." (R 354).

Detective Walley testified that Appellant's sister did not appear injured (R 368). There was no evidence she was kicked in the face (R 396). She stated that she was not injured (R 414).

Appellant testified that before shooting the victim, he pulled the victim off Appellant's sister (R 505). He was able to do that (R 505).

In his taped statement Appellant said that while the victim and Appellant's sister were fighting, Appellant got mad at his wife (SR 11). He and his wife got in an argument because Appellant would not help his sister (SR 11). Appellant then pulled the victim off his sister (SR 12). The victim swung and hit Appellant once. At that time Appellant said "I told you all to stop. That's when I pulled out the gun and I shot." (SR 12).

2

## SUMMARY OF THE ARGUMENT

### I

The instruction was not warranted as there was no reputation evidence presented.  Any error was harmless.

### II

This issue was not preserved.  The question was relevant as it was the State's position that the gun was a semi-automatic. The trial judge's cautionary instruction cured any error.  Any error was harmless.

### III

This issue was not preserved.  There was no communication with the jurors while the trial judge was not present.  Any error was harmless because Appellant was convicted of manslaughter with a firearm.

### IV

It was not improper to ask if the officer developed a suspect.  There was no dispute that Appellant was the shooter. Any error was harmless where the information was previously brought out without objection.

## ARGUMENT

### I

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
IN DENYING THE INSTRUCTION ON REPUTATION FOR
VIOLENCE WHEN THERE WAS NO TESTIMONY ON THE
VICTIM'S REPUTATION FOR VIOLENCE.

The standard jury instruction entitled "Reputation of

victim," states:

> If you find that (victim) had a reputation
> of being a violent and dangerous person and
> that his reputation was known to the
> defendant, you may consider this fact in
> determining whether the actions of the
> defendant were those of a reasonable person
> in dealing with an individual of that
> reputation.

(emphasis supplied) Fla. Standard Jury Inst. (Crim) p. 43.

The instruction is to be given only if applicable.  Id.

"Specific acts of violence" and "reputation for violence" are two

entirely different concepts.    The trial court properly found

that there was no reputation evidence presented (R 524).  See §

90.405, Fla. Stat. (1995) (distinguishing between specific act

evidence and reputation evidence);  Hager v. State, 439 So. 2d

996, 997 (Fla. 4th DCA 1983)(same); Michaels v. State, 429 So. 2d

338, 339 (Fla. 2d DCA 1983), approved in part, 454 So. 2d 560

(Fla. 1984)(State should have proved reputation for violence

through testimony about defendant's reputation, not by cross-

examination of defendant concerning specific prior acts of

violence) and Erhardt Florida Evidence § 405.1 (1996)("In order

to prove reputation, it is necessary to lay the foundation that

the witness aware of the person's reputation in the community.")

4

See also <u>Wisiniki v. State</u>, 508 So. 2d 504 (Fla. 4th DCA), <u>rev.</u> <u>denied</u>, 518 So. 2d 1278 (Fla. 1987)(reputation must be based on discussions among a broad group of people so that it accurately reflects the person's character, rather than the biased opinions or comments of two or three persons).

Assuming error, it was harmless. Appellant stated that he knew he had done something for which he would go to jail (R 23). The uncontradicted evidence showed that the amount of force used was not reasonable in response to an unarmed man. Appellant stated that he was able to pull the victim off Appellant's sister (R 505).

## ISSUE II

THE TRIAL COURT DID NOT ABUSE ITS
DISCRETION IN DENYING APPELLANT'S
MOTION FOR MISTRIAL.

This issue was not preserved. After the prosecutor's question, the defendant moved for a mistrial. The trial judge denied the motion for mistrial (R 497). Defense counsel then asked for a cautionary instruction (R 497). The trial judge gave the requested instruction (R 500):

> [TRIAL COURT]: Folks, at this time I will advise you that the last question of the prosecutor concerning that it's a violation of the law to -- that it's not legal in the United States to have a firearm, an automatic firearm I will sustain the objection and advise you that the only law that comes to you that you apply to the evidence comes from the Court not from the attorney's, okay? So a lawyer can say to you, cannot say to you that this is the law or this isn't the law. Neither lawyers are permitted to do that. The law comes for the Court, not the lawyers, okay. So any law that's applicable to the evidence in this case comes from the Court not from the lawyers. And the applicable law that you will hear in this case and that is relevant to this case comes form the Court at the conclusion of trial.

Defense counsel then asked that the trial judge instruct the jury to disregard the inference from the question. The trial judge then told the jury (R 500-01):

> [TRIAL COURT]: I sustained the objection and I told the jury -- I thought I told the jury - I will say again the jury is instructed to disregard -- first of all questions are not evidence, okay. You don't base your decisions on questions. I think I told you that several times during my opening remarks that evidence comes from the witnesses on the witness stand as well as exhibits marked into evidence. So no questions constitute evidence.
>
> Secondly, I'm telling you that if in the form of the question the prosecutor asked he made a statement concerning the status of the law in the United States

regarding what possession of some firearm is, and I'm
telling you any law that's applicable to this case
comes from the Court.  So you are not to draw any
inferences or any conclusions from any questions that
either lawyers asked.  Okay, let's proceed.

After the trial judge gave these instructions, Appellant did
not object that the cautionary instructions were inadequate to
cure the alleged error.  Accordingly, this issue was not
preserved. See Rhoades v. State, 638 So. 2d 920, 926 (Fla.
1994)(claim of error waived where defendant voiced no objection
to curative procedure).  Additionally, the question was relevant
as it was the State's position that the gun was a semi-automatic.
If the gun were a semi-automatic, the trigger had to be pulled
for each of the four bullets that hit the victim.

Assuming error, it was harmless.  The jury was instructed to
disregard the remark.  See Hand v. State, 188 So. 2d 364, 367
(Fla. 1st DCA 1967), quashed on other grounds, 199 So. 2d 100
(Fla. 1967) (jury is presumed to follow trial court's
instructions); Mellins v. State, 395 So. 2d 1207, 1209 (Fla. 4th
DCA), rev. denied, 402 So. 2d 613 (Fla. 1981) (jury is presumed
to follow trial judge's instruction).

A motion for mistrial is only appropriate when the error
committed was so prejudicial as to vitiate the entire trial.)
Gore v. State, 475 So. 2d 1205, 1209 (Fla. 1985), cert. denied,
475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986) (Whether
substantial justice requires the granting of a mistrial is a
determination within the sound discretion of the trial court.).
The question regarding the permit was not objected to at the time

it was asked (R 501). Additionally, as found by the trial judge, it is not normally illegal to possess a firearm in one's home without a permit (R 498). The permit question was relevant because a training course on the proper use of a gun is necessary to get a permit (R 498-99).

Moreover, the jury knew that Appellant was a twice convicted felon (R 463). The jury obviously knew that Appellant had no legal right to possess any type of firearm. Additionally, the jury knew that Appellant was committing another crime that night by possessing and smoking marijuana (SR 14). They also knew that this twice convicted felon thought it was proper to let the victim beat his sister for a while because she had earlier hit the victim (R 393, SR 11). They knew Appellant had purchased the gun and bullets off the street from a stranger (R 501).   In short, the jury knew Appellant was not a law abiding citizen. Accordingly, any error was harmless.   See also Harmon v. State, 527 So. 2d 182, 186 (Fla. 1988)(error in admission of less serious collateral crime evidence harmless where there was ample evidence of guilt).

## POINT III

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
BY NOT ANSWERING THE JURY'S QUESTION.

During deliberations, the jury gave the bailiff a question
(R 625). The bailiff told the jury that the trial judge was in
an emergency meeting and would answer the question as soon as he
got back (R 625). Apparently, it was during the lunch hour and
no one but the bailiff was in the courtroom (R 625). The jury
reached a verdict about fifteen minutes after the jury gave the
question to the bailiff (R 625). The trial judge asked the jury
if they wished an answer to the question (R 628). The jury said
that it did not (R 628). The jury was able to answer the
question itself (R 628).

This issue was not preserved. Appellant did not object to
the trial judge's absence from the courtroom at the time of the
question. In fact, it appears that no one but the bailiff was in
the courtroom at the time of the question. Had Appellant
objected at the time of the question, the alleged error may have
been avoided.

Assuming preservation, there was no error. Brown v. State,
538 So. 2d 833 (Fla. 1989), is not on point. In that case, there
was an official communication with the jury without the trial
judge's presence. "We do find, however, that the *communication*
with the jury during there judge's absence constituted reversible
error (emphasis supplied)." Id. at 834. Here, there was no
communication without the trial judge's presence. The jury
simply reached a verdict befǫre the trial judge had a chance to

9

answer the question.  Under Appellant's view of the law, a trial
judge would commit reversible error if while relieving himself
the jury asked a question, but then reached a verdict while the
trial judge was still in the bathroom.  That is not the law.

Assuming error, it was harmless.  Contrary to Appellant's
claim, there is not a reasonable possibility that the outcome
would have been different but for the alleged error (initial
brief p. 14).  The jury question had to do with the difference
between second degree murder with a firearm and manslaughter with
a firearm (R 627).   The jury was instructed twice on the
definitions of those crimes (R 626).  More important, it is
obvious from the question that the jury had decided Appellant was
guilty of one of those crimes.  They found him guilty of the
lesser offense.  Accordingly, any error was harmless.

## POINT IV

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
IN ALLOWING THE OFFICER TO TESTIFY THAT HE
DEVELOPED A SUSPECT AFTER TALKING TO
WITNESSES.

The prosecutor simply asked if the Officer developed a
suspect after talking with witnesses (R 313). That question is
not improper. The question did not say what the witnesses said
and did not indicate that Appellant was the suspect. When the
prosecutor later asked if he put out a BOLO for Appellant, there
was no objection (R 315). Accordingly, any claim of error with
regard to the question about the BOLO was not preserved.

Assuming preservation and error, any error was harmless.
The cases relied on by Appellant are not on point. In Trotman v.
State, 652 So. 2d 506 (Fla. 3d DCA 1995), without any evidence
concerning the circumstances of the offense, an officer was
permitted to testify that after speaking to a non-testifying
witness, he went to the location of the victim's car and arrested
the defendant. Id. at 507. The Third District found reversible
error because the only other evidence against the defendant was a
victim identification. Id.

Here, there were several witnesses that testified at trial
that Appellant was the shooter (R 322-24, 342, 354-54). More
important, there was no dispute that Appellant was the shooter.
In his opening statement he admitted that he was the shooter and
that he fled after the shooting (R 298, 299). He knew he had
done something for which he would go to jail (R 412). Appellant
stated that he knew the police were looking for him (SR 8).

11

During his testimony, Appellant stated that he shot the victim (R
484). Finally, Appellee notes that there was no objection when
the prosecutor stated in opening that the police developed a
suspect after talking to witnesses and placed a BOLO for
Appellant (R 289). <u>See</u> <u>Thomas v. State</u>, 563 So. 2d 207 (Fla. 4th
DCA 1990) (error cumulative and harmless where information was
previously brought up without objection). Accordingly, any error
was harmless.

## CONCLUSION

Based on the preceding argument and authorities, this Court should affirm.

Respectfully Submitted,

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL
Tallahassee, Florida

James J. Carney
Assistant Attorney General
1655 Palm Beach Lakes Blvd.
Third Floor
W. Palm Beach, FL 33401

## CERTIFICATE OF SERVICE

I certify that a true copy of this document has been sent by mail or courier to: Joseph Chloupeck, Criminal Justice Building\6th Floor, 421 Third Street, W. Palm Beach, FL 33401, this ___9___ day of September 1996.

Of Counsel

**Exhibit 3**

# M A N D A T E

from

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Bobby W. Gunther, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

DATE:                      March 21, 1997

CASE NO.:                  95-3410

COUNTY OF ORIGIN:          Broward

T.C. CASE NO.:             94-10764 CF10A

STYLE:                     Jeremy Lockhart v. State

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

MAR 24 1997

CRIMINAL OFFICE
WEST PALM BEACH

A TRUE
COPY

Marilyn Bettenmuller, Clerk
District Court of Appeal
Fourth District

ORIGINAL TO:    Hon. Robert E. Lockwood, Clerk

cc:  Public Defender #15
     Attorney General - W. Palm Beach

     /CR

**Exhibit 4**

IN THE DISTRICT COURT OF APPEAL

FOURTH DISTRICT OF FLORIDA

JEREMY LOCKHART,
 Petitioner,

VS.

STATE OF FLORIDA,
 Respondent,
_____/

CASE NO:

SERVICED
OFFICE OF THE
ATTORNEY GENERAL

MAY 07 1997

CRIMINAL OFFICE
WEST PALM BEACH

## PETITION FOR WRIT OF HABEAS CORPUS

**COMES NOW**, petitioner/Appellant, Jeremy Lockhart, proceeding pro-se, pursuant to Rule 3.850(h); Florida Rules of Criminal Procedure; and Rule 9.100(a), Florida Rules of Appellate Procedure., Respectfully petitions this Honorable Court to grant him a writ of habeas corpus. In support thereof, petitioner states the following:

I

Petitioner is attacking this Court's March 5, 1997; opinion, affirming the conviction and sentence presented to this Court on a <u>Direct Appeal</u>, resulting from a jury trial in Broward County, Florida held on August 14 and 15, 1995. Petitioner was found guilty of a lesser included offense; to-wit: <u>Manslaughter with a firearm</u>. F.S. 782.04. Thereafter, the petitioner was sentenced to (30) years imprisonment under the Habitual Violent Felony Offender Act, pursuant to F.S. 775.084(4)(b). The trial Court elected to impose a mandatory (15) years imprisonment.

1

## II

Petitioner filed a timely notice of appeal, through the assistance of the Public Defender's Office of the Fourteenth Judicial Circuit.

The Public Defender's Office was appointed to represent the petitioner in perfecting his appeal. The Public Defender's Office, assistant Public Defender Mr. Robert E. Godwin, withdrew and assistant Public Defender Mr. Joseph R. Chloupek was appointed to represent the petitioner.

Mr. Chloupek filed petitioner's brief in this Court. Thereafter, the Assistant Attorney General filed an answer brief on September 9, 1996. No reply brief was filed.

On March 5, 1997, this Court filed it's decision <u>affirming</u> the Judgment of conviction and sentence in the instant case. No motion for rehearing was filed, and this court's mandate was forwarded to the trial Court.

## III & IV

No other motion, application or petition has been filed in this Court or any other State or Federal Court pursuant to this cause.

## V

### NATURE OF THE RELIEF SOUGHT

1. For this Court to Vacate it's origional opinion rendered on March 5, 1997, pursuant to petitioner's <u>Direct</u> <u>Appeal</u>.

2. For this court to grant the petitioner a reasonable bond due to the extensive abuse of petitioner's Civil and Constitutional rights.

2

3. For this court to ensure that counsel is appointed to assist the petitioner in effectively perfecting his appeal; with directions to prevent the undue delay that has previously characterized petitioner's pursuit of his Constitutional right to a Direct Appeal.

4. Any other and further relief this court deems necessary in the interest of justice.

## VI

### GROUNDS FOR RELIEF

**PETITIONER HAD INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, BY HIS ATTORNEY'S FAILURE TO PRESENT REVERSIBLE TRIAL ERRORS ON DIRECT APPEAL.**

#### "SUPPORTING FACTS"

Appellant's counsel Mr. Joseph R. Chloupek, rendered ineffective assistance when filing petitioner's appeal brief in this court, in which resulted in the affirmance and/or dismissal of petitioner's Direct Appeal. Petitioner asserts that counsel's actions herein, deprived petitioner of a procedural due process of law: "A Direct Appeal"

To prevail on an ineffective assistance claim, petitioner must establish that his attorney's performance was deficient, falling below that of a reasonable competent attorney. The petitioner must also show that counsel's deficient performance caused him prejudice, i.e., that the results of his case would or could have been different. **STRICKLAND V. WASHINGTON, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).**

3

In the instant case, counsel failed to raise issues' on appeal that would have resulted in the reversal of petitioner's judgment of conviction and sentence and remanded for a new trial, based on the significance of the trial errors.

1. It is petitioner's strenous belief, that the record on appeal, clearly shows that the trial Judge abused his discretion when overruling certain defense objections and/or denying defense motions for mistrial and Judgment of Acquittal.

The trial errors arose when the Assistant State Attorney made improper statements during his closing arguments.

In his cross examination on the petitioner, the prosecutor referred to the gun used by the petitioner was an illegal weapon in the United State [TR-495].

Defense counsel immediately thereafter, moved for a mistrial based on the prosecutor's improper comments. And after defense counsel proffered his basis for a mistrial, [TR-496]; The trial Judge sustained the objection, but denied the motion for mistrial. [TR-497].

Although, the Judge gave the jury a causionary instruction, asking the jury to disregard the comment, that would not circumvent the fact that the jury heard the comment and that it did not draw infrences in the juries mind, which in this case could have influenced the juries ability to be fair and impartial. Specifically, in light of the out come of petitioner's first trial resulting in a [hung jury], and the record in the first trial is void any of the prejudicial prosecutor comments. Therefore, it is petitioner's contention that his appellate

4

counsel performance in failing to raise this issue on appeal, was seriously deficient and prejudiced the out-come of his appeal. Counsel rendered ineffective assistance herein. See **BRUNO V. RUSHEN, 721 F.2d 1193 (9th Cir. 1983); U.S. V. TORRES, 809 F.2d 429 (7th Cir. 1987).**

2. Additionally, counsel for the petitioner, failed to raised the trial Judges' abuse of discretion in allowing the prosecutor to submit before the jury evidence that was not presented to the jury at trial, over defense objection. Abuse of discretion in overruling defense objections to the prosecutor's errors. [TR-498].

It is well established that the law specifically prohibits the prosecuting attorney from making such prejudicial comments that may influence the jury, specifically, during the closing arguments, which is a critical stage of the trial. As it is a law, the State Court refused to comply with this law, thus, constitutes a reversible error that should have been brought to this courts attention by the petitioner's counsel. Consequently, this issue was not presented to this court for review, ineffective assistance presumed. A review of **U.S. V. IGLESIAS, 915 F.2d 1524 (11th Cir.1990);** the court interprets that should the prosecutor commit such errors in a criminal prosecution, then the defendant was denied the right to a fair trial. Counsel in the instant case could have well argued this fact but failed to do so. The **IGLESIAS, Supra,** is on all fours with the facts of the instant case, and would support the petitioner's contentions

5

herein. Emphasis added; it can be shown that, counsel could and should have presented these issues on appeal. Moreover, not only does this mistake taint the petitioner's protected liberty interest of due process, it would also preclude the petitioner from raising these untouched issues in the trial court as fundamental irregularities. Thus, petitioner is now limited to the issues cognizable on post-convictio remedies.

Therefore, this case requires an evidentiary hearing.


3. Petitioner respectfully avers that, had counsel carefully examined the record on appeal, then he would have surely discovered the reversible errors. For example, the record shows an additional prosecutors comment that was in it--self, as a matter of law, prejudicial to the petitioner. Here the prosecutor makes a statement during closing arguments, "that the petitioner was in flight", proceedings are as follows:---[TR-506]

**MR. PATNER:**

Q. Now, you said you went down to Miami to tell your--let me ask you this. After you shot Patrick Brown did you feel you had done something wrong?

A. "I was hurting."

Q. Did you feel you had done something illegal?

**MR. GODWIN:** Objection, he's not a lawyer.

**COURT:** Sustained to the form of the question. proceed.

**MR. PATNER:**

Q. Did you feel you had done something wrong for what you could go to jail?

6

**MR. GODWIN:** Your Honor please he's not a lawyer, he doesn't know the law.

**MR. PATNER:** There is a relevence in flight, Judge.

**MR. GODWIN:** Your Honor, I request for a side bar.

**COURT:** Okay, I heard you the first time.

**MR. GODWIN:** "In pertinent part"

"No flight instructions are given and the prosecution stands up here arguing in front of the jury that it goe's to his flight. I'm going to ask you to instruct the jury that the prosecution's comment was improper and uncalled for and they are to disregard it.

**COURT:** Well, I know that the court is no longer entitled to instruct a jury on what previously was a standard instruction on flight, however, that does not prevent an attorney from bringing up the fact that he fled from the scene. To arguing to the jury then why didn't he just turn himself in if he had nothing to hide?

Based on the above, it was error for the trial Judge to overrule defense objection disregarding counsel's viable argument.

IF the trier of fact refuses to ameliorate the prosecutor's errors, further allowing the jury to draw infrerence from such comments, which may influence the juries decision in finding the petitioner guilty of even a lesser included to the offence of second degree murder. Although, the jury did find petitioner guilty of [manslaughter, w/firearm], the lesser included offense, does not indicate that the jury disregarded the prosecutor's comments. Thus, as defense counsel made timely objections and

7

moved for a mistrial based on these comments, the appellate counsel could and should have presented the trial Judge's abuse of discretion by allowing the prosecutor to make such prejudicial errors. Consequently, this was not appealed, depriving the petitioner of his right to appeal.

It is petitioner's contentions, that his appellate counsel's omissions herein, was deficient, and that such deficiency seriously prejudiced the out-come of the proceedings. Absent counsel's omissions, petitioner strongly believes that, there is a strong presumption of reasonable probability, that this case would have resulted in a different out-come.

The petitioner would respectfully request for this court to review the portions of transcripts of the trial proceedings complained of herein. Petitioner avers that the reversible errors herein, were not raised on petitioner's initial brief, that should have been raised. And thus, would demonstrate the two prongs set forth in **STRICKLAND V. WASHINGTON, Supra;**

A criminal defendant is entitled to both, trial counsel and appellate counsel, which the petitioner in the instant case has a protected right to that effectiveness under the [6]th Amendment, to the United States Constitution. See also **McMANN V. RICHARDSON, 397. U.S. 759; 90 S.Ct. 1441 25 L.Ed.2d 763 (1970); BEASLEY V. UNITED STATES, 491 F.2d 687 (6th Cir. 1974); U.S. CONST. AMEND. [6].**

The legal principles set forth in the above matters, is interpreted by the synophsis which specifically states that, "if the attorney makes a serious mistake which could affect the

out-come of the proceedings and/or the verdict. [reversal] is required. Even if the attorney was generally competent. Or as stated in **TROMBLEY V. ANDERSON, 439 F.Supp, 1250, 1256 (E.D. Mich. 1977), aff'd 584 F.2d 807 (6th Cir. 1975).**

This court indicated the focal issue is whether or not the actions of counsel could have changed the verdict or the out-come of the proceedings. Whereas, had counsel presented all relevent issues that could have been presented, then the issues, may well have succeeded.

Notwithstanding, the petitioner cannot possibly perdict what the out-come of his appeal would have been, absent counsel's omissions. Petitioner can only rely on the supporting authority in which petitioner has cited herein. Said authority, specifically identify the trial errors. And held that such errors, if found to be true, are in fact reversible errors. Therefore, counsel should have raised these issues to this court for review.

A.   **WHETHER COUNSEL RENDERED DEFICIENT PERFORMANCE IN FAILING TO THOROUGHLY REVIEW THE RECORD ON APPEAL AND PRESENT OTHER RELEVENT ISSUES ON APPEAL?**

In determining ineffective assistance of counsel, the first part of this analysis requires measuring the attorney's representation looking at all the circumstances, and indulging a strong presumption that counsel's conduct falls

9

> within the wide range of reasonable
> assistance.

A further review of the record on appeal, would establish counsel's deficient performance in the instant case, and such actions, falls below that of a reasonable attorney. Thus, a reversal of this courts origional opinion, is required.

### B. WHETHER COUNSEL'S OMISSIONS HEREIN, WAS SO SERIOUS AS TO CAUSE PREJUDICE WHICH AFFECTED THE OUT-COME OF THE PROCEEDINGS?

Under the sixth amendment of the United States Constitution, a criminal defendant is guaranteed the right to enjoy the benefit of the effective assistance of counsel.

Respectively, petitioner would be denied that right, should this court be inclined to grant the relief requesting herein. Or any other relief this petitioner may be entitled.

A close review of **BRALEY V. GLADDEN, 403 F.2d at 861;** The court noted; "when a State conducts jury trial in a criminal case, the trial must measure up to the reasonable standards of regularity". However, the petitioner does not assert that, the failure of an attorney to present all possible issues on appeal, necessarily constitutes [in]effective assistance. However, and most importantly, it is incompetent for an attorney to raise issues on appeal that has in many other high courts, failed. And for that attorney to file an appeal without presenting viable issues, that, on many occasions, was held as reversible errors. Thus, constitutes prejudice to the petitioner. Whereas, in this

10

case, the appeal proceedings could have resulted in a different out-come had counsel properly and timely raised other viable issues. The petitioner asserts with all honesty, he has shown that counsel's errors were significant, where such omissions negated the proceedings as to deprive the petitioner of a substantial right which Florida law and most importantly the Constitution has granted to others in a similar situated position, it cannot be countenanced.

This principle was up held by the U.S. Supreme Court in **HICKS V. OKLAHOMA, 447 U.S. 343, 100 S.Ct. 2227; 65 L.Ed.2d 175 (1980); JONES V. RUSSELL, 299 F.Supp. 970 (E.D. Tenn. 1968).**

The State Judge allowed the prosecutor to make improper comments over defense objection. Defense attorney representing the petitioner, advised the court that these comments were prejudicial and did not comply with State law. This however, should have raised on appeal, where it was the trial Judges ruling inwhich led to the deprivation of petitioner's right to a fair trial. Thus, same should have been and could have legally been raised on this appeal.

Additionally, in the trial court, the court refused to grant Mr. Lockhart, relief when denying his various motions for a new trial; mistrial; etc.

The Supreme Court held that a State defendant has a Federal Constitutional due process right "not to be deprived of his liberty, except in accordance with the laws of the State, and that[,] Federal right was violated, when State rules applied to others that were not applied to the petitioner. See **447. U.S. at**

11

346.

> "It is argued that all that is involved in
> this case is the denial of a procedural right
> of exclusively state concern. Where, however,
> a State has provided for the imposition of
> criminal punishment in the discretion of the
> trial jury, it is not correct to say that the
> petitioner's interest in the exercise of that
> discretion is merely a matter of State
> procedural law. The defendant in such a case
> has a substantial and legitimate expectation
> that he will be deprived of his liberty only
> to the extent determined by the jury in the
> exercise of its statutory discretion [cite
> omitted], and that liberty interest is one
> that the Fourteenth Amendment perserves
> against arbitrary deprivation by the State."

In both **BRALEY V. GLADDEN and HICKS V. OKLAHOMA,** the court
speaks of a "substantial" interest of the accused, in this case,
the petitioner's interest is a substantial one.

In light of the above, the petitioner has clearly demonstrated
the two components of the **Strickland analysis**, and therefore, has
proven ineffective assistance of his appellate counsel.

**WHEREFORE,** petitioner, Jeremy Lockhart, moves this Honorable
Court to grant the following relief:

a) Accept jurisdiction over this case pursuant to the Florida
Rules of Appellate Procedure 9.100(a), and Art. V, sec (4)(b)(3);
Fla. Const.

b) Require the respondent to answer the alligations asserted
herein.

c) Hold such evidentiary hearings as this Court may deem
necessary or appropriate;

d) Issue an order that this Court will grant a Writ of Habeas Corpus unless the respondent can show cause why petitioner should not be granted the relief requesting; and

e) Issue a Writ of Habeas Corpus vacating its origional decision affirming petitioner's conviction and sentence, and remand this case to the office of the Public Defenders with directions that said Office appoint petitioner an attorney to effectively perfect an appeal brief on behalf of the petitioner.

f) For this Court to relinguish jurisdiction back to the trial court upon the rendering of a final disposition hereof, for the purpose of exhuasting his post-conviction relief remedies, and granting the reinstatement of the [two] year time period in which to file his post-conviction relief in the trial court.

JEREMY LOCKHART (PRO-SE)
CALHOUN CORRECTIONAL INST.
POST OFFICE BOX 2000
BLOUNTSTOWN, FLORIDA 32424-2000

## CERTIFICATE OF UNNOTARIZED OATH

Under penalties of perjury, I declare that I have read the foregoing Writ of Habeas Corpus and that the facts stated in it are true.

JEREMY LOCKHART

## PROOF OF SERVICE

I, the undersigned, hereby certify under penalty of perjury that on this 28 day of April 1997, a true copy of this Writ of Habeas Corpus, has been furnished to Bob A. Butterworth, Attorney General, representing the State of Florida at The Capitol, Tallahassee, Florida 32399-1850 by U.S. mail.

13

IN THE DISTRICT COURT OF APPEAL

FOURTH DISTRICT OF FLORIDA

JEREMY LOCKHART,

    Petitioner,

VS.                   CASE NO. 95-3410

STATE OF FLORIDA,

    Respondent,

_____/

## MOTION FOR A WAIVER OF COST TO PROCEED

### FOR THE PURPOSE OF THIS APPEAL

COMES NOW, the petitioner, Jeremy Lockhart, proceeding pro-se, pursuant to Florida Statutes, 57.081 and 57.091, moves this court accept his affidavit of insolvency and allow him to proceed with out cost in the above styled cause. In support thereof, petitioner has attached a sworn to affidavit of insolvency, and other documents supporting petitioner's indigency whereas, petitioner avers that he cannot afford to pay the required cost of the above proceedings, therefore, respectfully request that this court grant him the right to proceed with out cost. Please see attached.

1. Affidavit of indigence.

2. Certificate regarding inmate account.

3. Print-out of petitioner's preceeding (6) month bank account status.

JEREMY LOCKHART

DATE: April 28th, 1997

**Exhibit 5**

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

JEREMY LOCKHART                     CASE NO. 97-01562

Petitioner(s),

vs.

STATE OF FLORIDA                    L.T. CASE NO. 94-10764 CF
                                    BROWARD
Respondent(s).

June 10, 1997

BY ORDER OF THE COURT:

        ORDERED that the Petition for Writ of Habeas Corpus, is

hereby denied.

I hereby certify the foregoing is a
true copy of the original court order.

MARILYN BEUTTENMULLER
CLERK

cc:   Jeremy Lockhart
      Attorney General-W. Palm Beach

      /DM

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

JUN 1 1 1997

CRIMINAL OFFICE
WEST PALM BEACH

2-0322

**Exhibit 6**

# Supreme Court of Florida

TUESDAY, JULY 8, 1997

JEREMY LOCKHART,                    * *

     Petitioner,                   * *        CASE NO. 90,902

vs.                                 * *        District Court of Appeal,
                                               4th District - No. 97-01562
STATE OF FLORIDA,                   * *        B. 94- 10764 CF 10 A

     Respondent.                   * *


It appearing to the Court that it is without jurisdiction, the Petition for Review is hereby dismissed.

No motion for rehearing will be entertained by the Court.

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

JUL 10 1997

CRIMINAL OFFICE
WEST PALM BEACH

A True Copy

TEST:

Sid J. White
Clerk Supreme Court

H
cc:    Hon. Marilyn N. Beuttenmuller, Clerk

     Mr. Jeremy Lockhart
     Hon. Robert A. Butterworth

**Exhibit 7**

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

$F A$

**STATE OF FLORIDA**,
Plaintiff,

vs.

**CASE NO: 94-10764-CF 10A**

**JEREMY LOCKHART,**
Defendant.

_____ /

## MOTION FOR POST CONVICTION RELIEF
## PURSUANT TO FLA. R. CRIM. P. 3.850

### MOTION

1.   Name and location of the court that entered the judgement of conviction under attack:
Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida

2.   Date of judgement of conviction: September 8,1995

3.   Length of Sentence: 30 years w/15 year minimum mandatory as HVFO

4.   Nature of Offense(s) involved (all counts) :  Manslaughter with a firearm

5.   What was your plea? (check only one)
     (a) Not Guilty  XX
     (b) Guilty
     (c) Nolo Contendere
     (d) Not Guilty by reason insanity

If you entered one plea to one count and a different plea to another count, give detail: N/A

6.   Kind of trial (check only one)       ✓
     (a) Jury  XX        (b) Judge only without jury

7.    Did you testify at the trial or any pretrial hearing?
      Yes XX          No

      If yes, list each such occasion: Jury Trial

8.    Did you appeal from the judgement of conviction?
      Yes X           No

9.    If you did appeal, answer the following:
      (a) Name of Court: District Court of Appeal, Fourth District of Florida
      (b) Results: Affirmed
      (c) Date of result: March 5,1997
      (d) Citation (if known): Citation Unknown / Case # 95-3410

10.   Other than a direct appeal from the judgement of conviction and sentence, have you previously filed any petitions, applications, motion, etc., with respect to this judgement in this court?
      Yes             No XX

11.   If your answer to number 10 was "yes" give the following information, (applies only to proceedings in this court):
(a)   (1) Nature of the proceeding : **
      (2) Grounds raised: **
      (3) Did you receive an evidentiary hearing on your petition, motion, application, etc.?
          Yes**     No**
      (4) Result: **
      (5) Date of result: **

(b)   As to any second petition, application, motion, etc., give the same information:
      (1) Nature of proceeding: **
      (2) Grounds raised: **
      (3) Did you receive an evidentiary hearing on your petition, motion, application, e t c . ?
      Yes**     NO**
      (4) Result: **
      (5) Date of result: **

12.   Other than a direct appeal from the judgement of conviction and sentence have you previously filed any petitions, applications, motions, etc., with respect to this judgement in any other court?
      Yes XX          No

13.   If your answer to number 12 was "yes" give the following information:

(a)   (1)    Name of court: District Coµrt of Appeal, Fourth District of Florida

(2)    Nature of proceeding: Petition for Writ of Habeas Corpus

(3)    Grounds raised: Ineffective Assistance of Appellate Counsel

(4)    Did you receive an evidentiary hearing on your petition, motion, application, etc.?
       Yes      No XX

(5) Results: Petition Denied

(6) Date of results: June 10,1997

(b)    As to any second petitions, application, motion, etc., give the same information:

(1)    Name of court : Supreme Court of the State of Florida

(2)    Nature of the proceeding: Request for Discretionary Review

(3)    Grounds raised: Decision of District Court of Appeal, Fourth District of Florida
directly and expressly conflicts with decisions of other District Courts of Florida and the Florida
Supreme Court on the same question of law.
       (4)    Did you receive an evidentiary hearing on your petition, motion application, etc.
              Yes      No XX
       (5)    Results: Dismissed for lack of jurisdiction

       (6)    Date of results: July 8,1997

       (c)    As to any third petition, motion, application, etc., give the same information:
       (1)    Name of court: **
       (2)    Nature of the proceeding: **
       (3)    Grounds raised: **
       (4)    Did you receive an evidentiary hearing on your petition, motion, application, etc.?
              Yes **        No **
       (5)    Result: **
       (6)    Date of result: **

14.

       A.    Ground 1: **Conviction Obtained In Violation of Defendant's Fundamental Right**
To    **A Fair and Impartial Trial by Jury**

Supporting Facts (tell your story briefly without citing cases or law):

       Defendant Lockhart was indicted by the Grand Jurors of the State of Florida for Second

Degree Murder with a Firearm in the shooting death of Patrick Brown, a human being. The

Defendant proceeded to trial and a six-member jury was selected and sworn to try the case. At trial,

the Defendant presented a defense of Self-Defense and/or Defense of Others.

Defendant, who testified on his own behalf at trial, was 24 years old, married with one child. Defendant and his family lived in the apartment where Patrick Brown was shot. On June 25, 1994, Defendant's wife left the apartment in the morning, as a result, Defendant, his daughter, and Patrick Brown remained. After Defendant's wife returned, taking the couple's daughter, Defendant invited various neighbors, including Darren Walker, to play cards with Defendant and Patrick Brown. Defendant and Patrick Brown were best friends. April Reese, Defendant's baby sister, had been Patrick Brown's girlfriend. April Williams was also a girlfriend of Patrick Brown, and had bore Brown a Child. April Reese was initially unaware of Patrick Brown's relationship with April Williams.

On the Afternoon of June 25, 1994, April Williams stopped by Defendant's apartment, leaving her baby with Patrick Brown. Subsequently, April Williams returned, then began speaking with Patrick Brown; shortly thereafter, April Reese came to Defendant's apartment and an argument began between April Reese and April Williams. Defendant heard a loud argument between the women, one of whom had a bottle and one a knife. In response, Defendant put both women and Patrick Brown outside the apartment. Defendant explained that he had prior problems with his land lord concerning loudness in the apartment; as a result ,Defendant wished to avoid any further conflict with his landlord. Defendant heard the two women threatening Patrick Brown with their weapons unless he chose one of them. Since Defendant didn't want Patrick Brown to be hurt, he allowed Brown to reenter the apartment. Brown then unlocked the apartment door, allowing the two women inside Defendant's premises. Although Defendant was able to convince April Williams to give him her knife, April Reese kept her bottle, then berated Patrick Brown for two-timing her with April Williams.

Defendant responded by attempting to disarm April Reese; at that time, Patrick Brown grabbed April Reese, then body slammed her to the floor. Brown then began punching at Reese in some kind of way, pounding Reese's head on the floor. According to Defendant, five to six weeks prior to the shooting, he saw Brown strike April Reese in the head with a baseball bat during a fight between the parties. Additionally, Defendant had previously saw Brown punch Reese in the jaw at a nightclub after Brown told Reese he didn't want to see her out. Keeping in mind these memories of prior acts of violence by Patrick Brown, Defendant began pulling Brown off April Reese. When

Brown punched Defendant in the jaw then tried to kick Defendant, and Defendant shot Brown, who at the time was kicking April Reese in the Crouch and punching at her face, causing her head to pound against the floor of the Defendant's apartment. Since Defendant's weapon was an automatic pistol, the weapon fired multiple shots, although Defendant pulled the trigger only once. According to Appellant, Patrick Brown was spun around by the initial shots fired. Defendant claimed he shot Brown to protect both his sister, April Reese, and himself, not out of ill will or hatred toward Patrick Brown. Two days later, Defendant turned himself in to police.

During the charge conference, defense counsel requested that the court instruct the jury on self-defense. In closing arguments, the claim of self-defense and defense of another was presented to the jury. Subsequently, the Trial Court instructed the jury on the law in relation to the case. Thereafter, the jury began its deliberations.

During deliberations, the jury initially requested reinstructions concerning second degree murder and manslaughter. Subsequently, while the trial court was outside the jury's presence the jury propounded a second question concerning the difference between second degree murder with a firearm and manslaughter with a firearm. At this time, the Bailiff informed the jury that the judge was in an emergency meeting and as soon as he came back he would answer the question. According to the jury, about thirty to forty-five minutes passed without having their second question answered, so they (the Jury) went on to reached a verdict. Thereafter, the trial court accepted the jury's verdict of guilty to the lesser-included offense of manslaughter with a firearm.

It is the Defendant's contention that the jury's second question concerning the difference between second degree murder with a firearm and manslaughter with a firearm would have required the inclusion of a Hedges instruction on justifiable     homicide and excusable homicide. and an instruction on Defendant's self-defense claim.         When the jury went on to reach a verdict "after thirty to forty-five minutes had passed without having their second question answered". the Defendant's fundamental right to a fair and impartial trial by jury was violated in that the jury was not afforded a meaningful opportunity to exercise its pardon power.


B.      Ground 2: **Multiple Enhancement Penalties Imposed On The  Defendant Violates His Right To Protection Against Double Jeopardy**

Supporting Facts (tell you story briefly without citing cases or law):

The Defendant was convicted and adjudicated guilty for manslaughter with a firearm, a second degree felony. The statutory maximum penalty for a second degree felony is Fifteen years. The trial Court enhanced this second degree felony to a first degree felony, because the offense dealt with possession or use of a firearm during commission of a felony. The statutory maximum penalty for a first degree felony is Thirty years.

The trial court, however, found that the Defendant was a habitual violent felony offender. The statutory maximum penalty for a first degree felony under the habitual violent felony offender statute is Life, and such offender shall not be eligible for release for 15 years. The trial court in this case again enhanced the Defendant's offense, this time from a first degree felony to a life felony as under the habitual violent felony offender statute, and sentenced the Defendant to a term of thirty years without eligibility for release for fifteen years.

It is the Defendant's contention that the multiple enhancement penalties imposed on him by the trial court violates his constitutional right to protection against double jeopardy. He further contends that since the enhancement penalty for possession or use of a firearm is mandatory and the enhancement penalty for habitual violent felony offenders is only permissible, the latter enhancement should be vacated and set aside.

C.    Ground 3: **Incompetence and Ineffective Assistance of Trial Counsel**

Supporting Facts (tell your story briefly without citing cases or law):

At all times mentioned hereinafter the Defendant was represented by court-appointed counsel Robert E. Godwin, Florida Bar # 173582.

On July 13, 1994, the Grand Jurors of the State of Florida indicted Defendant for second degree murder of Patrick Brown, a human being, by shooting him with a firearm, to-wit: a handgun, on the 25th day of June, 1994. The Defendant entered a plea of Not Guilty to the Charge and demanded a trial by jury.

Prior to trial, Mr. Godwin conducted a client-attorney interview with the Defendant. During this interview the Defendant informed Mr. Godwin that, at the time of the shooting incident ,the Victim, Patrick Brown, was punching and kicking his (defendant's) baby-sister, April Reese, who had berated the victim and hit the victim on his forehead with a bottle for two-timing her. When Defendant tried to grab the victim in an attempt to stop the victim from punching and kicking

defendant's sister, the Victim punched and kicked defendant. The Defendant backed away and the victim resumed kicking defendant's sister in the crouch and punching at her head while she was lying on the floor, causing her head to pound against the floor of Defendant's apartment. On a previous occasion where the victim struck Defendant's baby-sister, April Reese, to the head with a base ball bat the Defendant was able to gain control of the victim and prevent serious harm to his baby-sister. On a separate occasion where the victim jumped on defendant's baby-sister, April Reese, at a night-club for dancing with another man, the Defendant was able to gain control of the Victim and prevent any serious harm to his baby-sister. However, on this last occasion, the Defendant was of the belief that, he could not gain control of the victim and that his (defendant's) baby-sister, April Reese, was in danger of great bodily harm. Faced with these set of circumstances, the Defendant picked up his automatic handgun and shot the victim, pulling the trigger only once, striking the victim with four shots.

Mr. Godwin advised the Defendant to settle-down and relax; and then explain to him (Mr. Godwin) exactly what happened. The defendant then gave Mr. Godwin a detailed account on the shooting death of the victim.

After Defendant provided Mr. Godwin with a detailed account on the shooting incident, Mr. Godwin stated that the case appeared to be a case of self-defense but ,did not mention anything about justifiable and excusable homicide as a possible defense. in short, Mr. Godwin failed to explain the objectives of the representation to the extent reasonably necessary to permit the Defendant to make an informed decision regarding the representation.

Had Mr. Godwin explained the objectives of the representation to the Defendant on justifiable and excusable homicide in addition to the one on self-defense (justifiable use of deadly force),the Defendant would have chosen to rely on all three defenses. It was Mr. Godwin, however, who chose to limit the objectives of the representation to self-defense without consultation with the Defendant, and without the Defendant's consent.

The Defendant, subsequently, provided Mr. Godwin with the following names and addresses of potential witnesses to the above mentioned prior violent acts of the Victim, Patrick Brown; and advised counsel that these witnesses could also provide additional information on prior acts of violence by the victim:

1. April Reese and Katrina Kelley

1607 N.W. 13th Avenue
Ft. Lauderdale, Florida 33311

2. Maria Bass and Monica Dulley
1271 N.W. 29th Way
Ft. Lauderdale, Florida 33311

The Defendant directed Mr. Godwin to interview and call the above-listed witnesses at trial to bolster the Defendant's defense. Mr. Godwin, however, decide to not interview and to not call these witnesses at trial, without consultation with the Defendant and without the Defendant's consent.

At trial, John Hospodavis, a Ft. Lauderdale police officer, testified on behalf of the State. Hospodavis responded to Defendant's apartment concerning a report of a shooting on June 25,1994. Hospodavis found Patrick Brown lying faced down in the apartment; Brown had suffered four gunshot wounds, two to the chest and two to the buttocks. Hospodavis spoke with various alleged eye-witnesses on the scene, who identified Defendant as a suspect in Brown's shooting. Hospodavis put out a "BOLO" bulletin for Defendant, who was not on the scene at the time Hospodavis arrived.

Cheryl Grant testified at trial on behalf of the State. Grant lived across the hall from Defendant. Grant was able to specifically recall the events on June 25,1994 because it was her birthday. Around 4:00 p.m., Grant heard five steady gunshot-like sounds coming from Defendant's apartment. Later, Grant saw someone leaving the area with a firearm.

Darren Walker testified at trial on behalf of the State. Walker was staying with his brother in an apartment near Defendant's residence in June, 1994. On June 25, 1994, Walker was involved in a card game with the Defendant, Patrick Brown, and other men in Defendant's apartment. The card players split two six packs of beer during the day. Walker recalled two young females arriving during the card game; these two women began arguing with Patrick Brown. Defendant's sister, April. Reese, was the most outspoken of the two women arguing with Brown. According to Walker, Reese eventually gained possession of a bottle, while the second women, April Williams picked up a knife. Since Walker was attempting to avoid involvement in the incident, he did not pay attention to Defendant's initial actions involving the two women. Walker did hear Defendant tell both women to leave his apartment; however, Patrick Brown later allowed the women to reenter the apartment, which appellant had locked.

Thereafter, April Reese and April Williams again began arguing amongst themselves and

Patrick Brown concerning their relationships. As Walker left Defendant's apartment. April Reese hit Patrick Brown on the forehead with a bottle. Brown fell back onto a nearby couch. then got up. appearing dazed. At that time, April Williams asked Brown if he was going to let April Reese do him like that. After a slight delay, Brown and Reese began a mutual wrestling match. As a result, both Reese and Brown fell over a couch in the apartment. As Walker was leaving .he heard Defendant say "I don't want this shit in my house".As walker left the area, he heard four to five "quick pows." which Walker interpreted as gunshots

Walker admitted that Defendant and Patrick Brown Appeared to be good friends during the card game. and that trouble began only after the arrival of April Reese and April Williams.

Charles Forbes testified at trial on behalf of the State. Forbes lived next door to Defendant on June 25,1994; around 4:00 p.m., he heard four to five firecracker noises from within Defendant's apartment. one after the other. Stepping outside, Forbes saw numerous people, including a man holding a gun while muttering "I'm tired of this shit."

Michael Wally, a Ft. Lauderdale detective, testified at trial on behalf of the State. Wally was assigned the investigation into Patrick Brown's death. On June 27, 1994, Defendant turned himself in to police, then gave a taped statement to Wally. Wally testified extensively concerning the contents of Defendant's taped statement. According to Wally, Defendant began crying while relating how Defendant shot his best friend, Patrick Brown. In his statement, Defendant told Wally that Patrick Brown and Defendant were playing cards on June 25,1994 when Defendant's sister, April Reese, and another girl. April Williams came to Defendant's apartment, then began arguing with Patrick Brown, who had been seeing both women simultaneously. Once inside Defendant's apartment, April Reese grabbed a bottle, while April Williams grabbed a knife; in response, Defendant threw both women out of the apartment. Patrick Brown went outside the Defendant's apartment to speak with the two women, then reentered Defendant's apartment, allowing the two women back inside. After Defendant informed his sister that Patrick Brown planned on staying with April Williams, Ms. Reese reacted by hitting Patrick Brown on the forehead with a glass bottle. At that point, Brown and Reese began wrestling. According to Defendant, he remained neutral during this fight. since his sister had gotten her first lick, entitling Brown to get his lick back. However, when Brown began kicking Defendant's sister, April Reese numerous times in the kidney and crouch. Defendant began pulling Brown off of his sister. When Patrick Brown punched Defendant

once in response, Defendant pulled out his weapon, an automatic pistol, pulling the trigger once, firing multiple shots. Defendant claimed that Brown was kicking April Reese at the precise moment Defendant shot Brown.

Joshua Puerper, a forensic pathologist, testified at trial on behalf of the State. Puerper conducted an autopsy on Patrick Brown. Brown was five feet nine inches tall, and weighed 147 pounds. Brown had a laceration on his forehead, and four gunshot wounds, two in the front and two in the back. Puerper found only one of Brown's wounds fatal. Puerper admitted not being able to state the order in which Brown's bullet wounds were inflicted.

Robert Knutten, a crime scene technician with the Fort Lauderdale police department, testified a trial for the State. Knutten found six .22 caliber empty shell casings in Defendant's apartment. Knutten also found a knife underneath a love seat in the apartment.

Defendant, who testified on his own behalf at trial, was 24 years old, married with one child. Defendant and his family lived in the apartment where Patrick Brown was shot. On June 25, 1994, Defendant's wife left the apartment in the morning, as a result, Defendant, his daughter, and Patrick Brown remained. After Defendant's wife returned, taking the couple's daughter, Defendant invited various neighbors, including Darren Walker, to play cards with Defendant and Patrick Brown. Defendant and Patrick Brown were best friends. April Reese, Defendant's baby sister, had been Patrick Brown's girlfriend. April Williams was also a girlfriend of Patrick Brown, and had bore Brown a Child. April Reese was initially unaware of Patrick Brown's relationship with April Williams.

On the Afternoon of June 25, 1994, April Williams stopped by Defendant's apartment, leaving her baby with Patrick Brown. Subsequently, April Williams returned, then began speaking with Patrick Brown; shortly thereafter, April Reese came to Defendant's apartment and an argument began between April Reese and April Williams. Defendant heard a loud argument between the women, one of whom had a bottle and one a knife. In response, Defendant put both women and Patrick Brown outside the apartment. Defendant explained that he had prior problems with his land lord concerning loudness in the apartment; as a result ,Defendant wished to avoid any further conflict with his landlord. Defendant heard the two women threatening Patrick Brown with their weapons unless he chose one of them. Since Defendant didn't want Patrick Brown to be hurt, he allowed Brown to reenter the apartment. Brown then unlocked the apartment door, allowing the two women

inside Defendant's premises. Although Defendant was able to convince April Williams to give him her knife, April Reese kept her bottle, then berated Patrick Brown for two-timing her with April Williams.

Defendant responded by attempting to disarm April Reese; at that time, Patrick Brown grabbed April Reese, then body slammed her to the floor. Brown then began punching at Reese in some kind of way, pounding Reese's head on the floor. According to Defendant, five to six weeks prior to the shooting, he saw Brown strike April Reese in the head with a baseball bat during a fight between the parties. Additionally, Defendant had previously saw Brown punch Reese in the jaw at a nightclub after Brown told Reese he didn't want to see her out. Keeping in mind these memories of prior acts of violence by Patrick Brown, Defendant began pulling Brown off April Reese. When Brown punched Defendant in the law then tried to kick Defendant, and Defendant shot Brown, who at the time was kicking April Reese in the Crouch and punching at her face, causing her head to pound against the floor of the Defendant's apartment. Since Defendant's weapon was an automatic pistol, the weapon fired multiple shots, although Defendant pulled the trigger only once. According to Appellant, Patrick Brown was spun around by the initial shots fired. Defendant claimed he shot Brown to protect both his sister, April Reese, and himself, not out of ill will or hatred toward Patrick Brown.

It is worthy to note that Defendant's trial counsel, Mr. Godwin, failed to call any of the defense witnesses, provided to him by Defendant prior to trial, to testify on the issue of Patrick Brown's prior specific instances of conduct of violence to bolster Defendant's defense.

During the charge conference, Mr. Godwin should have; but failed to, request that the Court's instruction to the jury on justifiable homicide, excusable homicide, and self-defense include an instruction on the effect of Patrick Brown's (prior) specific instances of conduct of violence on Defendant's defense claim. In closing argument to the jury, Mr. Godwin failed to argue justifiable homicide and excusable homicide in the heat of passion as defense claims. Thereafter, in instructing, then reinstructing Defendant's jury, the trial court did not include an instruction on the effect of Patrick Brown's prior specific conduct of violence .

The jury returned a verdict of Guilty for Manslaughter with a firearm, a lesser included offense.

The foregoing information establishes that Jeremy Lockhart was convicted as the result of

incompetence and ineffective assistance of counsel, which is evidenced by the specific omission and overt acts of trial counsel herein identified and which falls outside the wide range of professionally competent assistance. Absent these omissions, there is a reasonable probability that the outcome of Lockhart's trial would have been different. Had corroborating testimony and jury instructions on Patrick Brown's specific instances of violence been offered at trial to bolster Lockhart's defense ; and, had a defense claim been made in opening statement and closing argument to the jury on justifiable homicide and excusable homicide as Lockhart's primary defense, " the decision reached would reasonably likely have been different," in that Lockhart's trial jury would reasonably likely have found that the shooting death of Patrick Brown was justifiable and/or excusable and returned a verdict of Not Guilty.

The concern here should not be the protection of criminal defense lawyers from post trial attack; it should be to enforce the guarantee that every defendant - even one who is poor and black with a prior criminal record of robbery - receives a fair trial. **Jeremy Lockhart** did not get one due to the incompetence and ineffective assistance of his defense lawyer.


15.    If any of the grounds listed in 14 A, B, C, D, were not previously presented on your direct appeal, state briefly what grounds were not so presented and give your reasons why they were not so presented: Grounds 1 and 2 were not previously raised on direct appeal because the errors were not preserved for appellate review or otherwise due to ineffective assistance of appellate counsel; Ground 3 was not previously raised on direct appeal because a claim on ineffective assistance of trial counsel is not a matter appropriate for appellate review.

16.    Do you have any petition, application, appeal, motion, etc., now pending in any court, either state or federal, as to the judgment under attack?    Yes        No XX

17.    If your answer to number 16 was <u>Yes</u> give the following information:
    (a)    Name of Court: **
    (b)    Nature of the proceedings: **
    (c)    Grounds raised: **
    (d)    Status of the proceedings: **

18.    Give the name and address, if known of each attorney who represented you in the following stages of the judgment attacked herein.
    (a)    At preliminary hearing: Unknown
    (b)    At arraignment and plea: Robert E. Godwin, 528 S.W. 69th Place, Miami, Florida 33155.

    (c)    At trial:  Same as 18 (b) above
    (d)    At sentencing:  Same as 18 (b) above
    (e)    On appeal:  Joseph R. Chloupek, 421 Third St.,West Palm Beach, Florida 33401
    (f)    In any post-conviction proceeding:  N/A


    **WHEREFORE,** movant requests that court grant all relief in which the movant may be entitled in this proceeding, including but not limited to (here list the nature of the relief sought):
1.    Enter and issue an Order granting Defendant's motion for post conviction relief and, vacating and setting aside the judgment of conviction and sentence imposed.

2.    Such other and further relief as the court deems just and proper.


## NOTARY OATH

**STATE OF FLORIDA**
**COUNTY OF CALHOUN**

    Before me, the undersigned authority, this day personally appeared, **Jeremy Lockhart,** who first being duly sworn, and who produced an Florida Department Of Corrections Inmate I. D. Card as identification, and who says that he is the defendant in the above-styled cause, that he has read the foregoing motion for post conviction relief and has personal knowledge of the facts and matters therein set forth and alleged and that each and all of these facts and matters are true and correct.


                           **Jeremy Lockhart DC #188231**
                           Calhoun Correctional Institution
                           RT.# 1 - Box# 1 (Dorm H-1208-U)
                           Blountstown, Florida 32424-9700


**SWORN TO AND SUBSCRIBED** before me this /1 ᵗʰ day of _Dec_ 199 7.


                           **NOTARY PUBLIC**


Helen E. Maloy
MY COMMISSION # CC588843 EXPIRES
December 30, 2000
BONDED THRU TROY FAIN INSURANCE INC

## CERTIFICATE OF SERVICE

I, Jeremy Lockhart DC# 188231, do hereby certify that a true and correct copy of the foregoing Motion for Post-Conviction Relief (3.850) has been sent to Michael J. Satz, State Attorney at: 201 S.E. 6th Street, Ft. Lauderdale, Florida 33301 on this ⫽ th day of _____ 199 7 by U.S. Mail.

Jeremy Lockhart DC# 188231
Calhoun Correctional Institution
Rt.# 1 - Box# 1 (Dorm H-1208-U )
Blountstown, Florida 32424-9700

**Exhibit 8**

OFFICE OF THE ATTORNEY GENERAL
RECEIVED
OCT 29 1998
CRIMINAL DIVISION
WEST PALM BEACH

IN THE CIRCUIT COURT OF
THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA                )          CASE NO.: 94-10764 CF
                                )
                                )          JUDGE: JULIAN
vs.                             )
                                )
JEREMY LOCKHART                 )
                                )
_____Defendant_____     )

## RESPONSE TO DEFENDANT'S MOTION FOR
## POST-CONVICTION RELIEF

**COMES NOW**, the State of Florida, by and through the undersigned Assistant State Attorney, and responds to the Defendant's Motion for Post-Conviction Relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure and the Order of this Honorable Court as follows:

1. The allegation in ground one regarding alleged trial error in responding to a jury question was raised on appeal (Exhibit I). The fact that the Fourth District Court of Appeals affirmed this matter without comment means that the appellate court reviewed the point of error raised by the defendant on its merits and rejected it. *Shayne v. Saunders*, 176 So. 495 (Fla. 1937). Since this matter was raised on appeal and rejected, it is not cognizable in a motion for post-conviction relief. *Koon v. Dugger*, 619 So.2d 246 (Fla. 1993); *Medina v. State*, 573 So.2d 293 (Fla. 1990).

2. The allegation that the enhancement of the crime of

1

manslaughter with a firearm being a first degree felony, and the sentencing of the defendant as a violent habitual felony offender constitutes double jeopardy is a matter which was or could have been raised on appeal, and is not cognizable in a motion for post-conviction relief. *Koon, supra; Medina, supra.* Even if this issue could be raised, the enhancement for use of a firearm pursuant to F.S. § 775.087 and the defendant being sentenced as a violent habitual felony offender pursuant to F.S. § 775.084 would not be violative of the double jeopardy clause. See *Gayman v. State*, 616 So.2d 17 (Fla. 1993); *Williams v. State*, 517 So.2d 681 (Fla. 1988). Furthermore, the defendant was sentenced to 30 years in prison with a 15 year mandatory minimum sentence as a violent habitual felony offender (Exhibit II), which would be a legal sentence under that statute even if enhancement pursuant to F.S. § 775.087 were not permissible.

3. The allegation of the defendant that trial counsel, Robert Godwin, was ineffective for failing to call April Reese, Katrina Kelley, Maria Bass, and Monica Dulley regarding prior violent acts of the victim, Patrick Brown, is without merit. This issue is legally insufficient in that the defendant fails to specifically state what the potential testimony of these witnesses would be, and how the failure to call these witnesses constituted ineffective assistance. *Swain v. State*, 502 So.2d 494 (Fla. 1st DCA 1987). It should be noted that this issue was raised in a pretrial hearing (Exhibit III), trial counsel mentioned the prior incident in opening statement (Exhibit IV); trial counsel on cross examination

2

had Detective Walley mention that there were several reports on
Patrick Brown for fighting (Exhibit V); the defendant himself
testified as to other violent acts of the defendant, including the
acts alleged in the motion (Exhibit VI, pp. 478-482); the defendant
testified that he shot the victim to protect his little sister
(Exhibit VI, p. 486); and that trial counsel raised this issue in
closing arguments (Exhibit VII and VIII). Since these fact were
brought into evidence, without losing the "sandwich" in closing,
and testimony about the prior matters from other witnesses would
have been, at best, duplicitous, there was no prejudice to the
defendant, therefore, precluding a finding of ineffective
assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 80
L.Ed.2d 674, 104 S.Ct. 2052 (1984); *Lockhart v. Fretwell*, 113 S.Ct.
838 (1993).

4. The allegation of ineffective assistance of counsel for
failing to ask for the reputation instruction in the justifiable
use of force instruction is without merit. Trial counsel asked for
the instruction, but the Court declined the request (Exhibit IX).
Trial counsel also argued that the killing of Patrick Brown was a
justifiable use of deadly force (Exhibits VII and VIII). Since the
record refutes the allegations of the defendant, these grounds must
be summarily denied.

**WHEREFORE**, the State of Florida respectfully requests this
Honorable Court to deny the Defendant's Motion for Post-Conviction
Relief.

3

**I HEREBY CERTIFY** that a copy of the foregoing was furnished by U.S. Mail to Jeremy Lockhart, Defendant, Pro Se, Inmate #188231, Calhoun Correctional Institution, Route 1, Box 1, Blountstown, Florida 32424-9700, this 1st day of September, 1998.

MICHAEL J. SATZ
State Attorney

By: _____
JOEL SILVERSHEIN
Assistant State Attorney
Florida Bar #608092
Room 675
201 S.E. 6th Street
Fort Lauderdale, Florida
33301
Telephone: (954) 831-7913

4

## POINT III

### THE TRIAL COURT'S ABSENCE DURING A JURY QUESTION CONSTITUTES REVERSIBLE ERROR.

During deliberations, the jury propounded a question concerning "the difference between second degree murder with a firearm and manslaughter with a firearm" (R 624). According to a colloquy between the trial court, defense counsel, and the court's bailiff, it was established that the Court was absent during this question; however, the jury subsequently arrived at a verdict thirty to forty five minutes after propounding the question (R 625-628). In response to a subsequent question by the trial court, one of the jurors indicated that the jury no longer required a response to its question concerning second degree murder and manslaughter (R 627-628). As a result, the trial court denied defense counsel's request to answer the jury's question before accepting a verdict, and overruled the defense's motion for mistrial (R 625-628). This was error.

In providing a criminal defendant with a fair trial, the presence of a trial judge during all stages in the proceedings is essential, Brown v. State, 538 So. 2d 833, 834-836 (Fla. 1989). In this case, given the fact that the jury propounded two separate questions to the trial court concerning the definitions of second degree murder and manslaughter, fundamental fairness to Appellant required the trial court to answer the jury's question before accepting the verdict below, since a "reasonable possibility" existed that the trial court's erroneous failure to be present during the jury's question effected the jury's verdict see generally State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986); compare Jackson v. State, 636 So. 2d 99, 100 (Fla. 3d DCA 1994) (reversal required where judge, who was absent from courtroom when note was received from jury, directed bailiff to transmit to that jury "innocuous response" to the jury's question).

Thus, Appellant's conviction and sentence must be reversed and remanded with directions to grant Appellant a new trial.

14

EXHIBIT I

# THE CIRCUIT/COUNTY COURT, IN AND FOR BROWARD COUNTY, FLORIDA

**FAILURE TO PAY FINE BY THE BELOW DATE MAY RESULT IN A WARRANT FOR YOUR ARREST AND/OR THE SUSPENSION OF YOUR DRIVER'S LICENSE AND DELINQUENCY FEES IMPOSED**

9|8|95   CASE NO. 94-10764CF10   ARREST NO. FL94-6449

ROR/IC/SURETY SUMMONS/CASH BOND _____

AGENCY _____

DEFENDANT: JEREMY LOCKHART   AKA

## COURT STATUS

MAGISTRATE [ ] TRIAL [ ] CHANGE OF PLEA
ARRAIGNMENT [ ] JURY [X] PLED GUILTY
SENTENCING [ ] COURT [ ] PLED NOLO
[ ] 1ST. V.O.
[ ] FINAL V.O.

[ ] ADJ. GUILTY 8-17-95 ___ VC ___ TRUST FUND / HOURS COMM. SERVICE
[ ] WITHHELD ___ VC EACH COUNT ___ ASSESSMENT EACH COUNT
[ ] NOLLE PROSEQUI [ ] DISMISSED [ ] ACQUITTED

WORN / PERM.

1. MANSLAUGHTER W/ FIREARM
   1F

STATE MOTION TO DECLARE DEFENDANT TO BE A
and HABITUAL FELONY OFFENDER - GRANTED

SENTENCE: 30 years F.S.P. AS A Violent HABITUAL FELONY OFFENDER with 15 years
mand. min. w/ credit for 439 days time served

* DO NOT HOUSE THE DEFENDANT IN THE SAME
  FACILITY WITH MICHAEL BROWN (Deceased Brothr

EXHIBIT II

**DUI USE ONLY**

COUNT _____

PROBATION W/SPECIAL CONDITION _____
LICENSE SUSP. _____ HOURS COMM SERVICE _____

CASAP/DUI SCHOOL _____   CASAP EVALUATION _____

$ _____ 5% _____ VC _____ CJC _____ VC _____ EMTF _____

| COURT COST | | |

JAIL TIME _____
OTHER _____

| COUNT(S) | | TIME SERVED | | DAYS |
|---|---|---|---|---|
| $ | FINE | COURT COST 5% | V.C. | CJC |
| $ | FINE | COURT COST 5% | V.C. | CJC |
| $ | FINE | COURT COST 5% | V.C. | CJC |
| | PLUS $ | COURT COST 5% | V.C. | CJC |

BY _____   DEFERRAL FEE TO: _____

_____ SPEISER
JUDGE

J 1/87

73

```
1              (Thereupon, the proceedings were concluded.)
2              THE COURT:   Okay, do we need to discuss
3      anything before we get the jury or not?
4              MR. PATNER:   Judge, two things.   There's been
5      a stipulation entered with the defense that the
6      deceased alleged in the indictment, Patrick Brown,
7      is in fact the victim in this case.
8              MR. GODWIN:   That's correct that was a
9      previous stipulation and that is a stipulation
10     now.
11             MR. PATNER:   Secondly, Judge, there is - and
12     I do have a motion in limine which I mentioned to
13     the Court last week and informed counsel of.
14     Judge, its fortunate that Your Honor had the
15     benefit of hearing the case struck, and in that
16     case the defense elicited testimony that the
17     victim Patrick Brown had struck had several
18     instances of violence.   And the first addresses
19     the issue of striking April Reese with a baseball
20     bat in the back of the head.   That - with the
21     proper predicate that testimony under the facts of
22     this case as I see it is appropriate.   However,
23     the predicate for that is for the defendant to
24     testify to it.   The defendant did not testify as
25     to that event and in fact it was brought out in
```

JUSTICE REPORTING SERVICES, INC.       523-6114



EXHIBIT III

74

1    opening statement, was brought out through cross

2    examination of statements of witnesses and that's

3    improper, Judge. And State versus Smith speaks

4    pretty clearly to that. I do have copies of the

5    cases cited and the motion which I will go through

6    and I can address it further in a moment if

7    necessary.

8        The bottom line is in a self-defense or

9    defense of others the relevance is not that the

10   incident happened because that's just bringing in

11   the bad character.

12       THE COURT: Right.

13       MR. PATNER: The relevance is what does the

14   defendant think about it. And if the defendant

15   doesn't testify up until the point the defendant

16   testifies it's not relevant, it doesn't come in.

17   That would be the issue as to that and that's

18   pretty clear. The second -- so what I'm first

19   asking the Court is there be no mention in voir

20   dire or opening statement or cross examination of

21   any of the State witnesses until if and when the

22   defendant testifies.

23       Now, Smith does go on to say that should the

24   defendant testify, and this is reiterated I

25   believe in Williams, as well Williams is almost

75

1     factually right on the line with our case.  If the
2     defendant testifies they can for limited purposes
3     call those witnesses back just to corroborate or
4     show the defendant wasn't lying as to that
5     incident happening.  And the Court limited that he
6     can't put on the whole bulk of the cases and say
7     what a bad guy he is, but they could bring out a
8     couple witnesses to say that did in fact happen.
9     That's the first thing.

10         The second thing is much of the testimony in
11    the last trial was elicited from April Williams as
12    to that incident.  And when you get right to the
13    bottom line after much of the cross examination of
14    April Williams as to the incident with Patrick
15    Brown --

16         THE COURT:  Sorry, go ahead.

17         MR. PATNER:  -- much of the testimony came in
18    through April Williams.  Well, when you finally
19    got through her testimony, and after lengthy
20    questioning by defense counsel and after that her
21    basis of knowledge was she heard about it.  April
22    Williams was not present, she certainly was not
23    present.  In addition -- it's hearsay as to April
24    Williams.

25         In addition to being irrelevant under Smith

JUSTICE REPORTING SERVICES, INC.     523-6114

76

```
 1        and State versus Williams the third incident is
 2        that April - the third matter all related is that
 3        April Williams was cross examined and it was sort
 4        of an off the cuff question about Patrick Brown
 5        hitting her again.  The defendant is not
 6        testifying to that, the defendant was not present
 7        for it, and at that point we're getting pretty far
 8        into acts of violence as April Reese and the
 9        defendant could say.
10             I would agree with the defense that if the
11        predicate read you see Patrick Brown attacking
12        April Reese then he's forced to respond.  I would
13        agree that is admissible given the proper
14        predicate.  I indicated I do not see how it's
15        relevant that the victim had hit April Williams,
16        and he's now getting into bad character which
17        Smith says he specifically cannot do.
18             THE COURT:  Okay.
19             MR. PATNER:  That's all.
20             MR. GODWIN:  Well, in the first place, Your
21        Honor, as you may recall you ruled upon these
22        issues and it's the law of the case.
23             THE COURT:  I don't remember ruling on it but
24        I'm not saying that I didn't, I don't remember
25        ruling on it.  But if in fact a ruling is proven
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1       to me to be inaccurate I won't be afraid to admit

2       that I'm wrong.

3               MR. GODWIN:   I understand that.   The fact

4       that the deceased Patrick Brown struck April Reese

5       in the head with a baseball bat is clearly

6       relevant because if Your Honor will recall from

7       the facts of this case Patrick Brown was fighting

8       with April Reese at the time of the shooting.   My

9       client had knowledge of that, and there will be

10      testimony that he had previously struck her in the

11      head with a baseball hat, and that my client was

12      acting to defend her while Mr. Brown was attacking

13      her.   And the law is that the defendant's

14      reputation for violence is admissible, and

15      particular acts of violence known to the defendant

16      are admissible.   Both of those are admissible.

17              THE COURT:   If in fact it's establish the

18      defendant knew that.

19              MR. GODWIN:   That's correct, Your Honor.

20              THE COURT:   That's the key point.

21              MR. GODWIN:   That's one key point.   I have to

22      - I have to advise that while Mr. Patner had said

23      he had the motion in limine about eliciting

24      hearsay from Ms. Williams he has gone further here

25      then anything I'm prepared to address at the

1    moment.  But I can tell the Court that there will

2    be testimony that Patrick Brown did strike April

3    Reese in the head with a baseball bat.  That was

4    known to my client, he witnessed it, he saw it, he

5    smacked her in the head with a baseball bat and

6    split her head open.  He was acting to defend her

7    when he took the act that he did that resulted in

8    this prosecution.

9        In addition to that, Judge, Patrick Brown's

10    reputation for violence is admissible and the

11    representation of previously beating up either

12    April Reese or April Williams, and that was known

13    to Mr. Lockhart, and that's admissible as well.

14    And there will be such evidence.

15        THE COURT:  Well, what is if?

16        MR. GODWIN:  What do you mean?

17        THE COURT:  How is that going to come in that

18    your client knew about it?

19        MR. GODWIN:  I have witnesses who will

20    testify to that, Judge.

21        THE COURT:  Well, I need for you to proffer

22    for me first of all with respect to the - forget

23    the reputation I'm talking about specific

24    incidents of the decedent hitting April Williams,

25    April Reese?

JUSTICE REPORTING SERVICES, INC.    523-6114

1      MR. PATNER:  Reese.

2      THE COURT:  April Reese with a baseball bat.

3   Was he present when that happened?

4      MR. GODWIN:  Yes, he was present when that

5   happened.

6      MR. PATNER:  I don't disagree with the

7   defense attorney's assertion that it's relevant,

8   however, he's got to lay a predicate.  He's got to

9   testify to it at trial.

10      THE COURT:  If someone can testify that the

11   defendant was present and looking at it when it

12   happened why does the defendant himself have to

13   take the stand?

14      MR. PATNER:  Because the relevance is not the

15   incident it's apprehension in the defendant's

16   state of mind.  And the only one who can testify

17   as apprehension in the defendant's state of mind

18   is the defendant.  And that's exactly what Smith

19   says.

20      THE COURT:  Where?

21      MR. PATNER:  On page 318 going down to

22   footnote 16 and 17.  Should be head note 16 and

23   17.  Says the defendant's testimony that he or she

24   knew about specific acts of violence committed by

25   the decedent is relevant and shows the

80

1    reasonableness apprehension.  Testimony of other
2    people who knew specific acts of violence were
3    committed by the victim are not relevant because
4    she didn't know the defendant's state of mind.

5        THE COURT:  Well, both those propositions are
6    not mutually exclusive of one another.  I mean, I
7    agree with both of those propositions but the
8    point is you don't take issue with the fact that
9    that happened right in the presence of the
10   defendant, right?

11       MR. PATNER:  I -- no one has testified to
12   that so I can't say that yes or no.  We know April
13   Williams heard about it, and we hear the
14   statements from defense counsel.

15       THE COURT:  April Williams - see I don't
16   remember, was April Williams present at the time?

17       MR. PATNER:  No, she heard about it.  I can't
18   say that did happen whether it did or not is
19   really irrelevant.  Whether the defendant is going
20   to testify to it --

21       THE COURT:  The only one that can testify --
22   let's see the one that was hit in the head was
23   April Reese?

24       MR. GODWIN:  April Reese, Judge, she will
25   testify that she was hit in the head with a

/

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1    baseball bat.

 2         THE COURT:  How does she know the defendant

 3    was present?

 4         MR. GODWIN:  Because he was present and she

 5    will testify he was present when it happened.

 6         MR. PATNER:  How can she testify to the

 7    defendant's apprehension at the time of the second

 8    incident?  The only one who can do that is in fact

 9    the defendant.

10         MR. GODWIN:  Well, if Your Honor pleases the

11    law is that particular acts of violence known to

12    the defendant of course those are admissible as

13    well as the victim's reputation for violence.

14    Your Honor well knows that the victim's reputation

15    for violence is an issue in this case and we

16    discussed that extensively and Your Honor ruled as

17    well --

18         THE COURT:  How are you going to show the

19    defendant knows his reputation for violence?

20         MR. GODWIN:  I'm going to show two ways,

21    Judge, I'll have testimony - I'll have testimony

22    from witnesses that my client knew it, as well as

23    the possibility of my client testifying to it.

24    And furthermore, Judge --

25         MR. PATNER:  That's who?
```

1          THE COURT:  I need to make a ruling at this

2     time.  What witnesses are going to testify and how

3     are they going to testify that your client knew

4     about the decedent's reputation for violence?

5          MR. GODWIN:  Well my client, Judge, is a

6     witness in this case.

7          THE COURT:  Right, he wasn't the last time.

8          MR. GODWIN:  I understand that but we are in

9     a new situation now and my client is a witness in

10    this case.  A potential witness in this case and

11    he was possessed of that knowledge, and he was

12    present when the act of violence took place.  In

13    addition to that April Reese will be a witness in

14    the case and she was present when the act of

15    violence took place against her in the presence of

16    my client.  So it was also known to my client

17    because he was present when Patrick brown hit her

18    in the head with the baseball bat and he saw that

19    happen, and she'll testify to that.  That's prior

20    specific acts of violence known to the defendant

21    and are relevant whether he testifies to them or

22    not as long as he was present and he knew about

23    them.

24         THE COURT:  No, no, no, I take issue with

25    that.  It has to be proven that he knew about

83

```
 1      them.
 2              MR. GODWIN:  And he knew about this.
 3              THE COURT:  Right.
 4              MR. GODWIN:  Exactly, as well as other people
 5      told him.
 6              THE COURT:  I'm not going to allow any
 7      testimony before this Court, or any -- I'm not
 8      going to allow in opening statements any reference
 9      about the reputation of the victim to your client
10      unless you either are willing to commit to me
11      beforehand that your client is going to take the
12      stand, or establish to me beforehand how your
13      client knew about it, knew about this reputation.
14      Otherwise if your client does - if you're not
15      going to commit or establish to me how your client
16      knew about it you would be precluded from talking
17      about reputation until your client takes the stand
18      at which time obviously closing you can make any
19      reference you want to reputation.
20              MR. GODWIN:  I think I need to bring Your
21      Honor some case law before you make a final ruling
22      on that about specific acts of violence known to
23      the defendant whether he was present or not.
24              THE COURT:  Absolutely, I agree with you.
25              MR. GODWIN:  Are admissible.
```

1          THE COURT:  Clearly.

2          MR. GODWIN:  Well a victim's reputation of

3     violence if that was told to him, if he knew the

4     victim had a representation of violence which he

5     did, if that was told to him and bears on the

6     reasonableness of his acts and I will have

7     testimony as to both those situations.

8          THE COURT:  Yeah, but you see the fact that

9     they told him the decedent's representation

10    doesn't establish the state of mind of your

11    client.  The fact that they told him that hey

12    listen this guy is a meany (sic) he's a tough guy

13    and he goes around and beats the crap out of

14    everybody.  That doesn't establish what effect

15    that had on him it merely establishes his --

16         MR. GODWIN:  That he was told and that's an

17    inference for the jury to draw, that's what the

18    case law allows.

19         THE COURT:  I will have to see cases on that

20    because the mere fact that he was told that is, I

21    don't think necessarily is a permissible inference

22    that it had an effect on his state of mind because

23    he could be a tough guy and he's not afraid of

24    anybody, right?  So that wouldn't put necessarily

25    fear in his state of mind.

```
 1              MR. GODWIN:  I understand what the Court is
 2         saying.  I'm simply stating I would give Your
 3         Honor case law that the victim's reputation for
 4         violence is admissible.  I know the Court knows
 5         that as well as particular acts of violence known
 6         to the defendant are admissible, both those are
 7         admissible.
 8              THE COURT:  I don't disagree, I don't think
 9         he does either.
10              MR. PATNER:  No, Judge.
11              THE COURT:  Has he established the state of
12         mind of the fact that ten people told him that --
13         if we're talking about Mike Tyson being the
14         defendant, the fact that ten people told him that
15         Patrick Brown did this, what effect is that going
16         to have on Mike Tyson?  I don't know what effect
17         it's going to have on your client.
18              MR. PATNER:  And, Judge, what I would --
19         reading from Williams, Williams versus State
20         Williams' defense tactics at trial was he in deed
21         was acting in defense of others.  During cross
22         examination of witness Williams is not permitted -
23         Williams' attorney is not permitted to explore his
24         prior roles of violence.  It goes on to say other
25         specific acts of violence are admissable and must
```

1    be shown that the defendant was aware of specific
2    acts.    There's no proffer made here, or testimony
3    sought that somebody admitted Williams did not
4    testify, therefore the trial court properly
5    excused it.

6        I don't want to be in a situation, Judge,
7    where defense counsel is cross examining witnesses
8    and asking these witnesses questions which the
9    only questions asked in Williams are hearsay
10   anyway, and making these statements in opening
11   statement then not backing them up.    I'm asking
12   the Court - I have agreed to almost everything the
13   defense attorney said as far as admissibility of
14   that evidence, however, I don't a want to hear
15   anything about -- the Court shouldn't hear
16   anything until that time it comes relevant until
17   witnesses testify.    I'd say it's the defendant's
18   -- if the Court feels that April Reese, another
19   witness who was present, can testify to the
20   Defendant's state of mind because he was present
21   -- well, maybe we are splitting hairs.

22       THE COURT:    The fact that the defendant was
23   there when April Reese was hit by Patrick Brown,
24   April Reese can testify to that, to that fact.    I
25   don't need the defendant to testify to that fact

1      that they say he was present.  April Reese can

2      testify that he was there when it happened.  But

3      to establish what effect that had on him, and to,

4      with respect to his knowledge and the effect of

5      the victim's reputation for violence, you know,

6      the mere fact that other people told him, unless

7      you have a case that establishes that, that

8      establishes his state of mind I will need

9      something to that effect.

10      MR. GODWIN:  I will have to give you some new

11      case law I just brought.

12      THE COURT:  1977 4th District opinion prior

13      knowledge is not necessary in order to introduce

14      reputation evidence on the issue of decedent's

15      conduct at the time of the incident in question.

16      MR. PATNER:  Judge, I believe --

17      MR. GODWIN:  In addition, Judge --

18      THE COURT:  This case doesn't really get us

19      to where we need to be.

20      MR. PATNER:  No, it doesn't and I'll address

21      why not if it doesn't, if I need to but it's not

22      applicable.  It's an, he's --

23      THE COURT:  Why do you say that?

24      MR. PATNER:  Because what they are saying -

25      and the basic first half of the case backs up what

/

JUSTICE REPORTING SERVICES, INC.      523-6114

1    I'm telling you. First it says prior knowledge is

2    not necessary to introduce reputation evidence on

3    the issue of the decedent's conduct at the time of

4    the incident. What they are making under there

5    was a series of cases which follows this, Marino

6    versus State and Soveno (phonetic) versus State

7    comes to mind. It essentially reverses a

8    William's Rule situation where you're showing how

9    the victim is acting each time with these

10    incidents. And you can't show that here either if

11    he had hit three other girlfriends with a baseball

12    bat hitting this girl with a baseball bat and then

13    it comes into place here.

14    MR. GODWIN: Well, Judge, I have additional

15    cases which I will submit to the Court and I want

16    to cite Sanchez versus State -- this motion, he

17    just gave me this motion at this moment and it

18    does not go to the issue that he told me. It goes

19    to more issues then what we addressed.

20    MR. PATNER: Well, I mean I don't necessarily

21    agree where that. I did tell defense counsel

22    generally what this was about.

23    THE COURT: See this case Sanchez that he's

24    citing at 445 So.2nd a 3rd District opinion 1984

25    basically stands for the proposition all the

1    defendant has to do is know about it and it says

2    there has to be evidence as to what effect it what

3    on his state of mind.

4        MR. GODWIN:    Exactly, Judge, that's why the

5    testimony is admissible so that the jury can then

6    draw the inference and that's when we have the

7    jury instruction if he knew this man committed

8    previous acts of violence that's an inference the

9    jury can use to decide whether or not he acted

10   reasonably.    For a person to get up and say I knew

11   about it and I was afraid of him that's fine but

12   it's also self-serving and not necessary that he

13   has to get up and testify as to what he was

14   thinking because he knew about the prior act of

15   violence.    The prior acts of violence known to him

16   are admissible in and of itself, that's what

17   Sanchez says.

18       MR. PATNER:    What I want to know is this.

19   How is - if the Court precludes defense counsel

20   from mentioning it until they can bring in any

21   type of evidence that the defendant knew about it,

22   I don't see how that would contradict with

23   Sanchez.    I'll talk about - I can go further into

24   that if necessary.    There is no State witness who

25   can testify, there is no witness other then April

1    Reese that I've heard that can testify to this

2    other then the defendant.

3         THE COURT:  Testify to what?

4         MR. PATNER:  That the defendant knew about

5    this incident with the baseball bat.

6         THE COURT:  Well, April Reese can testify to

7    that.

8         MR. PATNER:  April Reese was not called at

9    the last trial by the defense.  She did not

10    testify.  Again what I'm trying to avoid is a

11    situation where the defense attorney stands up

12    here in opening statements and gives a horror

13    story about what the defendant saw the victim do

14    to April Reese before, and then never hear it

15    again.

16         THE COURT:  Lets put it this way, are you

17    calling April Reese?

18         MR. PATNER:  I haven't made a final decision

19    on it.

20         THE COURT:  If he doesn't call April Reese?

21         MR. PATNER:  I'll tell the Court right now

22    I'm anticipating not calling April Reese, and if

23    he were to call April Reese then I suppose I would

24    have to live with the cross examination as to that

25    issue.  If I don't call her, which I'll tell the

```
 1    Court right now I'm not.  You remember April Reese
 2    is not exactly my best friend.
 3              THE COURT:  That's the one that was here?
 4              MR. PATNER:  Right.  And giving that --
 5              THE COURT:  If he doesn't call April Reese.
 6              MR. GODWIN:  But she is my witness as well,
 7    Judge.
 8              THE COURT:  I'm saying --
 9              MR. PATNER:  Fine.
10              THE COURT:  He's telling you right now he's
11    not calling April Reese.
12              MR. GODWIN:  He's not saying that.
13              MR. PATNER:  I'll commit right now.
14              THE COURT:  He's saying he's not calling
15    April Reese.  If he's not calling April Reese then
16    you're not allowed to bring out what happened with
17    the incident unless you're planing on calling your
18    client.
19              MR. GODWIN:  I am planing on calling my
20    client at this point, Judge.  I intend to make all
21    these issues known to the jury because these are
22    crucial issues.
23              THE COURT:  We are going around in circles
24    here and I have to leave.  But the bottom line is
25    I am ruling that with respect to opening
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1    statements since the prosecutor -- listen we are

2    only as good as our reputation in this field and

3    he's telling me as an attorney, as an officer of

4    the Court that he's not calling April Reese.  If

5    that changes between now and opening statements

6    then so be it.  But if he's standing by that

7    decision then you will not be permitted to make

8    reference to your client's knowledge of what

9    happened at that incident unless your client is

10   taking the stand, or you're calling April Reese.

11           MR. GODWIN:  Well, I am doing one or both of

12   those at least.

13           THE COURT:  Okay, fine, fine.

14           MR. PATNER:  Could we then leave it out of

15   opening until --

16           THE COURT:  No.  He's telling me likewise as

17   an officer of the Court he's calling either April

18   Reese or the defendant.  I take his word equally

19   as valuable as yours, okay.

20           MR. PATNER:  As to the issue of April

21   Williams I don't think defense counsel disputes

22   the hearsay issue and he can't question April

23   Williams about that incident.

24           THE COURT:  Sure.

25           MR. PATNER:  But violence upon --

/

93

```
 1            THE COURT:  Well, what happened?
 2            MR. PATNER:  With Reese, that Williams heard
 3       about --
 4            THE COURT:  Oh yeah that would be hearsay.
 5            MR. PATNER:  That did come in the last time.
 6            MR. GODWIN:  No, but I can question her about
 7       the knowledge of the specific acts of violence by
 8       Patrick Brown against her that she's aware of.
 9            THE COURT:  That she related to the
10       defendant.
11            MR. PATNER:  Okay, if you're going to proffer
12       first she related to the defendant --
13            MR. GODWIN:  Not that she related to the
14       defendant prior specific acts of violence by the
15       deceased.  Again her --
16            MR. PATNER:  That's exactly what Smith says
17       is not admissible.
18            THE COURT:  Not admissible.
19            MR. GODWIN:  It's going to his reputation of
20       violence.
21            THE COURT:  It's not admissible unless your
22       clients knows about it.
23            MR. GODWIN:  That's exactly the case I gave
24       you.
25            THE COURT:  No, no, no, it said he had
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1   knowledge it doesn't say -- Sanchez said he had to

2   have knowledge of it.  It didn't say that he had

3   to demonstrate what effect it had on him.  It said

4   he had to have knowledge.

5        MR. GODWIN:  I understand what the Court is

6   saying and my client has that knowledge and there

7   will be testimony of that.

8        THE COURT: Well, when he testifies to that if

9   he wants to call April Williams back in and

10  address it at that point hearsay is inadmissible.

11       MR. GODWIN:  I'm telling the Court I have

12  that evidence and I will put it on.

13       MR. PATNER:  I have evidence he committed a

14  prior armed robbery bot that's not coming in

15  either.

16       THE COURT:  Wait a second.  April Williams

17  can testify about her knowledge of his reputation

18  as well as prior incidents of conducts, okay.  But

19  -- well, reputation she can only talk about what

20  reputation -- basically it's like a hearsay

21  exception.  She can testify what other people told

22  her generally about his reputation.  She cannot

23  talk about a specific incident unless she was

24  there and saw it firsthand.

25       MR. GODWIN:  Okay.

JUSTICE REPORTING SERVICES, INC.     523-6114

1          THE COURT:  All right.

2          MR. PATNER:  That reputation that's a whole

3     different can of worms now because reputation

4     evidence has to be spoken to ten or fifteen people

5     in the community, diverse community which is

6     defendant, and they are not going to be able to

7     lay predicate.  I'll tell the Court right now they

8     can't lay that predicate.

9          THE COURT:  I don't know of any case that

10    says she has to speak to ten or fifteen people.

11         MR. PATNER:  I will have that by the time you

12    take the bench again.

13         THE COURT:  I don't -- I am not aware of a

14    minimum of ten or fifteen people.

15         MR. PATNER:  If I'm wrong I will correct

16    myself.

17         THE COURT:  With respect to the reputation

18    again, unless April Williams is able -- based on

19    Sanchez unless you find something that suggests,

20    and she is limited -- Sanchez says all they have

21    to show is that he had knowledge.  It doesn't say

22    he has to show what effect it had on him.  He had

23    knowledge of it.  But before I would allow April

24    Williams to testify about this she is going to

25    have to be in the position to testify that she

96

```
 1    told the defendant --
 2         MR. PATNER:  That's fine Judge, can I ask for
 3    a proffer from defense counsel then?
 4         THE COURT:  Are you telling me she is going
 5    to be saying she told him about the reputation?
 6    You're saying that April Williams is going to be
 7    in the position to testify that she told your
 8    client about what Patrick Brown's reputation was?
 9         MR. GODWIN:  No, no, I'm not saying that.
10         THE COURT:  Then that can't come in.
11         MR. GODWIN:  I will bring the case law,
12    Judge.
13         THE COURT:  Okay.
14         (Thereupon, a lunch recess was had, after
15    which the following proceedings were had in the
16    presence of the perspective jury panel.)
17         THE COURT:  Good afternoon everyone.  I can
18    tell by looking at all of your smiling faces that
19    you are really happy and excited to be here, and
20    that this has been your life long dream to become
21    a juror.  And I am very happy to be with you on
22    this very blessed day.  Being very serious I know
23    most of you would prefer to be anywhere other then
24    where you're sitting right now.  Whether that be
25    at the beach, working, or enjoying your
```

1       MR. GODWIN:   I need a moment, Your Honor.
2    Good afternoon ladies and gentlemen as I told you
3    earlier the prosecution always gets to go first
4    and that puts the defense at the disadvantage.
5    You get to hear the prosecutions theory first and
6    sometimes people form impressions based on what
7    they first hear and they make up their minds.  I'm
8    going to ask you just to follow the law right now
9    to do what his honor Judge Speiser instructed you
10   to do.  Which is to look at Jeremy Lockhart right
11   now as he sits there and presume him innocent.
12   The facts are going to show you that that was a
13   tragic case but a case of justifiable homicide.
14   This was a case about a young man who tried to
15   prevent a fight.  Because he became the piece
16   maker he got caught up in the fight and tragically
17   he had to use force to stop the fight.  He did so
18   only as a last resort.  He did so only to protect
19   a member of his own family.

20       Now, I just put this little diagram up here
21   because it explains the triangle that was
22   involved.  Patrick Brown is the deceased in this
23   case.  He has a street name and they call him Bump
24   (sic) B-U-M-P.  Some of the witnesses refer to him
25   as Bump, Mr. Patrick Brown.

JUSTICE REPORTING SERVICES, INC.      523-6114

EXHIBIT IV

1    Mr. Brown had a girlfriend named April
2    Williams, and by whom he had a child.  By the way
3    Ms. Williams had a child and Mr. Brown also had a
4    girlfriend named April Reese.

5    April Reese is Jeremy Lockhart's sister.
6    There were some other witnesses there but they are
7    not main players in this.  So you understand that
8    April Reese is my client's sister.  Patrick Brown
9    had two girlfriends and on June 25th, 1994 over a
10   year ago Patrick Brown was at Jeremy Lockhart's
11   house.  And the evidence is going to show you that
12   Patrick Brown and my client Jeremy Lockhart were
13   best friends.  They were just, they were good
14   buddies, and Christopher Williams was over there
15   and Derrick Walker.  They were all friendly, they
16   were playing cards, they were drinking beer, and
17   they were smoking a little bit a pot.  And just
18   hanging out at Jeremy Lockhart's house.

19   April Williams came to the house and brought
20   her baby with her.  Remember Patrick is the father
21   of her baby.  April Williams brought her baby with
22   her and she wanted to go shopping or something so
23   she was going to leave the baby off with Patrick.
24   She asked Patrick to look after the baby and then
25   April Williams left.

1          When April Williams came back to the house

2     she finds that April Reese is there.  April Reese

3     had recently been romantic with Patrick Brown and

4     there was - the fact of the matter is that Patrick

5     Brown had two girl friends at once.  So when April

6     Williams returned to the house she saw that April

7     Reese was in the bedroom, not that there was any

8     sex going on but Patrick Brown and April Reese

9     were in the bedroom together and April Williams

10     got angry and she grabbed a knife.  She grabbed a

11     knife.

12          Jeremy Lockhart, Jeremy took the knife away

13     from April Williams.  He said there is not going

14     to be any fighting in my house.  Jeremy tried to

15     be the peacemaker, he tried to stop the fight.  He

16     told April Reese, his sister, he told April

17     Williams you all get outside there is not going to

18     be any of that going on here in my house.

19          April Reese had picked up a beer bottle, she

20     picked up a beer bottle.  April Williams had the

21     knife and they were about to get into it with each

22     other.  Jeremy made them leave, he made them go

23     outside of his house and he locked the door so

24     that April Reese and April Williams were locked

25     outside.  Remaining inside were Patrick Brown,

 1    Jeremy, and the other guys who were in their

 2    playing cards.   Patrick for some reason, Patrick

 3    maybe he enjoyed a little feud between the two

 4    girls, Patrick unlocked the door.

 5        Patrick Brown unlocked the door so that April

 6    Reese and April Williams would come back inside.

 7    April Reese came inside and she had a beer bottle

 8    in which Jeremy had tried to take away from her.

 9    He was not successful and she came inside and she

10    had the beer bottle and she smacked Patrick Brown

11    right in the head with the beer bottle.   No

12    question about it.   Just like it was said she hit

13    him right in the head, hit him very hard with the

14    beer bottle.

15        April Williams comes inside and her knife has

16    been taken away from her and she sees April Reese

17    smack Patrick Brown.   And April Williams says to

18    her boyfriend, April Williams says to Patrick are

19    you going to take that from her?  Are you going to

20    let her hit you like that?  When you and I get

21    into it you beat me up real good.

22        MR. PATNER:   Excuse me, Judge, there is no

23    evidence of that whatsoever.

24        MR. GODWIN:   That's exactly what the evidence

25    is going to be.

1          THE COURT:  Exactly what the evidence is

2     going to be?  I will sustain the objection.  What

3     these lawyers says is not evidence.  I said that

4     to you God knows how many times and I will say it

5     to you again.  Nothing the lawyer says can be

6     considered by you as evidence only what comes from

7     the witness stand.

8          MR. GODWIN:  There will be evidence that

9     April Williams said to Patrick Brown --

10          MR. PATNER:  Excuse me.

11          THE COURT:  Yes, yes, I sustained the

12     objection.

13          MR. GODWIN:  This is what the evidence is

14     going to show.

15          THE COURT:  You already said what you

16     believed the evidence was going to be and I

17     ruled.  All right, lets proceed.

18          MR. GODWIN:  Then April Williams said are you

19     going to let her get away with that?  So Patrick

20     Brown, Patrick Brown grabbed April Reese and threw

21     try her to the ground, knocked her to the floor.

22     Then he got on top of her and started hitting

23     her.

24          Jeremy Lockhart is standing there, he watched

25     this whole thing.  He didn't interfere at that

```
 1        point because he thought his sister had started
 2        the fight as she had by hitting him with a beer
 3        bottle.  But then Patrick Brown had April Reese on
 4        the ground and he's hitting her.  Then he went to
 5        far.  He started taking her head and smashing it
 6        into the floor.  Jeremy realized he had to do
 7        something to protect his sister, Jeremy knew his
 8        sister was in danger.  He was afraid that Patrick
 9        Brown was going to split his sister open again for
10        the second time.

11            Six weeks earlier, six weeks earlier Patrick
12        Brown and April Reese had a fight where Patrick
13        Brown took a baseball bat and smacked April Reese
14        right in the head with it.  Smacked her in the
15        head with the baseball bat and split her head
16        open.  She had to go to the hospital, she had to
17        have four staples put into her head.  Jeremy was
18        there when that happened, he saw it happened.  He
19        saw Patrick Brown split April Reese's head open.
20        He knew she had been hospitalized.

21            And so knowing about this previous attack,
22        and knowing that his sister is now on the floor
23        and Patrick is going to far he tried to pull
24        Patrick Brown off his sister.  And yes Jeremy had
25        a gun in his own house.  He had a gun and I'm not
```

297

```
1    here to defend that, but he's not on trial for
2    that.  He was in his own house, he had a gun, he
3    pulled Patrick Brown off of his sister and as he
4    pulled Patrick Brown up he turned him around and
5    Patrick Brown swung a punch at him.  But you'll
6    see that Patrick Brown didn't just swing a punch
7    at Jeremy he was also kicking.  Patrick Brown was
8    kicking at April Reese, kicking at her and kicking
9    her, ladies and gentlemen, between her legs.
10   Kicking her between her legs.  And when he did
11   that Patrick Brown was pulled off by Jeremy
12   Lockhart.
13        And Jeremy spun him around and fired.  Now,
14   the gun was an automatic, the gun was an automatic
15   and Jeremy told that to the police.  I shot,
16   pulled the trigger one time and four shots went
17   off.
18        You'll hear from the medical examiner I think
19   that a shot like this, and this is when he spun
20   and shot hit him.  I think one in the buttocks and
21   another a little lower.  There were four shots and
22   they happened very quickly.  Jeremy shot and
23   killed his best friend.  It's sad, it's tragic and
24   no one is happy about it but that's what
25   happened.  He did it to protect his sister.  To
```

298

1    protect his sister who's being assaulted.

2    And then in a panic, he is a kid - he is a

3    young kid in a panic, and he did something stupid,

4    he ran away. He walked out of the apartment and

5    took the gun with him and he went to visit - he

6    went to Miami to tell his grandparents who raised

7    him what had happened because he was scared. And

8    he stayed at his grandparents for about a day

9    and-a-half and then he came back to Fort

10   Lauderdale and picked up his wife and went down to

11   the police station and turned himself in to the

12   police.

13   And Jeremy told the police what had

14   happened. He told them why he did it. And the

15   police because they already had their minds made

16   up, weren't going to listen and they tried to

17   twisted around what he said. Jeremy told them

18   that he shot, he was trying to protect his

19   sister. He told them he had thrown the gun away.

20   He took them out to the lake where he had thrown

21   the gun, and shown them where he had thrown the

22   gun. The police decided for some reason never to

23   try and get the gun.

24   There is going to be an issue whether it was

25   an automatic or whether he pulled the trigger four

CRITICAL

299

1   times.  But you'll see he pulled the trigger one
2   time and four shots went off.  The evidence is
3   going to show that Jeremy Lockhart did not want to
4   use force.  He tried to take the fight outside.
5   He tried to lock the people out of his house from
6   fighting.  He tried to stop the fight, he tried to
7   keep peace.  And he acted only to protect his
8   sister from further injury.

9        The law does not require him to wait until
10   Patrick Brown splits her head open again.  The law
11   doesn't say that.  The law says if it's reasonable
12   to use force, deadly force protect someone from
13   imminent harm then you can do so under the
14   circumstances.

15        Jeremy shot in self-defense and he killed his
16   best friend.  He did not commit any crime.  He had
17   no malice in his heart, no hate, no ill will, no
18   spite; he did it to protect someone that he
19   loved.

20        And when this case is over and when you have
21   heard all the evidence and when the law has been
22   explained to you about justifiable use of deadly
23   force and about reasonable doubt you will be
24   confident in your verdict of not guilty.  Thank
25   you.

```
 1       Q.    Did he tell you that as Patrick Brown was
 2   kicking at his sister as we described, Patrick Brown
 3   swung at him and hit him one time?
 4       A.    I believe so.
 5       Q.    And at that time he pulled out the gun and
 6   shot?
 7       A.    Where are you referring to?  What portion of
 8   the transcribed copy?
 9       Q.    I'll show you, sir.
10       A.    Yes he said that.  He made a comment that at
11   that time I said I told you all to stop.  And then he
12   pulled out and started - he pulled out the gun and
13   started firing.
14       Q.    Now, sir, did Jeremy Lockhart tell you that
15   there was several reports on Patrick Brown for
16   fighting?
17       A.    Yes, I believe he mentioned that.
18       Q.    Did you investigate those reports, sir?
19       A.    No sir.  Again after this day I had no
20   further involvement in this case as far as follow ups
21   were concerned.
22       Q.    You did no further investigation of Mr.
23   Brown's background?
24       A.    I did not personally, no.
25       Q.    You didn't ask anybody else to?
```

JUSTICE REPORTING SERVICES, INC.     523-6114



```
 1        A.    Sir, I don't think we would have to ask the
 2   daily detective that's something he would do on his
 3   own.
 4        Q.    You were in charge of this case, were you
 5   not?
 6        A.    No I was not.  I was one of the detective
 7   involved.  The lead detective, however, is actually
 8   John Abrams.
 9        Q.    Are you aware of any investigation that was
10   done into Patrick Brown's background and after Mr.
11   Lockhart --
12             MR. PATNER:  Object to relevance.
13             THE COURT:  Yes, sustained.
14             MR. GODWIN:  Judge, this is in report.
15             THE COURT:  No, no, sustained.
16   BY MR. GODWIN:
17        Q.    You were told there were several reports on
18   Mr. Brown, weren't you?
19        A.    Yes.
20        Q.    And you never attempted to secure those, did
21   you?
22             MR. PATNER:  Judge, again same objection,
23        same question.
24             THE COURT:  Sustained.
25             MR. GODWIN:  Judge, I asked if he ever
```

```
 1          attempted to secure the statements.  Reports, Your
 2     Honor.
 3               THE COURT:  Well, you've asked -- he said he
 4          has done absolutely no follow up investigation
 5          whatsoever on this case since the arrest of the
 6          defendant.  So I will sustain the objection.
 7     BY MR. GODWIN:
 8          Q.   Did Jeremy tell you that the police had been
 9     to his mother's house about this matter?  I'm talking
10     about the previous reports?
11          A.   I don't know if it's in his statement you can
12     it to me too, I don't recall that.
13          Q.   Page five, sir.
14          A.   Yes.
15          Q.   Now, sir, with respect to the gun Mr.
16     Lockhart, Jeremy described the gun for you, didn't he?
17          A.   Yes, sir, he did.
18          Q.   He told you it was an automatic, correct?
19          A.   Yes, he claimed that it was an automatic.
20          Q.   He told you he pulled the trigger one time?
21          A.   Yes, and it continued to fire.
22          Q.   And he also took you, and your partner was
23     Detective Abrams?
24          A.   No, it wasn't my partner it was another
25     detective who was in the office and agreed to accompany
```

461

```
 1   having been first duly sworn, was examined and

 2   testified as follows.

 3             THE CLERK:  State your full name and spell

 4   your last name for the record please.

 5             THE DEFENDANT:  Jeremy Lockhart,

 6        L-O-C-K-H-A-R-T.

 7             MR. GODWIN:  Could we have the microphone,

 8        Your Honor.

 9             THE COURT:  That's it right there

10        (indicating).

11                      DIRECT EXAMINATION

12   BY MR. GODWIN:

13        Q.  Jeremy, I want you to keep your voice up nice

14   and loud, okay?

15        A.  Yes, sir.

16        Q.  So that everybody in the courtroom including

17   this young lady down here can hear you, all right?

18        A.  Yes, sir.

19        Q.  I want you to look at the jury when you give

20   your answers, can you do that?

21        A.  Yes, sir.

22        Q.  Tell us your name again.

23        A.  Jeremy Lockhart.

24        Q.  Again I'm going to ask you to keep your voice

25   up if you would, all right.
```

EXHIBIT VI

462

```
 1      A.   Jeremy Lockhart.

 2      Q.   Jeremy, how old are you?

 3      A.   24.

 4      Q.   Are you nervous?

 5      A.   Yes, sir.

 6      Q.   Try to keep your voice up, okay.

 7      A.   Yes, sir.

 8      Q.   Jeremy, where were you born?

 9      A.   Miami, Florida.

10      Q.   Where did you go to high school?

11      A.   Dillard High in Fort Lauderdale, Dillard High

12   in Fort Lauderdale.

13      Q.   That's good keep your voice up like that,

14   okay.  When did you finish high school?

15      A.   '90.

16      Q.   1990?

17      A.   Yes, 1990.

18      Q.   Jeremy, I want you to look at the jury in the

19   eye, okay?  Have you ever been convicted of a felony?

20      A.   Yes, I have.

21      Q.   How may times?

22      A.   Twice.

23      Q.   Did you plead guilty in those cases?

24      A.   Yes, sir.

25      Q.   Were you guilty?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1      A.    Yes, I was.

 2      Q.    After you got that behind you did you get

 3   married?

 4      A.    Yes, I did.

 5      Q.    How old were you approximately when you got

 6   married?

 7      A.    Twenty-two years old.

 8      Q.    Keep your voice up nice and loud, okay.

 9      A.    Twenty-two years old.

10      Q.    What's the name of the woman that you

11   married?

12      A.    Monica Lockhart.

13      Q.    And do you have a child by her?

14      A.    Yes, I do a two year old little girl, Takelia

15   Lockhart.

16      Q.    Jeremy, I'm a little hard of hearing?

17      A.    A two year old little girl, Takelia

18   Lockhart.

19      Q.    And Jeremy what kind of work were you doing

20   at the time that that incident happened with Patrick

21   Brown?

22      A.    I was working at Pep Boy an auto shop that do

23   oil changes, tune ups, tire changes.

24      Q.    Jeremy, you got to speak up a little bit I

25   know you're not use to speaking in public but just a
```

 1  little louder please.

 2      A.  Auto mechanic shop that does quick oil

 3  changes, tune up, little my more repair jobs, you know,

 4  that's done on the cars.

 5      Q.  Judge, I wonder if we could put the

 6  microphone a little closer.

 7          THE COURT:  It doesn't move closer.

 8          MR. GODWIN:  If you'll put your hands up

 9      there and try and lean forward, okay?

10          THE COURT:  It's on full volume.

11          MR. GODWIN:  Could I all ask the jurors if

12      you all hear him okay?  Okay.

13          THE JURORS: Yes.

14  BY MR. GODWIN:

15      Q.  At the time this incident happened, Jeremy,

16  were you working?

17      A.  Yes, I was.

18      Q.  Were you supporting your wife?

19      A.  Yes, I was.

20      Q.  And your child?

21      A.  Yes, I was.

22      Q.  Do you remember where you were living at this

23  time?

24      A.  Yes, I was living at 2217 Northwest 9th

25  Street, apartment three.

465

```
 1        Q.   And who was paying the rent there?
 2        A.   I was.
 3        Q.   Jeremy, I want to take your attention back to
 4   June the 25th, 1994 the day this happened, all right?
 5        A.   Yes, sir.
 6        Q.   Go back to around 10:30 or 11:00 in the
 7   morning, all right?
 8        A.   Yes, sir.
 9        Q.   Can you tell the members of the jury who was
10   at your house on that day?
11        A.   That morning my wife was just leaving to go
12   on a job interview, my daughter and my friend Patrick
13   Brown.
14        Q.   Anybody else?
15        A.   Not at that time.
16        Q.   Did your wife leave to go on the job
17   interview?
18        A.   Yes, she did.
19        Q.   Leaving you an Patrick Brown and your
20   daughter at the house?
21        A.   Yes, she did.
22        Q.   Pardon me?
23        A.   She left, she left me Patrick and my daughter
24   there for a little while and then her mother came back
25   and picked up my little girl.
```

466

```
1     Q.   Then it was just you and Patrick?

2     A.   Yes, it was.

3     Q.   Did you invite some other people over to the

4  house?

5     A.   Yes, I invited a couple of my neighbors,

6  Darren Walker, and Christopher Williams.

7     Q.   Darren Walker is the gentleman who testified

8  in here the other day?

9     A.   Yes, sir.

10    Q.   And a person named Christopher Williams?

11    A.   Yes he, he stay in a different building, he

12  stay in the building closer to Darren Walker then me.

13    Q.   Okay.  What was your relationship with

14  Patrick Brown?

15    A.   He was my best friend.

16    Q.   Was he friends with your wife?

17    A.   Yes, he was.

18    Q.   Did he play with your daughter?

19    A.   Yes, he did.

20    Q.   Jeremy, who is April Reese?

21    A.   My baby sister.

22    Q.   Jeremy, was there a relationship between

23  April Reese and Patrick Brown?

24    A.   Yes, it was.

25    Q.   Tell the jury what the relationship was
```

467

```
 1   please?
 2        A.   They was dating, they were boy --
 3        Q.   They were dating?
 4        A.   Boyfriend and girlfriend.
 5        Q.   Was there also a women named April Williams
 6   that you knew?
 7        A.   Yes.
 8        Q.   Who was April Williams?
 9        A.   Somewhat of a friend or a girlfriend however
10   you would say it.
11        Q.   I'm sorry?
12        A.   Somewhat of a girlfriend or a friend.
13        Q.   Girlfriend or a friend to who?
14        A.   Patrick Brown.
15        Q.   And did she have a baby by Patrick Brown?
16        A.   Yes, she did.
17        Q.   Did your sister know about this?
18        A.   No, she didn't.
19        Q.   Now, the morning that you're at your house
20   with Patrick Brown, Darren Walker, Christopher Williams
21   and yourself, did you all start to play cards?
22        A.   Yes, we did.
23        Q.   Did somebody come over to the house?
24        A.   Yes, April Williams came to the house.
25        Q.   April Williams came?
```

468

```
 1        A.    Yes, sir.

 2        Q.    Tell the jury what happened when April

 3   Williams came to the house?

 4        A.    April Williams came over and she asked

 5   Patrick to keep the baby for a little while.  She left

 6   Patrick to care for her and she said she'd come back a

 7   couple hours later.  Meanwhile me, Patrick, Darren

 8   Walker, and Christopher Williams was just sitting in my

 9   house listening to my stereo and drinking a couple

10   beers playing cards minding our own business.

11        Q.    After April Williams came to the house did

12   she leave the baby there?

13        A.    Yes, she did.

14        Q.    Did somebody else come to the house after

15   April Williams left?

16        A.    My little sister, April Reese.

17        Q.    Tell the jury what happened when your sister

18   April Reese got there?

19        A.    My little sister April came and she knocked

20   on the door.  I asked --

21        Q.    Keep your voice up?

22        A.    My little sister April came to my house, she

23   knocked on my door and I asked who was it.  She told me

24   who it was and I told her to come in.  She asked where

25   was my wife and my little girl and I told her my wife
```

```
 1   was going to a job interview, and my little girl was to
 2   her grandmother's house.  So she turned and look at
 3   everybody and she didn't really say nothing to nobody
 4   she just looked around and turned around and walked out
 5   of the house and Patrick said a couple words to her.
 6        Q.    What did Patrick say to her?
 7        A.    He asked her what she was doing.
 8        Q.    Did she say anything to him?
 9        A.    She mumbled something about cross the street
10   to somebody's house or something or other, or doing
11   something.  I really didn't catch it because I was to
12   busy messing with my stereo at the time.
13        Q.    So then what happened after, did she leave?
14        A.    Yes, she did.
15        Q.    What happened when she left?
16        A.    We went back to playing cards and listening
17   to the music.  I talked to Patrick and I said you
18   have --
19        Q.    Did you have any discussion with Patrick but
20   the situations about these two girlfriends?
21        A.    Yes, I did I told him to choose who he
22   wants.  I said choose.  He said he choose to be with
23   his son's mother at that time.  But I told him also you
24   can't say you going to do one thing and then change
25   your mind and do a different thing.  For instance, say
```

```
 1    we go to a club or something, all right and everything
 2    and then my sister come in there and he won't say
 3    nothing to her but the minute somebody else show
 4    attention to her he get upset and he want to get right
 5    in and he want to fight.  And I feel as though that
 6    wouldn't be right if he tell her he don't want to be
 7    with her.  Then he be talking about he want to get mad
 8    at her and want to jump on her and fight her.
 9         Q.   Did you tell Patrick that he should let your
10    sister know that he had a girlfriend?
11         A.   Yes, I did.
12         Q.   What did he say about that?
13         A.   He said he had already taken care of that
14    there.  He said don't worry about it I got this.  His
15    exact words wee I got this, I'll take care of this,
16    this is my problem.
17         Q.   So then what happened?
18         A.   After that I ain't, I didn't really bring
19    nothing else up about it and we sat there and played
20    cards.  About two or three hours later his son's mother
21    came up and knocked on the door.  I asked who was it
22    again and she said April.  Me thinking that's my little
23    sister again I said come in but it's his baby's mama.
24    She come to the door.
25         Q.   April Williams?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

471

1      A.    She don't come all the way in she just asked
2    him to come outside.  So he turned and walked to the
3    door.  I asked Patrick, I say where is my little
4    sister?  She's across the street don't worry about it
5    she ain't going to see me go outside.  About a minute
6    or two later he come running back in the house.

7      Q.    Who came running back in the house?

8      A.    He come running back in the house talking
9    about oh lord your little sister coming, your little
10   sister coming.  I said I told you to tell her and make
11   your decision.  He had the perfect opportunity to
12   explain to her then when the baby mama was gone and it
13   wouldn't have came to this point of them getting into
14   an argument.  So he runs in the house and he's looking
15   for somewhere to go but there ain't to many place to go
16   in the house.  There's either two rooms or the bathroom
17   so he go in my cousin's room.  My sister come in right
18   behind him and asked where he at.  I told her he went
19   back there and they go back there.

20     Q.    Your sister went back where?

21     A.    In my cousin's room and they sat and talked
22   for a while.

23     Q.    Who was back in the back room?

24     A.    Patrick Brown and April Reese.

25     Q.    Your sister Patrick Brown?

472

```
 1      A.   Yes, my sister Patrick Brown.

 2      Q.   Just the two of them?

 3      A.   Yes.

 4      Q.   In the back room?

 5      A.   Yes.

 6      Q.   What happened did April Reese come in the

 7   apartment -- April Williams come in the house?

 8      A.   Yes, he and April Williams and then shortly

 9   after that there she walks in.  I don't know who told

10   her to come in but she walks in, she come in the house

11   and the next thing I know she is in the back room back

12   there with them.

13      Q.   What happened when she want back there with

14   them?

15      A.   I hear it getting kind of loud into an

16   argument so I go back there and stop the fight and

17   tearing up my house so I go in the back room telling

18   them --

19      Q.   Jeremy, when you went back there who was in

20   the back room?

21      A.   Patrick Brown, April Reese, and April

22   Williams.

23      Q.   Did anybody have a weapon?

24      A.   Yes April Reese, April Williams.

25      Q.   All right, what did your sister April Reese -
```

JUSTICE REPORTING SERVICES, INC.    523-6114

473

1    what did she have?

2         A.    A bottle, a beer bottle.

3         Q.    And what about April Williams what did she

4    have?

5         A.    A knife, a kitchen knife.

6         Q.    Did she have it in her hands?

7         A.    Yes, she did.

8         Q.    What happened when you went back there and

9    you saw the two girls one with the bottle and one with

10   the knife?

11        A.    It was mostly making threats telling them he

12   got to choose who he's going to be with, he got to

13   choose who he going to be with.  I told them I was not

14   going to have the fighting and stuff going on in my

15   house and I put all of them out.

16        Q.    When you say you put all of them out who are

17   you talking about?

18        A.    April Reese, April Williams and Patrick

19   Brown.

20        Q.    Where did you put them?

21        A.    Outside.

22        Q.    Where did you tell them to go?

23        A.    Out of my house.

24        Q.    Out the front door?

25        A.    Yes.

JUSTICE REPORTING SERVICES, INC.        523-6114

474

 1      Q.    You just have the one door to the house seen
 2   in the picture?

 3      A.    I have the back door but they went out the
 4   front door.

 5      Q.    Why did you put them outside, Jeremy?

 6      A.    Because I really didn't want the arguments.
 7   I was already having problems with my rent people based
 8   on I throwed a party recently over there and they got
 9   in an argument and stuff and the neighbors went to
10   complain.   One of the ladies that testified she was one
11   of the ladies that went to the rent officer to complain
12   about the noise and arguments and stuff I made.

13      Q.    Were you trying to stop any fight?

14      A.    Yes, I was trying to avoid the whole
15   situation I didn't want to see no one get hurt and no
16   one get in no fight.

17      Q.    Jeremy, when the three of them were outside,
18   Patrick Brown, your sister April Reese, other girl
19   April Williams, tell the jury what happened out there?

20      A.    They was standing outside and they was busy
21   telling Patrick, telling him he got to choose who he
22   wants.   April Williams say she was going it stab him
23   and my sister say she was going to hit him in the head
24   with a bottle.   They was making threats to him and by
25   this being my closest friend I didn't want to see him

475

1    get hurt so I tell him to come back in the house.

2    April Williams --

3         Q.    Did he come back in the house?

4         A.    Yeah.  I told him to come back in the house.

5    April Williams say if you move anywhere I'm going to

6    stab you.  My sister say if you move I'm going to hit

7    you with this bottle.  He told both of them F that I'm

8    going anywhere and he walks back in the house and he

9    shut the door behind him and locked the door.

10        Q.    Why did he lock the door?

11        A.    To keep them from coming back in and starting

12   more fuss.  I said to myself if they stay out there

13   long enough they will calm down and come to their

14   senses and talk like reasonable people.

15        Q.    Now, did you leave the door locked?

16        A.    Yes, I did.

17        Q.    Did somebody unlock that door?

18        A.    Yes, Patrick Brown.

19        Q.    Patrick unlocked the door, tell the jury what

20   happened?

21        A.    When I told him just let them sit out there

22   and cool down he told me don't worry about that I got

23   this there, I'll take care of this nothing is going to

24   happen.  So he walks back around and picks up the beer

25   and takes a swallow.  On the way back he picked up a

476

 1    cigarette off the radio and unlocked the door and stood

 2    there and --

 3         Q.    What happened when he unlocked the door?

 4         A.    My little sister was standing there and April

 5    Williams was standing right there by the door.

 6         Q.    Did you try to take weapons from anybody?

 7         A.    Yes, I tried to retrieve both of them.

 8         Q.    Tell the jury what he did?

 9         A.    I asked April Williams would she give me the

10    knife and she gave me the knife.  I asked my little

11    sister would she give me the bottle and she told me

12    no.  She put up a little fuss and I said April give me

13    the bottle ain't no need for a weapon, ain't nobody

14    got, ain't nobody around here going to fight.  She

15    ain't got no knife she can't do nothing to you.  She

16    told me no I ain't giving you nothing.  He should be

17    straight with he's going to be straight with me and he

18    should have told me, should have told me.

19              I said I been telling you that there.  Well,

20    he ain't got no right coming to the club and jumping on

21    me and telling me I ain't got no business with this

22    person saying that he's with me and then he with her.

23         Q.    All right.  So what happened then after you

24    took the knife from April Williams and you couldn't get

25    the bottle from your sister April Reese?  What

1   happened?

2        A.    I tried to close the door back and tell them
3   to go on and Patrick said don't worry about it I got
4   this.

5        Q.    So what happened, tell the jury what
6   happened?

7        A.    I turned and tossed the knife back and I
8   tried to retrieve the bottle again.  And after a while
9   he said don't worry about it I got it.  I turned away
10  to walk away but my sister swung and hit him in the
11  head with the bottle.

12       Q.    Where was he when she hit him with the
13  bottle?

14       A.    Standing in the doorway.

15       Q.    What happened when she hit him with the
16  bottle?

17       A.    Well, I caught a glimpse of her swinging the
18  bottle and I tried to catch her, stop from hitting him
19  but I didn't.  I didn't catch her in time and she had
20  struck him.  And I had grabbed him to the, grabbed her
21  to keep her from striking him again and at that time he
22  grabbed her and he jerked her away from me and went
23  like into a body slam with her and they landed on the
24  table.  He sat up and started punching at her in some
25  kind of way.

```
 1      Q.    Where were they at that point?

 2      A.    They were between the living room table and

 3   my stereo at that time.  They tussled and fought for a

 4   little while and they managed to make it around by the

 5   china cabinet there.  And I grabbed Patrick --

 6      Q.    Now, Jeremy, hold on a minute.  What

 7   happened, what happened between Patrick Brown and your

 8   sister while they were fighting there on the floor at

 9   your apartment?

10      A.    At that time I was punching her, grabbing her

11   by her head and pounding her head on the floor and on

12   the concrete floor.

13      Q.    Jeremy, had you ever seen -- first of all,

14   who was winning the fight?

15      A.    At that time Patrick was.

16      Q.    But your sister was fighting back?

17      A.    Somewhat, she was trying, she was on the

18   bottom.

19      Q.    Patrick was on top?

20      A.    Yes.

21      Q.    What did you say he did to her head?

22      A.    Grabbed her by her hair and was pounding it

23   on the ground.  .

24      Q.    Now, Jeremy, I want you to tell the jury had

25   you ever seen Patrick Brown commit other acts of
```

```
 1   violence against your sister, April Reese?
 2        A.    Yeah, prior to that about five, six weeks
 3   before that.
 4        Q.    I want you to tell the jury what happened
 5   five or six weeks before that?  First of all, where
 6   were you when this happened?
 7        A.    At that time we was to my sister's house.
 8        Q.    Which sister?
 9        A.    My eldest sister Regina.  We was to her house
10   and my little sister wanted to go out with some of her
11   friends.
12        Q.    Who is April Reese?
13        A.    Yeah, April Reese wanted to go out with a
14   couple of her friends.  I was sitting in the house
15   looking at T.V., and she went to go outside and Patrick
16   was sitting in there with us and he told her I told you
17   you couldn't go nowhere and he jerked her back in the
18   house.  She had a little words --
19        Q.    What do you mean he jerked her back in, how
20   did he jerk her back in?
21        A.    Grabbed her by the collar of the shirt and
22   smacked her back in.  She said I'm going anywhere I
23   want went to go outside.  There was a bat, metal bat
24   sitting by the door and he grabbed the bat and swung it
25   and hit her in the top of the head somewhere up in here
```

480

1   (indicating).

2       Q.   What happened when he hit her with the

3   baseball bat?

4       A.   She fell into some glass jalousies that was

5   right by the door, our next door neighbor, and she fell

6   back into the jalousies.

7       Q.   Did she bleed?

8       A.   Yeah she was bleeding and unconscious at that

9   time.

10      Q.   Did somebody have to call an ambulance?

11      A.   Yes, the ambulance was called and she was

12  transported to Broward General Medical Center.

13      Q.   What happened to her at Broward General

14  Medical Center?

15      A.   She received several staples in the top of

16  her head.

17      Q.   Several what?

18      A.   Staples.

19      Q.   Medal staples?

20      A.   Metal.

21      Q.   Do you know how may she had?

22      A.   Anywhere between five and seven.

23      Q.   Are you aware of any other acts of violence

24  of Patrick Brown against your sister before this

25  happened on the day of the shooting?

481

```
 1      A.    Yeah.

 2            MR. PATNER:  Judge, object to lack of

 3      predicate as to that question.

 4            THE COURT:  Sustained.

 5   BY MR. GODWIN:

 6      Q.    All right, did you see with your own eyes any

 7   other acts of violence between Patrick Brown and your

 8   sister?

 9      A.    Yes, I did.

10      Q.    What was that?

11      A.    One night we was going to a nightclub.

12      Q.    What nightclub?

13      A.    Troy's night club on Sunrise Boulevard.  I

14   was just arriving there and my sister and my wife and a

15   couple more friends were already there.  Patrick just

16   pulled up, and just as I pulled up my sister was

17   standing out there talking and I seen Patrick run from

18   across the street and just punch my sister in the jaw

19   and say I told you not to go out that night.  I told

20   you not to go out that night.

21      Q.    What happened when he punched her in the jaw?

22      A.    She fell and jumped up and ran to me.  I told

23   him I can't get in any problems, you know, that's

24   between you and him.  I told her either be with him or

25   leave him alone.  Either keep going through this or
```

482

```
 1    leave him alone and I carried her home.

 2         Q.   Now, Jeremy, I want you to come back, come

 3    back and tell the jury what happened the day that you

 4    were in your apartment the day of the shooting, okay?

 5    You said Patrick was on the floor with your sister?

 6         A.   Yes, he was.

 7         Q.   What was he doing to her?

 8         A.   Pounding her head into the floor.

 9         Q.   Did you see that happening?

10         A.   Yes, I did.

11         Q.   What did you do?

12         A.   I tried to stop it.

13         Q.   Tell the jury what you did?

14         A.   I merely pulled him off and pushed him back.

15         Q.   Pardon me?

16         A.   I pulled him up and pushed him back and said

17    that was enough.  He swung and hit me and he fell back

18    to the left.

19         Q.   Where did he hit you?

20         A.   He hit me in the jaw.

21         Q.   In the jaw?

22         A.   Yes, he hit me in the left side of my jaw and

23    I fell back -- I mean right side.  I fell back and I

24    came back up and he was turned around and he went to

25    kick me and that's when --
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1        Q.   You said he turned around and went to kick --
 2        A.   Yeah, he turned.
 3             MR. GODWIN:  Your Honor, with the Court's
 4        permission can he step down here please.
 5             THE COURT:  Yes.
 6   BY MR. GODWIN:
 7        Q.   Let's say that I'm Patrick Brown, okay, you
 8   say you pulled him up?
 9        A.   Yeah, I pulled him off of her and that's when
10   he hit me and I fell back this way.
11        Q.   Where was your sister at that point?
12        A.   She was right there (indicating).
13        Q.   You say he swung and hit you?
14        A.   Yes.
15        Q.   And you fell back?
16        A.   Yeah.
17        Q.   What did he do?
18        A.   He turned back around went to kicking.
19        Q.   Which way?
20        A.   He turned right, he was facing me and he
21   turned this way and went back to kick.
22        Q.   Facing you?
23        A.   Facing me.
24        Q.   I'm going to be him, so about like this?
25        A.   Yes.
```

484

1      Q.    What did you do?

2      A.    Tried to stop him from doing that and there

3  was a tussle and I pulled out the gun and shot him.

4      Q.    Is this the - approximately the angle you

5  were at when you shot him?

6      A.    Little more like this here but about this

7  close (indicating).

8      Q.    What was he doing at the moment that you

9  fired the shot?

10     A.    He was kicking my sister in the lower part of

11 her body.

12     Q.    What do you mean the lower part of her body,

13 tell the jury.

14     A.    Between the legs, kidney area.  Lower part of

15 her body.

16     Q.    Have a seat.  Jeremy, I want you to tell this

17 jury why did you have the gun?

18     A.    The neighborhood I stay in is not one of the

19 best neighborhoods in the world.  It's a lot of

20 robbing, stealing, and assaults.  And with everything

21 going on in that neighborhood I need, I need a gun for

22 protection.  I have a family, I have a daughter, I have

23 a wife.

24     Q.    Where was the gun before you took it out to

25 use it?  Where was it?

JUSTICE REPORTING SERVICES, INC.     523-6114

485

1      A.    In my pocket.

2      Q.    What kind of gun was it?  Tell the jury what

3    kind of gun it was?

4      A.    A .22 mark one.

5      Q.    Do you knew the difference between an

6    automatic and semi automatic?

7      A.    Yes.

8      Q.    What's the differences?

9      A.    Automatic when you pull the trigger it just

10   continues to shoot.  A semi automatic is the shooter

11   type where you pull the trigger.

12     Q.    How may times did you pull the trigger?

13     A.    Once.

14     Q.    How many times did the gun go off?

15     A.    To my recollection four.

16     Q.    You showed the jury before how you were

17   standing, could you come -- with the Court's

18   permission?

19           THE COURT:  Yes.

20   BY MR. GODWIN:

21     Q.    If I understand you correctly you said

22   Patrick was about like this (indicating)?

23     A.    Yes.

24     Q.    You fired the first shot what did his body

25   do?

JUSTICE REPORTING SERVICES, INC.    523-6114

486

```
 1        A.    He spined, spined all the way around.

 2        Q.    About like this, did you just have the gun

 3   out like that (indicating)?

 4        A.    Had it like this pulled out.

 5        Q.    Did he fall to the floor?

 6        A.    Yes, he did.

 7        Q.    Did you ever shoot him when he was on the

 8   ground?

 9        A.    No, I didn't.

10        Q.    Jeremy, tell the jury why did you shoot

11   Patrick Brown?

12              THE COURT:  He can return to his seat.

13   BY MR. GODWIN:

14        Q.    Keep your voice up please and I want you to

15   tell the jury why did you shoot Patrick Brown?

16        A.    To protect somebody I love.

17        Q.    Who was that?

18        A.    My little sister.

19        Q.    What did you think he was doing to your

20   sister?

21        A.    He was going to hurt her again, put her in

22   the hospital again.

23        Q.    You thought he might put her in the hospital

24   again?

25        A.    Yes.
```

| | | |
|---|---|---|
| 1 | Q. | That's why you shot him? |
| 2 | A. | Yes, it is. |
| 3 | Q. | Did you have any hatred towards Patrick |
| 4 | Brown? | |
| 5 | A. | I love him like a brother. |
| 6 | Q. | Did you have any ill will towards Patrick |
| 7 | Brown? | |
| 8 | A. | No. |
| 9 | Q. | Or spite? |
| 10 | A. | No. |
| 11 | Q. | Jeremy -- |
| 12 | A. | Yeah. |
| 13 | Q. | Jeremy, after you fired the shot what did you |
| 14 | do? | |
| 15 | A. | I left. |
| 16 | Q. | Pardon me? |
| 17 | A. | I left. |
| 18 | Q. | Where did you go? |
| 19 | A. | Went to my grandma. |
| 20 | Q. | Tell the jury why you left? |
| 21 | A. | Because I wanted to see them, I wanted to |
| 22 | tell them what happened. | |
| 23 | Q. | Where did they live? |
| 24 | A. | Dade County. |
| 25 | Q. | Did you come down to Dade County? |

488

```
 1      A.   Yes, I did.

 2      Q.   Did you go and throw the gun away first

 3   somewhere?

 4      A.   Yes, I did.

 5      Q.   How did you get to Dade County?

 6      A.   Tri rail.

 7      Q.   When you got to Dade County did you tell your

 8   grand folks what had happened?

 9      A.   Yes.

10      Q.   Was that a Saturday night?

11      A.   Yes, it was.

12      Q.   What did you all do the next day, Sunday?

13      A.   Went to church and prayed.

14      Q.   Did you decide to turn yourself in?

15      A.   Yes, I did.

16      Q.   After you had spoken to your grand folks?

17      A.   Yes, I did.

18      Q.   Did you come back on the following Monday,

19   the 27th?

20      A.   Yes, I did.

21      Q.   Did you get your wife?

22      A.   Yes.

23      Q.   Where did you go?

24      A.   Went to the police station and turned myself

25   in.
```

```
 1                    THE COURT:  Talk louder please.
 2     BY MR. GODWIN:
 3          A.   Went to the police station and turned myself
 4     in.
 5          Q.   Were you scared?
 6          A.   Yes, I was.
 7          Q.   Have you ever had any legal training, Jeremy?
 8          A.   No I haven't.
 9          Q.   Do you know anything about the law?
10          A.   No, I don't.
11          Q.   Did you talk to a lawyer before you went down
12     and talked to the police officers?
13          A.   No, I didn't.
14          Q.   Jeremy, I want you to tell the jury how you
15     feel about what happened on that day?
16          A.   It hurts.
17               MR. PATNER:  Object to relevance.
18               THE COURT:  Yes, sustained.  Next question.
19               MR. GODWIN:  That's all the questions I have.
20               THE COURT:  Thank you, your witness.
21               MR. PATNER:  Thank you, Judge
22                    CROSS EXAMINATION
23     BY MR. PATNER:
24          Q.   Good afternoon Mr. Lockhart.  You said you
25     had no training in the legal system?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

490

```
 1        A.    No I don't.
 2        Q.    You're a two time convicted felon, correct?
 3        A.    Yes, I am.
 4        Q.    Before you came in and turned yourself in to
 5   the police you had two days to think about what you
 6   were going to tell them, right?
 7        A.    What do you mean by that?
 8        Q.    You had two days to reflect upon what
 9   happened before you made a statement to the police,
10   correct?
11        A.    To reflect upon what I had to say to the
12   police?  I told them what exactly had happened.
13        Q.    But you didn't tell them right after it
14   happened you had two days to think about it, right?
15        A.    Why should I think about it?
16        Q.    And at this point now prior to taking talking
17   the stand here today you've had over a year to
18   contemplate your testimony in this trial, correct?
19        A.    Why should I, why should I do that?
20        Q.    You certainly thought about what you were
21   going to say, haven't you?
22        A.    No.  Why should I think about it?  Why should
23   I think about it?
24        Q.    You haven't had any thoughts about what you
25   were going to say here today?
```

/

JUSTICE REPORTING SERVICES, INC.      523-6114

491

```
 1        A.    No, I don't.

 2        Q.    You haven't discussed with your attorney?

 3        A.    No I --

 4              MR. GODWIN:  I'm going to object it's

 5        improper to ask what he discussed with me Your

 6        Honor well knows that.

 7              THE COURT:  As to whether he discussed this

 8        testimony with you.

 9              MR. GODWIN:  No, no.

10              THE COURT:  No, overruled.

11              MR. GODWIN:  Whether he discussed anything

12        with an attorney or not.

13              MR. PATNER:  Regarding testimony.

14              THE COURT:  Overruled.

15   BY MR. PATNER:

16        Q.    Had you discussed your testimony with the

17   attorney prior to today?

18        A.    No, I haven't.

19        Q.    Have not?

20        A.    No, I haven't.

21        Q.    You have the police reports in the case, do

22   you not?

23        A.    Yes, I have.

24        Q.    Copies of all the reports, right?

25        A.    I have statements.
```

492

```
 1       Q.   You have the statements of all the witnesses?
 2       A.   Yes.
 3       Q.   Over in that brown folder there, right?
 4       A.   Yes, it is.
 5       Q.   But you haven't thought about what you were
 6   going to say here today?
 7       A.   No I haven't I just read over what people
 8   said.
 9       Q.   Now, you needed this gun for protection?
10       A.   Yes.
11       Q.   You're hanging out at your own house, right?
12       A.   Yes.
13       Q.   Drinking?
14       A.   Yes.
15       Q.   Smoking some pot?
16       A.   Yes.
17       Q.   With your friends?
18       A.   Yes.
19       Q.   Patrick Brown didn't have a gun for
20   protection, he was seemingly okay, right?
21       A.   I guess.
22       Q.   And with the four other guys that were there
23   with their friends drinking beer and smoking pot you
24   thought it would be best if you had a loaded handgun in
25   your pocket?
```

493

1      A.    Best?  I just had it in my pocket, I was in
2    the privacy of my home.

3      Q.    And in your statement that you gave to the
4    police you don't mention anywhere in here, anywhere on
5    this tape, do you, the situation with this baseball
6    bat?  Do you say that anywhere on here?

7      A.    No, I told the officer.

8      Q.    You sat here and listened to this tape in
9    court yesterday, didn't you?

10     A.    Yes, I did.

11     Q.    Nowhere on here did you mention anything
12   about a baseball bat, did you?

13     A.    No, but he asked me about it that day.

14     Q.    He asked you if there's anything else you
15   wanted to say?

16     A.    No, he asked me did I have anything regarding
17   this case.

18     Q.    Well, in regards to this case you thought it
19   was important to say that about your sister, see she
20   just go drinking and she just get wild because the
21   police have been over there.  Now that wasn't about
22   this case, was it?

23         MR. GODWIN:  Wait a minute, Judge, objection
24     he's just pulling a segment out of the statement
25     and he's reading it with no basis for it.  That's

/

494

1       improper.

2           THE COURT:  No, overruled.

3   BY MR. PATNER:

4       Q.   The fact about your sister going wild and the

5   police coming over there, that wasn't about this day,

6   was it?

7       A.   No, it wasn't.

8       Q.   You were talking about your sister going

9   wild, right?

10      A.   Both of them get wild.

11      Q.   That may be but you didn't tell the police

12  that?

13          MR. GODWIN:  Objection to the comment by the

14          prosecutor, Your Honor --

15          MR. PATNER:  If I could finish my question.

16          THE COURT:  Overruled.

17          MR. GODWIN:  Your Honor, I object to the

18          comment that may be that's not a question.

19          THE COURT:  Well, I haven't heard the whole

20          question.

21          MR. GODWIN:  Well, that's an improper

22          statement that's what I'm trying to get at.

23          THE COURT:  Overruled at this point.

24  BY MR. PATNER:

25      Q.   You didn't tell the police about the

                            /

            JUSTICE REPORTING SERVICES, INC.    523-6114

495

1     situation about Patrick, you told them about your

2     sister going wild, correct?

3          A.     He asked me about my sister.

4                 THE COURT:     Can everyone hear him okay?

5                 THE JURORS:    Yes.

6     BY MR. PATNER:

7          Q.     How big was this gun?  Show me with your

8     hands?

9          A.     About that big (indicating).

10         Q.     Where did you have it?

11         A.     In my pocket.

12         Q.     Front pocket, back pocket?

13         A.     Front pocket.

14         Q.     Loaded?

15         A.     Yes.

16         Q.     Now, let's get something straight here.  This

17    isn't a machine gun, is it?

18         A.     No.

19         Q.     It's a semi automatic pistol, you pull the

20    trigger one time and it shoots one time?

21         A.     No, it's an automatic.

22         Q.     An automatic the type that's illegal in the

23    United States, correct?

24                MR. GODWIN:    Object to that that's improper.

25         I'm asking for a side bar right now.

496

1       THE COURT:  Okay, thank you.

2           (Thereupon, the following proceedings were

3       had at side bat outside the hearing of the

4       jurors.)

5       MR. GODWIN:  I move for mistrial based on the

6       improper comment by the prosecutor that the weapon

7       is illegal.  It's improper and it's not illegal to

8       have an automatic weapon in the United States.  A,

9       it's not the law.  B, he's not charged with

10      illegal possession of a firearm in this case and

11      for him to stand here and tell the jury that he's

12      guilty of some sort of crime by having an

13      automatic weapon which he is not charged with is

14      improper and he knows it's improper and it's

15      literally prejudicial.  I can't think of anything

16      more prejudicial and I'd move for a mistrial.

17      THE COURT:  You said it's not the law that

18      it's illegal to posses an automatic firearm?

19      MR. GODWIN:  Right, an automatic handgun.

20      THE COURT:  Right.  You're saying that it's

21      not illegal?

22      MR. GODWIN:  That's exactly my understanding

23      of law, yes.

24      MR. PATNER:  Judge, my purpose in asking the

25      question is that it is the State's position this

497

```
 1        was not an automatic it's a semi automatic.

 2              THE COURT:   Right, right.

 3              MR. PATNER:   And furthermore he could not

 4        have purchased a semi automatic, I mean an

 5        automatic pistol.

 6              THE COURT:   Did you ask him how he got it?

 7              MR. PATNER:   I'm getting to that.

 8              THE COURT:   Ask him how he got it and whether

 9        he had a license for it anything like that.

10              MR. PATNER:   Well, that's where I was going

11        I'm not trying to make any inferences violating

12        the law.

13              THE COURT:   I'll sustain the objection,

14        motion for mistrial denied.

15              MR. GODWIN:   I'm asking you to caution this

16        jury.

17              THE COURT:   You want to talk loud so everyone

18        can hear?

19              MR. GODWIN:   I'm asking you to caution the

20        jury that this is an improper comment and that

21        they are to disregard it.  He is, he's not charged

22        with illegal possession of a weapon in this case

23        and I'm asking --

24              THE COURT:   All right, I will caution - I

25        will give the jury a cautionary instruction.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1            MR. PATNER:  But you're allowing me to though
 2       and --
 3            THE COURT:  I will allow you to ask how he
 4       got it and where he got it?  I mean did he --
 5            MR. PATNER:  Did you have a permit for it?
 6            MR. GODWIN:  Judge, but there is no issue
 7       here about whether he had a permit.  That's not an
 8       issue before this jury whether he had possession
 9       of a weapon without a permit.  You're allowing him
10       to get into other actions that are illegal.
11            THE COURT:  No, no, I mean you can have a gun
12       in your house without having a permit for it.  You
13       can have your gun in your house without having a
14       permit.  We are going to ask if he had a permit
15       for it.
16            MR. GODWIN:  It's irrelevant to any issue
17       here whether he had a permit.
18            THE COURT:  Or whether he had any training --
19       no, overruled.
20            MR. GODWIN:  What he basis -- what's the
21       relevance to that question did he have a permit
22       for if that has no relevance to anything?
23            THE COURT:  Goes to -- because, I'll tell you
24       what the relevance is because it goes to, to get a
25       permit to have a firearm you have to go through a
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1    training course and through the training course

2    you learn you don't have a firearm when you're

3    drinking and when you're smoking pot.

4        MR. GODWIN:  He's not charge with possession

5    of a firearm by an intoxicated person or anything

6    like that, Judge.

7        THE COURT:  It goes to the issue of his

8    having a firearm.  This is a the murder, second

9    degree with a firearm.  Cause reckless disregard

10   for human life.  All right, I feel that's

11   relevant.

12       MR. GODWIN:  Judge, I'd make my objection in

13   the most strenuous terms in introducing bad acts

14   for which my client is not charged.  He's not on

15   trial for that and it's wrong for the prosecutor

16   to imply he's broken some law by not having a

17   permit.

18       THE COURT:  I'm not allowing that --

19       MR. GODWIN:  It's not relevant to anything.

20       THE COURT:  Okay, I feel it is relevant.  We

21   can go back and forth.

22       MR. GODWIN:  Will you give a cautionary

23   instruction?

24       THE COURT:  Yes, I will.

25       (Thereupon, the following proceedings were

JUSTICE REPORTING SERVICES, INC.      523-6114

500

```
1     resumed in the presence of the jury.)

2          THE COURT:  Folks, at this time I will advise

3     you that the last question of the prosecutor

4     concerning that it's a violation of the law to --

5     that it's not legal in the United States to have a

6     firearm, an automatic firearm I will sustain the

7     objection and advise you that the only law that

8     comes to you that you apply to the evidence comes

9     from the Court not from the attorneys, okay?  So a

10    lawyer can say to you, cannot say to you that this

11    is the law or this isn't the law.  Neither lawyers

12    are permitted to do that.  The law comes from the

13    Court not from the lawyers, okay.  So any law

14    that's applicable to the evidence in this case

15    comes from the Court not from the lawyers.  And

16    the applicable law that you will hear in this case

17    and that is relevant to this case comes from the

18    Court at the conclusion of the trial.  Thank you.

19         MR. GODWIN:  Judge, I'm asking you to

20    instruct the jury to disregard the inference from

21    that question.

22         MR. PATNER:  The Court already ruled.

23         THE COURT:  I sustained the objection and I

24    told the jury -- I thought I told the jury - I

25    will say again the jury is instructed to disregard
```

JUSTICE REPORTING SERVICES, INC.    523-6114

501

1        -- first of all questions are not evidence,

2        okay.  You don't base your decisions on

3        questions.  I think I told you that several times

4        during my opening remarks that evidence comes from

5        the witnesses on the witness stand as well as

6        exhibits marked into evidence.  So no questions

7        constitutes evidence.

8            Secondly, I'm telling you that if in the form

9        of the question the prosecutor asked he made a

10       statement concerning the status of the law in the

11       United States regarding what possession of some

12       firearm is, and I'm telling you any law that's

13       applicable to this case comes from the Court.  So

14       you are not to draw any inferences or any

15       conclusions from any questions that either lawyer

16       asked.  Okay, lets proceed.

17   BY MR. PATNER:

18       Q.   Where did you buy the gun?

19       A.   On the streets.

20       Q.   From who?

21       A.   I don't know.

22       Q.   Forgot?

23       A.   I don't know him.

24       Q.   Did you have a permit to have an automatic

25   weapon?

502

```
 1      A.    No, I didn't.

 2      Q.    Pardon me?

 3      A.    No, I didn't.

 4      Q.    You did not?

 5      A.    No.

 6      Q.    How much marijuana did you smoke that day?

 7      A.    I smoked one time and --

 8            THE COURT:  All right, sir, you're going to

 9      have to talk louder.  You have to talk louder into

10      the microphone, sir.  Okay, thank you.

11  BY MR. PATNER:

12      Q.    When you shot that firearm casings are

13  ejected from the gun, correct?

14      A.    Yes.

15      Q.    .22 shells, right?

16      A.    Yes.

17      Q.    .22 caliber?

18      A.    Yes.

19      Q.    Now, your sister on the date that you shot

20  Patrick Brown was jealous of April Williams, right?

21      A.    Basically just jealous of each other.

22      Q.    Okay.  April Williams was jealous of April

23  Reese and April Reese was jealous of April Williams, is

24  that fair?

25      A.    Yes.
```

503

1       Q.    Because of Patrick Brown, right?

2       A.    Yes.

3       Q.    On June 25th the date of the shooting April

4    Reese wanted to continue her relationship with Patrick

5    Brown, correct?

6       A.    Yes, she did.

7       Q.    April struck Patrick in the forehead with a

8    bottle, right?

9       A.    Yes.

10      Q.    Splitting his forehead open, correct?

11      A.    Yes.

12      Q.    Knocking him back in the chair?

13      A.    She struck him and he laid back on the wall

14   and charged, they charged each other.

15      Q.    He was dazed was he not from the bottle

16   striking him in the head?

17      A.    Not to my recollection because he grabbed her

18   as soon as --

19      Q.    You agree it was a fairly serious wound to

20   his head, wouldn't you?

21      A.    I don't know the nature of the wound I just

22   seen it on the photograph and I know she hit him.

23      Q.    Well, she must have hit him pretty good to

24   cause those wounds, didn't she?

25            MR. GODWIN:   Object calls for speculation on

JUSTICE REPORTING SERVICES, INC.     523-6114

504

 1          his part.

 2                  THE COURT:  No, overruled.

 3     BY MR. PATNER:

 4          Q.    She hit him pretty good, didn't she?

 5          A.    All I know is she hit him I wasn't face to

 6     face with them at the time I had turned to walk away

 7     because he said he got this, he will take care of this.

 8          Q.    Did you see her hit him or not?

 9          A.    I seen her swing.  At first I thought she was

10     going to hit me because my back was turned, and I

11     turned around and grabbed her when I seen that she had

12     struck him.

13          Q.    Let me ask you a yes or no question.  Did you

14     see April Reese strike Patrick Brown in the forehead

15     with a bottle, yes or no?

16          A.    Yes, I did.

17          Q.    Okay.  Did she strike him hard?

18          A.    I can't tell you I am not the person that was

19     hit.

20          Q.    Well, the person -- up until the time Patrick

21     Brown was shot was anyone else injured?  Did anyone

22     else have any visible injury other then Patrick Brown?

23          A.    I didn't see any.

24          Q.    Pardon me?

25          A.    Not that I could see.

                              /

               JUSTICE REPORTING SERVICES, INC.     523-6114

505

1       Q.   Not that you saw?

2       A.   No.

3       Q.   The only one who was injured was Patrick

4   Brown in the forehead and later with the four bullets

5   wound to the body, correct?

6       A.   That was visible at that time.

7       Q.   You mentioned that - I think your phrase was

8   April Reese and Patrick Brown you said tussled and

9   fought, right?  Remember saying that?

10      A.   Yes.

11      Q.   So it was a mutual thing?

12      A.   Naturally it's going to be a mutual thing

13   because she was fighting to protect herself and he was

14   fighting to try to hurt her.

15      Q.   You pulled him off of her, right?

16      A.   Yes, I did.

17      Q.   You were able to do that?

18      A.   Yes, I was.

19      Q.   How far away were you when you shot Patrick

20   Brown?

21      A.   Two to three feet.

22      Q.   Two to three feet?

23      A.   Yeah.

24      Q.   And your sister was behind you, right?

25      A.   No my sister was to the side of us.

506

1      Q.     There was also - how may children were in the
2    apartment?

3      A.    One.

4      Q.    Who was with the child when you shot him?

5      A.    Child was by the door on the couch.

6      Q.    On the couch?

7      A.    By the door.

8      Q.    Now, you said you went down to Miami to tell
9    your -- let me ask you this.  After you shot Patrick
10   Brown did you feel you had done something wrong?

11     A.    I was hurting.

12     Q.    Did you feel you had done something illegal?

13          MR. GODWIN:  Objection, he's not a lawyer.

14          THE COURT:  Sustained to the form of the

15          question.  Proceed.

16   BY MR. PATNER:

17     Q.    Did you feel you had done something wrong for
18   what you could go to jail?

19          MR. GODWIN:  Your Honor please he's not a

20          lawyer, he doesn't know the law.

21          MR. PATNER:  There is a relevance in flight,

22          Judge.

23          MR. GODWIN:  Your Honor, I request for a side

24          bar again.  I'd ask for a side bar please.

25          THE COURT:  Okay, I heard you the first time.

                              /

JUSTICE REPORTING SERVICES, INC.     523-6114

507

1        (Thereupon, the following proceedings were

2    had at side bar outside the hearing of the

3    jurors.)

4        MR. GODWIN:   Now the Court knows there is no

5    flight instructions given in Florida, that's not

6    the law anymore.   No flight instructions are given

7    and the prosecutor stands up here arguing in front

8    of the jury that it goes to his flight.   I'm going

9    to ask you to instruct the jury that the

10   prosecution's comment was improper and uncalled

11   for and they are to disregard it.   You know very

12   well that the flight instruction this prosecutor

13   -- this is the most prejudicial cross examination

14   I've ever seen.   You've already allowed him to go

15   into issues about the weapon he's not charged with

16   and now the prosecutor stands up here and asks him

17   questions about flight.   I mean that's just

18   improper, Judge, and you know it.

19       THE COURT:   Well, I know that the Court is no

20   longer entitled to instruct a jury on what

21   previously was a standard instruction on flight,

22   however, that does not prevent an attorney from

23   bringing up the fact that he fled from the scene

24   to arguing to the jury then why didn't he just

25   turn himself in if he had nothing to hide?   That

/

1       he fled from the scene.  There's absolutely

2       nothing wrong with bringing out that fact.  You

3       brought it up on your direct examination instead

4       of going to the police he went down to see his

5       family, and he went to see his family because he

6       wanted to see them one last time before he went to

7       jail and church.  And you brought that out.

8              MR. GODWIN:   That has nothing to do with

9       flight, Judge.

10             THE COURT:   What do you call that?

11             MR. GODWIN:   Exactly what happened in the

12      case.

13             THE COURT:   He leaves the scene and does not

14      stay around.

15             MR. GODWIN:   That does not give the

16      prosecutor the right to stand up there and talk

17      about flight when there is no flight instruction.

18             THE COURT:   He can talk about the fact that

19      he left whether you call it leave or flee.   The

20      point is I have no problem with that.

21             MR. PATNER:   If I can ask counsel to avoid

22      the lengthy objections which now have been said in

23      front of the jury I don't have a problem --

24             THE COURT:   Okay but with respect to the

25      question you asked about that he did something

JUSTICE REPORTING SERVICES, INC.     523-6114

509

1       wrong that he knew he could go to jail for I will
2       sustain the objection, okay.  With respect to any
3       objection about the fact that he made -- his
4       question about flight when he said the word flight
5       I have no problem with that, that objection is
6       overruled.
7           (Thereupon, the following proceedings were
8       resumed in the presence of the jury.)
9           MR. PATNER:  May I proceed?
10          THE COURT:  Yes, sir.
11  BY MR. PATNER:
12      Q.   I was talking about you going down to Miami.
13  You testified on direct that you went down to Miami to
14  tell your grandparents what had happened, right?
15      A.   Yeah.
16      Q.   And you never mentioned anything about jail,
17  but isn't it true the real reason you went down to
18  Miami is you didn't want to go to jail?
19      A.   No, I went to Miami to tell my grandparents
20  because I was scared.
21      Q.   Remember being asked a question by Detective
22  Walley why didn't you go call the police?  Answer, it
23  was like I know I had - I know I had did something I
24  was going to go to jail for.  Remember saying that
25  statement?

510

```
 1        A.    Yes, I did.

 2        Q.    That's on tape, right?

 3        A.    Yes, it is.

 4        Q.    And he also asked you where did you go?

 5   Answer, I went to the tri rail station and went to

 6   Miami to visit my grandmother because I know if I go to

 7   jail then I wouldn't get a chance to see them.

 8        A.    Yes.

 9        Q.    So you wanted one last chance -- after

10   shooting Patrick Brown you wanted one last chance to

11   see your grandparents before you went to jail?  That's

12   what you told the police, right?

13        A.    Yes.

14        Q.    You threw the weapon in the lake, right?

15        A.    Yes.

16        Q.    You ern your shirt off and threw that in the

17   dumpster?

18        A.    Yes.

19        Q.    And you want to Miami?

20        A.    Yes.

21        Q.    That was a yes?

22        A.    Yes.

23              MR. PATNER:   I have no further questions,

24        Judge, thank you.

25              THE COURT:   Redirect?
```

JUSTICE REPORTING SERVICES, INC.       523-6114

511

1          MR. GODWIN:  Just a couple questions.

2               RE-DIRECT EXAMINATION

3    BY MR. GODWIN:

4          Q.   Jeremy, when is the first time you told me

5    that you wanted to testify in this case?

6          A.   Just a few minutes ago when I came in.

7          Q.   Did you sit down and go over any of this

8    testimony?

9          A.   No, I didn't.

10         Q.   Did you tell the truth?

11         A.   Yes, I did.

12         Q.   Did you speak from your heart?

13         MR. PATNER:  Judge, object to self-serving.

14         THE COURT:  Yes, sustained, sustained,

15    sustained.

16    BY MR. GODWIN:

17         Q.   In your statement to Detective Walley did you

18    tell him several times about all the reports that have

19    been made on Patrick Brown?

20         A.   Yes, I did.

21         Q.   Have you told the truth here today?

22         MR. PATNER:  Judge, I will --

23         THE COURT:  Sustained, that's for the jury to

24    decide.

25         MR. GODWIN: Nothing further.

JUSTICE REPORTING SERVICES, INC.     523-6114

512

```
 1              THE COURT: Re-cross?

 2              MR. PATNER: No.

 3              THE COURT:  You are excused, sir, return to

 4         your seat.  Thank you.

 5              THE COURT:  Any additional witness for the

 6         defense?

 7              MR. GODWIN:  At this time, Your Honor, on

 8         behalf of the accused, Mr. Lockhart, we rest.

 9              THE COURT:  Okay, any additional witnesses

10         for the State?

11              MR. PATNER:  No, sir.

12              THE COURT:  Okay, folks that completes the

13         evidentiary phase of the trial and I need to speak

14         with the lawyers for a few minutes outside of your

15         presence.  It will actually be about fifteen

16         minutes so we'll take a fifteen minute recess at

17         the time.  If you have any notes please leave them

18         here.

19              (Thereupon, the following proceedings were

20         had outside the hearing of the jurors.)

21              THE COURT:  Okay.  Outside the presence of

22         the jury did you have a motion?

23              MR. GODWIN:  Judge, I'd move for a mistrial

24         first of all based on the prosecutor's cross

25         examination of my client.  I think it was highly
```

JUSTICE REPORTING SERVICES, INC.    523-6114

542

1    you or misstate the law but please bear in mind

2    the law comes from the Court not from the jury.

3    They have the right to refer to what they believe

4    the applicable law is but the actual law comes

5    from the Court not from the attorneys.

6        Number two, if you recall the evidence

7    different from the way the lawyers recall the

8    evidence it's your recollection that counts and

9    controls because you are the judges of the facts.

10    The lawyers are not the judges of the facts.

11        Now, under the rules of criminal procedure

12    each side gets an equal amount of time to address

13    the jury.  And each side will have 40 minutes.  So

14    under the rules of criminal procedure Mr. Godwin

15    will be speaking with you initially, to be

16    followed by Mr. Patner, to be followed by Mr.

17    Godwin.  Mr. Godwin.

18        MR. GODWIN: Good afternoon ladies and

19    gentlemen, now we are down to the real nuts and

20    bolts, the tough part of the case.  I'm going to

21    ask you to think back to some of the things we

22    talked about in jury selection some of the

23    principles of law that we talked about.  Now that

24    you folks are about to become the ultimate judge I

25    will ask you to remind yourself of the promises

JUSTICE REPORTING SERVICES, INC.        523-6114

EXHIBIT VII

543

1    that you made, the oath that you took and to
2    follow the law.  I know you going to do that, I
3    know you all ern the oath seriously and to apply
4    the law fairly in this case.  You recall that when
5    we started out you all agreed to follow the law
6    but the presumption of innocence.  You said you
7    would presume Mr. Lockhart innocent.  That the
8    burden of proof would be on who?  The burden of
9    proof would always be on the State.  And that Mr.
10   Lockhart and his attorney, we don't have to prove
11   anything.  And furthermore that the State has this
12   burden of proof by a certain standard.  Do you
13   recall you have to prove the case by a certain
14   standard beyond and to the exclusion of every
15   reasonable doubt.  The State hats to prove it's
16   case beyond every reasonable doubt.

17         You also said you agree with the principles
18   and protection of the law that everyone should be
19   treated fairly.  The legal issue in this case is
20   really quite simple.  Has the State, has the State
21   brought you proof beyond and to the exclusion of
22   every reasonable doubt that Jeremy Lockhart is
23   guilty of second degree murder?  That he acted out
24   of hatred, ill will, spite, or evil intent?
25   Hatred, ill will, spite, or evil intent.  That's

544

1    the legal issue.  Remember, the burden is on the

2    State to prove that he's guilty of second degree

3    murder.  Mr. Lockhart does not have to prove to

4    you that's acted in self-defense, remember that.

5    He does not have to prove that he acted in

6    self-defense it's an issue that we raised because

7    those are the facts of the case.  But keep in mind

8    that we the defense don't have to prove to you

9    that it was self-defense.  When I say self-defense

10   I mean defense of others as well self defense or

11   defense of others.  The law simply says if you

12   have a reasonable doubt, if you have a reasonable

13   doubt about his state of mind that he was acting

14   in self-defense then you must give him the benefit

15   of the doubt and find him not guilty.

16       Now, my client is accused of second degree

17   murder and his entire future depends on the

18   decision that's reached in this case.  I know you

19   take the responsibility seriously, we would rely

20   upon you to give careful consideration and

21   thought, full consideration to this matter.  And

22   if you believe - if you believe that the State has

23   not proved its case beyond a reasonable doubt then

24   stick to your guns and do the right thing and make

25   the hard decision in this case.  Do the right

1        thing and protect the rights of an American

2        citizen.   It's easy to say and I know you if I was

3        sitting in your position I could.   It's easy to

4        say we won't have any bias or prejudices that

5        effect us in reaching our decision.   But

6        nevertheless I think whether you recognize it or

7        not there is a certain bias in a case like this.

8        I mean if Jeremy Lockhart was charged with

9        stealing a loaf of bread to feed his family you'd

10       have probably some natural sympathy for him

11       because he was poor and had to steal to feed his

12       family.   That's the kind of thing that grabs a

13       person by the heart and says, you know, too bad

14       I've got to give him a break.

15            But here he's charged with murder, he's

16       charged with murder so there is a natural bias.   I

17       suggest there's a natural bias against Jeremy

18       Lockhart.   It's normal to want to seek to avenge a

19       wrong.   But you have to recognize any bias you

20       might have because of the nature of the charge and

21       you just say to yourself I'm go to doing my duty

22       if I'm going to recognize any bias I have, and I'm

23       going to set it aside and I'm going to follow the

24       law.

25            In a few minutes his honor Judge Speiser is

546

```
1    going to instruct you on what the law is in this
2    case.  One of the instructions he's going to give
3    you is, a reasonable doubt may arise from the
4    evidence, from conflicts in the evidence, and from
5    the lack of evidence.  Now, I've taken the liberty
6    of blowing up a few of the illustrations here that
7    I know you're going to be given.  And let me just
8    take a moment to go over this with you.

9        The judge is going to tell you - can you all
10   see that?  The judge is going to tell you that a
11   person is justified in using force likely to cause
12   death or great bodily harm if he reasonably
13   believes that such force is necessary to prevent
14   imminent death or great bodily harm to himself or
15   to another, his sister April Reese.  Or the
16   imminent commission of a forcible felony against
17   himself or another, basically another way of
18   saying the same thing.

19       A person is justified in using deadly force
20   if he reasonably believes it's necessary to
21   protect himself or his sister.  Now, you folks
22   heard the facts in this case, you heard what was
23   going on in that house.  There was a violent
24   struggle and Patrick Brown had April Reese down on
25   the ground and he was hitting her, and he was
```

JUSTICE REPORTING SERVICES, INC.      523-6114

547

```
 1      punching her.  And he was shoving her head into
 2      the floor, and he had previously split her head
 3      open with a baseball bat six weeks earlier and she
 4      had to go to the hospital.  She had to have
 5      staples put into her head.  That's what you call
 6      great bodily harm, that's serious.  That's a
 7      serious injury.
 8          Aggravated battery.  Aggravated battery is
 9      just one person slapping another person, punching
10      another person.  Aggravated battery is using
11      serious force, great force trying to do serious
12      bodily harm to somebody.  Here you have a young
13      woman who's laying on the floor.  She is being
14      attacked by her boyfriend and there's no doubt
15      about the fact that she started it.  I won't argue
16      about that for one second or minute.  April Reese
17      clearly started the fight.  She hit Patrick Brown
18      in the head with a beer bottle.  She was clearly
19      wrong but did that give Patrick Brown the right to
20      do what he did to her and to endanger her life?
21          My client tried his best to stop this fight.
22      He told them take it outside I don't want any
23      problems in here.  Patrick Brown is the one who
24      unlocked the door and let the people come back
25      inside.  You may say to yourself was Patrick Brown
```

1   really going to split her head open again?  Well,
2   you know what, the law doesn't require Jeremy
3   Lockhart to sit by on his hands and wait and see
4   if his sister's head was split open again and she
5   was hospitalized again.  The law says in deciding
6   whether the defendant was justified in the use of
7   force likely to cause death or great bodily harm
8   you must judge him by the circumstances in which
9   he was surrounded at the time the force was used.
10  The danger facing the defendant need not have been
11  actual.  However, to cause death or great bodily
12  harm the appearance of danger must have been so
13  real that a reasonable prudent person, cautious
14  and prudent person under the circumstances would
15  have believed the danger could have been avoided
16  only through the use of that force.  Based upon
17  the appearance the defendant must have actually
18  believed that the danger was real.

19      Now, did Jeremy Lockhart have a reasonable
20  basis for believing that his sister's welfare was
21  in danger when she is laying on the floor and Mr.
22  Brown is smashing her head into the floor and he
23  pulls Mr. Brown off of her and Mr. Brown punches
24  him and then goes back to kicking her between the
25  legs.

1       Did Jeremy Lockhart have to wait and say

2    well, go ahead beat her some more maybe you won't

3    put her in the hospital this time?  The law says

4    Jeremy Lockhart had the right to use force to

5    protect his sister, to protect a member of his

6    family that's what this is all about, protecting a

7    member of your family.

8       Now again keep in mind, folks, I don't have

9    to prove to you - I don't have to convince you

10   beyond a reasonable doubt that he had a right to

11   use deadly force.  That's very important.  I don't

12   have to prove that to you.  All I have to do is

13   raise the issue if you have and if have a tiny,

14   tiny, microscopic reasonable doubt that Jeremy

15   Lockhart was trying to protect his sister and had

16   the right to do what he did you must give him the

17   benefit of the doubt and find him not guilty.

18      One other principal of law I want to discuss

19   with you very briefly is that Florida has what's

20   known as Causwell (phonetic) doctrine.  Generally

21   speaking if a person has a fight he has a duty to

22   retreat from using force, retreat if he can.  But

23   the judge is going to tell you if the defendant

24   was attacked in his own home and on his own

25   premises, that's where this happened in his own

JUSTICE REPORTING SERVICES, INC.    523-6114

1      home, he had no duty to retreat.  He didn't have

2      to run away and leave his sister there.  And he

3      had the lawful right to stand his ground and to

4      meet force with force and to the extent of using

5      force likely to cause death or great bodily harm

6      if necessary to prevent great bodily harm to

7      another, his sister.

8           You see how that applies in this case?

9      That's what this case is all about.  Jeremy

10     Lockhart was protecting his sister from an

11     assault.  His sister who's been hospitalized and

12     had her head split open by Patrick Brown six weeks

13     earlier.  Who had been beaten by Patrick Brown in

14     front of nightclub, punched in the jaw and knocked

15     down.

16          Patrick Brown wanted to have the both.  He

17     wanted to have two girlfriends a lot of people

18     want to do that but he had no right to beat this

19     woman and put her in the hospital.  It's not right

20     to do what he did to her on that day, kicked her

21     between the legs.  Kicked her in the head.  Kicked

22     her in the kidney.  Jeremy Lockhart was doing what

23     any brother would do under any circumstances,

24     trying to protect his sister's well-being.

25          Now there is  one other issue in this case I

551

1     want to discuss with you just very briefly.  We
2     all talked about checking biases at the front
3     door.  And you said you'd try to do that, said you
4     would follow the law.  Jeremy Lockhart had a
5     firearm with him.  I don't how you feel about
6     that, if you like them or you don't like firearms
7     at all, maybe he had no business having a firearm,
8     and I'm not going to disagree with you on that for
9     a second.  You have every single right to hold
10    that opinion.  You don't like firearms, maybe you
11    don't like people who have firearms so that's okay
12    to have those feelings.  But that can not become
13    an issue in this case.  This is where you have to
14    remember that you are the judges and you have to
15    set aside your feelings about firearms and put
16    them aside because he's not charged in this case
17    with a firearm violation.  What he's charged with
18    is murder.  And you can not base your decision in
19    this case with the fact that you don't like the
20    fact that he had a firearm.  Or maybe you don't
21    like the fact that he was smoking marijuana or
22    drinking beer.  You're entitled not to like those
23    things, but you must do your duty.

24         Remember your oath that you would put those
25    feelings aside and just follow the law in this

JUSTICE REPORTING SERVICES, INC.      523-6114

1    case?  So when you go back in the jury room if
2    someone starts to say, you know, that kid had no
3    business having a firearm.  I agree with you but I
4    hope one of you will be strong enough to stand up
5    and say, you know, that's not the issue here,
6    that's not the issue.  The firearm is not the
7    issue.  The issue is whether he was justified in
8    protecting his sister from the beating she was
9    taking.  That's what the case was about.  He was
10   in his own home and he had a gun.  I don't like it
11   and maybe you don't like it but you must follow
12   your oath and not let that the become an issue
13   which clouds your judgment in this case.  So I'm
14   asking one of you to stand up and say if it comes
15   up in the jury room this kid had no business
16   having a gun, he's not charged with that, okay.
17   He's charged with murder and he did have the right
18   to use reasonable force to protect his sister and
19   that's what he did in this case.

20        So again I'd ask you to come back to when we
21   started.  I'm asking you to presume Jeremy
22   Lockhart innocent.  Remember that the State has
23   the burden of proof and we don't have to prove
24   anything.  Jeremy didn't even have to testify in
25   this case.  But he did, he got up and told you his

JUSTICE REPORTING SERVICES, INC.    523-6114

553

1      side of it.  He didn't have to prove that he is

2      innocent, and the State has to prove guilt beyond

3      a reasonable doubt and they have failed do so.

4          After Mr. Patner comes up and speaks to you I

5      will stand up here one more time and I believe I

6      can show beyond all doubt that you should find Mr.

7      Lockhart not guilty.

8          Thank you very much.

9          THE COURT:  Thank you Mr. Godwin.  Mr.

10     Patner.  Are you two in the agreement if the tape

11     s being played the court reporter does not need to

12     take down the tape?

13         MR. GODWIN: Yes, Your Honor.

14         MR. PATNER:  Ladies and gentlemen of the

15     jury, unlike the defense attorney this is my last

16     opportunity to speak to you and I first want to

17     say thank you all for sitting here.  Its been

18     hectic for several days and there's been a lot of

19     witnesses.  And quite a few yesterday you've had

20     to leave and come back in that maybe made it seem

21     may longer or maybe shorter.  You may have heard

22     about trials in other parts of the country that

23     last a lot longer then this but just because it

24     was three days doesn't mean it's not important.

25         The defendant is charged with second degree

570

```
 1    not going to have you deliberate today we are
 2    going to have you come back tomorrow morning to
 3    deliberate, okay, because by the time we finish
 4    closing argument and I give you the jury
 5    instructions on the law you wouldn't get the case
 6    until 5:30. And of course there is no time limit
 7    on deliberations so I'm going to ask you to come
 8    back tomorrow at 9:00 and then we'll give you the
 9    case then and you can begin your deliberations,
10    okay.
11         MR. GODWIN: I know you folks are tired. And
12    this is my last opportunity to speak to you on
13    behalf of the accused, Jeremy Brown, Jeremy
14    Lockhart, excuse me. I think you've heard the
15    expression taken out of context. The prosecutor
16    played a one, maybe five second portion of the
17    entire conversation that Mr. Lockhart had with
18    Detective Walley. Take that statement back into
19    evidence and listen to it, and listen to it in the
20    entire context and you will hear what Jeremy
21    Lockhart said when he was asked where was - where
22    was Patrick when he shot him. He was steadily
23    kicking at April at that time. How far away from
24    you? About three feet. He said he was steadily
25    kicking at April at that time. If you believe
```

JUSTICE REPORTING SERVICES, INC.    523-6114


EXHIBIT VIII

571

1    that Jeremy Lockhart shot his best friend because

2    his best friend punched him that's one thing,

3    that's not what this case was all about.

4         Jeremy Lockhart's best friend was beating up

5    and seriously injuring or about to seriously

6    injure April Reese. The law says if in your

7    consideration of the issue of self-defense you

8    have a reasonable doubt on the question of whether

9    or not the defendant was justified in the use of

10   force likely to cause death or great bodily harm

11   you should find the defendant not guilty.

12        Now, you heard the prosecutor stand here a

13   moment ago and say if you feel in your heart it

14   was defense of others then you should vote not

15   guilty. Well, that sounds good but that is not

16   the law. It's not if you feel in your heart it

17   was defense of others. The question is if you

18   have a reasonable doubt, if you've heard evidence

19   that causes you to have a reasonable doubt to say

20   that Jeremy Lockhart was trying to defend his

21   sister and he didn't have hatred or ill will or

22   spite or evil intent, if you have a reasonable

23   doubt about what was going on in Jeremy's mind

24   then you must find him not guilty.

25        Remember I don't have to prove to you that he

JUSTICE REPORTING SERVICES, INC.     523-6114

572

 1    had a right to use deadly force.  I don't have to
 2    prove that, that's very important.  All you have
 3    to do is listen to these facts and say you know I
 4    don't know if he did it.  I don't know if he
 5    didn't.  I'm not really sure, I'm not sure if it
 6    was justified or not.  If that's the way you feel
 7    in your gut say I'm not sure if he could have
 8    called the police maybe he had to protect his
 9    sister right then and then there.  If you're not
10    sure then you know what the answer is.  You have a
11    reasonable doubt and you must vote not guilty.
12    You must vote not guilty.  That is what the law
13    is.   That is the law that protects each and
14    everyone of us.

15    Anybody can find themselves in a terrible
16    situation like this and that person might have to
17    act quickly.  And you have to judge Jeremy
18    Lockhart by the circumstances he was facing at
19    that moment.  It's easy to sit back here now and
20    say gosh Jeremy why didn't you call the police?
21    Why didn't you tie him up?  Why didn't you
22    handcuff him?  Why didn't you do this?  Why didn't
23    you do that?  Jeremy was acting in the moment when
24    the confrontation was going on.  He knew his
25    sister had previously had her head split open and

1      there's no dispute about that but the prosecutor
2      says where is the proof?  Where is the proof?  Who
3      has the burden of proof?  Who has the burden of
4      proof?  The prosecution.

5          Jeremy gave his statement to the police.  He
6      told the police what happened.  He stood up here
7      and told you folks what happened.  He subjected
8      himself to the cross examination of the
9      prosecutor.  He wanted you to hear out of his own
10     lips and from his own heart what was going on.  If
11     you think that boy had murder in his heart fine.
12     If you think he was sorry and didn't mean to do it
13     and he acted only out of desperation to protect
14     his sister then you've got to give him the benefit
15     of the doubt.  The law says you must give him the
16     benefit of the doubt and find him not guilty.

17         Jeremy said to the police I did this for
18     somebody I loved dearly.  Who do you mean?  My
19     little sister.  He didn't say I did it because, I
20     did this because Patrick punched me.  There's no
21     evidence he did this because Patrick punched him.
22     He was trying to stop the fight, Jeremy tried to
23     keep peace that day.  You heard all the testimony
24     about that.  That's why I hurt because I killed my
25     best friend over her, over her.  The young lady

JUSTICE REPORTING SERVICES, INC.    523-6114

574

```
1    was kicked in the genitalia, kicked between the
2    legs.
3         I told Detective Walley and I'm not trying to
4    be cute with the detective but obviously he didn't
5    go out an conduct an examination to see whether
6    she had been kicked in the genitalia or not.
7    Jeremy Lockhart did not have to wait, Jeremy
8    Lockhart did not have the wait until his sister's
9    head was split open again.  If you're out walking
10   in the dessert and you see a rattlesnake that's
11   poised and ready to strike you, you don't have to
12   wait for it to bite you before you can use defense
13   to kill it.  Well that's the law folks.
14        Jeremy did not have to wait until his sister
15   went into the hospital again.  He tried to keep
16   peace he did everything he could.  Patrick Brown
17   let the girls back in that day.  Patrick Brown
18   maybe enjoyed the little argument going on about
19   him.  Jeremy was acting in what he thought was a
20   proper way to protect his sister.  He didn't want
21   to do it, and it broke his heart to do it.
22        Now we can say how come he didn't call the
23   police?  Because he is a young kid, he's scared
24   and he got scared and went to his grandparents the
25   people who raised him.  Is that so unusual for
```

1    anybody who's been involved in a shooting to be

2    traumatized? We hear about police officer who

3    shoot people the people always say I was so

4    traumatized after I shot I didn't know what I was

5    saying. I didn't know what I was doing. Jeremy

6    is not a trained police officer he's just a young

7    kid and he fired and killed his find. What other

8    reaction would he have but to want to go there?

9    And he went there and then he came back and told

10   the police this is where the gun is.

11   And the police never bothered to go get it

12   and that would solve the issue right then and

13   there if it was an automatic or not. If you have

14   some question in your mind as to whether this was

15   an automatic why didn't the police go and get the

16   gun? Jeremy shot the gun and he went and pointed

17   out to them where it was and they decided to leave

18   it in the lake.

19   It's the State that has the burden of proof.

20   The State has to bring you the evidence not the

21   defense. Keep that in mind, please. It's the

22   State that has to bring you the evidence. Also

23   keep in mind there's no duty to retreat when

24   you're attacked in your own home. The judge will

25   give you that instruction. A person's home is his

1    castle.  Jeremy had the right to try and keep the

2    peace in his own home.

3        Listen to the tape.  And on the issue of the

4    firearm again I'd ask you - he's not charged with

5    illegal possession of a firearm in this case

6    that's not what this case is about.  I don't like

7    the firearm anymore then you do but he was in his

8    own home and he told you he lives in a rough

9    neighborhood so he had it for protection.  You

10   don't have to like the firearm, I don't like it

11   but that's not the issue and if there is someone

12   back there saying that kid had no business having

13   a firearm one of you please stand up and say you

14   know what you're not here to judge him on whether

15   he had a right to have the firearm or not.  We are

16   here to judge whether he used force to protect his

17   sister.  Whether we have a reasonable doubt that

18   he had the right to use that force.  That's really

19   what the case is about.

20       You have to really ask yourself this one

21   question.  Did Jeremy have to wait until Patrick

22   put her in the hospital again?  Is that what the

23   law requires?  And the answer is no.  This is a

24   difficult case because someone has been killed and

25   no one likes that.  No one is asking you to go

/

577

1    back and prove a killing.  That's not what this is

2    about.  This is about the rights of a citizen, a

3    young man, a family man, to try to keep his home

4    in peace and trying to protect his sister from an

5    attack.  He doesn't like what he did anymore then

6    any of us do.  You saw him on the stand here.  You

7    saw the emotion.  You can judge whether he is

8    sincere or not.  I'd ask you to give him the same

9    benefit of doubt that you would want if you were

10   in his place.  I ask you to find him not guilty.

11   Thank you.

12        THE COURT:  All right.  Folks I'm now going

13   to read you the law that's applicable to the

14   evidence in this case and then we'll adjourn and

15   then we'll reconvene tomorrow at 9:00.  I will ask

16   you to be here at about ten minutes to nine and

17   then you'll retire to begin your deliberations.

18        Okay, before I read you the applicable law

19   I'm going to re-read to you an indictment, a copy

20   of which will be given to you to take back into

21   the jury room.  The charge again is that Jeremy

22   Lockhart on June 25th, 1994 in Broward County

23   state of Florida did then and there unlawfully and

24   feloniously by an act imminently dangerous to

25   another, and evincing a depraved mind regardless

524

1      that's what our theory is and that's why you need

2      to give that instruction.

3            THE COURT:  Okay, I'll give that.  Mere

4      threats?

5            MR. PATNER:  No.  Judge, what are we going to

6      have if it was necessary to prevent, are you going

7      to give both or those?

8            THE COURT:  No just death or get bodily harm

9      to himself or April Reese.

10           MR. GODWIN: Or the commission of a forcible

11     felony which is an aggravated battery.

12           THE COURT:  Okay, I will give that.  Prior

13     threats, no.  Reputation of the victim?

14           MR. GODWIN: Yes, we'd ask for that.

15           MR. PATNER:  No, Judge, there is --

16           THE COURT:  There is no testimony about

17     reputation in this case.

18           MR. PATNER:  That's correct.

19           MR. GODWIN: Your Honor, my client testified

20     -- the State put my client's statements into

21     evidence and he told the police officer repeatedly

22     in his statement that Patrick Brown was known for

23     starting fights.  There were many reports on

24     Patrick Brown and that he also testified that he

25     saw specific acts of violence by Patrick Brown

EXHIBIT IX

1    against --

2        THE COURT:  Okay where in that report did he

3    say -- where in the statement?

4        MR. GODWIN: Referring to page eight of the

5    transcript.  I don't think the transcript in

6    evidence is highlighted and underlined there and

7    also he mentioned it in other portions of the

8    statement.  I will show you.

9        THE COURT:  Several reports on him, no that's

10   not enough for me.  Go ahead what else do you

11   have?  Because there is several reports been

12   called in on Patrick Brown about him and my sister

13   getting into it, my daddy and I made --

14       MR. GODWIN: Uh-huh (affirmative response.)

15       THE COURT:  No.

16       MR. GODWIN: I think -- Your Honor, I think we

17   have shown sufficient predicate, sufficient

18   predicate to have the Court give that instruction

19   on the reputation of the deceased.

20       THE COURT:  State?

21       MR. PATNER:  Judge, the two specifically say

22   proving reputation to prove the victim's

23   reputation in the community for the peacefulness

24   or aggressiveness was not done.  He had to under

25   90.405 I believe it's 405, certainly under case

```
 1      law about reputation not by specific acts which we
 2      only heard one of frankly, but by reputation of
 3      the community after speaking to people in the
 4      community.  Now, I said before you had to have ten
 5      or fifteen people and I didn't find that case
 6      Wisinski, W-I-S-I-N-S-K-I a fourth district '87
 7      case said discussions amongst four or five people
 8      is not enough testimony nor predicate laid for any
 9      type of reputation of victim for violence.
10              THE COURT:  I'm not giving it.
11              THE COURT:  Physical abilities, nothing here
12      to indicate, you know, that one was bigger then
13      the other here from what I have heard, no.  Theory
14      in all cases, I'll read those two paragraphs.
15      Okay, then that leads us to reasonable doubt, do
16      you want that instruction?
17              MR. GODWIN:  Well, yes.
18              THE COURT:  All right, we'll give you that
19      one.
20              MR. GODWIN:  What page are you on, Judge?
21              THE COURT:  Just finished 12 and 13 now I'm
22      on fourteen, weighing the evidence 2.04.  One
23      through five.  I will give -- with me?
24              MR. GODWIN:  One second, Judge, I'm trying to
25      catch up with you.
```

**Exhibit 8**

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA

    Plaintiff,

vs.

JEREMY LOCKHART,

    Defendant.

_____/

CASE NO.   94-10764CF10

DIVISION: FA

JUDGE:     JULIAN

## ORDER DENYING DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF

THIS CAUSE having come on this day upon the Defendant's Motion for Post-Conviction Relief, and the Court having considered same along with the State's Response thereto, being fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that the Defendant's Motion for Post Conviction Relief, is hereby DENIED for reasons outlined in the State's Response, a copy of same is attached hereto and made a part thereof.

DONE AND ORDERED at Fort Lauderdale, Broward County, Florida, this ___11th___ day of ___September___, 1998.

                                   JOYCE A. JULIAN
                                   Circuit Court Judge

cc:  Defendant
     State Attorney's Office

**Exhibit 9**

IN THE CIRCUIT COURT OF THE ___17th___ JUIDICIAL CIRCUIT
IN AND FOR __Broward__ COUNTY, FLORIDA

JEREMY Lockhart.
**Appellant/Defendant,**

vs.

CASE NO.: __94-10764CF10A__

STATE OF FLORIDA,
**Appellee/Plaintiff.**

JUDGE: Joyce A. Julian

RECEIVED
FILE OF THE ATTORNEY GENERAL
OCT 28 1998
CRIMINAL DIVISION
WEST PALM BEACH

**NOTICE OF APPEAL**

RECORD

NOTICE IS GIVEN that __JEREMY Lockhart__, Defendant/Appellant,
pro se, and pursuant to Rule 9.140(i), Florida Rules of Appellate
Procedure, appeals to the __Fourth__ District Court of Appeal,
the Order of this Court rendered on the __11th__ day of __SEPTEMBER__
199_8_. The nature of the order is a final order denying __3.850__
__Post Conviction Relief Motion__.

STATE OF FLORIDA
BROWARD COUNTY
I DO HEREBY CERTIFY the within and foregoing is a true
and correct copy of the original as it appears on record
and filed in the office of the Circuit Court Clerk of Broward
County, Florida.
Witness my hand and official seal at Fort Lauderdale,
Florida this __28__ day of __Oct__ A.D. 19 _98_.
Robert E. Lockwood, Clerk

Deputy Clerk **CETIFICATE OF SERVICE**

/s/ Jeremy Lockhart

Washington Correctional Inst.
4455 Sam Mitchell Drive
Chipley, Florida 32428

I HEREBY CERTIFY, that a true copy of the the foregoing Notice
Of Appeal, has been furnished to Office of the State Attorney,
__Michael G. Satz 201 S.E. 6th Street Ft. Lauderdale Florida 33301__,
and the Attorney General, Hon. Robert A. Butterworth, The Capital-
Legal Affairs, __West Palm Beach, Fla 33401-2299__ by placing same in the
U.S. Mail this __6__, day of __October__, 199_8_.

/s/ Jeremy Lockhart

IN THE CIRCUIT COURT OF THE _SEVENTEENTH_ JUDICIAL CIRCUIT
IN AND FOR _BROWARD_ COUNRT, FLORIDA

_JEREMY Lockhart_.
     Defendant/Appellant,

vs.                   CASE NO.: _94-10764CF10A_

STATE OF FLORIDA,
     Plaintiff/Appellee.

_____/

### MOTION FOR LEAVE TO PROCEED ON APPEAL
### WITHOUT PRE-PAYMENT OF COSTS OR FEES

Defendant/Appellant, _JEREMY Lockhart_ , PRO SE, and
pursuant to Rule 9.430, Florida Rules of Appellate Procedure; and
moves this Court to render an Order allowing Defendant/Appellant to
proceed on appeal in the above-styled cause, without pre-payment of
the costs, fees or to security thereof, as the attached affidavit
would show in support.

                     _Jeremy Lockhart_
                              pro se

Washington Correctional Inst.
4455 Sam Mitchell Drive
Chipley, Florida 32428

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Motion for
Leave to Proceed on Appeal Without Pre-Payment, and Affidavit Of
Insolvence attached thereto, has been furnished to the Office of the
State Attorney, _Michael G Satz. 201 SE. 6ª St. Ft Lauderdale. Flouds. 33301_
and the Attorney General , Florida, Hon. Robert Butterworth, The
Capital-Legal Affairs, _West Palm Beach, Fla. 33401-2299_ . by placing
same in the U.S. Mail this _6_ day of _October_ , 199_8_.

                     _Jeremy Lockhart_
                              pro se

IN THE CIRCUIT COURT OF THE _SEVENTEENTH_ JUDICIAL CIRCUIT

IN AND FOR _BROWARD_ COUNTY, FLORIDA

Case No. _94-10744CF10A_

_JEREMY Lockhart_
_Defendant_ / Appellant,

v.

_STATE of Florida_
_Plaintiff_ / Appellee,

_____/

## AFFIDAVIT OF INSOLVENCY

As required by the court, I hereby answer the following questions under oath:

1. Are you presently employed in an inmate work program within the Department of Corrections?

___YES   ✓NO

a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (list both gross and net salary)

b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received. _date_ / _Salary_ /Month
_6/27/94_ / _$350_ / _1,400_

2. Are you presently employed in a work release program?

___YES   ✓NO

a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (list both gross and net salary)

b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.
_6/27/94_ / _$350_ / _1,400_

3  Are you gainfully employed in any capacity?

___YES        ✔NO

a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (List both gross and net salary)

b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.

*6/27/94 /350⁰⁰ /1,400*

4.  Do you own any cash, or do you have money in checking or savings accounts?

___YES        ✔NO  (Include any funds in prison accounts.)

If the answer is "yes," state the current balance $_____, and attach a printout or statement showing all of the account activity for the last three months.

5.  Do you own or have any interest in any real estate, stocks, bonds, notes, automobiles or other valuable property (excluding ordinary household furnishings and clothing)?

___YES        ✔NO

If the answer is "yes," describe the property and state its approximate value.

6. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

_____
SIGNATURE

STATE OF FLORIDA
COUNTY OF _Washington_

Sworn to and subscribed before me this _6_day of _October_ 1998 by _JEREMY_

_Lockhart_, # _18823_, who has shown D.O.C. identification and did take an oath that

the above is true

(SEAL)

Rodney A. Coffey
MY COMMISSION # CC487103 EXPIRES
August 8, 1999
BONDED THRU TROY FAIN INSURANCE, INC.

_____
NOTARY PUBLIC
My Commission Expires:

IN THE CIRCUIT COURT of THE 17TH JUDICIAL CIRCUIT IN
AND FOR BROWARD county, FLORIDA.

JEREMY Lockhart
   Defendant / Appellant

VS.

   CASE No: 94-10764CF10A
   Judge: Joyce A. JULIAN

STATE of FLORIDA
   Plaintiff / Appellee(s)

## JUDICIAL ACTs to BE REVIEW

COMES NOW the Defendant / Appellant JEREMY Lockhart
hereby set foweth the following Judicial Act he seeking review
on Appeal:

1) Conviction Obtained In Violation of Defendant Fundamental
Right TO A Fair and Impartial TRIAL By JURY.

2) Multiple Enhancement Penalties Imposed On The
Defendant Violation His Right To Protection Against
Double Jeopardy.

3) Incompetence and Ineffective Assistance of Trial
Counsel.

( 1 )

<u>CETTFTCATE OF SERUICE</u>

I HEREBy CERTIFy that a true and correct copu of the foregoing has been furnished VIA US MAIl to _State Attorney Michael n. Satn 201 S.E. 6ᵗʰ St Ft Lauderdale Florida, 33301_ and by U.S. MAIl to the _Attorney General Robert A. Butterworth 1655 west Palm Beach Lake_ this 6 Blvd. West Palm Beach, Florida 33401 day of _October_ 1998

_Jeremy Lockhart_
PRO SE
JEREMy LockHart DC#188231
WAShington Correctional Institution
4455 SAM Mitchell Drive (FIIO.
Chipley, FLORidA. 32428

(2)

**Exhibit 10**

# M    A    N    D    A    T    E

from

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Barry J. Stone, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

DATE:                    January 5, 1999

CASE NO.:                98-3769

COUNTY OF ORIGIN:        Broward

T.C. CASE NO.:           94-10764 CF10

STYLE:                   Jeremy Lockhart v State



**RECEIVED**
OFFICE OF THE ATTORNEY GENERAL

JAN 0 6 1999

CRIMINAL DIVISION
WEST PALM BEACH

Marilyn Beuttenmuller, Clerk
District Court of Appeal
Fourth District

ORIGINAL TO:    Hon. Robert E. Lockwood, Clerk

cc:    Jeremy Lockhart
       Attorney General - W Palm Beach
       State Attorney #17

/AL

**Exhibit 11**

rb
Ci - cd

**IN THE DISRTICT COURT OF APPEAL**
FOR THE _Foueth_ DISTRICT
STATE OF FLORIDA

RECEIVED
UFFICE OF THE ATTORNEY GENERAL

JAN 0 6 1999

CRIMINAL DIVISION
WEST PALM BEACH

_Jeremy Lockhart_ .
Petitioner,

vs.
_STATE of Florida_
Repsondent.

CASE NO.: _____
LT No. 98-3769

### NOTICE TO INVOKE DISCRETIONARY JURISDICTION

**NOTICE IS GIVEN** that _Jeremy Lockhart_ , pro se, and pursuant to Rule 9.030(a)(2)(4), Florida Rules of Appellate Procedure, invokes the discretionary jurisdiction of the Florida Supreme Court to review the decision of this Court rendered on the _16_ᵀᴴof _December_ , 199 _8_ .

The decision is within the discretionary jurisdiction of the Florida Supreme Court because it is a decision that expressly conflict with a previous decision of the Florida Supreme Court or of a nother districe Court of appeal.

**RESPECTFULLY SUBMITTED** this _4_ day of _JANUARY_ , 199 _8._

/s/ _Jeremy Lockhart_
_DC# 18231_    pro se
Washington Corr. Inst.
4455 Sam Mitchell DR.
Chipley, Florida 32428

### CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a copy of the foregoing has been furnished by U.S. Mail, to:
_Robert Butterworth_
_Attorney General_
_1655 Palm Beach Lake Blvd_
_W. Palm Beach Fl 33401_
on this _4_ day of _January,_ , 199 _8_ .

_Jeremy Lockhart_
pro se

**Exhibit 12**

# Supreme Court of Florida

THURSDAY, JANUARY 28, 1999

| | | |
|---|---|---|
| JEREMY LOCKHART, | ** | |
| Petitioner, | ** | CASE NO. 94,744 |
| vs. | ** | District Court of Appeal |
| | | 4th District - No. 98-3769 |
| STATE OF FLORIDA, | ** | |
| Respondent. | ** | |

It appearing to the Court that it is without jurisdiction, the Petition for Review is hereby dismissed. <u>Jenkins v. State</u>, 385 So. 2d 1356 (Fla. 1980).

No Motion for Rehearing will be entertained by the Court.

A True Copy

TES

Sid J.
Clerk Supreme Court

H

cc:  Hon. Marilyn N. Beuttenmuller , Clerk
Hon. Robert E. Lockwood, Clerk
Hon. Joyce Julian, Judge

Mr. Jeremy Lockhart
Hon. Robert A. Butterworth

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

FEB 01 1999

CRIMINAL DIVISION
WEST PALM BEACH

**Exhibit 13**

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

JEREMY LOCKHART                          CASE NO. 95-03410

Appellant(s),

vs.

STATE OF FLORIDA                         L.T. CASE NO. 94-10764 CF10A
                                         BROWARD
Appellee(s).

February 28, 1996

BY ORDER OF THE COURT:

        ORDERED that appellant's motion filed February 23, 1996,
for supplemental record and toll time for filing initial brief
is granted. The material requested in the motion shall be
included in the record on appeal. Appellant shall be
responsible for prompt preparation and filing of the
supplemented material within twenty (20) days from the date of
this order; further,

        ORDERED that the time for filing appellant's initial
brief is tolled pending receipt of the supplemental record.

I hereby certify the foregoing is a
true copy of the original court order.

                                         RECEIVED
                                         OFFICE OF THE
                                         ATTORNEY GENERAL

                                         JUN  6 1996

MARILYN BEUTTENMULLER                    CRIMINAL OFFICE
CLERK                                    WEST PALM BEACH

cc:  Attorney General-W. Palm Beach
     Robert E. Lockwood, Clerk  (Copy of motion attached)
     Public Defender 15

/CH                                      7-0313

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FOURTH DISTRICT

JEREMY LOCKHART )
)
)
Appellant, )
)
vs. ) Case No. 95-3410
)
STATE OF FLORIDA )
)
Appellee. )



### UNOPPOSED MOTION FOR SUPPLEMENTAL RECORD AND TOLL TIME FOR FILING INITIAL BRIEF

Appellant by and through undersigned counsel, moves this Court for an Order supplementing the record with the following:

State's Exhibit #2 (Defendant's typed statement to Detective Michael Walley, dated January 27, 1994). The court reporter was Michelle Meeker, Justice Reporting Services, Inc.

Appellant states the following grounds:

1. It is essential to the appellant's appeal for appellate counsel to review the contents the statement. The appellant would receive ineffective assistance of appellate counsel if undersigned counsel fails to review the documents.

2. Assistant Attorney General Michelle Koenig, has represented to undersigned counsel that she has no objection to this motion to supplement.

3. Appellant also requests the tolling of the 30-day time period in which Appellant's Supplemental Brief is due until undersigned counsel receives the supplemental record on appeal.

WHEREFORE, Appellant respectfully requests an order granting this motion to

supplement and to toll the time for filing Initial Brief.

> Respectfully Submitted,
> RICHARD L. JORANDBY
> Public Defender
> 15th Judicial Circuit of Florida
> 9th Floor, Governmental Center
> 421 3rd Street/6th Floor
> West Palm Beach, Florida 33401
> (407) 355-7600
>
> JOSEPH R. CHLOUPEK
> Assistant Public Defender
> Attorney for Jeremy Lockhart
> Florida Bar No. 434590

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has been furnished by courier to

Michelle Koenig, Assistant Attorney General, Third Floor, 1655 Palm Beach Lakes

Boulevard, West Palm Beach, Florida 33401 by courier this **22ND** day of February,

1996.

Attorney for Jeremy Lockhart

2

OR# 94-100329

DEATH (HOMICIDE)

The following is the statement of JEREMY LOCKHART as given to Det. Walley on June 27, 1994 and is beginning at 11:51 a.m.

Q. Jeremy, as a police officer that means that I can take statements that are sworn to or given under oath. Would you raise your right hand. Do you swear that what you're about to tell me is the truth and nothing but the truth so help you God?
A. Yes sir.
Q. Jeremy, for the record would you just tell me your full name and your birthday.
A. Jeremy Lockhart, date of birth 5/28/71.
Q. And you live where?
A. 2215 N.W. 9 Street, Bldg. 5, Apt. 3.
Q. Jeremy, you came in this morning and you came into the police station with Monica.
A. Yes sir.
Q. And Monica is your wife.
A. Yes sir.
Q. And you knew the police were looking for you and you came in to turn yourself in.
A. Yes sir.
Q. And when you came up here I first explained to you who I was.
A. Yes sir.
Q. This was about I guess 10:40 a.m. that you came in and I told you that I was one of the detectives that was in charge of the case.
A. Yes sir.
Q. And, you know, you came back here and we were in one of the interview rooms and I went out and did some paperwork and I explained to you what was going to happen, that you were going to be charged with murder and that all of the statements, the witness statements and all of the witnesses and the police would go and they would testify if the State Attorney wanted at what is called a Grand Jury Hearing.
A. Yes sir.
Q. And at that time they would ask questions of all the witnesses and then they would decide, they ultimately decide what crime you should be charged with but right now as far as the police are concerned you're charged with murder.
A. Yes sir.
Q. Okay. And I was out doing some paperwork and you knocked on the door and said, told Det. Stone that you wanted to know if I was going to take your statement.
A. Yes sir.
Q. And you told me that you want to give your side of it.
A. Yes sir.
Q. So that they can hear that also.
A. Yes sir.
Q. When I came in I read you your rights from this piece of paper that's in front of us.
A. Yes sir.
Q. And I read this to you.
A. Yes sir.
Q. Did you have any trouble understanding?
A. No sir.

Det. M. Walley  #FL713          27 June 1994          #FL7065bc

DEATH (HOMICIDE)

PAGE #2 - JEREMY LOCKHART

Q.  And I wrote down what you said back to me every time I read one of
    these things, is that right?
A.  Yes sir.
Q.  And then you printed your name here.
A.  Yes sir.
Q.  And then I read this last paragraph.
A.  Yes sir.
Q.  Jeremy, have I mistreated you in any way?
A.  No sir.
Q.  Has any police officer mistreated you since you came in here?
A.  No sir.
Q.  Why don't you start in the very beginning and just tell me exactly
    what happend.
A.  How that day went?
Q.  Yeah.
A.  Alright, it was about 11:00, about 11:45. Patrick Brown was over,
    came over to my house right before my wife left to go to her mother's
    house. We were sitting out there talking. We played with my little
    daughter for a little while. My wife left and went with her mother
    cause she had to go to a job interview, I think that's what she was
    going to that day. Alright, after she left we stood out there. One,
    one of the guys across the hall from me, I asked him, say would you
    want, you want to play some cards, said we can chip on some beer,
    alright.
Q.  You could do what?
A.  We all, we can all chip on some beer so we can have something to drink
    while we're playing cards. So they went and got the beer. Me and
    Patrick stayed there. I went back in the house, took me a shower.
    By the time I got out of the shower he was standing in the house, you
    know, cause he was like a brother to me. We were real close. So I
    got out of the shower, I get dressed. After a while he comes back
    in and tells me that his son's mother, two month old baby's mother was
    outside, her name is April. Alright, he's standing over there talking
    to her. He had, we had not too long got through fixing his car,
    working on his car. So she was going to take his car to her house
    and park it until he get his tag, tag and everything right on the car.
    Okay, she left in the car. She left me and him with the baby. So we
    go back in the house and we sitting, sitting there in front of the
    fan listening to the radio. The other two guys come back, started
    playing spades. Then they left. No, we started playing spades.
    After, while the girl April was gone my little sister came, April
    Reese. She came by, walked in the house. She seen Pat, Patrick
    Brow known as Bump, that what we call him, Bump.
Q.  Bunk?
A.  Bump, Bump. Alright, he was sitting in the chair. His little baby
    sitting him but she didn't even pay no attention to the little baby.
    She was just wondering, she noticed everybody in the house cause we
    grew up around there in the neighborhood, everybody know us. So she
    walked in, asked where my wife was. I told her she was going to her
    mom's house. So she walks back outside. At that time Bump aid boy
    I don't know what I'm going to do. I said Bump I been told you to
    Det. M. Walley #FL713      27 June 1994         #FL7065bc (con't)

OR# 94-100329

DEATH (HOMICIDE)

PAGE #3 - JEREMY LOCKHART

A. (con't) go on ahead and tell her that you got a baby from another girl. He said but no I keep telling her I don't want to be with her, said but she don't want to give it up like that. I said Bump you got to stick behind what you say, you just can't say I don't want to mess with you this minute, the next minute you all out to the club, you want to be, you want to get mad at her because she's dancing with something, you know. So after that there, it was about forty-five minutes later the girl April come back.

Q. This is a different April.

A. Yeah.

Q. Not April Reese.

A. It's the baby's mama. She comes back. She walks in the house. She tell Bump to come outside, Pat, Patrick Brown, tell him to come outside. He goes outside. They stands outside and talk. The whole while, before they, before he even went outside I had asked him was my sister still there. He say yeah she across the street. So he goes outside with the girl anyway, you know, knowing that my little sister going to see him and know she quick to start a fight. After a while he spot her. He come charging back in the house. He shut the door behind him. My little sister walked in right behind, opened the door and walked right back in there. He walked in the room. My little sister walked in the room. She grabbed a bottle of the radio, a Molsen Ice bottle, she grabbed that off the radio. So I goes in there and I'm trying to prevent every, no. Yeah, I went in there and tried to stop them from arguing and stuff. The other girl April come in the house. She comes in my cousin's room, J.J. She goes in his room. There was a knife on his dresser. She grabbed the knife. So now his baby's mama got the knife and my little sister got the bottle at him. So I tell them you all got to get out of my house, I'm already having a problem with the rent people about noise and arguments and stuff. So I put all of them outside. They out there talking about they going to do something to him. By this being my closest friend....

Q. They're out there saying they're going to do something to him?

A. Yeah, to Patrick Brown. By this being my closest friend I tried to tell him, I tell him, I say Bump come in the house, come in the house and just chill, they can't come in here cause I'm going to shut my door and lock it, they'll leave after a while. Alright, he come in. First the girl April say (UI) you go in or what. Bump said fuck that I'm going anyway. He walked right between the both of them, come in the house. I shut the door and locked it. Alright, my little sister put up a little tussle about keeping the door open but I said you don't tell me how to run my house. This is my house, this where I pay bills at. So I shut my door and I locked it. So Bump walked around, picked up a little Molsen Ice bottle, took a little swallow out of it, got a cigarette and lit it up, walked back by the door. I tell him, I said Bump don't open the door. He said no it's going to be all right, I'm going to open the door anyway. He opened the door. So I go back to the door to keep them from trying to stab him or hit him with the bottle. I goes to the door. I tell his baby's mama, I said April give me the knife and she gave me the knife with no problem. I took the knife and walked, turned, turned to my side

Det. M. Walley  #FL713          27 June 1994          #FL7065bc (con't)

OR# 94-100329

DEATH (HOMICIDE)

PAGE #4 - JEREMY LOCKHART

A.  (con't) and tossed it on the side of my little love chair that's
    sitting by the window right by the door. There should be a knife
    still right there in that corner. Alright, my little sister still
    standing by the door. She standing like right outside the door
    leaning on the railing. Bump standing inside the doorway but he
    in reaching distance. So I go back and tell her April give me the
    bottle. No, fuck that, fuck that, you should have told me. I said
    damn I been told you. The man told you himself, he done told you
    several times. Alright, he told, he told her then in front of the
    other girl April, his baby's mama, he told in front of his baby's
    mama told my little sister that he didn't want her, he going to stay
    with his baby's mama. She got hysterical, she got, she wanted to
    get loud and rowdy. Then I'm trying to stop any fighting from going
    on from in front of my door cause my neighbors already know that
    go on they be over and tell the rent office. So I'm trying to stop
    that. I turn around to go say forget it, you know, he getting himself
    into this here cause I not try to stop it. I turned to walk away.
    My little sister swang the bottle and hit him across the top of his
    head on his side, on his right side of his face on the top. There
    should be a gash there cause he was bleeding. Alright, I reached
    to grab her. He grabbed her too. At that time he jerked her out
    of my arms and they landed on my mirror table. That shattered, I
    knew that shattered. They fell over off the table. They fell on
    the ground. I felt that though she hit him first so it would be
    wrong of me to stop him from getting his lick back for hitting him
    cause I try to stay out of their business. I told my wife. I got
    mad at my wife. We got in an argument about that, about why you
    won't get in there, he jumping on your sister and all that. I try
    to stay out all my sister's business, you know. Bam, they fighting,
    they fighting so I pulled Bump, I pulled him up off of her. That
    should have been left at that. He started kicking her, started
    kicking her all around the kidney and the ankle, kicked between the
    legs, he's kicking her in the face. So I'm trying to push him back
    and stop him but he feels though, he probably feels though I was
    trying to hit him or something, trying to provoke a fight with him
    to stop him from fighting with her. He swung and he hit me but he
    only hit me one time. At that time I said I told you all to stop.
    That when I pulled out the gun and I shot. No really when I pulled
    the trigger by it being automatic it just went off, it just started
    going on. By the time I let go he had done fell. I turned around
    and walked out of the house. That was it.
Q.  Who all was there when this happened?
A.  April Reese, the other April.
Q.  April Reese is your sister.
A.  Yeah.
Q.  The other April, do you know her last name?
A.  No I don't know her last name.
Q.  And who else was there?
A.  I know his first name, one named Chris and I think the other one
    named Wayne.
Q.  Now did Chris stay there the whole time?

    Det. M. Walley #FL713        27 June 1994        #FL7065bc

OR# 94-100329

DEATH (HOMICIDE)

PAGE #5 - JEREMY LOCKHART

A. Yeah Chris was there.
Q. And then Wayne, was he there the whole time?
A. No, that's the one that was on probation. He's the one left when they started coming in there with all the arguing and fussing. He's the one that lives in the apartment across the way, right?
Q. He's the one that lives in the apartment across the way, right?
A. Yeah, right across. Like my building sit here, his building sit here. He stay in that corner apartment up front. And Chris stay across the street in front of Wayne's apartment building upstairs in the corner apartment, Apt. 6.
Q. Now you said that April, your sister, you knew that she was quick to start a fight.
A. Yeah.
Q. How do you know that?
A. Cause there's several reports been called on Mr. Patrick Brown about him and my sister getting into it my daddy and I made. The police now even been to his mother's house about this here. So about when I came home I'm seeing how she act. See she go to drinking and she, she just get wild.
Q. Jeremy, when this happened how much had you had to drink?
A. One Molsen Ice and one Lowenbrau, that was it.
Q. Were you smoking marijuana?
A. I hit it one time, that was it.
Q. You just did it one time.
A. Yeah just hit once.
Q. Were you inside or outside when that happened?
A. I was inside the house.
Q. If people had told me that you were outside smoking marijuana would that be true?
A. No sir.
Q. Was Patrick?
A. We was locked up in the house smoking weed. It was just four guys at first.
Q. But you only did it, you took one toke and that was it?
A. That one toke, we were sitting there cause I was mainly the man who was playing, I was playing the radio, you know.
Q. Now the gun that you had what kind of a gun was it?
A. A 22 Ruger Mock One.
Q. How many bullets would it hold?
A. I think it holds seven.
Q. Do you know how many were in it?
A. Yeah.
Q. How many?
A. About seven or eight.
Q. How many times did you fire the gun?
A. I just pulled the trigger and it started going off. When I, when I took the clip out and throwed the gun away there was two in the clip and one in the chamber. So I feel that it only went off four times cause it only holds seven or eight.
Q. You told me before I think that you threw the gun in a lake over by Dillard High School?
A. Yeah I throwed in a lake off 15 Avenue.

Det. M. Walley  #FL713          27 June 1994          #FL7065bc

OR# 94-100329

DEATH (HOMICIDE)

PAGE #6 - JEREMY LOCKHART

Q.  And the clip also?
A.  Yeah.
Q.  After this happened where did you go to?
A.  I went to Tri Rail station and went to Miami to visit my grandmother
    cause I know if I go to jail then I wouldn't get a chance to them,
    you know, so I went and seen them, let them know what was going on.
Q.  Just your grandmother?
A.  My grandmother and my grandfather and my real father.
Q.  Did you tell them what had happened?
A.  Yeah I explained to them how everything went on.
Q.  And then what, you came back down here?
A.  I came back, called my wife this morning and told her I was coming
    to turn myself in.
Q.  She came with you?
A.  She came with me.
Q.  The shirt that you had on that day where is that at?
A.  Probably in the dumpster somewhere cause I took that off and throwed
    it off.
Q.  When you left the scene?
A.  Yeah.
Q.  Now the pants and the shoes that you had on are those the same things
    that you had on when you came in this morning.
A.  Yes sir.
Q.  Did you shoot at Patrick while he was laying on the floor?
A.  No sir.
Q.  If both Aprils told me that you had would that be true?
A.  It couldn't have been cause he was standing.
Q.  Your sister told me that you grabbed him by the back of his shirt and
    pulled him up and then shot him twice as you were standing face to
    face with him and then when he fell down you kept on firing the gun.
A.  No, I pulled the trigger once.
Q.  Well how do you explain, how can you explain the fact that there are,
    there are six casings that were found there in the apartment?
A.  Well to my knowledge I the one who loaded the gun.  I know how many
    bullets was in there and I know when I took the clip out I distinctly
    remember that.  I looked at it and it had two bullets in there.  I
    looked at it.  I pulled it back and there was a bullet still stuck
    in the chamber.
Q.  Have you ever fired that gun before?
A.  Yeah several times outside.
Q.  Have you ever had a time where you fired it before where you'd pull
    the trigger and you'd have a problem with the gun firing?
A.  No.
Q.  Normally for every time you've got to fire it you've got to pull that
    trigger once.
A.  No, it was a automatic, you just pull.
Q.  The gun is an automatic?
A.  Yeah you just hold the trigger and it...
Q.  How big is the gun?
A.  About that big.
Q.  You're talking like maybe twelve or thirteen inches, right?

Det. M. Walley  #FL713          27 June 1994          #FL7065bc

OR# 94-100329

DEATH (HOMICIDE)

PAGE #8 - JEREMY LOCKHART

A.    (con't) cause he turned, after I grabbed him when she was like
      mobilized he turned around and throwed her on the couch. He stood
      back up with her and throwed her on my table, on my mirror table.
Q.    And that's when you...
A.    That's when they tumbled over on the floor. I pulled him up. He
      went to kicking.
Q.    Do you think he was trying to kick you or do you think he was
      trying to kick her?
A.    I feel as though, I, in my eyes I know naturally that he was trying
      to kick her. He was trying to kick her. Cause there's several
      reports on him.
Q.    Okay, let me ask you something. Thinking back now to what happened
      do you think there's any way after, you know, you got him up do you
      think there's any way you could have handled this other than by
      shooting him?
A.    No cause he, he took a swing at me.
Q.    Okay, well he wasn't armed with anything was he? I mean did he have
      anything in his hands?
A.    See when all this went on it was like a big ruckus. I'm not the
      type of person that start a fight. I avoid trouble before I start
      trouble. I avoid it in a heartbeat.
Q.    But, Jeremy, you're walking around the apartment with a machine gun
      in your procket.
A.    That's not a machine gun, it's a handgun.
Q.    Well if it keeps on firing bullets one right after another that
      makes it a machine gun. I mean it's an automatic handgun, right?
A.    Umhum. But I had it in my pocket cause anybody can just, see I
      was in and out of my house, walking in and out of my house so
      anybody could have just walked in there cause I leave it in one
      spot in my closet sitting on the shelf. Anybody could have walked
      in there, picked up the gun and walked out of the house and then
      I'd have been like hey who took the gun, then my fingerprints are
      on the bullet casings.
Q.    So the reason you had it in your pocket is because you don't want
      anybody to steal it and do something with it and it'll come back
      to you.
A.    It'll come back to me.
Q.    What's the reason that you need a gun like that to begin with?
A.    I just bought it to have it, you know, something. to have around
      the house.
Q.    How much did you pay for it?
A.    Twenty-five dollars.
Q.    How many gunshots do you think you heard, do you remember hearing?
A.    I was too busy yelling telling them I told you all to get out of
      my house, I told you all to get out of my house.
Q.    When were you yelling that, while the gun was going off?
A.    NA
Q.    How many shots do you think you heard, could you tell?
A.    About four or five, about four or five.
Q.    How, how fast together were they, I mean...
A.    Boom, boom, boom, boom, boom, boom.

Det. M. Walley  #FL713              27 June 1994              #FL7065bc

OR# 94-100329

DEATH (HOMICIDE)

PAGE #9 - JEREMY LOCKHART

Q.  Alright, let me ask you this.  After you knew you shot him, did you know you shot him?
A.  Only one I seen that hit him was the one that was in this side here, that's the only one.
Q.  Like the right side?
A.  Yeah.
Q.  Where was he at when you shot him, when that shot hit him?
A.  He was steady, he was kicking at April at that time.
Q.  How far away from you was he?
A.  About our distance now.
Q.  Just maybe three feet.
A.  Yeah.
Q.  And you saw that shot hit him.
A.  Yeah I saw that.
Q.  After you knew you shot him and he fell down on the floor..
A.  That's when I was like damn I told you all, I told you all to get out of my house.  I couldn't say.....
Q.  Why didn't you go and call the police?
A.  It was like I know I had, I know I had now did something that I was going to go to jail for.  Like I was thinking about when I was on the train, it was like I did this for somebody that I love dearly.
Q.  Who do you mean?
A.  My little sister.
Q.  I mean what I'm thinking of is I mean if you thought you were defending your sister, you know, you love her so much you were defending her why didn't you just go call the police?  I mean you said Patrick was like a brother to you.
A.  He is.
Q.  Why didn't you go see if you could get some help for him?
A.  That's why I hurt, I killed my best friend over her.
Q.  Jeremy, is there anything else that you can think of that we haven't talked about that you think is important?  You're shaking your head no?
A.  No sir.
Q.  Jeremy, this happened in the City of Fort Lauderdale, right?
A.  Yes sir.

This concludes the statement at 12:16 p.m.

OR# 94-100329

DEATH (HOMICIDE)

The following is the statement of JEREMY LOCKHART as given to Det. Walley on June 27, 1994 and it is beginning at 12:58 p.m.

Q. Jeremy, I've already taken a statement from you once today on the tape recorder and I explained to you then that as a policeman I could take statements that were sworn to and you raised your hand and I swore you in, remember?
A. Yes sir.
Q. For the record you're still under oath, in other words you still have to tell me the truth, okay?
A. Yes sir.
Q. Jeremy, after we got done you and I had a conversation about where the gun was.
A. Yes sir.
Q. And you told me that you would take me out and show me where you threw it, is that right?
A. Yes sir.
Q. And I told you then that you didn't have to do that if you didn't want to.
A. Yes sir.
Q. And you told me that you would show me.
A. Yes sir.
Q. And you went out with Det. Stone and I and we went to the, the 2700 block of N.W. 15 Court.
A. Yes sir.
Q. That's where you showed us where to go, right?
A. Yes sir.
Q. And then you walked down with Det. Stone and showed him where you threw it, is that right?
A. Yes sir.
Q. Now you told me that you had taken the clip out?
A. Yes sir.
Q. When did you do that?
A. I took the clip out after I, as soon as I left the house.
Q. And you thought how many bullets were left in the clip?
A. Two and one in the chamber.
Q. And when you got...how did you get over to where you took us today?
A. Bicycle.
Q. Where did you get the bike from?
A. One of my home boys they gave me a bike. I asked him to let me hold the bike. He said alright and I went back and went over there. See he, he didn't know what had happened, he didn't know what had went on.
Q. Okay. And then we went over and you showed Det. Stone where it was. When you threw that in the water did you throw the gun and the clip in there?
A. I throwed the gun, then I throwed the clip.
Q. Alright. And right down the street from there is your mother's house, right?
A. Yes sir.
Q. Jeremy, did I threaten you or promise you anything for you to take us out and show us that?
A. No sir.
Q. Is there anything else you can think of that you think is important?
A. No sir.
This concludes the statement at 1 o'clock.
Det. M. Walley #EL713    27 June 1994    #EL7065hc

SUBJECT: _JEREMY LOCKHART_    PLACE: _1300 W BROWARD_
INTERROGATING
OFFICER: _DET. WALLEN_    DATE: _6-27-94_

TIME: _11.46 AM_

_JEREMY_ , before I ask you any questions, I
want to advise you of your rights under the law. Do you
understand that I am a police officer? _All Right_ .

You have the right to remain silent; that is, you need not
talk to me or answer any questions if you do not want to. Do you
understand? _Yes S.L_

You have the right to talk to an attorney before talking to
me and to have an attorney here with you during questioning now
or later. Do you understand? _Yes S.L_

If you cannot afford to retain your own attorney and you
want an attorney, one will be appointed for you before we ask you
any questions. Do you understand? _Yes S.L_

If you decide to answer the questions now, without an
attorney present, you will still have the right to stop answering
my questions at any time until you talk to an attorney. Do you
understand? _Yes S.L_

Should you talk to me, anything you might answer to my
questions will be introduced in evidence in a court of law
against you. Do you understand? _Yes S.L_

Knowing and understanding your rights as I have explained
them to you, are you willing to answer my questions without an
attorney present? _Yes S.L_

I, _Jeremy Lockhart_ , have read this
statement of my rights, or have had it read to me; and I
understand what my rights are. I am willing to make a statement
and answer questions. I have not previously requested any law
enforcement officer to allow me to speak to an attorney about
this incident. I do not wish an attorney to be present at this
time. No threats or promises have been made to me. No pressure
of any kind has been used against me, nor have I been tricked or
fooled into giving this statement. I understand and know what I
am doing. This statement will be used in a court of law against
me.

SIGNED _Jeremy Lockhart_

WITNESS: _Det. Michael Wallen_

WITNESS: _____

DATE: _6-27-94_

TIME: _11.55 AM_

OR# 94-100329

DEATH (HOMICIDE)

PAGE #7 - JEREMY LOCKHART

A.    Yeah it's about this big.
Q.    So it's like a machine gun, it keeps on firing?
A.    It's a German Ruger, it's a old, a Mock One.
Q.    Where did you get that from?
A.    I bought it off the street.
Q.    Who did you buy it from?
A.    I don't know the guy. He just pulled up and said he had a gun for
      sale.
Q.    Where were at when you bought it?
A.    On what that is, 15th, (UI) store.
Q.    How long have you had it?
A.    About a month or two.
Q.    Where did you get the bullets for that?
A.    He sold me the bullets and all.
Q.    How many bullets did he sell you?
A.    I don't know, a little plastic bagful of them.
Q.    Where is that bag at now?
A.    It should be, the bag should be in the house.
Q.    Do you know where?
A.    It was in my room last time I seen it.
Q.    Where at in your room?
A.    On the floor.
Q.    So you're saying that, what was the reason that you shot him, I mean
      what were you thinking when you shot?
A.    It's, alright, when they get into a fight I can understand if they
      pass licks hand to hand cause I know my little sister like a book.
      She'll fight for so long and then she'll back off. But what Brown
      did that night, that day wasn't called for cause I feel as though
      he was trying to start a fight. I've seen him fight, you know,
      trying to show out cause he's known for doing this here.
Q.    Well let me ask you something. You know I talked to your sister
      and I talked to the other April and it kind of seemed like to me
      that when they were doing the physical part of it, you know, your
      sister and Patrick she, she was getting the better of him. I mean
      she had already split his head open with the beer bottle.
A.    How she was getting the better of him, she was laying on the ground
      and he was kicking her in the face.
Q.    Well I don't have anybody that's told me that, that she got kicked
      in the face, and I saw her right after it happened and she didn't
      look like she'd been kicked in the face.
A.    I was standing right over her.
Q.    I'm not saying that that didn't happen or, you know, he may have
      been kicking at her or something but I mean you know for sure that
      he had his head split open.
A.    I seen that.
Q.    And you said that you saw that.
A.    Yeah, that's why I didn't, I didn't jump right in it to try to break
      it up then.
Q.    That's my question. When that happened why didn't you just grab her
      and say hey enough's enough here or go call the police or something.
A.    When she swung the bottle, alright, she jumped on his back. I the one
      that grabbed her off his back. I was but he jerked out of my hand

Det. M. Walley  #FL713        27 June 1994        #FL7065bc    (con't)

```
 1    State of Florida     )
                           ):ss           Mark A. Speiser
 2    County of Broward    )

 3
                    IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
                IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6    STATE OF FLORIDA,

 7           Plaintiff,

 8    -vs-                         Case No. 95-03410

 9    JEREMY LOCKHART,

10           Defendant.

11    _____/

12

13           Tape played before the Honorable Mark A.

14    Speiser, one of the Judges of said Court, Fifth floor,

15    Room 5900 Broward County Courthouse, Fort Lauderdale,

16    Broward County, Florida, on the 15th day of August,

17    1995, commencing at or about the hour of 1:00 o'clock

18    a.m., and being a jury trial.

19

20    APPEARANCES:

21           JOSEPH PATNER, Esquire,
             Assistant State Attorney,
22           Appearing on behalf of the Plaintiff.

23           ROBERT GODWIN, Esquire,
             Assistant Public Defender,
24           Appearing on behalf of the Defendant.

25
```

JUSTICE REPORTING SERVICES, INC.     523-6114

7-0313

```
 1              (Thereupon, the following proceedings
 2         were had:)
 3                      * * * * * *
 4              (Thereupon, the tape was played for the
 5         jury.)
 6    BY DETECTIVE WALLEY:
 7              Testing one, two, three, four, five, testing
 8         one two.  Zero 94-100329.  The following is a
 9         statement of Jeremy Lockhart as given to Detective
10         Walley on June 27th of 1994 and is beginning at
11         11:51 a.m.
12         Q.   Jeremy, as a police officer that means that I
13    can take statements that are sworn to or given under
14    oath.  Would you raise your right hand.  Do you swear
15    that what you're about to tell me is the truth and
16    nothing but the truth so help you God?
17         A.   Yes sir.
18         Q.   Jeremy, for the record would you just tell me
19    your full name and your birthday?
20         A.   Jeremy Lockhart.  Date of birth 5-28-71.
21         Q.   Okay.  And you live where?
22         A.   2215 Northwest 9th Street_building five,
23    apartment three.
24         Q.   All right.  Now, Jeremy you came in this
25    morning, and you came into the police station with
```

```
 1    Monica?
 2         A.    Yes sir.
 3         Q.    And Monica is your wife?
 4         A.    Yes sir.
 5         Q.    And you knew the police were looking for you
 6    and you came in to turn yourself in?
 7         A.    Yes sir.
 8         Q.    Okay.  And when you came up here I first
 9    explained to you who I was?
10         A.    Yes sir.
11         Q.    Now this was about I guess 10:40 a.m., that
12    you came in and I told you that I was one of the
13    detectives that was in charge of the case?
14         A.    Yes sir.
15         Q.    And, you know, you came back here and we were
16    in one of the interview rooms and I went out and did
17    some paperwork.  And I explained to you what was going
18    to happen, that you were going to be charged with
19    murder, and that all of the statements, the witness'
20    statements and all of the witnesses and the police
21    would go and they would testify if the State Attorney
22    wanted at what is called a Grand Jury Hearing.
23         A.    Yes sir.
24         Q.    And at that time they would ask questions of
25    all the witnesses and then they would decide, they
```

```
 1    ultimately would decide what crime you should be

 2    charged with.  But right now as far as the police are

 3    concerned you're charged with murder.

 4         A.   Yes sir.

 5         Q.   Okay.  And I was out doing some paperwork and

 6    you knocked on the door and said, told Detective Stone

 7    that you wanted to know if I was going to take your

 8    statement?

 9         A.   Yes.

10         Q.   And you told me that you wanted to give your

11    side of it?

12         A.   Yes sir.

13         Q.   So that they can hear that also?

14         A.   Yes sir.

15         Q.   Okay.  When I came in I read you your rights

16    from this piece of paper that's in front of us?

17         A.   Yes, sir.

18         Q.   And I read this to you?

19         A.   Yes sir.

20         Q.   Did you have any trouble understanding it?

21         A.   No sir.

22         Q.   Okay.  And I wrote down what you said back to

23    me every time I read one of those things, is that

24    right?

25         A.   Yes sir.
```

```
 1      Q.   And then you printed your name here?

 2      A.   Yes sir.

 3      Q.   And then I read this last paragraph?

 4      A.   Yes sir.

 5      Q.   Jeremy, have I mistreated you in any?

 6      A.   No sir.

 7      Q.   Has any police officer mistreated you since

 8  you came in here?

 9      A.   No sir.

10      Q.   All right.  Why don't you start in the very

11  beginning and just tell me exactly what happened?

12      A.   How that day went?

13      Q.   Yeah.

14      A.   All right, it was about 11:00 about 11:45.

15  Patrick Brown was over, came over to my house right

16  before my wife left to go to her mother's house.  We

17  were sitting out there talking.  We played a little

18  with my little daughter for a little while.  My wife

19  left and went with her mother cause she had to go to a

20  job interview, I think that's what she was going to do

21  that day.

22      Q.   All right.

23      A.   After she left we stood out there, one, one

24  of the guys across the hall from me, I asked him, say

25  would you want -- you want to play some cards, said we
```

1   can chip on some beer, all right.

2      Q.   You could do what?

3      A.   We all -- we can all chip on some beer so we

4   can have something to drink while we are playing

5   cards.  So they went and got the beer.  Me and Patrick

6   stayed there.  I went back in the house, took me a

7   shower.  By the time I got out of the shower he was

8   standing in the house, you know, cause he was like a

9   brother to me.  We were real close.  So I got out of

10  the shower, I get dressed.  After a while he comes back

11  in and tells me that his son's mother, two month old

12  baby's mother was outside.  Her name is April.

13     Q.   Uh-huh.

14     A.   All right.  He's standing over there talking

15  to her.  He had - we had not too long got through

16  fixing his car, working on his car.  So she was going

17  to take his car to her house and park it until he get

18  his tag, tag and everything right on the car.

19     Q.   Uh-huh.

20     A.   Okay.  She left in the car, she left me and

21  him with the baby.  So we go back in the house and we

22  sitting, sitting there in front of the fan listening to

23  the radio.  The other two guys come back, started

24  playing spades.

25     Q.   Uh-huh.

```
1        A.    Then they left.  No, we started playing
2   spades.  After a while the girl April was gone my
3   little sister came, April Reese.

4        Q.    Okay.

5        A.    She came by, walked in the house.  She seen
6   Pat, Patrick Brown, known as Bump, that what we call
7   him, Bump.

8        Q.    Bunk?

9        A.    Bump, Bump.  All right, he was sitting in the
10  chair.  His little baby sitting him on side she didn't
11  even pay no attention to the little baby.  She was just
12  wondering, she noticed everybody in the house cause we
13  grew up around there in the neighborhood, everybody
14  know us.  So she walk in asked where my wife was I told
15  her she was going to her mom's house.  So she walks
16  back outside.

17        At that time Bump said boy I don't know what I'm
18  gonna to do.  I said Bump I been told you to go on
19  ahead and tell her that you got a baby from another
20  girl.  He said but no I keep telling her I don't want
21  to be with her.  She said she don't want to give up
22  like that.  I said Bump you got to stick behind what
23  you say, you just can't say I don't want to mess with
24  you this minute, the next minute you all out to the
25  club, you want to be, you want to get mad at her
```

1    because she's dancing with somebody, you know.

2        Q.    Uh-huh.

3        A.    So after that there, it was about 45 minutes

4    later the girl April come back.

5        Q.    This is a different April not April Reese?

6        A.    Yeah.

7        Q.    Not April Reese?

8        A.    It's the baby's mama.  She comes back, she

9    walks in the house she tell Bump to come outside,

10   Patrick, Patrick Brown, tell him to come outside.  He

11   goes outside.  They stands outside and talk.  The whole

12   while before he went outside I had asked him was my

13   sister still there.  He say yeah she across the

14   street.  So he goes outside with the girl anyway.  You

15   know, knowing that my little sister going to see him

16   and that she could start a fight.

17       Q.    Uh-huh.

18       A.    After a while he spot her he come charging

19   back in the house.  He shut the door behind him.  My

20   little sister walked in right behind him, opened the

21   door and walked right back in there.  He walked in the

22   room.  My little sister walked in the room.  She

23   grabbed a bottle off the radio, a Molsen Ice bottle.

24   She grabbed that off the radio.  So I goes in there and

25   I'm trying to prevent every -- no.  Yeah, I went in

```
1    there and tried to stop them from arguing and stuff.
2    The other girl April come in the house.  She comes in
3    my cousin's room J.J.  She goes in his room.  There was
4    a knife on his dresser, she grabbed the knife.  So now
5    his baby's ma'am got the knife and my little sister got
6    the bottle at him.  So I tell them you all got to get
7    out of my house, I'm already have a problem with the
8    rent people about noise and arguments and stuff.  So I
9    put all of them outside.  They out there talking about
10   they going to do something to him.  By this being my
11   closest friend --
12         Q.   They're out there saying they're going to do
13   something to him?
14         A.   Yeah, to Patrick Brown.  By this being my
15   closest friend I try to tell them, I tell him I say
16   Bump come in the house, come in the house and just
17   chill.  They can't come in here because I'm going to
18   shut the door and lock it and they'll leave after a
19   while.  All right, he come in.  First the girl April
20   say I - you go in or what.  Bump said fuck that I'm
21   going anyway.  He walked right between the both of
22   them, come in the house.  I shut the_door and locked
23   it.  All right, my little sister put up a little tussle
24   about keeping the door opened so I said you don't tell
25   me how to run my house.  This is my house, this is
```

```
 1    where I pay the bills at.  So I shut my door and locked
 2    it.  So Bump walked around, picked up a little Molsen
 3    Ice bottle, took a little swallow out of it, got a
 4    cigarette and lit it up, walked back by the door.  I
 5    tell him, I said Bump don't open the door.  He said no
 6    it's going to be all right, I'm going to open the door
 7    anyway.  He opened the door.  So I go back to the door
 8    to keep them from trying to stab him or hit him with
 9    the bottle.  I goes to the door.  I tell his baby's
10    mama, I said April give me the knife.  And she gave me
11    the knife with no problem.  I took the knife and
12    walked, turned, turned to my side and tossed it on the
13    side of my little love chair that's sitting by the
14    window right by the door.  There should be a knife
15    still right there in the corner.  All right, my sister
16    still standing by the door.  She standing like right
17    outside the door leaning on the railing.  Bump standing
18    inside the doorway but he in reaching distance.
19         Q.    Uh-huh.
20         A.    So I go back and tell her April give me the
21    bottle.  No, fuck that, fuck that, he should have told
22    me.  I said damn he been told you.  The man told you
23    himself, he done told you several times.  All right, he
24    told, he told her then in front of the other girl
25    April, his baby's mama, he told in front of his baby's
```

```
 1    mama told my little sister that he didn't want her, he
 2    going to stay with his baby's ma'am.  She got upset,
 3    she got, she wanted to get loud and rowdy.  Then I'm
 4    trying to stop any fighting from going on from in front
 5    of my door cause my neighbors already know everything
 6    that go on they go over and tell the rent office.  So
 7    I'm trying to stop that.  I turn around to go say
 8    forget it, you know, he getting himself into this here
 9    cause I not try to stop it.  I'm turned to walk away.
10    My little sister swang the bottom and hit him across
11    the top of his head on his side, right side of his face
12    on the top.  There should be a gash there.
13         Q.    Uh-huh?
14         A.    Cause he was pleading.  All right, I reached
15    to grab her.  He grabbed her too.  At that time he
16    jerked her out of my arms and they landed on my mirror
17    table.  That shattered, I knew that shattered.  They
18    fell over off the table.  They fell on the ground.  I
19    felt that though she hit him first so it would be wrong
20    of me to stop him from getting his lick back for
21    hitting him cause I try to stay out of their business.
22    I told my wife.  I got mad at my wife.  We got in an
23    argument about that, about why you won't to get in
24    there he jumping on your sister and all that.  I try to
25    stay out all my sister's business, you know.  Bam they
```

1    fighting, they fighting so I pulled Bump, I pulled him
2    off of her.  That should have been left at that.  He
3    started kicking her, started kicking her all around the
4    kidney and the ankle, kicked between the legs, he's
5    kicking her in the face.  So I'm trying to push him
6    back and stop him but he feels though, he probably
7    feels as though I was trying to hit him or something,
8    trying to provoke a fight with him to stop him from
9    fighting with her.  He swung and he hit me but he only
10   hit me one time.

11       Q.    Uh-huh.

12       A.    At that time I said I told you all to stop.
13   That's when I pulled out the gun and I shot.  No really
14   when I pulled the trigger by it being automatic it just
15   went off, it just started going off.  By the time I let
16   it go he had done fell.  I turned around and walked out
17   the house.  That was it.

18       Q.    Okay.  Who all was there when this happened?

19       A.    Um, April Reese.

20       Q.    Okay.

21       A.    The other April.

22       Q.    April Reese is your sister?

23       A.    Yes.

24       Q.    The other April do you her last name?

25       A.    No, I don't know her last name.

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1     Q.   And who else is there?

 2     A.   I know his first name, one named Chris.

 3     Q.   Okay.

 4     A.   And I think the other one named Wayne.

 5     Q.   Now, did Chris stay there the whole time?

 6     A.   Yeah, Chris was there.

 7     Q.   And then Wayne, was he there the whole time?

 8     A.   No that's the one that was on probation.  He

 9  is the one left when they started coming in there with

10  all the arguing and fussing.

11     Q.   He's the one that lives in the apartment

12  across the way?

13     A.   Yeah, right across the way.  Like my building

14  sit here, his building sit here.  He stay in that

15  corner apartment up front.

16     Q.   Okay.

17     A.   And Chris stay across the street in front of,

18  Wayne's apartment building upstairs in the corner

19  apartment, apartment six.

20     Q.   Okay.  Now, you said that April, your sister,

21  you knew that she was quick to start a fight?

22     A.   Yeah.

23     Q.   How do you know that?

24     A.   Cause there is several reports been called on

25  Mr. Patrick Brown about him and my sister getting into
```

1    it my daddy and I made.  The police now even been to

2    his mother's house about -- so about when I came here I

3    am seeing how she act.  See she go to drinking and she,

4    she just get wild.

5         Q.   Okay.  Jeremy, when this happened how much

6    had you had to drink?

7         A.   One Molsen Ice and one Lowenbrau, that was

8    it.

9         Q.   Okay.  Were you smoking Marijuana?

10        A.   I hit it one time that was it.

11        Q.   You just hit it one time?

12        A.   Yeah, just once.

13        Q.   Okay.  Were you inside or outside when that

14   happened?

15        A.   I was inside the house.  We was locked up in

16   the house it was just four guys.

17        Q.   But you only did it, you took one toke on it

18   and that was it?

19        A.   That one toke, we was sitting there cause I

20   was mainly the one who was play - I was playing the

21   radio, you know.

22        Q.   Now, the gun that you had, what kind of gun

23   was it?

24        A.   A .22 Ruger, Mock One.

25        Q.   And how many bullets would it hold?


JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1      A.    I think it holds seven.

 2      Q.    Do you know how many were in it?

 3      A.    Yeah.

 4      Q.    How many?

 5      A.    About seven or eight.

 6      Q.    Okay.  How many times did you fire the gun?

 7      A.    I just pulled the trigger and it started

 8  going off.  When I -- when I took the clip out and

 9  throwed the gun away there was two in the clip and one

10  in the chamber.

11      Q.    Okay.

12      A.    So I feel that it only went off four times

13  because it only holds seven or eight.

14      Q.    Okay.  You told me before I think that you

15  threw the gun in the lake over by Dillard High School?

16      A.    Yeah, I throwed it in a lake off of 15th

17  Avenue.

18      Q.    Okay, and the clip also?

19      A.    Yeah.

20      Q.    After this happened where did go to?

21      A.    I went to tri-rail station and went to Miami

22  to visit my grandmother cause I know if I go to jail

23  then I wouldn't get a chance to see them, you know, so

24  I went and seen them, let them now what was going on.

25      Q.    Just your grandmother?
```

```
 1          A.    My grandmother and my grandfather, and my
 2     real father.
 3          Q.    Okay.  Did you tell them what had happened?
 4          A.    Yes, I explained to them how everything went
 5     on, you know, and --
 6          Q.    And then what you came back down here?
 7          A.    And I came back, called my wife this morning
 8     and told her I was coming to turn myself in.
 9          Q.    She came with you?
10          A.    She came with me.
11          Q.    Okay.  This shirt that you had on that day,
12     where is that at?
13          A.    Probably in the dumpster somewhere because I
14     took that off and throwed it off.
15          Q.    When you left the scene?
16          A.    Yeah.
17          Q.    Okay.  Now, the pants and the shoes that you
18     had on are those the same things that you had on when
19     you came in this morning?
20          A.    Yes sir.
21          Q.    Okay.  Did you shoot at Patrick while he was
22     laying on the floor?
23          A.    No sir.
24          Q.    Well, there were six casings that were found
25     at the apartment?
```

1    A.    Well, to my knowledge I the one who loaded
2    the gun. I know how many bullets was in there and I
3    know when I took clip out I distinctly remember that.
4    I looked at it and it had two bullets in there.  I
5    looked at it.  I pulled it back and there was a bullet
6    still stuck in the chamber.

7    Q.    And when you fired it before you just pulled
8    the trigger and you didn't have a problem with the gun
9    firing?

10    A.    No.

11    Q.    Normally for every time you've got to fire it
12    you've got to pull that trigger once?

13    A.    No, it was an automatic.

14    Q.    The gun is an automobile?

15    A.    Yeah, you just hold the trigger and it --

16    Q.    How big is the gun?

17    A.    About that big.

18    Q.    You're talking like maybe 12 or 13 inches,
19    right?

20    A.    Yeah, it's about this big.

21    Q.    So it's like a machine gun it keeps on
22    firing?

23    A.    It's a German Ruger, it's a old, a Mock One.

24    Q.    Okay where did you get that from?

25    A.    I bought it off the street.

JUSTICE REPORTING SERVICES, INC.    523-6114

```
1        Q.   Who did you buy it from?

2        A.   I don't know the guy he just pulled up and

3   say he had a gun for sale.

4        Q.   Where were you at when you bought it?

5        A.   On what that it 15th -- store.

6        Q.   How long have you had it?

7        A.   Um, about a month or two.

8        Q.   Where did you get the bullets for that?

9        A.   He sold me the bullets and all.

10       Q.   How many bullets did he sell you?

11       A.   I don't - like a little plastic bag full of

12  them.

13       Q.   Where is that bag at now?

14       A.   It should be -- the bag should be in the

15  house.

16       Q.   Do you know where?

17       A.   It was in my room last time I seen it.

18       Q.   Where at in your home?

19       A.   On the floor.

20       Q.   All right.  So you're saying that - what was

21  the reason that you shot him?  I mean, what were you

22  thinking when you shot?

23       A.   It's -- all right, when they get into a fight

24  I can understand if they pass licks hand to hand cause

25  I know my little sister like a book.  She'll fight for
```

1  so long and then she'll back off. But what Brown did

2  that night that day wasn't called for. Cause I feel as

3  though he was trying to start a fight. I've seen them

4  fight, you know, trying to show out cause he's known

5  for doing this here.

6      Q. -- matter or something but you know for sure

7  that he had his head split open?

8      A. I seen that.

9      Q. And you said that you saw that?

10     A. Yeah that's why I didn't, I didn't jump right

11  in and try to break it up then.

12     Q. Okay, that's my question. When that happened

13  why didn't you just grab her and say hey that's enough

14  enough here or go call the police or something?

15     A. When she swung the bottle, right, she jumped

16  on his back, right, I the one that grabbed her off his

17  back. I was but he jerked out of my hand because he

18  turned, after I grabbed him most like he turned around

19  and throw her on the couch. He stood back up with her

20  and throwed her on the table, on my mirror table.

21     Q. And that's when you --

22     A. That's when they tumbled over on the floor, I

23  pulled him up, he went to kicking.

24     Q. Okay. Do think he was trying to kick you or

25  do you think he was trying to kick her?

 1          A.    I feel as though, in my eyes I know naturally

 2     that he was trying to kick her.  He was trying to kick

 3     her.

 4          Q.    Okay.

 5          A.    Cause there is several reports on him.

 6          Q.    Okay, let me ask you something.  Thinking

 7     back now to what happened, do you think there is any

 8     way after you know you got him up, do you think there

 9     is anyway you could have handled this other then by

10     shooting him?

11          A.    No cause he, he took a swing at me.

12          Q.    Okay.  Well, he wasn't armed with anything

13     was he?  Did he have anything in his hand?

14          A.    See when all this went on it was like a big

15     ruckus.  I'm not the type of person that start a fight,

16     I avoid trouble before I start trouble.  I avoid it in

17     a heartbeat.

18          Q.    Okay.  But Jeremy you're walking around the

19     apartment with a machine gun in your apartment?

20          A.    That's not a machine gun, a handgun.

21          Q.    But it keeps on firing bullets one right

22     after another that makes it a machine gun.  I mean it's

23     an automatic handgun, right?

24          A.    But I had it in my pocket cause anybody can

25     just, see I was in and out of my house, walking in and

1    out of my house.  So anybody could have just walked in

2    there because I leave it in one spot one spot siting on

3    the shelf and anybody could have walked in and picked

4    up the gun walked out of the house.  And then I'd have

5    been like hey who took the gun, then my fingerprints

6    are on the bullet casings.

7         Q.   Okay.  So the reason you had it in your

8    pocket is because you don't want anybody to steal it

9    and do something with it and it will come back to you?

10        A.   It will come back to me.

11        Q.   What's the reason that you need a gun like

12   that to begin with?

13        A.   I just bought it to have it, you know,

14   something to have around the house.

15        Q.   How much did you pay for it?

16        A.   Twenty-five dollars.

17        Q.   Okay.  How many gun shots do you think you

18   heard, do you remember hearing?

19        A.   I was too busy yelling telling them I told

20   you all to get out of my house.  I told you all to get

21   out of the house.

22        Q.   When were you yelling that?  While the gun

23   was going off?

24        A.   No.

25        Q.   How many shots do you think you heard could

JUSTICE REPORTING SERVICES, INC.    523-6114

1    you tell?

2        A.    About four or five, about four or five.

3        Q.    Okay.  How - how fast together were they, I

4    mean?

5        A.    Boom, boom, boom, boom, boom, boom.

6        Q.    Okay.  All right let me ask you this.  After

7    you knew you shot him, did you know you shot him?

8        A.    Only one I seen that hit him was the one that

9    was in this side here, like the only one.

10       Q.    Like the right side?

11       A.    Yeah.

12       Q.    Okay.  Where was he at when you shot him,

13   when that shot him?

14       A.    He was steady, he was kicking at April at

15   that time.

16       Q.    How far away from you was he?

17       A.    About our distance now.

18       Q.    Just maybe three feet?

19       A.    Yeah.

20       Q.    Okay, and you saw that shot hit him?

21       A.    Yeah, I saw that.

22       Q.    Okay.  Well, after you knew you shot him and

23   he fell down on the floor?

24       A.    That's when I was like damn I told you all, I

25   told you all to get out of my house.  I couldn't say --

1    Q.    Okay.  Why didn't you go and call the police?

2    A.    It was like, I know I had -- I know I had now

3  did something that I was going to go to jail for.

4    Q.    Uh-huh.

5    A.    Like I was thinking about it when I was on

6  the train.  It was like I did this for somebody that I

7  love dearly.

8    Q.    Who do you mean?

9    A.    My little sister.

10    Q.    Okay.  Well, I mean what I am thinking of I

11  mean if you thought you were you defending your sister

12  you love, you love her so much and you were defending

13  her why didn't you go call the police?  I mean you said

14  Patrick was like a brother to you?

15    A.    He is.

16    Q.    Why didn't you go see if you could get some

17  help for him?

18    A.    That's why I hurt, I killed my best friend

19  over her.

20    Q.    Okay.  All right, Jeremy, is there anything

21  else that you can think of that we haven't talked about

22  that you think is important?  You're shaking your head

23  no?

24    A.    No sir.

25    Q.    Jeremy, this happened in the city of Fort

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1    Lauderdale, right?

 2         A.   Yes sir.

 3         Q.   Okay.   This concludes the statement at 12:16

 4    p.m.

 5                        *  *  *  *  *  *  *

 6              (Thereupon, the proceedings were concluded:)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    C E R T I F I C A T E

2                        - - - - -

3      STATE OF FLORIDA

4      COUNTY OF BROWARD

5            I, MICHELLE MEEKER, Shorthand Reporter, Notary
       Public, do hereby certify that I was authorized to and
6      did stenographically report the foregoing proceedings
       and that the transcript is a true and correct
7      transcription of my stenotype notes of the proceedings.

8            Dated this 2nd day of June        , 1996.

9

10                      MICHELLE MEEKER
                        Shorthand Reporter
11

12
       STATE OF FLORIDA
13
       COUNTY OF BROWARD
14
             The foregoing certificate was acknowledged
15     before me this  5 day of   June        , 1996, by
       MICHELLE MEEKER who is personally known to me.
16

17

18                      Notary Public State of Florida
                        My Commission No.
19                      Expires:

20
                            OFFICIAL NOTARY SEAL
21                            CINDY L ROTH
                        NOTARY PUBLIC STATE OF FLORIDA
22                       COMMISSION NO CC528202
                        MY COMMISSION EXP JAN 29 2000

23

24

25
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1   State of Florida      )
                          ):ss          Mark A. Speiser
2   County of Broward     )

3
                    IN THE CIRCUIT COURT OF THE
4                 SEVENTEENTH JUDICIAL CIRCUIT,
                 IN AND FOR BROWARD COUNTY, FLORIDA
5

6   STATE OF FLORIDA,

7           Plaintiff,

8   -vs-                          Case No. 94-10764 CF10A

9   JEREMY LOCKHART,

10          Defendant.

11   _____/                    COPY

12

13

14              ----------------------------------
                APPEAL ON BEHALF OF THE DEFENDANT
15              ----------------------------------

16

17                        ---------
                          VOLUME I
18                        ---------
                        Pages 1-200
19

     APPEARANCES:
20
                CRAIG BLINDERMAN, Esquire,
21              Assistant State Attorney,
                Appearing on behalf of the Plaintiff.
22
                ROBERT GODWIN, Esquire,
23              Assistant Public Defender,
                Appearing on behalf of the Defendant.
24

25

```
 1                        I-N-D-E-X

 2
       PROCEEDINGS                          PAGES
 3
 4     April 7th, 1995                     1-62

 5     April 10th, 1995                   63-71

 6     August 14th, 1995                 72-200

 7     WITNESSES            Direct Cross Re-direct

 8     MICHAEL WALLEY          11      -        -

 9     ALAN STONE              27      32       -

10     JEREMY LOCKHART         33      38       48

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   State of Florida      )
                           ):ss            Mark A. Speiser
 2   County of Broward     )

 3

                      IN THE CIRCUIT COURT OF THE
 4                  SEVENTEENTH JUDICIAL CIRCUIT,
                  IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6   STATE OF FLORIDA,

 7          Plaintiff,

 8   -vs-                            Case No. 94-10764 CF10A

 9   JEREMY LOCKHART,

10          Defendant.

11   _____/

12

13          Proceedings had and taken before the Honorable

14   Mark A. Speiser, one of the Judges of said Court, fifth

15   floor, Room 5900 Broward County Courthouse, Fort

16   Lauderdale, Broward County, Florida, on the 7th day of

17   April, 1995, commencing at or about the hour of 9:00

18   o'clock a.m., and being a hearing.

19

20   APPEARANCES:

21          CRAIG BLINDERMAN, Esquire,
            Assistant State Attorney,
22          Appearing on behalf of the Plaintiff.

23          ROBERT GODWIN, Esquire,
            Appearing on behalf of the Defendant.
24

25
```

```
 1              (Thereupon, the following proceedings were

 2         had:)

 3              THE COURT:  Okay we back on the record on the

 4         state of Florida versus Lockhart, Jeremy Lockhart.

 5              MR. GODWIN:  Robert Godwin G-O-D-W-I-N, here

 6         on behalf of Jeremy Lockhart.  And would Your

 7         Honor please in order to expedite matters I would

 8         be willing for purposes of this hearing only to

 9         stipulate to the admissibility of the tape

10         recording that contains Mr. Lockhart's

11         statements.  And I think Mr. Blinderman could

12         agree with me, and I'm only talking about the

13         first two or three minutes of that tape

14         recording.  It's not going to be the entire

15         statement but I'm certainly willing to do that if

16         it will save time.

17              THE COURT:  Okay.

18              MR. GODWIN:  Secondly, Your Honor, I would

19         like to invoke the rule.  There are two police

20         officers here in the court room that are likely to

21         be testifying I believe.

22              THE COURT:  Who's going to be the first

23         witness?

24              MR. BLINDERMAN:  The first witness is going

25         to be Detective Walley.
```

```
1              THE COURT:  Is it all right for him to stay
2         here while I listen to the tape or not?
3              MR. BLINDERMAN:  I have to, I mean --
4              MR. GODWIN:  Well, I don't know how he's
5         going to proceed but I'd just like to have the
6         witnesses excluded until we reach their time.
7              THE COURT:  Well, we don't have to go through
8         any testimony to get the tape in, you're
9         stipulating for me to listen to it then I assume
10        you're stipulating for --
11             MR. BLINDERMAN:  Right.
12             THE COURT:  So if you just step outside for a
13        minute then we'll play the first two minutes of
14        this tape and then we'll call Mr. Walley.
15             MR. BLINDERMAN:  Additionally, Judge, I took
16        the curtesy of copying the transcript of the tape
17        for the Court's identification, and if there is no
18        problem with that I would just offer that at this
19        point as an Exhibit so the Court could also follow
20        that.
21             MR. GODWIN:  I have no problem with that.
22             MR. BLINDERMAN:  For the record this is the
23        exact same copy of the transcript you were
24        provided with in discovery.
25             THE COURT:  The tapes been marked in as State
```

```
1          Exhibit 1 for this hearing.  Lets play it.
2              THE COURT:  Do you need the court reporter to
3          take down the contents of the tape that I'm
4          listening to on the record?  We are only going to
5          be listening to two minutes you said, right?  Why
6          don't you try and take down what you can.
7              MR. GODWIN:  I just want to be sure before we
8          --
9              THE COURT:  Two.
10             MR. BLINDERMAN:  Two because that's going to
11         be an exhibit.
12             THE COURT:  This will be one, that will be
13         two.
14             MR. GODWIN:  If Your Honor please before we
15         proceed I just want to be certain to say that I'm
16         willing to do this to expedite matters, and I want
17         to be certain the State is going to call Detective
18         Walley.
19             MR. BLINDERMAN:  I don't play games.
20             MR. GODWIN:  I just want to be sure we are on
21         the same track.
22             MR. BLINDERMAN:  I hope my reputation
23         precedes me in that regard.
24             MR. GODWIN:  Some lawyers in Dade County walk
25         out.
```

/

```
 1              MR. BLINDERMAN:  I'm in Broward.
 2              MR. BLINDERMAN:  Ready Mr. Godwin?
 3              MR. GODWIN:  Yes.
 4              (Thereupon, the tape was played and
 5         transcribed to the best of the court reporter's
 6         ability.)
 7              TAPE: Testing one, two, three, four, five.
 8    94-10764.  Statement of Jeremy Lockhart given to
 9    detectives on June 27th, 1994 beginning at 11:51 a.m.
10    Jeremy as a police officer that means that I can take
11    statements that are sworn to and given under oath.
12    Would you raise your right hand.  Do you swear that
13    what you're about to tell me is the truth and nothing
14    but the truth so help me God?
15         A.   Yes, sir.
16         Q.   Jeremy, for the record state your full name
17    and your birth date?
18         A.   Jeremy Lockhart, date of birth is 5-28-71.
19         Q.   Okay.  You live where?
20         A.   2215 Northwest 9th Street, building five
21    apartment three.
22         Q.   Jeremy, you came in this morning, you came in
23    through the police station with Monica?
24         A.   Yes, sir.
25         Q.   And Monica is your wife?
```

8

1       A.    Yes.

2       Q.    You know the police officers were looking for

3    you and you came in to turn yourself in?

4       A.    Yes, sir.

5       Q.    When you came up there I first explained to

6    you who I was?

7       A.    Yes, sir.

8       Q.    And this was about I guess 10:40 a.m., that

9    you came in and I told you I was one of the detectives

10   in charge of the case?

11      A.    Yes, sir.

12      Q.    And you know you came back here and we are in

13   one of the interview rooms, and I went out and did some

14   paperwork.  And I explained to you what was going to

15   happen, that you were going to be charged with murder

16   and that all of the statements, the witness' statements

17   and all the witnesses and the police would go and they

18   would testify and if the State Attorney wanted that you

19   would have what's called a grand jury hearing?

20      A.    Yes, sir.

21      Q.    And at that time they'd ask questions of all

22   the witnesses and they would decide, they ultimately

23   decide what crime you should be charged with.  But

24   right now as far as the police are concerned with

25   you're charged with murder.

                              /

1       A.    Yes, sir.

2       Q.    Okay.  I was out doing some paperwork and you

3   knocked on the door and said, you told Detective Stone

4   that you wanted to know if I was going to take your

5   statement?

6       A.    Yes, sir.

7       Q.    You told me that you wanted to give your side

8   of it?

9       A.    Yes, sir.

10      Q.    So that they could hear that also?

11      A.    Yes.

12      Q.    Okay.  When I came in I read you your rights

13  from this piece of paper in front of us?

14      A.    Yes, sir.

15      Q.    And I read this to you?

16      A.    Yes, sir.

17      Q.    Did you have any trouble understanding me?

18      A.    No, sir.

19      Q.    Okay.  And I wrote down what you said back to

20  me every time I read one of these things, is that

21  right?

22      A.    Yes.

23      Q.    Then you printed your name here?

24      A.    Yes, sir.

25      Q.    Then I read this last paragraph?

10

```
 1        A.    Yes, sir.

 2        Q.    Jeremy, have I mistreated you in anyway?

 3        A.    No, sir.

 4        Q.    Has any police officer mistreated you since

 5   you came in?

 6        A.    No, sir.

 7        Q.    Okay.  Why don't you start in the very

 8   beginning.

 9        A.    All right.

10        Q.    And just tell me exactly what happened

11              (Thereupon, the tape was stopped by Mr.

12        Blinderman.)

13              MR. BLINDERMAN:  May the record reflect I'm

14        handing back exhibit two to the clerk.

15              THE COURT:  Phil, could you bring in

16        Detective Walley.  Thank you.

17   Thereupon,

18                      MICHAEL WALLEY,

19   having been first duly sworn, was examined and

20   testified as follows.

21              THE COURT:  Please be seated and state your

22        full name and spell your last name for the

23        record.

24              THE WITNESS:  M. Walley, W-A-L-L-E-Y.

25              MR. BLINDERMAN:  May I proceed?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1              THE COURT:  Yes.
 2                   DIRECT EXAMINATION
 3   BY MR. BLINDERMAN:
 4         Q.   Good morning Detective, how are you?
 5         A.   Good morning.  Fine, thank you.
 6         Q.   Detective, can you tell the Court where you
 7   are employed?
 8         A.   I'm employed by the city of Fort Lauderdale
 9   as a police officer.
10         Q.   Do you have any special --
11              THE COURT:  Hold on one second.
12   BY MR. BLINDERMAN:
13         Q.   Detective, are you assigned to any special
14   division within the Fort Lauderdale Police Department?
15         A.   Yes, I am currently assigned to the homicide
16   squad.
17         Q.   How long have you been in the homicide squad?
18         A.   Since 1981.
19         Q.   Approximately - to the best of your
20   recollection how many homicide investigations have you
21   participated in?
22         A.   A few hundred.  I would say I was the lead
23   detective in approximately 150 cases.
24         Q.   Detective, approximately to the best of your
25   recollection how many statements have you taken from
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1    defendants in the course of your investigation for

 2    homicide?

 3                  MR. GODWIN:   Objection, relevancy.

 4                  MR. BLINDERMAN:   Goes to his experience and

 5            training.

 6                  THE COURT:   Overruled, overruled.

 7                  THE WITNESS:   I would say well over a

 8            hundred.

 9    BY MR. BLINDERMAN:

10        Q.    Detective, did you have any active

11    participation in the investigation into a homicide

12    where Jeremy Lockhart was considered a prime suspect?

13        A.    Yes, I did.

14        Q.    Would you briefly tell the Court what your

15    participation was leading to your contact with Mr.

16    Lockhart?

17        A.    I responded to the scene of the homicide on

18    the day of the occurrence, which was June the 25th,

19    1994.   I had an opportunity to go to the crime scene,

20    view the crime scene.   And I also had an opportunity to

21    speak with witnesses on that day.

22        Q.    At that time did it become apparent to you

23    that Jeremy Lockhart may be a suspect in this case?

24        A.    Yes.

25        Q.    How did that come about?
```

1        A.    It came through the taking of taped sworn

2    statements from eye witnesses to the incident.

3        Q.    At that time did you make contact with Jeremy

4    Lockhart himself at the scene of the crime?

5        A.    No, he had fled the scene and contact wasn't

6    made with Mr. Lockhart until June the 27th, 1994.

7        Q.    Would you explain to the Court how you made

8    contact with Mr. Lockhart on June the 27th?

9        A.    Yes, he came to the Fort Lauderdale Police

10   Station and surrendered himself.

11       Q.    Who if anyone was present with him at that

12   time?

13       A.    I believe a women who identified herself as

14   his wife Monica was with him.

15       Q.    How did you become personally aware of the

16   fact that he was at the police station surrendering

17   himself?

18       A.    To my recollection the person that works the

19   front desk at the police department called our unit and

20   told us he was presently in the lobby wishing to

21   surrender himself.

22       Q.    What if anything did you do at that point?

23       A.    I went to the lobby area with another

24   detective.

25       Q.    What detective, sir?

JUSTICE REPORTING SERVICES, INC.    523-6114

1     A.   I believe Detective Stone.  At that time he

2  identified himself as Jeremy Lockhart and I identified

3  myself and he was handcuffed and taken into custody.

4     Q.   Did you have a conversation with him at that

5  time?

6     A.   Just to identify myself and have him identify

7  himself.

8     Q.   Okay.  Once he was taken into custody what if

9  anything did you do next?

10    A.   He was escorted to our office and placed in

11  one of the interview rooms.

12    Q.   Where is your office located in reference to

13  the station itself?

14    A.   It's located on the second floor in the west

15  wing of the police department.  Incorporated in our

16  office is two interview rooms which is where we

17  interview witnesses as well as suspects.

18    Q.   Are the interview rooms locked rooms or are

19  they unlocked rooms?

20    A.   They can be locked.

21    Q.   Did you place Mr. Lockhart directly into an

22  interview room?

23    A.   Yes.

24    Q.   Would you describe what the interview room

25  consists of?

1     A.    It's a room which is approximately 12 feet by

2    12 feet.    It's square and there is a table and three or

3    four chairs.

4        Q.    Is there sufficient lighting?

5        A.    Oh yes, overhead lighting.

6        Q.    Are the chairs comfortable?

7        A.    Yes, we use them.

8        Q.    Okay.    How long approximately did you place

9    Mr. Lockhart in the interview room for?

10       A.    Well, he was there for a very short period of

11    time.    When I made contact with him and explained to

12    him after I had a very brief conversation with his

13    wife, I explained to him I was one of the detectives

14    involved in an investigation concerning his arrest.    He

15    was under arrest for murder in the first degree, and

16    that if he wished to do so we would take a statement

17    from him, tape recorded statement like we had with the

18    witnesses.

19            We were also interested in recovering the

20    handgun involved in the incident if he wishes to take

21    us to the handgun.

22       Q.    What was your tone of voice like when you

23    communicated this, what you testified you said to the

24    defendant?

25       A.    Exactly as it is now.

/

JUSTICE REPORTING SERVICES, INC.        523-6114

16

1       Q.      Conversational?

2       A.      Yes.

3       Q.      Did you make any threats to him at that time?

4       A.      No.

5       Q.      Did you suggest what the ultimate penalty may

6       be for first degree murder?

7       A.      No, never discussed that.

8       Q.      Did Mr. Lockhart at any time request to use

9       the restroom facilities to the best of your

10      recollection?

11      A.      No.

12      Q.      Did you deny him any request to eat or drink

13      or smoke cigarettes, or any of those requests?

14      A.      No, to my recollection he made no requests

15      like that.

16      Q.      Did you ever promise Mr. Lockhart at any time

17      that you'd go lenient with him or help him in any way?

18      A.      No, at no time.

19      Q.      Did you ever at any time tell Mr. Lockhart

20      that you had information as to other witnesses or

21      physical evidence in reference to this case that would

22      implicate him to the crime?

23      A.      No, I don't think we discussed the elements

24      of the offense itself whatsoever as far as what

25      witnesses had said what or what evidence there was

```
 1    leading up to his arrest.

 2         Q.    At the time that Mr. Lockhart surrendered

 3    himself to you, detective, how would you describe his

 4    demeanor?

 5         A.    Very --

 6         Q.    Was he agitated?

 7         A.    Very coherent, he listened to what I was

 8    telling him.  He was cooperative and seemed to

 9    understand everything that I was saying to him.  I

10    certainly had no problem understanding him.

11         Q.    Did you detect an odor of alcohol on his

12    breath at any time?

13         A.    No.

14         Q.    Did you detect an odor of narcotics, or

15    anything based on your training and experience to

16    indicate he may be under the influence of narcotics or

17    a controlled substance?

18         A.    No, I had no reason to think that.

19         Q.    Was his speech slurred?

20         A.    Not at all.

21         Q.    Was he able to understand the questions?

22         A.    Seemed to be.

23         Q.    Did he seem to be lucid?

24         A.    Very much so.

25         Q.    Getting back to the interview room.  After
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1    you explained to Mr. Lockhart why he was in custody, at
2    any time did he request to speak to an attorney?

3        A.    Yes, he asked for an attorney when I told him
4    that we were interested in taking a statement from him
5    if he wished to give one.

6        Q.    What was his direct response to that inquiry?
7        A.    I think I should talk to an attorney I
8    believe is what he said.

9        Q.    What if anything, detective, did you do at
10   that time?

11       A.    I told him at that point I could have no
12   conversational contact with him concerning the incident
13   as far as taking a statement or going out to attempt to
14   retrieve the weapon, and I left the interview.

15       Q.    Was anyone else in the interview room at that
16   time?

17       A.    No, I was by myself.  We also discussed - at
18   that point I explained to him what was going to happen
19   from that point forward was that he would be booked
20   into our jail and then he would be transported to the
21   Broward County Sheriff's Office jail.  Once all the
22   case was put together, the statements and paper work
23   and the evidence, that would be forwarded to the State
24   Attorney's Office.  And then the State Attorney's
25   Office would make a decision as to whether or not the

1   case should be presented to the Broward County grand

2   jury where they or the State Attorney would review all

3   evidence to make the final determination as to what if

4   any crime he should be charged with.

5        Q.   Was that information volunteered by you or

6   was that in response to a question of the defendant as

7   to what was going to happen from that point on?

8        A.   No, it was volunteered to him.

9        Q.   In your normal course of taking statements or

10  confessions from suspects do you normally give them

11  information as to what they should expect now that

12  charges have been filed against them?

13       A.   Yes, I think they have the right to know what

14  to expect from that point.

15            MR. GODWIN:  I will object to normal

16       situations.

17            THE COURT:  Sustained, sustained, sustained.

18  BY MR. BLINDERMAN:

19       Q.   Detective, where if anywhere did you go after

20  you left that interview room?

21       A.   I left that room and went to my office and

22  began to prepare a probable cause affidavit.

23       Q.   How far away was your office from the

24  interview room?

25       A.   Probably 25 to 30 feet from that particular

```
 1    door.
 2         Q.   Was Mr. Lockhart still in the interview room
 3    at that time?
 4         A.   Yes.
 5         Q.   Was he handcuffed or was he not handcuffed?
 6         A.   No, he was not handcuffed.
 7         Q.   Approximately how much time did it take you
 8    to prepare your probable cause affidavit when you went
 9    to prepare it after he wanted to cease questioning?
10         A.   Actual typing and preparation time I'd say
11    approximately half an hour.
12         Q.   Did you have any contact with him between the
13    time you left the interview room and the time you
14    actually prepared your probable cause affidavit?
15         A.   No.
16         Q.   Sir, after you prepared your probable cause
17    affidavit was there any time where you re-entered into
18    contact or re-contacted the defendant?
19         A.   Yes.  I was still in the process of doing a
20    probable cause affidavit when Detective Stone came to
21    me.
22         Q.   He came to your office?
23         A.   Yes.
24         Q.   Your station?
25         A.   Yes.
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1        Q.    What if anything did Detective Stone say to

2    you?

3        A.    He told me that Mr. Lockhart had knocked on

4    the door and asked him when I was going to come in and

5    take his statement.

6        Q.    What was your response to that?

7        A.    I told Detective Stone that he had chosen to

8    have an attorney present, and at that point I

9    re-entered the interview room.

10       Q.    What if anything did you say to the defendant

11   at that time?

12       A.    At that time I told him that it was my

13   understanding that he had chosen not to make a

14   statement because he wanted to talk to an attorney.  He

15   told me at that point he did want to give a taped sworn

16   statement and give his side, what had transpired the

17   day of the incident.

18       Q.    What happened next?

19       A.    I retrieved a rights waiver form which our

20   agency uses.  He was read his rights from that form by

21   me, and at the conclusion of that we went on tape and a

22   tape recorded statement was taken from him.

23            MR. BLINDERMAN:  Your Honor, may I approach

24       the witness?

25            THE COURT:  Yes.

```
 1              MR. BLINDERMAN:  Counsel, this is a photocopy
 2         of the rights waiver form.  Your Honor, at this
 3         time I would like to mark this for purposes of
 4         this hearing only as exhibit C for identification
 5         at this time.
 6              THE COURT:  Any problem with that being
 7         marked into evidence?
 8              MR. GODWIN:  No objection.
 9              THE COURT:  State's exhibit 3.
10              (Thereupon, State's Exhibit No. 3 was marked
11         in evidence.)
12              MR. BLINDERMAN:  Thank you, Judge.
13    BY MR. BLINDERMAN:
14         Q.   Detective, I'm showing you what's been marked
15    for purposes of this hearing as State's Exhibit 3, do
16    you recognize it?
17         A.   Yes.
18         Q.   What is it?
19         A.   It's a photocopy of the rights waiver form I
20    read to Mr. Lockhart on June the 27th, 1994 by me.
21         Q.   Do you have a copy of the original in your
22    file?
23         A.   Yes, I do.
24         Q.   If you could look at your original and look
25    at this are they exactly the same?
```

```
 1        A.   Yes.

 2        Q.   Detective, this is the rights waiver form

 3   that you read to Mr. Lockhart, is that correct?

 4        A.   That's correct.

 5        Q.   And Mr. Lockhart filled in the blanks yes

 6   sir, all right, yes sir, down the row as you read him

 7   these rights and asked him if he understood that, is

 8   that correct?

 9        A.   I filled those in, those were his responses

10   to my readings to him and I filled in his responses.

11        Q.   That's your handwriting?

12        A.   Yes, it is.

13        Q.   As I understand it he would say that and then

14   you would write down what he said?

15        A.   That's correct.

16        Q.   At the end of this rights statement here, or

17   waiver, is there any indication where Mr. Lockhart

18   signed it?

19        A.   Yes, at the beginning of the paragraph where

20   it says I Jeremy Lockhart and he printed his name.

21   Thereafter I read the bottom paragraph to him and then

22   at the bottom beneath that he signed his signature to

23   that.

24        Q.   And did you sign this document in any place?

25        A.   Yes, I did where it says witness, the very
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1    first witness.

2         Q.    Did you date this document?

3         A.    Yes, I did.

4         Q.    Did you date the exact time this statement

5    was read and signed?

6         A.    Yes.

7         Q.    And that is also indicated on the rights

8    waiver form?

9         A.    Yes, it's documented when it commenced and

10   it's documented when it ended.

11        Q.    And as you read him these rights was it

12   apparent to you that he understood what you were

13   saying?

14        A.    Yes, or I would have taken greater pains to

15   explain it to him.

16        Q.    At the time that you were reading him this

17   rights waiver form did - at any time did he indicate to

18   you that he once again desired to speak to an attorney?

19        A.    No.

20        Q.    Did he ever indicate to you that once again

21   he desired to stop answering any questions that you may

22   have at this time?

23        A.    No, no.

24        Q.    After you finished doing the rights waiver

25   form did you take a taped statement from Mr. Lockhart?

25

```
 1       A.    Yes, I did.
 2       Q.    Physically how long was that taped statement?
 3       A.    I believe it lasted from 11:51 a.m., to
 4    12:16 p.m.
 5       Q.    So approximately 25 minutes?
 6       A.    Yes.
 7       Q.    At any time during that statement did he wish
 8    to cease questioning or answering questions and seek
 9    the advice of an attorney?
10       A.    No.
11       Q.    Did his voice appear to be clear as he
12    answered questions?
13       A.    Oh, yes.
14       Q.    Did he appear to be lucid?
15       A.    Very much so, yes.
16             THE COURT:    Your motion goes to what happened
17       up until the actual giving of an alleged
18       confession, right?
19             MR. GODWIN:    That's correct.
20             THE COURT:    What happened from that point
21       forward is of no consequence, right?
22             MR. BLINDERMAN:    I will cease questioning
23       then because that's where, that's leading to --
24       Judge, just one other thing for the record.
25    BY MR. BLINDERMAN:
```

26

1      Q.    Detective Walley, was there actually another
2    taped statement taken?

3      A.    Yes, there was.

4      Q.    That would be considered a second statement?

5      A.    Yes.

6      Q.    That was in reference to what?

7      A.    We had gone out and had attempted to recover
8    a handgun, and when we came back to the station I took
9    a subsequent statement about the attempts to recover it
10   and his volunteering to attempt to do that and how the
11   weapon ended up where it had.

12     Q.    Was he advised of his rights again before
13   that statement?

14     A.    I believe not from the rights waiver form or
15   this form, but I think I did remind him during the
16   statement that was something he didn't have to do.  And
17   we discussed that he had done that voluntarily as far
18   as going out and trying to recover the weapon.

19     Q.    Detective, the individual that you took the
20   statement from back on June 27th, 1994 do you see that
21   person present in court?

22     A.    Yes, sir, seated at the table with the brown,
23   green, and white shirt.

24          THE COURT:   Record reflect the witness
25          identified the defendant.

1            MR. GODWIN:  Stipulate, Your Honor.

2    BY MR. BLINDERMAN:

3        Q.    This statement was taken in Broward County,

4    Florida?

5        A.    Yes sir.

6            THE COURT:   Your witness.

7            MR. GODWIN:   One moment please, Your Honor.

8            MR. BLINDERMAN:   Thank you, detective.

9            MR. GODWIN:   No questions.

10            THE COURT:   No questions, okay, thank you.

11            MR. BLINDERMAN:   My next witness is a very

12        brief witness, Judge, Detective Stone.

13    Thereupon,

14                        ALAN STONE,

15    having been first duly sworn, was examined and

16    testified as follows.

17            THE CLERK:   Okay, state your full name and

18        spell your last name for the record.

19            THE WITNESS:   Alan Stone, S-T-O-N-E.

20                    DIRECT EXAMINATION

21    BY MR. BLINDERMAN:

22        Q.    Good morning, detective.

23        A.    Morning.

24        Q.    Detective, would you tell the Court where you

25    are employed?

```
 1        A.    City of Fort Lauderdale Police Department.

 2        Q.    What capacity?

 3        A.    I'm currently assigned to the detective

 4    bureau.

 5        Q.    Any specialized division, detective?

 6        A.    Yes, sex crimes, child abuse.

 7        Q.    Detective, were you employed on, back on June

 8    27th, 1994?

 9        A.    Yes, I was.

10        Q.    Were you at the station at approximately

11    eleven, about eleven - between eleven and twelve in the

12    morning?

13        A.    Yes, I was.

14        Q.    Do you recall where you were at that time?

15        A.    I was at my desk typing up reports on one of

16    my cases.

17        Q.    Where is your desk in reference to, I would

18    call them interview rooms?

19        A.    It's the desk that's probably closest to both

20    of them.

21        Q.    At any time while you were at your desk did

22    you observe Detective Walley bring a suspect in on the

23    case he was investigating?

24        A.    Yes, I did.

25        Q.    That person later become known to you as
```

```
 1   Jeremy Lockhart?

 2        A.   Yes.

 3        Q.   Do you see Jeremy Lockhart in court today?

 4        A.   Yes, I do.

 5        Q.   Would you please point out to him or her?

 6             MR. GODWIN:   Stipulate this is Mr. Lockhart.

 7   BY MR. BLINDERMAN:

 8        Q.   Detective Stone, did you observe Detective

 9   Walley to lead the suspect, lead the suspect Mr.

10   Lockhart into the interview room?

11        A.   Yes, I believe they went into interview room

12   number five.

13        Q.   How far in distance is that away from your

14   desk?

15        A.   Ten, fifteen feet, most.

16        Q.   Were you privy to the conversation that

17   Detective Walley had with Jeremy Lockhart at that time?

18        A.   No, I was not.

19        Q.   Did you ever observe Detective Walley to

20   leave the actual interview room at some point?

21        A.   Yes, I did.

22        Q.   Did he leave with Mr. Lockhart or by himself?

23        A.   By himself.

24        Q.   Do you recall where he went?

25        A.   No, I was busy.  He just left the office.
```

1      Q.   Were you able to ascertain whether or not Mr.
2  Lockhart was still in the interview room by himself at
3  that time?

4      A.   I, assumed he was.  You know, they weren't in
5  there together Detective Walley left by himself so I
6  assumed he was still there.

7      Q.   Did there come an occasion, Detective, where
8  the defendant Mr. Lockhart got your attention in some
9  manner?

10     A.   Yes, sir.

11     Q.   When did that happen?

12     A.   Approximately 11:40 a.m., he was knocking on
13  the door.

14     Q.   Approximately how much time had elapsed from
15  the time Detective Walley left the interview room
16  initially and you heard that knock?

17     A.   Just a few minutes, not very long.

18     Q.   Did you engage in a conversation with Mr.
19  Lockhart?

20     A.   Yes, I went to see what he wanted.

21     Q.   What if anything did he say to you?

22     A.   He said to me when is that guy going to take
23  my statement.

24     Q.   What if anything did you do in response to
25  that?

1      A.   I told him that he had just left the room let

2    me go see if I could find him.

3      Q.   What did you do next?

4      A.   I started to walk out to the hallway to see

5    if I could locate Detective Walley.  At that time

6    Detective Walley was walking back into the office and I

7    informed Detective Walley what transpired.

8      Q.   What if anything did you observe Detective

9    Walley do in response to what you told him?

10      A.   He said all right and I think he went and got

11   the tape recorder and walked over to the room.

12      Q.   Did you observe Detective Walley to go back

13   into the interview room?

14      A.   Yes.

15      Q.   Did you company him back into the interview

16   room?

17      A.   No, sir, I did not.

18      Q.   Did you hear any conversation at that time

19   that Detective Walley had with the defendant, Jeremy

20   Lockhart?

21      A.   Just briefly as he opened the door he said

22   something to him, but I don't really recall exactly

23   what it was.

24      Q.   Did you have any other participation in

25   reference to that scenario that you just described him

1      Q.    He asked you whether or not you believed
2    anybody threatened you in any way and you said no?
3      A.    Yes, I did.
4      Q.    He asked you whether or not you had any
5    trouble understanding him and you said no?
6      A.    Yes, I did.
7      Q.    And in the statement here he asked you, he
8    told you he was doing some paperwork and that you told
9    Detective Stone that you wanted to know if you were
10   going to, if he was going to take your statement and
11   you agreed?
12     A.    I asked him, I asked Detective Stone to let
13   him know I'm willing to make a statement not to come
14   take a statement.  I'm willing to make a statement.
15     Q.    And you said at that time that you wanted to
16   give your side of it.  Did he ask you that question and
17   your answer was yes, sir?
18     A.    I wanted to give my version of the story.
19           MR. BLINDERMAN:  I have no further questions,
20     Judge.
21           THE COURT:  Any redirect?
22           MR. GODWIN:  Just a couple things.
23                   RE-DIRECT EXAMINATION
24   BY MR. GODWIN:
25     Q.    After you told Detective Walley that you

1    wanted to speak to an attorney was it then that he told

2    you about the case going to the grand jury?

3         A.    Yes, it is.

4         Q.    That he had statements from witnesses?

5         A.    Yes, he did.

6         Q.    And that the State Attorney would take those

7    statements to the grand jury?

8         A.    Yes, he did.

9         Q.    And that if you didn't give a statement the

10   grand jury wouldn't hear your side of it?

11        A.    Yes, he did.

12        Q.    Then he told you let me know if you want to

13   make a statement?

14        A.    Yes, he did.

15        Q.    Did he ask you if you understood that?

16        A.    He didn't ask me did I understand he said if

17   I wanted to make a statement let him know.  He just

18   says let him know if I want to make a statement.

19        Q.    Did he ask you if you understood the case was

20   going to go to the grand jury without you giving a

21   statement?

22        A.    Yes, yes he did.

23        Q.    Was that what caused you to change your mind

24   and make a statement?

25        A.    Yes, it was.

1              MR. GODWIN:  No further questions.

2              THE COURT:  Okay, thank you.

3         Anymore witnesses?

4              MR. GODWIN:  No, Your Honor.

5              THE COURT:  Argument?

6              MR. GODWIN:  I believe it's the State's

7         burden, Your Honor.

8              MR. BLINDERMAN:  Judge, the case that I'm

9         going to rely on is State versus, or Traylor

10        T-R-A-Y-L-O-R versus State cited at 596 So.2nd

11        956.  A 1992 Florida Supreme Court case, and

12        here's a copy for the Court as well as for

13        defense.

14             THE COURT:  Nice short case.

15             MR. BLINDERMAN:  I'm going to try to get the

16        pertinent part of it, Judge.  This case really is

17        the flag ship as far as the analysis that the

18        Supreme Court of Florida has towards knowingly,

19        voluntarily, and free willed confessions or

20        admissions to police officers.  And they delineate

21        a test whether or not a confession is valid in

22        determining whether or not it was made with free

23        will depending upon the totality of the

24        circumstances surrounding the confession.

25             And part of the totality of the circumstances

JUSTICE REPORTING SERVICES, INC.    523-6114

1     they look at is of course the police officers and
2     other factors such as the station house setting,
3     which we have here.  Police suggesting details of
4     a crime which I believe was not ever done based on
5     Detective Walley's testimony.  He was not - the
6     defendant was not subjected to a multitude or
7     borage of questioning from different officers at
8     one time.  He was not deprived of his right to
9     eat, go to the bathroom, smoke cigarettes, drink
10    soft drinks, or water.  And I believe based on the
11    testimony he never even requested any of these
12    things.  He was not promised with leniency for
13    giving a confession or admission.  And he was not
14    on the other side of the coin threatened with
15    harm.

16         The ultimate sanction for the crime of first
17    degree murder was not discussed with him, or any
18    incarceration, or the electric chair.  He was not
19    physically coerced into any kind of statement.
20    They did not delude him of his own position as to
21    testifying.  Detective Walley in my opinion gave a
22    text book rights waiver analysis.  He gave him not
23    only oral rights but he wrote them down in
24    writing.  The defendant by his own admission
25    understood them.

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1              He was not under the influence of alcohol.
 2        He was not under the influence of any kind of
 3        intoxicating substances.  And he was lucid and
 4        able to understand the questions, and he was
 5        answering them.  He was able to make a knowingly,
 6        and voluntary intelligent waiver of his rights.
 7              The defendant by his own admission was the
 8        individual who after he asked to speak to an
 9        attorney re-initiated contact with the
10        detectives.  And I don't think there is any
11        dispute that he re-initiated contact with the
12        detectives.  The only issue is a factual dispute
13        as to whether or not Detective Walley told him
14        about the grand jury previous to his request for
15        an attorney or --
16              THE COURT:  Hold on a second.
17              MR. BLINDERMAN:  The only factual dispute,
18        Judge, is whether or not the detective told him
19        about the grand jury proceeding before he
20        initiated his request for an attorney.  Before or
21        after.
22              Judge, I'm going to ask the Court -- the
23        Court is going to have to actually be the trier of
24        fact as to that.  He is a seasoned homicide
25        detective, and he's been a homicide detective
```

JUSTICE REPORTING SERVICES, INC.     523-6114

53

1    since I believe 1981 and he's participated in
2    hundreds of investigations, and he's participated
3    in many, many taped confessions in situations
4    exactly like this.  As opposed to the defendant
5    here by his own admission knew what the
6    consequences were for the crime that he's charged
7    with, as well as the fact that based on
8    conversations that he had with whoever in the
9    community, that he knew that there was a
10   ramification for committing an act like this.  So
11   who would have the actual motivation to mislead
12   the Court in that respect?

13        Additionally, Judge, there is another case
14   that's interesting and I have a copy for the
15   Court, I'm sorry Mr. Godwin I don't have a copy
16   for you but I'll let you see mine.  This is the
17   State versus Manning cited at 506 So.2nd 10 a 3rd
18   DCA case 1987 case, and this case essentially
19   holds that a police officer can actually make up
20   information that's not true, and they write here
21   sexual battery sub-note two, header note two
22   sexual battery.  Defendant's confession was
23   voluntarily given even though officers made false
24   statements concerning existence of incriminating
25   evidence.  The Court went so far as to say that

1    the police officers in this case can actually
2    delude somebody of information that's not true and
3    that does not necessarily mean that the
4    defendant's confession or admission would be
5    involuntary.

6           And in this case the police at the station at
7    10:40 a.m., the defendant was advised of his
8    rights and he signed a waiver rights form exactly
9    the way we have here, based on our testimony here,
10   and an interview began.  And first the defendant
11   denied everything including the fact that he had a
12   venereal disease in this case of a sexual
13   battery.  The detective told him that there was
14   evidence, there were medical records that he had a
15   venereal disease.  After, and after rest breaks
16   and an hour-and-a-half of questioning eventually
17   the defendant admitted to the crime and admitted
18   to having the venereal disease, and that was used
19   against him to secure a conviction.

20          The Court found that the police officers
21   don't have to tell the defendant the truth in
22   reference to certain information that they know
23   and there could still be a valid admission.  In
24   this case Detective Walley testified that what he
25   was doing was attempting to give the defendant the

55

1    courtesy of knowing what was going to happen to
2    him based on the fact that he would be charged
3    with a crime like that.  I don't see any coercive
4    police conduct that would rise to the level of
5    alleviating his knowingly and willing voluntary
6    rights and his waiver of those rights.  And that's
7    the State's arguments.

8         MR. GODWIN:  Your Honor, briefly, the Manning
9    case that counsel cites, I'm aware of the fact
10   that some Courts have sanctioned police officers
11   for lying and using trickery and so fourth to
12   secure confessions, and that's not what this is.
13   But I recognize that's the state of the law.  We
14   are talking about a situation here where a man has
15   affirmatively asked for an attorney.  We are
16   talking about Edwards versus Arizona the right to
17   have counsel, a man who has invoked his right to
18   an attorney.  And Mr. Blinderman said the only
19   factual dispute is whether the detective said to
20   him before he asked for an attorney or after he
21   asked for an attorney that the grand jury was
22   going to consider the case with the witnesses
23   statements and so forth.

24        If Your Honor recalls, and I think you know
25   what I'm focusing on, the detective testified, and

/

1       there is a record of it here, the detective

2       testified that after Mr. Lockhart asked for an

3       attorney the detective then said to him I'm going

4       to forward this case, or words to this effect, I'm

5       going to forward this case to the State Attorney's

6       Office and the witness' statements will go before

7       the grand jury, and the grand jury will have to

8       make a decision whether to charge you or not

9       without your statement.

10          The detective testified he said that to him

11      after Mr. Lockhart had asked for an attorney.

12          THE COURT:   Right.

13          MR. GODWIN:   And Your Honor specifically

14      asked the detective did he ask you what was going

15      to happen?   Did he initiate the conversation or

16      did you volunteer it?   The detective said I

17      volunteered it.   So it's the detective's behavior

18      that we are talking about here, that coercive

19      police activity.   What is the purpose of saying to

20      Mr. Lockhart after he asked for an attorney well

21      now this case is going to go to the grand jury

22      with the statements of the other witnesses and the

23      grand jury is going to consider this case with the

24      statements of the other witnesses.

25          Mr. Lockhart has testified, and he is

57

```
1    entitled I think to some credibility.  Your Honor,
2    he turned himself in.  He's acknowledged that he
3    was read his rights.  He said he was scared but
4    under Edwards versus Arizona, and I have only one
5    copy but I'm sure the Court --

6         THE COURT:  You're saying basically once
7    somebody invokes their rights to counsel you must
8    cease any further interrogation.  I think one of
9    the issues here that has to be resolved is whether
10   that statement was made by Walley which I asked
11   whether it was in response to a question or
12   voluntary and he said it was volunteered on his
13   part.  Whether that shall be construed as a subtle
14   form of questioning or whether it was just a mere
15   statement not designed to elicit any response?

16        MR. GODWIN:  Yes.  And if I may, Your Honor,
17   the case also says that -- Edwards also says that
18   although we've held that after initially being
19   advised of his Miranda rights the accused may
20   waive his rights in response to interrogation.
21   The Court has strongly indicated additional
22   safeguards are necessary when the accused asks for
23   counsel.  We now hold -- this is 1981 -- we now
24   hold that when an accused has invoked his rights
25   to have counsel present during custodial
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1       interrogation a valid waiver of that right can not

2       be established by showing only that he responded

3       to further police initiated custodial

4       interrogation, even if he's been advised of his

5       rights.  I concede he's advised of his rights and

6       of course there's no question about that.  But

7       that came about after Detective Walley had said to

8       him this case was going to go to the jury and

9       statements were going to go before the grand jury

10      and the State Attorney will decide what to present

11      to the grand jury.

12          If Your Honor recalls I asked Mr. Lockhart

13      did the detective ask you if you had understood

14      that, or did he ask you if you wanted to make the

15      statement?  He said yes that's what he asked, and

16      the essence of that is further police coercive

17      conduct by saying to him now this is going to go

18      before the grand jury.  And the other statements

19      that the other witnesses have given are going to

20      go before the grand jury, and the grand jury will

21      decide whether to charge you with first degree

22      murder just based on what they have without your

23      statement.

24          The effect of that, Your Honor, is to put

25      pressure on him to make a statement even after he

```
 1      has asked for an attorney and he clearly beyond
 2      all doubt asked for an attorney.  I think Your
 3      Honor has focussed in on exactly what the issue is
 4      and I would simply suggest, Your Honor, that under
 5      this record that the only reasonable construction
 6      is that this was a form of coercion on Mr.
 7      Lockhart to give a statement.  Because it's clear
 8      he asked for a lawyer and the detective clearly
 9      said to him after he asked for the lawyer this is
10      going to go to the grand jury and they are going
11      to have all the statements except yours and this
12      is your chance here and now to give a statement.
13                  THE COURT:  Okay, let me --
14                  MR. BLINDERMAN:  I have brief response to
15      that, Judge.  The Court was absolutely correct in
16      its inquiry to Detective Walley's comments and if
17      they were considered to be interrogation.  The
18      State submits that they weren't.  He did not begin
19      questioning on any relevant facts in this case
20      pursuant to this defendant's admission or
21      confession.  He merely advised him of the way the
22      procedure would be.  And taking into account the
23      totality of the circumstances, and the Court heard
24      the defendant's answers on tape and his demeanor
25      and the calmness in his voice as he answered
```

```
1     questions as Detective Walley went through those
2     rights on the waiver form.  I don't see how the
3     totality of the circumstances would convene upon
4     the defendant to force him to be scared to the
5     point where he would be not be giving a knowingly
6     and voluntarily and free willed confession.
7          MR. GODWIN:  I'd just make one final comment,
8     Judge.  I stipulated to statements to come in and
9     save time and we did cut off after the first two
10    minutes.  But if you listen to the very end of the
11    tape Mr. Lockhart is crying.
12         MR. BLINDERMAN:  That's in reference to the
13    fact that he's talking about at that point that he
14    shot a friend of his, Judge.
15         MR. GODWIN:  Well, my point is --
16         MR. BLINDERMAN:  I don't know that kind of --
17         MR. GODWIN:  We're talking about --
18         MR. BLINDERMAN:  I don't think that rises to
19    the level of being an individual who is scared, or
20    someone who was upset over what happened.
21         THE COURT:  Okay, let me re-read Edwards and
22    I'll read this case here.
23         MR. GODWIN:  Traylor, that's a good case,
24    Judge, it's a long case.
25         THE COURT:  I thought it was quick.
```

1          MR. GODWIN:   It has to do with murders
2     committed in Alabama.
3          THE COURT:   Okay, you only have one copy of
4     Edwards?
5          MR. GODWIN:   Judge, I will bring you a copy
6     of Edwards in just a few minutes, sorry.
7          THE COURT:   I'll set this down for -- I'll
8     rule on this on Monday at about 10:30.   Okay,
9     thank you.
10          MR. BLINDERMAN:   Just for the record another
11     case I want to sight, Judge, is a case that the
12     State is also relying on and that's State versus
13     Sawyer, and this is cited at 561 So.2nd 278.   It
14     is a 2nd DCA opinion from 1990.   Once again here's
15     a copy for the Court and for defense counsel.   It
16     basically delineates some of the coercive
17     proceedings that they found to be unconstitutional
18     in a confession or admission.
19          THE COURT:   Okay.
20          MR. GODWIN:   Thank you.
21          (Thereupon, the proceedings were concluded.)
22
23
24
25

62

1                    C E R T I F I C A T E

2                         - - - - -

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5         I, MICHELLE MEEKER, Shorthand Reporter, Notary
     Public, do hereby certify that I was authorized to and
6    did stenographically report the foregoing proceedings
     and that the transcript is a true and correct
7    transcription of my stenotype notes of the proceedings.

8         Dated this �net⎹OH day of ⎯⎯ , 1995.

9

10                    MICHELLE MEEKER
                      Shorthand Reporter

11

12
     STATE OF FLORIDA
13
     COUNTY OF BROWARD
14
          The foregoing certificate was acknowledged
15   before me this 5th day of ⎯⎯ , 1995, by
     MICHELLE MEEKER who is personally known to me.
16

17

18                    Notary Public-State of Florida
                      My Commission No.
19                    Expires:

20

21

22

23

24

25

                              ,

         JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1   State of Florida      )
                           ):ss           Mark A. Speiser
 2   County of Broward     )

 3
                    IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
                 IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6   STATE OF FLORIDA,

 7          Plaintiff,

 8   -vs-                           Case No. 94-10764 CF10A

 9   JEREMY LOCKHART,

10          Defendant.

11   _____/

12

13          Proceedings had and taken before the Honorable

14   Mark A. Speiser, one of the Judges of said Court, fifth

15   floor, Room 5900 Broward County Courthouse, Fort

16   Lauderdale, Broward County, Florida, on the 10th day of

17   April, 1995, commencing at or about the hour of 9:00

18   o'clock a.m., and being a hearing.

19

20   APPEARANCES:

21          CRAIG BLINDERMAN, Esquire,
            Assistant State Attorney,
22          Appearing on behalf of the Plaintiff.

23          ROBERT GODWIN, Esquire,
            Appearing on behalf of the Defendant.
24

25
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1                  (Thereupon, the following proceedings were
 2          had:)
 3                  THE COURT:  All right, we are here on the
 4          case of the State the Florida versus Jeremy
 5          Lockhart where we had a motion to suppress a
 6          statement that was entertained by this Court on
 7          Friday, and the Court had an opportunity to read
 8          over the weekend the cases that were presented to
 9          the Court, that is Edwards versus Arizona at 101
10          Supreme Court 1880.  And I read over also
11          pertinent portions of - I actually had Traylor
12          before me on another occasion so I re-read Traylor
13          which was that lengthy case in the Florida Supreme
14          Court at 396 So.2nd 957.  And two other cases were
15          furnished State versus Manning at 506 So.2nd 1094,
16          and State versus Sawyer at 561 So.2nd 278.  And I
17          also took into account a couple other cases that I
18          came across that I thought were relevant and that
19          is Walker versus State at 494 So.2nd 1322 which is
20          a 3rd district opinion in March of 1986.  Arnold
21          versus State at 505 So.2nd 1104.  And State versus
22          Moore at 530 So.2nd 349 a 2nd District opinion.
23                  MR. GODWIN:  Could you give that last cite
24          again?
25                  THE COURT:  530 So.2nd 349 a 2nd District
```

```
 1        opinion.  And essentially what we have here is a
 2        situation where a defendant, who knew that there
 3        was an outstanding warrant for his arrest on the
 4        charge of homicide, and I guess at that point in
 5        time it wasn't determined whether it's going to be
 6        first degree or second degree murder, but he knew
 7        there was an outstanding warrant for homicide and
 8        he surrendered himself to the Fort Lauderdale
 9        Police Department.  And there he was met by,
10        downstairs by Detective Walley and another
11        detective who immediately handcuffed him and
12        brought him upstairs and they advised him of his
13        rights in an interview room.
14              He indicated that in fact he wanted to have
15        an attorney present and thereafter he indicated he
16        wanted an attorney.  Detective Walley advised him
17        of what the next steps would be in the process, in
18        terms of having the case presented to the grand
19        jury, that witnesses would be presented to the
20        grand jury.  And then at that point in time
21        Detective Walley left the room and went to his
22        desk and was apparently working on paperwork.  And
23        at that point in time thereafter the defendant Mr.
24        Lockhart knocked on the window and told another
25        detective, who's desk was right outside the
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1      interview room, that he wanted to speak to

2      Detective Walley.

3      And Detective Walley then came over and at

4      that point in time the defendant apparently

5      indicated he wanted to make a statement. And at

6      that juncture prior to making a statement there

7      was a rights waiver form that was executed by the

8      defendant. And then a taped statement was given.

9      And the argument was made to the Court that this

10     Court, that after he was -- well I heard from the

11     two detectives that testified, together with the

12     defendant, and the posture of the defense is that

13     after the defendant invoked his right to counsel

14     there was some type of subtle suggestion or

15     pressure that was placed on the defendant after he

16     invoked his right to counsel that led to his

17     decision to subsequently change his mind and make

18     a statement to the police which was apparently of

19     an inculpatory nature.

20     And it's the defense's posture that after -

21     one, after a defendant raises his, requests his

22     attorney, that no further interrogation can

23     occur. It's the Court's position after reading

24     over the relevant cases that I'll have to

25     respectfully deny the motion to suppress. It's

JUSTICE REPORTING SERVICES, INC.      523-6114

1         the Court's possession that Edwards versus State
2         stands for the proposition specifically that there
3         be no further custodial interrogation after a
4         defendant invokes his right to counsel.  And I
5         read over Edwards again and again and I want to
6         stress that Edwards focuses on interrogation.  And
7         this Court is obviously familiar that there are
8         other forms of subtle type of pressure that could
9         be put on the defendant that may not necessarily
10        be construed interrogation that would be designed
11        to elicit the same type of responses that a
12        "direct interrogation" would have.

13             First of all I would note that having heard
14        the testimony in this case I'm of the opinion that
15        in fact there was no further interrogation after
16        the defendant had indicated that in fact he wanted
17        to speak to his counsel but rather -- and I think
18        an informative revelation by Detective Walley to
19        the defendant as to what was going to happen next
20        in terms of the process and procedure.

21             I do not feel that having heard what
22        Detective Walley indicated that would in any way,
23        shape, fashion, or form directly or indirectly be
24        considered, or be construed by this Court to be
25        any type of subtle pressure, or any type of

1    statement made by the police officer designed to
2    elicit a response by the accused, or merely an
3    informative resuscitation as to what was going to
4    happen to the defendant next, and what was going
5    to happen in terms of the procedure.

6          There was no statement, no suggestion
7    whatsoever that the defendant had to make a
8    statement that would be presented to the grand
9    jury.  He advised the defendant as to how the
10   grand jury operates and what would be the
11   procedure and how they would make the
12   determination.  And I would note that in Edwards
13   again it talks about police initiated custodial
14   interrogation.  I find that what happened in this
15   particular case after the defendant indicated he
16   wanted to have an attorney that there was no
17   further police initiated custodial interrogation.

18         I would note that in foot note number 8 on
19   page 1885 of Edwards versus Arizona it indicates
20   the following language that I thought was
21   relevant.  A valid waiver of counsel's rights
22   should not be inferred when a mere response by the
23   accused overt or more subtle forms of
24   interrogation or other efforts to elicit
25   incriminated information.  I think I reviewed the

JUSTICE REPORTING SERVICES, INC.     523-6114

1       totality of the circumstances here and they

2       clearly indicate this is what happened here.  The

3       statement made by Detective Walley can not be

4       construed by this Court to be a subtle form of

5       interrogation or any effort on his part designed

6       to elicit incriminating information.

7            I would furthermore note as a report of my

8       position this was marked in as an exhibit.  He

9       indicated when he testified that he thought he was

10      pressured, that he thought he was threatened.  I

11      have the rights waiver form which he signed, and

12      right above his name it indicates that I Jeffery

13      Lockhart have read this statement of my rights, or

14      have had it read to me, and I understand what my

15      rights are.  I am willing to make a statement and

16      answer questioning.  I have not previously

17      requested any law enforcement officer to allow me

18      to speak to an attorney about this incident.  I do

19      not wish an attorney to be present at this time.

20      And then he said no threats or promises have been

21      made to me.  No pressure of any kind has been used

22      against me nor have I been tricked or fooled into

23      giving this statement.

24           I feel this relevant language which appears

25      right above his signature, coupled with what's

70

```
 1    considered to be a subjective review of the
 2    evidence before me, leaves this Court to no
 3    alternative but to conclude the statement was
 4    freely and voluntarily given.
 5         Where does that leave us?
 6         MR. GODWIN:  We have a trial date of --
 7    pardon me.
 8         THE COURT:  May 1st.
 9         MR. GODWIN:  We have a status conference,
10    Your Honor.
11         THE COURT:  April 20th.
12         MR. GODWIN:  If I could just put on the
13    record an agreement I had with the prosecutor.
14    There is a witness named April Williams that I've
15    subpoenaed to come in for deposition and detective
16    Walley has agreed to accept service on her behalf
17    and I am just going to subpoena her on Detective
18    Walley.  I put on the record that I have an
19    agreement with the State's Attorney's Office and
20    Detective Walley offered to do that as a curtesy.
21         (Thereupon, the proceedings were concluded.)
22
23
24
25
```

71

1                    C E R T I F I C A T E

2                      - - - - -

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5         I, MICHELLE MEEKER, Shorthand Reporter, Notary
     Public, do hereby certify that I was authorized to and
6    did stenographically report the foregoing proceedings
     and that the transcript is a true and correct
7    transcription of my stenotype notes of the proceedings.

8         Dated this _____ day of _____, 1995.

9

10                   MICHELLE MEEKER
                     Shorthand Reporter

11

12
     STATE OF FLORIDA
13
     COUNTY OF BROWARD
14
          The foregoing certificate was acknowledged
15   before me this _____ day of _____, 1995, by
     MICHELLE MEEKER who is personally known to me.

16

17

18                   Notary Public-State of Florida
                     My Commission No.
19                   Expires:

20

21

22

23

24

25

```
 1    State of Florida      )
                            ):ss          Mark A. Speiser
 2    County of Broward     )

 3
                     IN THE CIRCUIT COURT OF THE
 4                   SEVENTEENTH JUDICIAL CIRCUIT,
                  IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6    STATE OF FLORIDA,

 7             Plaintiff,

 8    -vs-                            Case No. 94-10764 CF10A

 9    JEREMY LOCKHART,

10             Defendant.

11    _____/

12

13         Proceedings had and taken before the Honorable

14    Mark A. Speiser, one of the Judges of said Court, Fifth

15    floor, Room 5900 Broward County Courthouse, Fort

16    Lauderdale, Broward County, Florida, on the 14th day of

17    August, 1995, commencing at or about the hour of 1:30

18    o'clock p.m., and being a jury trial.

19

20    APPEARANCES:

21              JOE PATNER, Esquire,
                Assistant State Attorney,
22              Appearing on behalf of the Plaintiff.

23              ROBERT GODWIN, Esquire,
                Appearing on behalf of the Defendant.
24

25
```

```
 1                (Thereupon, the proceedings were concluded.)

 2                THE COURT:  Okay, do we need to discuss

 3      anything before we get the jury or not?

 4                MR. PATNER:  Judge, two things.  There's been

 5      a stipulation entered with the defense that the

 6      deceased alleged in the indictment, Patrick Brown,

 7      is in fact the victim in this case.

 8                MR. GODWIN:  That's correct that was a

 9      previous stipulation and that is a stipulation

10      now.

11                MR. PATNER:  Secondly, Judge, there is - and

12      I do have a motion in limine which I mentioned to

13      the Court last week and informed counsel of.

14      Judge, its fortunate that Your Honor had the

15      benefit of hearing the case struck, and in that

16      case the defense elicited testimony that the

17      victim Patrick Brown had struck had several

18      instances of violence.  And the first addresses

19      the issue of striking April Reese with a baseball

20      bat in the back of the head.  That - with the

21      proper predicate that testimony under the facts of

22      this case as I see it is appropriate.  However,

23      the predicate for that is for the defendant to

24      testify to it.  The defendant did not testify as

25      to that event and in fact it was brought out in
```

74

1    opening statement, was brought out through cross
2    examination of statements of witnesses and that's
3    improper, Judge.  And State versus Smith speaks
4    pretty clearly to that.  I do have copies of the
5    cases cited and the motion which I will go through
6    and I can address it further in a moment if
7    necessary.
8         The bottom line is in a self-defense or
9    defense of others the relevance is not that the
10   incident happened because that's just bringing in
11   the bad character.
12        THE COURT:  Right.
13        MR. PATNER:  The relevance is what does the
14   defendant think about it.  And if the defendant
15   doesn't testify up until the point the defendant
16   testifies it's not relevant, it doesn't come in.
17   That would be the issue as to that and that's
18   pretty clear.  The second -- so what I'm first
19   asking the Court is there be no mention in voir
20   dire or opening statement or cross examination of
21   any of the State witnesses until if and when the
22   defendant testifies.
23        Now, Smith does go on to say that should the
24   defendant testify, and this is reiterated I
25   believe in Williams, as well Williams is almost

/

JUSTICE REPORTING SERVICES, INC.    523-6114

1     factually right on the line with our case.  If the
2     defendant testifies they can for limited purposes
3     call those witnesses back just to corroborate or
4     show the defendant wasn't lying as to that
5     incident happening.  And the Court limited that he
6     can't put on the whole bulk of the cases and say
7     what a bad guy he is, but they could bring out a
8     couple witnesses to say that did in fact happen.
9     That's the first thing.

10         The second thing is much of the testimony in
11     the last trial was elicited from April Williams as
12     to that incident.  And when you get right to the
13     bottom line after much of the cross examination of
14     April Williams as to the incident with Patrick
15     Brown --

16         THE COURT:  Sorry, go ahead.

17         MR. PATNER:  -- much of the testimony came in
18     through April Williams.  Well, when you finally
19     got through her testimony, and after lengthy
20     questioning by defense counsel and after that her
21     basis of knowledge was she heard about it.  April
22     Williams was not present, she certainly was not
23     present.  In addition -- it's hearsay as to April
24     Williams.

25         In addition to being irrelevant under Smith

/

JUSTICE REPORTING SERVICES, INC.      523-6114

1    and State versus Williams the third incident is
2    that April - the third matter all related is that
3    April Williams was cross examined and it was sort
4    of an off the cuff question about Patrick Brown
5    hitting her again.  The defendant is not
6    testifying to that, the defendant was not present
7    for it, and at that point we're getting pretty far
8    into acts of violence as April Reese and the
9    defendant could say.

10    I would agree with the defense that if the
11    predicate read you see Patrick Brown attacking
12    April Reese then he's forced to respond.  I would
13    agree that is admissible given the proper
14    predicate.  I indicated I do not see how it's
15    relevant that the victim had hit April Williams,
16    and he's now getting into bad character which
17    Smith says he specifically cannot do.

18    THE COURT:  Okay.

19    MR. PATNER:  That's all.

20    MR. GODWIN:  Well, in the first place, Your
21    Honor, as you may recall you ruled upon these
22    issues and it's the law of the case.

23    THE COURT:  I don't remember ruling on it but
24    I'm not saying that I didn't, I don't remember
25    ruling on it.  But if in fact a ruling is proven

JUSTICE REPORTING SERVICES, INC.    523-6114

1    to me to be inaccurate I won't be afraid to admit
2    that I'm wrong.

3    MR. GODWIN:   I understand that.   The fact
4    that the deceased Patrick Brown struck April Reese
5    in the head with a baseball bat is clearly
6    relevant because if Your Honor will recall from
7    the facts of this case Patrick Brown was fighting
8    with April Reese at the time of the shooting.   My
9    client had knowledge of that, and there will be
10   testimony that he had previously struck her in the
11   head with a baseball hat, and that my client was
12   acting to defend her while Mr. Brown was attacking
13   her.   And the law is that the defendant's
14   reputation for violence is admissible, and
15   particular acts of violence known to the defendant
16   are admissible.   Both of those are admissible.

17   THE COURT:   If in fact it's establish the
18   defendant knew that.

19   MR. GODWIN:   That's correct, Your Honor.

20   THE COURT:   That's the key point.

21   MR. GODWIN:   That's one key point.   I have to
22   - I have to advise that while Mr. Patner had said
23   he had the motion in limine about eliciting
24   hearsay from Ms. Williams he has gone further here
25   then anything I'm prepared to address at the

/

JUSTICE REPORTING SERVICES, INC.     523-6114

1      moment.  But I can tell the Court that there will

2      be testimony that Patrick Brown did strike April

3      Reese in the head with a baseball bat.  That was

4      known to my client, he witnessed it, he saw it, he

5      smacked her in the head with a baseball bat and

6      split her head open.  He was acting to defend her

7      when he took the act that he did that resulted in

8      this prosecution.

9          In addition to that, Judge, Patrick Brown's

10     reputation for violence is admissible and the

11     representation of previously beating up either

12     April Reese or April Williams, and that was known

13     to Mr. Lockhart, and that's admissible as well.

14     And there will be such evidence.

15          THE COURT:  Well, what is if?

16          MR. GODWIN:  What do you mean?

17          THE COURT:  How is that going to come in that

18     your client knew about it?

19          MR. GODWIN:  I have witnesses who will

20     testify to that, Judge.

21          THE COURT:  Well, I need for you to proffer

22     for me first of all with respect to the - forget

23     the reputation I'm talking about specific

24     incidents of the decedent hitting April Williams,

25     April Reese?

/

```
 1              MR. PATNER:  Reese.

 2              THE COURT:  April Reese with a baseball bat.

 3         Was he present when that happened?

 4              MR. GODWIN:  Yes, he was present when that

 5         happened.

 6              MR. PATNER:  I don't disagree with the

 7         defense attorney's assertion that it's relevant,

 8         however, he's got to lay a predicate.  He's got to

 9         testify to it at trial.

10              THE COURT:  If someone can testify that the

11         defendant was present and looking at it when it

12         happened why does the defendant himself have to

13         take the stand?

14              MR. PATNER:  Because the relevance is not the

15         incident it's apprehension in the defendant's

16         state of mind.  And the only one who can testify

17         as apprehension in the defendant's state of mind

18         is the defendant.  And that's exactly what Smith

19         says.

20              THE COURT:  Where?

21              MR. PATNER:  On page 318 going down to

22         footnote 16 and 17.  Should be head note 16 and

23         17.  Says the defendant's testimony that he or she

24         knew about specific acts of violence committed by

25         the decedent is relevant and shows the
```

```
 1    reasonableness apprehension.  Testimony of other
 2    people who knew specific acts of violence were
 3    committed by the victim are not relevant because
 4    she didn't know the defendant's state of mind.
 5         THE COURT:  Well, both those propositions are
 6    not mutually exclusive of one another.  I mean, I
 7    agree with both of those propositions but the
 8    point is you don't take issue with the fact that
 9    that happened right in the presence of the
10    defendant, right?
11         MR. PATNER:  I -- no one has testified to
12    that so I can't say that yes or no.  We know April
13    Williams heard about it, and we hear the
14    statements from defense counsel.
15         THE COURT:  April Williams - see I don't
16    remember, was April Williams present at the time?
17         MR. PATNER:  No, she heard about it.  I can't
18    say that did happen whether it did or not is
19    really irrelevant.  Whether the defendant is going
20    to testify to it --
21         THE COURT:  The only one that can testify --
22    let's see the one that was hit in the head was
23    April Reese?
24         MR. GODWIN:  April Reese, Judge, she will
25    testify that she was hit in the head with a
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1    baseball bat.

2         THE COURT:  How does she know the defendant

3    was present?

4         MR. GODWIN:  Because he was present and she

5    will testify he was present when it happened.

6         MR. PATNER:  How can she testify to the

7    defendant's apprehension at the time of the second

8    incident?  The only one who can do that is in fact

9    the defendant.

10        MR. GODWIN:  Well, if Your Honor pleases the

11   law is that particular acts of violence known to

12   the defendant of course those are admissible as

13   well as the victim's reputation for violence.

14   Your Honor well knows that the victim's reputation

15   for violence is an issue in this case and we

16   discussed that extensively and Your Honor ruled as

17   well --

18        THE COURT:  How are you going to show the

19   defendant knows his reputation for violence?

20        MR. GODWIN:  I'm going to show two ways,

21   Judge, I'll have testimony - I'll have testimony

22   from witnesses that my client knew it, as well as

23   the possibility of my client testifying to it.

24   And furthermore, Judge --

25        MR. PATNER:  That's who?

1      THE COURT:  I need to make a ruling at this
2    time.  What witnesses are going to testify and how
3    are they going to testify that your client knew
4    about the decedent's reputation for violence?
5      MR. GODWIN:  Well my client, Judge, is a
6    witness in this case.
7      THE COURT:  Right, he wasn't the last time.
8      MR. GODWIN:  I understand that but we are in
9    a new situation now and my client is a witness in
10   this case.  A potential witness in this case and
11   he was possessed of that knowledge, and he was
12   present when the act of violence took place.   In
13   addition to that April Reese will be a witness in
14   the case and she was present when the act of
15   violence took place against her in the presence of
16   my client.  So it was also known to my client
17   because he was present when Patrick brown hit her
18   in the head with the baseball bat and he saw that
19   happen, and she'll testify to that.  That's prior
20   specific acts of violence known to the defendant
21   and are relevant whether he testifies to them or
22   not as long as he was present and he knew about
23   them.
24      THE COURT:  No, no, no, I take issue with
25   that.  It has to be proven that he knew about

1    them.

2         MR. GODWIN:   And he knew about this.

3         THE COURT:   Right.

4         MR. GODWIN:   Exactly, as well as other people

5    told him.

6         THE COURT:   I'm not going to allow any

7    testimony before this Court, or any -- I'm not

8    going to allow in opening statements any reference

9    about the reputation of the victim to your client

10   unless you either are willing to commit to me

11   beforehand that your client is going to take the

12   stand, or establish to me beforehand how your

13   client knew about it, knew about this reputation.

14   Otherwise if your client does - if you're not

15   going to commit or establish to me how your client

16   knew about it you would be precluded from talking

17   about reputation until your client takes the stand

18   at which time obviously closing you can make any

19   reference you want to reputation.

20        MR. GODWIN:   I think I need to bring Your

21   Honor some case law before you make a final ruling

22   on that about specific acts of violence known to

23   the defendant whether he was present or not.

24        THE COURT:   Absolutely, I agree with you.

25        MR. GODWIN:   Are admissible.

1            THE COURT:  Clearly.

2            MR. GODWIN:  Well a victim's reputation of

3      violence if that was told to him, if he knew the

4      victim had a representation of violence which he

5      did, if that was told to him and bears on the

6      reasonableness of his acts and I will have

7      testimony as to both those situations.

8            THE COURT:  Yeah, but you see the fact that

9      they told him the decedent's representation

10      doesn't establish the state of mind of your

11      client.  The fact that they told him that hey

12      listen this guy is a meany (sic) he's a tough guy

13      and he goes around and beats the crap out of

14      everybody.  That doesn't establish what effect

15      that had on him it merely establishes his --

16            MR. GODWIN:  That he was told and that's an

17      inference for the jury to draw, that's what the

18      case law allows.

19            THE COURT:  I will have to see cases on that

20      because the mere fact that he was told that is, I

21      don't think necessarily is a permissible inference

22      that it had an effect on his state of mind because

23      he could be a tough guy and he's not afraid of

24      anybody, right?  So that wouldn't put necessarily

25      fear in his state of mind.

                        /

JUSTICE REPORTING SERVICES, INC.      523-6114

1          MR. GODWIN:   I understand what the Court is

2      saying.   I'm simply stating I would give Your

3      Honor case law that the victim's reputation for

4      violence is admissible.   I know the Court knows

5      that as well as particular acts of violence known

6      to the defendant are admissible, both those are

7      admissible.

8          THE COURT:   I don't disagree, I don't think

9      he does either.

10         MR. PATNER:   No, Judge.

11         THE COURT:   Has he established the state of

12     mind of the fact that ten people told him that --

13     if we're talking about Mike Tyson being the

14     defendant, the fact that ten people told him that

15     Patrick Brown did this, what effect is that going

16     to have on Mike Tyson?   I don't know what effect

17     it's going to have on your client.

18         MR. PATNER:   And, Judge, what I would --

19     reading from Williams, Williams versus State

20     Williams' defense tactics at trial was he in deed

21     was acting in defense of others.   During cross

22     examination of witness Williams is not permitted -

23     Williams' attorney is not permitted to explore his

24     prior roles of violence.   It goes on to say other

25     specific acts of violence are admissable and must

```
1       be shown that the defendant was aware of specific

2       acts.  There's no proffer made here, or testimony

3       sought that somebody admitted Williams did not

4       testify, therefore the trial court properly

5       excused it.

6            I don't want to be in a situation, Judge,

7       where defense counsel is cross examining witnesses

8       and asking these witnesses questions which the

9       only questions asked in Williams are hearsay

10      anyway, and making these statements in opening

11      statement then not backing them up.  I'm asking

12      the Court - I have agreed to almost everything the

13      defense attorney said as far as admissibility of

14      that evidence, however, I don't a want to hear

15      anything about -- the Court shouldn't hear

16      anything until that time it comes relevant until

17      witnesses testify.  I'd say it's the defendant's

18      -- if the Court feels that April Reese, another

19      witness who was present, can testify to the

20      Defendant's state of mind because he was present

21      -- well, maybe we are splitting hairs.

22           THE COURT:  The fact that the defendant was

23      there when April Reese was hit by Patrick Brown,

24      April Reese can testify to that, to that fact.  I

25      don't need the defendant to testify to that fact
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1     that they say he was present.  April Reese can

2     testify that he was there when it happened.  But

3     to establish what effect that had on him, and to,

4     with respect to his knowledge and the effect of

5     the victim's reputation for violence, you know,

6     the mere fact that other people told him, unless

7     you have a case that establishes that, that

8     establishes his state of mind I will need

9     something to that effect.

10     MR. GODWIN:  I will have to give you some new

11     case law I just brought.

12     THE COURT:  1977 4th District opinion prior

13     knowledge is not necessary in order to introduce

14     reputation evidence on the issue of decedent's

15     conduct at the time of the incident in question.

16     MR. PATNER:  Judge, I believe --

17     MR. GODWIN:  In addition, Judge --

18     THE COURT:  This case doesn't really get us

19     to where we need to be.

20     MR. PATNER:  No, it doesn't and I'll address

21     why not if it doesn't, if I need to but it's not

22     applicable.  It's an, he's --

23     THE COURT:  Why do you say that?

24     MR. PATNER:  Because what they are saying -

25     and the basic first half of the case backs up what

```
 1      I'm telling you.  First it says prior knowledge is
 2      not necessary to introduce reputation evidence on
 3      the issue of the decedent's conduct at the time of
 4      the incident.  What they are making under there
 5      was a series of cases which follows this, Marino
 6      versus State and Soveno (phonetic) versus State
 7      comes to mind.  It essentially reverses a
 8      William's Rule situation where you're showing how
 9      the victim is acting each time with these
10      incidents.  And you can't show that here either if
11      he had hit three other girlfriends with a baseball
12      bat hitting this girl with a baseball bat and then
13      it comes into place here.
14          MR. GODWIN:  Well, Judge, I have additional
15      cases which I will submit to the Court and I want
16      to cite Sanchez versus State -- this motion, he
17      just gave me this motion at this moment and it
18      does not go to the issue that he told me.  It goes
19      to more issues then what we addressed.
20          MR. PATNER:  Well, I mean I don't necessarily
21      agree where that.  I did tell defense counsel
22      generally what this was about.
23          THE COURT:  See this case Sanchez that he's
24      citing at 445 So.2nd a 3rd District opinion 1984
25      basically stands for the proposition all the
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1       defendant has to do is know about it and it says
2       there has to be evidence as to what effect it what
3       on his state of mind.

4           MR. GODWIN:   Exactly, Judge, that's why the
5       testimony is admissible so that the jury can then
6       draw the inference and that's when we have the
7       jury instruction if he knew this man committed
8       previous acts of violence that's an inference the
9       jury can use to decide whether or not he acted
10      reasonably.   For a person to get up and say I knew
11      about it and I was afraid of him that's fine but
12      it's also self-serving and not necessary that he
13      has to get up and testify as to what he was
14      thinking because he knew about the prior act of
15      violence.   The prior acts of violence known to him
16      are admissible in and of itself, that's what
17      Sanchez says.

18          MR. PATNER:   What I want to know is this.
19      How is - if the Court precludes defense counsel
20      from mentioning it until they can bring in any
21      type of evidence that the defendant knew about it,
22      I don't see how that would contradict with
23      Sanchez.   I'll talk about - I can go further into
24      that if necessary.   There is no State witness who
25      can testify, there is no witness other then April

```
1      Reese that I've heard that can testify to this
2      other then the defendant.
3              THE COURT:  Testify to what?
4              MR. PATNER:  That the defendant knew about
5      this incident with the baseball bat.
6              THE COURT:  Well, April Reese can testify to
7      that.
8              MR. PATNER:  April Reese was not called at
9      the last trial by the defense.  She did not
10     testify.  Again what I'm trying to avoid is a
11     situation where the defense attorney stands up
12     here in opening statements and gives a horror
13     story about what the defendant saw the victim do
14     to April Reese before, and then never hear it
15     again.
16             THE COURT:  Lets put it this way, are you
17     calling April Reese?
18             MR. PATNER:  I haven't made a final decision
19     on it.
20             THE COURT:  If he doesn't call April Reese?
21             MR. PATNER:  I'll tell the Court right now
22     I'm anticipating not calling April Reese, and if
23     he were to call April Reese then I suppose I would
24     have to live with the cross examination as to that
25     issue.  If I don't call her, which I'll tell the
```

1        Court right now I'm not.  You remember April Reese

2        is not exactly my best friend.

3                  THE COURT:  That's the one that was here?

4                  MR. PATNER:  Right.  And giving that --

5                  THE COURT:  If he doesn't call April Reese.

6                  MR. GODWIN:  But she is my witness as well,

7        Judge.

8                  THE COURT:  I'm saying --

9                  MR. PATNER:  Fine.

10                 THE COURT:  He's telling you right now he's

11       not calling April Reese.

12                 MR. GODWIN:  He's not saying that.

13                 MR. PATNER:  I'll commit right now.

14                 THE COURT:  He's saying he's not calling

15       April Reese.  If he's not calling April Reese then

16       you're not allowed to bring out what happened with

17       the incident unless you're planing on calling your

18       client.

19                 MR. GODWIN:  I am planing on calling my

20       client at this point, Judge.  I intend to make all

21       these issues known to the jury because these are

22       crucial issues.

23                 THE COURT:  We are going around in circles

24       here and I have to leave.  But the bottom line is

25       I am ruling that with respect to opening

1      statements since the prosecutor -- listen we are

2      only as good as our reputation in this field and

3      he's telling me as an attorney, as an officer of

4      the Court that he's not calling April Reese.  If

5      that changes between now and opening statements

6      then so be it.  But if he's standing by that

7      decision then you will not be permitted to make

8      reference to your client's knowledge of what

9      happened at that incident unless your client is

10     taking the stand, or you're calling April Reese.

11         MR. GODWIN:  Well, I am doing one or both of

12     those at least.

13         THE COURT:  Okay, fine, fine.

14         MR. PATNER:  Could we then leave it out of

15     opening until --

16         THE COURT:  No.  He's telling me likewise as

17     an officer of the Court he's calling either April

18     Reese or the defendant.  I take his word equally

19     as valuable as yours, okay.

20         MR. PATNER:  As to the issue of April

21     Williams I don't think defense counsel disputes

22     the hearsay issue and he can't question April

23     Williams about that incident.

24         THE COURT:  Sure.

25         MR. PATNER:  But violence upon --

```
1              THE COURT:  Well, what happened?
2              MR. PATNER:  With Reese, that Williams heard
3         about --
4              THE COURT:  Oh yeah that would be hearsay.
5              MR. PATNER:  That did come in the last time.
6              MR. GODWIN:  No, but I can question her about
7         the knowledge of the specific acts of violence by
8         Patrick Brown against her that she's aware of.
9              THE COURT:  That she related to the
10        defendant.
11             MR. PATNER:  Okay, if you're going to proffer
12        first she related to the defendant --
13             MR. GODWIN:  Not that she related to the
14        defendant prior specific acts of violence by the
15        deceased.  Again her --
16             MR. PATNER:  That's exactly what Smith says
17        is not admissible.
18             THE COURT:  Not admissible.
19             MR. GODWIN:  It's going to his reputation of
20        violence.
21             THE COURT:  It's not admissible unless your
22        clients knows about it.
23             MR. GODWIN:  That's exactly the case I gave
24        you.
25             THE COURT:  No, no, no, it said he had
```

```
1    knowledge it doesn't say -- Sanchez said he had to
2    have knowledge of it.  It didn't say that he had
3    to demonstrate what effect it had on him.  It said
4    he had to have knowledge.
5            MR. GODWIN:  I understand what the Court is
6    saying and my client has that knowledge and there
7    will be testimony of that.
8            THE COURT: Well, when he testifies to that if
9    he wants to call April Williams back in and
10   address it at that point hearsay is inadmissible.
11           MR. GODWIN:  I'm telling the Court I have
12   that evidence and I will put it on.
13           MR. PATNER:  I have evidence he committed a
14   prior armed robbery bot that's not coming in
15   either.
16           THE COURT:  Wait a second.  April Williams
17   can testify about her knowledge of his reputation
18   as well as prior incidents of conducts, okay.  But
19   -- well, reputation she can only talk about what
20   reputation -- basically it's like a hearsay
21   exception.  She can testify what other people told
22   her generally about his reputation.  She cannot
23   talk about a specific incident unless she was
24   there and saw it firsthand.
25           MR. GODWIN:  Okay.
```

1           THE COURT:   All right.

2           MR. PATNER:   That reputation that's a whole

3   different can of worms now because reputation

4   evidence has to be spoken to ten or fifteen people

5   in the community, diverse community which is

6   defendant, and they are not going to be able to

7   lay predicate.   I'll tell the Court right now they

8   can't lay that predicate.

9           THE COURT:   I don't know of any case that

10  says she has to speak to ten or fifteen people.

11          MR. PATNER:   I will have that by the time you

12  take the bench again.

13          THE COURT:   I don't -- I am not aware of a

14  minimum of ten or fifteen people.

15          MR. PATNER:   If I'm wrong I will correct

16  myself.

17          THE COURT:   With respect to the reputation

18  again, unless April Williams is able -- based on

19  Sanchez unless you find something that suggests,

20  and she is limited -- Sanchez says all they have

21  to show is that he had knowledge.   It doesn't say

22  he has to show what effect it had on him.   He had

23  knowledge of it.   But before I would allow April

24  Williams to testify about this she is going to

25  have to be in the position to testify that she

```
 1      told the defendant --

 2          MR. PATNER:  That's fine Judge, can I ask for

 3      a proffer from defense counsel then?

 4          THE COURT:  Are you telling me she is going

 5      to be saying she told him about the reputation?

 6      You're saying that April Williams is going to be

 7      in the position to testify that she told your

 8      client about what Patrick Brown's reputation was?

 9          MR. GODWIN:  No, no, I'm not saying that.

10          THE COURT:  Then that can't come in.

11          MR. GODWIN:  I will bring the case law,

12      Judge.

13          THE COURT:  Okay.

14          (Thereupon, a lunch recess was had, after

15      which the following proceedings were had in the

16      presence of the perspective jury panel.)

17          THE COURT:  Good afternoon everyone.  I can

18      tell by looking at all of your smiling faces that

19      you are really happy and excited to be here, and

20      that this has been your life long dream to become

21      a juror.  And I am very happy to be with you on

22      this very blessed day.  Being very serious I know

23      most of you would prefer to be anywhere other then

24      where you're sitting right now.  Whether that be

25      at the beach, working, or enjoying your
```

1  retirement.  And we appreciate that fact and

2  that's why we'll try and make making your stay

3  here as palpable and as comfortable as we can

4  under the circumstances.

5    I imagine furthermore that many of you are

6  possessed with some degree of trepidation and

7  anxiety because you have never been this close to

8  a courthouse, never mind this close to a

9  courtroom, never mind this close to being on a

10  jury.  That being the case you have no idea what's

11  going to happen.  My purpose and mission for the

12  next fifteen or twenty minutes is to speak with

13  you and enlighten you and educate you about what

14  we are going to do here.  And hopefully after

15  doing so you'll feel a little bit more

16  comfortable, and a little bit more relaxed.  I'm

17  not suggesting to you that after speaking with you

18  you would be ready to pass the Florida Bar and

19  become a very much needed additional lawyer here

20  in Broward County, but at least you'll be a little

21  bit more comfortable because you're going to know

22  exactly what's going to happen.

23    Now, my name is Mark Speiser and I'm a

24  Circuit Court Judge.  As a Circuit Court Judge the

25  Circuit Court is the highest trial court the state

1    of Florida has.  A Circuit Court Judge can be
2    assigned by the chief judge to one of the five or
3    six divisions that we have and that is the civil
4    division, juvenile division, probate division,
5    family division, the domestic violence division,
6    or the criminal division.  I happen to be in the
7    criminal division and this is going to be a
8    criminal, felony trial.

9         Crimes are divided up into two categories.
10   Misdemeanors and felonies.  Misdemeanors are
11   crimes which if the defendant is found guilty the
12   maximum potential punishment that he is exposed
13   to, or she is exposed to is up to one year in the
14   local county jail.  Misdemeanors are handled by
15   the lower trial courts that we have in the state
16   of Florida and that's the County Court.  We have
17   County Court, and Circuit Court, Court of Appeals,
18   and Supreme Court.

19        County Court judges preside, among other
20   things, over misdemeanors.  Circuit Court judges
21   such as myself preside over felonies.   The
22   difference is that a felony is a crime which if
23   the defendant is found guilty of, depending upon
24   what he's charged with, what if anything he or she
25   is convicted of, the range of potential punishment

                              /

JUSTICE REPORTING SERVICES, INC.     523-6114

1     would be anywhere from excess of one year in state
2     prison up to and including death in the electric
3     chair.   That's the difference between misdemeanors
4     and felonies.

5        Now, being that this is going to be a
6     criminal felony trial, my remarks are not going to
7     be on how you go about getting a divorce, or how
8     you conduct a probate of a will, but on how a
9     criminal trial is conducted.

10       Now, in every single criminal trial there are
11    always two parties.   There is the plaintiff and
12    the defendant.   The plaintiff in every single
13    criminal trial is always the state of Florida.
14    That is in the state of Florida all criminal
15    charges are brought in the name of the state and
16    that's true in any state.   If we were in the state
17    of Wisconsin it would be the state of Wisconsin
18    versus the defendant.   If we were sitting in the
19    state of Idaho it would be the state of Idaho
20    versus the defendant.   But since I believe at this
21    moment we are still in the State of Florida it's
22    the state of Florida versus the identified
23    defendant.

24       Now, the State of Florida is always
25    represented by the State Attorney who is the

1    elected State Attorney in the judicial circuit
2    where the crime allegedly took place.  We are in
3    the 17th Judicial Circuit and the elected State
4    Attorney is Michael J. Satz.  And he obviously
5    cannot be everywhere at once so he has hired a
6    number of Assistant State Attorneys to work for
7    and represent him.  There are approximately 165
8    Assistant State Attorneys in Broward County
9    alone.  So the Assistant State Attorney who's
10   representing the State here, who in effect
11   represents the state of Florida who's the
12   plaintiff in this case is Mr. Joe Patner.  That's
13   Mr. Patner, he is the Assistant State Attorney.
14   He is the prosecutor in this particular case.

15       Now, the defendant in this case is the
16   individual who is charged, the individual alleged
17   to have committed the crime and his name is Mr.
18   Jeremy Lockhart.  Mr. Lockhart can you stand up
19   please and let the jury see who you are.  That's
20   Jeremy Lockhart.

21       Now, the defendant is entitled to have an
22   attorney represent him.  Just like we have an
23   attorney representing the State of Florida we have
24   an attorney representing the defendant.  The
25   defense counsel in this case is Mr. Robert Godwin,

1       that's Mr. Godwin.

2              MR. GODWIN:  Good afternoon, folks.

3              THE COURT:  Now, the other folks who are in

4       the courtroom on a more routine regular basis, the

5       lady that normally sits right here who is

6       momentarily absent, her name is Lizette, and she

7       is a deputy clerk.  She is responsible for

8       maintaining all the files generated on all the

9       cases that are assigned to this division.  We have

10      fourteen divisions in the criminal division and we

11      all basically have the same courtrooms, and our

12      courtroom staff is essentially the same.  We have

13      the deputy clerk and she is also responsible for

14      maintaining custody over any and all exhibits that

15      are marked into evidence.  She is also responsible

16      for pronouncing in open court what the verdict is

17      once the verdict is reached.

18             The two folks that are sitting here in the

19      green jackets they are court deputies and they

20      work for the sheriff of Broward County.  It's

21      their responsibility to make sure that order

22      prevails and chaos does not rain.  This gentleman

23      right here is Mr. Phil Donahue, not the Phil

24      Donahue on the T.V., show but Phil Donahue the

25      retired Philadelphia police officer.  And that

1    lady back there is Linda Marino, her son went 0
2    for 21 I believe on Friday night. That's Ms.
3    Marino. No she's not Dan's mother but she happens
4    to be a former employee with the Broward Sheriff's
5    Office as a road deputy.

6        And last but not least, this lady sitting
7    right down here her name is Michelle. Michelle is
8    a certified court stenographer and it's her
9    responsibility to make sure that she takes down
10   everything that is being said while we are in
11   session. She has to go to school for
12   approximately two years to learn how to become a
13   certified court stenographer which means she is
14   capable of taking down a minimum of 225 words a
15   minute on that machine.

16       Okay. Now, how is a trial conducted? The
17   first phase of the trial is what's known as jury
18   selection. What happens is there are 30 of you
19   sitting back there and we have cards for each and
20   everyone of you. What we are initially going to
21   do is shuffle these cards up and initially sit
22   fourteen of you right there in the jury box. What
23   happens is after the first fourteen are selected I
24   question you and after I question you then Mr.
25   Patner will question you and then Mr. Godwin will

1    question you.   These questions are not designed to
2    aggravate you or embarrass you, but to merely get
3    you to start talking so we learn a little bit
4    about your personality, your backgrounds, your
5    predispositions, your hobbies, and your
6    interests.

7         Now, there is two types of challenges that
8    are available to the attorneys to enable them to
9    excuse perspective jurors from the panel.   And
10   they are known as challenges for cause and
11   peremptory challenges.  Now, the challenges for
12   cause are often times made in open court and you
13   can see who the author is of them, and sometimes
14   they are made over here at the side bar.  In any
15   event on the challenges for cause the lawyer has
16   to state a specific reason why they are seeking to
17   challenge the jury, challenge a juror based on
18   cause.  On challenges for cause they have to state
19   a reason why they're doing so and I as the judge
20   have the final say, I have total discretion and I
21   can accept it or reject it.

22        The other type of challenges the lawyers have
23   are peremptory challenges and on the peremptory
24   challenges each side has ten peremptory challenges
25   a piece, and on the peremptory challenges I have

1    no say, I have no discretion.  If they tell me
2    they want you to go you're gone.  So ultimately
3    out of this whole process we are going to end up
4    with six regular jurors and one alternate juror.

5         By the way if you're not one of the first
6    fourteen that are called up here don't think
7    you're home free yet because if we are not able to
8    get our jury panel out of the first fourteen
9    obviously some of the folks that are sitting out
10   there, some of the remaining 16 folks will then be
11   called up to replace those first fourteen that
12   were excused.  So ultimately out of the whole
13   process as I say we'll end up with six regular
14   jurors and one alternate juror.

15        Now, if you are not selected as a juror I
16   urge you, I beg you, I plead with you do not step
17   outside and contemplate committing suicide.  Like
18   I say I know all of you have been really anxious
19   to become a juror but if your fantasy does not
20   become a reality here today and you really want to
21   become a juror don't take that ultimate step just
22   leave me your telephone number and I'll be more
23   then happy to call for you and arrange for you to
24   be summoned for jury duty every week for the rest
25   of your life until you are ultimately selected as

1     a juror.  I extend you that curtesy.

2          Now, the reason why we have an alternate

3     juror is that by law in Florida a verdict must be

4     returned by six jurors.  So if I had no alternate

5     juror and something happened during the course of

6     the trial to one of our regular jurors then I'd

7     have to declare a mistrial because we cannot have

8     a verdict rendered by five, four, three, two or

9     one juror.  We have to have verdicts rendered by

10    six jurors.

11         The role of an alternate juror is that they

12    sit through the whole trial until and unless they

13    are needed to replace a regular juror.  If they

14    are not needed they are excused when the jury

15    retires to begin the deliberations.  If they are

16    needed the alternate juror becomes a regular juror

17    when that event happens, if it happens.

18         Now, a couple things you must bear in mind as

19    perspective jurors.  Number one, jurors are not

20    allowed to ask the witnesses any questions at

21    all.  That's the sole role and responsibility of

22    the lawyers.  Number two, the jurors are not

23    allowed to have any contact or communications with

24    the lawyers at any time during this trial except

25    during jury selection.  I'm not suggesting to you

1    by that statement that these lawyers are
2    unfriendly people, on the contrary they are very
3    affable individuals it's just that the cannons of
4    ethics that govern their conduct dictates and
5    mandates that they do not do anything at all which
6    would appear that they try and curry favor with
7    you.

8         So if they don't talk to you when you attempt
9    to acknowledge them don't think that they are
10   stoned faced and just don't have any time for you,
11   it's just that they cannot be overly friendly and
12   go out of their way to talk with you because it
13   would appear they are trying to curry favor with
14   you and they don't want to do that.

15        Number three, if you want to take notes
16   during the course of the trial you have that right
17   to do so.  I neither encourage you or discourage
18   you from taking notes.  If you want to take notes
19   you have that right to do so.  If you don't want
20   to take notes that's equally fine and dandy you
21   don't have to.

22        Number four, your verdict in this case must
23   be a unanimous verdict, that is all six regular
24   jurors must agree to the same verdicts.  It is not
25   by a majority vote but by a unanimous verdict.

1       Number five, please do not visit the scene of
2       the alleged crime.  Should it be necessary for us
3       to go there we will all go there together.  We
4       don't want any Sherlock Holmes, Matlock's or
5       Culombos on our jury trying to conduct their own
6       investigation privately at the scene of the
7       alleged crime.

8       Number six, during breaks and recesses during
9       the course of the trial you are absolutely
10      prohibited from having any exchange or
11      communications among yourselves as to how the case
12      is progressing.  We don't want any break by break
13      analysis and discussions as to the case and how
14      it's progressing.  And there's only one time you
15      are to discuss this case among yourselves and
16      that's at the end of the trial during jury
17      deliberations.

18      Lastly during over night recesses please do
19      not discuss this case with your husband's, your
20      wives, your boyfriends, your girlfriends, your
21      neighbors, your loved ones because undoubtedly
22      they are going to give you their two cents worth,
23      and subconsciously what they have to say to you
24      may very well have an impact upon you during your
25      jury deliberations.  So I'm very sorry to

1      disappoint all of you but I'm not going to be able

2      to go home with any of you at all during the

3      evening hours and your oath as a juror and

4      conscious have to serve as your guide if you're

5      going to discharge your responsibilities here

6      appropriately.

7          Now, the second phase of trial is what's

8      known as the opening statements.  That's when the

9      lawyers have an opportunity to tell you what the

10     case is all about.  Opening statements are

11     somewhat analogous to a preview or prologue to a

12     book where you get a sample, a flavor of what the

13     movie or the book is going to be about.  But in

14     this instance you get a sampling a favor of what

15     the case is going to be about.  Obviously at this

16     point in time the lawyers are as familiar with the

17     facts as they ever can be.  And during opening

18     statements that's where the lawyers have an

19     opportunity to outline to you from their

20     respective perspective what the case is going to

21     be about.

22         Now, the third phase of the trial is what's

23     known as the evidentiary phase of the case.  And

24     before I talk to you about the evidentiary phase

25     of the trial let me tell you what the charge is in

1    this particular case.

2         Now, the charge in this particular case is

3    contained on a piece of paper known as an

4    indictment.  This particular indictment is not

5    evidence that the defendant Mr. Lockhart committed

6    this particular case.  This is merely a piece of

7    paper that is utilized to initiate the prosecution

8    in this case.  This piece of paper is merely a

9    typed written piece of paper that contains the

10   allegations and identifies Mr. Lockhart as being

11   the defendant.

12        You cannot assume or presume that Mr. Jeremy

13   Lockhart is guilty merely because he's named in

14   this information and charged with this particular

15   allegation.  Now, the information in this

16   indictment is merely what he's charged with this

17   particular allegation.  So it is merely an

18   accusatory instrument called an indictment.  Now

19   in this particular case Jeremy Lockhart is charged

20   with murder in the second degree, second degree

21   murder.

22        The allegation is as follows:  That on June

23   25th, 1994 Jeremy Lockhart in Broward County state

24   of Florida did then and there unlawfully and

25   feloniously by an act eminently dangerous to

JUSTICE REPORTING SERVICES, INC.    523-6114

1    another evincing a depraved mind regardless of
2    human life, although without a premeditated design
3    to effect the death of any particular individual,
4    did unlawfully kill and murder one Patrick Brown,
5    a human being by shooting him with a firearm,
6    namely a handgun.  So the charge in this case is
7    second degree murder with a firearm.  That's the
8    allegation.

9         Now, in the evidentiary phase of the trial
10   there are three cardinal rules that apply to every
11   single criminal trial no matter who the judge is
12   or who the defendant is.  And no matter where the
13   case is being tried in all 50 states in the United
14   States of America, and rest assured these three
15   cardinal rules all apply.

16        Number one, at the outset of the trial as we
17   sit here today and begin this trial you must view
18   and presume the defendant, Jeremy Lockhart as
19   being innocent.  The defendant through his lawyer,
20   Mr. Godwin, has entered a plea of not guilty.  By
21   doing so he has in effect requested his day in
22   court.  Well, today is Mr. Jeremy Lockhart's day
23   in court.  When he walks into this courtroom and
24   begins this trial here today you must view and
25   presume him as being innocent.

/

1          Cardinal rule number two is the State, the
2     governmental body which Mr. Patner represents has
3     the burden of attempting to prove to you that the
4     defendant is guilty.  In other words, if the State
5     or a governmental agency is going to charge
6     somebody with committing a crime they must prove
7     it.   They have the burden of proof in every
8     criminal trial.  The State, the agency that
9     charged the defendant with committing the crime
10    has the burden of attempting to prove it.  The
11    defendant, Mr. Lockhart never has to attempt to
12    prove to you, or convince you through his lawyer
13    why he's innocent.  The burden of proof always
14    rest and remains on the State.  In some commerce
15    totalitarian societies of which the numbers seem
16    to be rapidly dwindling these days if an
17    individual is charged with committing a crime,
18    number one, should he ever be lucky enough to get
19    his day in court, number two he walks in the
20    courtroom and begins that trial presumed guilty.
21    Number three, he has to convince the tribunal why
22    he's innocent.  That's not the way it is in the
23    good old U.S., in all fifty states of the United
24    States of America if you are charged with
25    committing a crime you are darn well entitled to

JUSTICE REPORTING SERVICES, INC.      523-6114

 1    your day in court AND when you walk into that
 2    courtroom and you begin that trial you're presumed
 3    innocent and the State must attempt to prove the
 4    defendant guilty.  The defendant never has to
 5    attempt to prove his innocence.

 6        Now, the third cardinal rule is that in order
 7    for you the jury to find the defendant guilty the
 8    State must convince you beyond and to the
 9    exclusion of every reasonable doubt of the
10    defendant's guilt.  That's what's known as
11    standard of proof.  An that burden of proof, that
12    standard of proof applies in all 50 states of the
13    United States of America.  State court, federal
14    court, no matter what the charge is whether it be
15    murder, robbery, rape, drug trafficking, arson,
16    burglary, stealing a six pack of beer; whatever
17    the charge is the burden of proof always remains
18    the same.  That is the State must convince the
19    jury beyond and to the exclusion of every
20    reasonable doubt of the defendant's guilt.  And
21    like I say I'll give you a more elaborate
22    definition of what that phrase beyond and to the
23    exclusion of every reasonable doubt means when I
24    give you the legal instructions at the conclusion
25    of the trial.

```
 1            Now, putting all that theory into reality how
 2       is the evidentiary phrase of the trial conducted?
 3       Well, in order to attempt to carry the burden Mr.
 4       Patner can't stand up in open court and say ladies
 5       and gentlemen Lockhart did this, Lockhart did
 6       that, and Lockhart did this and Lockhart did
 7       that.   That just doesn't cut the mustard.  Nothing
 8       that comes out of the mouths of either attorneys
 9       can ever be considered by you as evidence.  Now,
10       I'm not suggesting to you by that statement that
11       what these lawyers say isn't important, it may
12       very well be persuasive but it is not evidence.
13            You see evidence comes in two forms
14       testimonial and physical.  Testimonial evidence
15       consists of the verbal responses out of the mouths
16       of the witnesses on the witness stand under oath
17       in response to the questions of the lawyers.
18       That's testimonial evidence.
19            Physical evidence on the other hand consists
20       of something that's marked into evidence as an
21       exhibit, something you can see, look at, listen,
22       smell, feel, touch.  That's physical tangible
23       evidence.  So, since the lawyers are not going to
24       be taking the witness stand and testifying, and
25       since the lawyer is not a piece of physical
```

114

1    evidence nothing that comes out of the mouths of

2    either lawyer can ever be considered by you as

3    evidence.

4       You see this is an adversary proceeding and

5    both sides want to win, both sides are seeking to

6    prevail, and both sides are represented by

7    attorneys here appearing in their capacity as

8    advocates.  I'm not suggesting to you for a moment

9    that a lawyer can never be a witness to a

10   particular alleged criminal incident, but if in

11   fact that's the case that lawyer cannot be an

12   advocate in that proceeding where that criminal

13   incident is the subject matter of the litigation.

14      So putting all that theory into reality again

15   how is the evidentiary phase of the trial

16   conducted?  Well, Mr. Patner on behalf of the

17   State has -- since he has the burden of proof is

18   going to be calling witnesses on the stand.  He's

19   going to call witness after witness after

20   witness.  Every witness that Mr. Patner calls will

21   be subject to direct examination by Mr. Patner,

22   subject to cross examination by Mr. Godwin,

23   subject to redirect examination by Mr. Patner,

24   subject to re-cross examination by Mr. Godwin, and

25   that process will continue witness after witness

1    after witness will be called until Mr. Patner

2    stands up in open court and says Your Honor, the

3    state of Florida rest its case.

4         Now, that may or may not end the evidentiary

5    phase of the trial? Why do I say that? Well,

6    remember I said in a criminal trial a defendant

7    never has the burden of attempting to prove to the

8    jury his innocence. The only burden the defendant

9    ever has in any criminal case are two fold. Show

10   up for the trial and behave himself. That's all a

11   defendant ever has to do. A defendant never has

12   to testify or put witnesses on the stand, or

13   introduce exhibits. And no one can hold that

14   against the defendant. No one can assume or

15   presume the defendant is guilty merely because he

16   doesn't testify or put witnesses on the stand.

17   Now, if in fact, however, the defendant wants to

18   testify, or if in fact the defendant wants to call

19   witnesses he his that right to do so. And if in

20   fact the defendant is going to testify, or if in

21   fact he's going to put witnesses on the stand then

22   what will happen is Mr. Godwin will be questioning

23   him on direct examination and he will be subject

24   to cross examination by Mr. Patner, subject to

25   redirect examination by Mr. Godwin, re-cross

1    examination by Mr. Patner and that process will
2    continue until Mr. Godwin stands up in open court
3    and says Your Honor, the defense rest its case.

4         So when the evidentiary phase of the trial
5    ends, ladies and gentlemen, I have no idea. It
6    will end either when the State rests its case and
7    defense is not going to put on any evidence or
8    defense is going to put on evidence when the
9    defense rest its case.

10        Now, the fourth phase of the trial consists
11   of closing arguments and that's when the lawyers
12   do that which they are best known for and that is
13   argue to you. If in the course of the zeal and
14   passion and enthusiasm that arouses within an
15   attorney as he's standing in front of a jury with
16   all the vim and vigor that can arise within every
17   square inch of his body he is recalling the
18   evidence, and in the course of doing so he recalls
19   the evidence different from the way you recall the
20   evidence, ladies and gentlemen, it's your
21   recollection that counts and controls.

22        I'm not suggesting to you by that statement
23   that either one of these lawyers are going to
24   intentionally mislead you or misstate the
25   evidence, but they are human beings, at least I

1    think they are.  And they are subjected to the
2    same frailties that I am and you are, and if they
3    recall the evidence different from the way you
4    recall the evidence it's your recollection that
5    counts and controls.

6        You see what this proceeding really boils
7    down to is you have to separate the wheat from the
8    shaft and this is a factual controversy, this is a
9    factual dispute.  What we are seeking to enlist
10   here are six members of this community who
11   represent a cross sector of this community,
12   represent the conscious of this community who in
13   effect are going to sit here as judges of the
14   facts.

15       You see basically we have two sets of judges
16   in this courtroom.  I sit here as the judge of the
17   law and I make all the legal decisions.  I make
18   rulings on objections, I make decisions as to what
19   exhibits come into evidence.  I make decisions as
20   to what instructions of law to give the jury at
21   the conclusion of the trial.  And you folks who
22   are ultimately selected as our lucky six jurors,
23   you folks make the factual decisions, you are the
24   judges of the facts.  And the lawyers aren't the
25   judges of the facts, I'm not the judges of the

1        facts.   In other words, when the jury goes back,
2        when you all go back to deliberate you six that
3        are selected on the jury, I don't rip off my robe
4        in a superman like fashion and run back into the
5        jury room and deliberate with you otherwise it
6        would be a verdict rendered by seven folks instead
7        of six.   And basically our duties are independent
8        of one another.   I don't go back and deliberate
9        with you, and you don't come up and make the
10       decisions I have to, primarily because I don't
11       have enough room up here for all of you, and
12       secondarily because I don't have enough robes to
13       pass around.

14            The fifth phase of the trial consists of the
15       legal instructions and that's where I give you the
16       law you apply to the evidence in this case.   Any
17       preconceived ideas you have as to what the law is
18       or what the law should be must be disregarded by
19       you.   The only law you apply to the evidence in
20       this case is the law I give you.

21            The last phase of the trial consists of the
22       legal instructions, and that's where I give you
23       the law that you apply to the evidence in this
24       case and then you go back into the jury room and
25       deliberate and apply the law I've given you to the

JUSTICE REPORTING SERVICES, INC.      523-6114

1    evidence in this case and reach a unanimous
2    verdict as to whether or not the defendant is
3    guilty or not guilty.

4        Now, a couple other things you must bear in
5    mind.  Every crime in the Florida criminal code
6    has what's known as elements of proof.  I'll tell
7    you how many they are and what they are for the
8    crime of murder in the second degree with a
9    firearm.  Say hypothetically and for illustration
10   purposes only murder in the second degree with a
11   firearm had two elements of proof.  Well, for you
12   the jury to find the defendant guilty you must be
13   satisfied beyond and to the exclusion of every
14   reasonable doubt of the presence of both elements
15   of the crime of murder in the second degree with a
16   firearm.

17       Say hypothetically if the State convinces you
18   that one of these two elements are present, that
19   doesn't cut the mustard, not guilty.  But if
20   you're satisfied beyond and to the exclusion of
21   every reasonable doubt of the presence of both
22   elements of the crime of murder in the second
23   degree you should find the defendant guilty.

24       Now, sympathy is never an element of any
25   crime and I'll ask you to leave your sympathy

1    outside the courtroom and bring your common sense
2    into the courtroom.  Sentencing is my
3    responsibility, if you find the defendant not
4    guilty we never get to sentencing.  If in fact you
5    find the defendant guilty it's solely up to the
6    Court, the judge not the jury to decide what
7    sentence to impose.

8         And again the last point I want to make is
9    that nothing a lawyer says at any time during the
10   course of the trial can be considered by you as
11   evidence.  So what the lawyer says to you during
12   jury selection, that's not evidence.  So what the
13   lawyer says to you during opening statements,
14   that's not evidence.  The questions of the lawyers
15   to the witnesses, those questions are not
16   evidence.  The objections made during the course
17   of the trial by the lawyers, those objections are
18   not evidence.  And the closing arguments made by
19   the lawyers, those closing arguments are not
20   evidence.

21        I'm now going to list to you the names of the
22   perspective witnesses in this case.  If you know
23   any of these witnesses I'll ask you to raise your
24   hands.  Cheryl Grant who lives in Fort
25   Lauderdale.  Johnny Grant who lives in Fort

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1    Lauderdale.  Charles Forbes who lives in
 2    Hollywood.  Thera Jackson who lives in Fort
 3    Lauderdale.  Sergeant Bronson who's a Fort
 4    Lauderdale police officer.  As is Detective Al
 5    Stone.  As is Officer Mark Furdon.  As is Officer
 6    A. Thacker.  And then also we have an April Reese
 7    who lives in Fort Lauderdale.  April Williams who
 8    lives in Fort Lauderdale.  A Christopher Williams
 9    who lives in Fort Lauderdale.  A Darren Walker who
10    lives in Fort Lauderdale.  An officer, Detective
11    Michael Walley with the Fort Lauderdale Police
12    Department.  Bob Knutten with the Fort Lauderdale
13    Police Department.  Joshua Perper with the Broward
14    Sheriff's Office Medical Examiner.  Detective John
15    Abrams of the Fort Lauderdale Police Department.
16    Officer Neily with the Fort Lauderdale Police
17    Department.  Leslie Jones with the Fort Lauderdale
18    Police Department.  Dennis Grey with the Broward
19    Sheriff's Office.  And John Hospodavis with the
20    Fort Lauderdale Police Department.
21         Does anybody know any of these perspective
22    witnesses?  Your name and juror number?
23         MR. MORAN:  Thomas Moran I'm 87.
24         THE COURT:  Who do you know?
25         MR. MORAN:  Mark Furdon was a friend of my
```

JUSTICE REPORTING SERVICES, INC.      523-6114

```
1     brothers in high school, high school and college.
2          THE COURT:  When is the last time you saw
3     Mark Furdon?
4          MR. MORAN:  Been about eight or nine years.
5          THE COURT:  The fact that you knew him at one
6     time would have no bearing whatsoever on your
7     ability to be fair and impartial?
8          MR. MORAN:  No.
9          THE COURT:  Was he ever a police officer back
10    then when you last knew him?
11         MR. MORAN: Yes.
12         THE COURT:  That fact would not bear at all
13    on your neutrality?
14         MR. MORAN:  No.
15         THE COURT:  Anybody else?  Does anybody know
16    anyone who works for the Broward County State
17    Attorney's Office either as a secretary,
18    investigator or an attorney?  No one?  Does anyone
19    know anyone who works with the Broward County
20    State Attorney's office in any capacity?  Does
21    anyone know Mr. Patner the Assistant State
22    Attorney in this case?  Does anyone know either
23    one of the Court deputies Ms. Marino or Mr.
24    Donahue?  Does anyone know the court reporter
25    Michelle, or the deputy clerk Lizette?  Does
```

```
 1        anyone know me at all?  Would anyone want to know
 2        me at all?
 3             Okay.  You know me, sir, and your name and
 4        juror number?
 5             MR. WEIDNER: Juror 259.
 6             THE COURT:  Your name?
 7             MR. WEIDNER:  My name is William Weidner.
 8             THE COURT:  How do you know me?
 9             MR. WEIDNER:  I was -- about two years ago I
10        was a juror on one of the trials in your
11        courtroom.
12             THE COURT:  Okay, did it actually go to
13        trial?
14             MR. WEIDNER:  Yeah, it did.
15             THE COURT:  Okay, nice to see you you look
16        great and you haven't aged at all.  Nice to see
17        you.
18             Okay, all right.  We're now going to call our
19        first fourteen folks, when your name is called
20        please take the seat you're directed to by the
21        court deputy.  Josely Rodriguez.  Number two is
22        Alice Nolan.  Number three is Susan Warshawsky.
23        Number four is William Weidner.  Number five is
24        Thomas Burke.  Six is Denise Reed.  Seven is
25        Thomas Pokorny.  Eight is Kathleen Petrone.  Nine
```

1    is Kathryn Hayes.  Ten is Thomas Moran.  Eleven is

2    Freddie Scott.  Twelve is Michael Brown?  Thirteen

3    is Karlene Ellis.  Fourteen is Lisa Trapp.

4        Okay.  Do any of you fourteen folks know one

5    another socially or professionally prior to being

6    here today?  Do any of you fourteen folks have any

7    religious reasons known to you that would preclude

8    you or prevent you from serving as a juror?  All

9    right, I'm now going to ask you some questions

10    individually and it's absolutely imperative that

11    you answer these questions truthfully and candidly

12    for us to ensure that we have a fair and impartial

13    jury.

14        Ms. Rodriquez where are you from originally?

15        MS. RODRIGUEZ:  Brazil.

16        THE COURT:  How long have you been living in

17    the United States?

18        MS. RODRIGUEZ:  Since 1960.

19        THE COURT:  How long have you been living in

20    south Florida?

21        MS. RODRIGUEZ:  Thirty-four years.

22        THE COURT:  Okay, what city do you live in?

23        MS. RODRIGUEZ:  Cooper City.

24        THE COURT:  Cooper City.  Do you own your own

25    residence?

125

```
 1              MS. RODRIGUEZ:  Yes?
 2         THE COURT:  Single family home?
 3              MS. RODRIGUEZ:  Yes?
 4         THE COURT:  Married?
 5              MS. RODRIGUEZ:  Yes.
 6         THE COURT:  Children?
 7              MS. RODRIGUEZ:  And grandchildren.
 8         THE COURT:  How many children do you have?
 9              MS. RODRIGUEZ:  Three.
10         THE COURT:  What are their occupations?
11              MS. RODRIGUEZ:  One son is a school teacher.
12    The other one works for an ecological company in
13    Atlanta.  My daughter is now a housewife.
14         THE COURT:  Your occupation?
15              MS. RODRIGUEZ:  I have two jobs.  I work for
16    the school board in the day time and afterwards at
17    Eckards pharmacy at night.
18         THE COURT:  Where do you at work with the
19    school board?
20              MS. RODRIGUEZ:  Sheridan Vocational Center.
21         THE COURT:  What do you do?
22              MS. RODRIGUEZ:  I work in the office.
23         THE COURT:  At night you work at which
24    Eckards?
25              MS. RODRIGUEZ:  Corner of Griffin and
```

```
1      University.
2           THE COURT:  Your husband, what does he do?
3           MS. RODRIGUEZ:  Retired now he did
4      decorating.
5           THE COURT:  You own your own residence?
6           MS. RODRIGUEZ:  Yes.
7           THE COURT:  Ever been on a jury?
8           MS. RODRIGUEZ:  Yeah.
9           THE COURT:  One time?
10          MS. RODRIGUEZ:  This time, yes.  No, I
11     wasn't.
12          THE COURT:  Did you get this far?
13          MS. RODRIGUEZ:  Yes.
14          THE COURT:  Were you ever selected to be on a
15     jury?  Were you ever chosen to be on a jury?
16          MS. RODRIGUEZ:  No.
17          THE COURT:  Okay.  You have been called for
18     jury duty but you were never selected, is that
19     correct?
20          MS. RODRIGUEZ:  Yeah.
21          THE COURT:  You understand me?
22          MS. RODRIGUEZ:  I understand.
23          THE COURT:  Have you ever been the victim of
24     a crime?
25          MS. RODRIGUEZ:  No.
```

127

```
 1                THE COURT:  Do you have any friends or
 2      relatives in law enforcement?
 3                MS. RODRIGUEZ:  No.
 4                THE COURT:  No officers that are friends?
 5                MS. RODRIGUEZ:  Friends, yeah but not close
 6      friends.
 7                THE COURT:  Okay.  Just acquaintances?
 8                MS. RODRIGUEZ:  Yeah.
 9                THE COURT:  Would your relationship with them
10      have any bearing at all on your ability to be fair
11      and impartial?
12                MS. RODRIGUEZ:  No.
13                THE COURT:  Have you or anybody in your
14      family ever been arrested at all?
15                MS. RODRIGUEZ:  No.
16                THE COURT:  What do you do in your spare
17      time?
18                MS. RODRIGUEZ:  Watch baseball games and soap
19      operas.
20                THE COURT:  Okay, watch baseball games in
21      person or?
22                MS. RODRIGUEZ:  T.V., and sometimes in
23      person.
24                THE COURT:  Okay.  Any questions at all?
25                MS. RODRIGUEZ:  For you, no.
```

128

```
 1              THE COURT:  Sure?
 2              MS. RODRIGUEZ:  No.
 3              THE COURT:  Okay.  You don't want to ask me
 4      anything?
 5              MS. RODRIGUEZ:  No.
 6              THE COURT:  Nothing.  Thank you.  All right,
 7      thank you.
 8              Ms. Nolan, where are you from originally?
 9              MS. NOLAN:  Originally born in New York.
10              THE COURT:  How long have you been living in
11      south Florida?
12              MS. NOLAN:  About 43 years.
13              THE COURT:  What city do you live in?
14              MS. NOLAN:  Sunrise.
15              THE COURT:  Single family home?
16              MS. NOLAN:  Yes.
17              THE COURT: Children?
18              MS. NOLAN:  Yes.
19              THE COURT: How many?
20              MS. NOLAN:  Three.
21              THE COURT:  What are the occupations of your
22      children?
23              MS. NOLAN:  I have a son in the army, MP.
24              THE COURT:  Where?
25              MS. NOLAN:  Stationed in Hawaii.
```

```
 1              THE COURT:  Married?
 2              MS. NOLAN:  Yes.  My oldest daughter is a
 3     college student.
 4              THE COURT:  Where?
 5              MS. NOLAN:  FIU.
 6              THE COURT:  And my youngest daughter is just
 7     a recent drop out of high school and working at a
 8     dollar store.
 9              THE COURT:  Okay, and your occupation?
10              MS. NOLAN:  I am a commercial insurance
11     underwriter.
12              THE COURT:  For?
13              MS. NOLAN:  Cedric James in Florida.
14              THE COURT:  Your husband?
15              MS. NOLAN:  He works for American Airlines.
16              THE COURT:  What capacity?
17              MS. NOLAN:  Baggage handler.
18              THE COURT:  Where?
19              MS. NOLAN:  Miami international.
20              THE COURT:  Ever been on a jury before?
21              MS. NOLAN:  No.
22              THE COURT:  Victim of a crime?
23              MS. NOLAN:  Yes.
24              THE COURT:  What?
25              MS. NOLAN:  Attempted robbery, and my car was
```

```
 1        stolen.
 2              THE COURT:  How long ago were those
 3        instances?
 4              MS. NOLAN:  My car was stolen in 1986, and
 5        the attempted robbery was in '87 I believe.
 6              THE COURT:  Did they find out who did any one
 7        of those two things?
 8              MS. NOLAN:  My car was recovered and the
 9        attempted robbery I don't know.
10              THE COURT:  Would either one of those
11        circumstances bear at all on your ability to be
12        fair and impartial?
13              MS. NOLAN:  No.
14              THE COURT:  Do you have any friends or
15        relatives in law enforcement?
16              MS. NOLAN:  My son is a MP in the army.
17              THE COURT:  Would that bear at all on your
18        ability to be fair and impartial?
19              MS. NOLAN:  No.
20              THE COURT:  Have you or anybody in your
21        family ever been arrested at all?
22              MS. NOLAN:  My brother-in-law was arrested.
23              THE COURT:  How long ago?
24              MS. NOLAN:  Last summer.
25              THE COURT:  For?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

131

```
 1              MS. NOLAN:  For carrying a concealed weapon.
 2              THE COURT:  A firearm or a weapon?
 3              MS. NOLAN:  A firearm.
 4              THE COURT:  Firearm, what was the end result
 5         of that?  Did he go to prison or jail?
 6              MS. NOLAN:  No, he didn't.  I think he just
 7         got community service.
 8              THE COURT:  Would that bear at all on your
 9         ability to be fair?
10              MS. NOLAN:  No.
11              THE COURT:  Are you close to your
12         brother-in-law?
13              MS. NOLAN:  Fairly.
14              THE COURT:  That would not compromise your
15         ability to be fair in this case?
16              MS. NOLAN:  No.
17              THE COURT:  What do you do in your spare
18         time?
19              MS. NOLAN:  Um, I read, do walking.
20              THE COURT:  Okay.
21              MS. NOLAN:  And shopping of course.
22              THE COURT:  Any questions at all?
23              MS. NOLAN:  No.
24              THE COURT:  Thank you.  That leads me to Ms.
25         Warshawsky.  Where are you from originally?
```

132

```
 1              MS. WARSHAWSKY:  Illinois.
 2              THE COURT:  How long have you been living in
 3      south Florida?
 4              MS. WARSHAWSKY:  Seventeen years.
 5              THE COURT:  What city?
 6              MS. WARSHAWSKY:  Fort Lauderdale,
 7      unincorporated.
 8              THE COURT:  Do you own your own residence?
 9              MS. WARSHAWSKY:  Yes.
10              THE COURT:  Single family home?
11              MS. WARSHAWSKY:  Yes, trailer.
12              THE COURT:  Married?
13              MS. WARSHAWSKY:  No.
14              THE COURT:  Have you been before?
15              MS. WARSHAWSKY:  Yes.
16              THE COURT:  Any children?
17              MS. WARSHAWSKY:  Two, fifteen and eleven.
18              THE COURT:  Both in school?
19              MS. WARSHAWSKY:  My fifteen year old just
20      dropped out a year ago.  And my daughter still
21      continues to go to school.
22              THE COURT:  What does he do now?
23              MS. WARSHAWSKY:  Mainly lawn mowing.
24              THE COURT:  Your occupation?
25              MS. WARSHAWSKY:  I'm home.
```

```
 1              THE COURT:  Doing what?
 2              MS. WARSHAWSKY:  A mommy.
 3              THE COURT:  You said you're divorced?
 4              MS. WARSHAWSKY:  Yes, separated.
 5              THE COURT:  And what does your husband do?
 6              MS. WARSHAWSKY:  I don't know I haven't had
 7      any contact with him in the last fifteen years.
 8              THE COURT:  Okay.  So you don't know and you
 9      don't care?
10              MS. WARSHAWSKY:  No, I don't care.
11              THE COURT:  Okay.  All right, have you ever
12      been on a jury before?
13              MS. WARSHAWSKY:  No, I have not.
14              THE COURT:  Victim of a crime?
15              MS. WARSHAWSKY:  No, I have not.
16              THE COURT:  Do you have any friends or
17      relatives in law enforcement?
18              MS. WARSHAWSKY:  Yes, I do.
19              THE COURT:  Who would that be?
20              MS. WARSHAWSKY:  Robin Burns with Juvenile
21      Justice.
22              THE COURT:  Okay, how do you know Robin
23      Burns?
24              MS. WARSHAWSKY:  We implemented a juvenile
25      sort of like task force brought into our
```

1        community.  I'm the president of an organization
2        in the mobile home park.
3               THE COURT:  Would it bear at all on your
4        ability to be fair and impartial?
5               MS. WARSHAWSKY:  No.
6               THE COURT:  What do you do in your spare
7        time?
8               MS. WARSHAWSKY:  I watch children in the
9        park, mainly the teenagers.  I'm like a lookout in
10       the neighborhood for teens in the park.  I'm
11       resident mommy.
12              THE COURT:  Your look out for teenagers who
13       might be up to trouble, or people who might be
14       trying to do something?
15              MS. WARSHAWSKY:  I'm helping out the teens in
16       the trailer park that come to me and say they need
17       help, and I guide them to the right door and open
18       it for them.
19              THE COURT:  Any questions at all?
20              MS. WARSHAWSKY:  No.
21              THE COURT:  Do you think you could be fair
22       and impartial?
23              MS. WARSHAWSKY:  I think I could be.
24              THE COURT:  Thank you.  William Weidner,
25       where are you from?

135

```
 1              MR. WEIDNER:  Hollywood, Florida.

 2              THE COURT:  What city do you live in?

 3              MR. WEIDNER:  Hollywood.

 4              THE COURT:  Do you own your own residence?

 5              MR. WEIDNER:  Yes.

 6              THE COURT:  Single family home?

 7              MR. WEIDNER:  Yes.

 8              THE COURT:  Single family home?

 9              MR. WEIDNER:  Uh-huh (affirmative response.)

10              THE COURT:  Married?

11              MR. WEIDNER:  No.

12              THE COURT:  Have you been?

13              MR. WEIDNER:  No.

14              THE COURT:  What do you do for a living?

15              MR. WEIDNER:  Manage an Eckards store.

16              THE COURT:  Which one?

17              MR. WEIDNER:  Sunrise and Federal right

18      across from Sears Town.

19              THE COURT:  Wasn't that just held up recently

20      or something?

21              MR. WEIDNER:  I came the week after that.

22              THE COURT:  Week after that.  Okay, and where

23      were you before that?

24              MR. WEIDNER:  Just north of Oakland Park

25      Boulevard and A1A.
```

```
 1              THE COURT:  Okay.  Have you ever been on a
 2         jury?
 3              MR. WEIDNER:  Yes.
 4              THE COURT:  One time?
 5              MR. WEIDNER:  Correct.
 6              THE COURT:  What did that case involve?
 7              MR. WEIDNER:  I believe it was an assault and
 8         battery.
 9              THE COURT:  Okay.  And did you get a chance
10         to deliberate and reach a verdict?
11              MR. WEIDNER:  No, I was an alternate.
12              THE COURT:  You were the alternate?
13              MR. WEIDNER:  Yes.
14              THE COURT:  Any negative experiences from
15         being on the jury?
16              MR. WEIDNER:  No.
17              THE COURT:  Have you been the victim of a
18         crime?
19              MR. WEIDNER:  Not really just a shoplifting
20         case at work.
21              THE COURT:  Any friends or relatives in law
22         enforcement?
23              MR. WEIDNER:  No.
24              THE COURT:  Have you or anybody in your
25         family ever been arrested at all?
```

```
 1              MR. WEIDNER:  No.

 2              THE COURT:  What do you do in your spare

 3         time?

 4              MR. WEIDNER:  Play golf, basketball, and

 5         darts.

 6              THE COURT:  Okay.  What was the last thing?

 7              MR. WEIDNER:  Darts.

 8              THE COURT:  Okay, any questions at all?

 9              MR. WEIDNER:  No.

10              THE COURT:  Feel you could be fair and

11         impartial?

12              MR. WEIDNER:  Yes.

13              THE COURT:  Thank you.  That leads me to Mr.

14         Burke.  Where are you from originally?

15              MR. BURKE:  Pennsylvania.

16              THE COURT:  How long have you been living in

17         south Florida?

18              MR. BURKE:  About forty years.

19              THE COURT:  What city?

20              MR. BURKE:  Plantation.

21              THE COURT:  Do you own your own residence?

22              MR. BURKE:  Yes.

23              THE COURT:  Single family home?

24              MR. BURKE:  Yes.

25              THE COURT:  Married?
```

JUSTICE REPORTING SERVICES, INC.      523-6114

138

| | |
|---|---|
| 1 | MR. BURKE: Yes. |
| 2 | THE COURT: Children? |
| 3 | MR. BURKE: Two. |
| 4 | THE COURT: Their occupations? |
| 5 | MR. BURKE: My daughter is with HRS. |
| 6 | THE COURT: Doing what? |
| 7 | MR. BURKE: Group homes taking care of -- she |
| 8 | just started there I'm not really sure how to |
| 9 | describe it. My son is in the music business and |
| 10 | more of a sound engineer. |
| 11 | THE COURT: Okay, your occupation? |
| 12 | MR. BURKE: I'm a teacher. |
| 13 | THE COURT: Where? |
| 14 | MR. BURKE: BCC. |
| 15 | THE COURT: Teaching? |
| 16 | MR. BURKE: Physical education. |
| 17 | THE COURT: Okay. Do you coach any teams out |
| 18 | there at all? |
| 19 | MR. BURKE: Tennis. |
| 20 | THE COURT: And your wife? |
| 21 | MR. BURKE: She is a lab tech at Plantation |
| 22 | General Hospital. |
| 23 | THE COURT: Okay, have you ever been on a |
| 24 | jury before? |
| 25 | MR. BURKE: Got to this phase but we -- it |

```
1      was settled before we got to do anything.
2            THE COURT:  Have you ever been the victim of
3      a crime?
4            MR. BURKE:  No.
5            THE COURT:  Do you have any friends or
6      relatives in law enforcement?
7            MR. BURKE:  My daughter's boyfriend is a Fort
8      Lauderdale Police Officer.
9            THE COURT:  What's his name?
10           MR. BURKE:  Actually he just moved up I think
11     he's with the secret service now, in training with
12     them.  Gus Demartalis (phonetic).
13           THE COURT:  Yes, yes, I know him.  He
14     actually started off as a probation officer.
15           MR. BURKE:  Correct.
16           THE COURT:  Right, right.  Okay, he already
17     left Fort Lauderdale?
18           MR. BURKE:  Yes.
19           THE COURT:  Would that bear at all on your
20     ability to be fair and impartial?
21           MR. BURKE:  I don't think so.
22           THE COURT:  So you can still be a fair and
23     impartial juror?
24           MR. BURKE:  I think I could.
25           THE COURT:  Do you ever talk to him in any
```

140

```
 1          detail about the nature of his work?

 2              MR. BURKE:  Yeah, I've heard stories.

 3              THE COURT:  That would not blow your

 4     objectivity?

 5              MR. BURKE:  I don't think so.

 6              THE COURT:  Okay.  Have you or anybody in

 7     your family ever been arrested at all?

 8              MR. BURKE:  No.

 9              THE COURT:  What do you do in your spare

10     time?

11              MR. BURKE:  Sports.

12              THE COURT:  Any questions at all?

13              MR. BURKE:  No, sir.

14              THE COURT:  Feel you could be fair and

15     impartial?

16              MR. BURKE:  Yes, sir.

17              THE COURT:  Thank you.  That leads me to Ms.

18     Reed, where are you from originally?

19              MS. REED:  Indiana.

20              THE COURT:  How long have you been living in

21     south Florida?

22              MS. REED:  Twenty-eight years.

23              THE COURT:  What city?

24              MS. REED:  Margate.

25              THE COURT:  Do you own your own residence?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1              MS. REED:  Yes.

 2              THE COURT:  Single family home?

 3              MS. REED:  Yes.

 4              THE COURT:  Married?

 5              MS. REED:  Yes.

 6              THE COURT:  Children?

 7              MS. REED:  Yes.

 8              THE COURT:  How many?

 9              MS. REED:  Two.

10              THE COURT:  School age?

11              MS. REED:  Yes, nine and six.

12              THE COURT:  Your occupation?

13              MS. REED:  I'm a full-time student and a

14       parent.

15              THE COURT:  Where do you go to school?

16              MS. REED:  FAU.

17              THE COURT:  Taking up?

18              MS. REED:  I am a psyche major and criminal

19       justice minor.

20              THE COURT:  Okay, ultimately what do you seek

21       to do?

22              MS. REED:  Counseling.

23              THE COURT:  For psyche?

24              MS. REED:  Psychologist counseling,

25       psychologist.
```

```
 1              THE COURT:  As a child psychologist?

 2              MS. REED:  Yes.

 3              THE COURT:  Your husband, what does he do?

 4              MS. REED:  Subcontracting adjustor for

 5      insurance companies.

 6              THE COURT:  Have you ever been on a jury

 7      before?

 8              MS. REED:  No.

 9              THE COURT:  Victim of a crime?

10              MS. REED:  No.

11              THE COURT:  Do you have ay friends or

12      relatives in lay enforcement?

13              MS. REED:  Yes.

14              THE COURT:  Who?

15              MS. REED:  My father.

16              THE COURT:  Where does he work?

17              MS. REED:  Just retired from BSO.

18              THE COURT:  What's his name?

19              MS. REED:  Ed Kern.

20              THE COURT:  What capacity?

21              MS. REED:  He was a deputy at the airport for

22      the last-- his station was at the airport but he's

23      been with other cities though.

24              THE COURT:  Such as?

25              MS. REED:  Coral Springs.  City of Miami.
```

143

```
 1              THE COURT:  Okay, would that fact bear at all
 2       on your ability to be fair and impartial?
 3              MS. REED:  No.
 4              THE COURT:  YOU think independently of your
 5       father.
 6              MS. REED:  Pardon me?
 7              THE COURT:  Think independently of your
 8       father?
 9              MS. REED:  Very much so.
10              THE COURT:  Feel you could be fair and
11       impartial?
12              MS. REED:  Yes, sir.
13              THE COURT:  Okay.  Have you or anybody in
14       your family ever been arrested at all?
15              MS. REED:  No.
16              THE COURT:  What do you do in your spare
17       time?
18              MS. REED:  Take care of my kids, they keep me
19       busy.
20              THE COURT:  Any questions at all?
21              MS. REED:  No.
22              THE COURT:  Thank you.  That leads me to Mr.
23       Pokorny.
24              MR. POKORNY:  Yeah.
25              THE COURT:  Where are you from originally?
```

144

```
1              MR. POKORNY:  Long Island, New York.
2              THE COURT:  Okay, how long have you been
3        living in south Florida?
4              MR. POKORNY:  Eighteen months.
5              THE COURT:  Not long enough to loose the
6        accent, right?
7              MR. POKORNY:  Nope.
8              THE COURT:  What city do you live in?
9              MR. POKORNY:  Tamarac.
10             THE COURT:  Do you own your own residence?
11             MR. POKORNY:  Yes, townhouse.
12             THE COURT:  Married?
13             MR. POKORNY:  No.
14             THE COURT:  Have you been?
15             MR. POKORNY:  No.
16             THE COURT:  Thinking about it?
17             MR. POKORNY:  Maybe.
18             THE COURT:  Okay.  What do you do for a
19       living?
20             MR. POKORNY:  Work for Home Depot in Margate.
21             THE COURT:  Home Depot in Margate, what do
22       you do there?
23             MR. POKORNY:  Salesperson.
24             THE COURT:  Okay.  Have you ever been on a
25       jury before?
```

145

```
 1              MR. POKORNY:  No.

 2              THE COURT:  Victim of a crime?

 3              MR. POKORNY:  Yes.

 4              THE COURT:  What?

 5              MR. POKORNY:  About two-and-a-half years ago,

 6       three years ago up in New York I got held up in

 7       Home Depot with a shotgun.

 8              THE COURT:  Okay, during working hours?

 9              MR. POKORNY:  During working hours me and one

10       other guy were in the break room and two guys

11       walked in and asked for the manager and showed us

12       the shotguns.

13              THE COURT:  How do you walk in a Home Depot

14       with a shotgun without being seen?

15              MR. POKORNY:  Big over coat, it was during

16       the wintertime and they had overcoats on.

17              THE COURT:  What ultimately happened?

18              Mr. POKORNY:  They finally -- they didn't get

19       anything and they got caught and I had to go

20       select witnesses and stuff.

21              THE COURT:  They were apprehended, did you

22       actually testify in the case?

23              MR. POKORNY:  No I didn't testify but I

24       pointed them out.

25              THE COURT:  The case was apparently worked
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1    out without the necessity of you testifying at the
 2    trial?
 3            MR. POKORNY:  Correct.
 4            THE COURT:  Okay.  Would that bear at all on
 5    your ability to be fair and impartial?
 6            MR. POKORNY:  I'm not really sure.
 7            THE COURT:  Excuse me?
 8            MR. POKORNY:  I'm not really sure, I don't
 9    know.
10            THE COURT:  You feel that may bear on your
11    ability to be fair and impartial?
12            MR. POKORNY:  Yes.
13            THE COURT:  How long ago did that happen?
14            MR. POKORNY:  ABOUT two-and-a-half years ago.
15            THE COURT:  Have you or anybody in your
16    family ever been arrested at all?
17            MR. POKORNY:  No.
18            THE COURT:  What do you do in your spare
19    time?
20            MR. POKORNY:  Bowling, softball.
21            THE COURT:  Any questions at all?
22            MR. POKORNY:  No.
23            THE COURT:  Thank you.  Why do you feel it
24    may have a bearing on you?
25            MR. POKORNY:  I don't know just from having a
```

147

```
1        gun to me and whatever it's -- I can't explain it.
2             THE COURT:  I mean you think you may be
3        leaning more towards the favor of the State in
4        this case because of what happened?
5             MR. POKORNY:  That's a possibility.
6             THE COURT:  Okay.  All right, thank you.  Ms.
7        Petrone, where are you from originally?
8             MS. PETRONE:  Chicago.
9             THE COURT:  How long have you been living in
10       south Florida?
11            MS. PETRONE:  Twenty-eight years.
12            THE COURT:  Do you own your own residence?
13            MS. PETRONE:  No.
14            THE COURT:  Rent?
15            MS. PETRONE:  Rent a house in Hollywood.
16            THE COURT:  Married?
17            MS. PETRONE:  Divorced.
18            THE COURT:  Children?
19            MS. PETRONE:  Two.
20            THE COURT:  School age?
21            MS. PETRONE:  Twenty-four, she is a model.
22       And sixteen he goes to Nova.
23            THE COURT:  Nova?
24            MS. PETRONE:  High school.
25            THE COURT:  Your occupation?
```

148

```
 1              MS. PETRONE:  Personal director of the home
 2         club in Boca Raton.
 3              THE COURT:  Okay, you drive from Hollywood to
 4         Boca every day?
 5              MS. PETRONE:  Every day.
 6              THE COURT:  You're glad to be here?
 7              MS. PETRONE:  I am.
 8              THE COURT:  Your husband, your ex-husband
 9         what does he do?
10              MS. PETRONE:  I don't know.
11              THE COURT:  Not sure?
12              MS. PETRONE:  No, I don't know.
13              THE COURT:  Have you ever been on a jury
14         before?
15              MS. PETRONE:  Yes.
16              THE COURT:  One time?
17              MS. PETRONE:  Yes.
18              THE COURT:  Criminal case?
19              MS. PETRONE:  Drunk driving.
20              THE COURT:  Okay.  Did you get a chance to
21         deliberate and reach a verdict?
22              MS. PETRONE:  Yes, we did.
23              THE COURT:  Were you the foreman of the
24         jury?
25              MS. PETRONE:  Yes, I was.
```

```
 1              THE COURT:  Any negative experiences from
 2         being the jury?
 3              MS. PETRONE:  No.
 4              THE COURT:  Do you remember who the judge was
 5         in that case?
 6              MS. PETRONE:  I do not.
 7              THE COURT:  I hope I leave a more positive
 8         impression on you.  Do you remember when that
 9         was?
10              MS. PETRONE:  Approximately four years ago.
11              THE COURT:  Have you ever -- have you or
12         anybody in your family ever been arrested at all?
13              MS. PETRONE:  No.
14              THE COURT:  Ever been the victim of a crime?
15              MS. PETRONE:  No.
16              THE COURT:  Do you have any friends or
17         relatives in law enforcement?
18              MS. PETRONE:  No.
19              THE COURT:  What do you do in your spare
20         time?
21              MS. PETRONE:  I like to travel and read.
22              THE COURT:  Okay, any questions at all?
23              MS. PETRONE:  Not now.
24              THE COURT:  Think you could be fair and
25         impartial?
```

150

```
 1            MS. PETRONE:  Yes.

 2            THE COURT:  Thank you.  Ms. Hayes, where are

 3       from originally?

 4            MS. HAYES:  Born and raised here in Fort

 5       Lauderdale.

 6            THE COURT:  Okay.  What city do you live in

 7       now?

 8            MS. HAYES:  Fort Lauderdale.

 9            THE COURT:  Married?

10            MS. HAYES:  No.

11            THE COURT:  Have you been?

12            MS. HAYES:  No.

13            THE COURT:  Own your own residence, or rent?

14            MS. HAYES:  Own.

15            THE COURT:  Single family home?

16            MS. HAYES:  Yes.

17            THE COURT:  What do you do for a living?

18            MS. HAYES:  X-ray clerk with Holly Cross

19       Hospital.

20            THE COURT:  Okay, do you know Dr. Cotler over

21       there?

22            MS. HAYES:  Yes I do I was with him

23       yesterday.

24            THE COURT:  Ever been on a jury before?

25            MS. HAYES:  I've been on a jury a couple
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1        times.   I'm called like every two years I think.
 2             THE COURT:   You were one of these people that
 3        left your name wanting to be called.   You never
 4        actually served on a jury?
 5             MS. HAYES:   Yes.
 6             THE COURT:   One time?
 7             MS. HAYES:   Twice.
 8             THE COURT:   Any of them criminal cases?
 9             MS. HAYES:   No.
10             THE COURT:   Did you ever serve as the foreman
11        on any one of these juries?
12             MS. HAYES:   No.
13             THE COURT:   Any negative experiences from
14        being on the jury?
15             MS. HAYES:   No.
16             THE COURT:   Ever been the victim of a crime?
17             MS. HAYES:   Yes.
18             THE COURT:   What's that?
19             MS. HAYES:   Someone tried to steal my car
20        under the car port and my neighbor happen to see
21        them at the time and they not weren't able to get
22        away with the car.
23             THE COURT:   How long ago was that?
24             MS. HAYES:   Last year.
25             THE COURT:   Would that bear at all on your
```

```
 1          ability to be fair and impartial?
 2               MS. HAYES:  I don't think so.
 3               THE COURT:  Okay.  Do you have any friends or
 4          relatives in law enforcement?
 5               MS. HAYES:  Um, I know someone with BSO.
 6               THE COURT:  Who is that?
 7               MS. HAYES:  Leroy Frederick.
 8               THE COURT:  How do you know him?
 9               MS. HAYES:  I'm a friend of his sister.
10               THE COURT:  Okay.  Would that bear at all on
11          your ability to be fair and impartial?
12               MS. HAYES:  No, I don't think so.
13               THE COURT:  Have you or anybody in your
14          family ever been arrested at all?
15               MS. HAYES:  My brother.
16               THE COURT:  What was that for?
17               MS. HAYES:  Drugs.
18               THE COURT:  Okay, recently?
19               MS. HAYES:  About three years ago.
20               THE COURT:  What was the end result of that?
21               MS. HAYES:  He was in -- what's that place
22          down in Pompano?
23               THE COURT:  Stockade?
24               MS. HAYES:  He went to trial and worked out
25          some kind of agreement.  I know he didn't do much
```

153

```
 1      more then a week.

 2          THE COURT:  What's his name, your brother?

 3          MS. HAYES:  James Hayes.

 4          THE COURT:  Okay, has he ever had to go off

 5      to state prison at all for anything?

 6          MS. HAYES:  No.

 7          THE COURT:  Would that bear at all on your

 8      ability to be fair and impartial?

 9          MS. HAYES:  No.

10          THE COURT:  Are you close to your brother?

11          MS. HAYES:  Yes, I am.

12          THE COURT:  What do you do in your spare

13      time?

14          MS. HAYES:  I read, I shop a lot.

15          THE COURT:  Okay, any questions at all?

16          MS. HAYES:  No I can't think of anything.

17          THE COURT:  Okay.  Say hello to Dr. Cotler

18      for me.  Mr. Moran, where are you from

19      originally?

20          MR. MORAN:  Chicago.

21          THE COURT:  How long have you been living in

22      south Florida?

23          MR. MORAN:  Twenty-two years.

24          THE COURT:  Twenty-two years, do you own your

25      own residence?
```

154

```
 1          MR. MORAN:  No, rent.

 2          THE COURT:  Excuse me?

 3          MR. MORAN:  Rent an apartment.

 4          THE COURT:  What city?

 5          MR. MORAN:  Fort Lauderdale.

 6          THE COURT:  Married?

 7          MR. MORAN:  Single.

 8          THE COURT:  Have you ever been married?

 9          MR. MORAN:  No.

10          THE COURT:  What do you do for a living?

11          MR. MORAN:  Product buyer.

12          THE COURT:  For?

13          MR. MORAN:  Certified vacations.

14          MR. GODWIN:  Sorry, I didn't hear you.

15          THE COURT:  Certified vacations, product

16      buyer.

17          THE COURT:  That's right over here on

18      Broward, isn't it?

19          MR. MORAN:  Yes.

20          THE COURT:  Okay.  So you go out and like

21      sample the perspective hotels and things like

22      that?

23          MR. MORAN:  I contract and negotiate with the

24      hotels and transfer companies for about fifty

25      designations.
```

155

```
 1              THE COURT:  Do you travel a lot yourself?
 2              MR. MORAN:  Yes, I do.
 3              THE COURT:  Tough job huh?
 4              MR. MORAN:  Yeah.
 5              THE COURT:  Someone has to do it, right?
 6              MR. MORAN:  Right.
 7              THE COURT:  Ever been on a jury before?
 8              MR. MORAN:  No.
 9              THE COURT:  Victim of a crime?
10              MR. MORAN:  Yes.
11              THE COURT:  What's that?
12              MR. MORAN:  Twice my car was broken into and
13     attempted to be stolen.
14              THE COURT:  And what?
15              MR. MORAN:  Stolen.
16              THE COURT:  Did they find out who did either
17     one of those?
18              MR. MORAN:  No.
19              THE COURT:  Would that bear at all on your
20     ability to be fair and impartial?
21              MR. MORAN:  No.
22              THE COURT:  Do you have any friends or
23     relatives in law enforcement?
24              MR. MORAN:  One acquittance.
25              THE COURT:  Who is that?
```

156

```
 1              MR. MORAN:  Patrick Tie with BSO.

 2              THE COURT:  How do you know him?

 3              MR. MORAN:  His sister and mine are good

 4         friends.

 5              THE COURT:  Would that bear on your ability

 6         to be fair and impartial?

 7              MR. MORAN:  No.

 8              THE COURT:  Have you or anybody in your

 9         family ever been arrested at all?

10              MR. MORAN:  Yes.

11              THE COURT:  Who?

12              MR. MORAN:  Me.

13              THE COURT:  For?

14              MR. MORAN:  Drunk driving in 1981, or '82.

15              THE COURT:  Over 12, 13, 14 years ago.  Where

16         was that, down here?

17              MR. MORAN:  Fort Lauderdale.

18              THE COURT:  What was the end result of that?

19              MR. MORAN:  I pled guilty.

20              THE COURT:  And you received probation for

21         six months?

22              MR. MORAN:  Yes.

23              THE COURT:  Okay, would that effect your

24         ability to be fair and impartial?

25              MR. MORAN:  No.
```

157

```
1              THE COURT:  What do you do in your spare
2        time?
3              MR. MORAN:  Stay at home and do a lot things
4        with my family and my friends.  I do a lot of
5        reading.
6              THE COURT:  Okay.  Did you say you were
7        married or not?
8              MR. MORAN:  No sir.
9              THE COURT:  Any questions at all?  So like
10       when you travel and these hotels know you're with
11       certified tours do you get all the best
12       treatment?
13             MR. MORAN:  Yes.
14             THE COURT:  I would imagine.  Thank you Mr.
15       Moran.  Mr. Scott, where are you from originally?
16             MR. SCOTT:  Tampa, Florida.
17             THE COURT:  How long have you been living in
18       Broward County?
19             MR. SCOTT:  About twenty-four years.
20             THE COURT:  What city?
21             MR. SCOTT:  Sunrise.
22             THE COURT: Do you own your own residence?
23             MR. SCOTT:  Yes.
24             THE COURT:  Single family home?
25             MR. SCOTT:  Yes.
```

158

```
 1              THE COURT:  Married?
 2              MR. SCOTT:  Yes.
 3              THE COURT:  Children?
 4              MR. SCOTT:  Yes.
 5              THE COURT:  How many?
 6              MR. SCOTT:  Four.
 7              THE COURT:  About four?
 8              MR. SCOTT:  No, I said four.
 9              THE COURT:  What do they do?
10              MR. SCOTT:  One is a detention officer for
11         BSO.
12              THE COURT:  Which jail?
13              MR. SCOTT:  The main jail.
14              THE COURT:  Right over here at the main
15         jail?
16              MR. SCOTT:  Yes.  And one is a housewife.
17              THE COURT:  What's the name of the child that
18         works at the main jail?
19              MR. SCOTT:  Freddie Scott, Jr.
20              THE COURT:  Okay, go ahead.
21              MR. SCOTT:  One is a housewife, one is in
22         college, and one is nine years old.
23              THE COURT:  Okay, the one is in college
24         where?
25              MR. SCOTT:  At Tampa.
```

```
 1              THE COURT:  Your occupation?

 2              MR. SCOTT:  Unemployed.

 3              THE COURT:  What type of work do you normally

 4         do?

 5              MR. SCOTT:  Well, I worked for Cheveron for

 6         19 years as a retail territory manager, and since

 7         that time I'm going back to school.

 8              THE COURT:  Okay, where?

 9              MR. SCOTT:  At FAU and BCC.

10              THE COURT:  Taking up?

11              MR. SCOTT:  Political Science.

12              THE COURT:  Your wife?

13              MR. SCOTT:  She works for the county.

14              THE COURT:  In what capacity?

15              MR. SCOTT:  She's an assistant with Human

16         Services, she's an assistant administrator with

17         Human Service.

18              THE COURT:  Ever been on a jury before?

19              MR. SCOTT:  Yes.

20              THE COURT:  One time?

21              MR. SCOTT:  Three times.

22              THE COURT:  Any of them criminal cases?

23              MR. SCOTT:  One.

24              THE COURT:  What did that case involve?

25              MR. SCOTT:  DUI, and assault.
```

```
 1              THE COURT:  Okay, DUI and an assault?

 2              MR. SCOTT:  Yes.

 3              THE COURT:  In anyone of these cases did you

 4         get a chance to deliberate and reach a verdict?

 5              MR. SCOTT:  Two of them.

 6              THE COURT:  Two of them.  Did you reach a

 7         verdict in the DUI case?

 8              MR. SCOTT:  Yeah, we did.

 9              THE COURT:  Were you the foreman of any one

10         of these juries?

11              MR. SCOTT:  Two of the three.

12              THE COURT:  Any negative experience from

13         being on the jury?

14              MR. SCOTT:  No.

15              THE COURT:  Have you ever been the victim of

16         a crime?

17              MR. SCOTT:  No.

18              THE COURT:  Any friends or relatives in law

19         enforcement other then your son?

20              MR. SCOTT:  My son-in-law, and my brother.

21              THE COURT:  Son-in-law works where?

22              MR. SCOTT:  BSO.

23              THE COURT:  Corrections?

24              MR. SCOTT:  Also at the main jail.

25              THE COURT:  His name is?
```

161

```
 1              MR. SCOTT:  Jonathan Magrover.
 2              THE COURT:  And your brother?
 3              MR. SCOTT:  He's with Jackson State
 4         University Police Department.
 5              THE COURT:  In Alabama?
 6              MR. SCOTT:  Mississippi.
 7              THE COURT:  Okay, would those facts effect
 8         your ability to be fair and impartial?
 9              MR. SCOTT:  No.
10              THE COURT:  Okay, and have you or anybody in
11         your family ever been arrested?
12              MR. SCOTT:  No.
13              THE COURT:  What do you do in your spare
14         time?
15              MR. SCOTT:  Read.
16              THE COURT:  Read, okay.  Any questions at
17         all?
18              MR. SCOTT:  No.
19              THE COURT:  Thank you.  That leads me to Mr.
20         Brown.  Where are you from originally?
21              MR. BROWN:  Jamaica.
22              THE COURT:  How long have you been living in
23         south Florida?
24              MR. BROWN:  Twenty-one years.
25              THE COURT:  What city?
```

| | | |
|---|---|---|
| 1 | MR. BROWN: | Hollywood. |
| 2 | THE COURT: | Do you own your own residence? |
| 3 | MR. BROWN: | Yes. |
| 4 | THE COURT: | Single family home? |
| 5 | MR. BROWN: | Yes. |
| 6 | THE COURT: | Married? |
| 7 | MR. BROWN: | Yes. |
| 8 | THE COURT: | Children? |
| 9 | MR. BROWN: | Two girls. |
| 10 | THE COURT: | What do they do? |
| 11 | MR. BROWN: | Students fifteen and twelve. |
| 12 | THE COURT: | What is your occupation? |
| 13 | MR. BROWN: | Clerk. |
| 14 | THE COURT: | Where? |
| 15 | MR. BROWN: | Publix facility services. |
| 16 | THE COURT: | What is that? |
| 17 | MR. BROWN: | It's a chain supermarket. |
| 18 | THE COURT: | Yeah, I've heard of Publix. |
| 19 | THE COURT: | What do you do there? |
| 20 | MR. BROWN: | I'm a clerk. |
| 21 | THE COURT: | At one of their retail stores? |
| 22 | MR. BROWN: | No at the facility services we |
| 23 | issue the parts and so forth. | |
| 24 | THE COURT: | Okay, and your wife what does she |
| 25 | do? | |

163

```
1              MR. BROWN:  Home maker.

2              THE COURT:  Okay, have you ever been on a

3        jury?

4              MR. BROWN:  No.

5              THE COURT:  Victim of a crime?

6              MR. BROWN:  No.

7              THE COURT:  Do you have any friends or

8        relatives in law enforcement?

9              MR. BROWN:  No.

10             THE COURT:  Have you or anybody in your

11       family ever been arrested at all?

12             MR. BROWN:  No.

13             THE COURT:  What do you do in your spare

14       time?

15             MR. BROWN:  Both my kids practice medicine

16       and I do research with them, and sports.

17             THE COURT:  You do medical research with your

18       kids is that what you said?

19             MR. BROWN:  They're working towards medicine

20       and they do research.

21             THE COURT:  Do research.  Okay, any questions

22       at all?

23             MR. BROWN:  No.

24             THE COURT:  Feel you could be fair and

25       impartial?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

164

```
 1              MR. BROWN:  Yes.

 2              THE COURT:  That leads me to Ms. Ellis, where

 3         are you from originally?

 4              MS. ELLIS:  Here.

 5              THE COURT:  What city do you live in?

 6              MS. ELLIS:  Fort Lauderdale.

 7              THE COURT:  Married?

 8              MS. ELLIS:  Yes.

 9              THE COURT:  Children?

10              MS. ELLIS:  No.

11              THE COURT:  Do you own your own residence?

12              MS. ELLIS:  No.

13              THE COURT:  Rent.

14              MS. ELLIS:  My husband owns it.

15              THE COURT:  But not you?

16              MS. ELLIS:  No.

17              THE COURT:  Okay, and that's in Fort

18         Lauderdale?

19              MS. ELLIS:  Yes.

20              THE COURT:  What do you do for a living?

21              MS. ELLIS:  Work at Block Buster Video

22         Corporate Office.

23              THE COURT:  Right over here?

24              MS. ELLIS:  Yeah.

25              THE COURT:  What do you do there?
```

```
 1              MS. ELLIS:  I'm a purchasing clerk for the
 2       music department.
 3              THE COURT:  In the music department.  Okay,
 4       so like tape musical tapes and CD's and all that?
 5              MS. ELLIS:  Uh-huh (affirmative response.)
 6              THE COURT:  Do you have to like take them
 7       home and sample them?
 8              MS. ELLIS:  No, we just listen to them there.
 9              THE COURT:  That's all you do?
10              MS. ELLIS:  You can take them home if you
11       want to.
12              THE COURT:  You listen to them, what do you
13       do, grade them?
14              MS. ELLIS:  We tell the buyers if we like
15       them or not.
16              THE COURT:  You're involved in making that
17       decision?
18              MS. ELLIS:  Yes.
19              THE COURT:  So the buyers come to you all the
20       time with perspective tapes?
21              MS. ELLIS:  Yes.
22              THE COURT:  So before they appear in the
23       Blockbuster stores they have to be approved by
24       your department?
25              MS. ELLIS:  Yes.
```

```
 1              THE COURT:  Okay.  What does your husband
 2     do?
 3              MS. ELLIS:  Head custodian at Parkway Middle.
 4              THE COURT:  Ever been on a jury before?
 5              MS. ELLIS:  No.
 6              THE COURT:  Victim of a crime?
 7              MS. ELLIS:  No.
 8              THE COURT:  Do you have any friends or
 9     relatives in law enforcement?
10              MS. ELLIS:  No.
11              THE COURT:  Have you or anybody in your
12     family ever been arrested before?
13              MS. ELLIS:  My brother.
14              THE COURT:  For?  Brother or brothers?
15              MS. ELLIS:  Brother, singular.
16              THE COURT:  For?
17              MS. ELLIS:  Buying drugs from an undercover
18     cop.
19              THE COURT:  How long ago was that?
20              MS. ELLIS:  I don't know.
21              THE COURT:  What was the end result of that?
22              MS. ELLIS:  I think he had to go to class or
23     something.
24              THE COURT:  He didn't go to prison or
25     anything like that?
```

/

131

```
 1            MS. NOLAN:  For carrying a concealed weapon.
 2            THE COURT:  A firearm or a weapon?
 3            MS. NOLAN:  A firearm.
 4            THE COURT:  Firearm, what was the end result
 5       of that?  Did he go to prison or jail?
 6            MS. NOLAN:  No, he didn't.  I think he just
 7       got community service.
 8            THE COURT:  Would that bear at all on your
 9       ability to be fair?
10            MS. NOLAN:  No.
11            THE COURT:  Are you close to your
12       brother-in-law?
13            MS. NOLAN:  Fairly.
14            THE COURT:  That would not compromise your
15       ability to be fair in this case?
16            MS. NOLAN:  No.
17            THE COURT:  What do you do in your spare
18       time?
19            MS. NOLAN:  Um, I read, do walking.
20            THE COURT:  Okay.
21            MS. NOLAN:  And shopping of course.
22            THE COURT:  Any questions at all?
23            MS. NOLAN:  No.
24            THE COURT:  Thank you.  That leads me to Ms.
25       Warshawsky.  Where are you from originally?
```

132

```
 1              MS. WARSHAWSKY:  Illinois.

 2              THE COURT:  How long have you been living in

 3         south Florida?

 4              MS. WARSHAWSKY:  Seventeen years.

 5              THE COURT:  What city?

 6              MS. WARSHAWSKY:  Fort Lauderdale,

 7         unincorporated.

 8              THE COURT:  Do you own your own residence?

 9              MS. WARSHAWSKY:  Yes.

10              THE COURT:  Single family home?

11              MS. WARSHAWSKY:  Yes, trailer.

12              THE COURT:  Married?

13              MS. WARSHAWSKY:  No.

14              THE COURT:  Have you been before?

15              MS. WARSHAWSKY:  Yes.

16              THE COURT:  Any children?

17              MS. WARSHAWSKY:  Two, fifteen and eleven.

18              THE COURT:  Both in school?

19              MS. WARSHAWSKY:  My fifteen year old just

20         dropped out a year ago.  And my daughter still

21         continues to go to school.

22              THE COURT:  What does he do now?

23              MS. WARSHAWSKY:  Mainly lawn mowing.

24              THE COURT:  Your occupation?

25              MS. WARSHAWSKY:  I'm home.
```

133

```
 1                THE COURT:  Doing what?

 2                MS. WARSHAWSKY:  A mommy.

 3                THE COURT:  You said you're divorced?

 4                MS. WARSHAWSKY:  Yes, separated.

 5                THE COURT:  And what does your husband do?

 6                MS. WARSHAWSKY:  I don't know I haven't had

 7      any contact with him in the last fifteen years.

 8                THE COURT:  Okay.  So you don't know and you

 9      don't care?

10                MS. WARSHAWSKY:  No, I don't care.

11                THE COURT:  Okay.  All right, have you ever

12      been on a jury before?

13                MS. WARSHAWSKY:  No, I have not.

14                THE COURT:  Victim of a crime?

15                MS. WARSHAWSKY:  No, I have not.

16                THE COURT:  Do you have any friends or

17      relatives in law enforcement?

18                MS. WARSHAWSKY:  Yes, I do.

19                THE COURT:  Who would that be?

20                MS. WARSHAWSKY:  Robin Burns with Juvenile

21      Justice.

22                THE COURT:  Okay, how do you know Robin

23      Burns?

24                MS. WARSHAWSKY:  We implemented a juvenile

25      sort of like task force brought into our
```

```
 1    community.  I'm the president of an organization
 2    in the mobile home park.
 3         THE COURT:  Would it bear at all on your
 4    ability to be fair and impartial?
 5         MS. WARSHAWSKY:  No.
 6         THE COURT:  What do you do in your spare
 7    time?
 8         MS. WARSHAWSKY:  I watch children in the
 9    park, mainly the teenagers.  I'm like a lookout in
10    the neighborhood for teens in the park.  I'm
11    resident mommy.
12         THE COURT:  Your look out for teenagers who
13    might be up to trouble, or people who might be
14    trying to do something?
15         MS. WARSHAWSKY:  I'm helping out the teens in
16    the trailer park that come to me and say they need
17    help, and I guide them to the right door and open
18    it for them.
19         THE COURT:  Any questions at all?
20         MS. WARSHAWSKY:  No.
21         THE COURT:  Do you think you could be fair
22    and impartial?
23         MS. WARSHAWSKY:  I think I could be.
24         THE COURT:  Thank you.  William Weidner,
25    where are you from?
```

```
 1            MR. WEIDNER:  Hollywood, Florida.

 2            THE COURT:  What city do you live in?

 3            MR. WEIDNER:  Hollywood.

 4            THE COURT:  Do you own your own residence?

 5            MR. WEIDNER:  Yes.

 6            THE COURT:  Single family home?

 7            MR. WEIDNER:  Yes.

 8            THE COURT:  Single family home?

 9            MR. WEIDNER:  Uh-huh (affirmative response.)

10            THE COURT:  Married?

11            MR. WEIDNER:  No.

12            THE COURT:  Have you been?

13            MR. WEIDNER:  No.

14            THE COURT:  What do you do for a living?

15            MR. WEIDNER:  Manage an Eckards store.

16            THE COURT:  Which one?

17            MR. WEIDNER:  Sunrise and Federal right

18    across from Sears Town.

19            THE COURT:  Wasn't that just held up recently

20    or something?

21            MR. WEIDNER:  I came the week after that.

22            THE COURT:  Week after that.  Okay, and where

23    were you before that?

24            MR. WEIDNER:  Just north of Oakland Park

25    Boulevard and A1A.
```

1          THE COURT:  Okay.  Have you ever been on a

2     jury?

3          MR. WEIDNER:  Yes.

4          THE COURT:  One time?

5          MR. WEIDNER:  Correct.

6          THE COURT:  What did that case involve?

7          MR. WEIDNER:  I believe it was an assault and

8     battery.

9          THE COURT:  Okay.  And did you get a chance

10    to deliberate and reach a verdict?

11         MR. WEIDNER:  No, I was an alternate.

12         THE COURT:  You were the alternate?

13         MR. WEIDNER:  Yes.

14         THE COURT:  Any negative experiences from

15    being on the jury?

16         MR. WEIDNER:  No.

17         THE COURT:  Have you been the victim of a

18    crime?

19         MR. WEIDNER:  Not really just a shoplifting

20    case at work.

21         THE COURT:  Any friends or relatives in law

22    enforcement?

23         MR. WEIDNER:  No.

24         THE COURT:  Have you or anybody in your

25    family ever been arrested at all?

```
 1              MR. WEIDNER:  No.

 2              THE COURT:  What do you do in your spare

 3         time?

 4              MR. WEIDNER:  Play golf, basketball, and

 5         darts.

 6              THE COURT:  Okay.  What was the last thing?

 7              MR. WEIDNER:  Darts.

 8              THE COURT:  Okay, any questions at all?

 9              MR. WEIDNER:  No.

10              THE COURT:  Feel you could be fair and

11         impartial?

12              MR. WEIDNER:  Yes.

13              THE COURT:  Thank you.  That leads me to Mr.

14         Burke.  Where are you from originally?

15              MR. BURKE:  Pennsylvania.

16              THE COURT:  How long have you been living in

17         south Florida?

18              MR. BURKE:  About forty years.

19              THE COURT:  What city?

20              MR. BURKE:  Plantation.

21              THE COURT:  Do you own your own residence?

22              MR. BURKE:  Yes.

23              THE COURT:  Single family home?

24              MR. BURKE:  Yes.

25              THE COURT:  Married?
```

```
 1          MR. BURKE:  Yes.

 2          THE COURT:  Children?

 3          MR. BURKE:  Two.

 4          THE COURT:  Their occupations?

 5          MR. BURKE:  My daughter is with HRS.

 6          THE COURT:  Doing what?

 7          MR. BURKE:  Group homes taking care of -- she

 8     just started there I'm not really sure how to

 9     describe it.  My son is in the music business and

10     more of a sound engineer.

11          THE COURT:  Okay, your occupation?

12          MR. BURKE:  I'm a teacher.

13          THE COURT:  Where?

14          MR. BURKE:  BCC.

15          THE COURT:  Teaching?

16          MR. BURKE:  Physical education.

17          THE COURT:  Okay.  Do you coach any teams out

18     there at all?

19          MR. BURKE:  Tennis.

20          THE COURT:  And your wife?

21          MR. BURKE:  She is a lab tech at Plantation

22     General Hospital.

23          THE COURT:  Okay, have you ever been on a

24     jury before?

25          MR. BURKE:  Got to this phase but we -- it
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
1        was settled before we got to do anything.
2             THE COURT:  Have you ever been the victim of
3        a crime?
4             MR. BURKE:  No.
5             THE COURT:  Do you have any friends or
6        relatives in law enforcement?
7             MR. BURKE:  My daughter's boyfriend is a Fort
8        Lauderdale Police Officer.
9             THE COURT:  What's his name?
10            MR. BURKE:  Actually he just moved up I think
11       he's with the secret service now, in training with
12       them.  Gus Demartalis (phonetic).
13            THE COURT:  Yes, yes, I know him.  He
14       actually started off as a probation officer.
15            MR. BURKE:  Correct.
16            THE COURT:  Right, right.  Okay, he already
17       left Fort Lauderdale?
18            MR. BURKE:  Yes.
19            THE COURT:  Would that bear at all on your
20       ability to be fair and impartial?
21            MR. BURKE:  I don't think so.
22            THE COURT:  So you can still be a fair and
23       impartial juror?
24            MR. BURKE:  I think I could.
25            THE COURT:  Do you ever talk to him in any
```

/

JUSTICE REPORTING SERVICES, INC.     523-6114

140

```
 1          detail about the nature of his work?
 2               MR. BURKE:  Yeah, I've heard stories.
 3               THE COURT:  That would not blow your
 4          objectivity?
 5               MR. BURKE:  I don't think so.
 6               THE COURT:  Okay.  Have you or anybody in
 7          your family ever been arrested at all?
 8               MR. BURKE:  No.
 9               THE COURT:  What do you do in your spare
10          time?
11               MR. BURKE:  Sports.
12               THE COURT:  Any questions at all?
13               MR. BURKE:  No, sir.
14               THE COURT:  Feel you could be fair and
15          inpartial?
16               MR. BURKE:  Yes, sir.
17               THE COURT:  Thank you.  That leads me to Ms.
18          Reed, where are you from originally?
19               MS. REED:  Indiana.
20               THE COURT:  How long have you been living in
21          south Florida?
22               MS. REED:  Twenty-eight years.
23               THE COURT:  What city?
24               MS. REED:  Margate.
25               THE COURT:  Do you own your own residence?
```

```
 1              MS. REED:  Yes.
 2              THE COURT:  Single family home?
 3              MS. REED:  Yes.
 4              THE COURT:  Married?
 5              MS. REED:  Yes.
 6              THE COURT:  Children?
 7              MS. REED:  Yes.
 8              THE COURT:  How many?
 9              MS. REED:  Two.
10              THE COURT:  School age?
11              MS. REED:  Yes, nine and six.
12              THE COURT:  Your occupation?
13              MS. REED:  I'm a full-time student and a
14         parent.
15              THE COURT:  Where do you go to school?
16              MS. REED:  FAU.
17              THE COURT:  Taking up?
18              MS. REED:  I am a psyche major and criminal
19         justice minor.
20              THE COURT:  Okay, ultimately what do you seek
21         to do?
22              MS. REED:  Counseling.
23              THE COURT:  For psyche?
24              MS. REED:  Psychologist counseling,
25         psychologist.
```

```
 1              THE COURT:  As a child psychologist?
 2              MS. REED:  Yes.
 3              THE COURT:  Your husband, what does he do?
 4              MS. REED:  Subcontracting adjustor for
 5         insurance companies.
 6              THE COURT:  Have you ever been on a jury
 7         before?
 8              MS. REED:  No.
 9              THE COURT:  Victim of a crime?
10              MS. REED:  No.
11              THE COURT:  Do you have ay friends or
12         relatives in lay enforcement?
13              MS. REED:  Yes.
14              THE COURT:  Who?
15              MS. REED:  My father.
16              THE COURT:  Where does he work?
17              MS. REED:  Just retired from BSO.
18              THE COURT:  What's his name?
19              MS. REED:  Ed Kern.
20              THE COURT:  What capacity?
21              MS. REED:  He was a deputy at the airport for
22         the last-- his station was at the airport but he's
23         been with other cities though.
24              THE COURT:  Such as?
25              MS. REED:  Coral Springs.  City of Miami.
```

143

```
 1          THE COURT:  Okay, would that fact bear at all
 2     on your ability to be fair and impartial?
 3          MS. REED:  No.
 4          THE COURT:  YOU think independently of your
 5     father.
 6          MS. REED:  Pardon me?
 7          THE COURT:  Think independently of your
 8     father?
 9          MS. REED:  Very much so.
10          THE COURT:  Feel you could be fair and
11     impartial?
12          MS. REED:  Yes, sir.
13          THE COURT:  Okay.  Have you or anybody in
14     your family ever been arrested at all?
15          MS. REED:  No.
16          THE COURT:  What do you do in your spare
17     time?
18          MS. REED:  Take care of my kids, they keep me
19     busy.
20          THE COURT:  Any questions at all?
21          MS. REED:  No.
22          THE COURT:  Thank you.  That leads me to Mr.
23     Pokorny.
24          MR. POKORNY:  Yeah.
25          THE COURT:  Where are you from originally?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

144

1          MR. POKORNY:  Long Island, New York.

2          THE COURT:  Okay, how long have you been

3   living in south Florida?

4          MR. POKORNY:  Eighteen months.

5          THE COURT:  Not long enough to loose the

6   accent, right?

7          MR. POKORNY:  Nope.

8          THE COURT:  What city do you live in?

9          MR. POKORNY:  Tamarac.

10         THE COURT:  Do you own your own residence?

11         MR. POKORNY:  Yes, townhouse.

12         THE COURT:  Married?

13         MR. POKORNY:  No.

14         THE COURT:  Have you been?

15         MR. POKORNY:  No.

16         THE COURT:  Thinking about it?

17         MR. POKORNY:  Maybe.

18         THE COURT:  Okay.  What do you do for a

19   living?

20         MR. POKORNY:  Work for Home Depot in Margate.

21         THE COURT:  Home Depot in Margate, what do

22   you do there?

23         MR. POKORNY:  Salesperson.

24         THE COURT:  Okay.  Have you ever been on a

25   jury before?

145

1          MR. POKORNY:  No.

2          THE COURT:  Victim of a crime?

3          MR. POKORNY:  Yes.

4          THE COURT:  What?

5          MR. POKORNY:  About two-and-a-half years ago,

6     three years ago up in New York I got held up in

7     Home Depot with a shotgun.

8          THE COURT:  Okay, during working hours?

9          MR. POKORNY:  During working hours me and one

10    other guy were in the break room and two guys

11    walked in and asked for the manager and showed us

12    the shotguns.

13         THE COURT:  How do you walk in a Home Depot

14    with a shotgun without being seen?

15         MR. POKORNY:  Big over coat, it was during

16    the wintertime and they had overcoats on.

17         THE COURT:  What ultimately happened?

18         Mr. POKORNY:  They finally -- they didn't get

19    anything and they got caught and I had to go

20    select witnesses and stuff.

21         THE COURT:  They were apprehended, did you

22    actually testify in the case?

23         MR. POKORNY:  No I didn't testify but I

24    pointed them out.

25         THE COURT:  The case was apparently worked

146

```
 1        out without the necessity of you testifying at the

 2        trial?

 3              MR. POKORNY:  Correct.

 4              THE COURT:  Okay.  Would that bear at all on

 5        your ability to be fair and impartial?

 6              MR. POKORNY:  I'm not really sure.

 7              THE COURT:  Excuse me?

 8              MR. POKORNY:  I'm not really sure, I don't

 9        know.

10              THE COURT:  You feel that may bear on your

11        ability to be fair and impartial?

12              MR. POKORNY:  Yes.

13              THE COURT:  How long ago did that happen?

14              MR. POKORNY:  ABOUT two-and-a-half years ago.

15              THE COURT:  Have you or anybody in your

16        family ever been arrested at all?

17              MR. POKORNY:  No.

18              THE COURT:  What do you do in your spare

19        time?

20              MR. POKORNY:  Bowling, softball.

21              THE COURT:  Any questions at all?

22              MR. POKORNY:  No.

23              THE COURT:  Thank you.  Why do you feel it

24        may have a bearing on you?

25              MR. POKORNY:  I don't know just from having a
```

147

```
 1          gun to me and whatever it's -- I can't explain it.
 2              THE COURT:  I mean you think you may be
 3          leaning more towards the favor of the State in
 4          this case because of what happened?
 5              MR. POKORNY:  That's a possibility.
 6              THE COURT:  Okay.  All right, thank you.  Ms.
 7          Petrone, where are you from originally?
 8              MS. PETRONE:  Chicago.
 9              THE COURT:  How long have you been living in
10          south Florida?
11              MS. PETRONE:  Twenty-eight years.
12              THE COURT:  Do you own your own residence?
13              MS. PETRONE:  No.
14              THE COURT:  Rent?
15              MS. PETRONE:  Rent a house in Hollywood.
16              THE COURT:  Married?
17              MS. PETRONE:  Divorced.
18              THE COURT:  Children?
19              MS. PETRONE:  Two.
20              THE COURT:  School age?
21              MS. PETRONE:  Twenty-four, she is a model.
22          And sixteen he goes to Nova.
23              THE COURT:  Nova?
24              MS. PETRONE:  High school.
25              THE COURT:  Your occupation?
```

148

```
 1          MS. PETRONE:  Personal director of the home
 2     club in Boca Raton.
 3          THE COURT:  Okay, you drive from Hollywood to
 4     Boca every day?
 5          MS. PETRONE:  Every day.
 6          THE COURT:  You're glad to be here?
 7          MS. PETRONE:  I am.
 8          THE COURT:  Your husband, your ex-husband
 9     what does he do?
10          MS. PETRONE:  I don't know.
11          THE COURT:  Not sure?
12          MS. PETRONE:  No, I don't know.
13          THE COURT:  Have you ever been on a jury
14     before?
15          MS. PETRONE:  Yes.
16          THE COURT:  One time?
17          MS. PETRONE:  Yes.
18          THE COURT:  Criminal case?
19          MS. PETRONE:  Drunk driving.
20          THE COURT:  Okay.  Did you get a chance to
21     deliberate and reach a verdict?
22          MS. PETRONE:  Yes, we did.
23          THE COURT:  Were you the foreman of the
24     jury?
25          MS. PETRONE:  Yes, I was.
```

```
1              THE COURT:  Any negative experiences from
2       being the jury?
3              MS. PETRONE:  No.
4              THE COURT:  Do you remember who the judge was
5       in that case?
6              MS. PETRONE:  I do not.
7              THE COURT:  I hope I leave a more positive
8       impression on you.  Do you remember when that
9       was?
10             MS. PETRONE:  Approximately four years ago.
11             THE COURT:  Have you ever -- have you or
12      anybody in your family ever been arrested at all?
13             MS. PETRONE:  No.
14             THE COURT:  Ever been the victim of a crime?
15             MS. PETRONE:  No.
16             THE COURT:  Do you have any friends or
17      relatives in law enforcement?
18             MS. PETRONE:  No.
19             THE COURT:  What do you do in your spare
20      time?
21             MS. PETRONE:  I like to travel and read.
22             THE COURT:  Okay, any questions at all?
23             MS. PETRONE:  Not now.
24             THE COURT:  Think you could be fair and
25      impartial?
```

1        MS. PETRONE:  Yes.

2        THE COURT:  Thank you.  Ms. Hayes, where are

3   from originally?

4        MS. HAYES:  Born and raised here in Fort

5   Lauderdale.

6        THE COURT:  Okay.  What city do you live in

7   now?

8        MS. HAYES:  Fort Lauderdale.

9        THE COURT:  Married?

10       MS. HAYES:  No.

11       THE COURT:  Have you been?

12       MS. HAYES:  No.

13       THE COURT:  Own your own residence, or rent?

14       MS. HAYES:  Own.

15       THE COURT:  Single family home?

16       MS. HAYES:  Yes.

17       THE COURT:  What do you do for a living?

18       MS. HAYES:  X-ray clerk with Holly Cross

19   Hospital.

20       THE COURT:  Okay, do you know Dr. Cotler over

21   there?

22       MS. HAYES:  Yes I do I was with him

23   yesterday.

24       THE COURT:  Ever been on a jury before?

25       MS. HAYES:  I've been on a jury a couple

/

```
 1        times.  I'm called like every two years I think.
 2              THE COURT:  You were one of these people that
 3        left your name wanting to be called.  You never
 4        actually served on a jury?
 5              MS. HAYES:  Yes.
 6              THE COURT:  One time?
 7              MS. HAYES:  Twice.
 8              THE COURT:  Any of them criminal cases?
 9              MS. HAYES:  No.
10              THE COURT:  Did you ever serve as the foreman
11        on any one of these juries?
12              MS. HAYES:  No.
13              THE COURT:  Any negative experiences from
14        being on the jury?
15              MS. HAYES:  No.
16              THE COURT:  Ever been the victim of a crime?
17              MS. HAYES:  Yes.
18              THE COURT:  What's that?
19              MS. HAYES:  Someone tried to steal my car
20        under the car port and my neighbor happen to see
21        them at the time and they not weren't able to get
22        away with the car.
23              THE COURT:  How long ago was that?
24              MS. HAYES:  Last year.
25              THE COURT:  Would that bear at all on your
```

152

```
 1          ability to be fair and impartial?
 2                MS. HAYES:  I don't think so.
 3                THE COURT:  Okay.  Do you have any friends or
 4          relatives in law enforcement?
 5                MS. HAYES:  Um, I know someone with BSO.
 6                THE COURT:  Who is that?
 7                MS. HAYES:  Leroy Frederick.
 8                THE COURT:  How do you know him?
 9                MS. HAYES:  I'm a friend of his sister.
10                THE COURT:  Okay.  Would that bear at all on
11          your ability to be fair and impartial?
12                MS. HAYES:  No, I don't think so.
13                THE COURT:  Have you or anybody in your
14          family ever been arrested at all?
15                MS. HAYES:  My brother.
16                THE COURT:  What was that for?
17                MS. HAYES:  Drugs.
18                THE COURT:  Okay, recently?
19                MS. HAYES:  About three years ago.
20                THE COURT:  What was the end result of that?
21                MS. HAYES:  He was in -- what's that place
22          down in Pompano?
23                THE COURT:  Stockade?
24                MS. HAYES:  He went to trial and worked out
25          some kind of agreement.  I know he didn't do much
```

```
 1      more then a week.

 2              THE COURT:  What's his name, your brother?

 3              MS. HAYES:  James Hayes.

 4              THE COURT:  Okay, has he ever had to go off

 5      to state prison at all for anything?

 6              MS. HAYES:  No.

 7              THE COURT:  Would that bear at all on your

 8      ability to be fair and impartial?

 9              MS. HAYES:  No.

10              THE COURT:  Are you close to your brother?

11              MS. HAYES:  Yes, I am.

12              THE COURT:  What do you do in your spare

13      time?

14              MS. HAYES:  I read, I shop a lot.

15              THE COURT:  Okay, any questions at all?

16              MS. HAYES:  No I can't think of anything.

17              THE COURT:  Okay.  Say hello to Dr. Cotler

18      for me.  Mr. Moran, where are you from

19      originally?

20              MR. MORAN:  Chicago.

21              THE COURT:  How long have you been living in

22      south Florida?

23              MR. MORAN:  Twenty-two years.

24              THE COURT:  Twenty-two years, do you own your

25      own residence?
```

154

```
 1              MR. MORAN:   No, rent.

 2              THE COURT:   Excuse me?

 3              MR. MORAN:   Rent an apartment.

 4              THE COURT:   What city?

 5              MR. MORAN:   Fort Lauderdale.

 6              THE COURT:   Married?

 7              MR. MORAN:   Single.

 8              THE COURT:   Have you ever been married?

 9              MR. MORAN:   No.

10              THE COURT:   What do you do for a living?

11              MR. MORAN:   Product buyer.

12              THE COURT:   For?

13              MR. MORAN:   Certified vacations.

14              MR. GODWIN:   Sorry, I didn't hear you.

15              THE COURT:   Certified vacations, product

16      buyer.

17              THE COURT:   That's right over here on

18      Broward, isn't it?

19              MR. MORAN:   Yes.

20              THE COURT:   Okay.  So you go out and like

21      sample the perspective hotels and things like

22      that?

23              MR. MORAN:   I contract and negotiate with the

24      hotels and transfer companies for about fifty

25      designations.
```

155

```
 1          THE COURT:  Do you travel a lot yourself?

 2          MR. MORAN:  Yes, I do.

 3          THE COURT:  Tough job huh?

 4          MR. MORAN:  Yeah.

 5          THE COURT:  Someone has to do it, right?

 6          MR. MORAN:  Right.

 7          THE COURT:  Ever been on a jury before?

 8          MR. MORAN:  No.

 9          THE COURT:  Victim of a crime?

10          MR. MORAN:  Yes.

11          THE COURT:  What's that?

12          MR. MORAN:  Twice my car was broken into and

13     attempted to be stolen.

14          THE COURT:  And what?

15          MR. MORAN:  Stolen.

16          THE COURT:  Did they find out who did either

17     one of those?

18          MR. MORAN:  No.

19          THE COURT:  Would that bear at all on your

20     ability to be fair and impartial?

21          MR. MORAN:  No.

22          THE COURT:  Do you have any friends or

23     relatives in law enforcement?

24          MR. MORAN:  One acquittance.

25          THE COURT:  Who is that?
```

156

1          MR. MORAN: Patrick Tie with BSO.

2          THE COURT: How do you know him?

3          MR. MORAN: His sister and mine are good

4     friends.

5          THE COURT: Would that bear on your ability

6     to be fair and impartial?

7          MR. MORAN: No.

8          THE COURT: Have you or anybody in your

9     family ever been arrested at all?

10         MR. MORAN: Yes.

11         THE COURT: Who?

12         MR. MORAN: Me.

13         THE COURT: For?

14         MR. MORAN: Drunk driving in 1981, or '82.

15         THE COURT: Over 12, 13, 14 years ago.  Where

16    was that, down here?

17         MR. MORAN: Fort Lauderdale.

18         THE COURT: What was the end result of that?

19         MR. MORAN: I pled guilty.

20         THE COURT: And you received probation for

21    six months?

22         MR. MORAN: Yes.

23         THE COURT: Okay, would that effect your

24    ability to be fair and impartial?

25         MR. MORAN: No.

```
 1              THE COURT:   What do you do in your spare
 2         time?
 3              MR. MORAN:   Stay at home and do a lot things
 4         with my family and my friends.  I do a lot of
 5         reading.
 6              THE COURT:   Okay.  Did you say you were
 7         married or not?
 8              MR. MORAN:   No sir.
 9              THE COURT:   Any questions at all?  So like
10         when you travel and these hotels know you're with
11         certified tours do you get all the best
12         treatment?
13              MR. MORAN:   Yes.
14              THE COURT:   I would imagine.  Thank you Mr.
15         Moran.  Mr. Scott, where are you from originally?
16              MR. SCOTT:   Tampa, Florida.
17              THE COURT:   How long have you been living in
18         Broward County?
19              MR. SCOTT:   About twenty-four years.
20              THE COURT:   What city?
21              MR. SCOTT:   Sunrise.
22              THE COURT: Do you own your own residence?
23              MR. SCOTT:   Yes.
24              THE COURT:   Single family home?
25              MR. SCOTT:   Yes.
```

| | |
|---|---|
| 1 | THE COURT: Married? |
| 2 | MR. SCOTT: Yes. |
| 3 | THE COURT: Children? |
| 4 | MR. SCOTT: Yes. |
| 5 | THE COURT: How many? |
| 6 | MR. SCOTT: Four. |
| 7 | THE COURT: About four? |
| 8 | MR. SCOTT: No, I said four. |
| 9 | THE COURT: What do they do? |
| 10 | MR. SCOTT: One is a detention officer for |
| 11 | BSO. |
| 12 | THE COURT: Which jail? |
| 13 | MR. SCOTT: The main jail. |
| 14 | THE COURT: Right over here at the main |
| 15 | jail? |
| 16 | MR. SCOTT: Yes.  And one is a housewife. |
| 17 | THE COURT: What's the name of the child that |
| 18 | works at the main jail? |
| 19 | MR. SCOTT: Freddie Scott, Jr. |
| 20 | THE COURT: Okay, go ahead. |
| 21 | MR. SCOTT: One is a housewife, one is in |
| 22 | college, and one is nine years old. |
| 23 | THE COURT: Okay, the one is in college |
| 24 | where? |
| 25 | MR. SCOTT: At Tampa. |

```
 1              THE COURT:  Your occupation?
 2              MR. SCOTT:  Unemployed.
 3              THE COURT:  What type of work do you normally
 4    do?
 5              MR. SCOTT:  Well, I worked for Cheveron for
 6    19 years as a retail territory manager, and since
 7    that time I'm going back to school.
 8              THE COURT:  Okay, where?
 9              MR. SCOTT:  At FAU and BCC.
10              THE COURT:  Taking up?
11              MR. SCOTT:  Political Science.
12              THE COURT:  Your wife?
13              MR. SCOTT:  She works for the county.
14              THE COURT:  In what capacity?
15              MR. SCOTT:  She's an assistant with Human
16    Services, she's an assistant administrator with
17    Human Service.
18              THE COURT:  Ever been on a jury before?
19              MR. SCOTT:  Yes.
20              THE COURT:  One time?
21              MR. SCOTT:  Three times.
22              THE COURT:  Any of them criminal cases?
23              MR. SCOTT:  One.
24              THE COURT:  What did that case involve?
25              MR. SCOTT:  DUI, and assault.
```

160

```
1              THE COURT:  Okay, DUI and an assault?
2         MR. SCOTT:  Yes.
3              THE COURT:  In anyone of these cases did you
4    get a chance to deliberate and reach a verdict?
5         MR. SCOTT:  Two of them.
6              THE COURT:  Two of them.  Did you reach a
7    verdict in the DUI case?
8         MR. SCOTT:  Yeah, we did.
9              THE COURT:  Were you the foreman of any one
10   of these juries?
11        MR. SCOTT:  Two of the three.
12             THE COURT:  Any negative experience from
13   being on the jury?
14        MR. SCOTT:  No.
15             THE COURT:  Have you ever been the victim of
16   a crime?
17        MR. SCOTT:  No.
18             THE COURT:  Any friends or relatives in law
19   enforcement other then your son?
20        MR. SCOTT:  My son-in-law, and my brother.
21             THE COURT:  Son-in-law works where?
22        MR. SCOTT:  BSO.
23             THE COURT:  Corrections?
24        MR. SCOTT:  Also at the main jail.
25             THE COURT:  His name is?
```

161

```
 1              MR. SCOTT:  Jonathan Magrover.

 2              THE COURT:  And your brother?

 3              MR. SCOTT:  He's with Jackson State

 4    University Police Department.

 5              THE COURT:  In Alabama?

 6              MR. SCOTT:  Mississippi.

 7              THE COURT:  Okay, would those facts effect

 8    your ability to be fair and impartial?

 9              MR. SCOTT:  No.

10              THE COURT:  Okay, and have you or anybody in

11    your family ever been arrested?

12              MR. SCOTT:  No.

13              THE COURT:  What do you do in your spare

14    time?

15              MR. SCOTT:  Read.

16              THE COURT:  Read, okay.  Any questions at

17    all?

18              MR. SCOTT:  No.

19              THE COURT:  Thank you.  That leads me to Mr.

20    Brown.  Where are you from originally?

21              MR. BROWN:  Jamaica.

22              THE COURT:  How long have you been living in

23    south Florida?

24              MR. BROWN:  Twenty-one years.

25              THE COURT:  What city?
```

```
 1            MR. BROWN:   Hollywood.
 2            THE COURT:   Do you own your own residence?
 3            MR. BROWN:   Yes.
 4            THE COURT:   Single family home?
 5            MR. BROWN:   Yes.
 6            THE COURT:   Married?
 7            MR. BROWN:   Yes.
 8            THE COURT:   Children?
 9            MR. BROWN:   Two girls.
10            THE COURT:   What do they do?
11            MR. BROWN:   Students fifteen and twelve.
12            THE COURT:   What is your occupation?
13            MR. BROWN:   Clerk.
14            THE COURT:   Where?
15            MR. BROWN:   Publix facility services.
16            THE COURT:   What is that?
17            MR. BROWN:   It's a chain supermarket.
18            THE COURT:   Yeah, I've heard of Publix.
19            THE COURT:   What do you do there?
20            MR. BROWN:   I'm a clerk.
21            THE COURT:   At one of their retail stores?
22            MR. BROWN:   No at the facility services we
23      issue the parts and so forth.
24            THE COURT:   Okay, and your wife what does she
25      do?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

163

```
1              MR. BROWN:  Home maker.
2              THE COURT:  Okay, have you ever been on a
3      jury?
4              MR. BROWN:  No.
5              THE COURT:  Victim of a crime?
6              MR. BROWN:  No.
7              THE COURT:  Do you have any friends or
8      relatives in law enforcement?
9              MR. BROWN:  No.
10             THE COURT:  Have you or anybody in your
11     family ever been arrested at all?
12             MR. BROWN:  No.
13             THE COURT:  What do you do in your spare
14     time?
15             MR. BROWN:  Both my kids practice medicine
16     and I do research with them, and sports.
17             THE COURT:  You do medical research with your
18     kids is that what you said?
19             MR. BROWN:  They're working towards medicine
20     and they do research.
21             THE COURT:  Do research.  Okay, any questions
22     at all?
23             MR. BROWN:  No.
24             THE COURT:  Feel you could be fair and
25     impartial?
```

164

```
 1              MR. BROWN:  Yes.
 2              THE COURT:  That leads me to Ms. Ellis, where
 3       are you from originally?
 4              MS. ELLIS:  Here.
 5              THE COURT:  What city do you live in?
 6              MS. ELLIS:  Fort Lauderdale.
 7              THE COURT:  Married?
 8              MS. ELLIS:  Yes.
 9              THE COURT:  Children?
10              MS. ELLIS:  No.
11              THE COURT:  Do you own your own residence?
12              MS. ELLIS:  No.
13              THE COURT:  Rent.
14              MS. ELLIS:  My husband owns it.
15              THE COURT:  But not you?
16              MS. ELLIS:  No.
17              THE COURT:  Okay, and that's in Fort
18       Lauderdale?
19              MS. ELLIS:  Yes.
20              THE COURT:  What do you do for a living?
21              MS. ELLIS:  Work at Block Buster Video
22       Corporate Office.
23              THE COURT:  Right over here?
24              MS. ELLIS:  Yeah.
25              THE COURT:  What do you do there?
```

```
 1              MS. ELLIS:  I'm a purchasing clerk for the
 2         music department.
 3              THE COURT:  In the music department.  Okay,
 4         so like tape musical tapes and CD's and all that?
 5              MS. ELLIS:  Uh-huh (affirmative response.)
 6              THE COURT:  Do you have to like take them
 7         home and sample them?
 8              MS. ELLIS:  No, we just listen to them there.
 9              THE COURT:  That's all you do?
10              MS. ELLIS:  You can take them home if you
11         want to.
12              THE COURT:  You listen to them, what do you
13         do, grade them?
14              MS. ELLIS:  We tell the buyers if we like
15         them or not.
16              THE COURT:  You're involved in making that
17         decision?
18              MS. ELLIS:  Yes.
19              THE COURT:  So the buyers come to you all the
20         time with perspective tapes?
21              MS. ELLIS:  Yes.
22              THE COURT:  So before they appear in the
23         Blockbuster stores they have to be approved by
24         your department?
25              MS. ELLIS:  Yes.
```

```
 1            THE COURT:  Okay.   What does your husband
 2       do?
 3            MS. ELLIS:  Head custodian at Parkway Middle.
 4            THE COURT:  Ever been on a jury before?
 5            MS. ELLIS:  No.
 6            THE COURT:  Victim of a crime?
 7            MS. ELLIS:  No.
 8            THE COURT:  Do you have any friends or
 9       relatives in law enforcement?
10            MS. ELLIS:  No.
11            THE COURT:  Have you or anybody in your
12       family ever been arrested before?
13            MS. ELLIS:  My brother.
14            THE COURT:  For?  Brother or brothers?
15            MS. ELLIS:  Brother, singular.
16            THE COURT:  For?
17            MS. ELLIS:  Buying drugs from an undercover
18       cop.
19            THE COURT:  How long ago was that?
20            MS. ELLIS:  I don't know.
21            THE COURT:  What was the end result of that?
22            MS. ELLIS:  I think he had to go to class or
23       something.
24            THE COURT:  He didn't go to prison or
25       anything like that?
```

```
 1              MS. ELLIS:  I think he did but I don't think
 2      he stayed.
 3              THE COURT:  When I say prison I don't mean
 4      the jail I mean state prison?  He was local?
 5              MS. ELLIS:  Right.
 6              THE COURT:  Are you close to your brother?
 7              MS. ELLIS:  Yes.
 8              THE COURT:  Would that bear at all on your
 9      ability to be fair and impartial?
10              MS. ELLIS:  No.
11              THE COURT:  What do you do in your spare
12      time?
13              MS. ELLIS:  Fish.
14              THE COURT:  Salt water or fresh water?
15              MS. ELLIS:  Salt water.
16              THE COURT:  Do you go out on a boat or from
17      the bridge?
18              MS. ELLIS:  From a boat and bridge, both.
19              THE COURT:  Any questions at all?
20              MS. ELLIS:  No.
21              THE COURT:  Thank you.  Feel you could be
22      fair and impartial?
23              MS. ELLIS:  Yes.
24              THE COURT:  Ms. Trapp, where are you from
25      originally?
```

```
 1              MS. TRAPP:  Miami.

 2              THE COURT:  You've been living in south

 3      Florida all of your life?

 4              MS. TRAPP:  Yes.

 5              THE COURT:  What city do you live in now?

 6              MS. TRAPP:  Plantation.

 7              THE COURT:  Do you own your own residence?

 8              MS. TRAPP:  Yes.

 9              THE COURT:  Single family home?

10              MS. TRAPP:  Yes.

11              THE COURT:  Married?

12              MS. TRAPP:  Yes.

13              THE COURT:  Children?

14              MS. TRAPP:  Yes.

15              THE COURT:  How many?

16              MS. TRAPP:  Two.

17              THE COURT:  School age?

18              MS. TRAPP:  One four and one is two.

19              THE COURT:  Your occupation?

20              MS. TRAPP:  Letter carrier with the postal

21      service.

22              THE COURT:  Which branch?

23              MS. TRAPP:  Main facility.

24              THE COURT:  Your husband?

25              MS. TRAPP:  Main facility.
```

```
 1              THE COURT:  Your husband, what does he do?
 2              MS. TRAPP:  He is also a letter carrier.
 3              THE COURT:  Did you all meet at the post
 4         office?
 5              MS. TRAPP:  Yes, we did.
 6              THE COURT:  Did you have a wedding reception
 7         there?
 8              MS. TRAPP:  Yes, we did.
 9              THE COURT:  Ever been on a jury?
10              MS. TRAPP:  No.
11              THE COURT:  Have you or anybody in your
12         family ever been arrested at all?
13              MS. TRAPP:  No.
14              THE COURT:  What do you do in your spare
15         time?
16              MS. TRAPP:  Roller blade, I take my dog to
17         the beach.
18              THE COURT:  Do you do both at once?
19              MS. TRAPP:  No.
20              THE COURT:  Any questions at all?
21              MS. TRAPP:  No.
22              THE COURT:  Okay.  At this point in time I am
23         sure that you are pretty tired of hearing me talk,
24         and if that's not the case I must tell you I am
25         tired of talking.  So I'll give the lawyers a
```

```
 1              brief opportunity, that's B-R-I-E-F, to question
 2              you at this time.

 3                   Mr. Patner.

 4                   MR. PATNER:  Thank you, Your Honor.  Good
 5              afternoon ladies and gentlemen, as the judge said
 6              my name is Joseph Patner and I'm the prosecuting
 7              attorney here today and I'm going to try and be as
 8              brief as possible.

 9                   Can I see a show of hands of how many people
10              have been on a jury before?  A couple weren't.
11              Everybody has been on a jury, let me see your
12              hands for a moment.  About half of you.  Put your
13              hands down.  Of those of you who have sat on a
14              jury before, or maybe never sat on one perhaps
15              you'll have had an opportunity to sit on one.  You
16              may see something that I consider to be a miracle
17              and that's when the attorneys come in here with
18              all your names perfectly memorized and they say
19              them all correctly.  I want you to understand you
20              are not going to get any miracles from me.  I have
21              a chart with your names on it and I am probably
22              going to mispronounce a couple of yours but not
23              all of them so bear with me.

24                   Let me follow that up with a little bit of
25              questions about your occupations.  I was trying to
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1        decide who had the better job between Ms. Ellis
 2        and Mr. Moran either listening to music all day or
 3        traveling.  But we'll talk about that later.
 4             Mr. Brown, how long have you been with
 5        Publix?
 6             MR. BROWN:  September is going on one year.
 7             MR. PATNER:  Prior to that what were you
 8        doing?
 9             MR. BROWN:  Concert international
10        maintenance.
11             MR. PATNER:  How long have you been involved
12        in that, sir?
13             MR. BROWN:  Ten years.
14             MR. PATNER:  Here in Fort Lauderdale?
15             MR. BROWN: Hollywood.
16             MR. PATNER:  Ms. Hayes, you're over at Holly
17        Cross Hospital.
18             MS. HAYES:  Yes.
19             MR. PATNER:  I believe you said x-ray
20        technician?
21             MS. HAYES:  Clerk.
22             MR. PATNER:  Okay, specifically what does
23        your job involve?
24             MS. HAYES:  Make sure operations are skilled
25        properly for the examination.  Make sure the
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1          doctors office receives reports and stuff like
 2          that.  Make sure we hang x-rays for the
 3          radiologist so the poor babies don't have to hang
 4          them.
 5               MR. PATNER:  Ever have any dealings with
 6          emergency room admissions as they progress through
 7          the system?
 8               MS. HAYES:  Yes I work 11 to 7 p.m., so I see
 9          a lot because there are only two people in the
10          department during that time of night and we
11          usually help each other out.
12               MR. PATNER:  Ever see any victims with gun
13          shot wounds?
14               MS. HAYES:  Yes.
15               MR. PATNER:  Ever look at the x-rays for the
16          gunshot wounds?
17               MS. HAYES:  Yes.
18               MR. PATNER:  Ms. Petrone, you work over on
19          Yamato road, isn't it the Polo club?
20               MS. PETRONE:  Yes.
21               MR. PATNER:  How long have you been over
22          there?
23               MS. PETRONE:  Two-and-a-half years.
24               MR. PATNER:  What sort of things do you do
25          out there?
```

```
 1              MS. PETRONE:  I do hiring and firing
 2         researching.
 3              MR. PATNER:  Hiring is a lot more pleasant
 4         then firing somebody.
 5              MS. PETRONE:  Much.
 6              MR. PATNER:  Ms. Rodriguez, you had a son
 7         involved in an ecological company you said, I
 8         think you said in Atlanta?
 9              MS. RODRIGUEZ:  Yeah.
10              MR. PATNER:  What company was that?
11              MS. RODRIGUEZ:  He just got the job right
12         after he got married.  He told me the name of it
13         but I don't know it.
14              MR. PATNER:  Who's your favorite Marlin
15         player?
16              MS. RODRIGUEZ:  I don't like the Marlins I'm
17         a Braves fan.
18              MR. PATNER:  That's a risk there.  You said
19         you to like watch baseball and I was hoping
20         perhaps you were a Marlins fan.  You work the
21         cafeteria during the day you're not going to be
22         criticizing the food here if you choose to eat in
23         the building.  Ms. Nolan, your daughter who's at
24         FIU, what major is she studying?
25              MS. NOLAN:  She is -- she hasn't majored in
```

```
1       anything yet she's planing on transferring to New
2       York City to pursue a pharmacy degree.
3               MR. PATNER:  Mr. Weidner, you were a juror
4       here two years ago?
5               MR. WEIDNER:  Yeah.
6               MR. PATNER:  Ms. Hayes, you hit it right on
7       the head some people come up every two years and
8       there's other people that have never been called.
9       I guess you're lucky.  The Eckards drugstore how
10      long had you been over there?
11              MR. WEIDNER:  At this store or with Eckards?
12              MR. PATNER:  With Eckards total.
13              MR. WEIDNER:  Approximately seven years.
14              MR. PATNER:  This is fairly recent.  Which
15      one did you like better?
16              MR. WEIDNER:  Actually the one in Hollywood.
17      I've worked all over.
18              MR. PATNER:  Ms. Warshawsky, you're involved
19      quite a bit in community service sounds like?
20              MS. WARSHAWSKY:  Yeah.
21              MR. PATNER:  Ever have to call the police as
22      part of your job?
23              MS. WARSHAWSKY:  No, I haven't.
24              MR. PATNER:  When you say having to open the
25      right doors you're talking about --
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
1              MS. WARSHAWSKY:  Guiding.
2              MR. PATNER:  Calling the hot lines and that
3         type of things?
4              MS. WARSHAWSKY:  No, along with Robin Burns,
5         Robin Burns giving me phone numbers of where to
6         call or who to talk to to help certain children in
7         distress, or if they are doing bad in school and I
8         find out about it they choose to ask me for help
9         and I give them a phone number or I go with them
10        to an appointment and help them out in anyway that
11        I can.
12             MR. PATNER:  Rewarding work sounds like?
13             MS. WARSHAWSKY:  Pardon?
14             MR. PATNER:  Rewarding work?
15             MS. WARSHAWSKY:  Yes, it is.
16             MR. PATNER:  Mr. Burke, you said -- Mr.
17        Burke, you said you discuss cases with your - have
18        you ever discussed cases with your daughter's
19        boyfriend?
20             MR. BURKE:  They are engaged now.
21             MR. PATNER:  Soon to be son-in-law I guess.
22             MR. BURKE:  Next year.
23             MR. PATNER:  Did you ever discuss cases with
24        him?
25             MR. BURKE:  He heard stories, yeah.
```

```
 1              MR. PATNER:  Did he ever talk about
 2         testifying in a trial?
 3              MR. BURKE:  I'm not sure.
 4              MR. PATNER:  Just as an overview does
 5         anything stick in your mind one way or another
 6         before that?
 7              MR. BURKE:  No.
 8              MR. PATNER:  Do you ever talk about the State
 9         Attorney's Office?
10              MR. BURKE:  No.
11              MR. PATNER:  One way or another he never gave
12         you some sort of impression as to the State
13         Attorney's Office as far as trial and never
14         testifying or not testifying or anything along
15         those lines?
16              MR. BURKE:  Not that I recall.
17              MR. BLINDERMAN:  I believe you indicated your
18         wife was involved in the medical field as a lab
19         technician?
20              MR. BURKE:  Lab tech.
21              MR. PATNER:  Specifically what type of
22         involvement does she have?
23              MR. BURKE:  Well, she use to work anything
24         from the ER room drawing blood and so forth and
25         now she is up in the lab running tests.
```

```
1              MR. PATNER:   Uh-huh (affirmative response.),
2         does she ever discuss her emergency room work with
3         you?
4              MR. BURKE:   Just that it's very stressful
5         that's why she moved up in the lab.
6              MR. PATNER:   Some horror stories.  Ms. Reed,
7         you're a psychology criminal justice major or
8         minor?
9              MS. REED:   Major/minor.
10             MR. PATNER:   As far as the criminal justice
11        courses have you ever had an opportunity to go sit
12        in on a trial, watch a trial?
13             MS. REED:   I actually did in high school I
14        went to a trial.  A couple of years ago I was a
15        character witness for a neighbor of mine.
16             MR. PATNER:   Was that a criminal case or
17        civil suit?
18             MS. REED:   Criminal.
19             MR. PATNER:   And was your neighbor the person
20        that was charged with the crime?
21             MS. REED:   Yes.
22             MR. PATNER:   She came forward, you came
23        forward on her behalf?
24             MS. REED:   Yes, yes, a character witness I
25        guess.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1          MR. PATNER:  Okay.  Were you then cross

2     examined by a prosecutor?

3          MS. REED:  Yes.

4          MR. PATNER:  And that can I suppose not be a

5     pleasant thing, or perhaps it was but it obviously

6     wasn't me because we've never met before.  Was

7     that here in this building?

8          MS. REED:  Yes, it was.

9          MR. PATNER:  Do you have any thoughts about

10     the way the prosecutor handled that case in

11     general or specifically from you?

12          MS. REED:  I wasn't in the courtroom accept

13     for that.

14          MR. PATNER:  For your cross examination.  Do

15     you feel he tried to mislead you or was rude to

16     you or anything that left sort of a bad impression

17     in your mouth, or in your mind?

18          MS. REED:  No.

19          MR. PATNER:  Ms. Trapp, did you all work for

20     the same division at one point now and you're

21     separated now?

22          MS. TRAPP:  About seven years ago we worked

23     together.

24          MR. PATNER:  How long have you been with the

25     postal service?

```
 1              MS. TRAPP:  Eight years.
 2              MR. PATNER:  Plan on staying there?
 3              MS. TRAPP:  For about eight years then I will
 4         retire.
 5              MR. PATNER:  What do you plan on doing when
 6         you have all the free time of retirement?
 7              MS. TRAPP:  I don't know.
 8              MR. PATNER:  Okay, fair enough.  How long has
 9         your husband been doing it?
10              MS. TRAPP:  Seven years.
11              MR. PATNER:  Couldn't take the weather in New
12         York so you came down here?
13              MR. POKORNY:  Yep.
14              MR. PATNER:  You were at Home Depot there?
15              MR. POKORNY:  Been working with them about
16         seven years.
17              MR. PATNER:  Fortunate enough to be able to
18         transfer?
19              MR. POKORNY:  Yes.  My sister moved down here
20         that's why I came down.  My parents come down
21         every six months out of the year.
22              THE COURT:  They didn't pay for the move down
23         here?
24              MR. POKORNY:  No I paid for the house down
25         here for them.
```

```
 1              MR. PATNER:  You're studying political
 2         science over at FAU.  Do you have political
 3         aspirations when you graduate?
 4              MR. SCOTT:  No.
 5              MR. PATNER:  You're wife is involved in human
 6         services?
 7              MR. SCOTT:  Yes.
 8              MR. PATNER:  What does she do?
 9              MR. SCOTT:  Assistant director in the witness
10         department.
11              MR. PATNER:  What does the witness department
12         handle?
13              MR. SCOTT:  She's over at the human services
14         and there are about five divisions that are over
15         there.  There are so many I can't really be
16         specific about them.
17              MR. PATNER:  Fair enough.  You've been with
18         Chevron for 19 years?
19              MR. SCOTT:  Yes.
20              MR. PATNER:  Was that here or up north?
21              MR. SCOTT:  Here.
22              MR. PATNER:  One of the things the judge
23         touched on briefly and I want to follow up on is
24         one of the constitutional privileges that you hear
25         about, those of you that have been on a jury have
```

1       certainly heard about this before and you'll hear
2       about this in any criminal trial and that is
3       what's known as the burden of proof.  Does
4       everyone understand that the burden of proof in a
5       criminal case is on this table right here?  And
6       that this table here doesn't have to prove
7       anything?  Does everybody understand that?

8           That goes along with the fact that the
9       defendant has a right to make us prove our case,
10      the State's case.  One of the ways the State will
11      attempt to do that, or I'll attempt to do that in
12      the case is I'll be calling witnesses and some of
13      which will be police officers and we are going to
14      talk a little bit about police officers.

15          Can I see a show of hands of how many people
16      have ever been stopped for a ticket?  Maybe I
17      should rephrase this.  How many people have never
18      been stopped for a ticket?  Ms. Ellis you've been
19      stopped before it's not the most pleasant thing in
20      the world, is it?

21          MS. ELLIS:  No.

22          MR. PATNER:  Ever feel you've been given a
23      ticket for no reason at all?

24          MS. ELLIS:  No.

25          MR. PATNER:  That's fair.  Anybody feel


JUSTICE REPORTING SERVICES, INC.     523-6114

1       they've been given a ticket, pulled over and given

2       a ticket unfairly and the officer was wrong or

3       lied for whatever reason?  Anybody ever fought a

4       ticket?  Ms. Rodriguez, you got a ticket you felt

5       you shouldn't have gotten?

6               MS. RODRIGUEZ:  Yes.

7               MR. PATNER:  Was that here or somewhere

8       else?

9               MS. RODRIGUEZ:  Cooper City - yeah, in

10      Broward.

11              MR. PATNER:  Was that the Broward Sheriff's

12      Office?

13              MS. RODRIGUEZ:  Yeah.

14              MR. PATNER:  Do you feel the officer was

15      wrong or that he just had it out for you?

16              MS. RODRIGUEZ:  He was wrong and he didn't

17      show so I got off.  But I had pictures, I took

18      pictures.

19              MR. PATNER:  You were able to show it didn't

20      happen that way?

21              MS. RODRIGUEZ:  Yeah.

22              MR. PATNER:  Any hard feelings towards the

23      Broward Sheriff's Office?

24              MR. RODRIGUEZ:  It wasn't the Broward

25      Sheriff's Office it was Cooper City.

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1              MR. PATNER:  Sorry.  Any bad feelings towards
 2         police officers based upon the appearance of this
 3         officer?
 4              MS. RODRIGUEZ:  No, I waive to him he waives
 5         to me.
 6              MR. PATNER:  You still see him?
 7              MR. RODRIGUEZ:  Yes.
 8              MR. PATNER:  You don't mutter under your
 9         breath there is that jerk every time, do you?
10              MS. RODRIGUEZ:  Yeah, two houses away from me
11         she is a police officer and I tell her, I told her
12         about that time but not anymore.
13              MR. PATNER:  In any event none of the
14         witnesses in this case are Cooper City police
15         officers, I believe they are all with the Fort
16         Lauderdale Police Department.  Any bad feelings
17         based upon any of them just because they are
18         police officers also?
19              MS. RODRIGUEZ:  No.
20              MR. PATNER:  Your friend is not one of the
21         witnesses in this case.  Any feelings of you like
22         all police officers because you're friends with
23         them?
24              MS. RODRIGUEZ:  No.
25              MR. PATNER:  Would you agree with me that a
```

1       police officer takes the chair just like anybody
2       else.  There is good police officers or bad police
3       officers just like anyone else.  Would you agree
4       with that?

5           MS. RODRIGUEZ:  Yeah, like all of us, yeah.
6           MR. PATNER:  Anyone else feel they've gotten
7       a ticket you didn't deserve and fought one?  Mr.
8       Moran, you said you got a DUI back in '82.  I
9       don't want to pry into this to much but do you
10      feel just a matter of you were doing something you
11      shouldn't have been doing and you got caught, or a
12      matter of how the police were wrong?

13          MR. MORAN:  I was wrong.

14          MR. PATNER:  Any problems with the police or
15      the prosecutor's office that may have been
16      involved?

17          MR. MORAN:  No.

18          MR. PATNER:  Ms. Nolan, your brother-in-law
19      had a weapons charge?

20          MS. NOLAN:  Uh-huh (affirmative response.)

21          MR. PATNER:  Was that here or some where
22      else?

23          MS. NOLAN:  Miami.

24          MR. PATNER:  Metro Dade Police handled that?

25          MS. NOLAN:  Highway patrol actually.


JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1              MR. PATNER:  Did you -- same question so you
 2        see where I'm going with this.  Any bad feelings
 3        towards the police or perhaps the State Attorney's
 4        Office down there as to what ultimately happened?
 5              MS. NOLAN:  No.
 6              MR. PATNER:  Do you feel your brother was
 7        doing something that he maybe shouldn't have done
 8        and got caught?
 9              MS. NOLAN:  I did remember what happened and
10        the case was dismissed because the gun that they
11        found supposedly had been fired and they did a
12        test on it and the gun hadn't been fired so they
13        dismissed the case.
14              MR. PATNER:  They saved the gun and they were
15        able to show the gun had never been used?
16              MS. NOLAN:  Yes.
17              MR. PATNER:  Do you feel the system then
18        worked, ultimately?
19              MS. NOLAN:  Yeah, very well.
20              MR. PATNER:  Ms. Ellis, I'm going to ask you
21        a couple questions about your brother - it was
22        your brother, right?
23              MS. ELLIS:  Uh-huh (affirmative response.)
24              MR. PATNER:  Any bad feelings towards the
25        police or the prosecutor's office who were
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1            involved in that matter?
 2                 MS. ELLIS:  No.
 3                 MR. PATNER:  Do you think your brother got
 4            kind of caught doing something perhaps he
 5            shouldn't have been doing?
 6                 MS. ELLIS: Right.
 7                 MR. PATNER:  I appreciate that.
 8                 MR. PATNER:  Ms. Hayes, I believe it was your
 9            brother-in-law?
10                 MR. MORAN:  Brother.
11                 MR. PATNER:  It was also a drug charge?
12                 MS. HAYES:  Yes.
13                 MR. PATNER:  That went to trial?
14                 MS. HAYES:  No.
15                 MR. PATNER:  I got to ask you the same thing
16            I asked any one else, do you have any resentment
17            towards the system or the police involved in the
18            State Attorney's Office based on the incident?
19                 MS. HAYES:  No, because I think it was a wake
20            up call for him.
21                 MR. PATNER:  Turned him around a little bit?
22                 MS. HAYES:  Yeah.
23                 MR. PATNER:  Does anyone know anyone whose
24            ever been shot?
25                 MR. MORAN:  Me.
```

```
 1              MR. PATNER:  What were the circumstances
 2         regarding that?
 3              MR. MORAN:  A friend of mine was murdered in
 4         West Palm Beach.
 5              MR. PATNER:  When what that?
 6              MR. MORAN:  May 8th of this year.
 7              MR. PATNER:  Good friend of yours?
 8              MR. MORAN:  Yes.
 9              MR. PATNER:  Was there and arrest made?
10              MR. MORAN:  Yes.
11              MR. PATNER:  Is that a situation that's
12         pending?
13              MR. MORAN:  Yes.
14              MR. PATNER:  Was that a situation we've heard
15         about in the news, a lot of publicity?
16              MR. MORAN:   Yes.
17              MR. PATNER:  Any feelings -- obviously this
18         is a second degree murder charge here and it's
19         completely different parties, completely different
20         situations.  Do you feel you could, based upon
21         your acquaintance with her do you think you would
22         be able to sit as a juror in this case?
23              MR. MORAN:  Yes, it was a him.
24              MR. PATNER:  Excuse me, do you feel you would
25         be able to sit as a juror?
```

1          MR. MORAN:  Yes.

2          MR. PATNER:  Anyone else know anyone who's

3     been shot?  Ms. Ellis?

4          MS. ELLIS:  I have three brothers I only have

5     one now, two of my other brothers were killed.

6          MR. PATNER:  Okay.  And sorry I don't want to

7     pry but I need to ask you a couple questions about

8     that.  Was that recently or some time ago?

9          MS. ELLIS:  One of my brothers it's been

10    about, I don't know, eight years ago.

11         MR. PATNER:  Were these two separate

12    incidents.

13         MS. ELLIS:  Yeah, separate.

14         MR. PATNER:  One eight years ago, was anyone

15    ever prosecuted for that?

16         MS. ELLIS:  Yes.

17         MR. PATNER:  Were you a witness in that?

18         MS. ELLIS:  No.

19         MR. PATNER:  Do you feel justice was

20    ultimately done?

21         MS. ELLIS:  Yes.

22         MR. PATNER:  And the other brother?

23         MS. ELLIS:  Been a while it was one of my

24    oldest brothers so I can't even remember.

25         MR. PATNER:  Do you know the circumstances

189

```
1     surrounding that at all?
2          MS. ELLIS:  Someone just came in the club and
3     shot him for no reason.
4          MR. PATNER:  And did you know whether that
5     person was ever caught or not?
6          MS. ELLIS:  I think he got the electric
7     chair.
8          MR. GODWIN:  I'm sorry I couldn't hear.
9          MS. ELLIS:  I think he got the electric
10    chair.
11         MR. PATNER:  Do you -- do you feel the system
12    worked in that case what you know about it at
13    least in your mind?
14         MS. ELLIS:  I guess.
15         MR. PATNER:  It obviously doesn't bring your
16    brother back in either instance.
17         MS. ELLIS:  No.
18         MR. PATNER:  Anyone else?  I think I saw a
19    hand?  Yes ma'am, Ms. Hayes?
20         MS. HAYES:  My cousin's wife shot him but he
21    wouldn't press charges.
22         MR. PATNER:  Are they still together?
23         MS. HAYES:  They were together until he died
24    about five years ago.
25         MR. PATNER:  He didn't die as a result of the
```

JUSTICE REPORTING SERVICES, INC.      523-6114

```
 1    incident?  Did he shoot her or she shot him?
 2            MS. HAYES:  She shot him.
 3            MR. PATNER:  Did you ever discuss that with
 4    either one of them?
 5            MS. HAYES:  No.
 6            MR. PATNER:  Something you try to distance
 7    yourself from?
 8            MS. HAYES:  It was a family argument I don't
 9    get in the middle of family arguments.
10            MR. PATNER:  Do you feel she should have been
11    prosecuted for it?
12            MS. HAYES:  Yes.
13            MR. PATNER:  Thank you.  Was there anyone
14    else who knew someone that's been shot?  A couple
15    of you have some involvement, Ms. Nolan, you were
16    the victim of an attempted robbery?
17            MS. NOLAN:  Yes.
18            MR. PATNER:  Was that with a gun?
19            MS. NOLAN:  Yeah, sawed off shotgun.
20            MR. PATNER:  Seem to be the weapon of choice
21    for this panel.  In that incident did they get
22    what they wanted from you?
23            MS. NOLAN:  No.
24            MR. PATNER:  That's why they attempted.  Did
25    they ever catch the person?
```

```
1              MS. NOLAN:  Police never notified me if they
2       did.  I saw in the newspaper a very similar modus
3       operandi and the story --
4              MR. PATNER:  Your Latin is better then mine.
5              MS. NOLAN:  -- but I don't know for sure I
6       could not pick him out of a line up.  I was shown
7       ID's, you know, pictures and I couldn't pick him
8       out.
9              MR. PATNER:  Do you feel the police did what
10      they could as far as trying to find someone and
11      putting together a photo lineup?
12             MS. NOLAN:  Yes.
13             MR. PATNER:  Any resentment to the police
14      that they couldn't bring one in?
15             MS. NOLAN:  No.
16             MR. PATNER:  Did they shoot the gun off or
17      just waive it around?
18             MS. NOLAN:  Just pointed it at me.
19             MR. PATNER:  Mr. Pokorny, I think I pronounce
20      it different each time.  A shot gun you indicated
21      was pointed at you?
22             MR. POKORNY:  Didn't actually point it at me
23      his other partner had a smaller gun on me and he
24      had the shotgun on another employee that was in
25      the break room with me at the time.
```

JUSTICE REPORTING SERVICES, INC.      523-6114

```
 1              MR. PATNER:  The other one had a pistol or
 2         handgun?
 3              MR. POKORNY:  Yes.
 4              MR. PATNER:  Even though small it probably
 5         looked like a cannon pointed at you.  You seem to
 6         have a little bit or hesitation on whether you can
 7         be a fair juror in this case obviously Mr.
 8         Lockhart had nothing to do with that incident?
 9              MR. POKORNY: True.
10              MR. PATNER:  Do you think you would be able
11         to, because Mr. Lockhart had nothing to do with it
12         and for all I know he's never been to New York.
13         Any reason you couldn't give him a fair trial?
14              MR. POKORNY:  I really don't know because
15         after the incident me and the other guy from Home
16         Depot, we were, for two months straight we were
17         seeing see psychiatrist and stuff.  I really don't
18         know it still hurts me a little bit.
19              MR. PATNER:  Obviously a very traumatic
20         experience having a gun pointed at you.  Fair
21         enough, thank you sir.  Anyone else had a gun
22         pointed at them in a similar situation?  I think
23         that was all.
24              Anyone ever -- again I'm not trying to pry on
25         a person's life, but has anyone ever been in a
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1          situation where they feel they had to point a gun
2          at someone?  I'm not talking about in the military
3          I'm talking about in civilian life where they've
4          ever felt like they've been in a situation where
5          they've had to point a gun at someone, someone
6          breaking into the house or something along those
7          lines.

8              The defendant in this case is charged with
9          second degree murder.  Does anyone - does anyone
10         know the difference between a first degree murder
11         and second degree murder.

12             MR. MORAN:  Premeditation.

13             MR. PATNER:  Exactly.  There is no
14         premeditation for second degree murder, there is
15         no death penalty involved in a second degree
16         murder.  We are not here to death qualify a jury,
17         or to seek the death penalty if that's something
18         you thought about you can put that out of your
19         mind it's not an issue.  The death penalty is not
20         an issue in this case.

21             In that regard the law, the Judge indicated
22         that he will read the law in the case.  The law
23         may not be what you think it is from what you see
24         on movies or watching television, or perhaps there
25         is a certain case out in California, and I'm not

1      going to mention it, but some of you may have seen

2      a little bit on television.  The law is going to

3      be what the judge gives you, it may not be what

4      you think it is or may be what you think it should

5      be.  But we all agree to follow the law what the

6      judge gives you regardless of whether you like it

7      or not?

8           Would all of you agree with me that the law

9      should be applied equally to everyone, short,

10     tall, white, black, red, yellow, that's a fairly

11     simple statement but would all of you agree with

12     that?

13          Do you think the way justice in Washington

14     D.C., shows a picture of the scale on the hands

15     with a blind fold over the eyes, Mr. Moran, would

16     you agree there's justice for everyone?

17          MR. MORAN:  Yes.

18          MR. PATNER:  Mr. Scott, do you agree with

19     that sentiment as well?  I think everybody would.

20     One of the other constitutional provisions that

21     you're always going to hear about is talk about

22     the burden of proof.  That's the presumption of

23     innocence and it goes along hand and hand with the

24     burden of proof.  That if -- as an example Mr.

25     Burke, if I were to ask you right now to vote

JUSTICE REPORTING SERVICES, INC.     523-6114

1    guilty or not guilty what does that answer have to

2    be?

3         MR. BURKE:  Not guilty.

4         MR. PATNER:   That's correct because he's

5    presumed innocent and the State hasn't proven

6    anything to at this point, have they?  Does

7    everyone understand that everyone sits here

8    presumed -- Mr. Lockhart as he sits there right

9    now next to his attorney he's not guilty.

10        I'm just about finished I just need to touch

11   back for a moment on something.  And that is you

12   must follow the law whether you like it or not.

13   Let me give you an example.  How many people here

14   pay their taxes?  I should see all the hands up.

15   Okay, there is always one or two.  Ms. Reed, you

16   pay your taxes but you don't like doing it, why do

17   you do it?

18        MS. REED:  It's the law.

19        MR. PATNER:  No one likes paying their taxes

20   but it's a law and our system requires you to

21   follow that.  And similarly being a juror is a

22   little bit like paying your taxes.  You may not

23   like the law the judge gives you but you have to

24   follow it.  It's your duty as a juror to follow it

25   here today.  If you don't like the law when you're

    1       done write your congressman, write Tallahassee.

    2       We are not here to have tax rebut, okay.  Does

    3       everyone agree with me, with that statement?

    4       Thank you all very much.

    5               THE COURT:  Thank you.  Mr. Godwin.

    6               MR. GODWIN:  Thank you, Your Honor.

    7               MR. GODWIN:  Good afternoon ladies and

    8       gentlemen.  Everybody awake?  Anybody need a break

    9       to stand up and stretch or anything?  You want to

    10      get on with it, right?  As you will see during the

    11      course of the trial the prosecution always goes

    12      first and the defense always goes last so I got to

    13      get up and talk to you after you've been sitting

    14      here listening to all the other questions for

    15      quite a while.  I could hear most of what was said

    16      over there but because of my advanced age I had to

    17      ask for some of the answers to be repeated and the

    18      question.  If I ask you to repeat something it's

    19      not because I wasn't paying attention it's just

    20      that I didn't always hear all of your answers.

    21              Let me introduce myself again.  My name is

    22      Robert Godwin and I'm an Assistant Public Defender

    23      and I'm representing the accused, Jeremy

    24      Lockhart.  Jeremy, would you stand up a minute

    25      please.  Would you all take a look at Jeremy for a

```
 1    second please.  Anything about him that you don't
 2    like?  His looks or anything like that?  Mr.
 3    Burke?
 4         MR. BURKE:  No.
 5         MR. GODWIN:  I won't ask you if there is
 6    anything about me you don't like because that's
 7    too easy.
 8         MR. BURKE:  To easy.
 9         MR. GODWIN:  Mr. Lockhart is a 23 year old
10    man who went to Dillard High School here in
11    Broward County and he's married to a young woman
12    named --
13         MR. PATNER:  Judge, excuse me --
14         THE COURT:  You didn't introduce me or Mr.
15    Lockhart.
16         THE COURT:  What do you mean I didn't
17    introduce you or Mr. Lockhart?
18         MR. GODWIN:  When you asked if they knew
19    anybody else - when you asked the jury if they
20    knew anybody else you didn't get to me or Mr.
21    Lockhart, Judge?
22         THE COURT:  I didn't it must have been the
23    first time in 11 years, I apologize.  Does anybody
24    know Mr. Godwin the counsel for Mr. Lockhart?
25    Does anyone know Mr. Lockhart at all?
```

```
1              MR. GODWIN:  Mr. Lockhart works at Pep Boys
2         auto repair shop, anyone know that place?  Several
3         of course.  Do you know him or his family or his
4         child?
5              Okay.  Now, I said that I'm an Assistant
6         Public Defender, I work for the office of the
7         Public Defender.  Does anybody know Alan Schreiber
8         the Public Defender here in Broward County?  Does
9         anybody know who he is or what he does?  Mr.
10        Scott, do you know who Mr. Schreiber is?
11             MR. SCOTT:  Yes.
12             MR. GODWIN:  Can you tell us please.
13             MR. SCOTT:  You said he was the Public
14        Defender, right?
15             MR. GODWIN:  What does he do?
16             MR. SCOTT:  He represents people who are
17        indigent.
18             MR. GODWIN:  Well, I wouldn't say indigent
19        but people who can't afford an attorney so an
20        attorney will be appointed to them.
21             Okay.  Just as His Honor told you Mr. Satz is
22        the elected State Attorney here in Broward County
23        and he has the responsibility of prosecuting all
24        criminal cases, and Ms. Schreiber is the elected
25        Public Defender here in Broward County.
```

199

```
 1            The Public Defender's Office has the
 2       responsibility of representing anybody who gets
 3       charged with a crime who can not afford to hire a
 4       private attorney.  Does everyone understand that?
 5            MR. SCOTT:  Yeah.
 6            MR. GODWIN:  Mr. Moran, any problem with that
 7       idea?
 8            MR. MORAN:  No.
 9            MR. GODWIN:  Do you think this - do you think
10       that everybody who's charged with a crime ought to
11       be able to have an attorney represent him?
12            MR. MORAN:  Yes.
13            MR. GODWIN:  And if a person was too poor to
14       be able to go out and hire a private attorney you
15       can't hire F. Lee Bailey or Roy Black or somebody
16       like that, the Public Defender's Office gets
17       appointed, okay.  Do you think that's a fair
18       system?
19            MR. MORAN:  Yes.
20            MR. GODWIN:  Would you all agree with me rich
21       and poor you should be treated equally under the
22       law?
23            MR. MORAN:  Yes.
24            MR. GODWIN:  Ms. Trapp, do you think good
25       idea rich and poor should be treated equally under
```

JUSTICE REPORTING SERVICES, INC.    523-6114

200

| | |
|---|---|
| 1 | State of Florida    ) |
| |                    ):ss      Mark A. Speiser |
| 2 | County of Broward   ) |

3

                    IN THE CIRCUIT COURT OF THE
4                   SEVENTEENTH JUDICIAL CIRCUIT,
             IN AND FOR BROWARD COUNTY, FLORIDA

5

6    STATE OF FLORIDA,

7            Plaintiff,

8    -vs-                        Case No. 94-10764 CF10A

9    JEREMY LOCKHART,

10           Defendant.                     COPY

11    _____/

12

13    ----------------------------------

14    APPEAL ON BEHALF OF THE DEFENDANT
      ----------------------------------

15

16                    ---------

17                    VOLUME II
                      ---------
18                    Pages 200-400

19
      APPEARANCES:
20
              JOE PATNER, Esquire,
21            Assistant State Attorney,
              Appearing on behalf of the Plaintiff.
22
              ROBERT GODWIN, Esquire,
23            Appearing on behalf of the Defendant.

24

25

                          JUSTICE REPORTING SERVICES, INC.    523-6114

201

```
 1                      I-N-D-E-X

 2     Proceedings                   Pages

 3     August 14, 1995               203-301

 4     August 15th, 1995             302-400

 5

 6                  W-I-T-N-E-S-E-S

 7     WITNESSES        DIRECT   CROSS   RE-DIRECT   RE-CROSS

 8     JOHN HOSPODAVIS   304      319        -          -

 9     CHERYL GRANT      320      324       325         -

10     DARREN WALKER     326      344        -          -

11     CHARLES FORBES    352      381        -          -

12     MICHAEL WALLEY    365      381        -          -

13                  STATE'S EXHIBITS

14
       STATE'S EXHIBITS                       PAGE
15
       State's Exhibit 1                      310
16
       State's Exhibit 2                      378
17

18

19

20

21

22

23

24

25
```

JUSTICE REPORTING SERVICES, INC.    523-6114

202

```
 1   State of Florida      )
                           ):ss           Mark A. Speiser
 2   County of Broward     )

 3
                    IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
                  IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6   STATE OF FLORIDA,

 7          Plaintiff,

 8   -vs-                          Case No. 94-10764 CF10A

 9   JEREMY LOCKHART,

10          Defendant.

11   _____/

12

13          Proceedings had and taken before the Honorable

14   Mark A. Speiser, one of the Judges of said Court, fifth

15   floor, Room 5900 Broward County Courthouse, Fort

16   Lauderdale, Broward County, Florida, on the 14th day of

17   August, 1995, commencing at or about the hour of 1:00

18   o'clock p.m., and being a jury trial.

19

20   APPEARANCES:

21          JOSEPH PATNER, Esquire,
            Assistant State Attorney,
22          Appearing on behalf of the Plaintiff.

23          ROBERT GODWIN, Esquire,
            Appearing on behalf of the defendant
24

25
```

1        the law?

2              MS. TRAPP:  Yes.

3              MR. GODWIN:  Do you think that's the way it

4        is in reality?

5              MS. TRAPP:  I don't know.

6              MR. GODWIN:  Do you have any feelings about

7        it one way or another?  Do you think the rich and

8        poor are always treated the same in front of the

9        law?

10             MS. TRAPP:  I would like to think that they

11       are.

12             MR. GODWIN:  Okay.  Well, I understand you'd

13       like to think that in your heart but do you feel

14       that's the way it works out really?

15             MS. TRAPP:  To be honest with you I really

16       don't know because I have a very busy schedule.  I

17       wake up, and I go to work.  I work a lot of hours

18       every day and I don't watch the news.  I really

19       don't know.

20             MR. GODWIN:  Okay.  All right, fair enough.

21       Mr. Pokorny.

22             MR. POKORNY:  Yes.

23             MR. GODWIN:  Do you think the rich and poor

24       are always treated the same?

25             MR. POKORNY:  No.

                            ,

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1              MR. GODWIN:  But they should be though?
 2              MR. POKORNY:  Yes.
 3              MR. GODWIN:  All I'm trying to get at is if
 4         you're selected on this jury would you give Mr.
 5         Lockhart the same benefit of doubt that anybody
 6         else who's entitled to - I mean with a trial in
 7         this country would you do that?
 8              MR. POKORNY:  I would try, I really don't
 9         know.
10              MR. GODWIN:  Ms. Trapp?
11              MS. TRAPP:  Absolutely.
12              MR. GODWIN:  Okay.  So we all agree that the
13         rich and poor at least in theory should be treated
14         equally, am I correct Ms. Petrone?
15              MS. PETRONE:  Yes, in theory.
16              MR. GODWIN:  Okay.  Now, would you also agree
17         with me that we have a serious crime problem here
18         in Broward County?
19              MS. PETRONE:  Yes.
20              MR. GODWIN:  You agree with that?
21              MS. PETRONE:  Yeah.
22              MR. GODWIN:  You all agree with that that
23         there's a pretty serious crime problem here?
24         Okay, is there anybody here who feels -- let me
25         ask Ms. Warshawsky.  When you got your notice to
```

1        come down here and spend this time with us on jury

2        duty did you tell any of your neighbors you were

3        coming down for jury duty?

4              MS. WARSHAWSKY:  Yes, I did.

5              MR. GODWIN:  You discussed the fact that you

6        are going to be a guest of the State of Florida

7        for a few days?

8              MS. WARSHAWSKY:  Yes, I did.

9              MR. GODWIN:  And did anybody say all right

10       this is your chance to go out and convict those

11       criminals?

12             MS. WARSHAWSKY:  No.

13             MR. GODWIN:  Okay.  What I'm trying to get at

14       is you know we have serious crime problem in

15       Broward?

16             MS. WARSHAWSKY:  Yes, we do.

17             MR. GODWIN:  Do you feel just because you're

18       sitting on a jury because we have a serious crime

19       problem that you have to convict in order to do

20       your duty as a citizen?

21             MS. WARSHAWSKY:  No.

22             MR. GODWIN:  How come?

23             MS. WARSHAWSKY:  Well, it would depend on the

24       circumstances and what it is that's going on.  If

25       for instance in this case it wouldn't be right to

```
 1        say right here and now that he has to be convicted
 2        because he had a gun in his hand and shot
 3        somebody.   But on the other hand if it was proven
 4        that he actually did do it yes I would say it was
 5        my duty to convict him.
 6             MR. GODWIN:   Okay, all right.   But can you
 7        agree with me that under some circumstances a not
 8        guilty verdict can enforce the law just like a
 9        guilty verdict?
10             MS. WARSHAWSKY:   Yeah.
11             MR. GODWIN:   Would you all agree with that?
12        How about you Mr. Brown?
13             MR. BROWN:   Can you repeat the statement,
14        sir.
15             MR. GODWIN:   Okay.   And if I'm confusing you
16        let me know, okay.   I said would you agree - first
17        you agree we should be strict in enforcing the
18        law, you agree with that?
19             MR. BROWN:   Yes, sir.
20             MR. GODWIN:   Would you agree with me that a
21        not guilty verdict can enforce the law just as
22        much as a guilty verdict, it's justified by the
23        circumstances.
24             MR. BROWN:   I would say yes.
25             MR. GODWIN:   Tell me why if you would.
```

```
 1          MR. BROWN:  Well, if it's based on evidence
 2    and you come to a not guilty verdict --
 3          MR. GODWIN:  Little bit louder please.
 4          MR. BROWN:  -- based on the facts if you come
 5    to a not guilty verdict that's what you thought
 6    based on the facts.
 7          MR. GODWIN:  Okay.
 8          MR. BROWN:  That's about it.
 9          MR. GODWIN:  All right.  Let me ask Mr.
10    Burke.  Do you agree a not guilty verdict enforces
11    the law just like a guilty verdict?
12          MR. BURKE:  The law is there and if a not
13    guilty verdict comes forth then you are doing your
14    duty.
15          MR. GODWIN:  Okay, all right.  When you got
16    your notice you had to serve did you tell any
17    friends and neighbors that you were coming in?
18          MR. BURKE:  Just my family.
19          MR. GODWIN:  Would you be embarrassed to sit
20    on a jury here and find somebody not guilty
21    because the evidence justified it, and go back
22    into the community and say I did my duty and found
23    someone not guilty?
24          MR. BURKE:  I would not be embarrassed, I
25    wouldn't be embarrassed.
```

1        MR. GODWIN:  Can you do anything about a very

2   poor back hand?

3        MR. BURKE:  Yeah.

4        MR. GODWIN:  You teach on clay or hard

5   courts?

6        MR. BURKE:  Hard.

7        MR. GODWIN:  Let me ask Ms. Hayes if I could,

8   if you sit on this jury, if you hear all the

9   evidence, if the evidence convinces you the

10  verdict should be not guilty could you vote not

11  guilty and go back into the community and hold

12  your head high and say you did the right thing?

13       MS. HAYES:  Yes, I can.

14       MR. GODWIN:  Do you have any problems with

15  that at all?

16       MS. HAYES:  No problem at all.

17       MR. GODWIN:  All right, thank you.  Now, when

18  you all came into the courtroom, Ms. Nolan, when

19  you all came into the courtroom a little while ago

20  were you able to figure out which one of us two

21  were on trial?  Did you have an idea which one was

22  on trial?

23       MS. NOLAN:  Uh-huh (affirmative response).

24       MR. GODWIN:  Who did you think it was?

25       MS. NOLAN:  Him.

                          ,

1     MR. GODWIN:  Mr. Lockhart, he's not wearing a
2     suit he doesn't look as good as Mr. Patner or as
3     me.
4     MS. NOLAN:  That wasn't entirely it.  This
5     table only had one person, that table had two
6     people.
7     MR. GODWIN:  That's fair enough.
8     MR. GODWIN:  Anybody here have any trouble
9     figuring out who might be on trial?  Mr. Weidner,
10    you could figure it out?
11    MR. WEIDNER:  Just for the same thing.
12    MR. GODWIN:  Let me talk with Mr. Weidner.
13    Ever see somebody sitting in the back of a police
14    car, the police are arresting somebody and they're
15    sitting in the back of the car and maybe they are
16    handcuffed.  What's the first thing that normally
17    comes to your mind?
18    MR. WEIDNER:  Depends on the circumstances.
19    MR. GODWIN:  What do you normally think?
20    MR. WEIDNER:  Depends if I'm just driving by
21    I don't know they could be giving somebody a ride,
22    I don't know.
23    MR. GODWIN:  Ms. Nolan, do you have any
24    thoughts when you see somebody in the back of a
25    police car?

210

```
 1              MS. NOLAN:  That they are arrested.
 2              MR. GODWIN:  Do you wonder --
 3              MS. NOLAN:  What they did?
 4              MR. GODWIN:  Normal reaction, isn't it?
 5              MS. NOLAN:  Yes.
 6              MR. GODWIN:  All I'm trying to get at is when
 7         you walked in here today and you saw Mr. Lockhart
 8         sitting here the normal reaction was to say I
 9         wonder what he did.  Is that fair to say?
10              MS. NOLAN:  Yes.
11              MR. GODWIN:  Would you all agree with me that
12         that's a normal reaction, Mr. Nolan, are you with
13         me?  Sorry Mr. Moran?
14              MR. MORAN:  Yes.
15              MR. GODWIN:  The judge told you you're
16         suppose to look upon Mr. Lockhart right now and
17         presume him innocent.  You all said you would do
18         that.  What I want to suggest to you is that
19         that's a very difficult thing to do it goes
20         against human nature.
21              Would you agree with me, Ms. Rodriguez, that
22         it goes against human nature to just look at him
23         and say he must be guilty?
24              MS. RODRIGUEZ:  Yes.
25              MR. GODWIN:  Pardon me?
```

211

```
 1              MS. RODRIGUEZ:  Yes.
 2              MR. GODWIN:  What was your first thought when
 3         you came into the courtroom when you first saw
 4         him?
 5              MS. RODRIGUEZ:  Just like I wondered what he
 6         did, why he was being accused.
 7              MR. GODWIN:  You wondered what he did?
 8              MS. RODRIGUEZ:  Yeah.
 9              MR. GODWIN:  All I'm getting at is it's
10         perfectly normal to wonder what he did and it's a
11         normal and natural to say I bet he is innocent.
12         That's not your first reaction?
13              MS. RODRIGUEZ:  Honestly my first impression
14         was he is a child that was the first thing that
15         came to my mind.
16              MR. GODWIN:  Ms. Reed, if I could would you
17         agree with me this presumption of innocence is not
18         a normal reaction to have?  Would you agree with
19         that?
20              MS. REED:  Yes.
21              MR. GODWIN:  But the judge tells you that's
22         what the law is in this country and you're suppose
23         to look upon people as being presume innocent.
24              MS. REED:  Right.
25              MR. GODWIN:  What I'm getting at is all of us
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1          can say yes I will follow the law but knowing it's
 2          not a normal and natural reaction you're entitled
 3          to have whatever feelings you think about it.  If
 4          you sit as a juror in this case can you recognize
 5          that you got to set aside certain theories and
 6          apply the law as his honor Judge Speiser reads?
 7               MR. POKORNY:  Set aside all feelings and
 8          judge it according to evidence you're presented
 9          with.
10               MR. GODWIN:  Okay, that's fair enough.  No
11          one says we can't have biases or prejudices, we
12          all have them do you agree with that?
13               MR. POKORNY:  Yes.
14               MR. GODWIN:  We all have them.  The question
15          is can you take the biases and prejudices that you
16          have, everybody has, can you take them and set
17          them aside while you're serving as a juror in this
18          case?  Do you think you could do that?
19               MR. POKORNY:  Yes.
20               MR. GODWIN:  How about you, Mr. Scott?
21               MR. MORAN:  Yes.
22               MR. GODWIN:  You could do that?
23               MR. MORAN:  Yes.
24               MR. GODWIN:  Ms. Nolan, you can do that?
25               MS. NOLAN:  Yes.
```

213

```
 1          MR. GODWIN:  What I'm trying to say
 2     perspectively, okay, you have the feeling just we
 3     got to realize we are in the courtroom and the law
 4     tells you you have to look at the cases in a
 5     special way, can you do that?
 6          MS. NOLAN:  Yes.
 7          MR. GODWIN:  Suppose you're sitting in a case
 8     and you hear things about Mr. Lockhart's
 9     background, his life-style that you don't like.
10     He's not on trial for those things.  Could you put
11     aside any negative feelings you might have and
12     just judge him based on what he's charge with?
13          MS. NOLAN:  Suppose to just base it on the
14     evidence, hearsay or comments you don't take into
15     consideration.
16          MR. GODWIN:  But if you hear things about his
17     life-style, or the way he lives and you don't like
18     --
19          MS. NOLAN:  Shouldn't have anything to do
20     with it.
21          MR. GODWIN:  I know they said shouldn't, but
22     my question is --
23          MS. NOLAN:  Would it influence me is that
24     what you want to know?
25          MR. GODWIN:  Yeah.
```

/

JUSTICE REPORTING SERVICES, INC.    523-6114

214

```
 1              MS. NOLAN:  No.
 2              MR. GODWIN:  But it's normal and natural to
 3         have those feelings that's what I'm getting at.
 4         Can you take those feelings and say wait a minute
 5         --
 6              MS. NOLAN:  Put them aside.
 7              MR. GODWIN:  Can you do that?
 8              MS. NOLAN:  Yes.
 9              MR. GODWIN:  Could you force yourself to do
10         that?
11              MS. NOLAN:  I wouldn't have to force myself,
12         I mean, it's just something you would do.
13              MR. GODWIN:  Okay.
14              MS. NOLAN:  To be fair.  I mean, unless
15         you're an unfair person then you would take all
16         outside influences into consideration.
17              MR. GODWIN:  Now, you mentioned you have a
18         son in the army?
19              MS. NOLAN:  Yes.
20              MR. GODWIN:  He's in the military police?
21              MS. NOLAN:  Yes.
22              MR. GODWIN:  Did he ever discuss with you any
23         of his cases he was involved in?
24              MS. NOLAN:  No he is stationed far away and
25         we have brief telephone calls and visits.
```

1          MR. GODWIN:  Okay, let me ask you all has

2     anybody here ever made applications to work for a

3     law enforcement agency?  Let me see a show of

4     hands.  Anybody ever applied to work for a law

5     enforcement agency?

6          Okay, Mr. Patner asked if you had to reach a

7     verdict right now, Ms. Hayes, if you had to reach

8     a verdict right now what would your verdict be?

9          MS. HAYES:  I couldn't give you a verdict

10    right now.  I mean he hasn't presented any facts.

11         MR. GODWIN:  If you haven't heard any facts

12    yet, and if you're presuming Mr. Lockhart to be

13    innocent right now --

14         MS. HAYES:  It's not my place to have a

15    presumption.

16         MR. GODWIN:  Pardon me?

17         MS. HAYES:  It's not my place to make that

18    presumption I don't think.

19         MR. GODWIN:  Let me discuss that with you for

20    a moment.  Did you hear the judge earlier say that

21    everybody who's charged with a crime is presumed

22    innocent under the law?

23         MS. HAYES:  Yes.

24         MR. GODWIN:  Can you tell me what that means

25    to you everyone is presumed innocent?

1        MS. HAYES:  Just what he says as far as I am
2    concerned he hasn't done anything yet.  He's
3    sitting over there an innocent young boy, young
4    man - sorry about the boy, young man.  That's the
5    way it is now.  Once I hear the facts then I make
6    a decision yeah I don't have an opinion right now
7    except I want to go home.

8        MR. GODWIN:  You want to go home, you'd like
9    me to stop talking to you.  Can you understand
10   that somebody in my position representing a young
11   man charged with a crime needs to know what you're
12   thinking and what you're feeling?

13       MS. HAYES:  Sure I understand that.

14       MR. GODWIN:  You wish I'd stop talking to you
15   anyway.

16       MS. HAYES:  Yes, so I can go home.

17       MR. GODWIN:  But would you expect me to do my
18   job and fight hard for Mr. Lockhart?

19       MS. HAYES:  Yes, I do expect for you to fight
20   hard.

21       MR. GODWIN:  Now, what if I told you that the
22   law says you should have an opinion right now
23   about whether he's guilty or not?

24       MS. HAYES:  I would say the law is wrong.  I
25   know nothing about this young man.

1          MR. GODWIN:  All right, okay.  What about
2     this presumption of innocence that we discussed a
3     moment ago.  How does that effect you?  My
4     statement to you that you should have an opinion
5     right now?
6          MS. HAYES:  I think it's a stupid opinion.
7          MR. GODWIN:  Okay, you're certainly entitled.
8          MR. GODWIN:  Anybody agree with Ms. Hayes?
9          THE COURT:  Okay.  I'm sorry, are you saying
10    that you do - you agree with the fact that he's
11    presumed innocent at the outset of the trial?
12         MS. HAYES:  He's presumed innocent.  I
13    remember the correct saying he is presumed
14    innocent at this point in time and that's it.
15         THE COURT:  Right.
16         MS. HAYES:  I have no opinion now as to
17    whether he is innocent or not.
18         THE COURT:  The point that Mr. Godwin is
19    making I think before anyone walks into the
20    courtroom and you're told about this presumption
21    of innocence if someone asked you whether a
22    defendant was guilty or not guilty you would
23    probably say I don't know I haven't heard
24    anything.  Like you're saying.  But the law says
25    that the person is presumed innocent at the outset

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1    of the trial so obviously we are at the outset of
 2    the trial and he's presumed innocent.
 3         MS. HAYES:  Presumed innocent.
 4         THE COURT:  You agree with that?
 5         MS. HAYES:  Yes.
 6         MR. GODWIN:  And Ms. Hayes I don't mean to
 7    put you on the spot.
 8         MS. HAYES:  That's okay.
 9         MR. GODWIN:  Never mind lawyers go to law
10    school to study these things for years and years
11    and they argue about them.  They say speaking in
12    public is suppose to be one of the most difficult
13    things to do and I don't mean to be making you
14    nervous it's just getting a basic principle, okay.
15         MS. HAYES:  Okay.
16         MR. GODWIN:  So I'll try one more time
17    because lawyers never know when to stop and then I
18    will leave you alone.
19         MS. HAYES:  Okay, one more time.
20         MR. GODWIN:  The law says you should have an
21    opinion right now and your opinion should be you
22    presume him --
23         MS. HAYES:  Innocent.
24         MR. GODWIN:  That's all I'm asking you.  Can
25    you do that?
```

219

    1           MS. HAYES:  I can do that at this point in
    2      time, yes.
    3           MR. GODWIN:  Even if it goes against your
    4      natural feelings?
    5           MS. HAYES:  My natural feelings say I don't
    6      know anything so I cannot judge.
    7           MR. GODWIN:  Okay.  Now, the charge in this
    8      case is second degree murder this is a homicide
    9      case and Mr. Burke can I just talk to you for a
   10      second?
   11           MR. BURKE:  Certainly.
   12           MR. GODWIN:  You're a tennis player and this
   13      is a homicide case, a man has been killed, a man
   14      is dead.  I'm going to come right to the point and
   15      I'm going to tell you this young man, Jeremy
   16      Lockhart, fired the shots.
   17           MR. PATNER:  Excuse me, Your Honor, I'm going
   18      to object he's getting into the facts of the case
   19      at this point.
   20           MR. GODWIN:  I have to get into this, Judge.
   21           THE COURT:  I think what he's about to say is
   22      just to get to the issue of whether or not a
   23      perspective juror can accept a particular theory
   24      of his defense.
   25           MR. PATNER:  If that's what it is, that's

220

```
1    fine.
2              THE COURT:   That's correct.
3              MR. GODWIN:   Yeah.  Mr. Burke, I'm going to
4    tell you Mr. Lockhart actually fired the shots
5    that killed Patrick Brown, okay.  Understand right
6    here, I'll tell you that right now, okay no
7    dispute about that.  There is only going to be one
8    issue that you folks are going to have to decide
9    in this case and that's whether or not it was
10   justifiable homicide.  Have you ever heard that
11   term, justifiable homicide?
12             MR. BURKE:   Yeah.
13             MR. GODWIN:   Can you tell me basically what
14   it means to you?
15             MR. BURKE:   I think my understanding of it is
16   there would be just cause for him to shoot the
17   person.
18             MR. GODWIN:   Okay, can you give me an example
19   of what justifiable homicide means?
20             MR. BURKE:   In laymen's terms if I was
21   threatened - the person was threatened to injury
22   and to protect himself or themselves they might
23   shoot someone.
24             MR. GODWIN:   Let me give you an example.  How
25   about a police officer who sees a man robbing a
```

JUSTICE REPORTING SERVICES, INC.     523-6114

    1        bank and running away shooting people and an

    2        officer shoots at the bank robber and kills him is

    3        that justifiable homicide?

    4            MR. BURKE:  Yes, I think so.

    5            MR. GODWIN:  Just in general terms.  Okay,

    6        how about a women who shoots a man who's raping

    7        her ten year old daughter to stop him from

    8        committing the crime, is that justifiable

    9        homicide?

   10            MR. BURKE:  Possibly.

   11            MR. GODWIN:  Do you understand justifiable

   12        homicide can't apply both when you're protecting

   13        yourself or somebody else.  Can you go along with

   14        that basic principle?

   15            MR. BURKE:  Yes.

   16            MR. GODWIN:  Let me ask you this, just as a

   17        general principle of law I'm really asking all of

   18        you folks, okay.  As a general principle of law

   19        the law says a person is justified in using deadly

   20        force?

   21            MR. PATNER:  Judge, I'm going to object the

   22        Court's going to instruct them on the law in the

   23        case.

   24            THE COURT:  Sustain the objection.

   25            MR. GODWIN:  May we approach for a moment.

222

```
 1          (Thereupon, the following proceedings were
 2     had outside the hearing of the perspective
 3     jurors.)
 4          MR. PATNER:  I object, it would be improper
 5     for defense counsel to stand up there --
 6          THE COURT:  If you want to stand up and
 7     stretch feel free to do so.
 8          MR. PATNER:  -- give any part of a jury
 9     instruction without the context of all the
10     instructions.  In any event it's improper to do
11     during any part of voir dire.
12          MR. GODWIN:  If Your Honor please we
13     litigated this exact issue and I wrote down the
14     exact questions you allowed me to ask the last
15     time we tried this case.  And I can proffer them
16     into the record here.  I'm not getting into the
17     facts I'm going to ask him this question if I may
18     and this is based on what Your Honor advised me
19     the last time.  The law says a person is justified
20     in using deadly force if he reasonably believes
21     it's necessary to prevent imminent death or great
22     bodily harm to himself or another.  And ask them
23     if they can accept that basic principle of law if
24     they are so instructed.  Or the imminent
25     commission of force against himself or another.
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1    Judge, this is my defense, affirmative defense,
2    and I have to be able to ask the jurors if they
3    can accept it as a principle of law.
4         THE COURT:  Well, here's the --- again I've
5    had a lot between the last trial and this trial
6    and I don't remember what I did or didn't say.
7    First of all I took exception, I took exception to
8    it but he didn't raise any objection to it just
9    now to the example of what your opinion would be
10   self-defense like, you know, the person and the
11   police officer shooting somebody who's fleeing
12   from the bank robber.  And the other example, you
13   know, the point is just like the entrapment
14   defense, if a lawyer -- the defense attorney is
15   trying to, you know, solicit the juror to see
16   whether or not they would accept the defense of
17   entrapment.  I have no problem with you explaining
18   briefly, you know, in your words to them and if
19   he's going to raise an objection then he will -
20   he'll tell the jury that I'm the sole source of
21   the law but lawyers just like everybody else have
22   their opinions on what the laws are.  But the law
23   comes from the Court not from the lawyers.  The
24   point is I just want them to understand that
25   you're going to -- basically this is just like

1    entrapment and you're going to be relying on the
2    defense of self-defense.  If the judge gives you
3    an instruction on justifiable homicide would you
4    have any difficulty finding the defendant not
5    guilty because of the defense of self defense?

6         MR. GODWIN:  I have to be able to summarize
7    what the instruction is, Judge.  There's no
8    possible way I can instruct the jury unless I
9    summarize my version of what the defense is and
10   Your Honor will still give the elaborate
11   instruction later on.  I have to be able to know
12   if they can accept the basic principle of self
13   defense.  It's not just a word.

14        THE COURT:  What are your thoughts?

15        MR. PATNER:  I think the Court hit it right
16   on the head.  It's improper and out of context for
17   defense counsel to instruct them on any law at
18   this point.  He can talk in a general sense as he
19   has given great weight with those exhibits as to
20   the defense of others, or self-defense.  He can
21   talk in those sort of general terms.

22        THE COURT:  I'm going to read them the law if
23   you want to relate to them your opinion of what
24   the defense of self-defense is if he makes no
25   objection then we'll move on.  If there is an

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1        objection then I'll tell the jury that you're just
 2        giving them your opinion as to what self-defense
 3        is.   But I will be the one who gives the actual
 4        law you apply to the evidence in this case.   I
 5        don't want - unless you're going to agree to it I
 6        don't want you reading the jury the law on
 7        self-defense.
 8             MR. GODWIN:   I'm going to summarize the basic
 9        principle of self-defense in the form of a
10        question to the jurors and ask them if they can
11        accept that basic principle of law if they are so
12        instructed.   Judge, you know, Your Honor has
13        reviewed the case of Lava (phonetic) versus State
14        and that defense attorney must be able to voir
15        dire the jurors on their - whether they have the
16        state of mind to accept the basic affirmative
17        defense of self-defense.
18             THE COURT:   Right, that's what I'm saying.
19        You agree you're allowed to ask them about the
20        concept of the defense of self-defense and give
21        them your brief opinion of what you believe the
22        law is.   I agree with you on that decision, okay.
23             (Thereupon, the following proceedings were
24        resumed in the presence of the jury.)
25             MR. GODWIN:   Mr. Burke, and I'm really
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1    speaking to all of you folks, okay.  His honor is

2    going to give you instructions on this at a later

3    time, very detailed instructions and I want to ask

4    you if you can accept this basic principle of law

5    and apply it if you're so instructed.

6         Okay, the law says a person is justified in

7    using deadly force if he reasonably believes it's

8    necessary to prevent imminent death or great

9    bodily harm to himself or to another.  Can you

10   accept that basic principle of law?

11        MR. BURKE:  I can accept it for a family

12   member but the other I would be a little bit hasty

13   about so you'll have to clarify it for me.

14        MR. GODWIN:  You mean when you could use

15   deadly force to defend another person?

16        MR. BURKE:  Yes, right if it's a relative or

17   --

18        MR. GODWIN:  His honor will give you the

19   instructions on that but basically the law says

20   that a person is justified, can be justified in

21   using deadly force to prevent imminent death or

22   great bodily harm to yourself, or for example to

23   your wife or to another person.  Do you understand

24   what I'm saying?

25        MR. BURKE:  I could understand it more with

JUSTICE REPORTING SERVICES, INC.    523-6114

1     my wife then a neighbor.

2          MR. GODWIN:   But you understand that basic

3     principle of law that a person can be justified

4     using deadly force to protect himself or to

5     protect another person.   Can you go along with

6     that?

7          MR. BURKE: I understand what you're saying,

8     yes sir.

9          MR. GODWIN:   Do you understand - you

10    understand me, but can you accept that basic

11    principle if his honor so instructs you?

12         MR. BURKE:   Yes, with some more highlights.

13         THE COURT:   Right.   Let me just say there is

14    recognized in the state of Florida what we

15    characterize as affirmative defenses to certain

16    charges such as entrapment and self-defense which

17    is justifiable use of deadly force.   Voluntary

18    intoxication under certain circumstances.

19    Insanity --

20         THE COURT:   Folks, you are hearing from

21    defense counsel that he's indicating that he's

22    going to be relying on the affirmative defense of

23    justifiable use of deadly force.   Now, he's not in

24    the position to tell you, because he's only here

25    as an advocate, about what your conclusion is

1    going to be.  He just wants to know generally that

2    you will accept the fact that there is a defense

3    known as justifiable use of deadly force and if

4    the fact is substantiated that you could in fact

5    find the defendant not guilty based on that

6    affirmative defense.

7        Now, we're not asking you right now how

8    you're going to vote but he just wants to know

9    generally can you accept that as a defense of self

10    defense.  Now, for example some people have a hard

11    time with the concept of entrapment.  Some people

12    feel that that should not be an affirmative

13    defense.  But the point is that we are not talking

14    about entrapment we are talking about

15    self-defense.  Can you accept that as a

16    recognizable affirmative defense to the charge in

17    this case?

18        MR. BURKE:  I'm trying to make myself clear

19    very much so if it was me or my wife or just

20    another person I'm standing by, I need some

21    guidance with that.

22        THE COURT:  Again I can't, I will read you an

23    instruction later.

24        MR. BURKE:  I'm trying to be honest with you,

25    I am having a problem with that.

1        THE COURT:  Reasonable defense of one self or

2    others.

3        MR. BURKE:  The others I'm not sure about.

4        THE COURT:  If I in fact I give you the law

5    and it says you're allowed to use the defense of

6    self-defense for yourself or others would you

7    accept that?

8        MR. BURKE:  If it's coming from you, yes.

9        THE COURT:  Comes from my lips, I swear.

10        MR. BURKE:  I'll do the best I can.

11        THE COURT:  Okay, thank you.

12        MR. GODWIN:  All right.  So if the judge

13    gives you that instruction you'll be able to

14    follow it?

15        MR. BURKE:  Yes.

16        MR. GODWIN:  Would you all be able to do

17    that?  Anybody have any problem with that?  How

18    about you, Ms. Hayes?

19        MS. HAYES:  I hear the words but I don't

20    know.  Probably.

21        MR. GODWIN:  Let me say this.  There are some

22    folks that think that under no circumstances

23    should anybody ever be able to take a life of

24    another person it's just their religion, personal

25    belief, no one is ever justified using deadly

```
 1    force against another person.  That's the way you
 2    feel?
 3             MS. HAYES:  I have no problems with that
 4    because if someone is trying to harm me or one of
 5    my brothers, I mean, I am going - if I'm in the
 6    vicinity I'm going to jump in the action no doubt
 7    about that.  If I take a life, not intentional,
 8    but if it saves my brothers or myself from being
 9    harmed then, you know, that's just the way it
10    goes.  So I guess I have no problem with it.
11             MR. GODWIN:  So you can accept it?
12             MS. HAYES:  Justifiable homicide?
13             MR. GODWIN:  You can accept that basic
14    principle of law?
15             MS. HAYES:  Yes.
16             THE COURT:  Not justifiable homicide,
17    justifiable use of deadly force?
18             MS. HAYES:  Yes.
19             MR. GODWIN:  His honor is correct sometimes
20    the short version of justifiable homicide is
21    justifiable use of deadly force, okay.  The law
22    says -- the law also says that a person can use
23    deadly force if he believes it's necessary to
24    prevent the imminent commission of a forcible
25    felony against himself or against another person.
```

231

```
1        Are you okay with that Mr. Burke?

2             MR. BURKE:  Yes.

3             MR. GODWIN:  Can you accept that basic

4        principle?

5             MR. BURKE:  I'm not sure how it differs from

6        the first statement.

7             MR. GODWIN:  Just lawyer talk.  It's the same

8        thing just said in a different way sometimes the

9        law gives you two different versions of it.

10            MR. PATNER:  Judge, again I'm going to have

11       to object to defense counsel's version of the law

12       in this case.  Self-defense and the defense of

13       others is a long complicated instruction and the

14       Court will instruct the jury on it at the end of

15       the case.  It's not as simple as two lines as

16       counsel just indicated.  That would be the basis

17       of my objection.

18            THE COURT:  Okay, I will sustain the

19       objection but again I just want to advise you that

20       I have no problem - this is what the defense

21       attorney is suppose to do to find out from their

22       perspective because once a jury is sworn in it's

23       to late to find out how you feel, and to find out

24       whether or not he can accept the defense of

25       self-defense.  Obviously he's not in the position
```

```
 1          now to tell you what laws would be applied in this
 2          case, that's my job at the end of the case.  He is
 3          just trying to touch certain concepts with you.
 4          All right, let's proceed.
 5              MR. GODWIN:  Now, one other point in this
 6          area, Mr. Scott, you heard the prosecution say if
 7          they have to prove their case beyond a reasonable
 8          doubt, okay, it's their job to prove the case
 9          beyond a reasonable doubt.  You've heard me talk
10          about the issue of self-defense, you understand
11          that?
12              MR. SCOTT:  Yes.
13              MR. GODWIN:  Now, do I have to prove
14          self-defense to you beyond a reasonable doubt in
15          order for you to find Mr. Lockhart not guilty?
16              MR. SCOTT:  No.
17              MR. GODWIN:  How come?
18              MR. SCOTT:  The burden of proof is there.
19              MR. GODWIN:  Burden of proof is with the
20          State?
21              MR. SCOTT:  Yes.
22              MR. GODWIN:  I've talked about self-defense
23          and the point I'm trying to get at, and you're
24          absolutely correct and you've done your political
25          science very well I can see.  Raising the issue of
```

```
1     self-defense that does not mean Mr. Lockhart or me

2     his attorney has to prove self-defense beyond a

3     reasonable doubt.  Do you agree with that, that we

4     don't have to prove that beyond a reasonable

5     doubt?

6               MR. SCOTT:  I agree with that.

7               MR. GODWIN:  In fact, another way of putting

8     it is if the issue of self-defense creates a

9     reasonable doubt in your mind about his guilt then

10    your verdict would be?

11              MR. SCOTT:  Not guilty.

12              MR. GODWIN:  Can you all go along with that

13    basic principle?  Anybody have any problem with

14    that?  How about you, Ms. Ellis?

15              MS. HAYES:  No.

16              MR. GODWIN:  Ms. Ellis, I don't want to get

17    to something that's painful for you but I got to

18    talk about this a little bit, okay.  You told me

19    you lost your brothers?

20              MS. HAYES:  Uh-huh (affirmative response.)

21              MR. GODWIN:  They were both shot?

22              MS. HAYES:  Uh-huh (affirmative response.)

23              MR. GODWIN:  Here I am representing a man who

24    is accused of shooting somebody and I'm smiling

25    because you're smiling but I know it's not funny.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1        Tell me honestly in your heart how you feel about
 2        could Mr. Lockhart get a fair trial from you or
 3        would you rather not be here?
 4              MS. HAYES:  He can get a fair trial.
 5              MR. GODWIN:  How come how can I know that?
 6        Tell me how I can know that?
 7              MS. HAYES:  Because he doesn't have anything
 8        to do with my brothers getting killed.
 9              MR. GODWIN:  All right.  And if you sit on
10        this case and if you think the verdict should be
11        not guilty could you vote not guilty?
12              MS. HAYES:  Uh-huh (affirmative response.)
13              MR. GODWIN:  If you think it was a case of
14        justifiable use of deadly force could you vote not
15        guilty?
16              MS. HAYES:  Uh-huh (affirmative response.)
17              MR. GODWIN:  Mr. Pokorny, you're from New
18        York?
19              MR. POKORNY:  Yes.
20              MR. GODWIN:  If you sit as a juror in this
21        case and at the end of all the evidence you heard
22        the State proved the case and you heard the
23        defense talk about self-defense and you say well I
24        don't know if they proved the case beyond a
25        reasonable doubt, or I don't know if Mr. Godwin
```

```
 1    proved justifiable homicide, I'm just not sure one
 2    way or the other.  Under those circumstances what
 3    would your verdict have to be?
 4         MR. POKORNY:  To tell you the truth I don't
 5    know but it should be not guilty but I wouldn't
 6    know how I would --
 7         MR. GODWIN:  You wouldn't know because you
 8    told us about your own personal feelings.
 9         MR. POKORNY:  Right.
10         MR. GODWIN:  I'm not going to trying to say
11    anything to change your mind and I appreciate you
12    being honest with us.  Thank you very much.
13         MR. GODWIN:  Ms. Warshawsky, do you know what
14    a reasonable doubt is?
15         MS. WARSHAWSKY:  Yes.
16         MR. GODWIN:  You do?
17         MS. WARSHAWSKY:  Not positively, but yes.
18         MR. GODWIN:  His honor Judge Speiser at the
19    end of the case will give you a basic definition
20    of reasonable doubt.  And my question is if you
21    have a reasonable doubt you're suppose to vote not
22    guilty, you understand that, correct?
23         MS. WARSHAWSKY:  Yes.
24         MR. GODWIN:  Do you understand that there is
25    no size requirement for reasonable doubt.  It can
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1        be a little tiny, tiny microscopic reasonable

 2        doubt and if it causes a question in your mind, if

 3        there is a question in your mind that constitutes

 4        a reasonable doubt then your verdict must be --

 5              MS. WARSHAWSKY:  Not guilty.

 6              MR. GODWIN:  But if there is a question in

 7        your mind about whether or not it was justifiable

 8        homicide and you're just not sure one way or the

 9        other that creates a doubt, reasonable doubt in

10        your mind?

11              MS. WARSHAWSKY:  It would be not guilty.

12              MR. GODWIN:  You understand that I don't have

13        to prove, it's not my job to prove justifiable

14        homicide and if justifiable homicide creates a

15        reasonable doubt then your verdict would be --

16              MS. WARSHAWSKY:  Not guilty.

17              MR. GODWIN:  Would you all go along with

18        that?

19              THE JURORS:  Uh-huh (affirmative response.)

20              MR. GODWIN:  Let me ask one final question,

21        okay.  Ms. Petrone, as you sit here right now is

22        your state of mind such that if you were on trial

23        that you would be comfortable with a jury made up

24        of folks that were thinking like you?

25              MS. PETRONE:  Definitely.
```

```
 1          MR. GODWIN:  You think so?

 2          MS. PETRONE:  Yes.

 3          MR. GODWIN:  Okay.  Ms. Hayes, how about

 4     you?

 5          MS. HAYES:  Yes.

 6          MR. GODWIN:  Would you be comfortable if you

 7     were on trial yourself right now - would you be

 8     comfortable with people who were thinking like you

 9     sitting on a jury?

10          MS. HAYES:  Yes.

11          MR. GODWIN:  Mr. Moran?

12          MR. MORAN:  Yes.

13          MR. GODWIN:  Mr. Scott?

14          MR. SCOTT:  Yes.

15          MR. GODWIN:  Mr. Brown?

16          MR. BROWN:  Yes.

17          MR. GODWIN:  How but you, Ms. Ellis?

18          MR. BROWN:  Uh-huh (affirmative response.)

19          MR. GODWIN:  Ms. Trapp?

20          MS. TRAPP:  Yes.

21          MR. GODWIN:  Okay.  Ms. Reed how do you feel

22     about that?

23          MS. REED:  Would I want someone thinking my

24     way?  Yes.

25          MR. GODWIN:  Okay.  Mr. Burke, how about
```

JUSTICE REPORTING SERVICES, INC.     523-6114

238

```
 1      you?
 2              MR. BURKE:  Yes.
 3              MR. GODWIN:  Mr. Weidner?
 4              MR. WEIDNER:  Yes.
 5              MR. GODWIN:  You did mention that you have a
 6      friend who's a police officer, correct?
 7              MR. WEIDNER:  No.
 8              MR. GODWIN:  You did not?
 9              MR. WEIDNER:  No.
10              MR. GODWIN:  You said you knew Judge Speiser
11      from before?
12              MR. WEIDNER:  Yeah, I was in on a trial
13      before.
14              MR. GODWIN:  Did you say you reached a
15      verdict in that case?
16              MR. WEIDNER:  No, I was an alternate.
17              MR. GODWIN:  As you sit here today are you
18      comfortable -- if you were sitting on trial right
19      now accused of this crime would you want a jury
20      made up of someone sitting there like you?
21              MR. WEIDNER:  Yes.
22              MR. GODWIN:  Ms. Warshawsky?
23              MS. WARSHAWSKY:  Yeah.
24              MR. GODWIN:  Ms. Nolan?
25              MS. NOLAN:  Yes.
```

239

```
1              MR. GODWIN:  And Ms. Rodriguez?

2              MS. RODRIGUEZ:  Yes.

3              MR. GODWIN:  Thank you all very much.

4              THE COURT:  I'll give both sides a few

5         minutes to decide how they want to exercise

6         they're challenges.  When you're ready approach

7         the bench.

8              (Thereupon, the following proceedings were

9         had outside the hearing of the perspective

10        jurors.)

11             THE COURT:  Record shall reflect the

12        defendant is present participating in jury

13        selection, correct?

14             MR. GODWIN:  Yes.

15             THE COURT:  Okay, we'll start off with juror

16        number one.  Mr. Patner?

17             MR. PATNER:  Accept.

18             MR. GODWIN:  Accept.

19             THE COURT:  Number two, Mr. Godwin?

20             MR. GODWIN:  Accept.

21             MR. PATNER:  Accept.

22             THE COURT:  Number three, Mr. Patner?

23             MR. PATNER:  Strike.

24             THE COURT:  Number four, Mr. Godwin?

25             MR. GODWIN:  Just one second, Judge.  That
```

/

240

```
 1        was a strike, right?
 2               THE COURT:  Number three was stricken.
 3               MR. GODWIN:  Mr. Weidner, accept.
 4               THE COURT:  Number four acceptable to you?
 5        Number five?
 6               MR. PATNER:  Accept.
 7               THE COURT:  Five with you?
 8               MR. GODWIN:  Yeah he's okay for now.
 9               THE COURT:  Number six, Mr. Godwin?
10               MR. GODWIN:  Accept.
11               MR. PATNER:  Accept.
12               THE COURT:  Seven Mr. Godwin, Mr. Patner?
13               MR. PATNER:  Strike for cause.
14               THE COURT:  Any objection?
15               MR. GODWIN:  No.
16               THE COURT:  Eight, Mr. Godwin?
17               MR. GODWIN:  Accept.
18               THE COURT:  Eight with you.
19               MR. PATNER:  I accepted.  Well, do we have --
20               THE COURT:  I go through all fourteen.  Nine,
21        Mr. Patner?
22               MR. PATNER:  Judge, will the Court then -- I
23        am assuming we go through all fourteen and the
24        Court goes to the first six in order.  Number
25        nine, accept.
```

241

```
 1              MR. GODWIN:  Accept.

 2              THE COURT:  Ten, Mr. Godwin?

 3              MR. GODWIN:  Accept for now.

 4              MR. PATNER:  Accept.

 5              THE COURT:  Eleven, Mr. Patner?

 6              MR. PATNER:  Accept.

 7              MR. GODWIN:  Accept.

 8              THE COURT:  Twelve, Mr. Godwin?

 9              MR. GODWIN:  Accept.

10              MR. PATNER:  Accept.

11              THE COURT:  Thirteen, Mr. Patner?

12              MR. PATNER:  Accept.

13              THE COURT:  Mr. Godwin?

14              MR. GODWIN:  Accept.

15              THE COURT:  Fourteen, Mr. Godwin?

16              MR. GODWIN:  Accept.

17              THE COURT:  Mr. Patner?

18              MR. PATNER:  Accept.

19              THE COURT:  Okay, at this time -- stay where

20      you are.  Jurors number three and number seven,

21      you two folks are excused.  If you want to take

22      your cards and go back down to the fifth floor

23      please.

24              (Thereupon, the following proceedings were

25      had at side bar outside the hearing of the
```

242

```
 1      jurors.)
 2           THE COURT:  Start off again.  Number one, Mr.
 3      Patner?
 4           MR. PATNER:  Accept.
 5           THE COURT:  Mr. Godwin?
 6           MR. GODWIN:  Accept.
 7           THE COURT:  Two, Mr. Godwin?
 8           MR. GODWIN:  Accept.
 9           MR. PATNER:  Accept.
10           THE COURT:  Number four, Mr. Godwin?
11           MR. GODWIN:  You just asked me for number
12      two.
13           THE COURT:  Number two you said accept.
14      Number three was struck.
15           MR. GODWIN:  So it's to him.
16           THE COURT:  No four is an even number stay by
17      the seats.
18           MR. GODWIN:  You got me all confused.
19           THE COURT:  Four?
20           MR. GODWIN:  Strike.
21           THE COURT:  Four you're striking?
22           MR. PATNER:  Number four.
23           THE COURT:  Number four, sir, you are
24      excused.
25           THE COURT:  Number five, Mr. Patner?
```

243

```
 1            MR. PATNER:  Accept.

 2            THE COURT:  Mr. Godwin?

 3            MR. GODWIN:  Accept.

 4            THE COURT:  Number six, Mr. Godwin?

 5            MR. GODWIN:  Accept.

 6            THE COURT:  Mr. Patner?

 7            MR. PATNER:  Accept.

 8            THE COURT:  Number seven - I'm sorry eight,

 9    Mr. Godwin?

10            MR. GODWIN:  Accept.

11            THE COURT:  Mr. Patner?

12            MR. PATNER:  Accept.

13            THE COURT:  Number nine, Mr. Patner?

14            MR. PATNER:  Strike.

15            THE COURT:  Striking number nine.

16            MR. GODWIN:  We'd object, Judge, she's a

17    black lady and there's no basis for her - she's

18    answered all the questions intelligently and I see

19    no basis for striking her.  And let the record

20    reflect she is black.

21            THE COURT:  I concur with this observation.

22            MR. PATNER:  Judge, under slappy Neal - well

23    issues under slappy Neal they must show a

24    systematic exclusion.  The record reflect I have

25    accepted Ms. Ellis the black female, number
```

1    thirteen.

2         THE COURT:  Say that again.

3         MR. PATNER:  Record should reflect I have

4    accepted Ms. Ellis number thirteen who was also a

5    black female the first go around.  I'd like the

6    record to also reflect I accepted Mr. Scott who is

7    a black mall and I have no intention of striking

8    Mr. Scott.  That being said I believe there is no

9    showing of systematic exclusion of blacks or

10   females, or black females.

11        Now should that not be accepted to the

12   appellate court or this Court as a threshold issue

13   I further state this juror was the only one who

14   talked, who talked and made the statement if

15   someone were doing something to her brother she

16   would jump in, she would jump in and take a life.

17   She is the only one who made that sort of

18   statement, that sort of statement gives the State

19   great concern.  She seemed eager to intricate

20   herself into that type of situation.  On the facts

21   in this case that sort of statement causes me

22   concern.

23        I'd also point out she did in fact have an --

24   I'll strike that.  That's my reason.  Well, I

25   would also indicate she also said she thought -

1    the first go around she thought the presumption of
2    innocence was "stupid", and that also caused me
3    concern.

4         MR. GODWIN:   Judge, if Your Honor please you
5    asked her the question on presumption of innocence
6    and I think she said my question was stupid, which
7    it probably was.

8         THE COURT:   She didn't say the question was
9    stupid she said the concept was stupid.

10        MR. GODWIN:   Any way I straightened her out
11   on that issue.   Slappy Neal does not require any
12   showing of systematic exclusion of individualized
13   jurors a black woman gave answers the same as
14   everybody else and she is as qualified as
15   everyone.   She said she would accept the defense
16   of self-defense.   She said the same thing, nothing
17   different then anybody else.   There's no basis for
18   excusing this woman, Judge, other then the fact
19   that she's black.

20        MR. PATNER:   Obviously I'm always insulted
21   when I hear that, I understand what defense
22   counsel is doing is necessary to preserve the
23   record if he or she was the only one in contrast
24   to everyone else who put herself in that situation
25   to if it was my brother I'd get in there and take

1    a life.  That's caused me concern.  That is the

2    only reason I'm striking her.

3        In addition to her statement she thought a

4    legal concept was stupid and in this case it's

5    going to be very important from the State's point

6    of view that they follow the law carefully.

7    There's going to be complicated legal issues and

8    she thinks they're stupid and is not going to

9    follow it.  That causes me great concern and I

10   don't care if it's a black person, or white, or

11   purple.

12       THE COURT:  I feel the basis for striking her

13   is race neutral and his basis for striking the

14   juror is not based on any racial motivated

15   reasons.  Matter of fact, to be perfectly honest

16   with you I was sitting here and I thought you were

17   going to strike this particular juror.  She didn't

18   give answers that even I would consider to be very

19   favorable to you.  But to answer the question in

20   the context which is raised I feel that the

21   statement made by the defense here suggests that

22   his motivation and his reasons for striking this

23   juror are color blind and have no basis whatsoever

24   on her race.

25       MR. GODWIN:  Note my objection.

247

```
 1            THE COURT:  Okay.

 2            MR. PATNER:  So that's juror number nine.

 3            THE COURT:  Okay.  Juror number nine, ma'am,

 4       you are excused.

 5            THE COURT:  Number ten?

 6            MR. GODWIN:  Mr. Moran, strike him.

 7            THE COURT:  Mr. Moran, you are excused.  Okay

 8       number eleven, Mr. Patner?

 9            MR. PATNER:  Accept.

10            MR. GODWIN:  Accept.

11            THE COURT:  That's six so far.  Are those six

12       acceptable to both sides?

13            MR. PATNER:  Yes.

14            MR. GODWIN:  Give me a second, Judge.

15            THE COURT:  Okay, back on the record.

16            MR. GODWIN:  We'll strike Ms. Nolan.

17            THE COURT:  Which one is she?

18            THE DEFENDANT:  Number two.

19            THE COURT:  Ms. Nolan, you are excused.

20       Thank you.

21            THE COURT:  How about juror number twelve,

22       Mr. Godwin?

23            MR. GODWIN:  We accept.

24            MR. PATNER:  Just a moment, Judge.

25            THE COURT:  Yes.
```

248

```
 1              MR. PATNER:  Accept.

 2              THE COURT:  Those six acceptable to both

 3       sides?

 4              MR. PATNER:  Yes sir.

 5              THE COURT:  Note for the record jurors number

 6       eleven and twelve are black jurors.

 7              MR. GODWIN:  We'll excuse Ms. Reed.

 8              THE COURT:  Which one is that?

 9              MR. GODWIN:  Number six.

10              THE COURT:  Okay.  Ms. Reed, ma'am, you are

11       excused.

12              Is number thirteen acceptable to you?

13              MR. GODWIN:  Yes.

14              MR. PATNER:  Yes.

15              THE COURT:  Acceptable to you?  Note for the

16       record that juror number thirteen is black also so

17       there are three perspective blacks on the panel.

18              MR. GODWIN:  Okay.

19              THE COURT:  That panel is acceptable to you,

20       Mr. Lockhart?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  Okay, is juror number --

23              MR. GODWIN:  Judge, give me one second.

24              THE COURT:  How are we doing Mr. Godwin?

25              MR. GODWIN:  Strike Ms. Ellis.
```

```
 1              THE COURT:  Which one is Ms. Ellis, number
 2       thirteen?
 3              THE COURT:  Oh I thought that's who you
 4       wanted.  Isn't that why you all struck Ms. Reed to
 5       get to Ms. Ellis?
 6              MR. GODWIN:  Things change, Judge, what can I
 7       tell you.
 8              THE COURT:  That's okay.  Number fourteen?
 9              MR. PATNER:  Even number.
10              MR. GODWIN:  Accept.
11              MR. PATNER:  Accept.
12              THE COURT:  All right.
13              MR. GODWIN:  Strike Ms. Trapp the last juror,
14       number fourteen.
15              THE COURT:  Okay.  Juror number fourteen,
16       ma'am, you are excused.  Ma'am you are excused.
17       Number thirteen, you're excused.
18              Ella Terrell 3885.  Dawn Allen 323.  Theodore
19       Roland, 837.  Rochenel Belizaire 291.  David
20       Pasternik 42.  Kathryn Lupin.
21              Do any of you six folks know one another
22       socially or professionally prior to being here
23       today?  Do any of six folks have religious reasons
24       known to you that would preclude or prevent you
25       from serving as a juror?
```

```
 1              All right Ms. Terrell, where are you from
 2         originally?
 3              MS. TERRELL:  South Carolina.
 4              THE COURT:  How long have you been living in
 5         south Florida?
 6              MS. TERRELL:  31 years.
 7              THE COURT:  Do you own your own residence?
 8              MS. TERRELL:  Apartment.
 9              THE COURT:  What city?
10              MS. TERRELL:  Hollywood.
11              THE COURT:  Any children?
12              MS. TERRELL:  One.
13              THE COURT:  School age?
14              MS. TERRELL:  Six.
15              THE COURT:  You're married?
16              MS. TERRELL:  Separated.
17              THE COURT:  What do you do for a living?
18              MS. TERRELL:  Diet clerk.
19              THE COURT:  Where?
20              MS. TERRELL:  Memorial Hospital.
21              THE COURT:  Your husband?
22              MS. TERRELL:  I don't see him.
23              THE COURT:  Do you know what he does?
24              MS. TERRELL:  No.
25              THE COURT:  Ever been on a jury?
```

```
 1            MS. TERRELL:  No I was chosen but I never got
 2       picked.
 3            THE COURT:  Ever been the victim of a crime?
 4            MS. TERRELL:  No.
 5            THE COURT:  Do you have any friends or
 6       relatives in law enforcement?
 7            MS. TERRELL:  Friend.
 8            THE COURT:  Who?
 9            MS. TERRELL:  Rose Lanbock (phonetic).
10            THE COURT:  Who does she work with?
11            MS. TERRELL:  BSO.
12            THE COURT:  Where does she work, does she
13       work in the jail or out on the road?
14            MS. TERRELL:  Out on the road.
15            THE COURT:  She is road patrol?
16            MS. TERRELL:  She was on road patrol but
17       she's at a school now.
18            THE COURT:  She is a school resource
19       officer.  Okay, the school where your daughter
20       goes?
21            MS. TERRELL:  No.
22            THE COURT:  Would the fact that you know this
23       lady prevent you from being fair and impartial?
24            MS. TERRELL:  No.
25            THE COURT:  Have you or anybody in your
```

JUSTICE REPORTING SERVICES, INC.      523-6114

252

```
 1          family ever been arrested at all?
 2                  MS. TERRELL:  No.
 3                  THE COURT:  What do you do in your spare
 4          time?
 5                  MS. TERRELL:  Take my little girl to the
 6          movies and out playing.
 7                  THE COURT:  Any questions at all?
 8                  MS. TERRELL:  No.
 9                  THE COURT:  Feel you could be fair and
10          impartial?
11                  MS. TERRELL:  Yes.
12                  THE COURT:  Thank you.
13                  Dawn Allen, where are you from originally?
14                  MS. ALLEN:  Hallandale.
15                  THE COURT:  You live in Hallandale now?
16                  MS. ALLEN:  Yes.
17                  THE COURT:  Married?
18                  MS. ALLEN:  No.
19                  THE COURT:  Have you been?
20                  MS. ALLEN:  No.
21                  THE COURT:  Do you own your own residence?
22                  MS. ALLEN:  No.
23                  THE COURT:  Live with your folks?
24                  MS. ALLEN:  Yes.
25                  THE COURT:  How old are you.
```

253

```
 1              MS. ALLEN:   Twenty-five.

 2              THE COURT:   What do you do for a living?

 3              MS. ALLEN:   Receptionist at Agular Insurance.

 4              THE COURT:   Ever been on a jury before?

 5              MS. ALLEN:   No.

 6              THE COURT:   Victim of a crime?

 7              MS. ALLEN:   Like eight years ago.

 8              THE COURT:   What?

 9              MS. ALLEN:   Car jack.

10              THE COURT:   Did they find out who did that?

11              MS. ALLEN:   No.

12              THE COURT:   Would that bear at all on your

13      ability to be fair and impartial?

14              MS. ALLEN:   No.

15              THE COURT:   Do you have any friends or

16      relatives in law enforcement?

17              MS. ALLEN:   No but my mom is a code

18      enforcement officer.

19              THE COURT:   For Hallandale?

20              MS. ALLEN:   Hallandale.

21              THE COURT:   Have you or anybody in your

22      family ever been arrested at all?

23              MS. ALLEN:   My sister.

24              THE COURT:   For?

25              MS. ALLEN:   Shoplifting.
```

```
 1              THE COURT:  One time?
 2              MS. ALLEN:  Yeah.
 3              THE COURT:  What was the end result of that?
 4              MS. ALLEN:  The charges were dropped and she
 5      had to go to school.
 6              THE COURT:  Did it happen as a juvenile?
 7              MS. ALLEN:  No.
 8              THE COURT:  Would that bear at all on your
 9      ability to be fair and impartial?
10              MS. ALLEN:  No.
11              THE COURT:  What do you do in your spare
12      time?
13              MS. ALLEN:  Shop.
14              THE COURT:  Any questions at all?
15              MS. ALLEN:  I'm a witness in another trial in
16      Dade County and I don't know when -- it's been
17      going on for like two years and I don't know when
18      it's going to start.  I haven't been called to
19      trial yet but I am a witness in it.
20              THE COURT:  Criminal case?
21              MS. ALLEN:  I don't know, it's a drug case.
22              THE COURT:  Well, that's a criminal case.
23              Okay, well you didn't get a subpoena to be
24      there this week, did you?
25              MS. ALLEN:  No.
```

```
 1              THE COURT:  That wouldn't bear at all on your
 2       ability to be fair and impartial, would it?
 3              MS. ALLEN:  No.
 4              THE COURT:  Okay.  And you say -- let's see
 5       what do you do in your spare time?
 6              MS. ALLEN:  Shopping.
 7              THE COURT:  Okay, any questions at all?
 8              MS. ALLEN:  No.
 9              THE COURT:  Feel you could be fair and
10       impartial?
11              MS. ALLEN:  Yes.
12              THE COURT:  Are you a witness for the State
13       or defense in that case?
14              MS. ALLEN:  I'm a witness for the defense.
15              THE COURT:  For what?
16              MS. ALLEN:  Defense.
17              THE COURT:  Okay.  Do you know one of the
18       defendants?  Did you know the person that was
19       arrested in that case?
20              MS. ALLEN:  Yeah.
21              THE COURT:  How do you know that person?
22              MS. ALLEN:  Friend of mine.
23              THE COURT:  Were you present at the time this
24       --
25              MS. ALLEN:  Yes.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

256

```
 1                THE COURT: -- the crime allegedly occurred?
 2                MS. ALLEN:  Yes.
 3                THE COURT:  Were you arrested at all on
 4        that?
 5                MS. ALLEN:  No.
 6                THE COURT:  Okay.  Theodore Roland.
 7                How long have you been living in south
 8        Florida?
 9                MR. ROLAND:  Twenty-eight years.
10                THE COURT:  Do you own your own residence?
11                MR. ROLAND:  Yes.
12                THE COURT:  Single family home?
13                MR. ROLAND:  Condo.
14                THE COURT:  Married?
15                MR. ROLAND:  Single.
16                THE COURT:  Have you been married?
17                MR. ROLAND:  No.
18                THE COURT:  What do you do for a living?
19                MR. ROLAND:  A salesman.
20                THE COURT:  For?
21                MR. ROLAND:  Food service company, Manberg
22        Foods.
23                THE COURT:  Ever been on a jury before?
24                MR. ROLAND:  Yes.
25                THE COURT:  One time?
```

257

```
 1            MR. ROLAND:  Twice.

 2            THE COURT:  Criminal case?

 3            MR. ROLAND:  I know the second one was, I

 4       can't remember the first.

 5            THE COURT:  Okay, what did that case involve,

 6       the first one?

 7            MR. ROLAND:  Drunk driving.

 8            THE COURT:  Drunk driving, okay.  Did you get

 9       a chance to deliberate and reach a verdict?

10            MR. ROLAND:  Yes.

11            THE COURT:  Were you the foreman of that

12       jury?

13            MR. ROLAND:  No.

14            THE COURT:  Any negative experiences from

15       being on the jury?

16            MR. ROLAND:  None at all.

17            THE COURT:  Ever been the victim of a crime?

18            MR. ROLAND:  Yes, some kids tried to break in

19       my car one time.

20            THE COURT:  Did they find out who did that?

21            MR. ROLAND:  They didn't do it I ran out and

22       they ran away.

23            THE COURT:  Would that bear at all on your

24       ability to be fair and impartial?

25            MR. ROLAND:  No.
```

```
1              THE COURT:  Have you or anybody in your
2         family ever been arrested at all?
3              MR. ROLAND:  No.
4              THE COURT:  What do you do in your spare
5         time?
6              MR. ROLAND:  Attempt to play basketball and
7         work out to play basketball like I use to when I
8         was a kid.
9              THE COURT:  Any questions at all?
10             MR. ROLAND:  No.
11             THE COURT:  Feel you could be fair and
12        impartial?
13             MR. ROLAND:  Yes.
14             THE COURT:  That leads me to Mr. Belizaire.
15             MR. BELIZAIRE:  Yes.
16             THE COURT:  Where are you from originally?
17             MR. BELIZAIRE:  From Haiti.
18             THE COURT:  How long have you been living in
19        south Florida?
20             MR. BELIZAIRE:  Seventeen years.
21             THE COURT:  What city do you live in?
22             MR. BELIZAIRE:  Fort Lauderdale.
23             THE COURT:  Fort Lauderdale?
24             MR. BELIZAIRE:  Sunrise.
25             THE COURT:  Are you married?
```

259

```
 1              MR. BELIZAIRE:  Yes.

 2              THE COURT:  Children?

 3              MR. BELIZAIRE:  Yes.

 4              THE COURT:  How many?

 5              MR. BELIZAIRE:  Three.

 6              THE COURT:  Three, and are they in school or

 7         do they work?

 8              MR. BELIZAIRE:  School.

 9              THE COURT:  Do you own your own residence?

10              MR. BELIZAIRE:  Yes.

11              THE COURT:  You own your own house?

12              MR. BELIZAIRE:  Yes.

13              THE COURT:  In Fort Lauderdale?

14              MR. BELIZAIRE:  Yes.

15              THE COURT:  What do you do for a living?

16              MR. BELIZAIRE:  Cooking.

17              THE COURT:  Cooking?

18              MR. BELIZAIRE:  Yeah.

19              THE COURT:  Where?

20              MR. BELIZAIRE:  In the kitchen.

21              THE COURT:  In a kitchen, great, and at a

22         restaurant?

23              MR. BELIZAIRE:  Restaurant.

24              THE COURT:  Which restaurant?

25              MR. BELIZAIRE:  It's in Pembroke Pines.
```

```
 1              THE COURT:  Pembroke Pines, do you know the

 2       name of it?

 3              MR. BELIZAIRE:  Yeah, it's Ronieris.

 4              THE COURT:  I didn't hear you.

 5              MR. BELIZAIRE:  Italian gourmet food,

 6       R-O-N-I-E-R-I-S

 7              THE COURT:  So you're a cook in an Italian

 8       restaurant, are you the main chef there?

 9              MR. BELIZAIRE:  No, just a cook.

10              THE COURT:  Okay, and what does your wife do

11       for a living?

12              MR. BELIZAIRE:  She's working in a restaurant

13       too.

14              THE COURT:  Which restaurant?

15              MR. BELIZAIRE:  Cizar's.

16              THE COURT:  Have you ever been on a jury

17       before?

18              MR. BELIZAIRE:  No.

19              THE COURT:  Victim of a crime?

20              MR. BELIZAIRE:  No.

21              THE COURT:  Do you have any friends or

22       relatives in law enforcement?

23              MR. BELIZAIRE:  No.

24              THE COURT:  Have your or anybody in your

25       family ever been arrested at all?
```

261

```
 1              MR. BELIZAIRE:  No.

 2              THE COURT:  What do you do in your spare

 3         time?

 4              MR. BELIZAIRE:  Reading.

 5              THE COURT:  Reading, okay.  Any questions at

 6         all?

 7              MR. BELIZAIRE:  No.

 8              THE COURT:  Feel you could be fair and

 9         impartial?

10              MR. BELIZAIRE:  Yeah.

11              THE COURT:  You have understood everything

12         we've been talking about here?

13              MR. BELIZAIRE:  Some.

14              THE COURT:  Some of it?

15              MR. BELIZAIRE:  Yeah.

16              THE COURT:  There are some things you haven't

17         understood?

18              MR. BELIZAIRE:  Yeah, I understand.

19              THE COURT:  Okay, any questions at all?

20              MR. BELIZAIRE:  No.

21              THE COURT:  Thank you.  Mr. Pasternik, where

22         are you from originally?

23              MR. PASTERNAK:  New York.

24              THE COURT:  How long have you been living in

25         south Florida?
```

262

```
 1              MR. PASTERNAK:  Twenty years.

 2              THE COURT:  What city?

 3              MR. PASTERNAK:  Fort Lauderdale.

 4              THE COURT:  Married?

 5              MR. PASTERNAK:  No.

 6              THE COURT:  Have you been?

 7              MR. PASTERNAK:  No.

 8              THE COURT:  Thinking about it?

 9              MR. PASTERNAK:  No.

10              THE COURT:  And do you own a house?

11              MR. PASTERNAK:  No.

12              THE COURT:  Condominium?

13              MR. PASTERNAK:  No.

14              THE COURT:  Live with your family?

15              MR. PASTERNAK:  Yes.

16              THE COURT:  What do you do for a living?

17              MR. PASTERNAK:  Own an advertising agency.

18              THE COURT:  Free advertising, what's the name

19      of it?

20              MR. PASTERNAK:  Venture Promotions.

21              THE COURT:  How is business?

22              MR. PASTERNAK:  Good.

23              THE COURT:  Have ever been on a jury?

24              MR. PASTERNAK:  No.

25              THE COURT:  Victim of a crime?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

263

```
 1              MR. PASTERNAK:  No.
 2              THE COURT:  Have you or anybody in your
 3         family ever been arrested at all?
 4              MR. PASTERNAK:  No.
 5              THE COURT:  What do you do in your spare
 6         time?
 7              MR. PASTERNAK:  Work, go to school.
 8              THE COURT:  Where?
 9              MR. PASTERNAK:  Nova University.
10              THE COURT:  Taking up?
11              MR. PASTERNAK:  M.I.S.
12              THE COURT:  Any questions at all?
13              MR. PASTERNAK:  No.
14              THE COURT:  Thank you.  Ms. Lupin, where are
15         you from originally?
16              MS. LUPIN: Delaware.
17              THE COURT:  How long have you been living in
18         south Florida?
19              MS. LUPIN: Fifteen years.
20              THE COURT:  Do you own your own residence?
21              MS. LUPIN: Yes.
22              THE COURT:  Single family home?
23              MS. LUPIN: Yes, a condo and a single family
24         home.
25              THE COURT:  Which one do you stay in?
```

```
1              MS. LUPIN: The single family home.

2              THE COURT:  Okay, what city?

3              MS. LUPIN: Hollywood.

4              THE COURT:  Married?

5              MS. LUPIN: Yes.

6              THE COURT:  Children?

7              MS. LUPIN: No.

8              THE COURT:  What do you do for a living?

9              MS. LUPIN: Insurance adjustor.

10             THE COURT:  For?

11             MS. LUPIN: Capitol insurance.

12             THE COURT:  Your husband?

13             MS. LUPIN: He is a currier for a medical lab.

14             THE COURT:  Have you ever been on a jury?

15             MS. LUPIN:  No.

16             THE COURT:  Victim of a crime?

17             MS. LUPIN: No.

18             THE COURT:  Any friends or relatives in law

19    enforcement?

20             MS. LUPIN: Brother-in-law who's a lawyer, he

21    was a DEA agent.

22             THE COURT:  Where?

23             MS. LUPIN: San Francisco.

24             THE COURT:  That's where he works now?

25             MS. LUPIN: Works in San Diego.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

265

```
 1              THE COURT:  Does he do any criminal work?
 2              MS. LUPIN: Corporate law.
 3              THE COURT:  Okay, would that bear at all on
 4         your ability to be fair and impartial?
 5              MS. LUPIN: No.
 6              THE COURT:  Have you or anybody in your
 7         family ever been arrested at all?
 8              MS. LUPIN: No.
 9              THE COURT:  What do you do in your spare
10         time?
11              MS. LUPIN: Clean.
12              THE COURT:  Okay, any questions at all?
13              MS. LUPIN: Thank you.  Mr. Patner.
14              MR. PATNER:  Thank you, Judge.
15              MR. PATNER:  You know in a way it's kind of
16         good you all sat there in the back because I
17         assume you more or less paid attention during the
18         first go around so I am not going to go through
19         all that again except to touch on a couple of
20         things.
21              Everyone understands attorneys are not on
22         trial and attorneys are here not on trial and I'm
23         not going to be a witness, Mr. Godwin is not a
24         witness, and your personal feelings of us really
25         shouldn't come into play.  You all agree with
```

JUSTICE REPORTING SERVICES, INC.      523-6114

266

```
 1        that?   It really makes sense because there are
 2        real people who do have things involved in cases
 3        other then the attorneys.  That being said and
 4        I'll let anyone in the front row answer this.  Is
 5        there anything I've done at this point that is
 6        making you sit there thinking to yourself I can't
 7        stand to listen to that guy for five more
 8        minutes.  He talks to fast and he's jumping around
 9        making to many objections.  Does anybody have
10        those sort of feelings?  You're not going to
11        insult me I've heard it all before.  I've been
12        doing this longer then you think.  Anybody?  Okay,
13        fair enough.
14            Mr. Roland, you pay play basketball, okay,
15        there is certain rules you have to play by when
16        you're playing basketball, correct?  If you're
17        playing one on one with a guy he is allowed to
18        travel and you're not that's not really fair, is
19        it.
20            MR. ROLAND:   Correct.
21            MR. PATNER:   It's only a fair game whether
22        it's one on one or five on five if both sides play
23        by the same rules, correct?
24            MR. ROLAND:   Correct.
25            MR. PATNER:   You won't hold it against me if
```

JUSTICE REPORTING SERVICES, INC.      523-6114

267

```
 1      I make objections if I think I need to.  An
 2      attorney is going to make objections during the
 3      trial and I'm going to make probably more, maybe I
 4      won't but I'm anticipating there may be times that
 5      it's going to happen.  Any problems with me doing
 6      that?
 7           MR. ROLAND:   No.
 8           MR. PATNER:   Anybody feel that way?  Anybody
 9      who's utterly annoyed with what happened here
10      earlier?  No problem, fair enough.  Mr. Pasternak
11      tell me little bit more, specifically about the
12      company that you're involved with?
13           MR. PASTERNAK:   I own an advertising and
14      promotions company.
15           MR. PATNER:   What sort of accounts do you
16      do?
17           MR. PASTERNAK:   High tech accounts, high tech
18      promotions.
19           MR. PATNER:   Obviously when you graduate
20      that's what you wanted to keep going, a continuing
21      enterprise?
22           MR. PASTERNAK:   I graduated once already.
23           MR. PATNER:   What type of degree?
24           MR. PASTERNAK:   Bachelors in business
25      administration.
```

```
 1          MR. PATNER:  Ms. Lupin, your brother is an
 2     attorney and prior to that a DEA agent, did he
 3     ever do any criminal law?
 4          MR. LUPIN:  I don't believe so.
 5          MR. PATNER:  Did you ever discuss the cases
 6     with him when he was in DEA?
 7          MR. LUPIN:  He lives out there and I only see
 8     him like once every seven years.
 9          MR. PATNER:  So no feelings about that one
10     way or another.  Ms. Allen, you're a pending
11     defense - you're a defense witness in a pending
12     drug case?
13          MS. ALLEN:  Yes.
14          MR. PATNER:  And that's set for trial?
15          MS. ALLEN:  Yeah.
16          MR. PATNER:  You were present when whatever
17     happened that led to your friend being arrested?
18     You were present then?
19          MS. ALLEN:  Yes.
20          MR. PATNER:  And any feelings about the
21     police based on that incident, it's sort of an
22     awkward situation but do you feel the police
23     handled it fairly?
24          MS. ALLEN:  Yeah.
25          MR. PATNER:  You sort of hesitated a bit and
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1     smiled for a moment, do you think they perhaps did

 2     something they shouldn't have done?

 3          MS. ALLEN:   No.

 4          MR. PATNER:   Okay, fair enough.   Ms. Terrell,

 5     how long have you been working at the nursing

 6     home?

 7          MS. TERRELL:   Six years.

 8          MR. PATNER:   And before that?

 9          MS. TERRELL:   I worked in another nursing

10     home.

11          MR. PATNER:   And you've previously been on a

12     jury?

13          MS. TERRELL:   No.

14          MR. PATNER:   I thought you indicated you

15     had?

16          MS. TERRELL:   No.

17          MR. PATNER:   Have you been through this

18     questioning before?

19          MS. TERRELL:   Yes.

20          MR. PATNER:   Was that here or was that a

21     civil case or criminal case?

22          MS. TERRELL:   It was at the old courthouse.

23          MR. PATNER:   Okay, thank you.

24          MR. PATNER:   Mr. Belizaire, do you have any

25     children?
```

270

```
 1              MR. BELIZAIRE:  Yes.

 2              MR. PATNER:  How many?

 3              MR. BELIZAIRE:  Three.

 4              MR. PATNER:  All in school?

 5              MR. BELIZAIRE:  School age.

 6              MR. PATNER:  What ages?

 7              MR. BELIZAIRE:  Eleven, six, and four.

 8              MR. PATNER:  How long have you cooked over in

 9         Pembroke Pines?

10              MR. BELIZAIRE:  Seven years.

11              MR. PATNER:  You've been at the same

12         restaurant for seven years?

13              MR. BELIZAIRE:  Yeah.

14              MR. PATNER:  And how long has your wife been

15         over there?

16              MR. BELIZAIRE:  Nine months.

17              MR. PATNER:  And before that?  Before that

18         other then taking care of the children what other

19         full-time job or jobs did she have?

20              MR. BELIZAIRE:  Nothing.

21              MR. PATNER:  Is everyone -- would everyone

22         agree earlier on I stated that the law may not be

23         what you think it is, I talked about paying your

24         taxes that you may not like the law but you agree

25         here as jurors you'll follow the law?  Obviously
```

/

```
 1    you all come here honoring your notice for jury
 2    duty and you will take an equal oath as the judge
 3    gives you to follow that law as best as you can?
 4         Any of you all in the back row ever fought a
 5    traffic ticket?  Any of you all ever got a ticket
 6    unfairly?  Okay, fair enough, thank you.
 7         MR. GODWIN:  Good afternoon Ms. Terrell how
 8    are you doing?
 9         MS. TERRELL:  Fine.
10         MR. GODWIN:  Like to be someplace else?  Just
11    a couple questions, okay, did you hear my
12    discussions earlier about the law relating to
13    justifiable homicide?
14         MS. TERRELL:  Yes.
15         MR. GODWIN:  How do you feel about the basic
16    concept of justifiable homicide, justifiable use
17    of deadly force?
18         MS. TERRELL:  How do I feel about it?  I
19    understand it.
20         MR. GODWIN:  Could you speak up I'm a little
21    hard of hearing.
22         MS. TERRELL:  I understand.
23         MR. GODWIN:  Can you go along with the basic
24    principle of that?
25         MS. TERRELL:  Yes.
```

```
 1              MR. GODWIN:  If his honor tells you a person
 2      is justified in using deadly force if the person
 3      reasonably believes it's necessary to prevent
 4      imminent death or great bodily harm to himself or
 5      to somebody else a person can use deadly force?
 6              MS. TERRELL:  Yes.
 7              MR. GODWIN:  You can go along with that basic
 8      principle?
 9              MS. TERRELL:  Yes.
10              MR. GODWIN:  Ms. Allen, how did you feel
11      about that?
12              MS. ALLEN:  Yeah, same way.
13              MR. GODWIN:  You'd like to go home too,
14      wouldn't you?
15              MS. ALLEN:  Not really.
16              MR. GODWIN:  Mr. Roland, how do you feel
17      about that?
18              MR. ROLAND:  I understand the principle.
19              MR. GODWIN:  You understand the principle, do
20      you agree with that?
21              MR. ROLAND:  Yes, I do.
22              MR. GODWIN:  Any problem if his honor
23      instructs you on the basic law that you have to
24      follow?
25              MR. ROLAND:  No.
```

/

273

1          MR. GODWIN:  Ms. Allen, you go on the basic

2      idea of if there's a question of reasonable doubt,

3      there's no size requirement for reasonable doubt,

4      you understand that?

5          MS. ALLEN:  Yeah.  I want to refresh my

6      memory on the earlier definition, I want a

7      refresher of the definition of that but yes I

8      understand that.

9          MR. GODWIN:  His honor Judge Speiser will

10     tell me not to do it so I'm not going to do it.

11     He'll give you an instruction at some point what

12     reasonable doubt is, but my only question is you

13     understand there is no size requirement?

14         MS. ALLEN:  Yes.

15         MR. GODWIN:  On the question of who has the

16     burden of proof do I have to prove it was

17     justifiable homicide or just raise a reasonable

18     doubt?

19         MR. ROLAND:  You don't have to prove

20     anything.

21         MR. GODWIN:  If the question of justifiable

22     homicide leaves a reasonable doubt your verdict

23     would be?

24         MR. ROLAND:  Not guilty.

25         MR. GODWIN:  Mr. Belizaire where are you

274

```
 1      from, Puerto Rico?

 2              MR. BELIZAIRE:  Yeah.

 3              MR. GODWIN:  You understand us okay?

 4              MR. BELIZAIRE:  Yeah, I understand.  Can you

 5      go along with the basic principle of reasonable

 6      doubt?

 7              MR. BELIZAIRE:  Yes.

 8              MR. BELIZAIRE:  If his honor gives you an

 9      instruction on reasonable doubt would you follow

10      it?

11              MR. BELIZAIRE:  Follow it, yeah.

12              MR. GODWIN:  Okay.

13              THE COURT:  What was his answer, yeah?

14              MR. GODWIN:  He said he'd follow it, yes.

15              MR. GODWIN:  Are you understanding what we're

16      saying here?

17              MR. BELIZAIRE:  I understand some of it.

18              MR. GODWIN:  Some of it, how much would you

19      say you understand?

20              MR. BELIZAIRE:  You ask me some questions and

21      I understand.

22              MR. GODWIN:  I don't want to put you on the

23      spot but these are questions that we have to ask

24      you, do you understand that?

25              MR. BELIZAIRE:  Yeah.
```

```
 1              MR. GODWIN:  Tell us if you feel comfortable
 2     that you're understanding what's going on?
 3              MR. BELIZAIRE:  Yeah, I understand what's
 4     going on.
 5              MR. GODWIN:  Mr. Pasternak the question of
 6     justifiable homicide, do you go along with that
 7     basic principle of law?
 8              MR. PASTERNAK:  Yes.
 9              MR. GODWIN:  Any problem with that?
10              MR. PASTERNAK:  No.
11              MR. GODWIN:  Where is your add agency?
12              MR. PASTERNAK:  Plantation.
13              MR. GODWIN:  Are you a sole proprietor?
14              MR. PASTERNAK:  Yes.
15              MR. GODWIN:  Ms. Lupin, on the basic question
16     of justifiable use of deadly force, or justifiable
17     homicide you understood the questions that were
18     asked?
19              MR. LUPIN:  Yes.
20              MR. GODWIN:  How do you feel about it?
21              MS. LUPIN:  I agree with it.  I want to
22     protect myself if I have to.
23              MR. GODWIN:  Thank you all very much.
24              THE COURT:  Thank you.  Whenever you folks
25     are ready I'm waiting here.
```

```
 1              (Thereupon, the following proceedings were
 2       had at side bar outside the hearing of the
 3       jurors.)
 4              THE COURT:  With respect to our first five
 5       does either side have an objection to any one of
 6       the first five?
 7              MR. GODWIN:  No, Judge.
 8              MR. PATNER:  Bottom row, I mean you lost me
 9       there.  No I don't have an objection to the first
10       five we went through.
11              THE COURT:  How about juror number eight?
12              MR. GODWIN:  It's up to me?  Accept.
13              MR. PATNER:  Accept.
14              THE COURT:  Are those six acceptable to you?
15              MR. PATNER:  Accept.
16              THE COURT:  Okay.
17              MR. GODWIN:  Accept.
18              THE COURT:  That's acceptable to you, sir?
19              THE DEFENDANT:  (Defendant needs head in the
20       affirmative).
21              THE COURT:  All right, with respect to an
22       alternate you each have one challenge a piece.
23       How is number nine?
24              MR. PATNER:  Strike.
25              THE COURT:  He's striking number nine as an
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1        alternate.

2              MR. GODWIN:  Objection she is black lady and

3        there's no basis for striking her.

4              THE COURT:  First of all I'll note for the

5        record that our panel now consists -- I will note

6        for the record that the panel consists of three

7        blacks and three whites, and the State has no

8        objection to a black female so there are three

9        blacks and three whites.  I find that I don't even

10       need to ask the State for an explanation, I find

11       number one there is no systematic exclusion of

12       blacks.  Number two, assuming that is not the

13       requirement I find that there is a basis

14       independent of her race to strike her on the fact

15       that she's indicated, number one, that she is

16       testifying for a defendant in a criminal drug

17       case.  Number two, you know her reaction about the

18       conduct of the police in that case was less then

19       positive.  It would strike, you know, a worry for

20       the prosecutor.  So I find that the basis for

21       striking her is race neutral.

22             MR. GODWIN:  Please note my objection,

23       Judge.  She said the police were fair.  He asked

24       how the police acted in that case.

25             THE COURT:  Well, it's like one of these

```
1     things that you have to be here to see it.  When
2     she said they were fair her facial reaction was
3     certainly not consistent with that answer.  But in
4     any event I feel the fact that she is testifying
5     for a defendant in a criminal drug case would be
6     reasonable reason why the prosecutor would not
7     want her on the jury.
8            MR. GODWIN:  Please note my objection.
9            THE COURT:  Okay, how about the next
10    gentleman?
11           MR. GODWIN:  Acceptable.
12           MR. PATNER:  Yes.
13           THE COURT:  Okay.  He's acceptable as an
14    alternate to you, the third gentleman in the back
15    row?
16           THE DEFENDANT:  (The defendant nods head in
17    the affirmative).
18           THE COURT:  Yes.  Okay, thank you.
19           MR. PATNER:  Are we going to take a break?
20           THE COURT:  Five minute break before we have
21    openings.
22           (Thereupon, the following proceedings were
23    resumed in the presence of the jury.)
24           THE COURT:  Okay, ma'am, if you'll come down
25    and sit in seat number six.  And, sir, if you'll
```

```
 1    come down and sit in seat number seven.  And you
 2    other four folks in the back row, you are
 3    excused.  And you folks back there are excused.
 4    You don't need your cards, you don't need to go
 5    back down to the third floor, and you don't have
 6    to come back tomorrow.
 7         Okay.  If you all will stand up please and
 8    our illustrious clerk will swear you in.
 9         (Thereupon, the jury panel was duly sworn.)
10         THE COURT:  Okay.  All right, folks, at all
11    times you're in the courthouse you have to affix
12    your badge to a location on your outer garment so
13    that it can be clearly seen.  We are going to take
14    a five minute break at this time to let the
15    lawyers gather their thoughts and do what else
16    they have to do.  And then we'll come back and
17    we'll have opening statements then that will be it
18    for today.
19         Okay, thank you.
20         (Thereupon, the following proceedings were
21    had outside the hearing of the jurors.)
22         THE COURT:  You can come up folks.  I'm just
23    going to tell you folks in view of the hour it
24    took us a little longer to pick the jury then we
25    thought it would so I guess what I'm asking you is
```

```
 1          would you have a major maladjustment or heart
 2          attack if we have you testify tomorrow afternoon?
 3                  THE WITNESS:  Tomorrow is fine.
 4                  THE COURT:  Mr. Knutten?
 5                  THE WITNESS:  That will be fine.
 6                  THE COURT:  Do you have something else
 7          planed?
 8                  THE WITNESS:  I'll do the autopsy today.  Is
 9          it in the morning?
10                  THE COURT:  Just in the afternoon, 1:30.
11                  THE COURT:  How about you, ma'am?
12                  THE WITNESS:  Fine.
13                  THE COURT:  I know you've all been waiting
14          out there for a while but it just took a lot
15          longer to pick the jury then we thought it would.
16          You will probably be the second witness and we
17          probably wouldn't get to you today.  We're going
18          to give opening statements now and we probably
19          wouldn't get to you until about 6:00.  Can you be
20          here tomorrow at 1:30?
21                  THE WITNESS:  Yeah.
22                  THE COURT:  Okay.
23                  THE WITNESS:  Yeah.
24                  THE COURT:  Can I ask you nicely or do I have
25          to direct you?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

281

```
 1              THE WITNESS:  I'm fine.

 2              THE COURT:  Okay, you'll be here tomorrow at

 3         1:30?

 4              THE WITNESS:  1:30.

 5              THE COURT:  Okay, thank you.

 6              THE WITNESS:  Okay.

 7              THE COURT:  It's not his fault, not the

 8         lawyer's faults.

 9              MR. GODWIN:  Your Honor, may I ask a couple

10         questions before we start here?

11              THE COURT:  Yes, sir.

12              MR. GODWIN:  What time are we going to start

13         tomorrow?

14              THE COURT:  1:30 Wednesday, Thursday at

15         11:00.

16              MR. GODWIN:  I have - Judge Carney set a

17         competence hearing for me.

18              THE COURT:  For you?

19              MR. GODWIN:  Not for me for my client.  I

20         don't think I could pass one myself.  It's set on

21         Thursday at 11:00 and it's going to involve

22         witnesses.  I just wanted to let the Court know

23         that.

24              THE COURT:  Well, I will be happy to have you

25         instead.  I thought trials take priority?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1            MR. GODWIN:  I assume it does but I'm telling
 2    you because this was set some time ago.
 3            THE COURT:  You don't think there's a chance
 4    you'll be done Wednesday?
 5            MR. GODWIN:  We may very well be done.
 6            THE COURT:  Okay.  Well, if there is a
 7    problem I will call him up Wednesday afternoon and
 8    let him know where we stand, just remind me.
 9            Okay, let's bring in the jury.
10            THE BAILIFF:  Jury coming in.
11            (Thereupon, the following proceedings were
12    resumed in the presence of the jury.)
13            THE COURT:  Okay.  Everyone can be seated.
14    Now we're going to have opening statements and
15    after opening statements we'll recess until
16    tomorrow at 1:30.
17            Okay, Mr. Patner.
18            MR. PATNER:  Thank you, Your Honor.
19            MR. PATNER:  Ladies and gentlemen, again as
20    this Court indicated this is opening statements
21    and it's my opportunity to sort of just map out
22    what the State intends to prove to you over the
23    next day or couple of days of testimony.  I guess
24    to summarize it ladies and gentlemen what I'm
25    going to tell you is I'm going to prove to you two
```

1      things.

2          I'm going to prove to you that Jeremy

3      Lockhart, the man seated at the table behind me

4      next to his attorney, shot and killed Patrick

5      Brown.   And to shoot him he shot him four times

6      including twice in the back.   These aren't shots

7      on his arms or legs they are three right in the

8      middle of the torso, one is in the buttocks area.

9      In fact Patrick Brown the person he killed was a

10     target and Jeremy Lockhart hit the bulls eye.

11         The second thing I'm going to prove to you is

12     that there was no legal justification for the

13     murder of Patrick Brown.   And in this case it's

14     very important to listen closely at the end of the

15     case as to what the law is and what factually

16     happened in this case.

17         On June 25th, 1994 in the afternoon hours the

18     defendant Jeremy Lockhart had an apartment over on

19     Northwest 9th Street apartment number 3, in

20     particular 2217 Northwest 9th Street, Fort

21     Lauderdale address.   He was there playing cards

22     with some individuals Darren Walker, Patrick

23     Brown, the decedent person who was killed, and a

24     couple other individuals there.   Some of them were

25     not all there all the time.   They were playing

284

 1    cards and drinking beer and you'll hear about
 2    that, really no big deal.

 3        The defendant has a sister, April Reese.
 4    April Reese use to date, have a relationship with
 5    the victim in this case, Patrick Brown.  Patrick
 6    Brown at the time of his murder was currently
 7    dating April Williams.  Now it's a little
 8    confusing because there's going to be two women
 9    involved here both with the same first name of
10    April.  The victim was previously involved with
11    the sister of the defendant, April Reese.  He was
12    currently involved with April Williams, no
13    relation.  As the afternoon progresses the playing
14    cards and hanging out basically it developed
15    because of April Williams, the person involved
16    with Patrick Brown at the time of his death was
17    picking up her child at the apartment which was
18    over by where Mr. Brown was with Mr. Lockhart.

19        To make a long story short April Reese was
20    also present, and there is bad blood between the
21    two Aprils because of Patrick Brown.  It was bad
22    blood as to the fact that Patrick Brown was ending
23    the relationship with April Reese and was
24    continuing with April Williams, not that that was
25    really important but that's what led to the

285

1    animosity between those two.  And in fact it was
2    so bad that the sister of the defendant, April
3    Reese, got a beer bottle and April Williams got a
4    knife and they were arguing and they were going to
5    go at it.  And the defendant said hey not in here
6    get outside.  And he calmed down the two and in
7    fact asked April Williams, not his sister the
8    other April, give me the knife, okay, and she gave
9    him the knife.

10    But April Reese his sister was a little bit
11    angrier then April Williams was, and she had the
12    bottle and she didn't go after April Williams she
13    turned on Patrick Brown at this point who really
14    has not done anything, and she hits Patrick
15    Brown.  And when I say hit that would be a bit of
16    an under statement.  She whacks him over the
17    forehead with this beer bottle and you'll see the
18    result of - you will see the picture of it it's a
19    pretty good gash on his head.  And it opens,
20    splits by a fold probably the size of a half
21    dollar on the forehead.

22    Patrick Brown falls back on to the couch and
23    he's dazed.  You'll hear from Derrick Walker who
24    was present and says that he doesn't even know
25    where he is.  He's dazed and doesn't move and

JUSTICE REPORTING SERVICES, INC.    523-6114

1      doesn't respond immediately.  In fact, Derrick's
2      first thought was he was knocked unconscious, but
3      he wasn't.  April Williams - the other April
4      starts telling Patrick Brown hey are you going to
5      take that from her, she just whacked you over the
6      head with a bear bottle and split your head.  She
7      almost knocked you out and you'll just let her sit
8      there and let her do that to you.

9      At that point Patrick Brown does something
10     inexcusable.  He grabs the defendant's sister and
11     they fall to the floor and there is a tussle.
12     There is two things I want to say about this.
13     First of all, he shouldn't have hit a woman, but
14     you're not going to hear anybody come in here,
15     particularly a prosecutor, and tell you it's all
16     right for him to hit a woman but under the context
17     of what follows is what's important.  Because the
18     uncontradicted testimony is going to be that April
19     Reese was not injured.

20     You will hear from the parties there who will
21     say April Reese was not injured in fact at no
22     point did she have a bruise or a mark nor was she
23     bleeding, or did she seek any type of medical
24     attention.  Essentially they got Patrick Brown
25     with his head split open on the floor wrestling

JUSTICE REPORTING SERVICES, INC.      523-6114

1    maybe punches are being thrown and there may be
2    some confusion going one and they're falling on
3    the table and then on the floor.

4         The defendant does two things one entirely
5    reasonable and one is a completely unreasonable
6    overreaction for which he is charged with second
7    degree murder.

8         MR. GODWIN:   Objection to argument, Your
9    Honor.

10        THE COURT:   Overruled.

11        MR. PATNER:   The first thing he does is
12   perhaps what any brother would do, he pulls the
13   defendant - excuse me he pulls the victim Patrick
14   Brown off of his sister and throws him up against
15   the china cabinet, having no problem removing him
16   by the way.   He takes him and removes the threat
17   from his sister.   At that point April Reese is in
18   no danger of physical harm whatsoever, the fight
19   is over.   Except that wasn't enough because what I
20   haven't told you is that even though they were
21   hanging out, playing cards and there is no
22   problems for some reason, Jeremy Lockhart is of
23   the opinion that he wanted to have a gun on him,
24   and he did.   He had on him a loaded pistol.

25        And he became mad, not mad frankly for

1       hitting his sister, he becomes mad based upon his
2       own at the same time because then he thought the
3       victim was trying to take a swing at him.  And
4       just like there is a statement you don't take a
5       knife to fist fight, you don't take a gun to a
6       knife fight it's sort of the some street law.  You
7       certainly don't take a gun to a fist fight.  At
8       that point that's what he did he shot him four
9       times.  Most likely twice in the chest as the
10      victim was falling and turning and twice more in
11      the back.  I say most likely because we'll never
12      really know for sure the order of the bullets.
13      The medical examiner will be able to tell you the
14      direction of the bullets and he shot him four
15      times including twice in the back.

16          The defendant then doesn't call the police
17      and say look this is what I had to do.  He doesn't
18      say oh my god this is the last resort what he did,
19      and this is very important, he leaves.  He leaves
20      and he takes with him the murder weapon, the gun.
21      And you know what he does with that gun not
22      something where someone felt like he was acting in
23      accord with the law to preserve this piece of
24      evidence, rather someone who knows he did
25      something he shouldn't have done and he's going to

JUSTICE REPORTING SERVICES, INC.    523-6114

1    get rid of that piece of evidence and he throws it
2    in the lake.  At least that's what he tells the
3    police later because the gun is never recovered.

4        He removes his shirt either because it's got
5    blood spattered on it or perhaps he's trying to
6    change his appearance, and he throws that in the
7    dumpster and that's never found.  And ultimately
8    he takes off for Miami.

9        Well, he gets to Miami realizing that he was
10   witnessed doing this by, among other people, April
11   Williams, by his sister.  He's seen leaving the
12   apartment by at least three individuals walking
13   out with the gun.  He knows they seen him and he
14   knows the police are going to be looking for him
15   and they are because the police are at the scene
16   and they develope - they talk to the witnesses and
17   they develope a suspect.  There is what's known as
18   a bolo, "be on the lock out" for Jeremy Lockhart
19   for the crime of murder.

20       Knowing this two days later the defendant
21   then turns himself in.  And when he does so he
22   gives a statement.  He can't say he didn't do it
23   because he was caught by a number of people so
24   what he says was I had to do this.  And you are
25   going to hear the taped statement of the defendant

JUSTICE REPORTING SERVICES, INC.    523-6114

1      that was very interesting.  Ladies and gentlemen,

2      I want you to listen very closely for when he's -

3      when he's talking on this tape to the police

4      detectives when you hear the statements.  I want

5      you to listen for when he says why he actually

6      shot that gun, and what you're really going to

7      find out, you will hear he said that the he was

8      mad because the victim took a swing at him which

9      is no just cause anywhere for shooting someone.

10     It's somewhat of a challenging case, ladies

11    and gentlemen, and we believe if not factually - I

12    don't know if their will be a whole lot of dispute

13    about the facts in the case, I believe they are

14    going to be laid out pretty much as I told you.

15    However, it's going to be very important at the

16    end if you listen to what the judge tells you

17    about justifiable use of deadly force.  I am not

18    going to sit here and read the law to you because

19    it's not my job to do so right now.  The judge

20    will tell you at the end, and in closing argument

21    I will come up here and explain to you why the

22    defendant's actions were unjustified and why you

23    should return a verdict of murder in the second

24    degree, guilty as charged.  Thank you very much.

25      THE COURT:  Thank you.  Mr. Godwin.

1          MR. GODWIN:  I need a moment, Your Honor.
2     Good afternoon ladies and gentlemen as I told you
3     earlier the prosecution always gets to go first
4     and that puts the defense at the disadvantage.
5     You get to hear the prosecutions theory first and
6     sometimes people form impressions based on what
7     they first hear and they make up their minds.  I'm
8     going to ask you just to follow the law right now
9     to do what his honor Judge Speiser instructed you
10    to do.  Which is to look at Jeremy Lockhart right
11    now as he sits there and presume him innocent.
12    The facts are going to show you that that was a
13    tragic case but a case of justifiable homicide.
14    This was a case about a young man who tried to
15    prevent a fight.  Because he became the piece
16    maker he got caught up in the fight and tragically
17    he had to use force to stop the fight.  He did so
18    only as a last resort.  He did so only to protect
19    a member of his own family.

20          Now, I just put this little diagram up here
21    because it explains the triangle that was
22    involved.  Patrick Brown is the deceased in this
23    case.  He has a street name and they call him Bump
24    (sic) B-U-M-P.  Some of the witnesses refer to him
25    as Bump, Mr. Patrick Brown.

1           Mr. Brown had a girlfriend named April
2    Williams, and by whom he had a child.  By the way
3    Ms. Williams had a child and Mr. Brown also had a
4    girlfriend named April Reese.

5           April Reese is Jeremy Lockhart's sister.
6    There were some other witnesses there but they are
7    not main players in this.  So you understand that
8    April Reese is my client's sister.  Patrick Brown
9    had two girlfriends and on June 25th, 1994 over a
10   year ago Patrick Brown was at Jeremy Lockhart's
11   house.  And the evidence is going to show you that
12   Patrick Brown and my client Jeremy Lockhart were
13   best friends.  They were just, they were good
14   buddies, and Christopher Williams was over there
15   and Derrick Walker.  They were all friendly, they
16   were playing cards, they were drinking beer, and
17   they were smoking a little bit a pot.  And just
18   hanging out at Jeremy Lockhart's house.

19          April Williams came to the house and brought
20   her baby with her.  Remember Patrick is the father
21   of her baby.  April Williams brought her baby with
22   her and she wanted to go shopping or something so
23   she was going to leave the baby off with Patrick.
24   She asked Patrick to look after the baby and then
25   April Williams left.

```
 1              When April Williams came back to the house
 2         she finds that April Reese is there.  April Reese
 3         had recently been romantic with Patrick Brown and
 4         there was - the fact of the matter is that Patrick
 5         Brown had two girl friends at once.  So when April
 6         Williams returned to the house she saw that April
 7         Reese was in the bedroom, not that there was any
 8         sex going on but Patrick Brown and April Reese
 9         were in the bedroom together and April Williams
10         got angry and she grabbed a knife.  She grabbed a
11         knife.
12              Jeremy Lockhart, Jeremy took the knife away
13         from April Williams.  He said there is not going
14         to be any fighting in my house.  Jeremy tried to
15         be the peacemaker, he tried to stop the fight.  He
16         told April Reese, his sister, he told April
17         Williams you all get outside there is not going to
18         be any of that going on here in my house.
19              April Reese had picked up a beer bottle, she
20         picked up a beer bottle.  April Williams had the
21         knife and they were about to get into it with each
22         other.  Jeremy made them leave, he made them go
23         outside of his house and he locked the door so
24         that April Reese and April Williams were locked
25         outside.  Remaining inside were Patrick Brown,
```

1    Jeremy, and the other guys who were in their

2    playing cards.  Patrick for some reason, Patrick

3    maybe he enjoyed a little feud between the two

4    girls, Patrick unlocked the door.

5        Patrick Brown unlocked the door so that April

6    Reese and April Williams would come back inside.

7    April Reese came inside and she had a beer bottle

8    in which Jeremy had tried to take away from her.

9    He was not successful and she came inside and she

10   had the beer bottle and she smacked Patrick Brown

11   right in the head with the beer bottle.  No

12   question about it.  Just like it was said she hit

13   him right in the head, hit him very hard with the

14   beer bottle.

15       April Williams comes inside and her knife has

16   been taken away from her and she sees April Reese

17   smack Patrick Brown.  And April Williams says to

18   her boyfriend, April Williams says to Patrick are

19   you going to take that from her?  Are you going to

20   let her hit you like that?  When you and I get

21   into it you beat me up real good.

22       MR. PATNER:  Excuse me, Judge, there is no

23   evidence of that whatsoever.

24       MR. GODWIN:  That's exactly what the evidence

25   is going to be.

```
 1              THE COURT:  Exactly what the evidence is
 2        going to be?  I will sustain the objection.  What
 3        these lawyers says is not evidence.  I said that
 4        to you God knows how many times and I will say it
 5        to you again.  Nothing the lawyer says can be
 6        considered by you as evidence only what comes from
 7        the witness stand.
 8              MR. GODWIN:  There will be evidence that
 9        April Williams said to Patrick Brown --
10              MR. PATNER:  Excuse me.
11              THE COURT:  Yes, yes, I sustained the
12        objection.
13              MR. GODWIN:  This is what the evidence is
14        going to show.
15              THE COURT:  You already said what you
16        believed the evidence was going to be and I
17        ruled.  All right, lets proceed.
18              MR. GODWIN:  Then April Williams said are you
19        going to let her get away with that?  So Patrick
20        Brown, Patrick Brown grabbed April Reese and threw
21        try her to the ground, knocked her to the floor.
22        Then he got on top of her and started hitting
23        her.
24              Jeremy Lockhart is standing there, he watched
25        this whole thing.  He didn't interfere at that
```

1    point because he thought his sister had started
2    the fight as she had by hitting him with a beer
3    bottle.  But then Patrick Brown had April Reese on
4    the ground and he's hitting her.  Then he went to
5    far.  He started taking her head and smashing it
6    into the floor.  Jeremy realized he had to do
7    something to protect his sister, Jeremy knew his
8    sister was in danger.  He was afraid that Patrick
9    Brown was going to split his sister open again for
10   the second time.

11        Six weeks earlier, six weeks earlier Patrick
12   Brown and April Reese had a fight where Patrick
13   Brown took a baseball bat and smacked April Reese
14   right in the head with it.  Smacked her in the
15   head with the baseball bat and split her head
16   open.  She had to go to the hospital, she had to
17   have four staples put into her head.  Jeremy was
18   there when that happened, he saw it happened.  He
19   saw Patrick Brown split April Reese's head open.
20   He knew she had been hospitalized.

21        And so knowing about this previous attack,
22   and knowing that his sister is now on the floor
23   and Patrick is going to far he tried to pull
24   Patrick Brown off his sister.  And yes Jeremy had
25   a gun in his own house.  He had a gun and I'm not

1      here to defend that, but he's not on trial for
2      that.  He was in his own house, he had a gun, he
3      pulled Patrick Brown off of his sister and as he
4      pulled Patrick Brown up he turned him around and
5      Patrick Brown swung a punch at him.  But you'll
6      see that Patrick Brown didn't just swing a punch
7      at Jeremy he was also kicking.  Patrick Brown was
8      kicking at April Reese, kicking at her and kicking
9      her, ladies and gentlemen, between her legs.
10     Kicking her between her legs.  And when he did
11     that Patrick Brown was pulled off by Jeremy
12     Lockhart.
13            And Jeremy spun him around and fired.  Now,
14     the gun was an automatic, the gun was an automatic
15     and Jeremy told that to the police.  I shot,
16     pulled the trigger one time and four shots went
17     off.
18            You'll hear from the medical examiner I think
19     that a shot like this, and this is when he spun
20     and shot hit him.  I think one in the buttocks and
21     another a little lower.  There were four shots and
22     they happened very quickly.  Jeremy shot and
23     killed his best friend.  It's sad, it's tragic and
24     no one is happy about it but that's what
25     happened.  He did it to protect his sister.  To

1    protect his sister who's being assaulted.

2    And then in a panic, he is a kid - he is a

3    young kid in a panic, and he did something stupid,

4    he ran away.  He walked out of the apartment and

5    took the gun with him and he went to visit - he

6    went to Miami to tell his grandparents who raised

7    him what had happened because he was scared.  And

8    he stayed at his grandparents for about a day

9    and-a-half and then he came back to Fort

10   Lauderdale and picked up his wife and went down to

11   the police station and turned himself in to the

12   police.

13   And Jeremy told the police what had

14   happened.  He told them why he did it.  And the

15   police because they already had their minds made

16   up, weren't going to listen and they tried to

17   twisted around what he said.  Jeremy told them

18   that he shot, he was trying to protect his

19   sister.  He told them he had thrown the gun away.

20   He took them out to the lake where he had thrown

21   the gun, and shown them where he had thrown the

22   gun.  The police decided for some reason never to

23   try and get the gun.

24   There is going to be an issue whether it was

25   an automatic or whether he pulled the trigger four

1    times.  But you'll see he pulled the trigger one
2    time and four shots went off.  The evidence is
3    going to show that Jeremy Lockhart did not want to
4    use force.  He tried to take the fight outside.
5    He tried to lock the people out of his house from
6    fighting.  He tried to stop the fight, he tried to
7    keep peace.  And he acted only to protect his
8    sister from further injury.

9         The law does not require him to wait until
10   Patrick Brown splits her head open again.  The law
11   doesn't say that.  The law says if it's reasonable
12   to use force, deadly force protect someone from
13   imminent harm then you can do so under the
14   circumstances.

15        Jeremy shot in self-defense and he killed his
16   best friend.  He did not commit any crime.  He had
17   no malice in his heart, no hate, no ill will, no
18   spite; he did it to protect someone that he
19   loved.

20        And when this case is over and when you have
21   heard all the evidence and when the law has been
22   explained to you about justifiable use of deadly
23   force and about reasonable doubt you will be
24   confident in your verdict of not guilty.  Thank
25   you.

300

1          THE COURT:  Thank you.  Folks, we'll see you

2     tomorrow at 1:30 sharp.  Please be at the location

3     at the time the court deputy advises you.

4          (Thereupon, the proceedings were concluded

5     for the day.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

301

```
1                    C E R T I F I C A T E

2                        -  -  -  -  -

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5         I, MICHELLE MEEKER, Shorthand Reporter, Notary
     Public, do hereby certify that I was authorized to and
6    did stenographically report the foregoing proceedings
     and that the transcript is a true and correct
7    transcription of my stenotype notes of the proceedings.

8         Dated this  10th day of  Ju      , 1995.

9                    Milell Meeker

10                   MICHELLE MEEKER
                     Shorthand Reporter
11

12
     STATE OF FLORIDA
13
     COUNTY OF BROWARD
14
          The foregoing certificate was acknowledged
15   before me this     day of   Ju       , 1995, by
     MICHELLE MEEKER who is personally known to me.
16

17

18                   Notary Public-State of Florida
                     My Commission No.
19                   Expires:

20

21

22

23

24

25
```

/

302

```
 1    State of Florida      )
                            ):ss          Mark A. Speiser
 2    County of Broward     )

 3
                       IN THE CIRCUIT COURT OF THE
 4                     SEVENTEENTH JUDICIAL CIRCUIT,
                      IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6    STATE OF FLORIDA,

 7           Plaintiff,

 8    -vs-                               Case No. 94-10764 CF10A

 9    JEREMY LOCKHART,

10           Defendant.

11    _____/

12

13           Proceedings had and taken before the Honorable

14    Mark A. Speiser, one of the Judges of said Court, fifth

15    floor, Room 5900 Broward County Courthouse, Fort

16    Lauderdale, Broward County, Florida, on the 15th day of

17    August, 1995, commencing at or about the hour of 1:00

18    o'clock p.m., and being a jury trial.

19

20    APPEARANCES:

21                  JOSEPH PATNER, Esquire,
                    Assistant State Attorney,
22                  Appearing on behalf of the Plaintiff.

23                  ROBERT GODWIN, Esquire,
                    Appearing on behalf of the defendant
24

25                  THE COURT:
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1              (Thereupon, the following proceedings were
 2         had outside the presence of the jury.)
 3              THE COURT:   Okay, bring in the jury.
 4              MR. GODWIN:   Before April Williams testifies
 5         I have a motion in limine I just want to bring up
 6         before she testifies.
 7              MR. PATNER:   As to what?
 8              THE COURT:   Let's bring in the jury.  Is she
 9         your second or third witness?
10              MR. PATNER:   I'd like some idea, since she is
11         in my case, as to what the motion is.  I mean, we
12         don't have to argue it now just some idea what it
13         is.
14              MR. GODWIN:   Motion in limine is that she is
15         not to mention that --
16              THE COURT:   Same motion in limine I had
17         previously.  The motion in limine that I granted
18         previously which is that April Williams not
19         mention that Jeremy Lockhart met Mr. Brown in
20         jail.
21              MR. PATNER:   Fine.
22              THE COURT:   Granted.
23              (Thereupon, the following proceedings were
24         had in the presence of the jury.)
25              THE COURT:   Good afternoon everybody,
```

304

```
 1          everyone doing okay?  I'd ask you to call your
 2          first witness.
 3                 MR. PATNER:  Good afternoon, the State will
 4          call Officer Hospodavis.
 5     Thereupon,
 6                         JOHN HOSPODAVIS,
 7     having been first duly sworn, was examined and
 8     testified as follows.
 9                 THE CLERK:  State your full name and spell
10          your last name for the record.
11                 THE WITNESS:  John Hospodavis,
12          H-O-S-P-O-D-A-V-I-S.
13                 MR. PATNER:  May I proceed, Judge?
14                 THE COURT:  Yes, sir.
15                      DIRECT EXAMINATION
16     BY MR. PATNER:
17          Q.   Sir, obviously you're a police officer?
18          A.   Yes, sir.
19          Q.   Which department?
20          A.   City of Fort Lauderdale.
21          Q.   Mr. Hospodavis, how long have you been
22     involved in law enforcement?
23          A.   About thirteen years.
24          Q.   How long have you been with Fort Lauderdale?
25          A.   Five years this October.
```

305

```
 1        Q.    And prior to Fort Lauderdale Police
 2   Department what was your involvement in law
 3   enforcement?
 4        A.    U.S. Air force police for eight years.
 5        Q.    What duty are you currently assigned, sir?
 6        A.    Road patrol duty, uniform road patrol.
 7        Q.    I'd like to turn your attention back to June
 8   25th, 1994 at approximately four in the afternoon on
 9   Saturday.  Were you working that day, sir?
10        A.    Yes, I was.
11        Q.    Were you working on duty as a patrol officer?
12        A.    Yes, sir.
13        Q.    Did you have occasion to respond to 2217
14   Northwest 9th Street in North Lauderdale?
15        A.    Yes.
16        Q.    Was that in Broward County?
17        A.    Yes.
18        Q.    More particular did you respond to apartment
19   number three?
20        A.    Yes.
21        Q.    Were you called to that address?
22        A.    I had just left the police station, I was
23   coming on duty at four o'clock and we were dispatched
24   to a shooting.
25        Q.    What type of residence is this that you
```

JUSTICE REPORTING SERVICES, INC.    523-6114

306

1    responded to?

2        A.    It's a two story apartment building.

3        Q.    Okay.  And apartment number three is that on

4    the first floor or second floor?

5        A.    On the ground floor.

6        Q.    When you arrived at that residence was the

7    front door opened or closed?

8        A.    It was opened.

9        Q.    Did you go inside?

10       A.    Yes.

11       Q.    What did you find upon entering the

12   apartment?  Give us a brief overlay of what the

13   apartment looks like?

14       A.    It has two bedrooms, a bathroom, and a living

15   room.  When you come into the front door you enter the

16   living room.  If you look immediately to the right

17   through the living room you see the kitchen area.  And

18   directly to an angle of the front door is the two

19   bedrooms and bathroom.  Just as I walked in the front

20   door and I turned to the right and looked towards the

21   kitchen area I saw a black male laying face down half

22   in the living room and half in the kitchen.

23       Q.    Since you were responding to a shooting what

24   sort of things were you looking for?  Did you have a

25   heightened sense of caution because you were responding

1    to a shooting?

2         A.   Yes, I did.

3         Q.   Were you looking for anything in particular
4    upon entering?

5         A.   First thing we look for when we go to a
6    shooting call is anybody with a gun that is a threat to
7    us or a threat to other people.  We try to locate that
8    person immediately.  If that person is not immediately
9    identifiable or locatable we are still looking but now
10   since we can't openly see a culprit we are looking for
11   a victim, somebody who needs our help.

12        Q.   Upon responding to the apartment did you see
13   anyone there with a weapon?

14        A.   No.

15        Q.   As you looked towards the kitchen area can
16   you describe what you saw there, sir?

17        A.   Looking in towards the kitchen area on the
18   floor I saw a black male laying face down.  He had a
19   lot of blood on his face and on the back of his head.
20   There was some blood laying on the ground right in
21   front of him.

22        Q.   Can you tell whether this person was
23   conscious or not?

24        A.   As soon as I saw him I rushed to where he was
25   at directly.  I went over to where he was at and I

/

1    kneeled down on one knee and I yelled to him, I said

2    "I'm the police, I'm the police".  I said, "can you

3    hear me?"  At that point his eyes were opened and he

4    looked at me.  His eyes were moving, he tried to move

5    his lips a little bit and he moved for about three or

6    four seconds then he just closed his eyes at that

7    point.

8    Q.   Unable to speak?

9    A.   He couldn't speak or say anything but I could

10   tell he was trying to say something.

11   Q.   This was somebody obviously in critical,

12   medical condition?

13   A.   Very critical, yes.

14   Q.   Upon contacting him what did you do as far as

15   any emergency paramedic response?

16   A.   When we are dispatched to a shooting EMS and

17   fire are dispatched right along with us.  We get there

18   first and I knelt and saw that he was in critical

19   condition so I radioed to keep EMS coming code three.

20   Q.   What does code three mean?

21   A.   Lights and sirens, get there immediately.

22   Q.   How shortly after that did EMS arrive?

23   A.   Two minutes after I got there.

24   Q.   Paramedics?

25   A.   Yes.

1          Q.    Did they then immediately respond to treat

2     the victim?

3               MR. GODWIN:   Your Honor, object to the term

4          victim and move to strike that.

5               THE COURT:   The alleged victim.

6               MR. GODWIN:   Mr. Brown.

7               THE COURT:   Sustained.

8     BY MR. PATNER:

9          Q.    The individual laying there dying.

10              THE COURT:   The alleged victim or by name.

11    BY MR. PATNER:

12         Q.    Was the individual you described laying there

13    bleeding barely conscious -- did they respond to treat

14    him?

15         A.    Yes, they did.

16         Q.    And where did they - did they treat him there

17    or did they subsequently transport him?

18         A.    They did an initial treatment, whatever they

19    would do I don't know specifically what they were doing

20    when they got there.   They performed first aid on him

21    and they put him on the stretcher and they took him out

22    the back kitchen door and he was gone.

23         Q.    Do you know where he went?

24         A.    Broward Medical Center.

25              MR. PATNER:   Your Honor, let the record

JUSTICE REPORTING SERVICES, INC.     523-6114

310

```
 1        reflect I'm showing defense counsel what's been
 2        previously marked as State's Exhibit A for
 3        identification.   May I approach the witness, Your
 4        Honor?
 5             MR. GODWIN:   No objection, Your Honor, to it
 6        being admitted.
 7             THE COURT:   Do you want to mark it in?
 8             MR. PATNER:   Move it in evidence at this
 9        point.
10             THE COURT:   State Exhibit number one.
11             (Thereupon, State's Exhibit 1 was received in
12        evidence.)
13             MR. PATNER:   May I have the witness step
14        down, Your Honor.   Sir, would you step down.
15   BY MR. PATNER:
16        Q.   These photos are obviously in evidence and
17   will go back to the jury room and the jurors can look
18   at them.   Again do you recognize what's depicted in
19   photograph number A, State's Exhibit A?
20        A.   Yes, I do.
21        Q.   What's depicted in that photograph?
22        A.   The apartment I responded to on that day.
23        Q.   Where would the kitchen be in that picture?
24        A.   This is the kitchen back in the corner, this
25   little doorway leads from the living room into the
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1    kitchen.

2        Q.    Where was the body - obviously the body was

3    removed by?

4            MR. GODWIN:    Objection to the comment by the

5            prosecutor, Your Honor.

6            THE COURT:    Sustained.

7    BY MR. PATNER:

8        Q.    Was the body moved by the time the pictures

9    were taken?

10        A.    Yes.

11        Q.    And where was the body located?

12        A.    Right on the floor.    Right about here, here

13    on the floor that goes between the kitchen and the

14    living room right there (indicating).

15        Q.    And do you recognize what's depicted in

16    photograph B?

17        A.    Same apartment different view.

18        Q.    Is this - which direction is this picture

19    taken from?

20        A.    This is looking back towards the front door,

21    this is the front door.

22        Q.    Is this from the kitchen?

23        A.    Yes, from the little opening doorway leading

24    from the kitchen back to the living room.

25        Q.    You can have your seat.    Were you able to

1  take any, were there any other parties in the area, any

2  other people in the area?

3      A.  In the area there was probably about - when

4  we got there there was probably about twenty,

5  twenty-five people gathering around the apartment.  It

6  grew to about fifty or seventy-five people within a

7  matter of five minutes.

8      Q.  Is that unusual?

9      A.  No.

10      Q.  Once the victim, once the alleged -- I

11  apologize.  Once the alleged victim was taken from the

12  scene how did your duties change and what did you

13  attempt to accomplish there?

14      A.  As soon as the victim left the scene --

15          MR. GODWIN:  Your Honor, I have to make an

16      objection.  The gentleman is the alleged victim or

17      Mr. Brown.  There's no showing he's the victim.

18          THE COURT:  Okay until the jury returns a

19      verdict we'll not know that so I will sustain the

20      objection.

21  BY MR. PATNER:

22      Q.  If you refer to him either as the alleged

23  victim or Mr. Brown please.

24      A.  When Mr. Brown was taken from the apartment

25  and EMS, Emergency Medical Technicians, had taken him

1    to the hospital our duty now turns to securing the

2    scene, preserving evidence to try and locate the person

3    who did this.

4         Q.    Did you secure the scene?

5         A.    Yes.

6         Q.    What does that mean?

7         A.    What that means is we completely don't let

8    anybody inside the scene whether you live there or you

9    don't live there.  We normally – we posted a police

10   officer at the front door, the back door was closed and

11   again there is crime scene tape strung around the

12   apartment or any other approach to keep a nice distance

13   around the affected area so we could preserve evidence.

14        Q.    Were you able to make contact with any

15   witnesses to the incident, or alleged witnesses to the

16   incident?

17        A.    Yes, I was.

18        Q.    And based upon your discussions with them

19   were you able to develop a suspect?

20        A.    Yes.

21             MR. GODWIN:  Your Honor, I don't object to

22        him asking who he interviewed but that's an

23        improper question the way he asked it.  I object.

24             THE COURT:  The way he interviewed --

25             MR. PATNER:  That's not what I asked.  I

1    asked if he developed a suspect.

2         MR. GODWIN:   That question is improper.

3         THE COURT:   As to whether or not he developed

4    a suspect by interviewing people?

5         MR. GODWIN:   Yes.  May we come side bar for a

6    second?

7         THE COURT:   Okay.

8         (Thereupon, the following proceedings were

9    had at side bar outside the hearing of the

10    jurors.)

11         MR. GODWIN:   Judge, I have no objection to

12    him asking if he interviewed people, and who he

13    interviewed.  But by saying based on their

14    interviews did they developed a suspect, that's

15    back door hearsay.  Postal (phonetic) versus State

16    I think Your Honor is well aware of that situation

17    and I'm just asking you if you want to say he

18    interviewed people he interviewed, fine.  But to

19    say did you develop a suspect that's back door

20    hearsay.

21         MR. PATNER:   Well, since hearsay is first the

22    --

23         THE COURT:   Objection overruled.

24         (Thereupon, the following proceedings were

25    resumed in the presence of the jury.)

```
 1                THE COURT:  Objection overruled.
 2     BY MR. PATNER:
 3          Q.   Did you develope a suspect?
 4          A.   Yes.
 5          Q.   Was an individual known to you as Jeremy
 6     Lockhart present at the scene?
 7          A.   No.
 8          Q.   Did you subsequently put out what's known as
 9     a bolo or "be on the look out" for Jeremy Lockhart?
10          A.   Yes, I did.
11          Q.   And that was as a result of speaking with
12     individuals at the scene?
13          A.   Yes.
14          Q.   What is be on the look out, what is a bolo?
15          A.   A bolo is when you respond to a crime and
16     there's anything that requires the attention of other
17     police officers in the immediate area, the city, the
18     state, the country.  What we do is you can call into
19     the dispatcher or one of the phone operators, we call a
20     bolo, be on the look out and that basically gives a
21     very detailed description of the person's height,
22     weight, build, clothes, scars or other identifying
23     marks.  A vehicle, a piece of property, and an operator
24     puts it into the computer.  And any police officer that
25     comes in contact with a person fitting that description
```

316

1    a little flag goes up and will say this is the person

2    we are looking for and why we are looking for them.

3        Q.    He was not present at the scene?

4        A.    No, he wasn't.

5        Q.    Did you have contact with an individual who

6    identified herself as April Reese?

7        A.    Yes.

8        Q.    And was she the sister of the defendant?

9        A.    Yes.

10       Q.    And in speaking with her and having contact

11   with her did you notice whether or not she was injured

12   in any fashion?

13       A.    No physical injuries that I could see,

14   blatant injury that I could see; or open wounds, no.

15       Q.    Did she appear to be bleeding?

16       A.    She did not appear to be bleeding.

17       Q.    Did you see any bruises on her?

18       A.    No bruises that I could see.

19       Q.    Was she seeking medical treatment?

20       A.    No.

21       Q.    Was she complaining of any injuries?

22       A.    No.

23       Q.    Given the nature of the crime or the incident

24   that you had observed did you contact your superiors?

25       A.    Yes.

JUSTICE REPORTING SERVICES, INC.      523-6114

1      Q.    Is that standard procedure?

2      A.    Yes, that's policy.

3      Q.    What is that?

4      A.    We have to have a supervisor on scene to make

5    more important decisions, or he has the authority to

6    order things to happen that I don't have.  You also

7    have an on call detective that is trained, trained in

8    investigative techniques and interviewing suspects and

9    witnesses, to come to the scene immediately while

10   everything is fresh in everybody's mind.

11     Q.    A homicide detective was called?

12     A.    A general duty detective is called.

13     Q.    Were you ultimately contacted as to the - did

14   Broward contact you that afternoon as to what had

15   happened with the victim, with the alleged victim?

16     A.    We have a detail office who works at Broward

17   Emergency Room and he contacted the dispatch and told

18   them that Mr. Brown had passed away.

19     Q.    What time was that?

20     A.    Exactly 1738, that's 5:38 hours p.m.

21     Q.    That would be approximately an

22   hour-and-a-half after you originally responded?

23     A.    Roughly, yes.

24     Q.    Did you take any further actions then at the

25   scene, sir?

                            ╱

              JUSTICE REPORTING SERVICES, INC.    523-6114

1          A.    The scene was still secured, we contacted

2    forensic division experts to collect the physical

3    evidence, diagramming, photographing the scene.

4          Q.    And did in fact a crime scene technician come

5    to the scene?

6          A.    Yes, he did.

7          Q.    Who was that?

8          A.    I don't recall his name off the top of my

9    head.

10         Q.    But his purpose there was to collect

11   evidence?

12         A.    Yes.

13         Q.    Did you have any further contact there at the

14   scene, sir?

15         A.    Any further contact?

16         Q.    Any further involvement at the scene?

17         A.    I stayed there until the forensic detective

18   was finished collecting his evidence and he locked the

19   apartment with a - what we call a door knob lock it's

20   just a medal lock that goes over top the door knob so

21   no one can get in.  And it's still preserved the way it

22   was when I left there.

23              MR. PATNER:  Thank you, I have no further

24        questions.

25              THE COURT:  Your witness.

/

JUSTICE REPORTING SERVICES, INC.      523-6114

```
 1              MR. GODWIN:  Just a couple questions,
 2        officer.
 3                    CROSS EXAMINATION
 4   BY MR. GODWIN:
 5        Q.   Did you notice a knife there at the scene?
 6        A.   Anywhere at the scene?
 7        Q.   Yes.
 8        A.   Nothing stood out in my mind, but in the
 9   kitchen there were utensils around the sink.
10        Q.   Did you notice a knife when you came in by
11   the front door?
12        A.   No.
13        Q.   And just a couple other things.  Obviously
14   you didn't see what happened?
15        A.   No, I didn't.
16        Q.   You don't have any personal knowledge whether
17   this shooting was justified or not, do you?
18        A.   I have no idea.
19              MR. GODWIN:  That's all I have.
20              THE COURT:  Redirect?
21              MR. PATNER:  No, sir.
22              THE COURT:  Thank you, you are excused, sir.
23        Thank you.  Next witness.
24              MR. PATNER:  State calls Cheryl Grant.
25   Thereupon,
```

```
 1                         CHERYL GRANT,

 2      having been first duly sworn, was examined and

 3      testified as follows.

 4             THE CLERK:  State your full name and spell

 5          your last name for the record please.

 6             THE WITNESS:  Cheryl Grant, G-R-A-N-T.

 7             THE CLERK:  Have a seat.

 8                     DIRECT EXAMINATION

 9      BY MR. PATNER:

10          Q.   Good afternoon Ms. Grant.

11          A.   Hi.

12          Q.   It's important you speak, you're voice is

13      kind of quiet, so everyone can hear you, okay?

14          A.   Okay.

15          Q.   Where do you live, ma'am?

16          A.   2215 Northwest 9th Street, building five

17      apartment one.

18          Q.   Apartment one?

19             THE COURT:  You're going to have to -- they

20          can't hear her speak up a little bit.  You'll have

21          to push your chair up closer that's a microphone

22          right there.  All right.

23      BY MR. PATNER:

24          Q.   Where do you live in relation to apartment

25      number three, ma'am?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

321

```
 1        A.    Right across the hall.

 2        Q.    Across the hall?

 3        A.    Uh-huh (affirmative response.)

 4        Q.    I'd like to take your attention back to June

 5   25th, 1994 that Saturday, were you living across the

 6   hall from apartment three on that date?

 7        A.    Yes.

 8        Q.    Does that date stick in your mind for a

 9   couple of reasons?

10        A.    Yes.

11        Q.    And what's the first one?

12        A.    It's my birthday.

13        Q.    Were you home at approximately four p.m., on

14   that date?

15        A.    Yes.

16        Q.    What were you doing, were you inside?

17        A.    Yes.

18        Q.    What were you doing inside?

19        A.    Um, in my bedroom.

20        Q.    Did you hear anything that caught your

21   attention?

22        A.    Gun shots.

23        Q.    Gun shots you said?

24        A.    Yes.

25        Q.    About how many?
```

322

```
 1        A.    About five.

 2        Q.    Did this cause you some concern or alarm you?

 3        A.    Yes.

 4        Q.    What did you do upon hearing the five gun

 5   shots?

 6        A.    Ran to the door.

 7        Q.    Can you tell them what the gun shots -- did

 8   they appear to be rapid fire?  Was there a delay

 9   between them?  Could you give us any sort of idea as to

10   how those shots progressed?  Did they all appear to be

11   one gun same, type the of sound?

12        A.    Yes.

13        Q.    How much time elapsed between the shots?  Do

14   you have any idea?

15        A.    I can't remember.

16        Q.    Was it fairly steady or was it erratic?

17        A.    It was steady.

18        Q.    Upon hearing the gun shots what did you do?

19        A.    Ran to the front door.

20        Q.    And what did you first see when you looked

21   out of the door?

22        A.    Some kids.

23        Q.    What were the kids doing there?

24        A.    Standing in the front door of apartment

25   three.
```

```
 1        Q.    Did you see - did you see anyone leaving the
 2   area?
 3        A.    Later on.
 4        Q.    Pardon me?
 5        A.    Yes.
 6        Q.    And did you see - who did you see leaving the
 7   area?  Was it a man or a woman?
 8        A.    A man.
 9        Q.    Was he carrying anything?
10        A.    Yes.
11        Q.    What was he carrying?
12        A.    A gun.
13        Q.    Do you know the difference between say a
14   handgun as opposed to a rifle?
15        A.    Yes.
16        Q.    What was it, what type of gun was he
17   carrying?
18        A.    A handgun.
19        Q.    Did you hear him say anything?
20        A.    Yes.
21        Q.    What did you hear him say?
22        A.    He was saying that he was tired of him
23   messing with him.
24        Q.    Can you speak up and repeat that please.
25        A.    That he was tired of him messing with him,
```

324

```
 1    something like that.
 2         Q.   Did he say anything else?
 3         A.   Um, said that he was going to get him or
 4    something of that sort.
 5         Q.   He was tired of him messing with him, he was
 6    going to get him?
 7         A.   Uh-huh (affirmative response), something like
 8    that.
 9         Q.   Did you see - did he then leave the area?
10         A.   Yes.
11         Q.   No further questions, thank you, ma'am
12              MR. GODWIN:  Just a couple things.
13                        CROSS EXAMINATION
14    BY MR. GODWIN:
15         Q.   Ms. Grant, the person you saw walking out
16    with the handgun, he was mumbling, right?
17         A.   Yes.
18         Q.   You really couldn't hear him very well, could
19    you?
20         A.   The first party I heard.
21         Q.   Where he said I'm tired of them messing with
22    me?
23         A.   I'm tired of him.
24         Q.   That's all you could hear, right?
25         A.   He said he was tired of messing with him, he
```

                              ′

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1    was going to get him.  Then the rest he was mumbling.

 2         Q.    Then you heard, you heard him mumbling that,

 3    right?

 4         A.    Yes.

 5         Q.    You didn't see the shooting of course?

 6         A.    No.

 7         Q.    You don't know what caused it?

 8         A.    No.

 9               MR. GODWIN:   Thank you very much.

10               THE COURT:   Redirect.

11               MR. PATNER:   Just briefly.

12                    RE-DIRECT EXAMINATION

13    BY MR. PATNER:

14         Q.    You told, you told the police what he said

15    and you gave them a statement as to that, didn't you?

16               MR. GODWIN:   Objection, Your Honor, that's

17         irrelevant.

18               MR. PATNER:   Not --

19               THE COURT:   As to whether - say that again

20         that you heard.

21    BY MR. PATNER:

22         Q.    You told the police that you had heard him

23    make those statements, did you not?

24         A.    Yeah.

25               MR. GODWIN:   Objection.
```

326

1          THE COURT:  Yes, I will sustain the

2     objection.

3          MR. PATNER:  I have nothing further, thank

4     you, ma'am, you're excused.

5          MR. PATNER:  State calls Darren Walker.

6          THE BAILIFF:  Remain standing put your left

7     hand on the bible and face the clerk.

8  Thereupon,

9                    DARREN WALKER,

10 having been first duly sworn, was examined and

11 testified as follows.

12          THE CLERK:  State your full name spell and

13     the your last name for the record.

14          THE WITNESS:  Darren Walker, W-A-L-K-E-R.

15          THE CLERK:  Have a seat.

16                DIRECT EXAMINATION

17 BY MR. PATNER:

18     Q.   Good afternoon, Mr. Walker.

19     A.   How are you doing.

20     Q.   It's important that you speak up so everyone

21 can hear you, okay.

22     A.   Okay.

23     Q.   Sir, how old are you?

24     A.   Twenty-one years old.

25     Q.   Where do you currently live?

                        ,

      JUSTICE REPORTING SERVICES, INC.     523-6114

1       A.    Broward County, Lauderhill.

2       Q.    Had you previously lived over on 9th Street,

3    2217 Northwest 9th Street in that complex?

4       A.    I lived with my brother I didn't really live

5    there but, you know, I stayed there off and on.

6       Q.    Okay, what do you do for a living, sir?

7       A.    I work at Structure we build parts for little

8    kids and everything.

9       Q.    How long have you been doing that?

10      A.    For nine months then I stopped then I started

11   working.  Now I've been working for about eight months.

12      Q.    I'd like to take your attention back to June

13   25th, 1994 Saturday afternoon.  Were you staying over

14   at your brother's over on 9th Street on that day?

15      A.    In the apartment, yes, I was staying there

16   then.

17      Q.    You were actually living there at the time?

18      A.    Yes.

19      Q.    Was your brother living there too?

20      A.    Yes.

21      Q.    What apartment were you staying in at the

22   time?

23      A.    I think it was apartment A.

24      Q.    Had you had occasion to meet the people who

25   were staying over in apartment three?

328

```
 1        A.    When I first moved over - when I, the first

 2    day I moved over my brother was friends with the guys

 3    that stayed in apartment three, and I never met him

 4    before and we played cards the first day I moved there

 5    outside.

 6        Q.    Was that Jeremy Lockhart?

 7        A.    Yes, that was Jeremy Lockhart.

 8        Q.    And is Mr. Lockhart in the courtroom today?

 9        A.    Yes, Mr. Lockhart is.

10        Q.    Can you please point to him and tell me what

11    he is wearing.

12              MR. GODWIN:  We'll stipulate this is Mr.

13        Lockhart, Your Honor

14              THE COURT:  So noted.

15    BY MR. PATNER:

16        Q.    So you met him one time, you played cards

17    with him outside?

18        A.    Yes.

19        Q.    Was that prior to June 25th?

20        A.    Yeah, that was the bay before June 25th.

21        Q.    Do you consider yourself friends with Mr.

22    Lockhart?

23        A.    No I can't say that we was friends.

24        Q.    Acquaintances?

25        A.    Well acquaintance, not really even
```

329

1    acquaintance, you know, the first time I moved in was

2    the first time I met him.  And the second time that we

3    was playing cards was the second time we really

4    associated.

5        Q.   On June 25th, 1994 in the afternoon were you

6    over at Mr. Lockhart's apartment?

7        A.   Yes, I was.

8        Q.   What time did you first go over there?

9        A.   I can't point out exactly what time I went

10   over there it was in the day time, the sun, you know,

11   the sun was out.

12       Q.   What were you doing over there?

13       A.   Before we went in, you know, we saw, you

14   know, see each other hanging out in the complex and we

15   decided to play some cards.

16       Q.   And where were you playing cards at?

17       A.   We was playing inside Mr. Lockhart's house.

18       Q.   In the apartment?

19       A.   Yes.

20       Q.   Were you playing on a table in the apartment?

21       A.   Yes, we was playing on the table in the

22   apartment.

23           MR. PATNER:  May I approach the witness, Your

24       Honor.

25           THE COURT:  Yes.

JUSTICE REPORTING SERVICES, INC.    523-6114

330

1    BY MR. PATNER:

2        Q.    Showing you what's already in evidence as

3    State's Exhibit A, is this the table?

4              THE COURT:    State's Exhibit 1.

5              MR. PATNER:    Sorry.

6    BY MR. PATNER:

7        Q.    Number one is that the table, sir?

8        A.    Yes, that's the table.

9        Q.    How long were you playing cards, any idea?

10       A.    We played one game of spades, you know, I

11   can't even tell you exactly how long we was playing.

12   And we was on our second game around, our second game I

13   believe we was starting our second game.

14       Q.    Did you all do any drinking?

15       A.    Yes, we was drinking.

16       Q.    Heavily?

17       A.    Not really heavily I can't really recall

18   about heavily because I am, you know, certain people

19   drink a lot and certain people drink slowly.  So we was

20   drinking.  We had about two six packs at that time.

21   About three six packs at that time.

22       Q.    Each or two for the group?

23       A.    For the group.

24       Q.    How may people were there?

25       A.    Four people.

1      Q.    Was an individual you later found out to be

2    Patrick Brown, was he present?

3      A.    Yes, he was.

4      Q.    Was anybody what you would consider to be

5    drunk?

6      A.    I really couldn't tell for myself.  I for

7    myself I wasn't really drunk so I really couldn't

8    tell.

9      Q.    Okay, did there come a time when some other

10   people came to the apartment?

11     A.    Two young ladies.

12     Q.    All right, did you know these young ladies?

13     A.    No, I didn't.

14     Q.    Did something happen when these two females

15   arrived?

16     A.    When they arrived they knocked on the door.

17   I think we was just dealing out our hand, I remember

18   that clearly.  And they knocked on the door and we,

19   when the door was opened it was two ladies and they

20   was, you know, they had a little confusion with the guy

21   Patrick.  And when the confusion was starting --

22     Q.    What do you mean by confusion?

23     A.    I guess they wanted to get something squared

24   off, you know.

25     Q.    Were they arguing?

JUSTICE REPORTING SERVICES, INC.      523-6114

1       A.    Yeah, they was arguing.

2       Q.    All three of them?

3       A.    The two ladies - one of the ladies, you know,

4    was arguing.  She was I guess getting straightened out

5    trying to get everything straightened out, you know,

6    what's happened.

7       Q.    Did you later determine that one of them was

8    a sister of Mr. Lockhart?

9       A.    Yes.

10      Q.    Was she one of the two?

11      A.    Yeah, she was one of the two.

12      Q.    And was she one of the ones trying to get

13   things straightened out or was that the other one?

14      A.    She was the one - she was the outspoken one

15   as I could put it.  The most out spoken one.

16      Q.    Did they appear angry?

17      A.    Yeah, both of them appeared angry.

18      Q.    Were they arguing with each other or were

19   they arguing with Patrick Brown?

20      A.    They was arguing with Patrick.

21      Q.    What was he doing?

22      A.    He wasn't really -- at first I wasn't really

23   saying anything because the guy, Jeremy said that he

24   didn't want - he didn't want, he didn't want that in

25   his house.

JUSTICE REPORTING SERVICES, INC.       523-6114

1     Q.   What do you mean that in the house?  What was

2  going on?

3     A.   It was some kind of, you know, they had the

4  confusion fusing and fighting, you know, fusing.  It

5  was like arguing.

6     Q.   Did you at some point ever see the females

7  take some sort of weapons each?

8     A.   Yeah, when they walked up to the door.  I

9  can't really tell when but they did have the weapons at

10  the time that they was arguing.  Both of them had a

11  weapon.

12     Q.   Okay, do you recall what the sister of Mr.

13  Lockhart had?

14     A.   She had a bottle.

15     Q.   And how about the other individual?

16     A.   She had a knife.

17     Q.   Okay.  Did they ever use these weapons on

18  each other?

19     A.   No, they didn't.

20     Q.   Did the defendant do anything after seeing

21  these two females with the weapons?

22     A.   I really can't recall that.  I was in the

23  state of mind that I didn't know these people and I

24  wanted to get out of their house.  I really couldn't -

25  I can't recall that.

334

1      Q.    You didn't want anything to do with this?

2      A.    No I didn't want anything to do with this.

3      Q.    Did you see them use, did there come a time

4   when either one of them put the weapons down and they

5   no longer had either the knife or the bottle?

6      A.    No I didn't, I didn't see that.

7      Q.    Did you ever see either of the women use the

8   weapons on any persons in the apartment?

9      A.    Yes, I saw one of the young ladies use a

10  weapon.

11     Q.    Was that the sister of the defendant?

12     A.    Yes.

13     Q.    And she had the bottle?

14     A.    Yes.

15     Q.    What did she do with the bottle?

16     A.    On my way out of the door, you know, and they

17  was arguing.  This is when he came - this is the second

18  time they came back in the house.

19     Q.    Did she first leave the apartment?

20     A.    Yes, he told them to leave out the apartment.

21     Q.    Who is he?

22     A.    Jeremy Lockhart.

23     Q.    And did they leave?

24     A.    Yes.

25     Q.    Did they come back in?

1        A.    Yeah, we came back in and we was going to

2    start back playing again and they knocked on the door

3    again.

4        Q.    Did you leave with them too?

5        A.    No not at that time because when he told them

6    to leave out the apartment before this -- okay he told

7    them to leave out the apartment, okay, I guess they

8    went outside and they started explaining something and

9    he came back in the door.  And when he locked the door

10   we was about to start playing the game and they knocked

11   back on the door again.  And then when he opened the

12   door they started to argue again.

13       Q.    Who opened the door?

14       A.    Oh Patrick.

15       Q.    Did the defendant tell him not to open the

16   door?

17       A.    Yes.

18       Q.    And did Patrick go ahead and do it anyway?

19       A.    Yes he did.

20       Q.    And did they come back in?

21       A.    No they was standing at the door arguing

22   again - they started back the same thing.

23       Q.    Did you tell whether -- did they still have

24   the weapons at this point?

25       A.    She still had the bottle I didn't pay any

1    attention to the other young lady that's when I was on

2    my way out the door I couldn't really pay no attention

3    to her.

4        Q.    Did you see at this point Patrick Brown

5    threaten either one of these two women?

6        A.    No they was still arguing about, you know,

7    relationships and whatever else they was talking about.

8        Q.    Did Patrick Brown have any weapons on him?

9        A.    No, he didn't.

10       Q.    Had he done anything physically to either one

11   of these two women at this point?

12      A.    I don't know what he did when they was

13   outside but in my eye sight he did not.

14      Q.    You didn't eye anything?

15      A.    No I didn't.

16      Q.    All right.  When -- after coming back inside

17   did the defendant's sister do anything with the bottle?

18      A.    Okay, yeah, the confrontation continued and

19   on my way out the door I looked back and she hit him,

20   she struck him with the bottle.

21      Q.    Where did she hit him with the bottle?

22      A.    In the head area somewhere.

23      Q.    What happened when he was hit with the

24   bottle?

25      A.    He like fell back in the couch.

```
 1              MR. PATNER:  Again may I approach?  Your
 2         Honor, may I have the witness step down, Your
 3         Honor?
 4              THE COURT:  Yes.
 5              MR. PATNER:  Will you please step down.
 6    BY MR. PATNER:
 7         Q.   Which couch, and it's important why don't you
 8    stand to the side so everybody can see you.  Which
 9    couch did he fall back into?
10         A.   Right here (indicating).
11         Q.   This one against the window here to the
12    back?  So this confrontation with the bottle took place
13    in this area right here (indicating)?
14         A.   Yes.
15         Q.   Thank you, have a seat.  How did Mr. Brown
16    appear after getting hit with the bottle?
17         A.   When she hit him with the bottle he like fell
18    back in the couch and I was outside at that time so I
19    can see him fall back in the couch but I couldn't see
20    his face or anything.  And he was like in the couch for
21    about three seconds or more, then he stood up, you
22    know, and he was like dazed a little bit.  So I really
23    couldn't tell because I really couldn't see his face
24    because she was standing right there in front of him.
25         Q.   As best as you could tell though he appeared
```

1    to be dazed?

2         A.    He - yeah he appeared to be dazed because

3    when he stand up, stand up kind of slow.

4         Q.    Did he appear to be groggy?

5         A.    Could you explain that please?

6               MR. GODWIN:  Objection to leading, Your

7         Honor.

8               MR. PATNER:  I will withdraw the question.

9               THE COURT:  Yes, sustained.

10   BY MR. PATNER:

11        Q.    What did Patrick Brown do?  As he was getting

12   up he appeared kind of dazed, let me ask you this did

13   anyone say anything to Mr. Brown at this point?

14        A.    Yeah, I think his baby mother said is you

15   going to let her do you like that, or something in that

16   sort.  She said are you going to let her do you like

17   that.

18        Q.    Is that the other female other then the

19   defendant's sister?

20        A.    Yes.

21        Q.    And can you repeat that again what she said?

22        A.    You going to let her hit you like that and

23   not do anything?

24        Q.    Upon hearing that had he done anything in

25   response to the defendant's sister at this point before

1    her saying that statement?

2         A.    Not at that time, not exactly, it didn't

3    happen like as soon as he hit her he jumped up and

4    attacked her or anything, it was not exactly right

5    after it like paused for a second.

6         Q.    Then the statement was said?

7         A.    Uh-huh (affirmative response.)

8         Q.    Then what did he do?

9         A.    And at the same time about the -- at the same

10   time you could see both, both the young lady and the

11   young man start to like wrestle or tumble, wrestle each

12   other like.

13        Q.    Was it as if they both came to each other or

14   was he going after her -- and I'm by her and I'm

15   talking about the sister?

16        A.    It was like, it appeared to be the same

17   reactions, about the same reactions.

18        Q.    A mutual thing?

19        A.    Uh-huh (affirmative response.)

20        Q.    What happened when they came together?

21        A.    He like fell over the couch, he fell back on

22   the couch that I showed, that I pointed to.

23        Q.    Yes.

24        A.    He fell back over the couch, on the side of

25   the couch there is like - if I can show you with the

```
 1   picture.

 2              MR. PATNER:  If that would help in explaining

 3        it, sure.  May I have him come down again, Judge?

 4              THE COURT:  Sure.

 5              MR. PATNER:  Come on down Mr. Walker.

 6   BY MR. PATNER:

 7        Q.   Again it's important, like I say important

 8   that the jury sees, so indicate now where they fell to?

 9        A.   Like both the them tumbled over the couch on

10   to the couch right here (indicating).

11        Q.   Where did they end up?

12        A.   To that point I couldn't see anything else

13   because I was outside.

14        Q.   Okay.  As they came together and then went

15   over did you see any punches being thrown by either

16   side?

17        A.   No I didn't see any punches being thrown.

18        Q.   Did it appear that one side was injuring the

19   other side at that point?  I'm not talking about the

20   hit with the bottle I'm talking about after that.  Did

21   you see two parties injure each other in any manner?

22        A.   I couldn't even see anything like that.

23        Q.   Did you then leave after seeing them fall?

24        A.   I was walking towards - really I was talking

25   to a neighbor like she was like about four or five feet
```

1    away from me.  We was talking about, you know, what was

2    going on and I really, you know, what I'm saying, I

3    really didn't know these people.  You know, I was like

4    walking away at that point.

5          Q.    As you were walking away did you hear

6    anything?

7          A.    It was like, yeah, I heard some gun shots.

8          Q.    Okay.

9          A.    Sounded like gun shots.  It sounded like a

10    small - sounded like gun shots.

11          Q.    How many gun shots do you believe you heard?

12          A.    Around four, four or five, four.

13          Q.    Okay.  How much time passed between the time

14    that you saw the parties fall over as you're walking

15    away and then the sound of the first gunshot?

16          A.    It was around 30 long seconds, at least 30

17    seconds.

18          Q.    At least 30, could it have been longer?

19          A.    Could have been longer, 30 seconds that's my

20    recollection.

21          Q.    So it wasn't anything like five minutes or

22    anything like that?

23          MR. GODWIN:  Objection to leading, Your

24    Honor.

25          THE COURT:  No, overruled on that question.

1           THE WITNESS:   Thirty seconds could be a long

2       time.   I really, you know, around thirty seconds.

3    BY MR. PATNER:

4       Q.   Okay, fair enough.   What did you do when you

5    heard the gun shots?

6       A.   I started to run towards my house.

7       Q.   Did you see Mr. Lockhart leave?

8       A.   Yeah, as I peeped out the window I heard, I

9    heard a voice as I was running towards the door and as

10   I peeped out the window I could hear him saying that he

11   didn't want, you know, he didn't want this shit in his

12   house.   I heard him say he didn't want this shit in his

13   house.   I saw him leave, I couldn't see him exactly

14   because I was going in my house and I didn't want to be

15   around.   I heard him saying he didn't want this shit in

16   the house.   I saw him leave and I just shut the door.

17      Q.   Did you see if he had anything with him when

18   he was leaving?

19      A.   I really couldn't tell exactly if he had

20   anything with him.

21      Q.   You couldn't tell if he was carrying anything

22   or not?

23      A.   Not really, I really couldn't tell you.

24      Q.   You don't know if he didn't have anything

25   either?

```
 1        A.    Yeah, I didn't know if he didn't have

 2   anything.

 3        Q.    Okay.  Did you see Mr. Lockhart later that

 4   day or any other time that day?

 5        A.    No, I didn't I never see him since.

 6        Q.    How about the sister, after the gun shots

 7   went off and you left what did she do?

 8        A.    After the gun shots went off I started

 9   towards my house and the gun shots went off and that's

10   when the people starting running out the door.  And I

11   was on my way to run too so I saw people running out

12   the door.

13        Q.    So you see people running out of Mr.

14   Lockhart's apartment?

15        A.    Yes, I did.

16        Q.    Did you see his sister run out?

17        A.    Yeah, I saw her run out.

18        Q.    Did she appear to be injured in anyway as she

19   was running?

20        A.    I couldn't really tell you if she was injured

21   or not but I saw everyone running out the door.

22        Q.    Did she run as if she was stumbling or

23   falling or anything like?

24        A.    I think she was just running to get out the

25   house.  I really couldn't tell you exactly if she was
```

JUSTICE REPORTING SERVICES, INC.      523-6114

344

1    running or stumbling or anything or not.

2         Q.    Does anything stick out in your mind about

3    anything out of the ordinary as she was running?

4         A.    No nothing out of the ordinary.

5         Q.    Did she appear to be running normally?

6              MR. GODWIN:  Objection, asked and answered.

7              THE COURT:  Yes, sustained.

8              MR. PATNER:  I have no further questions,

9    sir, thank you.

10              THE COURT:  Your witness.

11                        CROSS EXAMINATION

12   BY MR. GODWIN:

13        Q.    Mr. Walker, that day when you went over to

14   play cards with Jeremy he and Patrick Brown were

15   getting along fine?

16        A.    Yeah, they was getting along fine.

17        Q.    Acting like good friends?

18        A.    Yes, they was.

19        Q.    You didn't hear bad words between them at

20   all?

21        A.    No, I didn't.

22        Q.    As far as you could tell Jeremy and Patrick

23   was good friends?

24        A.    Yes.

25        Q.    And everybody was nice and peaceful in the

JUSTICE REPORTING SERVICES, INC.    523-6114

1    house?

2         A.    Yeah, everybody was nice and peaceful playing

3    cards.

4         Q.    And it was when the two ladies came to the

5    house that trouble started?

6         A.    Yes.

7         Q.    Is that right?

8         A.    Yes.

9         Q.    And you said that these two women came and

10   knocked on the door?

11        A.    Yes, they did.

12        Q.    And they were both angry?

13        A.    Yeah, they was both angry.

14        Q.    And they were both arguing with Patrick

15   Brown?

16        A.    Yes, they was.

17        Q.    And one of them had a knife and one of them

18   had a bottle, is that right?

19        A.    Yes.

20        Q.    And did Jeremy Lockhart tell the ladies to

21   get out of the house?

22        A.    He told Patrick and the ladies to get out of

23   the house.

24        Q.    Did he tell him I don't want any problem in

25   this house?

```
 1      A.    Yes, he did.

 2      Q.    This is my house?

 3      A.    Yes.

 4      Q.    I don't want any fighting in here?

 5      A.    Yes.

 6      Q.    And he told April Reese his sister to leave?

 7      A.    Yeah, he told her to leave.

 8      Q.    And he told April Williams the other lady to

 9      leave?

10      A.    Yes, he did.

11      Q.    He even told Patrick to go outside?

12      A.    Yes.

13      Q.    After he told them all to go outside because

14      he didn't want any fighting did Patrick come back

15      inside eventually?

16      A.    Yeah, he came back in eventually, yeah.

17      Q.    And did Jeremy lock the door?

18      A.    I don't know if Jeremy - I think - I really

19      couldn't tell you who looked the door but the door was

20      locked.

21      Q.    Didn't you see Jeremy lock the door to keep

22      the girls out?

23      A.    Jeremy was the one who closed the door but I

24      don't know if he actually locked the door or not.

25      Q.    Okay, did Jeremy say to Patrick don't open
```

```
 1   the door?  He told him don't open the door?

 2        A.    I remember specifically he told them not to

 3   open the door.

 4        Q.    Because he didn't want any fighting in his

 5   house?

 6        A.    Yes.

 7        Q.    But did Patrick Brown open the door anyway?

 8        A.    When the ladies knocked on the door again he

 9   opened the door again.

10        Q.    Patrick went and opened the door again?

11        A.    Yes.

12        Q.    Even though Jeremy told him not to?

13        A.    Yes.

14        Q.    Now, at that point is that when April Reese

15   came in the house and hit Patrick with the bottle?

16        A.    Not exactly at that point they had a little

17   bit of a confrontation again.

18        Q.    Tell us about that?

19        A.    As they was having that confrontation he was

20   saying again he didn't want this shit.  He said exactly

21   like this he didn't want this shit in his house.

22        Q.    Who said that?

23        A.    Jeremy Lockhart.

24        Q.    Again when they started arguing again?

25        A.    Yes.
```

1      Q.   He said I don't want this in my house?

2      A.   Yes, he did.

3      Q.   Go ahead.

4      A.   That's when I started to proceed out the door

5   because myself I didn't want to be around any trouble.

6      Q.   You didn't want to be around any trouble at

7   all?

8      A.   No, I didn't.

9      Q.   Now, as you start to proceed out the door --

10   with the Court's permission, Your Honor?

11           THE COURT:   Yes, sir.

12   BY MR. GODWIN:

13      Q.   Could you step down here, Mr. Walker.  Do you

14   recognize this to be the front door of the apartment?

15      A.   Yes.

16           THE COURT:   State's Exhibit 1.

17           MR. GODWIN:   Pardon me, referring to State's

18      Exhibit number one.

19   BY MR. GODWIN:

20      Q.   Is this the door you started to walk out?

21      A.   Yes.

22      Q.   Let me go further and if you'll stand over

23   here on this side of me so the jury can see.  This is

24   the door you tried to walk out?

25      A.   This door right here (indicating).

1     Q.   Going straight out?

2     A.   Yes, this way.  Yeah, straight out.

3     Q.   All right.  Now, as you tried to walk out the

4   door did you see something happen?

5     A.   As I was walking out the door I like grazed

6   past his sister, you know, I don't know what her name

7   is.

8     Q.   April Reese?

9     A.   April Reese.  As I was looking back going

10  towards - they was still like arguing and then that's

11  when she struck him with the bottle.

12    Q.   Was Patrick Brown sitting here on this couch

13  (indicating)?

14    A.   He was standing, he was standing right here

15  (indicating).

16    Q.   Okay, standing here by the couch?

17    A.   Uh-huh (affirmative response.)

18    Q.   And April Reese hit him with the bottle?

19    A.   Yes.

20    Q.   Did you fall back on the couch?

21    A.   Yes, he did.

22    Q.   And you went out the door?

23    A.   Yes, he went out the door.

24    Q.   You said he was stunned for a second then he

25  got up?

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1        A.    Uh-huh (affirmative response.)
 2        Q.    When he got up you saw Patrick Brown and
 3   April Reese come together as if to fight?
 4        A.    Yes.
 5        Q.    And they fell over this chair right here
 6   (indicating)?
 7        A.    No, they fell over - I think they fell over
 8   this one right here (indicating) it was like tumbling
 9   then they fell like here (indicating).
10        Q.    Once they tumbled in this area could you see
11   anything else?
12        A.    No, I couldn't see anything.
13        Q.    You didn't see what Patrick Brown did to her?
14        A.    No, I didn't see anything.
15        Q.    You couldn't hear what he was doing to her at
16   all?
17        A.    I heard tumbling noises.
18        Q.    And it was about 30 seconds later that you
19   heard gun shots?
20        A.    Yes, about thirty seconds, yes.
21        Q.    Okay, thank you.  So after they fell back in
22   the house you couldn't see the rest of the fight, is
23   that right?
24        A.    No, I couldn't.
25        Q.    You said about 30 seconds later you heard
```

1    some gun shots?

2            A.    Yes, I did.

3            Q.    Were they one after another?  One shot right

4    after another?

5            A.    Yeah, it was one shot after another.

6            Q.    Quick pow, pow, pow, pow.

7            A.    Yeah, but pow, pow, pow, pow, it was one

8    after another?

9            Q.    And of course you didn't see what happened

10   just before the shooting?

11           A.    No, I didn't.

12                 MR. GODWIN:    Thank you very much, sir.

13                 THE COURT:    Any redirect?

14                 MR. PATNER:    No, sir, thank you.

15                 THE COURT:    Thank you, sir, you are excused.

16           Next witness.

17                 MR. PATNER:    State would call Charles

18           Forbes.

19                 THE BAILIFF:    Remain standing and raise your

20           right hand and put your left hand on the bible.

21   Thereupon,

22                          CHARLES FORBES,

23   having been first duly sworn, was examined and

24   testified as follows.

25                 THE CLERK:    State your full name and spell

                              /

JUSTICE REPORTING SERVICES, INC.      523-6114

352

1       your last name for the record please.

2            THE WITNESS:  Charles Forbes, F-O-R-B-E-S.

3       You can have a seat.

4                    DIRECT EXAMINATION

5   BY MR. PATNER:

6       Q.   Good afternoon Mr. Forbes.

7       A.   Good afternoon.

8       Q.   Sir, where do you live?

9       A.   3100 North 24th Avenue, Hollywood.

10      Q.   Did you previously live at 2217 Northwest 9th

11  Street?

12      A.   Yeah, I think that's the address.

13      Q.   Which apartment, do you remember which

14  apartment number you lived in there?

15      A.   Number four.

16      Q.   Do you know where number four is in relation

17  to number three?

18      A.   It's above and it's at the south end of the

19  building.

20      Q.   I'd like to take your attention back to June

21  25th, 1994.  That was a Saturday afternoon, do you

22  recall that day, sir?  Do you remember that day?

23      A.   I remember if it's the incident, yes I do.

24      Q.   Were you living at that time in apartment

25  number four?

353

```
 1      A.   Yes.
 2      Q.   At about 4:00 p.m., were you lying on the
 3   sofa?
 4      A.   I was lying on the sofa.
 5      Q.   Do you recall anything unusual happening that
 6   caused you some concern or caused your attention to be
 7   diverted?
 8      A.   Well, I thought it was some fire cracker
 9   going off, sounded pretty loud.
10      Q.   You heard a sound?
11      A.   Yes.
12      Q.   And you thought they were fire crackers?
13      A.   Yes.
14      Q.   How may did you hear?
15      A.   About four or five.
16      Q.   Were they one after another?
17      A.   One after another.
18      Q.   Did this cause you some concern?
19      A.   Yes, because I had my kids outside.
20      Q.   Kids were playing outside?
21      A.   Yes.
22      Q.   What did you do upon hearing this sound?
23      A.   I jumped up and went out on the balcony to
24   see who was throwing the fire crackers.
25      Q.   Did you see your children out there?
```

354

```
 1        A.    Yeah.

 2        Q.    Did you see anybody else?

 3        A.    No, yeah I see a lot of neighbors around.

 4        Q.    Did you see an individual walking away from

 5   the apartments that drew your attention?

 6        A.    Yes, it did.

 7        Q.    Why did this person draw your attention?

 8        A.    Because he was carrying a gun.

 9        Q.    Do you recall what kind the gun it was?

10        A.    To me it was like a German --

11        Q.    A pistol?

12        A.    A pistol.

13        Q.    Where did he have the gun?

14        A.    In his hand pointing it down.

15        Q.    Was this individual saying anything?

16        A.    Yeah, he was saying I'm tired of this shit

17   I'm tired of this shit like he was out of his mind and

18   he kept walking.

19        Q.    Did you ever see this person again?

20        A.    Not until I been here.

21        Q.    Other then in court you never saw this

22   individual again?

23        A.    No.

24        Q.    I have no further questions sir, thank you.

25                   CROSS EXAMINATION
```

355

```
 1   BY MR. GODWIN:

 2        Q.   How are you doing Mr. Forbes, just a couple

 3   questions.  You didn't see what caused the shooting,

 4   did you?

 5        A.   No, sir.

 6        Q.   You don't have any idea what brought it

 7   about?

 8        A.   No.

 9        Q.   And the gun that you saw Mr. Lockhart

10   carrying, he was pointing it down, is that correct?

11        A.   Right.

12        Q.   He wasn't pointing it at kids or anything?

13        A.   No.

14        Q.   Looked like an automatic to you, didn't it?

15        A.   Yes, it did.

16        Q.   Thank you, sir.

17             THE COURT:  Redirect?

18             MR. PATNER:  Nothing further.

19             THE COURT:  Thank you, sir, you are excused.

20             MR. PATNER:  May I approach the bench,

21        Your Honor?

22             (Thereupon, the following proceedings were

23        had at side bar outside the hearing of the

24        jurors.)

25             MR. PATNER:  I hate to say this, Judge, but
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1      we're moving along a lot quicker then I thought

2      and I also have a problem because my anticipated

3      next witness -- I just got this message handed to

4      me in court by the secretary and it's somewhat

5      self-explanatory.

6            THE COURT:   No, I won't say what I think

7      about this he's got to come here now.

8            MR. PATNER:   I couldn't agree with you more

9      I'm in a situation where I'm in court here and

10     it's hard for me to do anything he's my very next

11     witness and I have another witness who will be

12     here at 3:30.   I have another witness and I am not

13     going to attempt to defend that, but I have my

14     next witness who will be here 3:30.

15           THE COURT:   Do you know what his phone number

16     is, that's his beeper number.   If he doesn't come

17     here now I will - I will do exactly what Judge

18     Futch did on the other guy from Fort Lauderdale

19     who was subpoenaed to be here and issued a writ of

20     attachment for him if he doesn't come here.

21           MR. PATNER:   I will tell the Court I did tell

22     him he had to be here today, no question about

23     it.

24           MR. PATNER:   Judge, would it be possible to

25     excuse the jury for ten minutes?

```
 1              THE COURT:   You don't have another witness?
 2              MR. PATNER:   Apparently not I'm waiting on
 3       technician Knutten I told him between 3:00 and
 4       3:30.   I didn't know we would finish the witnesses
 5       as fast as we could.
 6              THE COURT:   You told him between what,
 7       between 3:00 and 3:30?  You got to have them all
 8       here.
 9              MR. PATNER:   I understand, Judge, I didn't
10       think get through all four as fast as we did.
11              THE COURT:   I wanted to finish all the
12       testimony today.
13              MR. PATNER:   I could potentially do that.   At
14       this point I'd have to ask for a recess until I
15       secure the witness here, Judge.
16              (Thereupon, the following proceedings were
17       resumed in the presence of the jury.)
18              THE COURT:   Okay, folks we are going to have
19       to take a break at this time so if want to go back
20       into the jury room.
21              (Thereupon, the following proceedings were
22       had outside the hearing of the jurors.)
23              MR. PATNER:   If I could step outside, Judge I
24       will get somebody here.  I have the detective out
25       there.
```

358

```
 1            THE COURT:  What detective?
 2            MR. PATNER:  Detective Walley.
 3            THE COURT:  Have him come in please.
 4            MR. PATNER:  I was going to indicate I am
 5       going to call the ID technician, he should be
 6       here.  Doctor Perper from the Medical Examiner's
 7       Office is on his way then I'm going to rest.
 8            THE COURT:  Lets bring in Detective Walley.
 9            Okay, so I need to get this straightened out
10       here so what you're saying is that you never -
11       what did you say to this lady?
12            DETECTIVE WALLEY:  She called me this morning
13       and said to be here at ten o'clock with one of the
14       witnesses.  Then she had called back and canceled
15       that and said be there at 12:00.  And then she
16       called me back, beeped me and I returned the call
17       and she said you're going to be on standby for
18       tomorrow.
19            THE COURT:  You're going to be on standby
20       tomorrow?
21            DETECTIVE WALLEY: Yes, around 2:30 she
22       called.  We had just taken two people into custody
23       for that and I'm doing the paperwork and she calls
24       and she says the prosecutor would like to have you
25       there at 3:30.  I knew that, or I thought that I
```

```
 1        was the next to last witness.  I knew that Mr.
 2        Knutten was the first witness and he was coming
 3        here at 3:30 too so I'm assuming that's the first
 4        witness and I'm going to be after him so I said
 5        would you please see if you can find out if he is
 6        going to use me today and let me now because right
 7        now we are booking two prisoners for murder.  I
 8        waited at my desk for her to return the call and
 9        the next thing I know you're calling me.  I
10        apologize.
11             MR. PATNER:  This is between me and my
12        secretary it's obviously not my witnesses fault.
13             THE COURT:  You gave me a note written - it's
14        her writing not yours.
15             MR. PATNER:  I understand that.
16             THE COURT:  Where is the note?
17             MR. PATNER:  I don't have it I looked for it.
18             THE COURT:  No, no, no, I gave it back to
19        you.
20             THE CLERK:  I don't have it.
21             THE COURT:  I gave it back to but you.  I'd
22        like you to find that note.  I gave you that
23        note.  It said that --
24             MR. PATNER:  It is somewhere I went into a
25        panic when I didn't have a witness and I'll accept
```

360

```
 1        responsibility for my secretary acting on my
 2        behalf.
 3            THE COURT:   That has to be straightened out
 4        because to be honest with you I got all upset at
 5        this detective here because she, on her note it
 6        says that Detective Walley called and says he is
 7        in the middle of booking somebody and would not be
 8        available until tomorrow.
 9            MR. PATNER:   That's exactly what the note
10        said and I had no discussions with her, Judge, I
11        was handed that noted in the middle of direct of a
12        witness and there's obviously been some
13        miscommunication.
14            THE COURT:   Did you tell her you wanted him
15        to testify after Knutten?
16            MR. PATNER:   I told her to the best of my
17        knowledge to have, around one o'clock, have the
18        detective here but I didn't discuss the order of
19        witnesses with her.
20            THE WITNESS:   Your Honor, it's my practice to
21        contact the secretary and ask her what the order
22        so that it is gives me an idea of when I'm going
23        to be used.
24            MR. PATNER:   Myself and detective have had
25        discussions for the past two weeks and it
```

JUSTICE REPORTING SERVICES, INC.    523-6114

361

1    certainly is not any reflection upon him either.

2    I was upset when I saw the note but it was just a

3    communication problem.

4         THE COURT:   You were just as upset as I was

5    because your reaction was God oh mighty I can't

6    believe that the detective is going to put booking

7    somebody over a trial.

8         MR. PATNER:   That was my reaction under the

9    circumstance plus when I didn't have a witness to

10    call obviously I started, you know, the detective

11    has been extremely cooperative with me and it was

12    just a communication problem and I will accept the

13    responsibility about that.

14         THE COURT:   We are trying to speak to the

15    secretary to find out where she got the idea that

16    he said he wouldn't be available until tomorrow.

17         THE WITNESS:   She may have interpreted me

18    meaning that because I was kind the anxious - I

19    was in the middle of doing this and she was

20    calling me.   I apologize, Your Honor.

21         THE COURT:   No problem.   Are all your

22    witnesses here?   We've wasted a half hour here,

23    are they are all here now?

24         THE COURT:   Is Knutten here?

25         MR. PATNER:   I'll check, Judge.

```
 1              THE COURT:  Bring in the jury.

 2              MR. PATNER:  Only thing I'd ask for if I

 3         could have just a moment.  As to Detective Walley

 4         I understand during the first motion to suppress

 5         there was an issue about the defendant's

 6         statements during the first trial and Detective

 7         Walley was not asked about the defendant first

 8         asking for an attorney and I wouldn't normally do

 9         that either though I understand he was cross

10         examined as to that.

11              If defense counsel has no objection to that

12         sequence and how the State came about it I will go

13         ahead and do that on direct.  I don't want to do

14         that first and then defense moves for a mistrial

15         based on that.

16              MR. GODWIN:  Because I'm going to move for a

17         mistrial because he has no business --

18              MR. PATNER:  During the second part of the

19         cross examination of this detective I agree with

20         the statement the defense attorney made in

21         reference that he was trying to hide that fact

22         from the jury that he didn't bring out all the

23         investigations.  I just want to know one way or

24         another what we are going to do here.

25              MR. GODWIN:  I'm not required to say, Judge.
```

1           MR. PATNER:  If I don't go into - if the

2      defense attorney brings it out on cross

3      examination will the Court allow me to redirect

4      the witness because you told him not to say it

5      because there was a legal issue as to that?

6           MR. GODWIN:  That would be improper, Judge.

7           MR. PATNER:  See, Judge, just like as to the

8      fairness issue as to how this is going to play out

9      for the jury, in the first trial defense attorney

10     made a big issue that the detective was hiding

11     that fact from the jury and he didn't get to bring

12     it out until cross.  So he doesn't get it both

13     ways, he can't get his cake and eat it to.

14          MR. GODWIN:  You know what, Judge, this is

15     one time I do get it both ways.  It is my right to

16     go into this.

17          THE COURT:  I will have to defer ruling until

18     after I see what happens on cross examination.

19          MR. PATNER:  Okay.

20          THE COURT:  Thank you.  Bring in the jury.

21          THE BAILIFF:  Jury coming in.

22          (Thereupon, the following proceedings were

23     had in the presence of the jury.)

24          THE COURT:  Okay, call your next witness.

25          MR. PATNER:  State calls Detective Michael

```
 1       Walley.
 2   Thereupon,
 3                    MICHAEL WALLEY,
 4   having been first duly sworn, was examined and
 5   testified as follows.
 6            THE CLERK:  State your full name and spell
 7        your last name for the record please.
 8            THE WITNESS:  Michael N. Walley,
 9        W-A-L-L-E-Y.
10            MR. PATNER:  May I proceed, Judge?
11            THE COURT:  Yes.
12                    DIRECT EXAMINATION
13   BY MR. PATNER:
14        Q.   Sir, state your name and occupation for the
15   jury?
16        A.   Michael Walley, I'm a police officer for the
17   city of Fort Lauderdale.
18        Q.   How long have you been involved with law
19   enforcement, sir?
20        A.   Since 1973.
21        Q.   What rank do you currently hold with Fort
22   Lauderdale Police Department?
23        A.   Detective assigned to the homicide squad.
24        Q.   As a detective with the homicide squad at
25   Fort Lauderdale Police Department please explain to the
```

```
 1            MR. PATNER:  Sure he is.

 2            MR. GODWIN:  I'm not required to say.

 3            MR. PATNER:  Here's the issue here, I can't

 4       win.  Now if I say he did ask for an attorney or

 5       if I don't say it then I'm hiding evidence from

 6       the jury.  I want to know which way to go.

 7            MR. GODWIN:  It's a very simple issue and

 8       it's up to me whether I want to bring it out or

 9       not.

10            MR. GODWIN:  I can do it on cross examination

11       if I wish to.

12            MR. PATNER:  He would probably make an

13       inference as he did the last time that I was

14       hiding something from the jury and that's what he

15       did.  It's entirely improbable and I'd like a

16       ruling from the Court one way or another that I

17       can either go into it or not.  I won't go into it

18       if he doesn't go, if the defense attorney doesn't

19       go into it.

20            THE COURT:  He has the right to go into it on

21       cross examination but he doesn't have to tell you

22       now whether he's going to go into that or not.

23       And if you in fact bring that out and then he

24       doesn't go into it then you're setting yourself up

25       for a mistrial.
```

1   jury some of your duties and roles as a homicide

2   detective, sir?

3      A.   Our squad investigates obviously homicides

4   that occur in the city of Fort Lauderdale as well as

5   anyone natural death such as suicide.  Accidental

6   death, with the exemption the traffic accidents.  Any

7   death that's unattended and also aggravated assaults,

8   aggravated batteries which occur in the city of Fort

9   Lauderdale.  As well as other major crimes such as

10   extortions or kidnaps and those types of offenses.

11      Q.   Do you have any idea of how may homicide

12   cases you've worked in your years as a detective, sir?

13      A.   A few hundred.  I've been in the homicide

14   squad since 1981.

15      Q.   Let me take your attention to June 25th, 1984

16   Saturday afternoon.  Were you so employed as a

17   detective on that date, sir?

18      A.   Yes, I was.

19      Q.   And were you working at the station or where

20   were you?

21      A.   No I had just left the station and was either

22   at home or in route to my home when I was beeped and

23   contacted and advised to respond, to respond to where

24   the shooting had taken place.

25      Q.   Are you on duty then at that time?

1      A.    I'm sorry?

2      Q.    Were you on duty when you were beeped?

3      A.    I was off duty but the practice of our office

4    is we have an on call team and whenever that on call

5    team is if there is a homicide that occurs after normal

6    working hours then that on call team is summoned and

7    they respond to the scene at that point in time the

8    investigation is commenced.

9      Q.    Did you then respond to 2217 Northwest 9th

10   Street, apartment number three, Fort Lauderdale?

11     A.    Yes.

12     Q.    What did you find when you first arrived

13   there, sir?

14     A.    By the time I arrived there were patrol

15   officers, uniformed officers who were present at the

16   scene.  The victim had already been transported from

17   the scene.  I met with Detective Abrams.

18          MR. GODWIN:  Excuse me, Your Honor, I have an

19          objection to the use of the term victim.  We went

20          through this before.

21          THE COURT:  Okay, you either refer to the

22          decedent by name or by the phrase alleged victim

23          THE WITNESSES: Yes, sir.

24   BY MR. PATNER:

25     Q.    Mr. Brown had previously had previously left

/

```
 1    the scene and had been taken to Broward General?

 2         A.    Yes.

 3         Q.    After making contact at the scene as you've

 4    already described previously did you return to the

 5    homicide squad?

 6         A.    Yes, I did.

 7         Q.    And who did you make contact with at the

 8    homicide squad?

 9         A.    I met with detective Abrams and an individual

10    by the name the April Reese.

11         Q.    What is April Reese's relation to the

12    defendant, Mr. Lockhart?

13         A.    I believe she is the sister.

14         Q.    Did you have a chance to meet briefly with

15    Ms. Reese at that point?

16         A.    Yes.

17         Q.    Did she appear to be injured?

18         A.    No.

19         Q.    Did you see any injury upon her?

20         A.    No.

21         Q.    Was she bleeding?

22         A.    Not that I saw.

23         Q.    Did you see any bruises or lacerations?

24         A.    No.

25         Q.    Was she complaining of any injuries?
```

369

```
 1     A.    No.

 2     Q.    Was a bolo placed out for Mr. Lockhart?

 3     A.    Yes, it was.

 4     Q.    So the police or law enforcement was looking

 5  for Mr. Lockhart?

 6     A.    That's correct.

 7     Q.    On that point on the afternoon of June 25th

 8  do you have any idea of where he was?

 9     A.    No.

10     Q.    I'd like to jump ahead up to June 27th, 1994

11  at approximately 10:30 a.m., were you at the station at

12  that time?

13     A.    Yes, I was.

14     Q.    Up until that time was there still an active

15  be on the look out for Jeremy Lockhart?

16     A.    Yes, there was.

17     Q.    And up until that time at 10:30 in the

18  morning did you have any idea of the whereabouts of

19  Jeremy Lockhart?

20     A.    No.

21     Q.    Did you have any idea of the whereabouts of

22  the murder weapon?

23     A.    No.

24     Q.    Did that change at approximately 10:30 a.m.?

25     A.    Yes, it did.
```

```
 1        Q.    An were you informed that the defendant was
 2   there at the station?
 3        A.    Yes.
 4        Q.    And what did he wish - did he wish to turn
 5   himself in?
 6        A.    Yes.
 7              DEFENSE:  Objection to leading.
 8              THE COURT:   Sustained, sustained.
 9   BY MR. PATNER:
10        Q.    At approximately 1140 a.m., did you make
11   contact with the defendant?
12        A.    Yes, I did.
13        Q.    Okay.  And at that time did he indicate to
14   you that he wished to make a statement?
15        A.    Yes, sir, he did.
16        Q.    Prior to you taking a statement from him did
17   you advise him of his rights?
18        A.    Yes.
19        Q.    And those are Miranda rights?
20        A.    Yes, sir.
21        Q.    What are the Miranda rights?
22        A.    Basically it's the rights of a person who has
23   been taken into custody or has been arrested with
24   reference to their conversing with the police and the
25   rights are that they do not have to do so.  We have a
```

1   standard form that's used by our agency.

2        Q.   And that is the Miranda right's form?

3        A.   Yes.

4        Q.   Did you go through the Miranda rights form?

5        A.   Yes, I did.

6        Q.   Do you have copy of that there?

7        A.   Yes, I did.

8        Q.   Would you please read to the jury what the

9   rights were that you read to the defendant?

10       A.   Sure.   Jeremy, before I ask you any questions

11  I want to advise you of your rights under the law.  Do

12  you understand that I am a police officer?  At that

13  point in time he tells me a response to that and I

14  record his response which in this case was all right.

15  You have the right to remain silent, that is you need

16  not talk to me or answer any questions if you do not

17  want to.  Do you understand?  His response was yes

18  sir.  You have the right to talk to an attorney before

19  talking to me, and to have an attorney here with you

20  during questioning now or later.  Do you understand

21  that?  His response was yes sir.  If you cannot afford

22  to retain your own attorney and you want an attorney

23  one will be appointed for you before we ask you any

24  questions, do you understand?  And his response yes

25  sir.  If you decide to answer the questions now without

```
 1   an attorney present you will still have the right to
 2   stop answering my questions at any time until you talk
 3   to an attorney, do you understand that?  Yes sir.
 4   Should you talk to me anything you might answer to my
 5   question will be introduced as evidence in a court of
 6   law against you.  Do you understand that?  Yes sir.
 7   Knowing and understanding your rights as I have
 8   explained them to you are you willing to answer my
 9   questions without an attorney present?  His response
10   was yes sir.   Then I read the bottom paragraph I
11   Jeremy Lockhart and he printed his name there, have
12   read this statement of my rights or have had it read to
13   me and I understand what my rights are.  And I am
14   willing to take a statement and answer questions.  I
15   have not previously requested any law enforcement
16   officer to allow me to speak to an attorney about this
17   incident.  I do not wish an attorney to be present at
18   this time.  No threats or promises have been made to
19   me.  No pressure at any time has been used against me
20   nor have I been tricked or fooled into giving a
21   statement.  I understand and I know what I am doing.
22   This statement will be used in a court of law against
23   me.  Then he signed the bottom of it and I witnessed
24   his signature signing my name and the date this
25   occurred which was June 27th, 1994 and the time it
```

```
 1   concluded which was 11:50 a.m.

 2        Q.   Did you read the rights to Mr. Lockhart as

 3   you read them to the jury?

 4        A.   Yes.

 5        Q.   Did he acknowledge and waive those rights?

 6        A.   Yes.

 7        Q.   And he agreed to speak to you?

 8        A.   Yes, sir.

 9        Q.   Had you offered him any promises or

10   inducements to have him testify?

11        A.   No at no time.

12        Q.   Did you threaten him with either subsequent

13   action or physical harm or any threats whatsoever in

14   order to have him give a statement?

15        A.   No not at all he was never mistreated in any

16   way.

17        Q.   How may times have you interviewed suspects

18   in a case can you begin to imagine?

19             DEFENSE: Objection, Your Honor, irrelevant.

20             THE COURT:  Overruled.

21             THE WITNESS:  Sorry, what was the question?

22   BY MR. PATNER:

23        Q.   Can you give any type of estimate on the

24   amount of times you have interviewed a suspect in a

25   case?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

374

1      A.    Hundreds.

2      Q.    And are you trained to do so?

3      A.    Sure.

4      Q.    Is that part of your job?

5      A.    Sure.

6      Q.    Did you in fact interview Mr. Lockhart on

7    June 27th, sir?

8      A.    Yes.

9      Q.    And did you do anything in order to secure

10   the accuracy of the defendant's statement?

11     A.    Yes, almost immediately at the conclusion of

12   the reading of the rights a statement was taken which

13   was tape recorded.

14           MR. PATNER:  Your Honor, I'm showing defense

15       what's been previously marked as State's Exhibit B

16       for identification.  May I approach the witness?

17           THE COURT:  Yes, sir.

18   BY MR. PATNER:

19     Q.    Sir, I'm showing you what's been mark as

20   State's Exhibit B if you could look in the case and

21   tell me if you can identify what's contained in that

22   case, sir?

23     A.    Yes sir.

24     Q.    And what is that?

25     A.    It is the recorded conversation that I had

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1    with him.
 2         Q.    Has your initials on it, does it not, that
 3    tape?
 4         A.    Yes.
 5         Q.    Does this fairly and accurately respect the
 6    statements given by Jeremy Lockhart to yourself on June
 7    27th, 1994?
 8         A.    Yes, sir, it does.
 9              MR. GODWIN:  Can we just approach for one
10         moment, Your Honor?
11              THE COURT:  Yes, sir.
12              (Thereupon, the following proceedings were
13         had outside the hearing of the jurors.)
14              MR. GODWIN:  That is the redacted version,
15         right?
16              MR. PATNER:  This is the tape that was moved
17         into evidence in the last trial.
18              THE COURT:  Not as a Court exhibit the actual
19         evidence.
20              MR. PATNER:  The actual exhibit.
21              THE COURT:  Do you want to mark it now
22         original unredacted version.
23              MR. PATNER:  This is the redacted - this is
24         the one that was played to the jury.
25              THE COURT:  As a court exhibit now for this
```

```
 1    trial would you like to mark in the original
 2    unredacted version of a court exhibit?
 3         MR. GODWIN:   That's what I'm doing I just
 4    wanted to be sure.
 5         THE COURT:   You don't need the unredacted
 6    one?
 7         MR. GODWIN:   Be sure it's the unredacted
 8    version.   I just want to renew my objection on
 9    that motion to suppress.
10         THE COURT:   All right, duly noted and I will
11    maintain the consistency of my previous ruling and
12    I will have to respectfully deny your motion.
13         MR. PATNER:   Judge, I'm going to publish the
14    tape now.
15         THE COURT:   So other then that objection you
16    have no other objection?   Are you passing out a
17    transcript too?
18         MR. PATNER:   No, I'm not going to pass out
19    the transcript.
20         THE COURT:   She has to take this down.
21         MR. PATNER:   I do have the transcript I don't
22    have an objection since the tape is going into the
23    court file, since the tape is going into evidence
24    I don't have an objection to the court reporter
25    not having to transcribe it.   I'll leave that to
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1    defense counsel.

2         MR. GODWIN:  That's okay with me I am happy

3    to make her job easier.

4         THE COURT:  So there is no issue of the

5    audibility?  That's not issue in this case, the

6    audibility of the tape?

7         MR. GODWIN:  No but obviously I'm going to go

8    over some things to make sure that it's clear but

9    she doesn't have to take it down.  That's fine

10   with me.

11        THE COURT:  Okay but audibility is not an

12   issue?  I mean the tape is an audible tape it's

13   not like a body bug.

14        MR. GODWIN:  It's semi audible -- I mean, I

15   am not -- I'll tell you right now I'm not

16   challenging the audibility, I'm not challenging

17   audibility.

18        THE COURT:  Have you discussed this with your

19   client?  There's no objection, is that correct?

20        MR. GODWIN:  Correct.

21        THE COURT:  To the court reporter not taking

22   down the contents of the tape?

23        MR. GODWIN:  That's correct.

24        THE COURT:  That's with the consent of the

25   attorney and his client.

/

JUSTICE REPORTING SERVICES, INC.     523-6114

1        MR. GODWIN:  Judge, I will go speak to him

2    just to be absolutely certain.

3        (Thereupon, the following proceedings were

4    resumed in the presence of the jury.)

5        MR. GODWIN:  We'll waive the necessity of

6    court reporter taking this down.

7        THE COURT:  Okay, your client is approving of

8    that?

9        MR. GODWIN:  Yes.

10        THE COURT:  All right, thank you.

11        All right, the tape will be marked in as the

12    next appropriate exhibit, State's Exhibit 2.  Are

13    you seeking to publicize it at this time?

14        (Thereupon, State's Exhibit No. 2 was

15    received in evidence.)

16        MR. PATNER:  Yes, sir.  Your Honor, at this

17    time the State would seek to publicize the tape to

18    the jury.

19        THE COURT:  That will be granted.  Folks,

20    we're going to play the tape at this time.  We'd

21    ask you to listen carefully to it since it's now

22    in evidence when you go back and deliberate of

23    course you can take the tape back to listen to it

24    again if you deem it necessary.

25        (Thereupon, the tape was played for the jury

```
 1          after which the following proceedings were had.)
 2     BY MR. PATNER:
 3          Q.   Detective, the defendant got upset towards
 4     the end of the last couple times he talked about
 5     shooting someone, shooting his best friend, he termed
 6     his best friend; is that correct?
 7          A.   Yes.
 8          Q.   Did he become visibly upset?
 9          A.   Yeah, he started crying.
10          Q.   And your statement at that time is that
11     accurately reflected upon the tape, sir, the
12     defendant's statement to you?
13          A.   Yes, sir.
14          Q.   Now, the defendant indicated he had done
15     something with the gun, correct?
16          A.   Yes, he did.
17          Q.   What did he say he had done with it?
18          A.   He had taken the clip out of the gun and had
19     taken the gun and the clip and thrown it in the lake.
20          Q.   Were you able to -- did you go out to the
21     lake?
22          A.   Yes.
23          Q.   Did he show you where that lake was?
24          A.   Yes, he did.
25          Q.   How did that come about?
```

1    A.    I asked him if he would be willing to take us

2   there and he said that he would.  So he showed us how

3   to get there, and we followed his directions and he led

4   us to the 2700 block of Northwest 15th Court.

5        Q.    That's the address of the lake?

6        A.    Yes.

7        Q.    Pond or a full size lake?

8        A.    Pretty good full size lake.

9        Q.    Did he indicate to you where he had thrown

10   it, in a general sense where he had thrown the gun?

11        A.    Yeah, he didn't have any shoes at the time,

12   he was bare footed, so he actually wore my shoes and

13   accompanied another detective down to the exact spot

14   where he threw the weapon.

15        Q.    And did he indicate how far he threw it or

16   anything like that?

17        A.    Yes, he did.

18        Q.    What did he say?

19        A.    I wasn't present when he said that he was

20   with Detective Stone who was the detective that

21   accompanied him down there.

22        Q.    Did he indicate what he had done with his

23   shirt after the shooting?

24        A.    Yes.  He said that he had thrown it in the

25   dumpster.

JUSTICE REPORTING SERVICES, INC.    523-6114

1      Q.    Did he ever indicate where, which particular

2    dumpster that was?

3      A.    No, he couldn't remember where it was.

4      Q.    So that obviously was never recovered?

5      A.    No.

6      Q.    Was the defendant subsequently arrested?

7      A.    Yes, he was.

8      Q.    Charged with murder?

9      A.    Yes.

10          MR. PATNER:  I have no further questions of

11        this witness, Your Honor.

12          THE COURT:  Your witness.

13                    CROSS EXAMINATION

14   BY MR. GODWIN:

15     Q.    Detective, the prosecutor just asked you

16   after the statement was Mr. Lockhart subsequently

17   arrested and you said yes he was.

18     A.    Yes.

19     Q.    Actually the fact is you arrested Mr.

20   Lockhart before you ever heard his statement, didn't

21   you?

22     A.    He was arrested and taken into custody when

23   he walked into the Fort Lauderdale Police Station and

24   was met by me in the lobby.

25     Q.    You arrested Mr. Lockhart before you ever

382

```
 1    heard his statement, didn't you?

 2         A.    That's right.

 3         Q.    Now, how long have you been a homicide

 4    investigator?

 5         A.    Since 1981.

 6         Q.    And you've investigated maybe three or four

 7    hundred homicides?

 8         A.    Been involved in, yes.

 9         Q.    You know it's important to be fair and to be

10    thorough in your homicide investigations, don't you?

11         A.    Sure.

12         Q.    To gather all the facts?

13         A.    Attempt to do so, sure.

14         Q.    Not to rush to conclusions?

15         A.    Sure.

16         Q.    In fact, you've taught classes at the police

17    academy on how to investigate homicides?

18         A.    I've taught some classes in interrogation,

19    yes.

20         Q.    You've taught courses on how to interview

21    suspects, how to interrogate suspects?

22         A.    Yes, I have.

23         Q.    How to take their statements?

24         A.    Yes.

25         Q.    You taught courses on how to testify to the
```

/

1    jury, haven't you?

2         A.    Yes.

3         Q.    So you're a professional witness is that fair

4    to say?

5         A.    Sir, I'm a professional police officer.

6         Q.    And a professional police officer would

7    always try to be fair and not jump to conclusions,

8    correct?

9         A.    Sure.

10        Q.    Mr. Lockhart came down to the police station

11   with his wife and turned himself in voluntarily on June

12   27th, correct?

13        A.    That's correct.

14        Q.    1994?

15        A.    Yes.

16        Q.    At about 10:30, 10:30 in the morning?

17        A.    Yes, it was around 10:30, yes when he

18   arrived.  And then I made contact with him shortly

19   after that.

20        Q.    You were notified that he was downstairs in

21   the lobby and he wanted to turn himself in?

22        A.    Yes, I was.

23        Q.    So you went downstairs, correct?

24        A.    Yes, I did.  And another detective --

25        Q.    And when you approached him did he say I'm

/

JUSTICE REPORTING SERVICES, INC.    523-6114

1   Jeremy Lockhart?

2       A.    I believe I may have asked him.  I don't

3   recall if there were any other people in the lobby.  I

4   think I directed my comments to him and asked him if he

5   was Jeremy Lockhart and he acknowledged that he was and

6   --

7       Q.    And then you said to him you're under arrest

8   for murder?

9       A.    That's correct.

10      Q.    Just like that?

11      A.    Exactly like that.

12      Q.    It was an hour-and-a-half later when you took

13  a statement from him?

14      A.    Yes, at 11:46 a.m., he was read his rights

15  and the statement began at 11:51 a.m.

16      Q.    Now, by the way you have a copy of the

17  transcript of the statement, don't you?

18      A.    Yes, I do.

19      Q.    I'm just going to go over some of the things

20  that you discussed with Mr. Lockhart if it will assist

21  you, sir, I'm on page two of the transcript.  Mr.

22  Lockhart told you that the day began when Patrick Brown

23  came over to his house and Mr. Lockhart was with his

24  wife and he was playing with his little daughter,

25  correct?  Isn't that what he told you?

```
 1        A.    Yes.

 2        Q.    And he told you that Patrick came over to

 3   play some cards?

 4        A.    Yes.

 5        Q.    And he told you that Patrick was like a

 6   brother to him?

 7        A.    That's correct.

 8        Q.    They were real close?

 9        A.    That's what he professed, yes.

10        Q.    And you don't have any reason to believe

11   otherwise, do you?

12        A.    No.

13        Q.    Patrick told you -- pardon me.  Jeremy told

14   you that Patrick had this problem with these two girls,

15   right?

16        A.    Yes.

17        Q.    One being his sister and one being April

18   Williams?

19        A.    Yes, one being Jeremy's sister.

20        Q.    One being Jeremy's sister?

21        A.    Yes.

22        Q.    And the other being April Williams?

23        A.    That's correct.

24        Q.    And Jeremy told you that he told Patrick just

25   be honest with my sister and tell her you don't want
```

386

1    her.  Didn't he say that to you, sir?

2         A.    Yes.

3         Q.    And he also told you that April Williams, the

4    other lady that had the baby by Patrick Brown, correct?

5         A.    Yes.  In fact that baby was present when this

6    took place.

7         Q.    The baby was not injured was it?

8         A.    No.

9         Q.    Fortunately.

10        A.    No, by the grace of God.

11        Q.    Now, Patrick Brown well -- strike that.

12   Jeremy Lockhart told you that he tried to stop this

13   fight, didn't he?

14        A.    Yes.

15        Q.    If fact, he told you that his sister came in

16   with a beer bottle and he tried to take it away from

17   her, correct?

18        A.    That's correct.

19        Q.    He told you April Williams picked up a knife,

20   correct?

21        A.    Right.

22        Q.    And he tried to take it away from her?

23        A.    Yeah.  In fact, I think that was taken away

24   and was out of the picture when the shooting took

25   place.

```
 1        Q.    The knife was recovered at the scene, wasn't

 2   it?

 3        A.    Yes, I believe it was.

 4        Q.    Right where Jeremy told you he had put it,

 5   correct?

 6        A.    Yeah, next to a kitchen I believe.

 7        Q.    And Jeremy told you that when the argument

 8   began that he told his sister and April Williams to go

 9   outside the house, didn't he?

10        A.    I believe so.

11        Q.    Didn't want any fighting in his house?

12        A.    Yes.

13        Q.    Didn't want any trouble in his house?

14        A.    That's correct.

15        Q.    Isn't that what he told you, sir?

16        A.    Yes, he did.

17        Q.    And didn't he tell you that he sent them all

18   outside and he locked the door?

19        A.    Yes.

20        Q.    Sent Patrick Brown outside, sent April Reese

21   outside, and April Williams outside?

22        A.    Right.

23        Q.    And then he let Patrick Brown come back

24   inside?

25        A.    That's what he said.
```

388

```
 1      Q.    That's what he told you, sir?

 2      A.    Uh-huh (affirmative response.)

 3      Q.    And he told you he shut the door and that he

 4  locked it, correct?

 5      A.    Yes.

 6      Q.    But that Patrick said - Patrick Brown said

 7  fuck that, fuck that, right?

 8      A.    Right, uh-huh, yes.

 9      Q.    And did he tell you that he shut the door and

10  locked it and my little sister put up a tussle about my

11  locking the door?

12      A.    Yes, uh-huh (affirmative response.)

13      Q.    And did he tell you, sir, that he told his

14  sister don't tell me how to run my house.  This is my

15  house I pay the bills here and I don't want any

16  fighting here?

17      A.    Yes, I recall that.

18      Q.    And did he tell you, sir, that it was Patrick

19  Brown who unlocked the door and opened the door?

20      A.    He may have but I don't recall that portion.

21      Q.    Well, you want to look at the statement on

22  page three towards the bottom.  Do you recall him

23  telling you to this effect, sir, maybe I can assist you

24      --

25           MR. PATNER:  Judge, if I may I am going to
```

1    object to relevance of this.  The tape is in

2    evidence and speaks for itself as to what was

3    said.  This isn't prior inconsistent statements

4    therefore it's not impeachment.  I fail to see the

5    relevance because the tape itself is into

6    evidence?

7         THE COURT:  Well he's -- rather then

8    rewinding, rather then just -- he has a right to

9    question him about statements made on the tape and

10   rather then just recycling the tape again to the

11   location he wants him to hear - I think it would

12   be more expeditious to just refer him to the

13   transcript of the tape.

14        Overruled.

15        THE WITNESS:  Mr. Godwin, are you on page

16   three where the statement begins so Bump (sic)

17   walked around?

18 BY MR. GODWIN:

19   Q.   Yes.  Did he tell you that Bump walked

20 around, picked up a beer bottle, took a swallow of it,

21 got a cigarette and walked back by the door?

22   A.   Yes.

23   Q.   And did he tell you that he told Bump not to

24 open the door?

25   A.   Yes.

1        Q.    And did he tell you that Bump said no I'm

2    going to open the door it will be all right.  I'm going

3    to open the door?

4        A.    Yes.

5        Q.    And did he tell you that Bump, Patrick Brown

6    opened the door?

7        A.    Yes.

8        Q.    The door that Jeremy Lockhart locked?

9        A.    Yes.

10       Q.    Did he tell you he took the knife away from

11   April Williams?

12       A.    Yes.

13       Q.    And tossed it over by the little love chair?

14       A.    Uh-huh (affirmative response.), that's

15   correct.

16       Q.    With the Court's permission if you can just

17   show the jury - could you step down here one second and

18   show the jury where the knife was recovered?  Where Mr.

19   Lockhart took it away from April Williams?

20       A.    Mr. Godwin, I'm sorry I can't because I

21   wasn't there when the knife was recovered.  All I know

22   is it was found in between a cushion in one of the arm

23   rests, but I don't know which one.

24       Q.    Do you know if it was down in this chair or

25   not?

JUSTICE REPORTING SERVICES, INC.    523-6114

391

```
 1       A.    No, I don't.
 2       Q.    Do you know that knife was about nine inches
 3  long, don't you?
 4       A.    I can't say the exact length but
 5  approximately, yes.
 6       Q.    You eventually saw the knife, didn't you?
 7       A.    I've seen a photograph of it at some point in
 8  time.
 9       Q.    You know it was approximately a nine inch
10  blade, don't you?
11       A.    I believe so.
12       Q.    And did he also tell you that he tried -- did
13  Jeremy tell you he tried to take the bottle away from
14  his sister?
15       A.    I believe so.
16       Q.    But his sister wouldn't let him take the
17  bottle away from her, is that correct, sir?
18       A.    Yes.
19       Q.    And did he tell you that his sister got loud
20  and rowdy?
21       A.    Yes.
22       Q.    And did he tell you again he was trying to
23  stop a fight from going on because he didn't want, he
24  didn't want to disturb his neighbors, he didn't want to
25  loose his rent?
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1     A.    Yes.

2     Q.    Now, he told you that his sister, April Reese

3  took the bottle and struck Patrick Brown in the head

4  with it, correct?

5     A.    Yes, he did.

6     Q.    All right, and that there was a gash in

7  Patrick's head, he was bleeding, correct?

8     A.    Yes, that's correct.

9     Q.    And did he tell you at that point he reached

10  out to grab his sister?

11     A.    When she hit him with the bottle?

12     Q.    Yes, sir.

13     A.    I believe so.

14     Q.    And that he reached out and he grabbed her,

15  is that what he told you?

16     A.    I'm sorry is that a question?  Yes, yes.

17     Q.    Did he tell you at that time that Patrick

18  Brown jerked his sister out of his arms?

19     A.    Yeah, I believe he did.

20     Q.    And it landed on the mirror table?

21     A.    Yes.

22     Q.    In fact Jeremy thought the table had been

23  shattered, didn't he?

24     A.    Yes, he did.

25     Q.    And did he also tell you that at first he

1    thought he should stay out of it because he thought his

2    sister started the fight?

3    A.    Yes.

4    Q.    And that she got the first lick in so to

5    speak?

6    A.    Right, he thought that Patrick should be

7    allowed to get his licks in.

8    Q.    Did he tell you that he felt that she got the

9    first licks in and it would be wrong of him to stop

10   Patrick from getting his lick in, right?

11   A.    Yes.

12   Q.    He tried to stay out of their business?

13   A.    Right.

14   Q.    Did he tell you that he and his own wife had

15   had arguments about the relationship between Patrick

16   Brown and April Reese?

17   A.    Yes, he did.

18   Q.    Did he tell you that he pulled Patrick off of

19   his sister?

20   A.    Yes.

21   Q.    Did he tell you that should have been the end

22   of it?

23   A.    Yes.

24   Q.    Did he tell you that after he pulled Patrick

25   off of his sister that Patrick started kicking her?

                              ╱

1      A.    I think he said he was kicking at her trying

2    to -- the impression I got was that he was trying to

3    kick her through him but he was between the two of

4    them.

5      Q.    Will you refer to page four, sir.

6      A.    Yes.

7      Q.    Did he tell you after he pulled Patrick off

8    of his sister that should have been left at that, but

9    that Patrick started kicking her?

10     A.    Yes.

11     Q.    Did he say that Patrick kicked her all around

12   the kidney?

13     A.    Yeah, he said the kidney and the ankle.

14     Q.    Did he tell you Patrick kicked her between

15   the leg --

16          THE COURT:    Let him finish.

17   BY MR. GODWIN:

18     Q.    -- between her legs and also kicked her in her

19   face?  Did he tell you that specifically Patrick kicked

20   his sister between her legs?

21     A.    Yes.

22     Q.    And I'm not trying to be a wise guy, sir, but

23   obviously you didn't go out and conduct any

24   investigation into that aspect of the case?

25     A.    No.

JUSTICE REPORTING SERVICES, INC.     523-6114

1     Q.   You didn't send any female officer out either
2     to do that, did you?

3         A.   No.

4         Q.   I asked earlier if you saw any cuts and
5     bruises on April Reese, you didn't inspect her closely,
6     did you?

7         A.   The only inspection that I did was the face
8     to face confrontation that we had two days prior to
9     that, immediately after the incident when I had an
10    opportunity to view just her - from the neck up.  I
11    didn't observe any injuries at that point and I
12    certainly had no reason at that point in time to look
13    at her genitalia or any other portions of her body.

14        Q.   But after Jeremy Lockhart gave you this
15    statement you didn't conduct any further investigation,
16    did you?

17        A.   No I didn't do any further follow up
18    whatsoever after that.

19        Q.   And he told you that Patrick Brown kicked her
20    in the genitalia, in essence he kicked her between her
21    legs?

22        A.   That's what he professed, yes.

23        Q.   And kicked her in the face?

24        A.   That's what he said even though there was no
25    evidence of that the night the incident took place.

```
1          Q.    Now, you have sense investigated Patrick

2     Brown's background, haven't you?

3          A.    As I just said I took no further active part

4     in this investigation after this.

5          Q.    Are aware, sir --.

6               MR. PATNER:  May we approach the bench, Your

7          Honor?

8               THE COURT:  Yes, sir.

9               (Thereupon, the following proceedings were

10          had at side bar outside the hearing of the

11          jurors.)

12               MR. PATNER:  I'll apologize to defense

13          counsel if this is not what he was going to ask

14          but I believe he's going to ask if he is aware

15          whether or not --

16               THE COURT:  What are you going to ask?

17               MR. GODWIN:  I'm going to ask if he

18          investigated the injury Patrick Brown previously

19          inflicted upon April Reese.  He is the lead

20          detective in the case it goes to his bias, motive,

21          and thoroughness of his investigation.

22               MR. PATNER:  That goes to smear the character

23          of Patrick Brown it's irrelevant.

24               THE COURT:  Sustain the objection.

25     BY MR. GODWIN:
```

1       Q.   Did he tell you that as Patrick Brown was

2   kicking at his sister as we described, Patrick Brown

3   swung at him and hit him one time?

4       A.   I believe so.

5       Q.   And at that time he pulled out the gun and

6   shot?

7       A.   Where are you referring to?  What portion of

8   the transcribed copy?

9       Q.   I'll show you, sir.

10      A.   Yes he said that.  He made a comment that at

11   that time I said I told you all to stop.  And then he

12   pulled out and started - he pulled out the gun and

13   started firing.

14      Q.   Now, sir, did Jeremy Lockhart tell you that

15   there was several reports on Patrick Brown for

16   fighting?

17      A.   Yes, I believe he mentioned that.

18      Q.   Did you investigate those reports, sir?

19      A.   No sir.  Again after this day I had no

20   further involvement in this case as far as follow ups

21   were concerned.

22      Q.   You did no further investigation of Mr.

23   Brown's background?

24      A.   I did not personally, no.

25      Q.   You didn't ask anybody else to?

```
 1          A.    Sir, I don't think we would have to ask the
 2    daily detective that's something he would do on his
 3    own.
 4          Q.    You were in charge of this case, were you
 5    not?
 6          A.    No I was not.  I was one of the detective
 7    involved.  The lead detective, however, is actually
 8    John Abrams.
 9          Q.    Are you aware of any investigation that was
10    done into Patrick Brown's background and after Mr.
11    Lockhart --
12                MR. PATNER:  Object to relevance.
13                THE COURT:  Yes, sustained.
14                MR. GODWIN:  Judge, this is in report.
15                THE COURT:  No, no, sustained.
16    BY MR. GODWIN:
17          Q.    You were told there were several reports on
18    Mr. Brown, weren't you?
19          A.    Yes.
20          Q.    And you never attempted to secure those, did
21    you?
22                MR. PATNER:  Judge, again same objection,
23          same question.
24                THE COURT:  Sustained.
25                MR. GODWIN:  Judge, I asked if he ever
```

```
 1        attempted to secure the statements.  Reports, Your
 2        Honor.
 3             THE COURT:  Well, you've asked -- he said he
 4        has done absolutely no follow up investigation
 5        whatsoever on this case since the arrest of the
 6        defendant.  So I will sustain the objection.
 7   BY MR. GODWIN:
 8        Q.   Did Jeremy tell you that the police had been
 9   to his mother's house about this matter?  I'm talking
10   about the previous reports?
11        A.   I don't know if it's in his statement you can
12   it to me too, I don't recall that.
13        Q.   Page five, sir.
14        A.   Yes.
15        Q.   Now, sir, with respect to the gun Mr.
16   Lockhart, Jeremy described the gun for you, didn't he?
17        A.   Yes, sir, he did.
18        Q.   He told you it was an automatic, correct?
19        A.   Yes, he claimed that it was an automatic.
20        Q.   He told you he pulled the trigger one time?
21        A.   Yes, and it continued to fire.
22        Q.   And he also took you, and your partner was
23   Detective Abrams?
24        A.   No, it wasn't my partner it was another
25   detective who was in the office and agreed to accompany
```

JUSTICE REPORTING SERVICES, INC.     523-6114

**Exhibit 13**
continued

IN THE DISTRIC. COURT OF APPEAL FOURTH DISTRICT
WEST PALM BEACH, FLORIDA

CLOCK IN

| DIVISION: APPELLATE | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION | |

Appellant

JEREMY LOCKHART
VS.
STATE OF FLORIDA,

Appellee

CASE NUMBER
94-10764CF10A
APPEAL NUMBER
95-3410

VOLUME ___III___ PAGES _400_____ TO _599___

RICHARD L. JORANDBY (15th P.D.),

.ttomey for Appellant

IOAN FOWLER,
.ssistant Attorney General

RECEIVED
ATTORNEY OFFICE OF THE
GENERAL
FE3 2 0 1996
CRIMINAL OFFICE
WEST PALM BEACH

7-0313

```
 1   State of Florida      )
                           ):ss          Mark A. Speiser
 2   County of Broward     )

 3
                   IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
                IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6   STATE OF FLORIDA,

 7             Plaintiff,

 8   -vs-                            Case No. 94-10764 CF10A

 9   JEREMY LOCKHART,

10             Defendant.

11   _____/               COPY

12

13
                    --------------------------------
14              APPEAL ON BEHALF OF THE DEFENDANT
                --------------------------------
15

16
                         ---------
17                       VOLUME III
                         ---------
18                     Pages 400-599

19
     APPEARANCES:
20
                 JOE PATNER, Esquire,
21               Assistant State Attorney,
                 Appearing on behalf of the Plaintiff.
22
                 ROBERT GODWIN, Esquire,
23               Appearing on behalf of the Defendant.

24

25
```

JUSTICE REPORTING SERVICES, INC.      523-6114

401

```
 1                          I-N-D-E-X

 2    Proceedings                       Pages

 3    August 15th, 1995                 400-458
      August 16th, 1994                 458-599
 4

 5

 6    WITNESSES         DIRECT   CROSS   RE-DIRECT   RE-CROSS

 7    MICHAEL WALLEY       -        -       407        413
                     FURTHER DIRECT      FURTHER CROSS
 8                        414                 414

 9    JOSHUA A. PERPER   418        429      441        443

10    ROBERT KNUTTEN     446        453       -          -

11
      DEFENSE WITNESSES
12
      JEREMY LOCKHART
13

14                          E-X-H-I-B-I-T-S

15    STATE'S EXHIBITS                  PAGES

16    State's Exhibit 3                  424
      State's Exhibit 4                  429
17    State's Exhibit 5                  446

18

19

20

21

22

23

24

25
```

JUSTICE REPORTING SERVICES, INC.      523-6114

402

```
 1   State of Florida      )
                           ):ss          Mark A. Speiser
 2   County of Broward     )

 3
                   IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
                 IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6   STATE OF FLORIDA,
               Plaintiff,
 7
     -vs-                         Case No. 94-10764 CF10A
 8
     JEREMY LOCKHART,
 9
               Defendant.
10
                               /
11

12        Proceedings had and taken before the Honorable

13   Mark A. Speiser, one of the Judges of said Court, fifth

14   floor, Room 5900 Broward County Courthouse, Fort

15   Lauderdale, Broward County, Florida, on the 15th day of

16   August, 1995, commencing at or about the hour of 1:00

17   o'clock p.m., and being a jury trial.

18

19   APPEARANCES:

20        JOSEPH PATNER, Esquire,
          Assistant State Attorney,
21        Appearing on behalf of the Plaintiff.

22        ROBERT GODWIN, Esquire,
          Appearing on behalf of the defendant
23

24

25
```

JUSTICE REPORTING SERVICES, INC.       523-6114

1   us so I could have another officer with me.

2       Q.   Who was that?

3       A.   Detective Stone.

4       Q.   Mr. Lockhart took you and Detective Stone

5   down to the lake where he threw the gun?

6       A.   Yes.

7       Q.   And pointed out the specific spot where the

8   gun was?

9       A.   Yes, he did.

10      Q.   And the police made a decision not to try to

11  retrieve the gun, correct?

12      A.   Yes.

13      Q.   Now, Jeremy told you that after this happened

14  he went down to Miami to visit his grandparents,

15  correct?

16      A.   That's correct.

17      Q.   And his real father?

18      A.   Yes.

19      Q.   Because he wanted to at least be able to talk

20  to them and tell them what had happened?

21      A.   Yes.

22      Q.   You asked Jeremy what was the reason, what he

23  was thinking when he shot, didn't you?

24      A.   Yes, I did.

25      Q.   And he said when they get into a fight I can

JUSTICE REPORTING SERVICES, INC.    523-6114

404

```
 1    understand if they pass licks hand to hand but I know
 2    my little sister likes to book, didn't he tell you
 3    that?
 4         A.    Yes.
 5         Q.    She'll fight for so long and then she'll back
 6    off?
 7         A.    That's what she said.
 8         Q.    But what Brown did that night - that day
 9    wasn't called for because I feel as though he was
10    trying to start a fight. He told you that, didn't he?
11         A.    Yes.
12         Q.    He said I seen him fight, you know, because
13    he's known for doing this.
14         A.    Uh-huh (affirmative response.), yes.
15         Q.    He told you Patrick Brown was known for
16    fighting, didn't he?
17         A.    Yes.
18         Q.    And again, sir, did you do any investigation
19    into that man's background?
20         A.    Again, sir --
21              MR. PATNER:  Judge, that's been asked and
22         answered now at least five times.
23              THE COURT:  Sustained, sustained.
24              MR. GODWIN:  The detective went into it Your
25         Honor, he asked him once.
```

405

```
 1              THE COURT:  No, I will sustain the
 2         objection.
 3              THE COURT:  He asked him once, no you asked
 4         him once.  No, I will sustain the objection.
 5    BY MR. GODWIN:
 6         Q.   You asked Jeremy if he thought - Jeremy
 7    thought Patrick was trying to kick him or kick his
 8    sister, didn't you?
 9         A.   Yes, I did.
10         Q.   And again Jeremy told you that he thought
11    Patrick was trying to kick his sister?
12         A.   Yes.
13         Q.   He said because there is several reports on
14    him, didn't he?
15         A.   Yes.
16         Q.   Do you have any of those reports, sir?
17         A.   Do I have any of those reports, no, not with
18    me.  My reports only concern my involvement.
19         Q.   And sir, you asked him, you asked Jeremy
20    where he was when he shot - when he shot Patrick Brown,
21    didn't you?
22         A.   Yes.
23         Q.   Well, excuse me.  You asked Jeremy where
24    Patrick Brown was when he shot, didn't you?
25         A.   Yes, yes I did.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

406

```
1        Q.    And he told you, Jeremy told you that Patrick
2    was, he was kicking at April at that time, didn't he?
3        A.    I believe so, yes.
4        Q.    And, sir, is it fair to say that he showed a
5    lot of sadness over what he had done, his best friend
6    had been killed?
7        A.    Yeah, he was emotional at the end.
8        Q.    He was crying?
9        A.    He cried, yes.
10       Q.    And you said he did it to protect someone he
11   loved very dearly, that being his sister?
12       A.    Are you referring to a specific point in
13   here?
14       Q.    Yes sir.
15       A.    Where?  Yeah, yeah, he professed that he was
16   sorry that he had killed a close friend of his because
17   of his sister.
18       Q.    And you saw him crying, didn't you?
19       A.    Yes, I did.
20       Q.    And he told you that Patrick was like a
21   brother to him, didn't he?
22       A.    Yes, yes he did.
23       Q.    And he said that's why he was hurt, that's
24   why he was crying?
25       A.    Yes.
```

407

```
 1         Q.    And after this statement you did no other
 2    investigation in the case, did you?
 3         A.    Well, other then, following the statement
 4    having him direct us to the lake and showing us that
 5    and then, you know, forwarding that information to
 6    other detectives.
 7         Q.    That was for you?
 8         A.    Yes.
 9              MR. GODWIN:   No further questions.
10              THE COURT:   Redirect?
11              MR. PATNER:   Thank you, Judge.
12                      RE-DIRECT EXAMINATION
13    BY MR. PATNER:
14         Q.    Sir, defense counsel in the beginning of
15    cross examination said it was important not to rush to
16    conclusions, correct?
17         A.    Sure.
18         Q.    And prior to arresting the defendants
19    obviously you, as well as the other police officers
20    that interviewed witnesses at the scene --
21
22              MR. GODWIN:   Objection to leading?
23              THE COURT:   Yes, sustained.
24    BY MR. PATNER:
25         Q.    Had you interviewed witnesses to the
```

JUSTICE REPORTING SERVICES, INC.      523-6114

408

```
 1   incident?

 2        A.   Yes.

 3        Q.   And had you reviewed those reports?

 4        A.   Yes.

 5        Q.   And in fact was evidence collected from the

 6   scene?

 7        A.   Yes.

 8        Q.   And were you familiar with that evidence?

 9        A.   Yes, I was.

10        Q.   You were familiar with the circumstances in

11   the case to the best of your ability?

12        A.   Yes.

13        Q.   And there had been other police officers

14   working on the case there, other police officers

15   working on the case as well?

16        A.   Yes, sir, there was.

17        Q.   Had you taken statements from witnesses?

18        A.   Yes.

19        Q.   And had other detectives taken statements of

20   witnesses?

21        A.   Yes, they had.

22        Q.   Were you familiar with the contents of the

23   statement prior to the defendant's arrest?

24        A.   Yes, I was.

25        Q.   Were you looking for the defendant for two
```

409

1    days?

2        A.    Yes.

3        Q.    And so when he walked into the police station

4    he was going to be detained, or was he going to be

5    detained based upon what you knew?

6        A.    Yes, yes he was.

7        Q.    Furthermore did you give him an opportunity

8    to tell you basically whatever he wanted?

9        A.    Sure.

10        Q.    And you took a statement from him, correct?

11        A.    Yes, I did.

12        Q.    I want to touch on a few things counsel

13    brought up in his questioning you about the statement.

14    First of all, as to April Reese did the defendant say

15    he had kick, that Patrick Brown had kicked April Reese

16    in the head and face, correct?

17        A.    Yes.

18        Q.    You saw no injury to that?

19        A.    No, I did not.

20        Q.    Was April Reese asked if she was injured?

21        A.    Yes, she was.

22        Q.    Did she answer that question?

23        A.    Yes.

24            MR. GODWIN:    Your Honor, please now we are

25        getting into hearsay.

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1              MR. PATNER:  I'll withdraw the question.
 2              THE COURT:  Sustained.
 3    BY MR. PATNER:
 4       Q.   On page - referring to page five of the
 5    transcript.  The defense attorney asked you about
 6    reports about Patrick Brown being, reports to the
 7    police about being out to the house.  I believe it's
 8    the fourth question and the subsequent answer to that.
 9    Do you remember the defense attorney asking you about
10    that?
11       A.   Yes, I do.
12       Q.   Doesn't the defendant go on to say that and
13    he's referring to his sister, I'm seeing how she acts
14    when she goes drinking and she just gets wild, correct?
15       A.   Yes.
16       Q.   So now is the defendant in fact referring to
17    his sister at that point?
18       A.   Yes.
19       Q.   You're also asked on page four, if you just
20    flip back a page towards the bottom big paragraph the
21    first paragraph, the answer of the defendant was asked
22    about the actions of the deceased Mr. Brown and the
23    defendant.  Then it goes on and did he not say that it
24    wasn't until Patrick Brown, Patrick Brown swung at the
25    defendant that he shot him?
```

411

1      A.    Yes.

2      Q.    And he in fact said he swung at me and hit me
3   but he only hit me one time.  At that time I said I
4   told you all to stop that's when I pulled out the gun
5   and I shot, period.  That is in fact the follow up,
6   that's how he continues his answer about April Reese
7   being allegedly struck, correct?

8      A.    Yes.

9      Q.    The defense attorney also asked you about the
10  defendant saying he was going to go to Miami to tell
11  his grandparents what happened.  Referring to page six
12  of the transcript on the second answer of that page.
13  Did he not -- the full answer saying that he wanted to
14  visit his grandmother because, you know, if I go to
15  jail then I wouldn't see them.

16     A.    Yes, that's correct.

17     Q.    And on page nine of the transcript the last
18  page about halfway down the defense attorney, do you
19  remember him asking you about the defendant saying he
20  was - that he had done something as far as protecting
21  someone he loved dearly?

22     A.    Yes.

23     Q.    Remember him asking you that question?

24     A.    Yes.

25     Q.    Prior to that though didn't he in fact say I

```
1    didn't call the police.  The question was why did you
2    not go and call the police?  Answer, it was like I know
3    I had -- I know I had done something that I was going
4    to go to jail for.  Wasn't that the full first part of
5    the answer?  Then he goes on to say that he killed
6    someone for someone he loved dearly?
7         A.   Yes, sir.
8         Q.   You don't know whether or not April Reese was
9    kicked other then the defendant saying it, correct?
10        A.   That's correct.
11        Q.   You saw no evidence upon her that she was
12   kicked, did you?
13        A.   No.
14        Q.   And did you hear her complain of any injury
15   upon her?
16        A.   No.
17        Q.   Did you in fact know whether or not the gun
18   was thrown into the lake or was it that's what the
19   defendant told you?
20        A.   That's just what he told us.
21             MR. PATNER:  May I have just a moment,
22        Judge?
23             THE COURT:  Yes.
24   BY MR. PATNER:
25        Q.   Did Jeremy Lockhart the defendant appear
```

JUSTICE REPORTING SERVICES, INC.    523-6114

413

1   injured in anyway when he came in?

2       A.    No.

3       Q.    And he also indicated to you - did he

4   indicate to you that he had smoked marijuana on the day

5   of the incident?

6       A.    Yes.

7           MR. PATNER:   I have no further questions,

8       judge.

9           THE COURT:   Re-cross?

10                  RE-CROSS EXAMINATION

11  BY MR. GODWIN:

12      Q.    Sir, as a fair thorough police officer did

13  you attempt to investigate anything that Mr. Lockhart

14  told you after you took the statement from him?

15      A.    Sir, again personally I took -- my active

16  part was I took the copy of the statement and gave it

17  to the other detective in charge of the case.  Any

18  further follow up was conducted by him.

19      Q.    Did you recommend any further follow up

20  recommendation after Mr. Lockhart gave you that

21  statement?

22      A.    I don't know if I did or not, it's possible I

23  may have.

24      Q.    Did you ask anyone to go over and interview

25  April Reese to find out about her being kicked between

```
 1   the legs?

 2        A.   No, I didn't no sir.

 3        Q.   How long did you say you've been a homicide

 4   investigator?

 5        A.   Since 1981.

 6             MR. GODWIN:  No further questions.

 7             THE COURT:  Thank you.

 8                  FURTHER DIRECT EXAMINATION

 9   BY MR. PATNER:

10        Q.   Was April Reese interviewed?

11        A.   Yes, she was.

12        Q.   By who?

13        A.   Detective John Abrams.

14        Q.   Was she asked whether or not she was injured?

15        A.   Yes.

16        Q.   What did she say?

17        A.   She said she was not.

18             MR. PATNER:  I have nothing further.

19                  FURTHER CROSS EXAMINATION

20   BY MR. GODWIN:

21        Q.   She wasn't asked if she was kicked between

22   the legs, was she sir?

23        A.   Not in my presence, no.

24        Q.   You know she was hit with a baseball bat?

25             MR. PATNER:  Judge, may I approach the
```

415

```
 1    bench?
 2            THE COURT:  Yes, sir.
 3            (Thereupon, the following proceedings were
 4    had at side bar outside the hearing of the
 5    jurors.)
 6            MR. PATNER:  It's irrelevant non-prejudicial
 7    and it's outside the scope.
 8            THE COURT:  Well, she wasn't hit with a
 9    baseball bat in this indent.
10            MR. GODWIN:  If Your Honor please, he went
11    into hearsay asking about what April Reese told
12    other people about whether she was injured in this
13    case.
14            THE COURT:  Right, you're talking about a
15    baseball bat and another indent.
16            MR. GODWIN:  Well, I want to go into it.
17            THE COURT:  I will sustain the objection.
18            THE COURT:  Objection, sustained.
19            (Thereupon, the following proceedings were
20    resumed in the presence of the jury.)
21            THE COURT:  Okay, no more questions?
22            MR. GODWIN:  No further questions.
23            MR. PATNER:  No further questions.
24            THE COURT:  Thank you, sir, you are excused.
25    Next witness.
```

416

```
 1              MR. PATNER:  May I approach for a minute,
 2         Judge?
 3              (Thereupon, the following proceedings were
 4         had at side bar outside the hearing of the
 5         jurors.)
 6              MR. PATNER:  Judge, I'd ask for just five
 7         minutes.  First of all I have to go to the
 8         restroom and second of all I'd like to speak to
 9         the doctor.
10              THE COURT:  All right, just five minutes.
11              (Thereupon, the following proceedings were
12         resumed in the presence of the jury.)
13              THE COURT:  All right, folks we going to take
14         a five minute recess.
15              MR. PATNER:  Thank you, Judge.
16              (Thereupon, the following proceedings were
17         had outside the hearing of the jurors.)
18              THE COURT:  Yes, sir?
19              MR. GODWIN:  What I need to raise with the
20         Court is Ms. April Reese is going to be a witness
21         for the defense, April Reese, R-E-E-S-E and she
22         left to go to work.  She had to be at work at 5:00
23         so I assume we are going to call the medical
24         examiner now?
25              MR. PATNER:  Yeah.
```

```
1              MR. GODWIN:  I'm asking if we can call her in
2       the morning, Judge.
3              THE COURT:  Well, he's got two more
4       witnesses, right?
5              MR. PATNER:  Medical examiner and the
6       technician.
7              THE COURT:  We are not going to get in - I
8       hope we can get to the technician.  Is he going to
9       be long, the medical examiner?  I'd like to finish
10      both today.
11             MR. PATNER:  I would too.
12             MR. GODWIN:  I wanted to let the Court know
13      my witness is going to leave.
14             THE COURT:  You have that witness and I'm not
15      going to start tomorrow at 1:30 but you have her
16      possibly?
17             MR. PATNER:  The technician will be ten
18      minutes and the medical examiner I have no idea
19      how long his cross examination will be.
20             THE COURT:  Okay, all right.
21             THE COURT:  All right.  Okay, let's bring in
22      the jury.
23             THE BAILIFF:  Jury coming in.
24             (Thereupon, the following proceedings were
25      resumed in the presence of the jury.)
```

418

```
 1              THE COURT:   Okay, call your next witness
 2         please.
 3              MR. PATNER:   Thank you, Judge, State calls
 4         Dr. Joshua Perper.
 5              THE BAILIFF:   Remain standing raise your
 6         right hand, place your left hand on the bile.
 7    Thereupon,
 8                         JOSHUA PERPER,
 9    having been first duly sworn, was examined and
10    testified as follows.
11                       DIRECT EXAMINATION
12    BY MR. PATNER:
13         Q.   State your full name and spell your last name
14    for the record, please.
15         A.   Joshua A Perper, P-E-R-P-E-R.
16         Q.   Good afternoon doctor, state your occupation
17    for the jury please?
18         A.   I'm a physician and my speciality is forensic
19    pathology.
20         Q.   How long have you been involved in the field
21    of forensic pathology?
22         A.   More then twenty years.
23         Q.   What current position do you hold with
24    Broward County?
25         A.   I'm currently the chief medical examiner for
```

1    Broward County.

2         Q.    What is your duty as a chief medical examiner
3    for Broward County?  What do you do in relation to your
4    job?

5         A.    My duties in my office are investigations of
6    sudden, unexpected, suspicious, or violent deaths.  And
7    under those circumstances when somebody dies in an
8    unnatural condition or suddenly or unexpectedly and
9    then we start an investigation of the cause and manner
10   of death.  And in this investigation we are obviously
11   assisted by a law enforcement agency and that
12   investigation consists of reviewing the circumstances
13   of the incident, sometimes going to the scene of the
14   incident and then performing an examination of the body
15   of the deceased which is called an autopsy.  Which
16   consists of an exterior examination of injuries of the
17   deceased.  And this is followed by an internal
18   examination of injuries or the various injuries.  We
19   photographs various sections, and then tissue are taken
20   for a microscopic examination.  And the reports are
21   written about the findings and conclusions are made
22   about the diagnosis.  In other words, the diseases or
23   the type of injury, and an opinion is formulated about
24   the cause and manner of death.

25         Q.    And doctor what sort of educational

420

1    background do you have which enables you to carry out
2    the position of chief medical examiner?

3        A.    I have a forensic degree, I have a medical
4    degree from the medical school of Dirby University
5    (phonetic) in 1962.  I have a law degree from the law
6    school of Cooper University.  And I have a master's of
7    science degree in forensic psychology and pathology
8    from John Hopkins University in 1969.

9        Q.    Have you kept current by attending and
10   receiving subsequent education in the field of forensic
11   pathology?

12       A.    Yes I am currently attending clinical
13   professional pathology at the medical school of
14   University of Miami.  I'm also with JAM a professional
15   in Anthropology at Florida Atlantic University.

16       Q.    And have you in fact been published in the
17   field of forensic pathology, sir?

18       A.    Yes I published more then a hundred
19   publications including six books or chapters in books
20   in the field of forensic pathology, legal medicine.

21       Q.    Do you hold any editorial positions with any
22   journals or with any journals in the field of forensic
23   medicine?

24       A.    Yes I'm currently the associate editor of the
25   journal of forensic medicine and pathology which is a

421

 1    major publication of forensic pathology in the country.
 2          Q.    How may pathologist do you have working on
 3    the staff, sir?
 4          A.    At this time I have three staff assistant
 5    pathologist and two residents.
 6          Q.    An are you the chief medical examiner?
 7          A.    That's correct.
 8          Q.    Have you ever been qualified as an expert in
 9    the field of forensic pathology in courts here in
10    Broward County?
11          A.    Yes.
12          Q.    Approximately how may times?
13          A.    Several times.
14          Q.    On June 27th, 1994, sir, at approximately
15    8:00 a.m., were you so employed as the chief medical
16    examiner for Broward County?
17          A.    Yes, I was.
18          Q.    Did you in fact come in contact with an
19    individual, a deceased individual by the name of
20    Patrick Brown?
21          A.    Yes, I performed an examination on him.
22          Q.    And where did you perform the examination at?
23          A.    In the autopsy room in the medical examiner's
24    office in Broward.
25          Q.    What time did that autopsy take place, sir?

422

```
1        A.    The autopsy was performed at 8:00 in the
2    morning.
3        Q.    Did you take any preliminary examination such
4    as height and weight of the individual, Mr. Brown?
5        A.    Yes.
6        Q.    And what was his height and weight?
7        A.    The height was sixty-nine inches and the
8    waited was one hundred and forty-seven pounds.
9        Q.    So sixty-nine inches would make him five feet
10   nine inches?
11       A.    Yes.
12       Q.    And did you conduct an internal and external
13   examination of the individual, Patrick Brown?
14       A.    Yes, I did.
15       Q.    Did you notice -- first of all I have to ask
16   you -- well I'd like to ask you about his head and face
17   area.  Did you notice any trauma about the head and
18   face area?
19       A.    Yes.
20       Q.    And in particular what did you notice about
21   the head and face area?
22       A.    There was a laceration or a tear on his mid
23   forehead.
24       Q.    Did you - and I'll come back to that in a
25   moment.  During your examination of his body or torso
```

423

1    or buttocks area did you see what appeared to be gun
2    shot wounds?

3        A.    Yes.

4        Q.    Approximately how many?

5        A.    There were four gunshot wounds.

6        Q.    And in a general sense can you indicate first
7    where those wounds were located?

8        A.    Yes.    There were four gunshot wounds, two in
9    the right front chest and one in the right upper chest,
10   the second one in the right lower chest.    And two
11   gunshot wounds in the left back, one on the left
12   buttocks and one above it in the left mid back.

13       Q.    And, doctor, in explaining the nature of
14   these wounds to the jury and the trauma would it aid in
15   your presentation to the jury to refer to a diagram of,
16   and show on the diagram where those wounds are?    Would
17   that be helpful in showing it to the jury?

18       A.    Sure.

19             MR. PATNER:    May I have just a moment?

20             THE COURT:    Yes, sir.

21             MR. PATNER:    Remain seated for a moment,

22       doctor.    Your Honor, let the record reflect

23       I'm showing defense counsel what's been previously

24       marked State's Exhibit C, composite.

25             MR. GODWIN:    I have no objection, Judge.


JUSTICE REPORTING SERVICES, INC.    523-6114

424

```
1              THE COURT:  Do you have any objection to it
2         coming right into evidence?
3              MR. GODWIN:  No it can come right into
4         evidence.
5              MR. PATNER:  Your Honor, at this time the
6         State would seek to move into evidence State's
7         Exhibit C.
8              THE COURT:  State's Exhibit C will now become
9         State's Exhibit 3.
10             (Thereupon, State's Exhibit No. 3 was
11        received in evidence.)
12   BY MR. PATNER:
13        Q.  Doctor, do you recognize the photographs in
14   these pictures?
15        A.  Yes, I do.
16             MR. PATNER:  Your Honor, may I have the
17        witness step down please?
18             THE COURT:  Yes, come down.
19   BY MR. PATNER:
20        Q.  Doctor, I'd like you to first look at what's
21   lettered B on State's Exhibit 3 are those in fact
22   pictures of Patrick Brown?
23        A.  Yes.
24        Q.  And do they show the trauma?
25        A.  This picture which is labeled B shows the
```

425

1    upper part of the face of the deceased.  You can see

2    here on the end of the forehead it's kind of a

3    triangular tear.  It's a laceration or tear that mostly

4    occurred as a result of some type of blunt force.

5        Q.    That's a bullet wound, that's apparently a

6    blunt force trauma wound?

7        A.    That's definitely right.

8        Q.    Referring to photograph A?

9        A.    Photograph A shows the right side -

10   photograph A shows the right side of the chest of the

11   deceased.  You can see the needle in this area and

12   below the needle you see two gunshot wounds.  Two

13   gunshot wounds, one an upper gunshot wound and the

14   second one a lower gunshot wound.  Both gunshot wounds

15   are below the right (indicating).

16       Q.    Are those both inerrant wounds, sir?

17       A.    Yes.

18       Q.    And photograph C can you explain what's

19   depicted in that photograph, sir?

20       A.    This photograph is a photograph of the left

21   side of the back of the deceased.  And you can see here

22   in the left side of the back and in the knee area there

23   is a gunshot wound a hole which represents the gunshot

24   wound (indicating).

25       Q.    And on photograph D what is represented on

JUSTICE REPORTING SERVICES, INC.    523-6114

426

1    that photograph, sir?

2        A.    Photograph D is the photograph of the area of

3    the buttocks of the individual.  And the again you can

4    see here there is a gunshot wound (indicating).

5        Q.    Doctor, can I ask you to just remain here so

6    I can refer you to the diagram so you can see the

7    context as to where these wounds are in the full

8    picture.  I'll give you a marker, I'd like you to first

9    describe the bullet wound on what is marked in your

10   report as wound number one right lower chest.  If you

11   please indicate on the diagram where that wound was?

12       A.    (indicating).

13       Q.    And what path did that bullet take upon

14   entering the body?

15       A.    This gunshot wound penetrated between the

16   ribs and then continued and perforated the right lung,

17   went down perforated the liver, and then perforated the

18   aorta which is a major artery.  Then perforated the

19   intestine and was recovered somewhere in the left flag.

20       Q.    So did the bullet take a downward path upon

21   entering the body?

22       A.    The bullet went from the right side of the

23   individual to his left side and downwards.  To the

24   connected backbones and associate that with this wound

25   there was an extensive amount of blood in the right

427

1    chest and there was a small amount of blood in the left

2    chest and a small amount of blood flowing in the

3    abdominal cavity.  Then a large amount of blood around

4    the aorta.

5         Q.    Would that bullet and subsequent damage cause

6    in and of itself to be fatal?

7         A.    This bullet is the fatal bullet

8    (indicating).  All the other three bullets were not

9    necessarily fatal.

10        Q.    May have been but not necessarily so that

11   bullet wound is --

12        A.    Not necessarily would it have been fatal but

13   as a result of complications it might have been.

14        Q.    Now, there was a wound in the right upper

15   chest, correct?

16        A.    That's correct.

17        Q.    You indicated in your report as wound number

18   three I don't know if you want to be consistent and go

19   with three?

20        A.    I think I'm going to put the numbers and then

21   I will describe them the back and front.

22        Q.    That's fine.

23        A.    Wound number three is a wound which basically

24   was not potentially lethal, and what wound number three

25   basically did is that it perforated the skin and then

1    curved against the curvature of the ribs.  In other
2    words, the chest is round and because it was not a
3    large caliber bullet it slid around the chest and it
4    ended up somewhere in the right upper chest.  So the
5    general direction of those wounds was from the right
6    side of the inside to his left.  Both of them in
7    front.

8         The wound number two which is the wound on
9    the bottom was somewhat of an unusual wound because
10    those two wounds went from the left of the individual
11    to his right and upwards.  But the lower, number two,
12    went to the right and hit the back of the bone here
13    (indicating), and as a result of that the course of the
14    bullet was deflected and instead of continuing and
15    going to the right it changed direction and went to the
16    left and ended close to the hip bone.

17         And finally number four again perforated the
18    skin, did not enter the body cavities but again slide
19    against the rip, against the back and was recovered
20    somewhere again in the right upper back at an angle of
21    about 35 or 40 degrees.

22    Q.    You can retake your seat.  Doctor, does this
23    diagram fairly and accurately represent on the body
24    where those bullet entrance wounds were?

25    A.    Yes.

429

```
1                 MR. PATNER:   Your Honor, I'm showing defense
2         counsel what's now marked as State's Exhibit D for
3         identification and I'd seek to move into evidence
4         State's Exhibit D I believe as State's Exhibit 4.
5                 MR. GODWIN:   No objection, Your Honor.
6                 THE COURT:   So ordered.
7                 (Thereupon, State's Exhibit No. 4 was
8         received in evidence.)
9    BY MR. PATNER:
10        Q.   Doctor, did you form an opinion to a
11   reasonable degree of medical certainty based upon your
12   training and experience and your examination as to the
13   cause of death of Patrick Brown?
14        A.   Yes.
15        Q.   What is that, sir?
16        A.   He died of multiple gunshot wounds to the
17   chest, back, and bottom.
18        Q.   What was the manner of death?
19        A.   Homicide.
20                MR. PATNER:   I have no further questions.
21                THE COURT:   Your witness.
22                MR. GODWIN:   Just a few questions.
23                      CROSS EXAMINATION
24   BY MR. GODWIN:
25        Q.   Doctor, we met before, have we not?
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1      A.    Yes.

 2      Q.    Doctor, are you able to tell the jury the

 3  order in which the gunshot wounds were fired?

 4      A.    No.    The numbers which I give to the gunshot

 5  wounds those are arbitrarily numbers for purposes of

 6  description.    They do not indicate in what sequence the

 7  gunshot wounds were inflicted.

 8      Q.    You don't know which was first or second or

 9  third or fourth?

10      A.    That's correct.

11      Q.    Am I correct?

12      A.    That's correct.

13      Q.    And the gunshot, pardon me.    The injury to

14  the head, injury to the head is clearly not a gunshot

15  wound, correct?

16      A.    That's correct.

17      Q.    Is that consistent with somebody being hit

18  with say a beer bottle?

19      A.    Could have been, could have been from a

20  fall.    I cannot tell you which one.

21      Q.    Now doctor, let's talk about gunshot wounds,

22  which is gunshot wound number one on your report?

23      A.    Gunshot wound number one is the gun shout

24  wound that is basically the lethal gunshot wound.    The

25  one to the right lower chest.
```

1      Q.    Could you just come down here for a moment

2    with the Court's permission?

3            THE COURT:   Yes, sir.

4    BY MR. GODWIN:

5      Q.    Could you come down here using me for just a

6    moment and just by pointing to the jury show the

7    direction of the gunshot wound?

8      A.    The gun shot wound, that's the chest here

9    (indicating), the right chest is here, and it went and

10   perforated between the ribs inside the chest cavity and

11   perforated the lung.   Then it continued down ESA which

12   is call the diaphragm and separates the chest quarters

13   from the abdominal organs and it perforated that

14   partisan and continued in through here to the big organ

15   which is the liver and it perforated the liver.   Then

16   it went backwards just close to the spinal bone which

17   you can feel in the back it's a big vessel called the

18   aorta, a major artery of the body and it perforated the

19   aorta.   Then it perforated the intestines.   So the

20   direction of this would be a line, if I could put my

21   hand like that (indicating).

22     Q.    Okay.  Now, do you -- you can have a seat if

23   you would.

24     A.    Sure.

25     Q.    Can you tell the jury how close the gun was

432

1    to the deceased when that shot was fired?

2        A.   No I cannot.  And the reason why I can not is
3    that I don't have the clothing.  In other words, it's
4    possible to say from what range a gunshot as inflicted
5    by looking at the firearm residue or soot or powder on
6    the target area.  In this particular case the target
7    area was part of the body which was clothed and
8    therefore, the crime lab only could say if they
9    examined the clothing whether they see any firearm
10   residue indicative of a close range.  In other words,
11   of a close proximity between the individual who shot
12   the weapon and the deceased.

13       Q.   You were never given clothing of Patrick
14   Brown to inspect, is that correct?

15       A.   That's correct.  Even if I were given
16   clothing it's not really my expertise.  If there had
17   been a larger amount of soot or powder I would be able
18   to see it but a more sophisticated test would have to
19   be done by the crime lab.

20       Q.   I know it's kind of basic but just show the
21   jury what I mean by contact gun shot wound?

22       A.   Using your hand this would be the gun and a
23   contact gunshot wound would be one which would be
24   actually touching, the muzzle would be touching the
25   clothing or the skin.  Then I would see marks of the

433

1    muzzle possibly and burns caused by the muzzle.  If it
2    would be a close range gunshot wound less then one or
3    two feet again there would some powder burns visible on
4    the body like a tattoo.

5         Q.    Can you tell the jury whether any of these
6    gunshot wounds were contact wounds?

7         A.    I did not see any contact wounds.  But again
8    as I said before without the clothing I would be
9    reluctant to make a final determination.  However, I
10   must say there shouldn't have been any contact gunshot
11   wounds because then I would have seen in the wound
12   track microscopically powder and I didn't see it.

13        Q.    So what you're saying to the jury within a
14   reasonable degree of medical certainty that these were
15   not contact gunshot wounds, is that correct?

16        A.    Correct.

17        Q.    Correct?

18        A.    Yes.

19        Q.    Your findings were consistent with these
20   being what I call intermediate range?

21        A.    Close range, intermediate range or distant
22   range.  Close range would be closer then one feet, two
23   feet.

24        Q.    Intermediate range is what?

25        A.    Intermediate range would not be close range

434

1    it would be up to one feet, two feet.  And more then

2    that would be distant.

3         Q.    Lets go over it one more time.  Contact wound

4    obviously is touching?

5         A.    Yes, contact would be close range.

6         Q.    Near contact is maybe like one or two inches?

7         A.    Yes.

8         Q.    Then you have what you call intermediate?

9         A.    Yes, up to two feet.

10        Q.    Two feet?

11        A.    And beyond that would be distant.

12        Q.    All right.  Now, do you have an opinion as

13   to, as to the range of any of these particular gunshot

14   wounds?

15        A.    As I said I didn't find evidence of powder in

16   the track of the wound but it can be near contact,

17   close range, to medium or distant.

18        Q.    Now, with respect to what you called the

19   fatal gunshot wound.

20        A.    Yes.

21        Q.    Could that wound have been inflicted as the

22   deceased was attempting to strike the person who shot

23   him?

24        A.    I cannot tell you what the deceased was

25   doing.

435

```
1         Q.    I didn't ask you if you could tell me.  Are
2    your findings consistent with the deceased trying to
3    strike the person who shot him when that wound was
4    inflicted.  Can you give an opinion on that?
5         A.    I cannot give an opinion on it because it's
6    consistent with any kind of fact which the deceased
7    might have done.
8         Q.    The question is in your opinion, are your
9    findings - are your findings of the fatal gunshot wound
10   consistent with the deceased trying to strike the
11   person who was shooting him?
12             MR. PATNER:  Judge, object to speculation and
13        it's also been asked and answered.
14             THE COURT:  Well, first of all he asked can
15        you give an opinion.  If he can give an opinion
16        yes go ahead.  If he can't it ends there.
17             THE WITNESS:  I can not give you an opinion
18        because my findings cannot indicate how the
19        deceased behaved immediately prior to his death.
20        There is no correlation between my finding and his
21        action.
22   BY MR. GODWIN:
23        Q.    I'm not asking you about his actions I'm
24   saying are your findings consistent with that scenario
25   that I'm giving you is it consistent with --
```

436

```
 1              MR. PATNER:  I renew my objection he has now
 2         answered that he does not have an opinion as to
 3         that.
 4              THE COURT:  Can you answer that question yes
 5         or no?
 6              THE WITNESS:  I can answer the question but I
 7         cannot, I cannot respond to the -- in other words,
 8         if you asked me if the guy was Buddhist, is this
 9         consistent with a guy being a Buddhist I would say
10         well he might be Buddhist but my findings don't
11         have any correlation to his religious convictions
12         and they don't have any correlation to what he did
13         prior to that.
14              THE COURT:  Okay, sustained.
15              MR. GODWIN:  Give me a moment please,
16         Judge.
17    BY MR. GODWIN:
18         Q.   Let me ask you this, doctor, do you have any
19    evidence, any physical evidence that this fatal gunshot
20    wound could not have been received while a deceased was
21    swinging a blow?  Any physical evidence --
22              MR. PATNER:  Judge, this has been covered he
23         indicated he has no opinion as to that.  It's been
24         asked an answered.
25              THE COURT:  Can you answer that question?
```

437

```
 1        Overruled.

 2             THE WITNESS:  Are you asking me if there is

 3        any evidence if the deceased struck the other

 4        person?

 5   BY MR. GODWIN:

 6        Q.   No I'm saying is there any physical evidence

 7   that the deceased was not striking someone when he was

 8   shot?

 9        A.   I can not have physical evidence of something

10   which did not happen.

11        Q.   So you have no physical evidence one way or

12   the other?

13        A.   I don't have -- my findings cannot indicate

14   one way or another whether he was threatening the other

15   person who shot him.

16        Q.   You cannot say one way or the other whether

17   he was threatening or attacking the person that shot

18   him?

19        A.   That's correct.

20        Q.   Is that fair to say?

21        A.   That's correct.

22        Q.   Now, let's talk about the second gunshot

23   wound which you described as a little bit higher up on

24   the chest, is that correct?

25        A.   Yes.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

438

1      Q.    That goes in this direction, am I correct?
2   (indicating)?

3      A.    Yes.

4      Q.    Do you have any opinion as to how close the
5   deceased was to the person who shot him when that
6   gunshot wound was received?

7      A.    No.    The same kind of reasoning which I
8   mentioned before applies to this one.

9      Q.    All right.    Would your findings be consistent
10   with what you call an undetermined range?

11      A.    It's an undetermined range in other words it
12   can be near, close range, or medium, or distant range
13   but not contact for the reason which I mentioned.

14      Q.    Can you give us any opinion as to what
15   position the deceased was in when that gunshot wound
16   was fired?

17      A.    No except to say that he had to be facing the
18   shooting gun.

19      Q.    Can you tell us whether or not he was
20   swinging at the person who was shooting?

21      A.    I can not tell you one way or another.

22      Q.    You cannot say?

23      A.    That's correct.

24      Q.    Now, let me ask you this, doctor, could just
25   step down here again for a second.

JUSTICE REPORTING SERVICES, INC.    523-6114

1       A.    Sure.

2       Q.    You got a gunshot wound approximately here

3    and here, is that right, (indicating)?

4       A.    Yes.

5       Q.    Now show the jury where the other gunshot

6    wounds are if you would?

7       A.    The other gunshot wound, one was in the left

8    bottom and the other one was in the left back.

9       Q.    Doctor, would your findings be consistent

10   with the deceased being shot once or twice in the chest

11   then spinning like this and falling when he was shot

12   the second, the third, and fourth time?

13      A.    Or the other way or around, yes.

14      Q.    But would it be consistent with the scenario

15   I described?

16      A.    Yes.

17      Q.    A man being shot twice here, spinning, and

18   falling and being shot?

19      A.    Yeah, or the other way around.  Shot in the

20   back.

21      Q.    Maybe shot in the back then spinning around

22   this way (indicating)?

23      A.    That's right.

24      Q.    Consistent with either one?

25      A.    Yes.

1       Q.    Thank you.  Do you have any opinion within a
2    reasonable degree of medical certainty whether Mr.
3    Brown was on the ground laying down when any of these
4    shots were inflicted?

5       A.    No because the projectivity of the wound
6    depends on the relative positions of the person who
7    shoots and the person who is shot.  And therefore I can
8    not tell you whether the individual was lying on the
9    ground or standing up with the exception of the fact
10   that the wound on the lower buttocks which was low
11   would be more probable and somewhat less likely to be
12   inflicted when he was standing up, though it's still
13   possible.

14      Q.    Still possible to be inflicted while he is
15   standing up?

16      A.    Right.

17      Q.    Or at least while he's spinning and falling,
18   correct?

19      A.    Correct.

20      Q.    By the way did Mr. Brown have evidence of a
21   low level of alcohol in his system?

22      A.    Yes.

23      Q.    Low level of blood alcohol, is that correct?

24      A.    Yes, I said yes.

25      Q.    Would it be consistent with him maybe

441

1    drinking a beer or two?

2         A.    Yes.

3         Q.    Now, of course the manner of death was deemed

4    to be homicide, correct?

5         A.    That's right.

6         Q.    And you don't offer any opinion at all to

7    this jury whether it was justified or not, do you?

8         A.    No that's not my responsibility that's the

9    responsibility of the jury and the Court.

10             MR. GODWIN:  Okay, that's all I have.   Thank

11        you very much.

12             THE COURT:  Redirect?

13             MR. PATNER:  Just briefly.

14                       RE-DIRECT EXAMINATION

15   BY MR. PATNER:

16        Q.    Doctor, there's tests done on the body for

17   alcohol and for drugs if there is any present, isn't

18   that correct?

19        A.    Yes.

20        Q.    Were there any drugs located in the system?

21        A.    Only drug which was there as lidocaine,

22   lidocaine is a medication which is given - this is not

23   a so called drug which people take.

24        Q.    Is that something the paramedics would have

25   given him trying to revive him?

JUSTICE REPORTING SERVICES, INC.     523-6114

442

1       A.    Yes, in the hospital.

2       Q.    Other then the lidocaine was there evidence

3    of marijuana, cocaine, or anything else?

4       A.    No.

5       Q.    And the blood alcohol level was .04 percent

6    .04 grams -- I always have a problem with that?

7       A.    It's 0.4 grams percent which meanings

8    fourteen milligram percent which is about half of what

9    is the presumptive legal level for intoxication when

10   driving a car.

11      Q.    And that would be a beer or two?

12      A.    Approximately, yes.

13      Q.    You stated that the only thing you could say

14   about the wounds to the back is that the back must have

15   been facing the gun, correct?

16      A.    And the same thing applies to the chest it

17   has to face the gun when it entered.

18      Q.    Sure.   And any residue, gun powder residue on

19   the clothing may not even - may not be visible on the

20   clothing itself if the gun was beyond a mere eighteen

21   inches, is that correct?

22      A.    That's correct.

23      Q.    And the wound we talked about the lower chest

24   wound it goes right to the left but it also goes

25   downwards, correct?

443

1        A.    That's correct.

2        Q.    And also from front to back at the same time?

3        A.    That's correct.

4        Q.    And the wound in the let buttocks goes upward

5    and also tracts from back to front, correct?

6        A.    From back to front and upwards, correct.

7        Q.    And also to the right?

8        A.    Right, yeah that's the initial course as I

9    said.

10            MR. PATNER:   Thank you, doctor, I have

11        nothing further.

12            MR. GODWIN:   Just one.

13                  RE-CROSS EXAMINATION

14   BY MR. GODWIN:

15        Q.    Doctor, both of the gunshot wounds to the

16   chest could have been inflicted while a deceased was

17   swinging a blow they person who shot him, is that fair

18   to say?

19            MR. PATNER:   Asked and answered.

20            THE COURT:   Sustained, sustained.

21            MR. GODWIN:   I think that's a different

22        question, Judge.

23            THE COURT:   Can you answer that question?

24            THE WITNESS:   I can answer it.  I cannot tell

25        you one way or another.  I think I said that the

JUSTICE REPORTING SERVICES, INC.    523-6114

444

```
 1          first time.
 2                    MR. GODWIN:  You don't rule that out?
 3                    THE COURT:  Already sustained.
 4                    THE WITNESS:  I cannot rule it out and cannot
 5          rule it in.
 6                    THE COURT:  Sustained, sustained.
 7                    MR. GODWIN:  One other thing, judge, one
 8          other question.
 9     BY MR. GODWIN:
10          Q.    Doctor, your findings are all consistent with
11     these gunshot wounds being fired with an automatic
12     weapon, correct?
13          A.    I could not tell you from my examination
14     whether there was an automatic weapon or not.  The
15     people who examined the casing of the bullet left would
16     be able to say if it comes from an automatic because
17     the casing is different, the casing of the bullet which
18     is ejected from an automatic is different from the
19     casing of a bullet which is ejected from a revolver and
20     that's not my job.
21          Q.    On an automatic you pull the trigger one time
22     and the gun just goes --
23                    MR. PATNER:  Object, outside the scope of
24          the witness and --
25                    THE COURT:  Sustained, sustained.
```

```
 1                    MR. GODWIN:  No further questions.
 2                    THE COURT:  Thank you, doctor.
 3                    THE WITNESS:  Thank you, Your Honor.
 4                    THE COURT:  You have one more witness, can
 5          you handle one more witness?  It will be our last
 6          witness for today.  That's a man by the way that
 7          you always want to see in a vertical position not
 8          in a horizontal position.
 9                    THE COURT:  Call your next witness then.
10                    MR. PATNER:  State calls Officer Knutten.
11                    (Thereupon, the following proceedings were
12          had at side bar outside the hearing of the
13          jurors.)
14                    MR. PATNER:  I'm a little concerned about the
15          juror on the end I noticed when I was - at some
16          point during the questioning she looked like she
17          was sweaty and I thought she was nodding off.
18                    THE COURT:  Okay, let me ask.  Okay.
19                    MR. PATNER:  I don't want to embarrass her I
20          think she may be a little sick.
21                    (Thereupon, the following proceedings were
22          resumed in the presence of the jury.)
23                    THE COURT:  Are you okay to proceed or would
24          you rather wait until tomorrow?
25                    THE JUROR:  I just have a headache that's not
```

446

```
1     getting any better.
2          THE COURT:  You sure?
3          THE JUROR:  I don't want to hold up anything.
4          THE COURT:  You're not holding up anything
5     this testimony will take about twenty minutes, is
6     that right?
7          MR. PATNER:  Would be less then the medical
8     examiners.
9          THE JUROR:  I will be all right.
10         THE COURT:  Wait until we get this lady the
11    medicine.  Okay.
12  Thereupon,
13                    ROBERT KNUTTEN,
14  having been first duly sworn, was examined and
15  testified as follows.
16         THE CLERK:  State your full name and spell
17    your last name for the record, please.
18         THE WITNESS:  Robert Knutten, K-N-U-T-T-E-N.
19         THE COURT:  Do you have any objection to
20    State's Exhibit E coming right into evidence.
21         MR. GODWIN:  I have no objection, Your Honor.
22         THE COURT:  Okay, that will become State's
23    Exhibit 5.
24         (Thereupon, State's Exhibit No. 5 was
25    received in evidence.)
```

JUSTICE REPORTING SERVICES, INC.    523-6114

447

```
1              MR. PATNER:  Thank you Your Honor.  May I
2         proceed, Judge.
3              THE COURT:  Yes, sir.
4                        DIRECT EXAMINATION
5    BY MR. PATNER:
6         Q.   Sir, state your full name for the record.
7         A.   Robber Knutten.
8         Q.   What do you do for a living, Mr. Knutten?
9         A.   Crime scene technician with the Fort
10   Lauderdale Police Department.
11        Q.   How long have you been involved in law
12   enforcement?
13        A.   Nineteen years.
14        Q.   Tell us a little bit about the
15   responsibilities of a crime scene technician?
16        A.   I go to crime scenes and photograph them,
17   dust for latent fingerprints and collect physical
18   evidence.
19        Q.   I'd like to take your attention back to June
20   27th, 1994, at approximately 4:30 p.m., did you have
21   occasion to respond to 2217 Northwest 9th Street
22   apartment number 3 in Fort Lauderdale?
23        A.   Yes.
24        Q.   What were you called to the scene for?
25        A.   A shooting homicide that had happened there.
```

448

```
 1      Q.    Do you recall what time you arrived at the
 2    scene?
 3      A.    About five after five.
 4      Q.    Was, what was the condition of the crime
 5    scene when you arrived there, was it secured?
 6      A.    Yes, it was roped off with crime scene tape.
 7      Q.    The yellow tape that we see?
 8      A.    Yes.
 9      Q.    Is that the Lennox Apartments you were at?
10      A.    Yes.
11      Q.    And was the decedent, Patrick Brown, was he
12    present there by the time you got there?
13      A.    No he had been transported to the hospital
14    prior to my arrival.
15      Q.    Can you briefly describe the apartment for
16    the jury?
17      A.    Just basically a two bedroom apartment with a
18    living and dining room area combined with a kitchen
19    added on.
20      Q.    And did you - were you made aware of the
21    nature of the homicide, of the nature of the incident?
22      A.    Just the basics.
23      Q.    Were you - was it known to you it was a
24    shooting?
25      A.    Yes.
```

449

```
 1        Q.   Did you look for evidence of a shooting, sir?
 2        A.   Yes.
 3        Q.   Did you find any evidence of a shooting at
 4   the crime scene?
 5        A.   Yes I found six fired .22 rim fire casings.
 6        Q.   What's a casing?
 7        A.   It's -- well, the entire bullet and the
 8   casing makes a cartridge and the cartridge is fired and
 9   the bullet goes out towards its target and the
10   remaining brass is the casing that holds the powder.
11        Q.   Do you have any familiarity with firearms?
12        A.   Yes.
13        Q.   How was that, sir?
14        A.   Just through various years of experience.
15        Q.   Is that part of your job on a regular basis
16   as a crime scene technician to look for bullet casing?
17        A.   Yes.
18        Q.   Is a casing what's expelled from the gun
19   after the bullet is shot from a semi automatic weapon?
20        A.   Yes, it is.
21        Q.   Did you in fact find some casings in the
22   apartment?
23        A.   Yes, six of them.
24        Q.   Okay.  And were those - were most of those
25   casings photographed?  Were the casings photographed?
```

JUSTICE REPORTING SERVICES, INC.     523-6114

450

```
 1      A.    Yes.

 2      Q.    Where were the casings located?

 3      A.    The majority was on the table near the south

 4   wall of the apartment and one was on the kitchen

 5   floor.

 6           MR. PATNER:  Your Honor, may I have the

 7      witness step down please.

 8           THE COURT:  Yes, sir.

 9   BY MR. PATNER:

10      Q.    First showing you what's already in evidence

11   as State's Exhibit 1 is that the apartment, sir?

12      A.    Yes.

13      Q.    And could you please in a general sense

14   indicate where the casings were?

15      A.    Okay.  The majority was on this table on the

16   south wall.

17      Q.    Okay, where is that?

18      A.    It's over here on this chair (indicating).

19      Q.    Okay, and taking your attention now to what's

20   now in evidence as State's Exhibit 5 I'd like you to

21   please look at that photograph, what's depicted in

22   photograph A; is that the table that we are talking

23   about?

24      A.    Yes.

25      Q.    And are there any casings located on that
```

JUSTICE REPORTING SERVICES, INC.    523-6114

451

1    table, sir?

2        A.    Yes, the casing right there (indicating).

3        Q.    And are any other casings indicated in that

4    photograph?

5        A.    I don't see any others.  Wait, yes there is.

6    There is another one down there (indicating).

7        Q.    And was there any beer bottles on that table?

8        A.    Yes.

9        Q.    And were there any casings found in relation

10   to the beer bottles?

11       A.    Yes, I found - go on to the next photograph

12   and I found another casing inside the wrapper of the

13   plastic bag.  And I found another casing actually

14   inside the carton (indicating).

15       Q.    And this is in fact the same table?

16       A.    Yes.

17       Q.    Taking your attention to photograph C, the

18   floor, was there casings recovered off the floor?

19       A.    Yes, that's the kitchen floor and there was

20   one more casing down there (indicating).

21       Q.    Do you have an idea of the distance of where

22   they were in relation to the table?

23       A.    Four or five feet.

24       Q.    So you found this casing for or five feet

25   away from the table, the other casings?

452

```
1      A.    Yes.
2      Q.    Are all these casings consistent with the
3  same type or caliber of bullet?
4      A.    Yes they were all .22 long rifle casings.
5      Q.    They are all .22 long rifle casings?
6      A.    Yes.
7      Q.    Now, did you - after processing the crime
8  scene did you in fact attend the autopsy of the victim?
9      A.    Yes.
10     Q.    And who was present during the autopsy?
11     A.    Doctor Perper performed it.
12     Q.    The individual that just testified here?
13     A.    Yes.
14     Q.    What was your purpose of attending the
15  autopsy?
16     A.    Just taking photographs and collecting any
17  physical evidence.
18     Q.    You took pictures of the gunshot wounds on
19  the body?
20     A.    Yes.
21     Q.    Were you able to collect any evidence from
22  the body itself?
23     A.    Yes, Dr. Perper removed four led projectiles.
24     Q.    Was that within the body?
25     A.    Yes.
```

453

```
 1        Q.    Showing you what's marked as D, State's
 2    Exhibit D do you recognize what's in that picture?
 3        A.    Those are the four projectiles.
 4        Q.    That's the actual part of the bullet that
 5    leaves the gun and entered in and was fired, correct?
 6        A.    Yes.
 7        Q.    There are the four bullets recovered from the
 8    body?
 9        A.    Right.
10        Q.    You could have a seat sir.  In your
11    experience, sir, do you know whether a .22 long can be
12    fired out of a pistol?
13        A.    A .22 can be fired out of a revolver or out
14    of a pistol too.
15        Q.    A .22 caliber is not the name of the rifle --
16            MR. GODWIN:  Objection, Your Honor, leading.
17            THE COURT:  Overruled.
18            THE WITNESS:  No, it's the name of the
19        cartridge itself.
20            MR. PATNER:  May I have just a moment,
21        Judge?
22            THE COURT:  Yes, sir.
23            MR. PATNER:  No further questions of this
24        witness.
25            THE COURT:  Your witness.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

454

1              MR. GODWIN:  Just one moment please, Your

2         Honor.

3                        DIRECT EXAMINATION

4     BY MR. GODWIN:

5         Q.   Sir, did you find a knife at the scene?

6         A.   Yes.

7         Q.   Where was the knife found?

8         A.   It was underneath the love seat on the west

9     wall of the apartment.

10        Q.   Let me show you what's called State's Exhibit

11    1 I believe.  Can you step down here and show the jury

12    where the knife was found?

13        A.   It was underneath this love seat on the north

14    side behind this area, by this area (indicating).

15        Q.   And can you describe that knife to the jury?

16        A.   It was a kitchen type knife with an eight

17    inch blade approximately thirteen inches overall.

18        Q.   Thank you.  In the course -- of course you

19    were not present when the shooting occurred, correct?

20        A.   Obviously.

21        Q.   You don't form any opinion yourself as to

22    whether it was justified or not, do you?

23        A.   No.

24             MR. GODWIN:  No further questions.

25             THE COURT:  Any redirect?

455

```
 1            MR. PATNER:  No further questions.
 2            THE COURT:  You're excused, sir.
 3            THE COURT:  Next witness for the State.
 4            MR. PATNER:  May I have just a moment, Your
 5       Honor.
 6            THE COURT:  If you want I can wait until
 7       tomorrow for you to answer that question.  You
 8       don't have to answer it today.
 9            MR. PATNER:  Your Honor, at this time the
10       State would rest it's case against Jeremy
11       Lockhart.
12            THE COURT:  The state of Florida rests.  Okay
13       folks, we'll see you tomorrow at 1:30.  Like I say
14       we should finish this case up either tomorrow or
15       latest, absolute latest would be Thursday, okay.
16       If anyone took notes we'd ask you to leave them
17       here.  We do not review them or look at them and
18       we'll give them back to you tomorrow.
19            (Thereupon, the following proceedings were
20       had outside the hearing of the jurors.)
21            THE COURT:  Okay outside the presence of the
22       jury, do you want to make a motion?
23            MR. GODWIN:  Yes.  Your Honor, at this time
24       on behalf of the accused, Jeremy Lockhart, we
25       would move for judgment of acquittal as to the
```

456

```
 1         indictment which charges second degree murder.
 2              THE COURT:  What do you need?
 3              MR. GODWIN:  A copy of the indictment.
 4              THE CLERK:  Sorry.
 5              MR. GODWIN:  And in support of our motion we
 6         would - in support of our motion we would say to
 7         the Court that the State has failed to prove each
 8         and every material allegation beyond and to the
 9         exclusion of a reasonable doubt.  Specifically
10         there's been no showing that Jeremy Lockhart acted
11         with a depraved mind regardless of human life.  I
12         think at most the State could show here a
13         manslaughter.  And I think that the Court should,
14         number one, either grant my motion to dismiss
15         entirely or, number two, should reduce the charge
16         to manslaughter.  Because the State has failed to
17         prove each and every material allegation as to
18         second degree murder which of course involves a
19         depraved mind which means a mind showing hatred,
20         ill will, spite, or reckless indifference.
21              THE COURT:  All right, I will have to
22         respectfully deny your motion.  I feel the State
23         has met its burden at this juncture in the
24         proceeding and I'd have to respectfully deny your
25         motion.
```

457

```
 1              MR. GODWIN:   I would renew my motion for a --
 2      well, I previously made my motion to suppress the
 3      confession if the Court would allow me to, I want
 4      to move for a mistrial based on the fact that the
 5      Court allowed that statement into evidence.
 6              THE COURT:   Okay, I will have to respectfully
 7      deny your motion again.   Tomorrow you have April
 8      Williams or Reese, and possibly one other
 9      witness?
10              MR. GODWIN:   Excuse me?
11              MR. GODWIN:   We are calling - we are going to
12      call Ms. Reese tomorrow and possibly one other
13      witness?
14              THE COURT:   Possibly one other witness, okay.
15      Thank you.
16              (Thereupon, the proceedings were concluded.)
17
18
19
20
21
22
23
24
25
```

458

```
1                    C E R T I F I C A T E

2                         - - - - -

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5         I, MICHELLE MEEKER, Shorthand Reporter, Notary
     Public, do hereby certify that I was authorized to and
6    did stenographically report the foregoing proceedings
     and that the transcript is a true and correct
7    transcription of my stenotype notes of the proceedings.

8         Dated this  10-16  day of  Dec  , 1996.

9
                    Michelle Meeker
10                  MICHELLE MEEKER
                    Shorthand Reporter
11

12
     STATE OF FLORIDA
13
     COUNTY OF BROWARD
14
          The foregoing certificate was acknowledged
15   before me this 15th day of Dec  , 1996, by
     MICHELLE MEEKER who is personally known to me.
16
                    Kilen Du Burton
17

18                  Notary Public-State of Florida
                    My Commission No.
19                  Expires:

20

21

22

23

24

25
```

JUSTICE REPORTING SERVICES, INC.      523-6114

459

```
 1    State of Florida    )
                          ):ss           Mark A. Speiser
 2    County of Broward   )

 3
                   IN THE CIRCUIT COURT OF THE
 4                SEVENTEENTH JUDICIAL CIRCUIT,
                IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6    STATE OF FLORIDA,

 7             Plaintiff,

 8    -vs-                         Case No. 94-10764 CF10A

 9    JEREMY LOCKHART,

10             Defendant.

11    _____/

12

13         Proceedings had and taken before the Honorable

14    Mark A. Speiser, one of the Judges of said Court, fifth

15    floor, Room 5900 Broward County Courthouse, Fort

16    Lauderdale, Broward County, Florida, on the 16th day of

17    August, 1995, commencing at or about the hour of 1:00

18    o'clock p.m., and being a jury trial.

19

20    APPEARANCES:

21             JOSEPH PATNER, Esquire,
               Assistant State Attorney,
22             Appearing on behalf of the Plaintiff.

23             ROBERT GODWIN, Esquire,
               Appearing on behalf of the defendant
24

25
```

457

1           MR. GODWIN:   I would renew my motion for a --
2      well, I previously made my motion to suppress the
3      confession if the Court would allow me to, I want
4      to move for a mistrial based on the fact that the
5      Court allowed that statement into evidence.
6           THE COURT:   Okay, I will have to respectfully
7      deny your motion again.   Tomorrow you have April
8      Williams or Reese, and possibly one other
9      witness?
10          MR. GODWIN:   Excuse me?
11          MR. GODWIN:   We are calling - we are going to
12     call Ms. Reese tomorrow and possibly one other
13     witness?
14          THE COURT:   Possibly one other witness, okay.
15     Thank you.
16          (Thereupon, the proceedings were concluded.)
17
18
19
20
21
22
23
24
25

JUSTICE REPORTING SERVICES, INC.     523-6114

458

```
 1                    C E R T I F I C A T E

 2                       - - - - -

 3     STATE OF FLORIDA

 4     COUNTY OF BROWARD

 5          I, MICHELLE MEEKER, Shorthand Reporter, Notary
       Public, do hereby certify that I was authorized to and
 6     did stenographically report the foregoing proceedings
       and that the transcript is a true and correct
 7     transcription of my stenotype notes of the proceedings.

 8          Dated this  1074 day of  ϑ~    , 1996.

 9                    Michelle Meeler

10                    MICHELLE MEEKER
                      Shorthand Reporter
11

12
       STATE OF FLORIDA
13
       COUNTY OF BROWARD
14
            The foregoing certificate was acknowledged
15     before me this 577 day of ϒ11    , 1996, by
       MICHELLE MEEKER who is personally known to me.
16

17                    Killen Due Buton

18                    Notary Public-State of Florida
                      My Commission No.
19                    Expires:

20

21

22

23

24

25
```

459

```
 1    State of Florida    )
                          ):ss            Mark A. Speiser
 2    County of Broward   )

 3
                   IN THE CIRCUIT COURT OF THE
 4                   SEVENTEENTH JUDICIAL CIRCUIT,
                  IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6    STATE OF FLORIDA,

 7             Plaintiff,

 8    -vs-                        Case No. 94-10764 CF10A

 9    JEREMY LOCKHART,

10             Defendant.

11    _____/

12

13         Proceedings had and taken before the Honorable

14    Mark A. Speiser, one of the Judges of said Court, fifth

15    floor, Room 5900 Broward County Courthouse, Fort

16    Lauderdale, Broward County, Florida, on the 16th day of

17    August, 1995, commencing at or about the hour of 1:00

18    o'clock p.m., and being a jury trial.

19

20    APPEARANCES:

21             JOSEPH PATNER, Esquire,
               Assistant State Attorney,
22             Appearing on behalf of the Plaintiff.

23             ROBERT GODWIN, Esquire,
               Appearing on behalf of the defendant
24

25
```

460

```
1              MR. GODWIN:  Judge, I attempted to go see my
2        client this morning and I was unable to go see him
3        because of rules and regulations.  I need about
4        five or ten minutes to finish speaking with him.
5        I just couldn't get over there, I tried but I
6        couldn't get over there to see him.
7              THE COURT:  We'll give you until two o'clock
8        then I have to start.  Are you ready to proceed?
9              MR. GODWIN: Yes.
10             THE BAILIFF:  Jury coming in.
11             (Thereupon, the following proceedings were
12       had in the presence of the jury.)
13             THE COURT:  Okay, record shall reflect we are
14       back in session everyone required to be present is
15       accounted for.  Good afternoon everyone, State
16       having rested its case I'll now turn to counsel
17       for the defendant and ask Mr. Godwin if he has any
18       witnesses he'd like to call on behalf of the
19       defense.
20             MR. GODWIN:  Yes Your Honor, at this time we
21       call the accused, Jeremy Lockhart.
22             THE BAILIFF:  Remain standing and place your
23       left hand on the bible.
24    Thereupon,
25                    JEREMY LOCKHART,
```

461

1    having been first duly sworn, was examined and

2    testified as follows.

3              THE CLERK:   State your full name and spell

4    your last name for the record please.

5              THE DEFENDANT:   Jeremy Lockhart,

6         L-O-C-K-H-A-R-T.

7              MR. GODWIN:   Could we have the microphone,

8         Your Honor.

9              THE COURT:   That's it right there

10        (indicating).

11                        DIRECT EXAMINATION

12   BY MR. GODWIN:

13        Q.   Jeremy, I want you to keep your voice up nice

14   and loud, okay?

15        A.   Yes, sir.

16        Q.   So that everybody in the courtroom including

17   this young lady down here can hear you, all right?

18        A.   Yes, sir.

19        Q.   I want you to look at the jury when you give

20   your answers, can you do that?

21        A.   Yes, sir.

22        Q.   Tell us your name again.

23        A.   Jeremy Lockhart.

24        Q.   Again I'm going to ask you to keep your voice

25   up if you would, all right.

462

| | | |
|---|---|---|
| 1 | A. | Jeremy Lockhart. |
| 2 | Q. | Jeremy, how old are you? |
| 3 | A. | 24. |
| 4 | Q. | Are you nervous? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Try to keep your voice up, okay. |
| 7 | A. | Yes, sir. |
| 8 | Q. | Jeremy, where were you born? |
| 9 | A. | Miami, Florida. |
| 10 | Q. | Where did you go to high school? |
| 11 | A. | Dillard High in Fort Lauderdale, Dillard High |
| 12 | in Fort Lauderdale. | |
| 13 | Q. | That's good keep your voice up like that, |
| 14 | okay. When did you finish high school? | |
| 15 | A. | '90. |
| 16 | Q. | 1990? |
| 17 | A. | Yes, 1990. |
| 18 | Q. | Jeremy, I want you to look at the jury in the |
| 19 | eye, okay? Have you ever been convicted of a felony? | |
| 20 | A. | Yes, I have. |
| 21 | Q. | How may times? |
| 22 | A. | Twice. |
| 23 | Q. | Did you plead guilty in those cases? |
| 24 | A. | Yes, sir. |
| 25 | Q. | Were you guilty? |

463

```
 1        A.   Yes, I was.
 2        Q.   After you got that behind you did you get
 3   married?
 4        A.   Yes, I did.
 5        Q.   How old were you approximately when you got
 6   married?
 7        A.   Twenty-two years old.
 8        Q.   Keep your voice up nice and loud, okay.
 9        A.   Twenty-two years old.
10        Q.   What's the name of the woman that you
11   married?
12        A.   Monica Lockhart.
13        Q.   And do you have a child by her?
14        A.   Yes, I do a two year old little girl, Takelia
15   Lockhart.
16        Q.   Jeremy, I'm a little hard of hearing?
17        A.   A two year old little girl, Takelia
18   Lockhart.
19        Q.   And Jeremy what kind of work were you doing
20   at the time that that incident happened with Patrick
21   Brown?
22        A.   I was working at Pep Boy an auto shop that do
23   oil changes, tune ups, tire changes.
24        Q.   Jeremy, you got to speak up a little bit I
25   know you're not use to speaking in public but just a
```

464

```
 1    little louder please.
 2         A.    Auto mechanic shop that does quick oil
 3    changes, tune up, little my more repair jobs, you know,
 4    that's done on the cars.
 5         Q.    Judge, I wonder if we could put the
 6    microphone a little closer.
 7              THE COURT:  It doesn't move closer.
 8              MR. GODWIN:  If you'll put your hands up
 9         there and try and lean forward, okay?
10              THE COURT:  It's on full volume.
11              MR. GODWIN:  Could I all ask the jurors if
12         you all hear him okay?  Okay.
13              THE JURORS: Yes.
14    BY MR. GODWIN:
15         Q.    At the time this incident happened, Jeremy,
16    were you working?
17         A.    Yes, I was.
18         Q.    Were you supporting your wife?
19         A.    Yes, I was.
20         Q.    And your child?
21         A.    Yes, I was.
22         Q.    Do you remember where you were living at this
23    time?
24         A.    Yes, I was living at 2217 Northwest 9th
25    Street, apartment three.
```

465

```
 1      Q.    And who was paying the rent there?
 2      A.    I was.
 3      Q.    Jeremy, I want to take your attention back to
 4   June the 25th, 1994 the day this happened, all right?
 5      A.    Yes, sir.
 6      Q.    Go back to around 10:30 or 11:00 in the
 7   morning, all right?
 8      A.    Yes, sir.
 9      Q.    Can you tell the members of the jury who was
10   at your house on that day?
11      A.    That morning my wife was just leaving to go
12   on a job interview, my daughter and my friend Patrick
13   Brown.
14      Q.    Anybody else?
15      A.    Not at that time.
16      Q.    Did your wife leave to go on the job
17   interview?
18      A.    Yes, she did.
19      Q.    Leaving you an Patrick Brown and your
20   daughter at the house?
21      A.    Yes, she did.
22      Q.    Pardon me?
23      A.    She left, she left me Patrick and my daughter
24   there for a little while and then her mother came back
25   and picked up my little girl.
```

466

```
 1       Q.    Then it was just you and Patrick?

 2       A.    Yes, it was.

 3       Q.    Did you invite some other people over to the

 4   house?

 5       A.    Yes, I invited a couple of my neighbors,

 6   Darren Walker, and Christopher Williams.

 7       Q.    Darren Walker is the gentleman who testified

 8   in here the other day?

 9       A.    Yes, sir.

10       Q.    And a person named Christopher Williams?

11       A.    Yes he, he stay in a different building, he

12   stay in the building closer to Darren Walker then me.

13       Q.    Okay.  What was your relationship with

14   Patrick Brown?

15       A.    He was my best friend.

16       Q.    Was he friends with your wife?

17       A.    Yes, he was.

18       Q.    Did he play with your daughter?

19       A.    Yes, he did.

20       Q.    Jeremy, who is April Reese?

21       A.    My baby sister.

22       Q.    Jeremy, was there a relationship between

23   April Reese and Patrick Brown?

24       A.    Yes, it was.

25       Q.    Tell the jury what the relationship was
```

467

```
 1   please?
 2        A.    They was dating, they were boy --
 3        Q.    They were dating?
 4        A.    Boyfriend and girlfriend.
 5        Q.    Was there also a women named April Williams
 6   that you knew?
 7        A.    Yes.
 8        Q.    Who was April Williams?
 9        A.    Somewhat of a friend or a girlfriend however
10   you would say it.
11        Q.    I'm sorry?
12        A.    Somewhat of a girlfriend or a friend.
13        Q.    Girlfriend or a friend to who?
14        A.    Patrick Brown.
15        Q.    And did she have a baby by Patrick Brown?
16        A.    Yes, she did.
17        Q.    Did your sister know about this?
18        A.    No, she didn't.
19        Q.    Now, the morning that you're at your house
20   with Patrick Brown, Darren Walker, Christopher Williams
21   and yourself, did you all start to play cards?
22        A.    Yes, we did.
23        Q.    Did somebody come over to the house?
24        A.    Yes, April Williams came to the house.
25        Q.    April Williams came?
```

468

1     A.   Yes, sir.

2     Q.   Tell the jury what happened when April
3   Williams came to the house?

4     A.   April Williams came over and she asked
5   Patrick to keep the baby for a little while.  She left
6   Patrick to care for her and she said she'd come back a
7   couple hours later.  Meanwhile me, Patrick, Darren
8   Walker, and Christopher Williams was just sitting in my
9   house listening to my stereo and drinking a couple
10  beers playing cards minding our own business.

11    Q.   After April Williams came to the house did
12  she leave the baby there?

13    A.   Yes, she did.

14    Q.   Did somebody else come to the house after
15  April Williams left?

16    A.   My little sister, April Reese.

17    Q.   Tell the jury what happened when your sister
18  April Reese got there?

19    A.   My little sister April came and she knocked
20  on the door.  I asked --

21    Q.   Keep your voice up?

22    A.   My little sister April came to my house, she
23  knocked on my door and I asked who was it.  She told me
24  who it was and I told her to come in.  She asked where
25  was my wife and my little girl and I told her my wife

469

```
 1    was going to a job interview, and my little girl was to
 2    her grandmother's house.  So she turned and look at
 3    everybody and she didn't really say nothing to nobody
 4    she just looked around and turned around and walked out
 5    of the house and Patrick said a couple words to her.
 6         Q.    What did Patrick say to her?
 7         A.    He asked her what she was doing.
 8         Q.    Did she say anything to him?
 9         A.    She mumbled something about cross the street
10    to somebody's house or something or other, or doing
11    something.  I really didn't catch it because I was to
12    busy messing with my stereo at the time.
13         Q.    So then what happened after, did she leave?
14         A.    Yes, she did.
15         Q.    What happened when she left?
16         A.    We went back to playing cards and listening
17    to the music.  I talked to Patrick and I said you
18    have --
19         Q.    Did you have any discussion with Patrick but
20    the situations about these two girlfriends?
21         A.    Yes, I did I told him to choose who he
22    wants.  I said choose.  He said he choose to be with
23    his son's mother at that time.  But I told him also you
24    can't say you going to do one thing and then change
25    your mind and do a different thing.  For instance, say
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1    we go to a club or something, all right and everything

2    and then my sister come in there and he won't say

3    nothing to her but the minute somebody else show

4    attention to her he get upset and he want to get right

5    in and he want to fight.  And I feel as though that

6    wouldn't be right if he tell her he don't want to be

7    with her.  Then he be talking about he want to get mad

8    at her and want to jump on her and fight her.

9        Q.    Did you tell Patrick that he should let your

10    sister know that he had a girlfriend?

11        A.    Yes, I did.

12        Q.    What did he say about that?

13        A.    He said he had already taken care of that

14    there.  He said don't worry about it I got this.  His

15    exact words wee I got this, I'll take care of this,

16    this is my problem.

17        Q.    So then what happened?

18        A.    After that I ain't, I didn't really bring

19    nothing else up about it and we sat there and played

20    cards.  About two or three hours later his son's mother

21    came up and knocked on the door.  I asked who was it

22    again and she said April.  Me thinking that's my little

23    sister again I said come in but it's his baby's mama.

24    She come to the door.

25        Q.    April Williams?

471

1        A.    She don't come all the way in she just asked
2    him to come outside.  So he turned and walked to the
3    door.  I asked Patrick, I say where is my little
4    sister?  She's across the street don't worry about it
5    she ain't going to see me go outside.  About a minute
6    or two later he come running back in the house.
7        Q.    Who came running back in the house?
8        A.    He come running back in the house talking
9    about oh lord your little sister coming, your little
10   sister coming.  I said I told you to tell her and make
11   your decision.  He had the perfect opportunity to
12   explain to her then when the baby mama was gone and it
13   wouldn't have came to this point of them getting into
14   an argument.  So he runs in the house and he's looking
15   for somewhere to go but there ain't to many place to go
16   in the house.  There's either two rooms or the bathroom
17   so he go in my cousin's room.  My sister come in right
18   behind him and asked where he at.  I told her he went
19   back there and they go back there.
20       Q.    Your sister went back where?
21       A.    In my cousin's room and they sat and talked
22   for a while.
23       Q.    Who was back in the back room?
24       A.    Patrick Brown and April Reese.
25       Q.    Your sister Patrick Brown?

JUSTICE REPORTING SERVICES, INC.    523-6114

472

1       A.    Yes, my sister Patrick Brown.

2       Q.    Just the two of them?

3       A.    Yes.

4       Q.    In the back room?

5       A.    Yes.

6       Q.    What happened did April Reese come in the

7    apartment -- April Williams come in the house?

8       A.    Yes, he and April Williams and then shortly

9    after that there she walks in.  I don't know who told

10   her to come in but she walks in, she come in the house

11   and the next thing I know she is in the back room back

12   there with them.

13      Q.    What happened when she want back there with

14   them?

15      A.    I hear it getting kind of loud into an

16   argument so I go back there and stop the fight and

17   tearing up my house so I go in the back room telling

18   them --

19      Q.    Jeremy, when you went back there who was in

20   the back room?

21      A.    Patrick Brown, April Reese, and April

22   Williams.

23      Q.    Did anybody have a weapon?

24      A.    Yes April Reese, April Williams.

25      Q.    All right, what did your sister April Reese -

473

1    what did she have?

2        A.    A bottle, a beer bottle.

3        Q.    And what about April Williams what did she

4    have?

5        A.    A knife, a kitchen knife.

6        Q.    Did she have it in her hands?

7        A.    Yes, she did.

8        Q.    What happened when you went back there and

9    you saw the two girls one with the bottle and one with

10   the knife?

11       A.    It was mostly making threats telling them he

12   got to choose who he's going to be with, he got to

13   choose who he going to be with.  I told them I was not

14   going to have the fighting and stuff going on in my

15   house and I put all of them out.

16       Q.    When you say you put all of them out who are

17   you talking about?

18       A.    April Reese, April Williams and Patrick

19   Brown.

20       Q.    Where did you put them?

21       A.    Outside.

22       Q.    Where did you tell them to go?

23       A.    Out of my house.

24       Q.    Out the front door?

25       A.    Yes.

474

 1        Q.    You just have the one door to the house seen
 2   in the picture?
 3        A.    I have the back door but they went out the
 4   front door.
 5        Q.    Why did you put them outside, Jeremy?
 6        A.    Because I really didn't want the arguments.
 7   I was already having problems with my rent people based
 8   on I throwed a party recently over there and they got
 9   in an argument and stuff and the neighbors went to
10   complain.  One of the ladies that testified she was one
11   of the ladies that went to the rent officer to complain
12   about the noise and arguments and stuff I made.
13        Q.    Were you trying to stop any fight?
14        A.    Yes, I was trying to avoid the whole
15   situation I didn't want to see no one get hurt and no
16   one get in no fight.
17        Q.    Jeremy, when the three of them were outside,
18   Patrick Brown, your sister April Reese, other girl
19   April Williams, tell the jury what happened out there?
20        A.    They was standing outside and they was busy
21   telling Patrick, telling him he got to choose who he
22   wants.  April Williams say she was going it stab him
23   and my sister say she was going to hit him in the head
24   with a bottle.  They was making threats to him and by
25   this being my closest friend I didn't want to see him

JUSTICE REPORTING SERVICES, INC.    523-6114

475

1    get hurt so I tell him to come back in the house.

2    April Williams --

3         Q.    Did he come back in the house?

4         A.    Yeah.  I told him to come back in the house.

5    April Williams say if you move anywhere I'm going to

6    stab you.  My sister say if you move I'm going to hit

7    you with this bottle.  He told both of them F that I'm

8    going anywhere and he walks back in the house and he

9    shut the door behind him and locked the door.

10        Q.    Why did he lock the door?

11        A.    To keep them from coming back in and starting

12   more fuss.  I said to myself if they stay out there

13   long enough they will calm down and come to their

14   senses and talk like reasonable people.

15        Q.    Now, did you leave the door locked?

16        A.    Yes, I did.

17        Q.    Did somebody unlock that door?

18        A.    Yes, Patrick Brown.

19        Q.    Patrick unlocked the door, tell the jury what

20   happened?

21        A.    When I told him just let them sit out there

22   and cool down he told me don't worry about that I got

23   this there, I'll take care of this nothing is going to

24   happen.  So he walks back around and picks up the beer

25   and takes a swallow.  On the way back he picked up a

476

1    cigarette off the radio and unlocked the door and stood
2    there and --
3        Q.    What happened when he unlocked the door?
4        A.    My little sister was standing there and April
5    Williams was standing right there by the door.
6        Q.    Did you try to take weapons from anybody?
7        A.    Yes, I tried to retrieve both of them.
8        Q.    Tell the jury what he did?
9        A.    I asked April Williams would she give me the
10   knife and she gave me the knife.  I asked my little
11   sister would she give me the bottle and she told me
12   no.  She put up a little fuss and I said April give me
13   the bottle ain't no need for a weapon, ain't nobody
14   got, ain't nobody around here going to fight.  She
15   ain't got no knife she can't do nothing to you.  She
16   told me no I ain't giving you nothing.  He should be
17   straight with he's going to be straight with me and he
18   should have told me, should have told me.
19             I said I been telling you that there.  Well,
20   he ain't got no right coming to the club and jumping on
21   me and telling me I ain't got no business with this
22   person saying that he's with me and then he with her.
23       Q.    All right.  So what happened then after you
24   took the knife from April Williams and you couldn't get
25   the bottle from your sister April Reese?  What

JUSTICE REPORTING SERVICES, INC.        523-6114

477

1    happened?

2        A.    I tried to close the door back and tell them
3    to go on and Patrick said don't worry about it I got
4    this.

5        Q.    So what happened, tell the jury what
6    happened?

7        A.    I turned and tossed the knife back and I
8    tried to retrieve the bottle again.  And after a while
9    he said don't worry about it I got it.  I turned away
10   to walk away but my sister swung and hit him in the
11   head with the bottle.

12       Q.    Where was he when she hit him with the
13   bottle?

14       A.    Standing in the doorway.

15       Q.    What happened when she hit him with the
16   bottle?

17       A.    Well, I caught a glimpse of her swinging the
18   bottle and I tried to catch her, stop from hitting him
19   but I didn't.  I didn't catch her in time and she had
20   struck him.  And I had grabbed him to the, grabbed her
21   to keep her from striking him again and at that time he
22   grabbed her and he jerked her away from me and went
23   like into a body slam with her and they landed on the
24   table.  He sat up and started punching at her in some
25   kind of way.

478

```
 1        Q.    Where were they at that point?

 2        A.    They were between the living room table and

 3   my stereo at that time.  They tussled and fought for a

 4   little while and they managed to make it around by the

 5   china cabinet there.  And I grabbed Patrick --

 6        Q.    Now, Jeremy, hold on a minute.  What

 7   happened, what happened between Patrick Brown and your

 8   sister while they were fighting there on the floor at

 9   your apartment?

10        A.    At that time I was punching her, grabbing her

11   by her head and pounding her head on the floor and on

12   the concrete floor.

13        Q.    Jeremy, had you ever seen -- first of all,

14   who was winning the fight?

15        A.    At that time Patrick was.

16        Q.    But your sister was fighting back?

17        A.    Somewhat, she was trying, she was on the

18   bottom.

19        Q.    Patrick was on top?

20        A.    Yes.

21        Q.    What did you say he did to her head?

22        A.    Grabbed her by her hair and was pounding it

23   on the ground.

24        Q.    Now, Jeremy, I want you to tell the jury had

25   you ever seen Patrick Brown commit other acts of
```

479

 1   violence against your sister, April Reese?

 2       A.    Yeah, prior to that about five, six weeks

 3   before that.

 4       Q.    I want you to tell the jury what happened

 5   five or six weeks before that?  First of all, where

 6   were you when this happened?

 7       A.    At that time we was to my sister's house.

 8       Q.    Which sister?

 9       A.    My eldest sister Regina.  We was to her house

10   and my little sister wanted to go out with some of her

11   friends.

12       Q.    Who is April Reese?

13       A.    Yeah, April Reese wanted to go out with a

14   couple of her friends.  I was sitting in the house

15   looking at T.V., and she went to go outside and Patrick

16   was sitting in there with us and he told her I told you

17   you couldn't go nowhere and he jerked her back in the

18   house.  She had a little words --

19       Q.    What do you mean he jerked her back in, how

20   did he jerk her back in?

21       A.    Grabbed her by the collar of the shirt and

22   smacked her back in.  She said I'm going anywhere I

23   want went to go outside.  There was a bat, metal bat

24   sitting by the door and he grabbed the bat and swung it

25   and hit her in the top of the head somewhere up in here

480

```
 1   (indicating).
 2        Q.   What happened when he hit her with the
 3   baseball bat?
 4        A.   She fell into some glass jalousies that was
 5   right by the door, our next door neighbor, and she fell
 6   back into the jalousies.
 7        Q.   Did she bleed?
 8        A.   Yeah she was bleeding and unconscious at that
 9   time.
10        Q.   Did somebody have to call an ambulance?
11        A.   Yes, the ambulance was called and she was
12   transported to Broward General Medical Center.
13        Q.   What happened to her at Broward General
14   Medical Center?
15        A.   She received several staples in the top of
16   her head.
17        Q.   Several what?
18        A.   Staples.
19        Q.   Medal staples?
20        A.   Metal.
21        Q.   Do you know how may she had?
22        A.   Anywhere between five and seven.
23        Q.   Are you aware of any other acts of violence
24   of Patrick Brown against your sister before this
25   happened on the day of the shooting?
```

481

```
 1        A.    Yeah.

 2              MR. PATNER:  Judge, object to lack of

 3        predicate as to that question.

 4              THE COURT:  Sustained.

 5    BY MR. GODWIN:

 6        Q.    All right, did you see with your own eyes any

 7    other acts of violence between Patrick Brown and your

 8    sister?

 9        A.    Yes, I did.

10        Q.    What was that?

11        A.    One night we was going to a nightclub.

12        Q.    What nightclub?

13        A.    Troy's night club on Sunrise Boulevard.  I

14    was just arriving there and my sister and my wife and a

15    couple more friends were already there.  Patrick just

16    pulled up, and just as I pulled up my sister was

17    standing out there talking and I seen Patrick run from

18    across the street and just punch my sister in the jaw

19    and say I told you not to go out that night.  I told

20    you not to go out that night.

21        Q.    What happened when he punched her in the jaw?

22        A.    She fell and jumped up and ran to me.  I told

23    him I can't get in any problems, you know, that's

24    between you and him.  I told her either be with him or

25    leave him alone.  Either keep going through this or
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1    leave him alone and I carried her home.

2        Q.    Now, Jeremy, I want you to come back, come

3    back and tell the jury what happened the day that you

4    were in your apartment the day of the shooting, okay?

5    You said Patrick was on the floor with your sister?

6        A.    Yes, he was.

7        Q.    What was he doing to her?

8        A.    Pounding her head into the floor.

9        Q.    Did you see that happening?

10       A.    Yes, I did.

11       Q.    What did you do?

12       A.    I tried to stop it.

13       Q.    Tell the jury what you did?

14       A.    I merely pulled him off and pushed him back.

15       Q.    Pardon me?

16       A.    I pulled him up and pushed him back and said

17   that was enough.  He swung and hit me and he fell back

18   to the left.

19       Q.    Where did he hit you?

20       A.    He hit me in the jaw.

21       Q.    In the jaw?

22       A.    Yes, he hit me in the left side of my jaw and

23   I fell back -- I mean right side.  I fell back and I

24   came back up and he was turned around and he went to

25   kick me and that's when --

JUSTICE REPORTING SERVICES, INC.      523-6114

483

```
 1        Q.    You said he turned around and went to kick --
 2        A.    Yeah, he turned.
 3              MR. GODWIN:  Your Honor, with the Court's
 4        permission can he step down here please.
 5              THE COURT:  Yes.
 6   BY MR. GODWIN:
 7        Q.    Let's say that I'm Patrick Brown, okay, you
 8   say you pulled him up?
 9        A.    Yeah, I pulled him off of her and that's when
10   he hit me and I fell back this way.
11        Q.    Where was your sister at that point?
12        A.    She was right there (indicating).
13        Q.    You say he swung and hit you?
14        A.    Yes.
15        Q.    And you fell back?
16        A.    Yeah.
17        Q.    What did he do?
18        A.    He turned back around went to kicking.
19        Q.    Which way?
20        A.    He turned right, he was facing me and he
21   turned this way and went back to kick.
22        Q.    Facing you?
23        A.    Facing me.
24        Q.    I'm going to be him, so about like this?
25        A.    Yes.
```

484

1     Q.   What did you do?

2     A.   Tried to stop him from doing that and there

3  was a tussle and I pulled out the gun and shot him.

4     Q.   Is this the - approximately the angle you

5  were at when you shot him?

6     A.   Little more like this here but about this

7  close (indicating).

8     Q.   What was he doing at the moment that you

9  fired the shot?

10    A.   He was kicking my sister in the lower part of

11  her body.

12    Q.   What do you mean the lower part of her body,

13  tell the jury.

14    A.   Between the legs, kidney area.  Lower part of

15  her body.

16    Q.   Have a seat.  Jeremy, I want you to tell this

17  jury why did you have the gun?

18    A.   The neighborhood I stay in is not one of the

19  best neighborhoods in the world.  It's a lot of

20  robbing, stealing, and assaults.  And with everything

21  going on in that neighborhood I need, I need a gun for

22  protection.  I have a family, I have a daughter, I have

23  a wife.

24    Q.   Where was the gun before you took it out to

25  use it?  Where was it?

485

1      A.    In my pocket.

2      Q.    What kind of gun was it?  Tell the jury what

3    kind of gun it was?

4      A.    A .22 mark one.

5      Q.    Do you knew the difference between an

6    automatic and semi automatic?

7      A.    Yes.

8      Q.    What's the differences?

9      A.    Automatic when you pull the trigger it just

10   continues to shoot.  A semi automatic is the shooter

11   type where you pull the trigger.

12     Q.    How may times did you pull the trigger?

13     A.    Once.

14     Q.    How many times did the gun go off?

15     A.    To my recollection four.

16     Q.    You showed the jury before how you were

17   standing, could you come -- with the Court's

18   permission?

19          THE COURT:  Yes.

20   BY MR. GODWIN:

21     Q.    If I understand you correctly you said

22   Patrick was about like this (indicating)?

23     A.    Yes.

24     Q.    You fired the first shot what did his body

25   do?

486

```
 1        A.   He spined, spined all the way around.

 2        Q.   About like this, did you just have the gun

 3   out like that (indicating)?

 4        A.   Had it like this pulled out.

 5        Q.   Did he fall to the floor?

 6        A.   Yes, he did.

 7        Q.   Did you ever shoot him when he was on the

 8   ground?

 9        A.   No, I didn't.

10        Q.   Jeremy, tell the jury why did you shoot

11   Patrick Brown?

12             THE COURT:  He can return to his seat.

13   BY MR. GODWIN:

14        Q.   Keep your voice up please and I want you to

15   tell the jury why did you shoot Patrick Brown?

16        A.   To protect somebody I love.

17        Q.   Who was that?

18        A.   My little sister.

19        Q.   What did you think he was doing to your

20   sister?

21        A.   He was going to hurt her again, put her in

22   the hospital again.

23        Q.   You thought he might put her in the hospital

24   again?

25        A.   Yes.
```

```
 1      Q.   That's why you shot him?

 2      A.   Yes, it is.

 3      Q.   Did you have any hatred towards Patrick

 4   Brown?

 5      A.   I love him like a brother.

 6      Q.   Did you have any ill will towards Patrick

 7   Brown?

 8      A.   No.

 9      Q.   Or spite?

10      A.   No.

11      Q.   Jeremy --

12      A.   Yeah.

13      Q.   Jeremy, after you fired the shot what did you

14   do?

15      A.   I left.

16      Q.   Pardon me?

17      A.   I left.

18      Q.   Where did you go?

19      A.   Went to my grandma.

20      Q.   Tell the jury why you left?

21      A.   Because I wanted to see them, I wanted to

22   tell them what happened.

23      Q.   Where did they live?

24      A.   Dade County.

25      Q.   Did you come down to Dade County?
```

488

```
 1        A.    Yes, I did.

 2        Q.    Did you go and throw the gun away first

 3   somewhere?

 4        A.    Yes, I did.

 5        Q.    How did you get to Dade County?

 6        A.    Tri rail.

 7        Q.    When you got to Dade County did you tell your

 8   grand folks what had happened?

 9        A.    Yes.

10        Q.    Was that a Saturday night?

11        A.    Yes, it was.

12        Q.    What did you all do the next day, Sunday?

13        A.    Went to church and prayed.

14        Q.    Did you decide to turn yourself in?

15        A.    Yes, I did.

16        Q.    After you had spoken to your grand folks?

17        A.    Yes, I did.

18        Q.    Did you come back on the following Monday,

19   the 27th?

20        A.    Yes, I did.

21        Q.    Did you get your wife?

22        A.    Yes.

23        Q.    Where did you go?

24        A.    Went to the police station and turned myself

25   in.
```

JUSTICE REPORTING SERVICES, INC.       523-6114

489

```
 1              THE COURT:  Talk louder please.
 2   BY MR. GODWIN:
 3       A.   Went to the police station and turned myself
 4   in.
 5       Q.   Were you scared?
 6       A.   Yes, I was.
 7       Q.   Have you ever had any legal training, Jeremy?
 8       A.   No I haven't.
 9       Q.   Do you know anything about the law?
10       A.   No, I don't.
11       Q.   Did you talk to a lawyer before you went down
12   and talked to the police officers?
13       A.   No, I didn't.
14       Q.   Jeremy, I want you to tell the jury how you
15   feel about what happened on that day?
16       A.   It hurts.
17              MR. PATNER:  Object to relevance.
18              THE COURT:  Yes, sustained.  Next question.
19              MR. GODWIN:  That's all the questions I have.
20              THE COURT:  Thank you, your witness.
21              MR. PATNER:  Thank you, Judge
22                    CROSS EXAMINATION
23   BY MR. PATNER:
24       Q.   Good afternoon Mr. Lockhart.  You said you
25   had no training in the legal system?
```

1        A.    No I don't.

2        Q.    You're a two time convicted felon, correct?

3        A.    Yes, I am.

4        Q.    Before you came in and turned yourself in to

5    the police you had two days to think about what you

6    were going to tell them, right?

7        A.    What do you mean by that?

8        Q.    You had two days to reflect upon what

9    happened before you made a statement to the police,

10   correct?

11       A.    To reflect upon what I had to say to the

12   police?  I told them what exactly had happened.

13       Q.    But you didn't tell them right after it

14   happened you had two days to think about it, right?

15       A.    Why should I think about it?

16       Q.    And at this point now prior to taking talking

17   the stand here today you've had over a year to

18   contemplate your testimony in this trial, correct?

19       A.    Why should I, why should I do that?

20       Q.    You certainly thought about what you were

21   going to say, haven't you?

22       A.    No.  Why should I think about it?  Why should

23   I think about it?

24       Q.    You haven't had any thoughts about what you

25   were going to say here today?

```
 1        A.    No, I don't.

 2        Q.    You haven't discussed with your attorney?

 3        A.    No I --

 4              MR. GODWIN:  I'm going to object it's

 5        improper to ask what he discussed with me Your

 6        Honor well knows that.

 7              THE COURT:  As to whether he discussed this

 8        testimony with you.

 9              MR. GODWIN:  No, no.

10              THE COURT:  No, overruled.

11              MR. GODWIN:  Whether he discussed anything

12        with an attorney or not.

13              MR. PATNER:  Regarding testimony.

14              THE COURT:  Overruled.

15   BY MR. PATNER:

16        Q.    Had you discussed your testimony with the

17   attorney prior to today?

18        A.    No, I haven't.

19        Q.    Have not?

20        A.    No, I haven't.

21        Q.    You have the police reports in the case, do

22   you not?

23        A.    Yes, I have.

24        Q.    Copies of all the reports, right?

25        A.    I have statements.
```

492

```
1       Q.   You have the statements of all the witnesses?

2       A.   Yes.

3       Q.   Over in that brown folder there, right?

4       A.   Yes, it is.

5       Q.   But you haven't thought about what you were

6  going to say here today?

7       A.   No I haven't I just read over what people

8  said.

9       Q.   Now, you needed this gun for protection?

10      A.   Yes.

11      Q.   You're hanging out at your own house, right?

12      A.   Yes.

13      Q.   Drinking?

14      A.   Yes.

15      Q.   Smoking some pot?

16      A.   Yes.

17      Q.   With your friends?

18      A.   Yes.

19      Q.   Patrick Brown didn't have a gun for

20  protection, he was seemingly okay, right?

21      A.   I guess.

22      Q.   And with the four other guys that were there

23  with their friends drinking beer and smoking pot you

24  thought it would be best if you had a loaded handgun in

25  your pocket?
```

1        A.    Best?  I just had it in my pocket, I was in
2    the privacy of my home.

3        Q.    And in your statement that you gave to the
4    police you don't mention anywhere in here, anywhere on
5    this tape, do you, the situation with this baseball
6    bat?  Do you say that anywhere on here?

7        A.    No, I told the officer.

8        Q.    You sat here and listened to this tape in
9    court yesterday, didn't you?

10       A.    Yes, I did.

11       Q.    Nowhere on here did you mention anything
12   about a baseball bat, did you?

13       A.    No, but he asked me about it that day.

14       Q.    He asked you if there's anything else you
15   wanted to say?

16       A.    No, he asked me did I have anything regarding
17   this case.

18       Q.    Well, in regards to this case you thought it
19   was important to say that about your sister, see she
20   just go drinking and she just get wild because the
21   police have been over there.  Now that wasn't about
22   this case, was it?

23            MR. GODWIN:   Wait a minute, Judge, objection
24       he's just pulling a segment out of the statement
25       and he's reading it with no basis for it.  That's


JUSTICE REPORTING SERVICES, INC.     523-6114

494

```
 1        improper.
 2              THE COURT:  No, overruled.
 3     BY MR. PATNER:
 4        Q.    The fact about your sister going wild and the
 5     police coming over there, that wasn't about this day,
 6     was it?
 7        A.    No, it wasn't.
 8        Q.    You were talking about your sister going
 9     wild, right?
10        A.    Both of them get wild.
11        Q.    That may be but you didn't tell the police
12     that?
13              MR. GODWIN:  Objection to the comment by the
14          prosecutor, Your Honor --
15              MR. PATNER:  If I could finish my question.
16              THE COURT:  Overruled.
17              MR. GODWIN:  Your Honor, I object to the
18          comment that may be that's not a question.
19              THE COURT:  Well, I haven't heard the whole
20          question.
21              MR. GODWIN:  Well, that's an improper
22          statement that's what I'm trying to get at.
23              THE COURT:  Overruled at this point.
24     BY MR. PATNER:
25        Q.    You didn't tell the police about the
```

495

```
 1   situation about Patrick, you told them about your
 2   sister going wild, correct?
 3        A.   He asked me about my sister.
 4             THE COURT:  Can everyone hear him okay?
 5             THE JURORS: Yes.
 6   BY MR. PATNER:
 7        Q.   How big was this gun?  Show me with your
 8   hands?
 9        A.   About that big (indicating).
10        Q.   Where did you have it?
11        A.   In my pocket.
12        Q.   Front pocket, back pocket?
13        A.   Front pocket.
14        Q.   Loaded?
15        A.   Yes.
16        Q.   Now, let's get something straight here.  This
17   isn't a machine gun, is it?
18        A.   No.
19        Q.   It's a semi automatic pistol, you pull the
20   trigger one time and it shoots one time?
21        A.   No, it's an automatic.
22        Q.   An automatic the type that's illegal in the
23   United States, correct?
24             MR. GODWIN:  Object to that that's improper.
25        I'm asking for a side bar right now.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

496

```
 1              THE COURT:  Okay, thank you.
 2              (Thereupon, the following proceedings were
 3         had at side bat outside the hearing of the
 4         jurors.)
 5              MR. GODWIN:  I move for mistrial based on the
 6         improper comment by the prosecutor that the weapon
 7         is illegal.  It's improper and it's not illegal to
 8         have an automatic weapon in the United States.  A,
 9         it's not the law.  B, he's not charged with
10         illegal possession of a firearm in this case and
11         for him to stand here and tell the jury that he's
12         guilty of some sort of crime by having an
13         automatic weapon which he is not charged with is
14         improper and he knows it's improper and it's
15         literally prejudicial.  I can't think of anything
16         more prejudicial and I'd move for a mistrial.
17              THE COURT:  You said it's not the law that
18         it's illegal to posses an automatic firearm?
19              MR. GODWIN:  Right, an automatic handgun.
20              THE COURT:  Right.  You're saying that it's
21         not illegal?
22              MR. GODWIN:  That's exactly my understanding
23         of law, yes.
24              MR. PATNER:  Judge, my purpose in asking the
25         question is that it is the State's position this
```

```
 1      was not an automatic it's a semi automatic.
 2              THE COURT:  Right, right.
 3              MR. PATNER:  And furthermore he could not
 4      have purchased a semi automatic, I mean an
 5      automatic pistol.
 6              THE COURT:  Did you ask him how he got it?
 7              MR. PATNER:  I'm getting to that.
 8              THE COURT:  Ask him how he got it and whether
 9      he had a license for it anything like that.
10              MR. PATNER:  Well, that's where I was going
11      I'm not trying to make any inferences violating
12      the law.
13              THE COURT:  I'll sustain the objection,
14      motion for mistrial denied.
15              MR. GODWIN:  I'm asking you to caution this
16      jury.
17              THE COURT:  You want to talk loud so everyone
18      can hear?
19              MR. GODWIN:  I'm asking you to caution the
20      jury that this is an improper comment and that
21      they are to disregard it.  He is, he's not charged
22      with illegal possession of a weapon in this case
23      and I'm asking --
24              THE COURT:  All right, I will caution - I
25      will give the jury a cautionary instruction.
```

1      MR. PATNER:  But you're allowing me to though

2      and --

3      THE COURT:  I will allow you to ask how he

4      got it and where he got it?  I mean did he --

5      MR. PATNER:  Did you have a permit for it?

6      MR. GODWIN:  Judge, but there is no issue

7      here about whether he had a permit.  That's not an

8      issue before this jury whether he had possession

9      of a weapon without a permit.  You're allowing him

10      to get into other actions that are illegal.

11      THE COURT:  No, no, I mean you can have a gun

12      in your house without having a permit for it.  You

13      can have your gun in your house without having a

14      permit.  We are going to ask if he had a permit

15      for it.

16      MR. GODWIN:  It's irrelevant to any issue

17      here whether he had a permit.

18      THE COURT:  Or whether he had any training --

19      no, overruled.

20      MR. GODWIN:  What he basis -- what's the

21      relevance to that question did he have a permit

22      for if that has no relevance to anything?

23      THE COURT:  Goes to -- because, I'll tell you

24      what the relevance is because it goes to, to get a

25      permit to have a firearm you have to go through a

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1    training course and through the training course
 2    you learn you don't have a firearm when you're
 3    drinking and when you're smoking pot.
 4         MR. GODWIN:  He's not charge with possession
 5    of a firearm by an intoxicated person or anything
 6    like that, Judge.
 7         THE COURT:  It goes to the issue of his
 8    having a firearm.  This is a the murder, second
 9    degree with a firearm.  Cause reckless disregard
10    for human life.  All right, I feel that's
11    relevant.
12         MR. GODWIN:  Judge, I'd make my objection in
13    the most strenuous terms in introducing bad acts
14    for which my client is not charged.  He's not on
15    trial for that and it's wrong for the prosecutor
16    to imply he's broken some law by not having a
17    permit.
18         THE COURT:  I'm not allowing that --
19         MR. GODWIN:  It's not relevant to anything.
20         THE COURT:  Okay, I feel it is relevant.  We
21    can go back and forth.
22         MR. GODWIN:  Will you give a cautionary
23    instruction?
24         THE COURT:  Yes, I will.
25         (Thereupon, the following proceedings were
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1       resumed in the presence of the jury.)

2           THE COURT:  Folks, at this time I will advise

3       you that the last question of the prosecutor

4       concerning that it's a violation of the law to --

5       that it's not legal in the United States to have a

6       firearm, an automatic firearm I will sustain the

7       objection and advise you that the only law that

8       comes to you that you apply to the evidence comes

9       from the Court not from the attorneys, okay?  So a

10      lawyer can say to you, cannot say to you that this

11      is the law or this isn't the law.  Neither lawyers

12      are permitted to do that.  The law comes from the

13      Court not from the lawyers, okay.  So any law

14      that's applicable to the evidence in this case

15      comes from the Court not from the lawyers.  And

16      the applicable law that you will hear in this case

17      and that is relevant to this case comes from the

18      Court at the conclusion of the trial.  Thank you.

19          MR. GODWIN:  Judge, I'm asking you to

20      instruct the jury to disregard the inference from

21      that question.

22          MR. PATNER:  The Court already ruled.

23          THE COURT:  I sustained the objection and I

24      told the jury -- I thought I told the jury - I

25      will say again the jury is instructed to disregard


JUSTICE REPORTING SERVICES, INC.      523-6114

501

1          -- first of all questions are not evidence,

2          okay.  You don't base your decisions on

3          questions.  I think I told you that several times

4          during my opening remarks that evidence comes from

5          the witnesses on the witness stand as well as

6          exhibits marked into evidence.  So no questions

7          constitutes evidence.

8              Secondly, I'm telling you that if in the form

9          of the question the prosecutor asked he made a

10         statement concerning the status of the law in the

11         United States regarding what possession of some

12         firearm is, and I'm telling you any law that's

13         applicable to this case comes from the Court.  So

14         you are not to draw any inferences or any

15         conclusions from any questions that either lawyer

16         asked.  Okay, lets proceed.

17     BY MR. PATNER:

18         Q.   Where did you buy the gun?

19         A.   On the streets.

20         Q.   From who?

21         A.   I don't know.

22         Q.   Forgot?

23         A.   I don't know him.

24         Q.   Did you have a permit to have an automatic

25     weapon?

```
 1        A.    No, I didn't.

 2        Q.    Pardon me?

 3        A.    No, I didn't.

 4        Q.    You did not?

 5        A.    No.

 6        Q.    How much marijuana did you smoke that day?

 7        A.    I smoked one time and --

 8              THE COURT:   All right, sir, you're going to

 9        have to talk louder.   You have to talk louder into

10        the microphone, sir.   Okay, thank you.

11   BY MR. PATNER:

12        Q.    When you shot that firearm casings are

13   ejected from the gun, correct?

14        A.    Yes.

15        Q.    .22 shells, right?

16        A.    Yes.

17        Q.    .22 caliber?

18        A.    Yes.

19        Q.    Now, your sister on the date that you shot

20   Patrick Brown was jealous of April Williams, right?

21        A.    Basically just jealous of each other.

22        Q.    Okay.   April Williams was jealous of April

23   Reese and April Reese was jealous of April Williams, is

24   that fair?

25        A.    Yes.
```

503

```
 1        Q.    Because of Patrick Brown, right?
 2        A.    Yes.
 3        Q.    On June 25th the date of the shooting April
 4   Reese wanted to continue her relationship with Patrick
 5   Brown, correct?
 6        A.    Yes, she did.
 7        Q.    April struck Patrick in the forehead with a
 8   bottle, right?
 9        A.    Yes.
10        Q.    Splitting his forehead open, correct?
11        A.    Yes.
12        Q.    Knocking him back in the chair?
13        A.    She struck him and he laid back on the wall
14   and charged, they charged each other.
15        Q.    He was dazed was he not from the bottle
16   striking him in the head?
17        A.    Not to my recollection because he grabbed her
18   as soon as --
19        Q.    You agree it was a fairly serious wound to
20   his head, wouldn't you?
21        A.    I don't know the nature of the wound I just
22   seen it on the photograph and I know she hit him.
23        Q.    Well, she must have hit him pretty good to
24   cause those wounds, didn't she?
25              MR. GODWIN:   Object calls for speculation on
```

504

```
1         his part.
2              THE COURT:  No, overruled.
3    BY MR. PATNER:
4         Q.    She hit him pretty good, didn't she?
5         A.    All I know is she hit him I wasn't face to
6    face with them at the time I had turned to walk away
7    because he said he got this, he will take care of this.
8         Q.    Did you see her hit him or not?
9         A.    I seen her swing.  At first I thought she was
10   going to hit me because my back was turned, and I
11   turned around and grabbed her when I seen that she had
12   struck him.
13        Q.    Let me ask you a yes or no question.  Did you
14   see April Reese strike Patrick Brown in the forehead
15   with a bottle, yes or no?
16        A.    Yes, I did.
17        Q.    Okay.  Did she strike him hard?
18        A.    I can't tell you I am not the person that was
19   hit.
20        Q.    Well, the person -- up until the time Patrick
21   Brown was shot was anyone else injured?  Did anyone
22   else have any visible injury other then Patrick Brown?
23        A.    I didn't see any.
24        Q.    Pardon me?
25        A.    Not that I could see.
```

505

```
1        Q.    Not that you saw?

2        A.    No.

3        Q.    The only one who was injured was Patrick

4   Brown in the forehead and later with the four bullets

5   wound to the body, correct?

6        A.    That was visible at that time.

7        Q.    You mentioned that - I think your phrase was

8   April Reese and Patrick Brown you said tussled and

9   fought, right?  Remember saying that?

10       A.    Yes.

11       Q.    So it was a mutual thing?

12       A.    Naturally it's going to be a mutual thing

13   because she was fighting to protect herself and he was

14   fighting to try to hurt her.

15       Q.    You pulled him off of her, right?

16       A.    Yes, I did.

17       Q.    You were able to do that?

18       A.    Yes, I was.

19       Q.    How far away were you when you shot Patrick

20   Brown?

21       A.    Two to three feet.

22       Q.    Two to three feet?

23       A.    Yeah.

24       Q.    And your sister was behind you, right?

25       A.    No my sister was to the side of us.
```

506

1      Q.   There was also – how may children were in the
2   apartment?

3      A.   One.

4      Q.   Who was with the child when you shot him?

5      A.   Child was by the door on the couch.

6      Q.   On the couch?

7      A.   By the door.

8      Q.   Now, you said you went down to Miami to tell
9   your -- let me ask you this.  After you shot Patrick
10  Brown did you feel you had done something wrong?

11     A.   I was hurting.

12     Q.   Did you feel you had done something illegal?

13         MR. GODWIN:  Objection, he's not a lawyer.

14         THE COURT:  Sustained to the form of the
15     question.  Proceed.

16  BY MR. PATNER:

17     Q.   Did you feel you had done something wrong for
18  what you could go to jail?

19         MR. GODWIN:  Your Honor please he's not a
20     lawyer, he doesn't know the law.

21         MR. PATNER:  There is a relevance in flight,
22     Judge.

23         MR. GODWIN:  Your Honor, I request for a side
24     bar again.  I'd ask for a side bar please.

25         THE COURT:  Okay, I heard you the first time.

JUSTICE REPORTING SERVICES, INC.    523-6114

507

1        (Thereupon, the following proceedings were
2    had at side bar outside the hearing of the
3    jurors.)

4        MR. GODWIN:   Now the Court knows there is no
5    flight instructions given in Florida, that's not
6    the law anymore.  No flight instructions are given
7    and the prosecutor stands up here arguing in front
8    of the jury that it goes to his flight.  I'm going
9    to ask you to instruct the jury that the
10   prosecution's comment was improper and uncalled
11   for and they are to disregard it.  You know very
12   well that the flight instruction this prosecutor
13   -- this is the most prejudicial cross examination
14   I've ever seen.  You've already allowed him to go
15   into issues about the weapon he's not charged with
16   and now the prosecutor stands up here and asks him
17   questions about flight.  I mean that's just
18   improper, Judge, and you know it.

19       THE COURT:   Well, I know that the Court is no
20   longer entitled to instruct a jury on what
21   previously was a standard instruction on flight,
22   however, that does not prevent an attorney from
23   bringing up the fact that he fled from the scene
24   to arguing to the jury then why didn't he just
25   turn himself in if he had nothing to hide?   That

JUSTICE REPORTING SERVICES, INC.      523-6114

```
 1        he fled from the scene.  There's absolutely
 2        nothing wrong with bringing out that fact.  You
 3        brought it up on your direct examination instead
 4        of going to the police he went down to see his
 5        family, and he went to see his family because he
 6        wanted to see them one last time before he went to
 7        jail and church.  And you brought that out.
 8             MR. GODWIN:  That has nothing to do with
 9        flight, Judge.
10             THE COURT:  What do you call that?
11             MR. GODWIN:  Exactly what happened in the
12        case.
13             THE COURT:  He leaves the scene and does not
14        stay around.
15             MR. GODWIN:  That does not give the
16        prosecutor the right to stand up there and talk
17        about flight when there is no flight instruction.
18             THE COURT:  He can talk about the fact that
19        he left whether you call it leave or flee.  The
20        point is I have no problem with that.
21             MR. PATNER:  If I can ask counsel to avoid
22        the lengthy objections which now have been said in
23        front of the jury I don't have a problem --
24             THE COURT:  Okay but with respect to the
25        question you asked about that he did something
```

JUSTICE REPORTING SERVICES, INC.      523-6114

1     wrong that he knew he could go to jail for I will

2     sustain the objection, okay. With respect to any

3     objection about the fact that he made -- his

4     question about flight when he said the word flight

5     I have no problem with that, that objection is

6     overruled.

7         (Thereupon, the following proceedings were

8     resumed in the presence of the jury.)

9         MR. PATNER: May I proceed?

10         THE COURT: Yes, sir.

11   BY MR. PATNER:

12     Q.    I was talking about you going down to Miami.

13   You testified on direct that you went down to Miami to

14   tell your grandparents what had happened, right?

15     A.    Yeah.

16     Q.    And you never mentioned anything about jail,

17   but isn't it true the real reason you went down to

18   Miami is you didn't want to go to jail?

19     A.    No, I went to Miami to tell my grandparents

20   because I was scared.

21     Q.    Remember being asked a question by Detective

22   Walley why didn't you go call the police? Answer, it

23   was like I know I had - I know I had did something I

24   was going to go to jail for. Remember saying that

25   statement?

1      A.    Yes, I did.

2      Q.    That's on tape, right?

3      A.    Yes, it is.

4      Q.    And he also asked you where did you go?

5    Answer, I went to the tri rail station and went to

6    Miami to visit my grandmother because I know if I go to

7    jail then I wouldn't get a chance to see them.

8      A.    Yes.

9      Q.    So you wanted one last chance -- after

10   shooting Patrick Brown you wanted one last chance to

11   see your grandparents before you went to jail?  That's

12   what you told the police, right?

13     A.    Yes.

14     Q.    You threw the weapon in the lake, right?

15     A.    Yes.

16     Q.    You ern your shirt off and threw that in the

17   dumpster?

18     A.    Yes.

19     Q.    And you want to Miami?

20     A.    Yes.

21     Q.    That was a yes?

22     A.    Yes.

23           MR. PATNER:  I have no further questions,

24   Judge, thank you.

25           THE COURT:  Redirect?

JUSTICE REPORTING SERVICES, INC.    523-6114

511

```
 1              MR. GODWIN:  Just a couple questions.
 2                     RE-DIRECT EXAMINATION
 3    BY MR. GODWIN:
 4        Q.   Jeremy, when is the first time you told me
 5    that you wanted to testify in this case?
 6        A.   Just a few minutes ago when I came in.
 7        Q.   Did you sit down and go over any of this
 8    testimony?
 9        A.   No, I didn't.
10        Q.   Did you tell the truth?
11        A.   Yes, I did.
12        Q.   Did you speak from your heart?
13             MR. PATNER:  Judge, object to self-serving.
14             THE COURT:  Yes, sustained, sustained,
15        sustained.
16    BY MR. GODWIN:
17        Q.   In your statement to Detective Walley did you
18    tell him several times about all the reports that have
19    been made on Patrick Brown?
20        A.   Yes, I did.
21        Q.   Have you told the truth here today?
22             MR. PATNER:  Judge, I will --
23             THE COURT:  Sustained, that's for the jury to
24        decide.
25             MR. GODWIN: Nothing further.
```

512

1          THE COURT: Re-cross?

2          MR. PATNER: No.

3          THE COURT:  You are excused, sir, return to

4     your seat.  Thank you.

5          THE COURT:  Any additional witness for the

6     defense?

7          MR. GODWIN:  At this time, Your Honor, on

8     behalf of the accused, Mr. Lockhart, we rest.

9          THE COURT:  Okay, any additional witnesses

10     for the State?

11          MR. PATNER:  No, sir.

12          THE COURT:  Okay, folks that completes the

13     evidentiary phase of the trial and I need to speak

14     with the lawyers for a few minutes outside of your

15     presence.  It will actually be about fifteen

16     minutes so we'll take a fifteen minute recess at

17     the time.  If you have any notes please leave them

18     here.

19          (Thereupon, the following proceedings were

20     had outside the hearing of the jurors.)

21          THE COURT:  Okay.  Outside the presence of

22     the jury did you have a motion?

23          MR. GODWIN:  Judge, I'd move for a mistrial

24     first of all based on the prosecutor's cross

25     examination of my client.  I think it was highly

JUSTICE REPORTING SERVICES, INC.      523-6114

1    prejudicial.   I think that the Court errored in
2    allowing the prosecutor to go into the questions
3    about the gun, whether he had a permit to have the
4    gun or not.   There's no charge here before this
5    jury on that and whether my client was licensed to
6    carry a gun or whether he had a permit to carry a
7    gun is entirely improper.

8         I'd also move for a mistrial based on the
9    prosecutor's comment about the illegality about
10   having an automatic handgun.   I'd ask the Court
11   for a mistrial based on those grounds, and I'd
12   also renew my motion for mistrial at this time
13   based on those two grounds as well as the other
14   grounds raised on cross examination.

15        THE COURT:   Do you want to respond to either
16   of those?

17        MR. PATNER:   Just what I stated earlier.

18        THE COURT:   Okay, motion for mistrial will be
19   denied.

20        MR. GODWIN:   At this time, Judge, on behalf
21   of the accused Mr. Jeremy Lockhart we would renew
22   our motion for judgment of acquittal as to each
23   and every count.   And we would say that the State
24   has failed to prove each and every material
25   allegation of the indictment.

```
1            And specifically the State has not proved,
2       specifically the State has not proved that Mr.
3       Jeremy Lockhart acted with a depraved mind
4       regardless of human life.  And the Court well
5       knows the definition of a deprived mind, and the
6       State has failed to prove any of those material
7       allegations and I would therefore ask the Court to
8       grant my motion for judgment of acquittal.
9            THE COURT:  Okay, I'll respectfully deny your
10      motion.
11           MR. GODWIN:  One other issue, Your Honor,
12      that I must raise.  There was a stipulation here
13      as to the legal identity of Patrick Brown.  The
14      State never put that stipulation into evidence.
15      There's been no proof here whatsoever as to the
16      identity of the deceased, Patrick Brown, and I'd
17      move for a judgment of acquittal now at the close
18      of all the evidence because the State has failed
19      to prove the identity of the deceased.
20           We had a stipulation, I told the Court I
21      would stipulate to it and the prosecutor never put
22      that into evidence.  There's no proof of the legal
23      identity of the deceased in that case.
24           MR. PATNER:  A stipulation does not need to
25      be moved into evidence if it's stipulated between
```

515

```
 1    the parties.  Furthermore the victim was
 2    identified as Patrick Brown by the coroner and was
 3    also identified by every party who testified in
 4    this instance, including the defendant in his own
 5    statement admitted to shooting Patrick Brown.
 6         MR. GODWIN:  He has to prove the legal
 7    identity of the deceased and that was not --
 8         THE COURT:  What does legal identity mean of
 9    the deceased?
10         MR. GODWIN:  Means somebody has to come in
11    specifically looking at a picture of Patrick Brown
12    who knew the person in life and identify that
13    person as being the person who was killed.
14         THE COURT:  Okay, first of all I will have to
15    deny your motion for mistrial.  More importantly
16    when the jury comes back in I will relate to the
17    jury that in fact there was a stipulation between
18    both sides whether you want to call it error of
19    the State by not seeking to have introduced it or
20    whether you want to call it an oversight by the
21    Court because I wasn't reminded to read it to the
22    jury.  I will advise the jury that both sides have
23    stipulated to the fact that the victim, the person
24    who was murdered in this case -- how do you want
25    to say - how do you want me to say it?  The
```

516

```
 1    deceased in this case is Patrick Brown.
 2         MR. GODWIN:  We do have that stipulation and
 3    I just want to make the point for the record,
 4    Judge, it's not properly put before the jury at
 5    the proper time.
 6         THE COURT:  We'll go over the instructions
 7    now.  The defendant is present, are you asking for
 8    any lessers?
 9         MR. GODWIN:  Yes, Your Honor, manslaughter.
10         MR. PATNER:  Judge, I'm not familiar with the
11    practice of this Court are you going to give
12    written --
13         THE COURT:  No.
14         MR. PATNER:  Okay.
15         THE COURT:  2.01, 2.02 is reading the
16    charge.  2.01(A) is the lesser included offenses.
17    Then I'll read introduction to homicide which is
18    page 361 in my book.
19         MR. GODWIN:  Judge, I think you skipped over
20    2.03.
21         THE COURT:  No, I'll get to that afterwards.
22         MR. GODWIN:  Where are you now?
23         THE COURT:  I'll now read the introduction to
24    homicide, page 61 in your book.
25         MR. GODWIN:  All right.
```

517

1          THE COURT:  Okay.

2          MR. GODWIN:  Introduction to homicide.

3          THE COURT:  So I'll read in this case the

4     defendant is accused of murder in the second

5     degree.  Then I'll read murder in the second

6     degree includes a lesser included crime of -- are

7     you asking for any lessers?

8          MR. GODWIN:  Yes, Your Honor, manslaughter.

9          THE COURT:  Manslaughter.  Then I'll read the

10    next paragraph killing is excusable.  Then I'll

11    read if you find the victim killed was by the

12    defendant and you then considered the

13    circumstances surrounding - I'll read that

14    paragraph.  And then I'll read --

15         MR. GODWIN:  I'm sorry, Judge, you're on

16    what?

17         THE COURT:  Page 361.  If you see that

18    paragraph there if you find.  See that paragraph

19    that starts off with if you find?

20         MR. GODWIN:  On introduction to homicide,

21    yes.

22         THE COURT:  I will read that paragraph, read

23    justifiable homicide.  I'll read excusable

24    homicide.

25         MR. GODWIN:  Judge, I think we went over this

1          -- one second please.  Judge, it would be

2      improper to read part three for the excusable

3      homicide instruction.  Your Honor may recall we

4      had that discussion previously and you ruled on

5      that.

6          MR. PATNER:  That's 2.03 that we are talking

7      about, excusable homicide.  He wants one and two

8      but not three.

9          THE COURT:  Right.

10         MR. PATNER:  Fine.

11         THE COURT:  Then I won't read dangerous

12     weapon.

13         MR. GODWIN:  Right.

14         THE COURT:  All right, then I'll read page

15     66, yes.  Then I'll read page 69.

16         MR. GODWIN:  Yes.

17         THE COURT:  Manslaughter?

18         MR. GODWIN:  Yes.

19         THE COURT:  Then I will read 2(A) and C,

20     manslaughter.

21         MR. PATNER:  Fine.

22         THE COURT:  All right, 2(B) is relevant?

23         MR. GODWIN:  Yes.

24         THE COURT:  That leads me to page 40 in your

25     book, justifiable use of deadly force.

JUSTICE REPORTING SERVICES, INC.     523-6114

519

```
 1              MR. GODWIN:  Page 40, Judge, all right.  All
 2       right.
 3              THE COURT:  Are you with me?
 4              MR. GODWIN:  Yeah, I'm with you, Judge.  I'm
 5       not finished reading the whole thing yet.
 6              THE COURT:  All right, I'll read an issue in
 7       this case, which is the first paragraph.
 8              MR. GODWIN:  Right.
 9              THE COURT:  Then the next paragraph the use
10       of force likely to cause death, I'll read that
11       paragraph.
12              MR. GODWIN:  I don't think that's applicable
13       here, Judge, let me just --
14              THE COURT:  You mean the next paragraph I
15       should read?
16              MR. GODWIN:  Right.  You would give a person
17       is justified in using force likely to cause death
18       or great bodily harm if -- see where it says give
19       if applicable?
20              THE COURT:  Yes.  If he reasonably believes
21       such force is necessary to prevent one, imminent
22       death or great bodily harm to himself or another.
23              MR. GODWIN:  Right.
24              THE COURT:  That's it?
25              MR. GODWIN:  Yes, and two, imminent
```

JUSTICE REPORTING SERVICES, INC.     523-6114

520

1    commission of -- we are asking for aggravated

2    battery against himself or another.

3        MR. PATNER:  Judge, I looked at that last

4    night and I think that an aggravated battery would

5    in effect be encompassed by great bodily harm in

6    paragraph one because it's redundant.  Because

7    then you're going to have to give the definition

8    of aggravated battery.  There is no allegation of

9    a weapon by Patrick Brown other then aggravated

10   battery and great bodily harm and that's gets us

11   back to paragraph one.

12       MR. GODWIN:  I think you have to give it

13   because you gave it the last time.

14       THE COURT:  Well, that argument wasn't raised

15   the last time.

16       MR. GODWIN:  It was raised the last time

17   that's an applicable forceful felony.  You're

18   talking about aggravated battery, you have to

19   define aggravated battery.

20       MR. PATNER:  But you're defining paragraph

21   one when all is said and done it's redundant.

22       THE COURT:  In other words, then why do they

23   have paragraph two there?

24       MR. PATNER:  Because there is other types of

25   forceful felonies such as armed robbery, armed

1    kidnaping, or held a bow and arrow to his head.

2    We don't have any of that here.

3         MR. GODWIN: If Your Honor please it's

4    obviously alleged that we are asking for the

5    definition of aggravated battery that you give

6    that as a applicable forceful felony. I'll give

7    the definition of it and that's what the law

8    requires.

9         THE COURT:  Yeah, but his point is that an

10    aggravated battery is consumed by paragraph one to

11    prevent imminent death or great bodily harm to

12    himself or another.

13         MR. GODWIN: My point is not consumed by that,

14    Judge, and you need to define aggravated battery.

15         MR. PATNER:  Judge, that's fine I will

16    withdraw that if defense counsel thinks it's that

17    important to have it read twice, fine.

18         THE COURT:  I will read paragraph one,

19    paragraph two.  I will read aggravated battery.

20         MR. GODWIN: And under that portion, Judge, I

21    would think you would leave out of course under

22    aggravated battery paragraph two.

23         THE COURT:  Last time I read just the first

24    paragraph.

25         MR. GODWIN: Right.

522

1          THE COURT:  One.  And then intentionally
2     touch or struck April Reese against her will.
3          MR. GODWIN: Right.
4          THE COURT:  And you read paragraph two in
5     committing the battery Patrick Brown
6     intentionally, knowingly, or intentionally or
7     knowingly caused great bodily harm to April
8     Reese.  I'm not going to read permanent disability
9     or permanent disfigurement.
10         MR. GODWIN: Right.
11         THE COURT:  Not going to read using a deadly
12    weapon knew she was pregnant.  Okay, moving right
13    along here with our page 40 that leads me to 141.
14    Use of force likely to cause death or great bodily
15    harm not justified, paragraph one is not
16    applicable.  Paragraph two?
17         MR. PATNER:  I don't believe any of that
18    section is applicable.
19         THE COURT:  I don't think I read this the
20    last time.  Okay, then page 41 I will read in all
21    cases.
22         MR. GODWIN: Yes.
23         THE COURT:  Necessity to avoid use of deadly
24    force, read in all cases.  Yes.  Retreat, yes
25    defense of home?

523

```
 1                    MR. GODWIN: Yes.
 2                    MR. PATNER:  Well --
 3                    THE COURT:  That only says that the defendant
 4              himself was attacked in his own house.
 5                    MR. GODWIN: Well, you gave that before, Your
 6              Honor.  Again there is evidence here that the
 7              defendant was attacked in his own home.
 8                    THE COURT:  By who?
 9                    MR. GODWIN: By Patrick Brown.  He testified
10              that Patrick Brown punched him and that's the
11              testimony before the Court.  He was attacked in
12              his own home.
13                    THE COURT:  And he had the right to meet
14              force with force?
15                    MR. PATNER:  Judge, it's not applicable.
16                    MR. GODWIN: Let me show you why it's
17              applicable.  Judge, defense of home is if the
18              defendant was attacked in his own home.  And there
19              is testimony that he was attacked in his own home
20              or on his own premises.  He had no duty to retreat
21              and had the lawful right to stand his ground and
22              meet force with force even to the extent of using
23              force likely to cause death or great bodily harm
24              if it was necessary to prevent death or great
25              bodily harm to himself or another.  Obviously
```

524

1   that's what our theory is and that's why you need
2   to give that instruction.
3        THE COURT:  Okay, I'll give that.  Mere
4   threats?
5        MR. PATNER:  No.  Judge, what are we going to
6   have if it was necessary to prevent, are you going
7   to give both or those?
8        THE COURT:  No just death or get bodily harm
9   to himself or April Reese.
10       MR. GODWIN: Or the commission of a forcible
11   felony which is an aggravated battery.
12       THE COURT:  Okay, I will give that.  Prior
13   threats, no.  Reputation of the victim?
14       MR. GODWIN: Yes, we'd ask for that.
15       MR. PATNER:  No, Judge, there is --
16       THE COURT:  There is no testimony about
17   reputation in this case.
18       MR. PATNER:  That's correct.
19       MR. GODWIN: Your Honor, my client testified
20   -- the State put my client's statements into
21   evidence and he told the police officer repeatedly
22   in his statement that Patrick Brown was known for
23   starting fights.  There were many reports on
24   Patrick Brown and that he also testified that he
25   saw specific acts of violence by Patrick Brown

```
 1        against --

 2             THE COURT:  Okay where in that report did he

 3        say -- where in the statement?

 4             MR. GODWIN: Referring to page eight of the

 5        transcript.  I don't think the transcript in

 6        evidence is highlighted and underlined there and

 7        also he mentioned it in other portions of the

 8        statement.  I will show you.

 9             THE COURT:  Several reports on him, no that's

10        not enough for me.  Go ahead what else do you

11        have?  Because there is several reports been

12        called in on Patrick Brown about him and my sister

13        getting into it, my daddy and I made --

14             MR. GODWIN: Uh-huh (affirmative response.)

15             THE  COURT:  No.

16             MR. GODWIN: I think -- Your Honor, I think we

17        have shown sufficient predicate, sufficient

18        predicate to have the Court give that instruction

19        on the reputation of the deceased.

20             THE COURT:  State?

21             MR. PATNER:  Judge, the two specifically say

22        proving reputation to prove the victim's

23        reputation in the community for the peacefulness

24        or aggressiveness was not done.  He had to under

25        90.405 I believe it's 405, certainly under case
```

526

1  law about reputation not by specific acts which we
2  only heard one of frankly, but by reputation of
3  the community after speaking to people in the
4  community.  Now, I said before you had to have ten
5  or fifteen people and I didn't find that case
6  Wisinski, W-I-S-I-N-S-K-I a fourth district '87
7  case said discussions amongst four or five people
8  is not enough testimony nor predicate laid for any
9  type of reputation of victim for violence.
10       THE COURT:  I'm not giving it.
11       THE COURT:  Physical abilities, nothing here
12  to indicate, you know, that one was bigger then
13  the other here from what I have heard, no.  Theory
14  in all cases, I'll read those two paragraphs.
15  Okay, then that leads us to reasonable doubt, do
16  you want that instruction?
17       MR. GODWIN:  Well, yes.
18       THE COURT:  All right, we'll give you that
19  one.
20       MR. GODWIN: What page are you on, Judge?
21       THE COURT:  Just finished 12 and 13 now I'm
22  on fourteen, weighing the evidence 2.04.  One
23  through five.  I will give -- with me?
24       MR. GODWIN: One second, Judge, I'm trying to
25  catch up with you.

527

```
 1              THE COURT:  One through five.  Six?
 2              MR. PATNER:  I don't believe that's
 3         applicable, Judge.
 4              THE COURT:  Seven?
 5              MR. PATNER:  Same thing.
 6              THE COURT:  Eight, yes.
 7              MR. PATNER:  Yes.
 8              THE COURT:  Nine, yes.  Ten, no.  2.04(A),
 9         yes.  B, 2.04(B), no.  2.04(C), yes.  2.04(D), no
10         2.04(E), yes.
11              MR. PATNER:  Judge, as to 2.04(E) it's always
12         been my understanding - it's always been my
13         impression that's referred to when the defendant
14         attacks the voluntariness of his statements.  The
15         defendant acknowledges on the fact of voluntary
16         decision.  I think 2.04(E) is only applicable when
17         defense raises coercion or threats or behavior as
18         to the Defendant's statement.  There is no
19         evidence before the jury for that.
20              MR. GODWIN:  I think it should be given any
21         time a statement is put before the jury.  I think
22         you should give it.
23              THE COURT:  I will give it.  2.04(E), 2.05,
24         yes.  Six, no.  Seven, yes.  Eight, yes.  2.08(A),
25         no.  B, no.
```

JUSTICE REPORTING SERVICES, INC.      523-6114

528

```
 1              MR. GODWIN: I'm sorry where are you, Judge?
 2              THE COURT:  2.08(A), no.  B, no.
 3              THE COURT:  2.08(C), no.
 4              THE COURT:  How about 2.08(D)?
 5              MR. GODWIN: D did you say?
 6              THE COURT:  Yeah.
 7              MR. GODWIN: 2.08(D)?
 8              MR. PATNER:  Presumption of guilt.
 9              MR. GODWIN: Is there a 2.08 --
10              THE COURT:  There isn't.  2.09.  Okay, all
11         right how much time do you want?  Your the ham and
12         he's the bread.  How much time do you need Mr.
13         Godwin?
14              MR. GODWIN: About 45 minutes, Judge.
15              THE COURT:  See the last time you only used
16         thirty.
17              MR. GODWIN: I only used thirty last time?
18              THE COURT:  You only asked for thirty last
19         time.
20              MR. GODWIN: Well, I'm asking for 45 because I
21         may use that much but I need to go down and get a
22         few things, Judge, from the office before we
23         start.
24              THE COURT:  We'll take it off the top here,
25         okay.  We'll give you 40 minutes a piece.
```

529

```
1              MR. PATNER:  Fine, Judge.
2              THE COURT:  How do you want your time divided
3         up Mr. Godwin?
4              MR. GODWIN: Oh about twenty and twenty.
5              THE COURT:  Do you want a notice, three
6         minute notice?
7              MR. GODWIN: Sure.
8              THE COURT:  You want a three minute warning?
9              MR. PATNER:  Make it five I don't think I
10        will ever get to that point.  But I have an issue
11        I'd like to raise at this point.  I would move in
12        limine to prevent him from commenting in closing
13        argument as to the failure of the State to call
14        any particular witness, in particular April
15        Williams.  Under, I will cite to the court
16        Haliburton versus State out of the Supreme Court
17        and I'll provide copies for the Court if you so
18        desire.  There is a series of cases, I think
19        Michaels and Haliburton are probably the most
20        forceful if a witness is equally available,
21        equally unavailable neither party may draw
22        inference to that witness unless the party has a
23        relationship to one side or the other.  For
24        example, the sister of the defendant, or the - or
25        a case detective that handled most of the case for
```

530

1    the, for the State.  And even then the cases go

2    both ways as to case detective.  Otherwise if it's

3    available or unavailable no inference is drawn.

4    That is an improper comment in closing argument

5    and I'll give the Court a copy of Haliburton.

6         THE COURT:  Your response?

7         MR. GODWIN:  I think either side can comment

8    on the evidence, lack of evidence, or conflict in

9    the evidence.  If you can comment on the lack of

10   evidence I am not going to talk about failure to

11   call specific witnesses.  If the Court rules that

12   this prosecution cannot call, cannot make the same

13   comments.  The prosecutor had the right if he

14   wished to subpoena --

15        THE COURT:  I'll tell you what my position

16   is.  I'm not going to grant that motion but on the

17   other hand if in fact you comment on his failure

18   to call witnesses I would allow him, or if it's

19   during your second closing argument if he raises

20   an objection I would advise the jury that both

21   sides have equal subpoena opportunity.  All

22   right?

23        MR. GODWIN:  Judge, if I understand what the

24   Court is saying then the prosecutor is not going

25   to be allowed to argue that the defense did not

531

```
1       call April Reese as a witness?

2              THE COURT:  Well, I think for the State --

3              MR. PATNER:  Judge, what Haliburton and

4       Michaels specifically say is if it's the brother

5       or sister or any other special party I can comment

6       on it all day.  That's what those cases say, they

7       were special relationship.

8              THE COURT:  I thought you raised this motion

9       because you weren't planning on commenting?

10             MR. PATNER:  Two separate issues.  He cannot

11      comment upon my inability to call either April

12      Reese or April Williams.  However, there is a

13      relationship between Mr. Lockhart and April Reese

14      which can be commented upon.  Defense counsel may

15      not like that but that is the law.

16             MR. GODWIN: Well, I disagree with that,

17      Judge.  We first of all have no burden of proof as

18      the Court knows.  We have no burden to prove

19      anything and any comment on our failure to call a

20      certain witness would be a comment on our right

21      not to put on testimony.  We don't have to put on

22      any evidence whatsoever.  I'm saying if the Court

23      wants to say either side could comment on the lack

24      of calling of witnesses I will go along with that

25      but otherwise I have a right to comment on
```

JUSTICE REPORTING SERVICES, INC.     523-6114

532

```
1       anything that he comments on.

2            MR. PATNER:  And, Judge, I'd also give to you

3       Martinez versus State at 478 So.2nd 871 which

4       says:  The general rule is that an inference

5       adheres to a party based on the party's failure to

6       call a witness is permissible when it is shown

7       that the witness is peculiarly within the party's

8       power to produce - and it lists several.  For

9       example, where the witness was the defendant's

10      daughter.  Or there was a friendship between the

11      party and witness, and they go on.  And clearly

12      that's what you have here.  That's Martinez.

13           THE COURT:  So in other words you're saying

14      you're planning on commenting on it?

15           MR. PATNER:  I'm not saying one way or

16      another I think I can legally --

17           THE COURT:  I thought you said -- I am not

18      granting his motion, I am not granting his motion

19      in limine.  But on the other hand --

20           MR. GODWIN: I'm moving in limine to ask the

21      Court to order the prosecution not to comment on

22      defense's failure to call April Reese as a

23      witness.  We have no obligation to call any

24      particular witnesses and the Court knows, and I'm

25      not going to be commenting on failure to call
```

JUSTICE REPORTING SERVICES, INC.    523-6114

1     witnesses.  I'm saying he has no right under
2     constitutional case law, I am not talking about
3     who has the right of the witness, that the defense
4     has no obligation, no burden to put on any
5     evidence whatsoever.  And therefore it would be
6     improper to allow the prosecution to comment on
7     the defense's failure to call April Reese as a
8     witness.
9            MR. PATNER:  Judge, I don't know how may
10     cases --
11            THE COURT:  Both these cases here.  Though
12     your citing is here in the context of a defendant
13     not in the context of precluding the defense from
14     arguing that the State should have called these
15     witnesses when there was a special condition.
16     Neither of these cases are in the context of the
17     State versus that --
18            MR. PATNER:  Hall V State t 470 So.2nd 796
19     I'd refer you to subsection three the head note
20     there.  There's been at least 20 cases on this
21     issue.  I mean I'm saying by way of the argument
22     --
23            THE COURT:  Just show me one where the State,
24     okay, prosecutor commented during closing argument
25     on defendant's failure to call the girlfriend as

534

1       alibi witness, after defendant indicated during

2       the course of his testimony that he was with her

3       at the time of the alleged crime.  And they

4       remarked on the defense attorney's failure to call

5       a witness.

6           MR. PATNER:  That seems to be pretty much

7       right on the money, Judge.

8           THE COURT:  Okay, I will deny your motion in

9       limine.

10          MR. GODWIN: Judge, please note my objection.

11      It's reversible error that case deals with alibi.

12          THE COURT:  Well, that case stands for the

13      proposition, the rules in Florida.  It's a fourth

14      district opinion and it says,"The rule in Florida

15      regarding the right of a prosecutor to comment on

16      the defendant's failure to produce a witness whom

17      the defendant contends could place him elsewhere

18      at the time of the crime"-- your point is well

19      taken. "could place him elsewhere at the time of

20      the crime is:  If a witness knows material facts

21      which would be helpful to a defendant in making

22      his defense, and the witness is competent and

23      available, the defendant's failure to produce the

24      witness is properly a subject of comment by the

25      prosecutor.  But it does say the rule in Florida

JUSTICE REPORTING SERVICES, INC.     523-6114

535

```
1       regarding the right of a prosecutor to comment
2       upon a defendant's failure to produce a witness
3       when the defendant contends he could place him
4       elsewhere.  It does seem to limit it to the
5       context of alibi.
6           MR. PATNER:  I'm looking, Judge.
7           MR. PATNER:  I'm quoting it from Michaels it
8       says the defense argued that it's applicable only
9       to alibi defenses.  It's not applicable here where
10      self-defense and defense of others is at issue.
11      We disagree the basis of the rule that the trier
12      of fact relevant evidence available and the
13      witness is equally available.  No inference drawn
14      here.  However, the witness was the daughter of
15      the defendant she was not equally available to the
16      prosecution and it goes on.
17          THE COURT:  Seems to be right on point.
18          MR. GODWIN: This witness is equally
19      available, Judge.
20          MR. PATNER:  That's special --
21          THE COURT:  Anyone is available for
22      subpoena.  We're talking about special
23      relationship.
24          MR. GODWIN: There's no showing that she's not
25      available to them.
```

536

```
1          THE COURT:  He's not talking about
2     availability he's talking about special
3     relationship.
4          MR. GODWIN: May I look at the case for a
5     second?
6          THE COURT:  Okay, here you go.  All right,
7     your motion in limine is denied based upon - I'll
8     cited State versus Michaels a 1984 decision at 454
9     So.2nd 560.  It's now 3:25 we are going to start
10    up at twenty-five of.  Thank you, here's your
11    other cases.
12         So you will prepare the verdict form for
13    second degree murder and manslaughter, we'll need
14    it for tomorrow morning.  The jury is not going to
15    deliberate tonight they'll do it tomorrow morning.
16         MR. GODWIN: Judge, may I address one issue?
17    I had the case to look over, the case of State
18    versus Michaels on the question of whether he has
19    the right to argue that I didn't call April Reese
20    as a witness.  And I know the Court doesn't want
21    to make error.  The case says, Judge, that where
22    witnesses are equally available to both parties,
23    no inference should be drawn or comments made on
24    the failure of either party to call the witness.
25    This is totally silent on the issue of whether or
```

537

```
 1     not there is any special relationship that is to
 2     say well, let me put -- the case says here the
 3     witness was the daughter of the defendant and she
 4     was not equally available to the prosecution
 5     because the parent child relationship. So we are
 6     talking about a child who was not called as a
 7     witness.  The defendant was alleging that he was
 8     defending his daughter who was a child.
 9          THE COURT:  I take issue with that because I
10     think that the record on the contrary is very
11     supportive of the fact that we have a sister here
12     who absolutely did not want to - this occurred in
13     your presence here.  Absolutely did not want to
14     meet with the prosecutor and obviously stated that
15     she doesn't want to have anything to do with the
16     prosecutor.  And she certainly conveyed to me and
17     anybody else in this courtroom that she was
18     because of her loyalty to her brother, did not
19     want to have anything to do with the State who was
20     actually trying to take his life away from him.
21          MR. GODWIN: No question she said that, Judge,
22     that is not a showing that she is not equally
23     available to either side.  We are the ones that
24     discovered her as a witness in the first place.
25     They have subpoena power in fact she's been
```

JUSTICE REPORTING SERVICES, INC.      523-6114

538

1    subpoenaed previously by the prosecution and she's
2    always responded to the subpoena.  There's no
3    showing she is not equally available to both sides
4    and that's my point that she's equally available
5    to both sides.  She was here, in fact she even
6    stayed here at the prosecutor's request when he
7    did not have her under subpoena.  I asked him are
8    you going to subpoena her and he said yes I am.  I
9    said I will have her be here.  We came back in
10   front of the Court and then Mr. Patner wanted to
11   speak to her in the office without a subpoena and
12   she had no obligation to speak to him.  She's
13   equally available to both sides, both sides have
14   subpoena powers.

15        THE COURT:  Says when such witnesses equally
16   available to both parties no inference should be
17   drawn or comments made on the failure of either
18   party to call the witness.  Here, however, the
19   witness was the daughter of the defendant she was
20   not quote "equally available" to the prosecution
21   because of parent child relationship which would
22   not normally bias her towards - which would
23   normally bias her towards supporting her father's
24   defenses.

25        MR. GODWIN: We are talking about a parent

539

1       child relationship.

2               THE COURT:   Well, this is a brother sister

3       relationship over whom he actually got into the

4       situation in the first place.

5               MR. GODWIN: Judge, the record does not show

6       she is not equally available.  In fact, she was

7       here, she came into the courtroom at the

8       prosecutor's request and said she didn't want to

9       talk to him.

10              THE COURT:   I suppose the reason why this

11      Supreme Court decision put equally available in

12      quotes here is that saying the same thing I'm

13      reading into it that is when they be physically

14      available to subpoena process but not available in

15      the sense of being a cooperating witness from the

16      party who was calling them.  Because as it says

17      here she was not equally available to the

18      prosecution because the parent child relationship

19      which would normally bias her towards supporting

20      her father's defenses.  Okay, I have already

21      ruled, thank you.

22              MR. GODWIN: This woman gave a statement to

23      the police, Judge, the day after the shooting.

24      She identified her brother as being the shooter.

25      The prosecutor tried to elicit hearsay evidence

JUSTICE REPORTING SERVICES, INC.     523-6114

540

```
 1    from the detective about what was in that women's
 2    statement and he did not call her as a witness.
 3    I'm simply making the record abundantly clear,
 4    Judge, that it would be improper for the
 5    prosecutor to comment on our failure to call April
 6    Reese as a witness.  We have no obligation to call
 7    any witnesses in this case.
 8         THE COURT:  It depends on how this happens if
 9    there is an objection of course I will have to
10    make a decision as to whether to give the
11    cautionary instruction.
12         MR. GODWIN:  I'm moving in limine to ask the
13    Court to order the prosecution not to comment --
14         THE COURT:  That's denied.
15         MR. GODWIN:  -- on the defense's failure to
16    call any particular witness.
17         THE COURT:  Denied at this time and the State
18    shepardized (sic) this case as far as checking to
19    see if Michaels has been overruled?
20         MR. PATNER:  Yes, that is correct.  And I
21    also put on the record Hall versus State in which
22    they held that relationship to the girlfriend.
23    They define what available was.  I don't want this
24    case reversed on appeal either and I would not do
25    anything that I know is improper.
```

JUSTICE REPORTING SERVICES, INC.       523-6114

541

```
 1            THE COURT:   There has to be a conviction
 2      before it's appealed so let's proceed.
 3            MR. PATNER:   That's true.
 4            MR. GODWIN: I made my objection I think it's
 5      improper to have that argument.
 6            THE COURT:   All right, I already ruled.
 7      Hall, did you cite that for the record, Hall
 8      versus State is at what?
 9            MR. PATNER:   470 So.2nd 796 out of the forth
10      district.
11            (Thereupon, the following proceedings were
12      resumed in the presence of the jury.)
13            THE COURT:   Thank you.  All right, ladies and
14      gentlemen, let's proceed.  Record shall reflect
15      the jury is present, everyone required to present
16      is accountable for.  We've now completed the
17      evidentiary phase of the trial and that leads us
18      to the fourth phase of the trial which is closing
19      arguments.  This is where the lawyers have a
20      chance to argue to you, and advance their
21      respective positions.  Please bear in mind again
22      that at no time what a lawyer represents to you
23      what they believe the law is should you interpret
24      that as actually being the law.  I don't believe
25      either lawyer is going to intentionally mislead
```

```
1    you or misstate the law but please bear in mind
2    the law comes from the Court not from the jury.
3    They have the right to refer to what they believe
4    the applicable law is but the actual law comes
5    from the Court not from the attorneys.
6         Number two, if you recall the evidence
7    different from the way the lawyers recall the
8    evidence it's your recollection that counts and
9    controls because you are the judges of the facts.
10   The lawyers are not the judges of the facts.
11        Now, under the rules of criminal procedure
12   each side gets an equal amount of time to address
13   the jury.  And each side will have 40 minutes.  So
14   under the rules of criminal procedure Mr. Godwin
15   will be speaking with you initially, to be
16   followed by Mr. Patner, to be followed by Mr.
17   Godwin.  Mr. Godwin.
18        MR. GODWIN: Good afternoon ladies and
19   gentlemen, now we are down to the real nuts and
20   bolts, the tough part of the case.  I'm going to
21   ask you to think back to some of the things we
22   talked about in jury selection some of the
23   principles of law that we talked about.  Now that
24   you folks are about to become the ultimate judge I
25   will ask you to remind yourself of the promises
```

1     that you made, the oath that you took and to
2     follow the law.  I know you going to do that, I
3     know you all ern the oath seriously and to apply
4     the law fairly in this case.  You recall that when
5     we started out you all agreed to follow the law
6     but the presumption of innocence.  You said you
7     would presume Mr. Lockhart innocent.  That the
8     burden of proof would be on who?  The burden of
9     proof would always be on the State.  And that Mr.
10    Lockhart and his attorney, we don't have to prove
11    anything.  And furthermore that the State has this
12    burden of proof by a certain standard.  Do you
13    recall you have to prove the case by a certain
14    standard beyond and to the exclusion of every
15    reasonable doubt.  The State hats to prove it's
16    case beyond every reasonable doubt.

17         You also said you agree with the principles
18    and protection of the law that everyone should be
19    treated fairly.  The legal issue in this case is
20    really quite simple.  Has the State, has the State
21    brought you proof beyond and to the exclusion of
22    every reasonable doubt that Jeremy Lockhart is
23    guilty of second degree murder?  That he acted out
24    of hatred, ill will, spite, or evil intent?
25    Hatred, ill will, spite, or evil intent.  That's

544

```
1      the legal issue.  Remember, the burden is on the
2      State to prove that he's guilty of second degree
3      murder.  Mr. Lockhart does not have to prove to
4      you that's acted in self-defense, remember that.
5      He does not have to prove that he acted in
6      self-defense it's an issue that we raised because
7      those are the facts of the case.  But keep in mind
8      that we the defense don't have to prove to you
9      that it was self-defense.  When I say self-defense
10     I mean defense of others as well self defense or
11     defense of others.  The law simply says if you
12     have a reasonable doubt, if you have a reasonable
13     doubt about his state of mind that he was acting
14     in self-defense then you must give him the benefit
15     of the doubt and find him not guilty.
16         Now, my client is accused of second degree
17     murder and his entire future depends on the
18     decision that's reached in this case.  I know you
19     take the responsibility seriously, we would rely
20     upon you to give careful consideration and
21     thought, full consideration to this matter.  And
22     if you believe - if you believe that the State has
23     not proved its case beyond a reasonable doubt then
24     stick to your guns and do the right thing and make
25     the hard decision in this case.  Do the right
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1        thing and protect the rights of an American
 2        citizen.   It's easy to say and I know you if I was
 3        sitting in your position I could.   It's easy to
 4        say we won't have any bias or prejudices that
 5        effect us in reaching our decision.   But
 6        nevertheless I think whether you recognize it or
 7        not there is a certain bias in a case like this.
 8        I mean if Jeremy Lockhart was charged with
 9        stealing a loaf of bread to feed his family you'd
10        have probably some natural sympathy for him
11        because he was poor and had to steal to feed his
12        family.   That's the kind of thing that grabs a
13        person by the heart and says, you know, too bad
14        I've got to give him a break.

15             But here he's charged with murder, he's
16        charged with murder so there is a natural bias.   I
17        suggest there's a natural bias against Jeremy
18        Lockhart.   It's normal to want to seek to avenge a
19        wrong.   But you have to recognize any bias you
20        might have because of the nature of the charge and
21        you just say to yourself I'm go to doing my duty
22        if I'm going to recognize any bias I have, and I'm
23        going to set it aside and I'm going to follow the
24        law.

25             In a few minutes his honor Judge Speiser is
```

546

```
1       going to instruct you on what the law is in this
2       case.  One of the instructions he's going to give
3       you is, a reasonable doubt may arise from the
4       evidence, from conflicts in the evidence, and from
5       the lack of evidence.  Now, I've taken the liberty
6       of blowing up a few of the illustrations here that
7       I know you're going to be given.  And let me just
8       take a moment to go over this with you.

9            The judge is going to tell you - can you all
10      see that?  The judge is going to tell you that a
11      person is justified in using force likely to cause
12      death or great bodily harm if he reasonably
13      believes that such force is necessary to prevent
14      imminent death or great bodily harm to himself or
15      to another, his sister April Reese.  Or the
16      imminent commission of a forcible felony against
17      himself or another, basically another way of
18      saying the same thing.

19           A person is justified in using deadly force
20      if he reasonably believes it's necessary to
21      protect himself or his sister.  Now, you folks
22      heard the facts in this case, you heard what was
23      going on in that house.  There was a violent
24      struggle and Patrick Brown had April Reese down on
25      the ground and he was hitting her, and he was
```

JUSTICE REPORTING SERVICES, INC.      523-6114

```
1      punching her.  And he was shoving her head into
2      the floor, and he had previously split her head
3      open with a baseball bat six weeks earlier and she
4      had to go to the hospital.  She had to have
5      staples put into her head.  That's what you call
6      great bodily harm, that's serious.  That's a
7      serious injury.
8           Aggravated battery.  Aggravated battery is
9      just one person slapping another person, punching
10     another person.  Aggravated battery is using
11     serious force, great force trying to do serious
12     bodily harm to somebody.  Here you have a young
13     woman who's laying on the floor.  She is being
14     attacked by her boyfriend and there's no doubt
15     about the fact that she started it.  I won't argue
16     about that for one second or minute.  April Reese
17     clearly started the fight.  She hit Patrick Brown
18     in the head with a beer bottle.  She was clearly
19     wrong but did that give Patrick Brown the right to
20     do what he did to her and to endanger her life?
21          My client tried his best to stop this fight.
22     He told them take it outside I don't want any
23     problems in here.  Patrick Brown is the one who
24     unlocked the door and let the people come back
25     inside.  You may say to yourself was Patrick Brown
```

1        really going to split her head open again?  Well,

2        you know what, the law doesn't require Jeremy

3        Lockhart to sit by on his hands and wait and see

4        if his sister's head was split open again and she

5        was hospitalized again.  The law says in deciding

6        whether the defendant was justified in the use of

7        force likely to cause death or great bodily harm

8        you must judge him by the circumstances in which

9        he was surrounded at the time the force was used.

10       The danger facing the defendant need not have been

11       actual.  However, to cause death or great bodily

12       harm the appearance of danger must have been so

13       real that a reasonable prudent person, cautious

14       and prudent person under the circumstances would

15       have believed the danger could have been avoided

16       only through the use of that force.  Based upon

17       the appearance the defendant must have actually

18       believed that the danger was real.

19           Now, did Jeremy Lockhart have a reasonable

20       basis for believing that his sister's welfare was

21       in danger when she is laying on the floor and Mr.

22       Brown is smashing her head into the floor and he

23       pulls Mr. Brown off of her and Mr. Brown punches

24       him and then goes back to kicking her between the

25       legs.

```
1           Did Jeremy Lockhart have to wait and say
2       well, go ahead beat her some more maybe you won't
3       put her in the hospital this time?  The law says
4       Jeremy Lockhart had the right to use force to
5       protect his sister, to protect a member of his
6       family that's what this is all about, protecting a
7       member of your family.
8           Now again keep in mind, folks, I don't have
9       to prove to you - I don't have to convince you
10      beyond a reasonable doubt that he had a right to
11      use deadly force.  That's very important.  I don't
12      have to prove that to you.  All I have to do is
13      raise the issue if you have and if have a tiny,
14      tiny, microscopic reasonable doubt that Jeremy
15      Lockhart was trying to protect his sister and had
16      the right to do what he did you must give him the
17      benefit of the doubt and find him not guilty.
18          One other principal of law I want to discuss
19      with you very briefly is that Florida has what's
20      known as Causwell (phonetic) doctrine.  Generally
21      speaking if a person has a fight he has a duty to
22      retreat from using force, retreat if he can.  But
23      the judge is going to tell you if the defendant
24      was attacked in his own home and on his own
25      premises, that's where this happened in his own
```

550

1    home, he had no duty to retreat.  He didn't have
2    to run away and leave his sister there.  And he
3    had the lawful right to stand his ground and to
4    meet force with force and to the extent of using
5    force likely to cause death or great bodily harm
6    if necessary to prevent great bodily harm to
7    another, his sister.

8         You see how that applies in this case?
9    That's what this case is all about.  Jeremy
10   Lockhart was protecting his sister from an
11   assault.  His sister who's been hospitalized and
12   had her head split open by Patrick Brown six weeks
13   earlier.  Who had been beaten by Patrick Brown in
14   front of nightclub, punched in the jaw and knocked
15   down.

16        Patrick Brown wanted to have the both.  He
17   wanted to have two girlfriends a lot of people
18   want to do that but he had no right to beat this
19   woman and put her in the hospital.  It's not right
20   to do what he did to her on that day, kicked her
21   between the legs.  Kicked her in the head.  Kicked
22   her in the kidney.  Jeremy Lockhart was doing what
23   any brother would do under any circumstances,
24   trying to protect his sister's well-being.

25        Now there is  one other issue in this case I

1       want to discuss with you just very briefly.  We
2       all talked about checking biases at the front
3       door.  And you said you'd try to do that, said you
4       would follow the law.  Jeremy Lockhart had a
5       firearm with him.  I don't how you feel about
6       that, if you like them or you don't like firearms
7       at all, maybe he had no business having a firearm,
8       and I'm not going to disagree with you on that for
9       a second.  You have every single right to hold
10      that opinion.  You don't like firearms, maybe you
11      don't like people who have firearms so that's okay
12      to have those feelings.  But that can not become
13      an issue in this case.  This is where you have to
14      remember that you are the judges and you have to
15      set aside your feelings about firearms and put
16      them aside because he's not charged in this case
17      with a firearm violation.  What he's charged with
18      is murder.  And you can not base your decision in
19      this case with the fact that you don't like the
20      fact that he had a firearm.  Or maybe you don't
21      like the fact that he was smoking marijuana or
22      drinking beer.  You're entitled not to like those
23      things, but you must do your duty.

24              Remember your oath that you would put those
25      feelings aside and just follow the law in this

JUSTICE REPORTING SERVICES, INC.     523-6114

552

```
 1    case?  So when you go back in the jury room if
 2    someone starts to say, you know, that kid had no
 3    business having a firearm.  I agree with you but I
 4    hope one of you will be strong enough to stand up
 5    and say, you know, that's not the issue here,
 6    that's not the issue.  The firearm is not the
 7    issue.  The issue is whether he was justified in
 8    protecting his sister from the beating she was
 9    taking.  That's what the case was about.  He was
10    in his own home and he had a gun.  I don't like it
11    and maybe you don't like it but you must follow
12    your oath and not let that the become an issue
13    which clouds your judgment in this case.  So I'm
14    asking one of you to stand up and say if it comes
15    up in the jury room this kid had no business
16    having a gun, he's not charged with that, okay.
17    He's charged with murder and he did have the right
18    to use reasonable force to protect his sister and
19    that's what he did in this case.
20         So again I'd ask you to come back to when we
21    started.  I'm asking you to presume Jeremy
22    Lockhart innocent.  Remember that the State has
23    the burden of proof and we don't have to prove
24    anything.  Jeremy didn't even have to testify in
25    this case.  But he did, he got up and told you his
```

1    side of it.  He didn't have to prove that he is

2    innocent, and the State has to prove guilt beyond

3    a reasonable doubt and they have failed do so.

4         After Mr. Patner comes up and speaks to you I

5    will stand up here one more time and I believe I

6    can show beyond all doubt that you should find Mr.

7    Lockhart not guilty.

8         Thank you very much.

9         THE COURT:  Thank you Mr. Godwin.  Mr.

10   Patner.  Are you two in the agreement if the tape

11   s being played the court reporter does not need to

12   take down the tape?

13        MR. GODWIN: Yes, Your Honor.

14        MR. PATNER:  Ladies and gentlemen of the

15   jury, unlike the defense attorney this is my last

16   opportunity to speak to you and I first want to

17   say thank you all for sitting here.  Its been

18   hectic for several days and there's been a lot of

19   witnesses.  And quite a few yesterday you've had

20   to leave and come back in that maybe made it seem

21   may longer or maybe shorter.  You may have heard

22   about trials in other parts of the country that

23   last a lot longer then this but just because it

24   was three days doesn't mean it's not important.

25        The defendant is charged with second degree

1  murder because he killed Patrick Brown.  I'm going
2  to take just a moment to just explain the charge
3  for second degree murder first of all to you.  But
4  before I do that I want you to hear the real
5  reason why Patrick Brown is dead.

6      (Thereupon, a portion of the tape was played,
7  after which the following proceedings were had.)

8      MR. PATNER:  That's why Patrick Brown is dead
9  not because he was protecting his sister but
10  because he was mad.  And in this state, in this
11  society you can't kill someone because you're mad
12  otherwise there would dead bodies all over
13  ninety-five every time somebody cuts you off in
14  traffic.

15     Self-defense does not apply in this case and
16  I'll talk about that in a moment.  The defendant's
17  words himself from what I just played you show
18  conclusively he did it because he was mad because
19  the guy ern a swing at him and that's why the
20  defendant is charged with second degree murder.
21  And I want to talk about second degree for a
22  moment.  This is first degree there's no death
23  penalty, no premeditation.  The defendant has
24  already had a huge consideration of the facts in
25  this case because he is not charged with

555

1    premeditation.

2        The defense attorney goes over and over and
3    over again how good friends they were beforehand.
4    Well, so what would you be happy if you shot a
5    perfect stranger.   Now one believes for a moment
6    that as the morning started out the defendant had
7    planed to kill Patrick Brown.   It is taken into
8    consideration already what happened and the
9    circumstances of what he was surrounded with and
10   that's why defendant is charged with second degree
11   murder.

12       What are the elements, what do you need to
13   prove beyond a reasonable doubt?   I'd I like to
14   just address for a moment the defense attorney
15   keeps referring to a tiny reasonable doubt, a
16   reasonable doubt.   A doubt you can attach a reason
17   to.   Not a speculative doubt, not an imaginary
18   doubt, a reasonable doubt.   What I have to prove
19   beyond a reasonable doubt is the elements of the
20   crime and disprove the defense.   One, Patrick
21   Brown is dead, well unfortunately --

22       THE COURT:   By the way I still forgot to tell
23   the jury --

24       MR. GODWIN: We stipulated that Patrick Brown
25   is dead, Your Honor.

556

```
 1              THE COURT:   There is a stipulation that is
 2         agreed to here by both attorneys that the deceased
 3         here is in fact Patrick Brown, okay?  And one of
 4         the elements that the State would have to prove is
 5         that the victim is dead and they have to tell you
 6         who the victim is.   The victim is not Mark Speiser
 7         the victim is Patrick Brown.   So the defense
 8         attorney -- is that correct Mr. Godwin that
 9         defense counsel and the State have in fact agreed
10         and stipulated to that?
11              MR. GODWIN: That's correct.
12              THE COURT:   That the deceased in this case is
13         in fact Patrick Brown as opposed to Tom Jones or
14         Mary Sue.   Okay, thank you.
15              MR. PATNER:   And ladies and gentlemen
16         unfortunately he's dead.   The first element of the
17         crime has been proven beyond all doubt.   The death
18         was caused by the criminal act or agency of the
19         defendant.   Well, he didn't die of a heart attack,
20         and he didn't die from a bump on the head.   He
21         died from a bullet wound of a gun possessed by the
22         defendant as he shot him.   It's uncontradicted
23         that he shot Patrick Brown.   There is no question
24         it was by the agency of the defendant not another
25         person.   It wasn't an accident, it was by the
```

557

```
1    agency or the agent of the defendant.  There was
2    an unlawful killing to Mr. Brown by an act
3    imminently dangerous to another and evincing a
4    depraved mind regardless of human life.
5        Well, what does that mean?  Sounds like
6    lawyer talk.  What that means is that an act is
7    imminently dangerous to another and regardless of
8    a depraved mind among other things done with ill
9    will, hatred, spite, or evil intent.  The defense
10   attorney seems to have a problem with that.  I
11   don't have to show one of those.  Spite you heard
12   from the tape itself.  Ill will, I suppose he was
13   trying to help him, he made good will towards him
14   oh here you go Mr. Brown have a few bullets in
15   him, it's obviously not done from ill will, he
16   meant to bring ill will upon Patrick Brown.
17       Now the defense attorney is trying to make
18   you believe that this hatred or ill will must
19   extend back to earlier in the day or some other
20   time.  They may have been best friends, so what.
21   When he pulled that trigger he meant ill will and
22   an evil intent to Mr. Brown.  He certainly did not
23   mean good intent, and certainly didn't mean best
24   wishes.  He meant to shoot him and to kill him.
25   The crime of second degree murder, as to the
```

1    elements of the crime itself have been proven now
2    the defense attorney though has raised the issue
3    of defense of others.  And I'll talk about the
4    elements of that in a moment.  But let's not loose
5    sight of what really happened here.  The only
6    person who is injured at all is Mr. Brown from
7    April Reese.

8         Now, I am not as I told you in opening
9    statements going to stand up here as a prosecutor
10   and try and justify Mr. Brown then attacking April
11   Reese as the parties came together as you heard
12   from the witnesses.  I'm not going to justify
13   that.  But it takes more then that to warrant
14   using deadly force upon someone.  You must have
15   the imminent commission of great bodily harm or
16   death.  Where is that in this case?  Where is the
17   injury the serious bodily injury to April Reese,
18   it doesn't exist.  Even if the defendant was doing
19   that to prevent that, which he wasn't by the way,
20   he was shot because the victim ern a swing at
21   him.  Even if it had existed there is no injury,
22   there is no injury to April Reese, no testimony
23   otherwise.

24        You heard from the detective that April Reese
25   was asked are you injured?  Answered, no.

559

1    MR. GODWIN: Objection, Your Honor, that's
2    hearsay.

3    MR. PATNER:  It came into the evidence,
4    Judge.

5    THE COURT:  The jury will be the best judge
6    as to evidence admitted.  They are the judges in
7    the case.

8    MR. PATNER:  You heard from Officer
9    Hospodavis who arrived at the scene, is she
10   injured?  No.  You heard from the detective not
11   injured.  She wasn't injured, therefore, there was
12   no imminent commission.  It hadn't gotten to that
13   level.  But more importantly it wasn't going to
14   get to that level.  And that's the part of
15   self-defense I wish to address to you next.

16       The defendant cannot justify the use of force
17   likely to cause death or great bodily harm unless
18   he uses every reasonable means within his power
19   before resulting to that force.  What is that in
20   English, last resort?  I can go to deadly force
21   which would be the highest type of force, the
22   highest standard under the law and that can only
23   be used as a last resort.

24       What is the testimony?  He has pulled the
25   individual off of his sister, the fight is over.

1    Did he attempt to threaten him with a gun?  Did he
2    attempt to fire a warning shot in the air?  Did he
3    attempt to punch him?  Did he attempt to drag him
4    outside?  Did attempt to waive it at him?  No, he
5    shot him.  He shot him.  The defense attorney
6    cannot have defense of others because the
7    defendant did not wait until the last resort.  I
8    want to talk about that just for a moment too.

9         The defendant in his statement, and he's like
10   any other witness.  You can accept or reject any
11   part of his testimony if it conflicts with other
12   testimony.  He says that the Patrick Brown is
13   kicking April Reese about the head and banging her
14   head into the floor.

15        Now, if that was true - if that's really true
16   how does she not have a mark on her?  How does she
17   not have a mark on her?  You don't have to accept
18   that's true.  In fact the testimony of Darren
19   Walker who is the impartial witness in fact if you
20   look at him he's friends with Mr. Lockhart - well
21   an acquaintance of Mr. Lockhart he's over at his
22   apartment.  He's certainly a guy with no beef one
23   way or another unlike the defendant.  He obviously
24   is going to say whatever he can to save himself at
25   this point.  Darren Walker says she hit him with

JUSTICE REPORTING SERVICES, INC.    523-6114

```
1        the bottle and he appears to be in the dazed.
2        They both come together and go to the floor when
3        he's leaving and within thirty seconds he hears
4        the gun shots.  When does this time frame happen?
5        The defendant is talking about because in those
6        thirty seconds he would have had to pull the
7        defendant off and go to the other side of the room
8        and then the shooting starts.  When does all this
9        kicking and beating and kicking between the legs
10       which there's no evidence of certainly but sounds
11       volatile.  I mean kicking a girl between the legs
12       sounds horrible.  Where in the time frame of this
13       going on though other then the defendant saying
14       this happened.  Where is the evidence of it?
15            If you look at the photos of the crime scene,
16       if you remember from Darren Walker they fall back
17       into the couch over here and the body of the
18       victim is found way over here.  That's because the
19       defendant pulls him off his sister and takes him
20       across the room and shoots him over here which is
21       why the casings were expelled on to this table
22       (phonetic).  The fight is over, and frankly, April
23       Reese -- can you just imagine for a moment,
24       imagine for a minute if Patrick Brown had hit the
25       defendant with a bottle over the head and caused
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1     an injury like this, can you imagine what the

2     defendant would be up here yelling he used deadly

3     force that he was entitled to use against him.

4     You know that's what he would be saying.

5     In reality it's Patrick Brown that's got his

6     head split open.  Patrick Brown got his head split

7     open and if the defendant hadn't intervened after

8     Patrick Brown had split April Reese's head open

9     like this he may have an argument that he had to

10    do that as a last resort.  Then maybe he's got an

11    argument, but he doesn't have it and he can't have

12    it.  He can't have it because the facts just don't

13    support it.

14    The danger must have been so real and the

15    circumstances were such that the danger could not

16    have been avoided.  It's so important this last

17    resort idea that the judge is going to tell you

18    that twice.  He is he going to read you this

19    provision and just think about what we are doing,

20    you know by voting not guilty you're basically

21    saying it was okay for him to take another

22    person's life and we wants to be pretty darn sure

23    pf that before we go ahead and authorize that

24    under law as citizen, that should make since to

25    you.  He didn't have to go to that force the fight

JUSTICE REPORTING SERVICES, INC.    523-6114

563

1       is over, the fight over.

2            Well, who is in the best position to know
3       what the defendant is thinking?  Certainly not me
4       or the defense attorney.  Who's in the best
5       position to know whether he was justified in doing
6       what he was doing, the defendant?  The defendant.
7       When a person has done something such as this and
8       it was lawful he did what he had to do does he
9       then go outside of his apartment I'm tired of him
10      messing with me, and that's Cheryl Grant that said
11      that and that was why I called her to stand.  That
12      was the purpose of her testimony.  I'm tired of
13      him messing with me.  Not with my sister, not oh
14      my god I had to do this to protect my sister.  Oh
15      no, no, no.  I'm tired of him messing with me.
16      That is the first indication of what's going on in
17      the defendant's mind.

18           Second indication and perhaps the most
19      relevant piece of evidence in this entire case is
20      the defendant knowing that he has just killed
21      somebody and if he's going to subsequently argue
22      it was lawful under the circumstances well, you'd
23      think maybe he'd call the police.  Does he do
24      that, no.  What is it that someone with a guilty
25      mind does?  Well, I better get rid of the murder

JUSTICE REPORTING SERVICES, INC.     523-6114

564

```
 1    weapon, and he throws it in the lake.  And I'd
 2    like to hear how that's consistent with someone
 3    who's acting lawful.  That's what's going on
 4    inside the defendant's mind.  He was there he
 5    knows what happened and he knows what he did was
 6    wrong.
 7           A third thing, well I'm going to stand up and
 8    tell the police what happened.  Huh-uh, I'm going
 9    to get out of here.  I'm going to go to Miami,
10    that's what he did.  He threw his shirt in the
11    dumpster, why because there is a bolo out for him
12    and a description with his shirt, and he is out of
13    there.  He's changing his appearance, he doesn't
14    want to be picked up, and he is gone.
15           Well, he goes to Miami, and he's there for
16    two days.  He knows the police are looking for
17    him, that's on the statement.  What else can he
18    say when he comes back?  Can he say he didn't do
19    it, no.  Half the complex sees him running out of
20    there with a gun.  His own sister is there.  Now
21    you may be thinking well, maybe my sister wouldn't
22    testify against me, probably not going to help the
23    State out.  But Darren Walker was right there and
24    he saw that, saw somebody leaving.  What else can
25    he say?  Okay, it was defense of others.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1              But even that story when you listen to the
 2      tape doesn't really hold water.  But when you
 3      listened to what I played on the tape everything
 4      on that statement is not consistent with an
 5      individual who really believed he had done what
 6      was lawful.  And no one knows what's going on
 7      inside his mind better then him.  And he may say
 8      that he doesn't know tje system but when you judge
 9      his credibility let's not forget the fat that he's
10      a two time convicted felon.

11              You know the defense attorney wants to talk
12      so much about the character of the victim Patrick
13      Brown and t sure is easy to talk about the dead
14      isn't it because I can't go out and shovel up
15      Patrick Brown's grave and bring him in here to say
16      this didn't happen and that didn't happen.  He can
17      say whatever he wants about Patrick Brown because
18      Patrick Brown is six feet under ground and he
19      knows nobody can do anything about that.

20              So he can say whatever he wants about this.
21      He can say he beat her head up with a baseball
22      bat.  Well, I'd like to see a medical report,
23      perhaps anything a picture if she went to a
24      hospital where is the doctor report?  Where is the
25      doctor who treated her, that would be nice to see,
```

1       wouldn't it?  Where is the prescription for the
2       bottle of aspirin that she had to get?  If that's
3       really the case why is April Reese so gun hoe for
4       still going out with him six weeks later?  And if
5       that's really the case and he's so concerned about
6       what he had seen why is he still his best friend?
7       Someone cracks someone's sister's head open I
8       think that best friend should end that day right
9       there.  Hey come on over my house we'll smoke some
10      pot, drink beer and hang out.

11          Actually the victim wasn't smoking pot.  You
12      heard from the coroner no marijuana in his
13      system.  The only person who was smoking pot who
14      testified here is the defendant.  Think about that
15      does that make him a reasonably stoned person or a
16      reasonably drunk person?  And it's interesting to
17      know how much that effected and inflamed his
18      passions because he was drunk or smoking pot.

19          The defense attorney said the gun isn't the
20      issue.  I suppose he's right and I can stand up
21      here and talk about the lies and talk about the
22      facts all day but you heard the same thing I heard
23      and you ultimately are the conscious of the
24      community.  You sit here as jurors and you make a
25      decision whether this was lawful or not.  But, I

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1      want you to -- see things didn't use to be like
 2      this.  People didn't resort to guns every time
 3      somebody --
 4           MR. GODWIN:  Your Honor, I object to this
 5      argument.  Object to this --
 6           MR. PATNER:  It's argument.
 7           MR. GODWIN: As to how the --
 8           THE COURT:  Overruled.
 9           MR. PATNER:  It doesn't have to come to
10      this.  If you feel in your heart that it had to
11      come to this, that it was the last resort facing
12      the defendant then what I want you to do is go
13      back into the jury room and I want you to check
14      off the not guilty verdict and that's only if you
15      feel in your heart and heart and believe that was
16      the last resort.  But before you do that take a
17      long hard look at what happened here.  Take a long
18      hard look.  You may not like what happened, you
19      may not like the law and may not like Patrick
20      Brown.  But I'm not up here to defend Patrick
21      Brown good, bad, or indifferent.  But I think he
22      deserves the same consideration as any other
23      member of society, same consideration the
24      defendant has.
25           You know if Patrick Brown had been prosecuted
```

568

1     for hitting his sister well then he would have an

2     attorney representing him and his attorney would

3     come up on behalf of him and argue and he would

4     have a jury of his peers.

5          Unfortunately the defendant became the judge

6     and he became the jury and you know what he became

7     an executioner.  There wasn't a trial for Patrick

8     Brown as to whether he did it or not.  Jeremy

9     Lockhart sold that.

10         One last thing I want to say is in opening

11    statements -- there is two things I want to touch

12    on.  In opening statements the defense attorney

13    said - he said the police did everything.  I hope

14    you remember this.  The police twisted the

15    defendant's statement.  Well, I don't know what

16    he's talking about and you heard the tape it

17    doesn't sound like the police twisted anything.

18    So when defense comes up and makes his last

19    argument consider the things said to you in

20    openings.

21         Then the second thing is how may times have

22    you heard him refer to the victim as a best friend

23    of the defendant?  And you know why he's doing

24    that?  I counted six times during opening

25    statements and I tried to keep track in the trial

1     but once we got up in double digits I started

2     loosing track.  You know why he's doing that?

3     He's doing it for sympathy, for sympathy of the

4     parties involved.  And you know what if you feel

5     sorry for the situation the defendant put himself

6     in then probably in your heart you've already

7     decided he's guilty.  There may be consideration

8     that goes to sentencing in this case and

9     fortunately you don't have to worry yourself about

10    that.  The judge will consider that if there is

11    anything that needs to be considered.

12         I ask you all as the conscious of the

13    community to look at the facts, look at the

14    evidence, and remember the attorneys are not on

15    trial.  The defense attorney is going to come up

16    here and make passions for the jury and that's

17    fine, that's his job.  But go back and take a look

18    at the evidence and think about what's reasonable,

19    and think about those words last resort.  And then

20    vote as to whether it was a last resort.  Thank

21    you all very much.

22         THE COURT:  Thank you very much.  Mr.

23    Godwin.

24         THE COURT:  Folks, just for your planing

25    purposes just so you know what we're doing we are


JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1        not going to have you deliberate today we are
 2        going to have you come back tomorrow morning to
 3        deliberate, okay, because by the time we finish
 4        closing argument and I give you the jury
 5        instructions on the law you wouldn't get the case
 6        until 5:30.  And of course there is no time limit
 7        on deliberations so I'm going to ask you to come
 8        back tomorrow at 9:00 and then we'll give you the
 9        case then and you can begin your deliberations,
10        okay.
11             MR. GODWIN:  I know you folks are tired.  And
12        this is my last opportunity to speak to you on
13        behalf of the accused, Jeremy Brown, Jeremy
14        Lockhart, excuse me.  I think you've heard the
15        expression taken out of context.  The prosecutor
16        played a one, maybe five second portion of the
17        entire conversation that Mr. Lockhart had with
18        Detective Walley.  Take that statement back into
19        evidence and listen to it, and listen to it in the
20        entire context and you will hear what Jeremy
21        Lockhart said when he was asked where was - where
22        was Patrick when he shot him.  He was steadily
23        kicking at April at that time.  How far away from
24        you?  About three feet.  He said he was steadily
25        kicking at April at that time.  If you believe
```

1    that Jeremy Lockhart shot his best friend because
2    his best friend punched him that's one thing,
3    that's not what this case was all about.

4         Jeremy Lockhart's best friend was beating up
5    and seriously injuring or about to seriously
6    injure April Reese.  The law says if in your
7    consideration of the issue of self-defense you
8    have a reasonable doubt on the question of whether
9    or not the defendant was justified in the use of
10   force likely to cause death or great bodily harm
11   you should find the defendant not guilty.

12        Now, you heard the prosecutor stand here a
13   moment ago and say if you feel in your heart it
14   was defense of others then you should vote not
15   guilty.  Well, that sounds good but that is not
16   the law.  It's not if you feel in your heart it
17   was defense of others.  The question is if you
18   have a reasonable doubt, if you've heard evidence
19   that causes you to have a reasonable doubt to say
20   that Jeremy Lockhart was trying to defend his
21   sister and he didn't have hatred or ill will or
22   spite or evil intent, if you have a reasonable
23   doubt about what was going on in Jeremy's mind
24   then you must find him not guilty.

25        Remember I don't have to prove to you that he

JUSTICE REPORTING SERVICES, INC.    523-6114

1    had a right to use deadly force.  I don't have to
2    prove that, that's very important.  All you have
3    to do is listen to these facts and say you know I
4    don't know if he did it.  I don't know if he
5    didn't.  I'm not really sure, I'm not sure if it
6    was justified or not.  If that's the way you feel
7    in your gut say I'm not sure if he could have
8    called the police maybe he had to protect his
9    sister right then and then there.  If you're not
10   sure then you know what the answer is.  You have a
11   reasonable doubt and you must vote not guilty.
12   You must vote not guilty.  That is what the law
13   is.  That is the law that protects each and
14   everyone of us.

15        Anybody can find themselves in a terrible
16   situation like this and that person might have to
17   act quickly.  And you have to judge Jeremy
18   Lockhart by the circumstances he was facing at
19   that moment.  It's easy to sit back here now and
20   say gosh Jeremy why didn't you call the police?
21   Why didn't you tie him up?  Why didn't you
22   handcuff him?  Why didn't you do this?  Why didn't
23   you do that?  Jeremy was acting in the moment when
24   the confrontation was going on.  He knew his
25   sister had previously had her head split open and

1    there's no dispute about that but the prosecutor
2    says where is the proof?  Where is the proof?  Who
3    has the burden of proof?  Who has the burden of
4    proof?  The prosecution.

5        Jeremy gave his statement to the police.  He
6    told the police what happened.  He stood up here
7    and told you folks what happened.  He subjected
8    himself to the cross examination of the
9    prosecutor.  He wanted you to hear out of his own
10   lips and from his own heart what was going on.  If
11   you think that boy had murder in his heart fine.
12   If you think he was sorry and didn't mean to do it
13   and he acted only out of desperation to protect
14   his sister then you've got to give him the benefit
15   of the doubt.  The law says you must give him the
16   benefit of the doubt and find him not guilty.

17       Jeremy said to the police I did this for
18   somebody I loved dearly.  Who do you mean?  My
19   little sister.  He didn't say I did it because, I
20   did this because Patrick punched me.  There's no
21   evidence he did this because Patrick punched him.
22   He was trying to stop the fight, Jeremy tried to
23   keep peace that day.  You heard all the testimony
24   about that.  That's why I hurt because I killed my
25   best friend over her, over her.  The young lady

JUSTICE REPORTING SERVICES, INC.    523-6114

1    was kicked in the genitalia, kicked between the

2    legs.

3        I told Detective Walley and I'm not trying to

4    be cute with the detective but obviously he didn't

5    go out an conduct an examination to see whether

6    she had been kicked in the genitalia or not.

7    Jeremy Lockhart did not have to wait, Jeremy

8    Lockhart did not have the wait until his sister's

9    head was split open again.  If you're out walking

10   in the dessert and you see a rattlesnake that's

11   poised and ready to strike you, you don't have to

12   wait for it to bite you before you can use defense

13   to kill it.  Well that's the law folks.

14       Jeremy did not have to wait until his sister

15   went into the hospital again.  He tried to keep

16   peace he did everything he could.  Patrick Brown

17   let the girls back in that day.  Patrick Brown

18   maybe enjoyed the little argument going on about

19   him.   Jeremy was acting in what he thought was a

20   proper way to protect his sister.  He didn't want

21   to do it, and it broke his heart to do it.

22       Now we can say how come he didn't call the

23   police?  Because he is a young kid, he's scared

24   and he got scared and went to his grandparents the

25   people who raised him.  Is that so unusual for

JUSTICE REPORTING SERVICES, INC.    523-6114

575

```
1     anybody who's been involved in a shooting to be
2     traumatized?  We hear about police officer who
3     shoot people the people always say I was so
4     traumatized after I shot I didn't know what I was
5     saying.  I didn't know what I was doing.  Jeremy
6     is not a trained police officer he's just a young
7     kid and he fired and killed his find.  What other
8     reaction would he have but to want to go there?
9     And he went there and then he came back and told
10     the police this is where the gun is.

11          And the police never bothered to go get it
12     and that would solve the issue right then and
13     there if it was an automatic or not.  If you have
14     some question in your mind as to whether this was
15     an automatic why didn't the police go and get the
16     gun?  Jeremy shot the gun and he went and pointed
17     out to them where it was and they decided to leave
18     it in the lake.

19          It's the State that has the burden of proof.
20     The State has to bring you the evidence not the
21     defense.  Keep that in mind, please.  It's the
22     State that has to bring you the evidence.  Also
23     keep in mind there's no duty to retreat when
24     you're attacked in your own home.  The judge will
25     give you that instruction.  A person's home is his
```

1    castle.  Jeremy had the right to try and keep the
2    peace in his own home.

3        Listen to the tape.  And on the issue of the
4    firearm again I'd ask you - he's not charged with
5    illegal possession of a firearm in this case
6    that's not what this case is about.  I don't like
7    the firearm anymore then you do but he was in his
8    own home and he told you he lives in a rough
9    neighborhood so he had it for protection.  You
10   don't have to like the firearm, I don't like it
11   but that's not the issue and if there is someone
12   back there saying that kid had no business having
13   a firearm one of you please stand up and say you
14   know what you're not here to judge him on whether
15   he had a right to have the firearm or not.  We are
16   here to judge whether he used force to protect his
17   sister.  Whether we have a reasonable doubt that
18   he had the right to use that force.  That's really
19   what the case is about.

20       You have to really ask yourself this one
21   question.  Did Jeremy have to wait until Patrick
22   put her in the hospital again?  Is that what the
23   law requires?  And the answer is no.  This is a
24   difficult case because someone has been killed and
25   no one likes that.  No one is asking you to go

```
1     back and prove a killing.  That's not what this is
2     about.  This is about the rights of a citizen, a
3     young man, a family man, to try to keep his home
4     in peace and trying to protect his sister from an
5     attack.  He doesn't like what he did anymore then
6     any of us do.  You saw him on the stand here.  You
7     saw the emotion.  You can judge whether he is
8     sincere or not.  I'd ask you to give him the same
9     benefit of doubt that you would want if you were
10    in his place.  I ask you to find him not guilty.
11    Thank you.
12         THE COURT:  All right.  Folks I'm now going
13    to read you the law that's applicable to the
14    evidence in this case and then we'll adjourn and
15    then we'll reconvene tomorrow at 9:00.  I will ask
16    you to be here at about ten minutes to nine and
17    then you'll retire to begin your deliberations.
18         Okay, before I read you the applicable law
19    I'm going to re-read to you an indictment, a copy
20    of which will be given to you to take back into
21    the jury room.  The charge again is that Jeremy
22    Lockhart on June 25th, 1994 in Broward County
23    state of Florida did then and there unlawfully and
24    feloniously by an act imminently dangerous to
25    another, and evincing a depraved mind regardless
```

578

```
1      of human life although without a premeditated
2      design to effect the death of any particular
3      individual did unlawfully kill and murder one
4      Patrick Brown, a human being, by shooting him with
5      a firearm, namely a handgun.
6           Now, this charge contained in the indictment
7      I referred to as the main allegation or the main
8      offense.  The reason why I say that is, after
9      considering the evidence you should consider the
10     possibility that all though the evidence may not
11     convince you that the defendant committed the main
12     crime for which he is accused, that is second
13     degree murder with a firearm, but that there is
14     evidence that he committed other acts that
15     constitute what's known as lesser included
16     crimes.  Therefore, if you decide that the main
17     accusation has not -- of murder second degree with
18     a firearm, has not been proved beyond a reasonable
19     doubt you would next need to decide if the
20     defendant is guilty of any lesser included crime.
21          Now, there is only one lesser included crime
22     that will be submitted to you in this particular
23     case and that's for the lesser included offense of
24     manslaughter.
25          Now, your verdict form which you will take
```

JUSTICE REPORTING SERVICES, INC.      523-6114

```
1     back to the jury room, a copy of which I don't
2     have at the moment, is styled state of Florida
3     versus the defendant, Jeremy Lockhart.  It has the
4     case number, has my name and says we the jury in
5     the above entitled action find as follows:  Then
6     there will be three lines, line A, B, and C.  Line
7     A will read the defendant is guilty of murder
8     second degree with a firearm as charged in the
9     indictment.  Line B will read the defendant is
10    guilty of the lesser included offense of
11    manslaughter.  And line C will read the defendant
12    is not guilty.  And then there is a place for the
13    insertion of tomorrow's date which is the 17th day
14    of August, as well as the line for the signature
15    of the foreperson.
16         So on this verdict form there are three items
17    of marking.  There is going to be a check mark on
18    the appropriate verdict which is line A, B, or C.
19    There is going to be the insertion of tomorrow's
20    date which is August 17th, 1915.  And then there
21    is going to be the signature of the foreperson.
22         How you handle this verdict form is as
23    follows.  You ask yourself has the State convinced
24    you beyond to the exclusion of every reasonable
25    doubt the defendant is guilty of the offense as
```

JUSTICE REPORTING SERVICES, INC.    523-6114

| | |
|---|---|
| 1 | charged in the indictment, murder in the second |
| 2 | degree with a firearm? If you're so satisfied you |
| 3 | would check line A. If you're not so satisfied |
| 4 | you then ask yourself has the State convinced you |
| 5 | beyond and to the exclusion of every reasonable |
| 6 | doubt the defendant is guilty of the lesser |
| 7 | included offence of manslaughter? If you're so |
| 8 | satisfied check line B, if you're not so satisfied |
| 9 | check line C which reads the defendant is not |
| 10 | guilty. |
| 11 | Now, the third item that you will be given by |
| 12 | the Court to take back into the jury room is a |
| 13 | jury questionnaire. This has the case number as |
| 14 | well as my name, and it has the style of the case, |
| 15 | state of Florida versus Jeremy Lockhart and says |
| 16 | we the jury in the above entitled action request |
| 17 | the following: And there's ten blank lines and |
| 18 | then there is a place for the insertion of today's |
| 19 | date as well as a line for the signature of the |
| 20 | foreperson. |
| 21 | This questionnaire is given to you so if in |
| 22 | the event while you're back there deliberating you |
| 23 | should have a question your question should be |
| 24 | reduced to writing and the foreperson should date |
| 25 | and sign it and press the buzzer and hand it to |

1     the court deputy and he'll hand it to me and I'll
2     attempt to resolve your question.  Now, by handing
3     you this questionnaire by no stretch of the
4     imagination do I want you to think for a moment
5     that I'm begging you, urging you, commanding you,
6     or directing you, or pleading with you to have a
7     question.  All I'm saying to you is if you have a
8     question that's fine and dandy just put it in
9     writing and I'll attempt to resolve it.  If you
10    have no question that's equally fine and dandy
11    bring back the blank questionnaire together with
12    the verdict form and the indictment once you have
13    arrived and reached a verdict.

14         Now, in this case Jeremy Lockhart is accused
15    of murder in the second degree.  Now, murder in
16    the second degree includes the lesser crime of
17    manslaughter both of which are unlawful.  A
18    killing that is excusable or was committed by the
19    use of justifiable deadly force is lawful.

20         If you find that the victim Patrick Brown was
21    killed by Jeremy Lockhart Jeremy Lockhart you will
22    then consider the circumstances surrounding the
23    killing in deciding if the killing was murder in
24    the second degree or manslaughter, or whether the
25    killing was excusable or resulted from justifiable

582

```
 1     use of deadly force.

 2          Justifiable homicide.  A killing of a human

 3     being is justifiable homicide and lawful if

 4     necessarily done while resisting an attempt to

 5     murder or commit a felony upon the defendant, or

 6     to commit a felony in any dwelling house in which

 7     the defendant was at the time of the killing.

 8     Excusable homicide --

 9          MR. GODWIN:  I think there is a problem,

10     Judge, can we come side bar for a second?

11          THE COURT:  I'm reading it verbatim.

12          MR. GODWIN:  Which page are you on?

13          THE COURT:  61.  The killing of a --

14     excusable homicide.  The killing of a human being

15     is excusable and therefore lawful under any one of

16     the following two circumstances:  One, when the

17     killing is committed by accident and misfortune in

18     doing any lawful act by lawful means with usual

19     ordinary caution and without any lawful intent,

20     or, two, when the killing occurs by accident or

21     misfortune in the heat of passion, upon any sudden

22     and sufficient provocation.

23          I now instruct you on the circumstances that

24     must be proved before the defendant Jeremy

25     Lockhart may be found guilty of murder in the
```

583

```
 1    second degree or any lesser included crime, namely
 2    manslaughter.
 3         So now I'm going to read you the law with
 4    respect to murder in the second degree.  Before
 5    you can find the defendant guilty of second degree
 6    murder the State must prove the following three
 7    elements beyond a reasonable doubt:  Number one,
 8    that Patrick Brown is dead.  Two, that the death
 9    was caused by the criminal act or agency of the
10    defendant, Jeremy Lockhart.  And three, there was
11    an unlawful killing of Patrick Brown by an act
12    imminently dangerous to another and evincing a
13    depraved mind regardless of human life.  Now, what
14    does that mean?  An act is one that is "imminently
15    dangerous to another and evincing a depraved mind
16    regardless of human life", if it is an act or
17    series of acts that:  One, a person of ordinary
18    judgment would know is reasonably certain to kill
19    or do serious bodily injury to another, and is
20    done from ill will, hatred, spite, or an evil
21    intent.  And is of such a nature that the act
22    itself indicates an indifference to human life.
23         In order to convict of Second Degree Murder,
24    it is not necessary for the State to prove that
25    the defendant had a premeditated intent to cause
```

584

1    death.

2         Now, if you find that the defendant, Jeremy
3    Lockhart, committed the felony of murder in the
4    second degree, and you also find that during the
5    commission of the crime the defendant possessed a
6    firearm you should find the defendant guilty of
7    murder in the second degree with a firearm.  Now,
8    if you find only that the defendant committed
9    murder in the second degree but did not possess a
10   firearm then you should find the defendant guilty
11   only of murder in the second degree.

12        Now, I will read to you the law with respect
13   to what a firearm is.  A firearm means any weapon
14   including a starter gun which will is designed to
15   or may readily be converted to expel any
16   projectile by the action of an explosive; or the
17   frame or receiver of any such weapon, any firearm
18   muffler, any firearm silencer.  Any destructive
19   device or any machine gun.  The term firearm does
20   not include antique firearm unless the antique
21   firearm is used in the commission of a crime.

22        I'll now read you the law with respect to the
23   lesser included offense of manslaughter.  Before
24   you can find the defendant guilty of manslaughter
25   the State must prove the following two elements

585

1        beyond a reasonable doubt:

2              Number one, that Patrick Brown is dead.  And

3        two, the defendant intentionally caused the death

4        of Patrick Brown, or the death of Patrick Brown

5        was caused by the culpable negligence of Jeremy

6        Lockhart.  However, the defendant could not be

7        guilty of manslaughter if the killing was either

8        justifiable or excusable homicide as I have and

9        will previously explain these terms.

10             I will now define culpable negligence for you

11       because remember I said that there are two

12       elements.  Number one, that the victim Patrick

13       Brown is dead.  And two, that the defendant

14       intentionally caused the death of Patrick Brown,

15       or the death of Patrick Brown was caused by the

16       culpable negligence of Jeremy Lockhart.

17             What is culpable negligence?  Each of us has

18       a duty to act reasonably towards others.  If there

19       is a violation of that duty without any conscious

20       intention to harm that violation is negligence.  A

21       culpable negligence is more then a failure to use

22       ordinary care towards others.  In order for

23       negligence to be culpable it must be gross, and

24       flagrant.  Couple negligence is a course of

25       conduct showing reckless disregard of human life,

586

```
 1       or the safety of persons exposed to its dangerous
 2       effects, or such an entire want of care as to
 3       raise a presumption of a conscious indifference to
 4       consequences, or which shows a wantonness or
 5       recklessness, or a grossly careless disregard of
 6       the safety and welfare of the public, or such an
 7       indifference to the rights of others as is
 8       equivalent to an intentional violation of such
 9       rights.  The negligent act or mission must have
10       been committed with an utter disregard for the
11       safety of others.  Culpable negligence is
12       consciously doing an act or following a course of
13       conduct that the defendant must have known or
14       reasonably should have known was likely to cause
15       death or great bodily injury.  In order to convict
16       of manslaughter -- excuse me, that's it.
17            I'll now read to you the law with respect to
18       the concept of justifiable use of deadly force.
19       An issue in this case -- everyone with me?
20       Great.  An issue in this case is whether the
21       defendant acted in self-defense.  It's a defense
22       to the offense with which the defendant Jeremy
23       Lockhart is charged, if the death of Patrick Brown
24       resulted in the justifiable use of force likely to
25       cause death or great bodily harm.  A person is
```

1    justified in using force likely to cause death or
2    great bodily harm if he reasonably believes that
3    such force is necessary to prevent one, imminent
4    death or great bodily harm to himself or another.
5    Or two, the imminent commission of a forcible
6    felony, in this instance aggravated battery,
7    against himself or another.

8         Now, what is aggravated battery?  Aggravated
9    battery has two elements.  Number one, as it
10   applies to this particular case remember I said
11   that a person is justified in using force likely
12   to cause death or great bodily harm if he
13   reasonably believes that such force is necessary
14   to prevent one, imminent death or great bodily
15   harm to himself or another.  Or the imminent
16   commission of an aggravated battery by Patrick
17   Brown against himself, namely against the
18   defendant or another.

19        Now, what is aggravated battery?  Number one,
20   you would have to be shown that beyond a
21   reasonable doubt that -- I'm sorry, strike that.
22   It would have to be shown that, one, Patrick Brown
23   intentionally touch or struck April Reese against
24   her will.  And two, in committing the battery
25   Patrick Brown intentionally or knowingly caused

1    great bodily harm to April Reese.

2        In deciding whether the defendant was

3    justified in the use of force likely to cause

4    death or great bodily harm you must judge him by

5    the circumstances by which he was surrounded at

6    the time the force was used.  The danger facing

7    the defendant need not have been actual; however,

8    to justify the use of force likely to cause death

9    or great bodily harm the appearance of danger must

10   have been so real that a reasonably cautious and

11   prudent person under the same circumstances would

12   have believed that the danger could be avoided

13   only through the use of that force.  Based upon

14   appearances the defendant must have actually

15   believed that the danger was real.

16       The defendant cannot justify the use of force

17   likely to cause death or great bodily harm unless

18   he uses every reasonable means within his power

19   and consistent with his own safety to avoid the

20   danger before resorting to that force.  The fact

21   that the defendant was wrongfully attacked cannot

22   justify his use of force likely to cause death or

23   great bodily harm if by retreating he could have

24   avoided the need to use this force.  However, if

25   the defendant was placed in a position of imminent

1    danger of death or great bodily harm and it would

2    have increased his own danger to retreat, then his

3    use of force likely to cause death or great bodily

4    harm was justifiable.

5        If the defendant was attacked in his own home

6    or on his own premises -- I'm sorry.  If the

7    defendant was attacked in his own home or on his

8    own premises he had no duty to retreat and had the

9    lawful right to stand his ground and meet force

10   with force, even to the extent of using force

11   likely to cause death or great bodily harm if it

12   was necessary to prevent death or great bodily

13   harm to himself or another, April Reese, or the

14   commission of a forceful felony.

15       If in your consideration of the issue of

16   self-defense you have a reasonable doubt on the

17   question of whether or not the defendant was

18   justified in the use of force likely to cause

19   death or great bodily harm you should find the

20   defendant not guilty.  However, if from the

21   evidence you are convinced that the defendant was

22   not justified in the use of force likely to cause

23   death or great bodily harm, you should find him

24   guilty if all the elements of the charge have been

25   proved.

1           I'm now going to read you the law with
2      respect to the concept of a plea of not guilty,
3      burden of proof, and reasonable doubt.   The
4      defendant has entered a plea of not guilty.   This
5      means you must presume or believe the defendant is
6      innocent.   The presumption of innocence stays with
7      the defendant as to each material allegation in
8      the information through each stage of the trial
9      until it has been overcome by the evidence to the
10     exclusion of and beyond a reasonable doubt.   To
11     overcome the defendant's presumption of innocence
12     the State has the burden of proving the following
13     two elements.

14          Number one, that the crime with which the
15     defendant was charged was committed.

16          And two the defendant is the person who
17     committed that crime.   Remember the defendant is
18     not required to prove anything.   Whenever you hear
19     the words reasonable doubt you must consider the
20     following:   A reasonable doubt is not a possible
21     doubt, speculative doubt, an imaginary doubt, or a
22     forced doubt.   Such a doubt should not influence
23     you to return a verdict of not guilty if in fact
24     you have an abiding conviction of guilt.   On the
25     other hand if after carefully considering,

1   comparing, and weighing all of the evidence there
2   is not an abiding conviction of guilt, or if
3   having a conviction it is one which is not stable
4   but one which waivers and vacillates then the
5   charge has not been proved beyond every reasonable
6   doubt and you must find the defendant not guilty
7   because the doubt is reasonable.

8       It is to the evidence introduced upon this
9   trial and to it alone that you are to look for
10  that proof.  A reasonable doubt may arise from the
11  evidence, lack of evidence, or conflict in the
12  evidence.  If you have a reasonable doubt you
13  should find the defendant not guilty.  If you have
14  no reasonable doubt you should find the defendant
15  guilty.  Excuse me.

16      Weighing the evidence.  It is up to you to
17  decide what evidence is reliable.  You should use
18  your common sense in deciding which is the best
19  evidence and which evidence should not be relied
20  upon.  In considering your verdict you may find
21  some of the evidence not reliable or less reliable
22  then the other evidence.  You should consider how
23  the witnesses acted as well as what they said.
24  Some things you should consider are, one, did the
25  witness seem to have an opportunity to see and

JUSTICE REPORTING SERVICES, INC.    523-6114

1    know the things about which the witness
2    testified?  Two, did the witness seem to you to
3    have an accurate memory?  Three, was the witness
4    honest and straight forward in answering the
5    questions of the lawyers?  Four, did the witness
6    have some interest in how the case should be
7    decided?  Five, does a witness' testimony agree
8    with the other testimony and other evidence in
9    this case?  Six, did the witness at some other
10   time make a statement that is inconsistent with
11   the testimony that he or she gave in court?  And
12   seven, was it proved that the witness had been
13   convicted of a crime?

14        Now, the defendant in this case has himself
15   become a witness.  Therefore, the same rules that
16   I just read to you that you are to utilize in
17   evaluating the testimony of the State's witnesses
18   are equally applicable to evaluating the testimony
19   of the defendant.  You may rely upon your own
20   conclusions about this witness.  A juror may
21   believe or disbelieve all or any part of the
22   evidence or the testimony of any witness.

23        Expert witnesses are like other witnesses
24   with one exception.  The law permits an expert
25   witness to give his or her opinion.  However, an

1    expert's opinion is only reliable when given on a
2    subject about which you believe him to be an
3    expert.  Like other witnesses you may believe or
4    disbelieve all or any part of an expert's
5    testimony.

6         A statement claimed to have been made by the
7    defendant outside of court has been placed before
8    you.  Such a statement should always be considered
9    with caution and be weighed with great care to
10   make certain it was freely and voluntarily made.
11   Therefore, you must determine from the evidence
12   that the defendant's alleged statement was
13   knowingly, voluntarily, and freely made.  In
14   making this determination you should consider the
15   total circumstances, including not limited to,
16   one, whether when the defendant made the statement
17   he had been threatened to make it.  And two,
18   whether anyone had promised him anything in order
19   to get him to make it.

20        If you conclude the defendant's out of court
21   statement was not freely and voluntarily made you
22   should disregard it.

23        Here's some general rules you should apply to
24   your discussion.  You must follow these rules in
25   order to return a lawful verdict.  Number one, you

```
 1    must follow the law as set out in these
 2    instructions.  If you fail to follow the law your
 3    verdict would simply be a miscarriage of justice.
 4    There's no reason for failing to follow the law in
 5    this case.  All of us are depending on each and
 6    everyone of you to make a wise and legal decision
 7    in this matter.
 8         Two, this case must be decided only upon the
 9    evidence you have seen in the form of the exhibits
10    that have been marked into evidence, and that you
11    have heard in the form of the verbal responses out
12    of the mouths of the witnesses on the witness
13    stand under oath in response to the questions of
14    the lawyers as well as these instructions of law.
15         Three, this case must not be decided for or
16    against anyone because you feel sorry for anyone
17    or you're angry with anyone.
18         Four, remember the lawyers themselves are not
19    on trial.  Your feelings about them should not
20    influence your decision in this case.
21         Five, your duty is to determine the defendant
22    guilty or not guilty in accordance with the law.
23    It is my responsibility as a judge to determine
24    what a proper sentence would be and to actually
25    impose sentence if in fact you find the defendant
```

1    guilty.

2          Six, whatever verdict you render must be a
3    unanimous verdict and each and every juror must
4    agree to the same verdict.

5          Seven, it is entirely proper for a lawyer to
6    talk to a witness about what testimony the
7    witnesses would give if called to the courtroom.
8    A witness' testimony should never be disregarded
9    merely because he or she talks to a lawyer prior
10   to coming to court about what his or her testimony
11   would be.

12         Eight, feelings of prejudice, bias, or
13   sympathy are not legally reasonable doubts and
14   should not be discussed by any of you in any way.

15         Your verdict must be based on your views of
16   the evidence and on the law contained in these
17   instructions.

18         Deciding the verdict is exclusively your
19   job.  I cannot participate in that decision in any
20   way.  Please disregard anything I may have said or
21   done that made you think I preferred one verdict
22   or another.  Only one verdict may be returned as
23   to the crime charged.  This verdict must be a
24   unanimous verdict.  That is all of you must agree
25   to the same verdict.  The verdict must be in

```
 1        writing and for your convenience the necessary
 2        form of verdict has been prepared for you.
 3            In just a few moments, which means actually
 4        tomorrow morning at 9:00 a.m., you will then be
 5        taken to the jury room by the bailiff.  The first
 6        thing you should do is select and elect a
 7        foreman.  Now, selection of the foreman should
 8        take no more then a minute or two.  If you're back
 9        there for hours carrying on and fighting,
10        debating, and arguing who the foreman is going to
11        be, ladies and gentlemen, you're royally missing
12        the boat.  We're not looking for the next chairman
13        of General Motors or Blockbuster Videos, we're
14        merely looking for a person to properly execute
15        the verdict form.  The foreman presides over the
16        deliberations like a chairman of a meeting.  It is
17        the foreman's job to sign and date the verdict
18        form when you all agree on a verdict.  The foreman
19        will bring the verdict back to the courtroom and
20        hand it to the court deputy.  And he'll then hand
21        it to the deputy clerk and she'll hand it to me
22        and I will peruse the verdict form to make sure
23        you properly executed the verdict and then I'll
24        hand it back to the deputy clerk and she'll stand
25        up in open court and announce what the verdict
```

JUSTICE REPORTING SERVICES, INC.    523-6114

597

1      is.

2          Either a man or woman may be the foreperson
3      of the jury.  A verdict finding the defendant
4      either guilty or not guilty must be a unanimous
5      verdict and must be the verdict of each juror as
6      well as the jury as a whole.

7          In closing let me remind you it is absolutely
8      imperative that you follow the law set out in
9      these instructions in arriving and deciding and
10     reaching your verdict.  There is no other laws
11     that apply to this case.  Even if you do not like
12     the laws that must be applied you must use them.
13     For two centuries we have agreed to a constitution
14     and to live by the law.  No one of us has the
15     right to violate the rules that we all share.

16         Okay.  Everyone with me?  All right, then all
17     seven jurors rest up this evening and don't eat to
18     much tonight.  See you tomorrow.

19         MR. GODWIN:  I'd just ask what the procedure
20     for tomorrow morning is?

21         THE COURT:  They go to where the court deputy
22     tells them and then they will come back and he'll
23     take them back into the jury room and they won't
24     start deliberating until I come back and say hello
25     and good-bye, okay.

JUSTICE REPORTING SERVICES, INC.    523-6114

1          MR. GODWIN: Okay.

2          THE COURT:   If you want to bring anything to

3      drink with you or eat with you feel free to do so

4      tomorrow.

5          (Thereupon, the following proceedings were

6      had outside the hearing of the jurors.)

7          THE COURT:   Outside the presence of the

8      jury.   Number one, I'd reiterate on the record

9      what was discussed off the record that is both

10     sides actually preferred when I gave them the

11     option of either reading the jury instructions

12     tonight or tomorrow morning and have the jury come

13     back and give them then and you both agreed to

14     give them tonight, is that correct?

15         MR. PATNER: Yes, sir.

16         MR. GODWIN: Yes, sir.

17         THE COURT:   Secondly I'm sure glad we spent

18     ten minutes on the issue which was never raised,

19     that is, talking about the absence of April Reese

20     as a witness.   Thirdly, I just want to make sure

21     that on the verdict form tomorrow you indicated

22     murder in the second degree with a firearm, as

23     well as murder in the second degree.

24         MR. PATNER:   I've seen it both ways I was

25     going to ask that.   Is it murder second degree as

JUSTICE REPORTING SERVICES, INC.      523-6114

599

```
1    charged or murder second degree, manslaughter with
2    a firearm?
3         MR. GODWIN:  There's no manslaughter with a
4    firearm.
5         THE COURT:   There's no three year minimum on
6    manslaughter.
7         MR. PATNER:  But it elevates it up a degree.
8         THE COURT:   I don't --
9         MR. PATNER:  It aggravates it from a second
10   degree to a first degree felony.  The other way
11   I've seen those verdict forms is the charge is
12   then with the use of a firearm yes or no.
13        THE COURT:  Are you asking for second degree
14   murder without a firearm or no?
15        MR. GODWIN:  You told the jury you were going
16   to do that.
17        MR. PATNER:  I think by -- it has to be with
18   a firearm, has to be there in order to get the
19   aggravated.
20        THE COURT:  Yeah, then it will have to be
21   murder second degree without the firearm.  Then on
22   manslaughter I seem to recall there was some --
23   there is no three year minimum on manslaughter.
24        MR. PATNER:  I don't disagree with that
25   statement.  What I'm more concerned with is --
```

**IN THE DISTRIC COURT OF APPEAL FOURTH L..STRICT**
**WEST PALM BEACH, FLORIDA**

| DIVISION:<br>APPELLATE | RECORD ON APPEAL FROM THE CIRCUIT COURT<br>OF THE SEVENTEENTH JUDICIAL CIRCUIT<br>IN AND FOR BROWARD COUNTY, FLORIDA<br>CRIMINAL DIVISION | |
|---|---|---|

Appellant

JEREMY LOCKHART
VS.
STATE OF FLORIDA,

Appellee

CASE NUMBER
94-10764CF10A
APPEAL NUMBER
95-3410

VOLUME __V__ PAGES __665__ TO __724__

RICHARD L. JORANDBY (15th P.D.),

Attorney for Appellant

JOAN FOWLER,
Assistant Attorney General

| DATE OF FILING | KIND OF INSTRUMENT | PAGES |
|---|---|---|
| | **VOL. I. COURT REPORTER TRANSCRIPT** | |
| 04-07-95 | HEARING...................................................... | 1-200 |
| | **VOL. II. COURT REPORTER TRANSCRIPT** | |
| 08-14-95 | JURY TRIAL................................................... | 200-400 |
| | **VOL. III. COURT REPORTER TRANSCRIPT** | |
| 08-15-95 | JURY TRIAL CONTINUED......................................... | 400-599 |
| | **VOL. IV. COURT REPORTER TRANSCRIPT** | |
| 09-08-95 | SENTENCING................................................... | 600-664 |
| | **VOL. V.** | |
| 07-13-94 | INFORMATION.................................................. | 665 |
| 08-10-94 | MOTION TO COMPEL AND/OR FOR SANCTIONS........................ | 666-667 |
| 09-27-94 | MOTION FOR DISQUALIFICATION OF JUDGE......................... | 668-675 |
| 09-27-94 | AFFIDAVIT OF JEREMY LICKHART................................. | 676-677 |
| 09-27-94 | ORDER DENYING MOTION FOR DISQUALIFICATION OF JUDGE......... | 678 |
| 02-17-95 | EXHIBIT LIST................................................. | 679 |
| 02-23-95 | MOTION TO SUPPRESS CONFESSIONS, ADMISSIONS AND STATEMENT... | 680-681 |
| 04-07-95 | HEARING PROCEEDING........................................... | 682 |
| 04-10-95 | ORDER DENYING MOTION TO SUPPRESS STATEMENTS................ | 683 |
| 04-10-95 | EXHIBIT LIST................................................. | 684 |
| 05-03-95 | NOTICE OF THE STATE'S IANTENT TO SEEK THAT THE COURT DECLARE THE DEFENDANT AN HABITUAL FELONY OFFENDER AND/OR AN HABITUAL VIOLENT FELONY OFFENDER..................................... | 685-686 |

| DATE OF FILING | KIND OF INSTRUMENT | PAGES |
|---|---|---|

VOL. V. CONTINUED

| | | |
|---|---|---|
| 05-04-95 | NOTES FROM THE CLERK............................................... | 687-688 |
| 05-05-95 | JURY QUESTIONS..................................................... | 689-691 |
| 05-05-95 | EXHIBIT LIST....................................................... | 692-694 |
| 05-05-95 | RECORD OF TRIAL PROCEEDINGS........................................ | 695 |
| 08-14-95 | STATE'S MOTION IN LIMINE NO. 1..................................... | 696-697 |
| 08-16-95 | NOTES FROM THE CLERK............................................... | 698-699 |
| 08-17-95 | JURY QUESTIONS..................................................... | 700 |
| 08-17-95 | EXHIBIT LIST....................................................... | 701 |
| 08-17-95 | VERDICT............................................................ | 702 |
| 09-08-95 | SENTENCE........................................................... | 703-705 |
| *8-17-95 | DISPOSITION........................................................ | 706 |
| 09-08-95 | EXHIBIT LIST....................................................... | 707 |
| 09-08-95 | SENTENCING GUIDELINES SCORESHEET................................... | 708-711 |
| 09-08-95 | DISPOSITION........................................................ | 712 |
| 09-08-95 | JUDGMENT AND RESTITUTION ORDER..................................... | 713-714 |
| 09-22-95 | NOTICE OF APPEAL................................................... | 715 |
| 09-22-95 | ORDER OF INSOLVENCY AND DESIG. 15TH. P.D........................... | 716 |
| 09-22-95 | STATEMENT OF JUDICIAL ACTS AND DESIG. TO CT. RPT................... | 717-719 |
| 11-07-95 | ORDER GRANTING EXTENSION TIME TO CT RPT............................ | 720-721 |
| 12-05-95 | ORDER GRANTING EXTENSION TIME TO CT RPT............................ | 722-723 |
| 01-03-96 | ORDER GRANTING EXTENSION TIME TO CT. RPT........................... | 724 |
| 02-15-96 | CERTIFICATE OF THE CLERK. | |

*********************************
*

In the Circuit Court of the Seventeenth Judicial Circuit
of the State of Florida

For Broward County, at the ___SPRING___ Term thereof, on the ___13th___ day of ___JULY___,
in the year of our Lord One Thousand Nine Hundred and Ninety_FOUR_____, to-wit:- The Grand
Jurors of the State of Florida, inquiring in and for the County of Broward, State of Florida, upon their oaths
do present that _____

JEREMY LOCKHART

on the 25th_____ day of __JUNE_____ , in the year of our Lord One Thousand Nine
Hundred and _NINETY-FOUR_____, in the County of Broward, State of Florida,
did then and there unlawfully and feloniously, by an act imminently dangerous to

another and evincing a depraved mind regardless of human life, although without

a premeditated design to effect the death of any particular individual, did

unlawfully kill and murder one PATRICK BROWN, a human being, by shooting him

with a firearm, to-wit: a handgun

against the form of the statute in such case pursuant to Section ___782.04(2)_____
of the Florida Statutes, made and provided to the evil example of all others in the like case offending, and
against the peace and dignity of the State of Florida.

A TRUE BILL:

FOREMAN

I HEREBY CERTIFY that I have advised the Grand Jury returning the Indictment, as authorized and required
by law.

PETER F. MAGRINO
Assistant State Attorney for the
Seventeenth Judicial Circuit of the State
of Florida, Prosecuting for said State       6 6 5

Rev 5/90                                                      #029

**ORIGINAL-CLERK**

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

CASE NO:   94-10764CF10A

STATE OF FLORIDA,          JUDGE:   Goldstein

    Plaintiff,

vs.

Jeremy Lockhart,

    Defendant,

_____/

## MOTION TO COMPEL AND/OR FOR SANCTIONS

Through counsel, the Accused moves this court to compel the
State to furnished discovery in this cause and/or to impose
sanctions on the State, as follows:

1.   The Accused was arraigned on July 28, 1994 for the
offense of Murder in the 2nd Degree.  The Accused in being held
without bond.

2.   Fifteen days or more have elapsed since the filing of
the charging document.

3.   The State has failed to provide discovery to the
Defense.

4.   Based upon the foregoing, the Accused moves this Court
to order one or more of the following remedies:

a.   Dismiss all charges pending in this cause;

b.   Prohibit the State from calling as witnesses  or
introducing at trial any persons or information not as yet
provided to the defense;

c.   Grant an immediate release to the accused on his own
recognizance;

666

d.    Charge a continuance to the State and order the State

to fully comply with its discovery obligations within two

(2) working days.

e.    Grant such other relief as may be just and appropriate.

WHEREFORE, counsel for the Accused moves this Court to grant

this Motion.

I HEREBY CERTIFY that a true and correct copy of the

foregoing has been furnished by hand to the Office of the State

Attorney, Broward County Courthouse, Fort Lauderdale, Florida,

this __10__ day of ___August___ , 1994.

> ALAN H. SCHREIBER
> Public Defender
> 17th Judicial Circuit
>
> Robert E. Godwin, #175582
> Assistant Public Defender
> Attorney for Defendant

667

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    CASE NO.   94-10764CF10
      Plaintiff,

v.                                   JUDGE:  GOLDSTEIN

JEREMY LOCKHART,
      Defendant.
_____/

Filed In Open Court.
ROBERT E. LOCKWOOD, CLERK
ON SEP 27 1994
BY:

## MOTION FOR DISQUALIFICATION OF JUDGE

Pursuant to Florida Rule of Judicial Administration 2.160,
the Defendant, JEREMY LOCKHART., by and through the undersigned
attorney, requests this Court to enter an order disqualifying
itself from all further proceedings in the above-styled cause,
and as grounds therefore states the following:

### FACTS

1. On September 14, 1994, this Court summarily found
guilty of direct criminal contempt of court the undersigned
counsel for referring to another client as a black male in the
case of State v. Ronald Riviere, case 94-8989CF10B. The court
denied counsel's repeated requests to phone his attorney before
proceeding with the contempt hearing.

2. This Court deferred sentencing on the contempt
conviction and has still not concluded the contempt proceedings
despite counsel's repeated requests to do so.

3. The Court disqualified itself from the Riviere case.

4. The Defendant's case is now scheduled for trial. The
Defendant is convinced that the court is refusing to sentence
counsel in order to influence counsel's "behavior" in this trial.

1

€€5

orig

5.    This Court has made statements to the press that undersigned counsel caused it to hold a female attorney in contempt on Tuesday, September 13, 1994.  Specifically, this Court was quoted as saying that the undersigned counsel had incited the incident, that it was "goaded" into its action by the public defender's office, and that undersigned counsel was "trying to be disruptive" in an article entitled "Short Day in Broward: Lawyer Arrested for Attire," published by the Miami Herald, Broward Edition, on September 14, 1994.  The court was quoted as saying that the office of the public defender was out to "get" it in an article appearing in the Miami Herald on September 14, 1994, entitled "Disorder in the court."  The court was also quoted as stating that "the public defender's office has mounted a campaign against him" in an article entitled "Lawyer: Judge charged me with contempt," published by the Miami Herald on September 15, 1994.

6.    This Court was again interviewed by staff writer Amy Driscoll of the Miami Herald for an article published Sunday, September 18, 1994 entitled "Tough judge a trial for defense lawyers."  The Court was quoted was saying that the Public Defender's Office is "trying to do everything they can to get me off the bench.  They are trying to provoke me."

7. This Court has accused undersigned counsel, in open court, of being an obstructionist and of wasting the court's time.

8.    Based on the foregoing, the Defendant has a well

2

grounded fear that this Court is prejudiced against him and his

counsel and that he will not receive a fair trial in this cause.

## ARGUMENT

This Court's order holding defense counsel in direct

criminal contempt of court, as well as its statements regarding

the conduct of the defense has caused the Defendant to reasonably

fear that he will not receive a fair and impartial trial.

A trial court presented with a motion to disqualify must

limit its review of the motion to making a "bare determination of

legal sufficiency." Bundy v. Rudd, 366 So. 2d 440, 442 (Fla.

1978).[1] The purpose of such a limitation is to "ensure public

confidence in the integrity of the judicial system . . . ."

Livingston v. State, 441 So. 2d 1083, 1086 (Fla. 1983); see

also Rogers v. State, 630 So. 2d 513 (Fla. 1993). The Florida

Supreme Court reiterated in Livingston:

> Prejudice of a judge is a delicate question to
> raise but when raised as a bar to the trial of a cause,
> if predicated on grounds with a modicum of reason, the
> judge against whom raised, should be prompt to recuse
> himself [sic]. No judge under any circumstances is
> warranted in sitting in the trial of a cause whose
> neutrality is shadowed or even questioned.

---

[1] Florida Rule of Judicial Administration 2.160(f)
explicitly provides the following:
    The judge against whom an initial motion to
disqualify under subdivision (d)(1) is directed shall
determine only the legal sufficiency of the motion and
shall not pass on the truth of the facts alleged.    If
the motion is legally sufficient, the judge shall
immediately enter an order granting disqualification
and proceed no further in the action.    If any motion is
legally insufficient, an order denying the motion shall
immediately be entered.    No other reason for denial
shall be stated, and an order of denial shall not take
issue with the motion.

3

670

> . . . .
> The judiciary cannot be too circumspect, neither
> should it be reluctant to retire from a cause under
> circumstances that would shake the confidence of the
> litigants in a fair and impartial adjudication of the
> issues raised.

441 So. 2d at 1085-86 (emphasis supplied) (citation omitted); see
also Hayslip v. Douglas, 400 So. 2d 553, 555 (Fla. 4th DCA 1981);
Code of Jud. Conduct Canon 3-C.

The proper avenue to seek disqualification of a trial judge in
Florida is through a Motion for Disqualification pursuant to
Florida Rule of Judicial Administration 2.160.   See Brown v. St.
George Island, Ltd., 561 So. 2d 253, 255 (Fla. 1990).[2]  Attached to
this motion is a sworn affidavit signed by the Defendant alleging
specifically the facts and reasons relied on to show the grounds
for disqualification. This motion is timely filed. Michaud-Berger
v. Hurley, 607 So. 2d 441 (Fla. 4th DCA 1992).  The motion is dated
the same day that the defendant was apprised of the grounds. The
cummulative nature of the grounds renders this motion timely.
Dura-Stress v. Law, 634 So. 2d 769 (Fla. 5th DCA 1994).   This
motion complies in all respects with the requirements contained in
Rule 2.160.

Rule 2.160(f) provides that this Court shall "determine only
the legal sufficiency of the motion and shall not pass on the truth
of the facts alleged.  If the motion is legally sufficient, the
judge shall immediately enter an order granting disqualification

---

[2]  Effective January 1, 1993, Rule 2.160 replaced Florida
Rule of Criminal Procedure 3.230 to govern motions for
disqualification.  The Florida Bar re Amendments to Florida Rules
of Judicial Administration, 609 So. 2d 465 (Fla. 1992).

4

and proceed no further in the action."

This motion is legally sufficient pursuant to rule 2.160.  The inquiry in a motion for disqualification "focuses on the reasonableness of the defendant's belief that he or she will not receive a fair hearing." Rogers v. State, 630 So. 2d 513 (Fla. 1993).  The Defendant "need only show a well grounded fear" that this Court cannot provide a fair hearing in this matter.  Id. (citation omitted).  Because the facts alleged, specifically that this Court has found defense counsel guilty of direct criminal contempt, has still not sentenced counsel, and has communicated its belief that defense counsel is an obstructionist, "would place a reasonably prudent person in fear of not receiving a fair and impartial" hearing, this Court should grant the motion.  See id. Any reasonable person would believe that the court is attempting to control the conduct of the defense during the course of the trial by deferring sentencing in the contempt proceeding.  The court's intentional interference with the defense clearly indicates the court's lack of impartiality.  The court's perception of whether it can be fair and impartial is not at issue.  State ex rel. Brown v. Dewell, 131 Fla. 566, 573, 179 So. 695, 697-98 (Fla. 1938).

The court's statement to the press that counsel is trying to be disruptive, that counsel is goading the court and that the office of the public defender has mounted a campaign against the court clearly indicate a predisposition against counsel.

Bias or prejudice against counsel constitutes a reasonable fear that a litigant will not receive a fair trial. Edwards v.

5

$C \overset{\sim}{\tau} \overset{\circ}{\sim}$

Andrews, 639 So. 2d 677 (Fla. 4th DCA 1994); Livingston v. State, 441 So. 2d 1083 (Fla. 1983); Hayslip v. Douglas, 400 So.2d 553 (Fla 4th DCA 1981), Lamendola v. Grossman, 439 So.2d 960 (Fla. 3d DCA 1983), Caleffe v. Vitale, 488 So.2d 627 (Fla. 4th DCA 1986). In Livingston, the Florida Supreme Court stated that "a judge may be disqualified due to prejudice towards an attorney where the prejudice is of such a degree that it adversely affects the client." 441 So. 2d at 1087. In the instant case, the court has expressed its dislike of counsel and his office not only in court but also in interviews with the media. Any reasonable person would fear that he could not receiver a fair trial before a court who vocalized its aversion to counsel so publicly.

The Florida Supreme Court has reasoned that "[t]he attitude of the judge and the atmosphere of the court room should indeed be such that no matter what charge is lodged against a litigant. . . [the litigant] can approach the bar with every assurance that he [or she] is in a forum where the judicial ermine is everything that it typifies, purity and justice." Crosby v. State, 97 So. 2d 181 (Fla. 1957)Id. at 194 (quoting Davis v. Parks, 141 Fla. 516, 194 So. 613, 615)).    This Court has consistently exhibited disdain and partiality against the Defendant and his counsel. The Court's actions have caused the Defendant to reasonably fear that he will not receive a fair trial in this case.

6

## CONCLUSION

WHEREFORE, based upon the foregoing, the Defendant requests this Court to grant the Motion for Disqualification of Judge, so another circuit court judge may be randomly assigned to preside over this case.

Respectfully Submitted,

ALAN H. SCHREIBER
PUBLIC DEFENDER
17TH JUDICIAL CIRCUIT

ROBERT E. GODWIN
Assistant Public Defender
Florida Bar No. 173582
201 S.E. 6th Street, Room 740
Ft. Lauderdale, Fl. 33301

Attorney for Defendant

## CERTIFICATE OF GOOD FAITH

I HEREBY CERTIFY that the motion and the Defendant's statements contained in the attached affidavit are made in good faith.

ROBERT E. GODWIN

7

STATE OF FLORIDA,        )
COUNTY OF _____ )

Before me, the undersigned authority, this day personally appeared **ROBERT E. GODWIN**, who first being duly sworn, says that he is the attorney in the above-styled cause, that he has read the foregoing motion, and that all of the matters are true and correct.

_____
Robert E. Godwin

SWORN AND SUBSCRIBED TO before me this 27th day of September, 1994.

_____
NOTARY   PUBLIC   or   other   person
authorized to administer an oath.

Personally known _____

Produced identification _____

Type of identification produced _____.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion for Disqualification of Judge has been furnished by hand to the Office of the State Attorney, Broward County Courthouse, Fort Lauderdale, Florida, this 27 day of September, 1994

_____
ROBERT E. GODWIN

8

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,
    Plaintiff,

v.

JEREMY LOCKHART.,
    Defendant.
_____/

CASE NO.  94-10764CF10

JUDGE:  GOLDSTEIN

## AFFIDAVIT OF JEREMY LOCKHART

The undersigned affiant, JEREMY LOCKHART, after being duly
sworn, deposes and states as follows:

    1.  I am the Defendant in the above-styled cause.

    2.  My case is presently being tried before Judge Goldstein.

    3.  My attorney advised me that this Court held him in
direct criminal contempt.  He further advised me that the Court
deferred sentencing my lawyer.

    4.  My attorney read to me an article published in the Miami
Herald in which Judge Goldstein stated that my lawyer was
disruptive.  My attorney also advised me that Judge Goldstein told
him that he was obstructing the court and wasting the court's time.

    5.  My attorney also read me article published in both the Sun
Sentinel and the Miami Herald which quote Judge Golstein as saying
that the Office of the Public Defender is out to get him off the
bench and trying to provoke him.

    6.  I believe that Judge Goldstein is prejudiced against me
and my lawyer.  Judge Goldstein's decision to hold my lawyer in
contempt and defer sentencing makes believe that he is trying to
control my lawyer and interfere with my case.  Judge Goldstein's

$670$

actions cause me to believe that I will not receive a fair trial in this case.

7. I have read the Motion for Disqualification of Judge and certify that it is an accurate representation of my understanding of what has occurred in this case.

_____
JEREMY LOCKHART

STATE OF FLORIDA,        )

COUNTY OF BROWARD        )

Before me, the undersigned authority, this day personally appeared JEREMY LOCKHART., who first being duly sworn, says that he is the DEFENDANT in the above-styled cause, that he has read the foregoing, and that all of the matters are true and correct.

_____
JEREMY LOCKHART

SWORN AND SUBSCRIBED TO before me this 27th day of _September_, 19 94.



ELLA PHILLIPS
MY COMMISSION # CC 3651??
EXPIRES: May 21, 1??-
Bonded Thru Notary Public Under?-

_____
NOTARY   PUBLIC   or   other   person
authorized to administer an oath.

Personally known _____

Produced identification _____

Type of identification produced ___Booking Photo___.

In the 17th Judicial Circui    and for Broward County

In the County Court in and for Broward County

DIVISION:
[X] CRIMINAL
[ ] TRAFFIC
[ ] OTHER

**ORDER**

THE STATE OF FLORIDA VS.

Jerrey Lockhart

**PLAINTIFF**          **DEFENDANT**

**CASE NUMBER**

94-10764 CF

CHARGE _Murder – 2ᵗʰ Degree_

The Motion for Disqualification of Judge

is Denied.

DONE AND ORDERED THIS _27_ DAY OF _Sept_ . 19 _94_ . IN

BROWARD COUNTY, FLORIDA

_____
JUDGE

COPIES:      BSO  /   -   SAO

SEP 29 1994

678

FORM #CC-252
REVISED 10/90

CHARGES: 1. Murder 2ND DEGR

CASE #: 94-10764 CF10          DIV. FA

ARRESTING AGENCY: Ft. Lauderdale          INCIDENT NUMBER: _____

NAME / STYLE: Jeremy Lockhart

CLERK Joyce Williams JUDGE MARK A. SPEISER VERDICT: _____

TYPE OF CASE / HEARING Arthur Hrg. M/to Suppress DATE 2-17-95 SENTENCE - DISPOSITION Denied

STATE / PLTF ATTORNEY Craig Blinderman PHONE NO. _____    DEFENSE ATTORNEY Robert Godwin PHONE NO. _____

INVENTORY LOCATION: _____

| DESCRIPTION OF EXHIBITS | STATE - PLTF EXHIBIT # | DEFENSE EXHIBIT # | COURT EXHIBIT # | CONTROL NUMBER |
|---|---|---|---|---|
| Transcript of Tape Statement (9 pages) | 1 | | | |
| Transcript of Tape Statement (1 Page) | 2 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CASE NUMBER

TYPE

COMPLETE THIS SECTION IF EVIDENCE RETURNED IN COURT.

DATE          RECEIVER          I.D.#

JUDGE _____

CLERK _____

679

EVIDENCE RECEIVED DATE 2/17/95          COURT CLERK          EVIDENCE CLERK

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

| | | | |
|---|---|---|---|
| STATE OF FLORIDA | ) | Case No. | 94-10764CF10A |
| | ) | Judge:  SPEISER | |
| vs. | ) | | |
| JEREMY LOCKHART, | ) | | |
| Defendant | ) | | |
| | ) | | |

Filed In Open Court,
ROBERT E LOCKWOOD,
CLERK
CN _____ FEB 3 1995
BY _____

## MOTION TO SUPPRESS CONFESSIONS,
## ADMISSIONS AND STATEMENTS

The Defendant, JEREMY LOCKHART, by and through the undersigned attorney, pursuant to Rule 3.190(i), Florida Rules of Criminal Procedure, moves this Honorable Court to suppress as evidence at the time of trial in the above-styled cause, all written and oral statements made by the Defendant to the police or other agents of the State. As grounds for the motion, the Defendant would state the following:

1.    The written and oral statements were obtained from the Defendant in violation of the Defendant's right to counsel, and the Defendant's privilege against self-incrimination guaranteed by the Fifth, Sixth and the Due Process Clause of the Fourteenth Amendment to the United States Constitution as interpreted by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2.    The written and oral statements obtained from the Defendant were not freely and voluntarily given, in violation of the Defendant's right guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Article I, Section 9 of the Florida Constitution.

894

3.    The written and oral statements were obtained from the Defendant in violation of the Defendant's right to counsel as guaranteed by Article I, Section 16 of the Florida Constitution.

4.    The written and oral statements obtained from the Defendant are not supported by an independent prima facie proof of the corpus delecti of the crime for which the Defendant is charged.

5.    Other grounds will be argued Ore Tenus.

WHEREFORE, the Defendant respectfully requests this Honorable Court grant this Motion to Suppress Confessions, Admissions and Statements.

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion has been furnished by inter-office mail to the Office of the State Attorney, Broward County Courthouse, Fort Lauderdale, Florida, this _____ day of February, 1995.

                              ALAN H. SCHREIBER
                              Public Defender
                              17th Judicial Circuit


                              _____
                              ROBERT E. GODWIN, 173582
                              Assistant Public Defender
                              Attorney for Defendant

In the County Court in and for Broward County, 17th Judicial Circuit in an | Broward County

**CLOCK IN**

| DIVISION:<br>[X] Criminal<br>[ ] Traffic<br>[ ] Other | **HEARING PROCEEDING** | |

THE STATE OF FLORIDA VS. JEREMY Lockhart

**PLAINTIFF**          **DEFENDANT**

**CASE NUMBER**
94-10764 CF10

CHARGES 1. 2ND Degree Murder

DATE April 7, 1995

This case being called for hearing on _Defense motion to Suppress_
the Defendant was/was not present in open Court with/without counsel
_Robert Goodwin_ Esq. The State represented by
_Craig Blinderman_ Esq., Assistant State Attorney. Court
Reporter _Michelle Meeker_ was also present.

The following witnesses were duly sworn and testified in this cause:

**PROSECUTION**
Det. Michael Walley
Det Alan Stone

**DEFENSE**
Jeremy Lockhart

After due consideration, this Court _Reserve Ruling to 4-10-95 @ 10:30A._
**GRANTED the Motion/s to** _____

**DENIED the Motion/s to** _____

BY: _K. Viaud For Joyce Williams_
**DEPUTY CLERK**

FORM 180P058
REVISED 11/93

882

[X] 17th Judicial Circu.  and for Broward County

[ ] In the County Court in and for Broward County

| DIVISION: | | |
|---|---|---|
| [X] CRIMINAL [ ] TRAFFIC [ ] OTHER | **ORDER** | APR 1 0 1995 CLOCK IN |

THE STATE OF FLORIDA VS.

Jeremy Lockhart

**PLAINTIFF**                    **DEFENDANT**

**CASE NUMBER**

94-10764 CF10

CHARGE  1. 2ND Degree Murder

Defense motion to suppress statements
is hereby __Denied__ .

**DONE AND ORDERED THIS** __10__ **DAY OF** __April__ , 19 __95__ , **IN**

BROWARD COUNTY, FLORIDA

_____
JUDGE

COPIES.    BSO  -  SAO

883

FORM #CC-252
REVISED 10-90

CHARGES: _2ND Degree Murder_

CASE #: _94-10764 CF20_    DIV _FA_

ARRESTING AGENCY: _Ft. Lauderdale PD_    INCIDENT NUMBER: _____

NAME / STYLE: _Jeremy Lockhart_

CLERK _Kathy Viaud_    JUDGE _Mark A. Speiser_    VERDICT: _____

TYPE OF CASE / HEARING _M/ to Suppress_    DATE _4.7.95_    SENTENCE - DISPOSITION _Ruling deferred_

STATE / PLTF ATTORNEY _C. Blinderman_    PHONE NO. _____    DEFENSE ATTORNEY _Robert Goodwin_    PHONE NO. _____

INVENTORY LOCATION: _____

| DESCRIPTION OF EXHIBITS | STATE - PLTF EXHIBIT # | DEFENSE EXHIBIT # | COURT EXHIBIT # | CONTROL NUMBER |
|---|---|---|---|---|
| Transcript (Judge have this evidence) | 1 | | | |
| Cassette tape | 2 | | | |
| Rights waiver form (Judge have this evidence) | 3 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CASE NUMBER

TYPE

COMPLETE THIS SECTION IF EVIDENCE RETURNED IN COURT.

DATE          RECEIVER          I.D.#

JUDGE _____

CLERK _____

894

EVIDENCE RECEIVED DATE _4-10-95_    COURT CLERK    EVIDENCE CLERK

CASE NO. 94- 10764CF10A

JUDGE: Speiser

STATE OF FLORIDA,                    :

                    Plaintiff,       :    NOTICE OF THE STATE'S INTENT TO SEEK
                                          THAT THE COURT DECLARE THE DEFENDANT
VS.                                  :    AN HABITUAL FELONY OFFENDER
                                               AND/OR
Jeremy Lockhart                      :    AN HABITUAL VIOLENT FELONY OFFENDER

                    Defendant.       :
_____:


        COMES NOW the State of Florida, by and through the undersigned

Assistant State Attorney, and hereby requests this Honorable Court to declare

the above-named Defendant to be an "Habitual Felony Offender" or an

"Habitual Violent Felony Offender", pursuant to Section 775.084,

Florida Statutes.

        In support of its request, the State relies on the following:

A.      (1)  The Defendant has previously been convicted of any
             combination of two (2) or more felonies or other
             qualified offenses; and

        (2)  The felony for which the Defendant is to be sentenced was
             committed within five (5) years of the date of the
             conviction of the last prior felony or other qualified
             offense of which he/she was convicted, or within five (5)
             years of the defendant's release, on parole or
             otherwise, from a prison sentence or other commitment
             imposed as a result of a prior conviction for a felony or
             other qualified offense, whichever is later;

                                                    Court,

                                        MAR     1995

                                                           #127.

Notice of the State's Intent to See
that the Court Declare the Defendan
an Habitual Felony Offender and/or
an Habitual Violent Felony Offender
Page Tw
------------------------------------------------------------------------

AND/OR

8.     (1)  The Defendant has been previously convicted
       of a felony or an attempt or conspiracy to commit
       a felony and one or more of the convictions was
       for arson, sexual battery, robbery, kidnapping,
       aggravated child abuse, aggravated assault, mur-
       der, manslaughter, the unlawful throwing, placing
       or discharging of a destructive device or bomb,
       armed burglary, or aggravated battery; and

       (2)  The felony for which the Defendant is to be
       sentenced was committed within five (5) years of
       the date of the conviction of the last prior en-
       umerated felony or within five (5) years of the
       date of the Defendant's release, on parole or
       otherwise, from a prison sentence or other com-
       mitment imposed as a result of a prior conviction
       for an enumerated felony, whichever is later.

I HEREBY CERTIFY that a true copy hereof was served on the
Defendant and the Attorney for the Defendant, in the Circuit
Court of the Seventeenth Judicial Circuit, in and for Broward
County, Florida, this ___3___ day of _____May_____,
A.D. 199_5__.

                    MICHAEL J. SATZ
                    State Attorney

                    By:_____
                    FLBar#__0896098__
                    Assistant State Attorney
                    _642_ Broward County Courthouse
                    201 Southeast Sixth Street
                    Fort Lauderdale, FL  33301-3306
                    Telephone: (305)__831-7935___

                                              OSC

STATE: Craig Blinderman
Defense: Robert Godwin
Reporter: Sharain Amcerally
Clerk: Joyce Williams
94-10764CF10
FL94-6449

STATE
vs.
JEREMY
LOCKHART

MAY 0 1 1995   1st Day Jury Trial Held
— Voir Dire Began
Jury Selected + Sworn
Reconvene 5/2/95 @ 11AM

MAY 02 1995   CIR S. Amcerally    2nd Day Trial
11:50am  State Opening Statement
12:04PM  Defense Opening Statement+
12:20PM  recess For lunch
2:00pm  State 1st Witness.   April Williams
2:36PM  Def Cross
2:50pm  State redirect
2:52pm  Def recross
2:53pm  State 2nd Witness   Dorin walker
3:15pm  Def Cross
3:19pm  State redirect
3:28PM  State 3rd Witness.   Charles Forbe
3:35pm  Def Cross
3:39pm  State 4 Witness   OFC Scott Neiley
3:51PM  recess till 5/3/95 @ 3:30pm
MAY 03 1995   States 5 Witness ⌐   CIR S Amcerally
//       3RD Day Trial   └→ Dennis Grey
         States 6 Witness.   Robert Newton
         States 7 Witness.   Det Wally
MAY 04 1995   CIR S Amcerally  /// 4 Day Trial
         States 7 Witness.   Continued
         States 8 Witness.   Det Stone
         States 9 Witness.   Dr Perper
         State rests                     E&7

DeF m/ JOA /// Denied
DeF m/ mistrial /// Denied
Charge ConF
recess til 5/5/95 @9am
9:15am Defense Closing          15Min
9:30am State Closing            40 min (3minu
10:05am Defense rebuttle        24 Min (3minu
10:21am Instructions read
10:50   Jury retires to Deliberate
  //    Alt excused
2:25    Jury returns w/ Question
        Instruction reasonable Doubt read
2:30pm  Jury retires to Deliberate
4:00pm  Mistrial Declared

6 6 6

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLA.

CASE NO._____

STATE OF FLORIDA                    JUDGE MARK A. SPEISER
    VS

_____

_____

_____

_____
    DEFENDANT(S)

WE, THE JURY, IN THE ABOVE - ENTITLED ACTION REQUEST THE

FOLLOWING:

WE ARE unAble to REAch A
uNANAmous Decision.

DATED THIS __5__ DAY OF ___May___, 19 _95_

_____
                        FOREPERSON

MAY 05 1995

689

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLA.

CASE NO. 94-10716 4 CF10

STATE OF FLORIDA                    JUDGE MARK A. SPEISER

VS

JEREMY LOCKHART

_____

_____

_____
DEFENDANT(S)

WE, THE JURY, IN THE ABOVE - ENTITLED ACTION REQUEST THE
FOLLOWING:

WE ARE UNABLE TO REACH A

UNANIMOUS DECISION. WHAT DO WE

DO NOW? ANY MORE INFORMATION ON

HOW TO HANDLE REASONABLE DOUBT?

_____

_____

_____

_____

DATED THIS ___5___ DAY OF _____MAY_____, 19 9 5

Mrs Susee D Lenn
FOREPERSON

690

OF THE
CIRCUIT
UNTY, FLA.

*POINTS of The LAWS AND unable*

*TO concur on one opinion.*

5-5-95                          *Susie Dunn*

DEFENDANT(S)

WE, THE JURY, IN THE ABOVE - ENTITLED ACTION REQUEST THE
FOLLOWING:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DATED THIS _____ DAY OF _____, 19_____

Filed in Open Court,
ROBER.. ... LOOKY CO,
MAY 0 5 1995 ... RK
ON _____

FOREPERSON

€ 0 1

CHARGES: murder 2°

CASE #: 04-107104CF10    DIV. FA

ARRESTING AGENCY: _____  INCIDENT NUMBER: _____

NAME / STYLE: Jeremy Lockhart

CLERK: Lizette Lopez    JUDGE _____    VERDICT: mistrial
TYPE OF CASE / HEARING: Jury Trial    DATE 5-5-05    SENTENCE - DISPOSITION
STATE / PLTF ATTORNEY: Blinderman    PHONE NO. _____    DEFENSE ATTORNEY: Groduin    PHONE NO. _____

INVENTORY LOCATION: _____

| DESCRIPTION OF EXHIBITS | STATE - PLTF EXHIBIT # | DEFENSE EXHIBIT # | COURT EXHIBIT # | CONTROL NUMBER |
|---|---|---|---|---|
| Casette tape | | | 1 | |
| | | | 2 | |
| Photo | 1 | | | |
| Photo | 2 | | | |
| Photo | 3 | | | |
| tape | 4 | | | |
| projectiles | 5 | | | |
| Casings | 6 | | | |
| video tape | 7 | | | |
| Photo | 8 | | | |
| Photo | 9 | | | |
| Photo | 10 | | | |
| Photo | 11 | | | |
| Photo | 12 | | | |
| Photo | 13 | | | |

COMPLETE THIS SECTION IF EVIDENCE RETURNED IN COURT.

DATE          RECEIVER          I.D.#

JUDGE _____

CLERK _____

692

EVIDENCE RECEIVED DATE          COURT CLERK          EVIDENCE CLERK

**EXHIBIT LIST**

CHARGES: murder 2°

CASE #: 94 107164CF10    DIV. FA

ARRESTING AGENCY: _____ INCIDENT NUMBER: _____

NAME / STYLE: Jeremy Lockhart

CLERK: Lizette Lopez    JUDGE: Speiser    VERDICT: _____

TYPE OF CASE / HEARING: Jury Trial    DATE: 5-5-95    SENTENCE - DISPOSITION: _____

STATE / PLTF ATTORNEY: C Blittermant    PHONE NO.: _____    DEFENSE ATTORNEY: Goldin    PHONE NO.: _____

INVENTORY LOCATION: _____

| DESCRIPTION OF EXHIBITS | STATE - PLTF EXHIBIT # | DEFENSE EXHIBIT # | COURT EXHIBIT # | CONTROL NUMBER |
|---|---|---|---|---|
| Photo | 29 | | | |
| | 30 | | | |
| | 31 | | | |
| Rights Form | 32 | | | |
| Cassette tape | 33 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

COMPLETE THIS SECTION IF EVIDENCE RETURNED IN COURT.

DATE        RECEIVER        I.D.#

JUDGE: _____

CLERK: _____

803

EVIDENCE RECEIVED DATE        COURT CLERK        EVIDENCE CLERK

CHARGES: _____

CASE #: _____    DIV. _____    _____

ARRESTING AGENCY: _____ INCIDENT NUMBER: _____

NAME / STYLE: _____

CLERK _____ JUDGE _____ VERDICT: _____
TYPE OF                                                      SENTENCE -
CASE / HEARING _____ DATE _____ DISPOSITION _____
STATE / PLTF                PHONE              DEFENSE                PHONE
ATTORNEY _____ NO. _____ ATTORNEY _____ NO. _____

INVENTORY LOCATION: _____

| DESCRIPTION OF EXHIBITS | STATE - PLTF EXHIBIT # | DEFENSE EXHIBIT # | COURT EXHIBIT # | CONTROL NUMBER |
|---|---|---|---|---|
| Photo | 14 | | | |
| Photo | 15 | | | |
| Knife | 16 | | | |
| empty Beer Bottles | 17 | | | |
| Photo | 18 | | | |
| Photo | 19 | | | |
| Photo | 20 | | | |
| | 21 | | | |
| | 22 | | | |
| | 23 | | | |
| | 24 | | | |
| | 25 | | | |
| | 26 | | | |
| | 27 | | | |
| | 28 | | | |

CASE NUMBER

COMPLETE THIS SECTION IF EVIDENCE RETURNED IN COURT.

DATE        RECEIVER        I.D.#

JUDGE _____

CLERK _____

CS4

EVIDENCE RECEIVED          COURT                    EVIDENCE
DATE                       CLERK                    CLERK

[X] 17th Judicial Circuit in and for Broward County
[ ] In the County Court in and for Broward County

| DIVISION:<br>[X] CRIMINAL<br>[ ] TRAFFIC<br>[ ] OTHER | RECORD OF TRIAL PROCEEDINGS |
|---|---|

THE STATE OF FLORIDA VS.

Jeremy Lockhart

**PLAINTIFF**        **DEFENDANT**

CASE NUMBER

94-10764CF10

CHARGE/S __murder 2°__       JUDGE __Speiser__

ARREST NO./S. _____

DATE/S __5-1-95 to 5-5-95__

This case was called for trial by (Jury)/Court. The Defendant (was)/was not present in open Court (with)/without counsel, __Robert Colvin_____, Esq. The Prosecution was represented by __C. Blinderman_____, Esq. Court Reporter, __S. Ameer__ll _____ was also present.

The following Jurors were duly selected and Sworn, to-wit:

| | |
|---|---|
| Susie Dunn | |
| John Gucci | |
| Fred Jameson | |
| Pamela Hawkins | |
| Raymond Granger | |
| Betty La Fleur | |
| ALT: Doreen Pluschau | ALT: |

The following witnesses were duly sworn and testified in this cause, to-wit:

| PROSECUTION | DEFENSE |
|---|---|
| April Williams | |
| Darrin Walker | |
| Charles Forbes | |
| OFC Scott Neely | |
| Dennis Grey | |

Form CC264 Revised 10/90

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

|  |  | CASE NO: | 94-10764 CF10(A) |
|---|---|---|---|
|  |  | JUDGE: | MARK SPEISER |
| STATE OF FLORIDA, | | : | |
| | Plaintiff, | : | |
| vs. | | : | STATE'S MOTION IN LIMINE NO. 1 |
| JEREMY LOCKHART, | | : | |
| | Defendant. | : | |

COMES NOW the State of Florida, by and through the undersigned Assistant State Attorney, and moves this Honorable Court in Limine to instruct the defense not to comment upon, refer to or question concerning the following:

1.  That the deceased, Patrick Brown, had previously struck April Reese.

2.  That the deceased, Patrick Brown, had previously struck April Williams.

3.  As grounds, the State would assert the following:

During the first trial the defense attorney, beginning in opening statement, stated to the jury that the deceased had previously struck April Reese with a baseball bat. Such statements and testimony, as presented, served only to place into evidence the victim's propensity for violence, which is inadmissible. State v. Smith, 573 So.2d 306, 313 (Fla. 1991).

The Defendant did not testify in the first trial. A Defendant's testimony that he knew of specific acts of violence committed by the victim may be relevant to a defense of other's claim. However, "testimony that other people knew of specific acts of violence committed by the victim is not relevant because it sheds no light on the Defendant's state of mind..." Id.

696

In <u>Williams v. State</u>, 600 So.2d 524 (Fla. 2nd DCA 1992), the defense asserted defense of others. Because the Defendant <u>did not testify</u>, it was proper for the trial Court to preclude defense counsel from questioning other witnesses about the victim's alleged prior acts of violence. <u>Id.</u> at 525. The relevant issue is not whether the acts occurred, but whether the Defendant was aware of the acts and whether the Defendant testified to them. See, <u>Charneski v. State</u>, 619 So.2d 486 (Fla. 5th DCA 1993).

During the first trial, testimony was elicited from April Williams that she had heard that the deceased had struck April Reese. Such testimony is hearsay and inadmissible.

WHEREFORE, the undersigned Assistant State Attorney respectfully requests this Court to grant its Motion in Limine and preclude the defense from commenting upon or referring to or questioning concering the above-mentioned issues until a proper predicate has been presented before the jury.

I HEREBY CERTIFY that a true copy hereof has been furnished by U.S. Mail/hand delivery this 17 day of August, 1995, to: ROBERT GODWIN, ESQ., Assistant Public Defender.

MICHAEL J. SATZ
State Attorney

By: _____
JOSEPH PATNER, ESQ.
Assistant State Attorney
Florida Bar #813557
201 S.E. Sixth Street, Suite 640
Fort Lauderdale, Florida 33301
(305) 831-7935

| | |
|---|---|
| State | 94-10764CF/C |
| V | Judge Speiser |
| Jeremy Lockhart | CLK  Lizette |
| | CLR  M Meeker |
| I: Murder 2° | State: Joe Patner |
| | Def: Robert Godw |

8-14-95  Voir Dire
- ✓  Jury Selected & Sworn
- ✓  State Opening
- ✓  Def  Opening
- ✓  recess til 8-15-95 @ 1³⁰ pm

2nd Day Trial
- ✓  State 1st Witness OFC Hospodavis
- ✓         2nd        Cheryl Grant
          3rd        Darren Walker
          4th        Charles Forbes
          5th        Det Woolley
          6th        Dr Perper
          7th        OFC Knutten
- ✓  States rests
- ✓  Def MI JOA /// Denied
- ✓  recess til 8-16-95 @ 1³⁰ pm # 5900

3rd Day Trial
- ✓  Def 1st       Witness  Jeremy Lockhart
- ✓  Def rests
- ✓  Def MI Mistrial - Denied
- ✓  Def MI JOA - Denied
- ✓  Charge Conf

✓ __ DeF Closing
✓ __ State Closing
✓ __ DeF Closing
✓ __ recess til 8-17-95 @ 9am #5900 (m)
___ 8-17-95 4th Day Trial
✓ __ Jury retires Deliberate alt excus
✓ __ return w/ verdict-Guilty manslaugh
___ ___ LID

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLA.

CASE NO. 94- 10764 C F10

STATE OF FLORIDA

VS

JUDGE MARK A. SPEISER

Jeremy Lockmpt

_____

_____

_____
DEFENDANT(S)

WE, THE JURY, IN THE ABOVE - ENTITLED ACTION REQUEST THE

FOLLOWING:

Definition in writing of the difference
between (B) Second degree murder
with a firearm, and (C) manslaughter
with a firearm.

DATED THIS 17 DAY OF August , 19 95

Filed in Open Court,
ROBERT E. LOCKWOOD,
CLERK
ON AUG 17 1995
BY

FOREPERSON

700

CHARGES: Murder 2°

CASE #: 94- 10764 CF10   DIV. FA

ARRESTING AGENCY: _____ INCIDENT NUMBER: _____

NAME / STYLE: Jeremy Lockett

CLERK Lizette   JUDGE Speiser   VERDICT: _____

TYPE OF CASE / HEARING Jury Trial   DATE 8-16-95   SENTENCE - DISPOSITION _____

STATE / PLTF ATTORNEY J Patner   PHONE NO. _____   DEFENSE ATTORNEY R Godwin   PHONE NO. _____

INVENTORY LOCATION: _____

| DESCRIPTION OF EXHIBITS | STATE - PLTF EXHIBIT # | DEFENSE EXHIBIT # | COURT EXHIBIT # | CONTROL NUMBER |
|---|---|---|---|---|
| Poster w/ Pictures | 1 | | | |
| Cassette | 2 | | | |
| Poster w/ Pictures | 3 | | | |
| Diagram | 4 | | | |
| Poster w/ Pictures | 5 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CASE NUMBER 94- 10764 CF10

TYPE

COMPLETE THIS SECTION IF EVIDENCE RETURNED IN COURT.

DATE          RECEIVER          I.D.#

JUDGE _____

701

CLERK _____

EVIDENCE RECEIVED DATE 8-17-95   COURT CLERK _____   EVIDENCE CLERK _____

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:    94-10764 CF10

JUDGE:      MARK A. SPEISER

STATE OF FLORIDA,                :

                    Plaintiff,   :

vs.                              :                    VERDICT

JEREMY LOCKHART,                 :

                    Defendant.   :

---

WE, THE JURY, find as follows as to the Defendant in this case: (Check only one)

    A.   The Defendant is Guilty of Second Degree Murder with a Firearm, as charged in the Indictment.

    B.   The Defendant is Guilty of Second Degree Murder.

  ✓C.   The Defendant is Guilty of Manslaughter with a Firearm, a lesser included offense.

    D.   The Defendant is Guilty of Manslaughter, a lesser included offense.

    E.   The Defendant is Not Guilty.

SO SAY WE ALL, this 17TH day of August, A.D. 1995, at Fort Lauderdale, Broward County, Florida.

_____
FOREPERSON

Filed In Open Court,
ROBERT E. LOCKWOOD,
CLERK
AUG 1 1995
BY

702

| DIVISION: Criminal FA | as to Count | **SENTENCE** T | |
|---|---|---|---|

| THE STATE OF FLORIDA VS. | | **CASE NUMBER** |
|---|---|---|
| **PLAINTIFF** | Jeremy Lockhart **DEFENDANT** | 94-10764CF10 |

The Defendant, being personally before this Court, accompanied by his attorney, _Robert Godwin_ and having been adjudicated guilty herein, and the Court having given the Defendant an opportunity to be heard and to offer matters in mitigation of sentence, and to show cause why he sentenced as provided by law, and cause shown,

 ☒  and the Court having on ___8-17-95___ deferred imposition of sentence until this date.

(Check One) [ ]  and the Court having previously entered a judgment in this case on the defendant now re sentences the defendant.

    [ ]  and the Court having placed the Defendant on Probation/Community Control and having subsequently revoked the Defendant's Probation/Community Control.

IT IS THE SENTENCE OF THE COURT that:

 The Defendant pay a fine of $ _____ , pursuant to F.S. 775.063, plus $ _____ at the 5% surcharge required by F.S. 960.25

☒  The Defendant is hereby committed to the custody of the Department of Corrections.

[ ]  The Defendant is hereby committed to the custody of the Sheriff of Broward County, Florida.

[ ]  The Defendant is hereby sentenced as a youthful offender in accordance with F.S. 958.04.

   TO BE IMPRISONED (check one: unmarked sections are inapplicable)

[ ]  For a term of Natural Life.

☒  For a term of ___Thirty (30) years___

[ ]  Said SENTENCE IS SUSPENDED for a period of _____ subject to conditions set forth in this Order.

If "split" sentence, complete either paragraph.

 _____ Followed by a period of _____ on Probation/Community Control under the supervision of the Department of Correction according to the terms and conditions of supervision set forth in separate order entered herein.

 _____ However, after serving a period of _____ imprisonment in

the balance of such sentence shall be suspended and the defendant shall be placed on Probation/Community Control for a period of _____ under supervision of the Department of Corrections according to the terms and conditions of Probation/Community Control set forth in a separate order entered herein.

FORM 180F070
REVISED 9-93

917

**DIVISION:**
CRIMINAL
-06T50-WPD
FA

**SENTENCE**
Document 14   Entered on FLSD Docket 05/18/2000   Pag
( AS TO COUNT _____ I _____ )

**CASE NUMBER**
94 - 10764CF10

In the event the defendant is ordered to serve additional split sentences, all incarceration portions shall be satisfied before the defendant begins service of the supervision terms.

## SPECIAL PROVISIONS
( As to Count _____ I _____ )

By appropriate notation, the following provisions apply to the sentence imposed:

MANDATORY/MINIMUM PROVISIONS:

**FIREARM**
_____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 775.087(2) are hereby imposed for the sentence specified in this count.

**DRUG TRAFFICKING**
_____ It is further ordered that the _____ mandatory minimum imprisonment provisions of Florida Statute 893.135(1) are hereby imposed for the sentence specified in this court.

**CONTROLLED SUBSTANCE WITHIN 1000 FEET OF SCHOOL**
_____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 893.13(1)(e) 1, are hereby imposed for the sentence specified in this court.

**HABITUAL FELONY OFFENDER**
_____ The Defendant is adjudicated a habitual felony offender and has been sentenced to an extended term in this sentence in accordance to the provisions of Florida Statue 775.084(4). The requisite findings by the court are set forth in a separate order or stated on the record in open court.

**HABITUAL VIOLENT OFFENDER**
X The Defendant is adjudicated a habitual violent felony offender and has been sentenced to an extended term in accordance with the provision of Florida Statute 775.084(4). A minimum term of _15 years_ year(s) must be served prior to release. The requisite findings by the court are set forth in a separate order or stated on the record in open court.

**LAW ENFORCEMENT PROTECTION ACT**
_____ It is further ordered that the defendant shall serve a minimum of _____ years before release in accordance with Florida Statute 775.0823.

**CAPITAL OFFENSE**
_____ It is further ordered that the Defendant shall serve no less than 25 years in accordance with the provisions of Florida Statute 775.082(1)

**SHORT-BARRELED RIFLE, SHOTGUN, MACHINE GUN**
_____ It is further ordered that the five-year minimum provisions of Florida Statute 790.221(2) are hereby imposed for the sentence specified in this court.

**CONTINUING CRIMINAL ENTERPRISE**
_____ It is further ordered that the 25 year mandatory minimum sentence provisions of Florida Statute 893.20 are hereby imposed for the sentence specified in this count.

FORM 160P100
REVISED 1064

Criminal

FA

**SENTENCE**

**(AS TO COUNT _I_ )**

OTHER PROVISIONS

RETENTION OF
JURISDICTION _____    The Court retains jurisdiction over the defendant pursuant to Florida Statutes 947.16(3).

JAIL CREDIT   X    It is further ordered that the Defendant shall be allowed a total of __439__ days as cred
for time incarcerated prior to imposition of this sentence.

PRISON CREDIT _____    It is further ordered that the Defendant be allowed credit for all time previously served on th
count in the Department of Corrections prior to resentencing.

CONSECUTIVE/
CONCURRENT AS
TO OTHER
COUNTS _____    It is further ordered that the sentence imposed by this count shall run _____ consecutive
to _____ concurrent with (check one) the sentence set forth in count _____ of this
case.

CONSECUTIVE/
CONCURRENT AS
TO OTHER
CONVICTIONS _____    It is further ordered that the composit term of all sentences imposed for the courts specified
in this order shall run
_____ consecutive to _____ concurrent with (check one) the following:
_____ Any active sentence being served.
_____ Specific sentences:

     _____
     _____
     _____
     _____

PSI ORDERED    YES [X]    NO [ ]

In the event the above sentence is to the Department of Corrections, the Sheriff of Broward County, Florida, is hereby ordered and
directed to deliver the Defendant to the Department of Corrections at the facility designated by the Department together with a copy
of this Judgment and Sentence and any other documents specified by Florida Statutes.

The Defendent in Open Court was advised of his right to appeal from this Sentence by filing notice of appeal within thirty days
from this date with the Clerk of this Court, and the Defendant's right to the assistance of counsel in taking said appeal at the
expense of the State upon showing of indigency.

In imposing the above sentence, the Court further ~~recommends~~ orders the Defendant not to be
placed in the Same Facility with Michael Brown
the Deceased Brother

DONE AND ORDERED in Open Court at Broward County, Florida, this __8th__ day of __Sept.__, 19 __95__.

705

JUDGE

FORM 180P101
REVISED 1/95

# THE CIRCUIT/COUNTY COURT, IN AND FOR BROWARD COUNTY, FLORIDA

**FAILURE TO PAY FINE BY THE BELOW DATE MAY RESULT IN A WARRANT FOR YOUR ARREST AND/OR THE SUSPENSION OF YOUR DRIVER'S LICENSE AND DELINQUENCY FEES IMPOSED.**

CASE NO. 94C10764CF10A   ARREST NO. FL9400G449   AGENCY FLFL

DEFENDANT JEREMY LOCKHART   AKA LOCKHART, JEREMY

ROR/RC/SURETY
SUMMONS/CASH BOND

☐ DUI MURDER IN 2ND DEGREE

## COURT STATUS

☐ TRIAL
☐ JURY
☐ COURT
☐ 1ST V.O.
☐ FINAL V.O.

☐ CHANGE OF PLEA
☐ PLED GUILTY
☐ PLED NOLO

☐ ADJ. GUILTY
☐ WITHHELD
☐ NOLLE PROSEQUI

VC
VC EACH COUNT
☐ DISMISSED

TRUST FUND / HOURS COMM. SERVICE
ASSESSMENT EACH COUNT

☐ ACQUITTED

COUNT _____

PROBATION W/SPECIAL CONDITION
LICENSE SUSP. _____

CASAP/DUI SCHOOL _____

$ _____  COURT COST _____ 5% _____ VC _____ CJC _____ EMTF

JAIL TIME _____

OTHER _____

### DUI USE ONLY

HOURS
COMM SERVICE

CASAP EVALUATION

WORK
PERMIT

_Psi ordered on or before_
_9-3-05 @ 9am # 300_

| COUNT(S) | | TIME SERVED | | DAYS |
|---|---|---|---|---|
| $ _____ FINE | COURT COST | 5% | VC | CJC |
| $ _____ FINE | COURT COST | 5% | VC | CJC |
| $ _____ FINE | COURT COST | 5% | VC | CJC |
| $ _____ FINE | COURT COST | 5% | VC | CJC |
| PLUS $ _____ | DEFERRAL FEE TO. _____ | | | |

BY _____
FINE COST _____

(DEPUTY CLERK)

JUDGE

**EXHIBIT LIST**

COUNTY COURT — 17th JUDICIAL CIRCUIT

CHARGES: Manslaughter w/ FA

CASE #: 94-10764CF10    DIV. FA

ARRESTING AGENCY: Ft. Lauderdale    INCIDENT NUMBER: _____

NAME / STYLE: Jeremy Lockhart

CLERK: Joyce Williams    JUDGE: Mark A. Speiser    VERDICT: _____

TYPE OF CASE / HEARING: State M/ to be Habitual Felony Offender    DATE: 9/8/95    SENTENCE - DISPOSITION: Granted

STATE / PLTF ATTORNEY: Joe Patner    PHONE NO. _____    DEFENSE ATTORNEY: Robert Godwin    PHONE NO. _____

INVENTORY LOCATION: _____

| DESCRIPTION OF EXHIBITS | STATE - PLTF EXHIBIT # | DEFENSE EXHIBIT # | COURT EXHIBIT # | CONTROL NUMBER |
|---|---|---|---|---|
| 3-26-90 Commitment | 1 | | | |
| 2-11-93 Commitment | 2 | | | |
| no clemency letter | 3 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CASE NUMBER

TYPE

| COMPLETE THIS SECTION IF EVIDENCE RETURNED IN COURT. | JUDGE _____ |
|---|---|
| DATE        RECEIVER        I.D.# | CLERK _____ |

EVIDENCE RECEIVED DATE 7-5-95    COURT CLERK    EVIDENCE CLERK

| 1. DATE OF SENTENCE | 2. PREP... BY ☐DC ☐SAO | 3. COUNTY | 4. SENTENCING JUDGE |
| MO DY YR | | | |

| 5. NAME (LAST, FIRST, M.I.) | 6. DOB | 7. DC# | 9. RACE | 10. GENDER |
| | MO DY YR | 8. OBTS# | ☐B ☐W ☐OTH | ☐M ☐F |
| Lockhart, Greom | 01 13 74 | | HISP. ☐YES ☐NO | 11. ☐PLEA ☐TRIAL |

☐ Check here if this sentencing is for only a revocation of probation or community control.

**CODES DC USE ONLY**

I. **PRIMARY OFFENSE:** If Qualifier, please check ___A ___S ___C (A=Attempt, S=Solicitation, C=Conspiracy)    **POINTS**

| DOCKET# | FELONY DEGREE | F.S. # | OFFENSE LEVEL | OFF. DATE |
| 94-16704CF | 2 | 782.07 | 7 | 09 25 94 |
| | | | | MO D Y YR |

Description: _____ Mandslaughter _____
(Level = Pts: 1=4, 2=10, 3=16, 4=22, 5=28, 6=36, 7=42, 8=74, 9=94, 10=116)

SEP 30

I. 42

II. **ADDITIONAL OFFENSE(S):** Supplemental page attached ☐

| DOCKET# | FEL/MM | F.S. # | OFFENSE LEVEL | QUALIFY A S C | CNTS | POINTS |
| 95-380CF | 2 | 790.23 | 5 | ☐☐☐ | 1 | x 5.4 = 5.4 |

Description: _____ Poss. F/A by Convicted Fel _____

| | / | / | ☐☐☐ | ___ x ___ = ___ |

Description: _____

| | / | / | ☐☐☐ | ___ x ___ = ___ |

Description: _____
(Level = Pts: M=0.2, 1=0.7, 2=1.2, 3=2.4, 4=3.6, 5=5.4, 6=7.2, 7=8.4, 8=9.6, 9=10.8, 10=12.0) Supplemental page points _____

II. 5.4

III. **VICTIM INJURY:**

| | | Number | Total | | | Number | Total |
| 2ND Degree Murder | 120 X ___ = ___ | Slight | 4 X ___ = ___ |
| Death | 60 X 1 = 60 | Sex Penetration | 40 X ___ = ___ |
| Severe | 40 X ___ = ___ | Sex Contact | 18 X ___ = ___ |
| Moderate | 18 X ___ = ___ | | |

III. 60

IV. **PRIOR RECORD:** Supplemental page attached ☐

| FEL/MM DEGREE | F.S. # | OFFENSE LEVEL | QUALIFY: A S C | DESCRIPTION | NUM | POINTS |
| F2 | 944.40 | 6 | ☐☐☐ | Escape | 1 x 4.4 = 4.5 |
| 1FEL | 812.13.2.C | 9 | ☐☐☐ | Robbery w/DF | 1 x 7.2 = 7.2 |
| | | | ☐☐☐ | Dr. SR x3 | ___ x ___ = .6 |
| | / | | ☐☐☐ | | ___ x ___ = ___ |
| | / | | ☐☐☐ | | ___ x ___ = ___ |

(Level = Pts: M=0.2, 1=0.5, 2=0.8, 3=1.6, 4=2.4, 5=3.6, 6=4.8, 7=5.6, 8=6.4, 9=7.2, 10=8.0)

Supplemental page points _____

IV. 12.6

Effective Date: January 1, 1994

DISTRIBUTION:
White (Original) / Clerk
Green / DC Data
Canary / State Attorney

Pink / Defense Attorney
Goldenrod / DC Offender File

Page Subtotal 119.4

120

1

VI. Release Program Violation - 6 Points X Number of Violations (Max 18 Pts) =   VI.   _____

VII. Firearm or Destructive Device = 18 Points   VII.   15

VIII. Semi-Automatic Weapon or Machine Gun = 25 Points   VIII.

Subtotal Sentence Points.   _____

IX. Enhancements (only one multiplier may be used)

| Law Enforcement Protection | Drug Trafficking |
|---|---|
| ☐ 1.5 Multiplier ☐ 2.0 Multiplier | ☐ 1.5 Multiplier |

Enhanced Subtotal Sentence Points IX.   _____

TOTAL SENTENCE POINTS   137

135

## SENTENCE COMPUTATION

· If total sentence points are less than, or equal to 40, the sentencing court may not impose a state prison sentence. The sentencing court may increase total sentence points that are less than or equal to 40 by up to 15 percent and may impose a state prison sentence if the increased total exceeds 40 points.

_____   x 1.15 =   _____
Total Sentence Points            Increased Sentence Points

· If total sentence points are greater than 40 and less than or equal to 52 the decision to incarcerate in a state prison is left to the discretion of the court. If total sentence points are greater than 52 the sentence must be a state prison sentence.
· A state prison sentence is calculated by deducting 28 from total or increased sentence points.

137   minus 28 =   109   110
Total Or Increased Sentence Pts.       State Prison Months

· The sentencing court may increase or decrease state prison months by up to 25 percent except where the total sentence points were less than or equal to 40 but have been increased by up to 15 percent to exceed 40 points. Any state prison sentence must exceed 12 months.

100   97.4        x .75   ____   157
State Prison Months         Minimum State Prison Months

x 1.25   114.25   (9.543)
Maximum State Prison Months

### TOTAL SENTENCE IMPOSED

|  | Years | Months | Days |
|---|---|---|---|
| ☑ State Prison | 30 w/ 15 yr min mand | | |
| ☐ County Jail | | | |
| ☐ Community Control | | | |
| ☐ Probation | | | |

· Please designate the particular type of sentence where an enhanced or mandatory sentence imposed.

☐ Habitual Felony Offender   ☐ Guidelines Aggravated Departure
☑ Habitual Violent Felony Offender   ☐ Guidelines Mitigated Departure
Mandatory pursuant to:   ☐ s.775.087   ☐ s.893.13   ☐ s.893.135

Lockhart, Jeremy                    94·10764 CF

| CODES DC USE ONLY | II. ADDITIONAL OFFENSE(S) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | DOCKET# | FEL/MM | F.S. # | | LEVEL | QUALIFY A S C | CNTS | POINTS | |
| ☐☐☐ | ____/ | ____/ | ____/ ___ | | ☐☐☐ | ___ X___ | = ___ | |
| | Description: _____ | | | | | | | | |
| ☐☐☐ | ____/ | ____/ | ____/ ___ | | ☐☐☐ | ___ X___ | = ___ | |
| | Description: _____ | | | | | | | | |
| ☐☐☐ | ____/ | ____/ | ____/ ___ | | ☐☐☐ | ___ X___ | = ___ | |
| | Description: _____ | | | | | | | | |
| ☐☐☐ | ____/ | ____/ | ____/ ___ | | ☐☐☐· | ___ X___ | = ___ | |
| | Description: _____ | | | | | | | | |
| ☐☐☐ | ____/ | ____/ | ____/ ___ | | ☐☐☐ | ___ X___ | = ___ | |

Description: _____
(Level = Pts: M=0.2, 1=0.7, 2=1.2, 3=2.4, 4=3.6, 5=5.4, 6=7.2, 7=8.4, 8=9.6, 9=10.8, 10=12.0)

II.____

**IV  PRIOR RECORD:** Supplemental page attached

| | FEL/MM DEGREE | F.S. # | LEVEL | QUALIFY A S C | DESCRIPTION | NUM | POINTS(s) | |
|---|---|---|---|---|---|---|---|---|
| ☐☐☐ | ___ ___ | ___/___ | | ☐☐☐ | _____ | ___ X ___ | = ___ | |
| ☐☐☐ | ___ ___ | ___/___ | | ☐☐☐ | _____ | ___ X ___ | = ___ | |
| ☐☐☐ | ___ ___ | ___/___ | | ☐☐☐ | _____ | ___ X ___ | = ___ | |
| ☐☐☐ | ___ ___ | ___/___ | | ☐☐☐ | _____ | ___ X ___ | = ___ | |
| ☐☐☐ | ___ ___ | ___/___ | | ☐☐☐ | _____ | ___ X ___ | = ___ | |
| ☐☐☐ | ___ ___ | ___/___ | | ☐☐☐ | _____ | ___ X ___ | = ___ | |

(Level = Pts: M=0.2, 1=0.5, 2=0.8, 3=1.6, 4=2.4, 5=3.6, 6=4.8, 7=5.6, 8=6.4, 9=7.2, 10=8.0)

IV.____

REASONS FOR DEPARTURE _____
_____
_____
_____
_____
_____
_____



JUDGE'S SIGNATURE

DISTRIBUTION
Effective Date: January 1, 1994        **White** *(Original) / Clerk*          **Pink** */ Defense Attorney*
                                       **Green** */ DC Data*                   **Goldenrod** */ DC Offender File*
                                       **Canary** */ State Attorney*

3

If reasons cited for d      e are not listed below, please write r      on the reverse side,
in the area specified "Reasons for Departure"

-06150-WPD    Document 14   Entered on FLSD Docket 05/18/2000    Pag

☐ Legitimate, uncoerced, plea bargain.

☐ Offense was one of violence and was committed in a manner that was especially heinous, atrocious or cruel.

☐ Offenses arose from separate episodes. Primary offense is at level 4 or higher and the defendant has committed 5 or more offenses within a 180 day period that have resulted in convictions.

☐ Primary offense is scored at level 3 and the defendant has committed 8 or more offenses within a 180 day period that have resulted in convictions.

☐ Offense was committed within 6 months of defendant's discharge from a release program or state prison.

☐ Defendant occupied a leadership role in a criminal organization.

☐ Offense committed by a public official under color of office.

☐ Defendant knew victim to be a law enforcement officer at the time of the offense, the offense was a violent offense; and that status is not an element of the primary offense.

☐ Offense created substantial risk of death or great bodily harm to many persons or to one or more small children.

☐ Victim especially vulnerable due to age or physical or mental disability.

☐ Offense was motivated by prejudice based on race, color, ancestry, ethnicity, religion, sexual orientation or national origin of the victim.

☐ Victim suffered extraordinary physical or emotional trauma or permanent physical injury, or was treated with particular cruelty.

☐ Victim was physically attacked by the defendant in the presence of one or more members of the victim's family.

☐ Offense resulted in substantial economic hardship to a victim and consisted of an illegal act or acts committed by means of concealment, guile or fraud to obtain money or property, to avoid payment or loss of money or property or to obtain business or professional advantage when two or more of the following circumstances were present:

  ☐ Offense involved multiple victims or multiple incidents per victim.

  ☐ Offense involved a high degree of sophistication or planning or occurred over a lengthy period of time;

  ☐ The defendant used position or status to facilitate the commission of the offense, including positions of trust, confidence, or fiduciary relationship; or

  ☐ The defendant was in the past involved in other conduct similar to that involved in the current offense.

☐ Offense committed in order to prevent or avoid arrest, to impede or prevent prosecution for the conduct underlying the arrest, or to effect an escape from custody.

☐ Defendant is not amenable to rehabilitation or supervision, as evidenced by an escalating pattern of criminal conduct as described in s. 921.001(8).

☐ Defendant induced a minor to participate in any of the offenses pending before the court for disposition.

☐ Primary offense is scored at level 7 or higher and the defendant has been convicted of one or more offense that scored, or would have scored, at an offense level 8 or higher.

☐ Defendant has an extensive unscoreable juvenile record.

### Reasons for Departure - Mitigating Circumstances

☐ Legitimate, uncoerced plea bargain.

☐ Defendant was an accomplice to the offense and was a relatively minor participant in the criminal conduct.

☐ The capacity of the defendant to appreciate the criminal nature of the conduct or to conform that conduct to the requirements of law was substantially impaired.

☐ Defendant requires specialized treatment for addiction, mental disorder, or physical disability and the defendant is amenable to treatment.

☐ The need for payment of restitution to the victim outweighs the need for a prison sentence.

☐ The victim was an initiator, willing participant, aggressor, or provoker of the incident.

☐ The defendant acted under extreme duress or under the domination of another person.

☐ Before the identity of the defendant was determined, the victim was substantially compensated.

☐ Defendant cooperated with the State to resolve the current offense or any other offense

☐ The offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse

☐ At the time of the offense the defendant was too young to appreciate the consequences of the offense.    ͅ ͅ ͅ

☐ Defendant to be sentenced as a youthful offender

# THE CIRCUIT/COUNTY COURT, IN AND FOR BROWARD COUNTY, FLORIDA

**FAILURE TO PAY ANY FINE BY THE BELOW DATE MAY RESULT IN A WARRANT FOR YOUR ARREST AND/OR THE SUSPENSION OF YOUR DRIVER'S LICENSE AND DELINQUENCY FEES IMPOSED.**

CASE NO. _94-10764CF10_    ARREST NO. _FL94-6449_    AKA _____

JEREMY LOCKHART

## COURT STATUS

COURT STATUS:
- ☐ TRIAL
- ☐ JURY
- ☐ COURT
- ☐ 1ST V.O.
- ☐ FINAL V.O.

- ☐ CHANGE OF PLEA
- ☒ PLED GUILTY
- ☐ PLED NOLO

- ☐ _____
- ☒ ADJ. GUILTY _8-17-95_
- ☐ WITHHELD
- ☐ NOLLE PROSEQUI

ROR/IC/SURETY SUMMONS/CASH BOND

VC _____  TRUST FUND / HOURS COMM. SERVICE
VC _____  ASSESSMENT EACH COUNT
VC EACH COUNT _____
☐ DISMISSED
☐ ACQUITTED

AGENCY _____

1. MANSLAUGHTER W/ FIREARM
   IF _____

DATE - MOTION TO DECLARE DEFENDANT TO BE A
HABITUAL FELONY OFFENDER - GRANTED

30 years F.S.P. As A Violent HABITUAL FELONY offender with 15 years
mand. min. w/credit for 439 days time served

* Do not house The Defendant in The SAME
Facility with MICHAEL BROWN (Deceased Brother)

COUNT _____
JAIL TIME _____
OTHER _____

$ _____ COUNT COST _____ 5% _____ V.C. _____ CJC _____ EMTF

**DUI USE ONLY**

PROBATION W/SPECIAL CONDITION
LICENSE SUSP. _____
CASAP/DUI SCHOOL _____
HOURS COMM SERVICE _____
CASAP EVALUATION _____

| COUNT(S) | | | TIME SERVED | DAYS |
|---|---|---|---|---|
| $ _____ FINE | COUNT COST _____ | 5% _____ | V.C. _____ | CJC _____ |
| $ _____ FINE | COUNT COST _____ | 5% _____ | V.C. _____ | CJC _____ |
| $ _____ FINE | COUNT COST _____ | 5% _____ | V.C. _____ | CJC _____ |
| PLUS $ _____ FINE | _____ | DEFERRAL FEE TO: | | |

JUDGE _____ SPEISER    BY _____ (DEPUTY CLERK)

CASE NO. 94-10764 cf

JUDGE JEFFREY E. STREITFELD

STATE OF FLORIDA.

                Plaintiff.

vs.

                                                JUDGMENT AND
RESTITUTION ORDER
(F.S. 775.089)

Jeremy Lockhart     Defendant(s).

---

THIS CAUSE having come on to be heard on the ____8____ day of ____Sept____ A.D. 19 _95_.

upon the State's motion for an Order requiring that the Defendant herein, pursuant to §775.089, Florida Statutes, pay restitution costs for the benefit of the aggrieved party herein.

(Name) _____

(Address) _____

(City, State ZIP) _____

and the Court being fully advised in the premises, it is thereby

ORDERED AND ADJUDGED as follows:

☑ Restitution is not applicable in this case because __Victim is deceased. No identifiable__

__costs or payees_____.

☐ The State's Motion is hereby granted and the Defendant shall pay restitution for the benefit of the above-named

aggrieved party, in the total sum of _____

_____ _____ (S _____ ).

1. Payment shall be made to  ☐ Clerk of Circuit Court (felony)

                                ☐ Clerk of County Court (misdemeanor)

                                ☐ Parole & Probation (State - felony)

                                ☐ County Probation (misdemeanor)

2. Payment Schedule [Check applicable instruction(s)]

Total shall be paid in installment payments of $ _____, payable during the term of probation on a ☐ weekly  ☐ monthly basis.

The Department of Corrections is ordered to collect any monetary payments made directly to the prisoner and any compensation for work performed in community programs and pay the money to the aggrieved party until restitution is paid in full. See §946.002(2)(a)(b)(c), Florida Statutes.

The Department of Corrections or County Probation Officer is ordered to determine if the victim has received an award from the Bureau of Crimes Compensation (Tel. 904/488-0848). If an award has been made to the victim the Department of Corrections or County Probation Officer is ordered to collect from the prisoner and pay to the "CRIMES COMPENSATION TRUST FUND" an amount of money equal to the award. See §§960.17, and, specifically, 960.17(4), Florida Statutes.

The Department of Corrections and Parole & Probation Commission are ordered to make restitution payable to the victim a special condition of any work release or any kind of early release program for the Defendant. See §§947.181, Florida Statutes.

The Court retains jurisdiction to modify restitution in this case.

Other, specified conditions: _____

_____

_____

_____

IT IS FURTHER ORDERED AND ADJUDGED that the Clerk of the Court shall provide to the aggrieved party named herein a certified copy hereof, in order for the aggrieved party to record this judgment as a lien, pursuant to §55.10, Florida Statutes.

DONE AND ORDERED at Fort Lauderdale, Broward County, Florida, this _____8th_____ day of ___Sept.___, A.D. 1995____.

_____
HONORABLE JEFFREY E. STREITFELD
Judge of the Circuit Court

Copies:

| | | |
|---|---|---|
| State Attorney | ☒ | |
| Defense Counsel | ☐ | |
| Victim | ☐ | (Certified copy) |
| Probation Officer | ☐ | |
| Dept. of Corrections | ☐ | |

Filed In Open Court,
ROBERT E. LOCKWOOD,
CLERK
By _____

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

JEREMY LOCKHART,
    Defendant/Appellant,              CASE NO.:   94-10764CF10A

vs.                              JUDGE:     MARK A. SPEISER

STATE OF FLORIDA,
    Plaintiff/Appellee.           **NOTICE OF APPEAL**

---

NOTICE IS HEREBY GIVEN that, JEREMY LOCKHART, Defendant/Appellant,

appeals to the District Court of Appeal, Fourth District of Florida, the final order imposing

judgment of conviction rendered on AUGUST 17, 1995 and the final order imposing sentence

rendered on SEPTEMBER 8, 1995 in the above-styled cause.

I HEREBY CERTIFY that a copy of the foregoing Notice of Appeal was hand delivered

to the Office of the State Attorney, Broward County Courthouse, Fort Lauderdale, Florida

33301, and by U.S. Mail to the Department of Legal Affairs, 1655 Palm Beach Lakes Blvd., 3rd

Floor, West Palm Beach, Florida 33401-2299, this 18 day of SEPTEMBER, 1995.

                         ALAN H. SCHREIBER
                         Public Defender

                         ROBERT E. GODWIN, 173582
                         Assistant Public Defender
                         201 S. E. 6th Street
                         Broward County Courthouse, Rm 3872
                         Fort Lauderdale, Florida 33301
                         (305) 831-8843
                         Attorney for Defendant/Appellant

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
BROWARD COUNTY, FLORIDA

JEREMY LOCKHART
    Defendant/Appellant,

vs.

STATE OF FLORIDA,
    Plaintiff/Appellee.

CASE NO.:    94-10764CF10A

JUDGE:    MARK A. SPEISER

**ORDER**

THIS CAUSE having come on the Motion of ROBERT E. GODWIN, 173582, to withdraw as Counsel for JEREMY LOCKHART, Defendant/Appellant for the purposes of appeal to have the Defendant/Appellant declared indigent for appeal, and to have the Office of the Public Defender appointed for appellate purposes,

IT IS HEREBY ORDERED AND ADJUDGED that ROBERT E. GODWIN, 173582 shall be permitted to withdraw and designate the Office of the Public Defender of the Fifteenth Circuit as Appellate Counsel when the record on appeal in this cause is completed and trial counsel has fully complied with Rule 9.140(b)(3), Florida Rules of Appellate Procedure.

IT APPEARING to this Court that Defendant/Appellant is indigent herein and that Defendant/Appellant has filed or intends to file a notice of appeal to the Fourth District Court of Appeal of Florida in the above-styled cause, it is hereby;

FURTHER ORDERED AND ADJUDGED that Defendant/Appellant be declared indigent for the purposes of appeal in accordance with the provisions of Section 924.17, Florida Statutes, and pursuant to Section 939.15, Florida Statutes. All costs allowed by law incident to the prosecution of Defendant/Appellant's appeal, including, but not limited to, the cost of any and all transcripts necessary to fully and properly prosecute said appeal, shall be paid by Broward County, Florida.

DONE AND ORDERED at Fort Lauderdale, Broward County, Florida, this 28 day of SEPTEMBER, 1995.

MARK A. SPEISER
Circuit Court Judge

cc:

Department of Legal Affairs
(Attorney General)

Office of the Public Defender,
Fifteenth Judicial Circuit

17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

CASE NO.:   94-10764CF10A

JEREMY LOCKHART,
Defendant/Appellant,                    JUDGE:   MARK A. SPEISER

vs.

STATE OF FLORIDA,
Plaintiff/Appellee.

**STATEMENT OF JUDICIAL ACTS TO BE
REVIEWED, DESIGNATION TO THE COURT
REPORTER, AND COURT REPORTER'S
ACKNOWLEDGMENT**

_____/

COMES NOW the Defendant/Appellant, JEREMY LOCKHART, an indigent, and sets forth the following

judicial act(s) relative to the above-styled cause of which he plans to seek review on appeal:

1.     The trial Court's denial of the Defendant's Motion to Suppress Statements heard on April 7, 1995

with the ruling on the Motion to Suppress on April 10, 1995.

2.     The trial Court's denial of the Defendant's various Motions for Mistrial.

3.     The trial Court's denial of the Defendant's Motion for Judgement of Acquittal.

FURTHERMORE, Defendant/Appellant, files this Designation to Reporter and directs the court

reporter to transcribe an original and one (1) copy of the following portions of the trial proceedings which must be

included in the appeal record so as to enable the appellate court to conduct a full and adequate review of the judicial

act(s) set forth above:

1.     The Defendant's Motion to Suppress Statements heard on April 7, 1995 with the ruling on the Motion

to Suppress on April 10, 1995.

2.  The entire trial proceedings recorded by the Reporter on August 14, 1995 through August 17, 1995 before

the Honorable MARK A. SPEISER.

3.  The court reporter is directed to file the original and one (1) copy with the clerk of the lower tribunal.

717

I HEREBY CERTIFY that a true and correct copy of the foregoing ... s been furnished to the Office of the State Attorney, Broward County Courthouse, Fort Lauderdale, Florida 33301, and by U.S. Mail to the Department of Legal Affairs, 1655 Palm Beach Lakes Blvd., 3rd Floor, West Palm Beach, Florida 33401-2299, this 21 day of SEPTEMBER, 1995.

ALAN H. SCHREIBER
Public Defender

ROBERT E. GODWIN, 173582
Assistant Public Defender
Counsel for Defendant/Appellant
(305) 831-8843

## REPORTER'S ACKNOWLEDGMENT

1. The foregoing designation was served on _____ and received _____.

2. Satisfactory arrangements have( ) have not( ) been made for payment of the transcript costs. These financial arrangements were completed on _____.

3. Number of trial or hearing days _____.

4. Estimated number of transcript pages _____.

5a. The transcript will be available within thirty (30) days of service of the foregoing designation and will be filed on or before the _____ day of _____, 19___. **OR**:

5b. For the following reason(s) the court reporter requests an extension of time of _____ days for preparation of the transcript(s) which will be filed on or before _____;

_____

6. Completion and filing of this acknowledgment by the court reporter

constitutes submission to the jurisdiction of the court for all purposes in connection with these appellate proceedings.

718

7. The undersigned court reporter certifies that the foregoing is true and correct and that a copy has been furnished by mail( ) hand delivery( ), this _____ day of _____, 19___, to each of the parties or their counsel.

_____
Court Reporter
Address: _____
_____

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

JEREMY LOCKHART                        CASE NO. 95-03410

  Appellant(s),

vs.

STATE OF FLORIDA                       L.T. CASE NO. 94-10764 CF10A
                                       BROWARD
  Appellee(s).

November 3, 1995

BY ORDER OF THE COURT:

        ORDERED that the court reporter's request for an
extension of time to file the transcript with the circuit court
is granted, and the time for preparation and service of the
transcript is hereby extended to and including November 28,
1995.  Attorneys shall notify this court of non-compliance;
further,

        ORDERED that all other time frames pertaining to the
filing of the record and briefs are hereby extended accordingly.
See Fla. R. App. P. 9.300(b).  (Appellant's initial brief shall
be filed within thirty (30) days from service of the index to
the record.)

720

I hereby certify ⌐ foregoing is a
true copy of the original court order

MARILYN BEUTTENMULLER
CLERK

cc:   Public Defender 17
      Attorney General-W. Palm Beach
      Robert E. Lockwood, Clerk
      State Attorney 17
      Public Defender 15
      Justice Reporting Service

    /KB

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

JEREMY LOCKHART                     CASE NO. 95-03410

  Appellant(s),

vs.

STATE OF FLORIDA                    L.T. CASE NO. 94-10764 CF10A
                                    BROWARD
  Appellee(s).

December 1, 1995
_____

BY ORDER OF THE COURT:

     ORDERED that the court reporter's request for an
extension of time to file the transcript with the circuit court
is granted, and the time for preparation and service of the
transcript is hereby extended twenty (20) days from the date of
this order.  Attorneys shall notify this court of
non-compliance; further,

     ORDERED that all other time frames pertaining to the
filing of the record and briefs are hereby extended accordingly.
See Fla. R. App. P. 9.300(b).  (Appellant's initial brief shall
be filed within thirty (30) days from service of the index to
the record.)

I hereby certify foregoing is a
true copy of the original court order.

MARILYN BEUTTENMULLER
CLERK

cc:   Public Defender 17
      Attorney General-W. Palm Beach
      Robert E. Lockwood, Clerk
      State Attorney 17
      Public Defender 15
      Justice Reporting Service

      /KB

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

JEREMY LOCKHART                          CASE NO. 95-03410

  Appellant(s),

vs.

STATE OF FLORIDA                         L.T. CASE NO. 94-10764 CF10A
                                         BROWARD
  Appellee(s).

January 2, 1996
_____

BY ORDER OF THE COURT:

        ORDERED that the court reporter's request for an

extension of time to file the transcript with the circuit court.

is granted, and the time for preparation and service of the

transcript is hereby extended to and including January 20, 1996.

Attorneys shall notify this court of non-compliance; further,

        ORDERED that all other time frames pertaining to the

filing of the record and briefs are hereby extended accordingly.

See Fla. R. App. P. 9.300(b).  (Appellant's initial brief shall

be filed within thirty (30) days from service of the index to

the record.)

I hereby certify the foregoing is a
true copy of the original court order.

MARILYN BEUTTENMULLER
CLERK

cc:   Public Defender 17              State Attorney, 17
      Attorney General-W. Palm Beach  Public Defender 15
      Robert E. Lockwood, Clerk
      Justice Reporting Service
/PB                                                    724

CLOCK IN

[ ]
[X] Criminal
[ ] Traffic
[ ] Other

CERTIFICATE OF THE CLERK

CASE NUMBER

94-10764

APPEAL NO. 95-3410

STATE OF FLORIDA :

COUNTY OF BROWARD:

I, ROBERT E. LOCKWOOD, CLERK OF THE CIRCUIT COURT FOR THE 17TH JUDICIAL CIRCUIT, COUNTY OF BROWARD, STATE OF FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING PAGES 1 TO __724__ INCLUSIVE CONTAINS A CORRECT TRANSCRIPT OF THE RECORD OF THE JUDGMENT IN THE CASE OF STATE OF FLORIDA vs **JEREMY LOCKHART** , AND A TRUE AND CORRECT RECORD AND COPY OF ALL SUCH PAPERS AND PROCEEDINGS IN SAID CAUSE AS APPEARS FROM THE RECORDS AND FILES OF MY OFFICE THAT HAVE BEEN DIRECTED TO BE INCLUDED IN SAID RECORD BY THE DIRECTIONS FURNISHED ME.

|     |     |     |
|-----|-----|-----|
| I   | 1   | 200 |
| II  | 200 | 400 |
| III | 400 | 599 |

Volume __IV__ , Pages __600__ to __664__ inclusive embrace the transcribed notes

of the reporter as made at the trial and certified to me by __HER__ .

IN WITNESS WHEREOF, I have hereunto set my hand affixed the seal of said Court

this __15TH__ day of __FEBRUARY__ , 19 __95__ .

ROBERT E. LOCKWOOD, Clerk
Circuit Court
Broward County, Florida

By: _____
Deputy Clerk

600

```
 1   State of Florida      )
                           ):ss          Mark A. Speiser
 2   County of Broward     )

 3
                    IN THE CIRCUIT COURT OF THE
 4               SEVENTEENTH JUDICIAL CIRCUIT,
               IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6   STATE OF FLORIDA,

 7              Plaintiff,

 8   -vs-                          Case No. 94-10764 CF10A

 9   JEREMY LOCKHART,

10              Defendant.
                                        COPY
11   _____/

12

13
                 ----------------------------------
14               APPEAL ON BEHALF OF THE DEFENDANT
                 ----------------------------------
15

16
                          ---------
17                        VOLUME VI
                          ---------
18                      Pages 600-664

19
     APPEARANCES:
20
                 JOE PATNER, Esquire,
21               Assistant State Attorney,
                 Appearing on behalf of the Plaintiff.
22
                 ROBERT GODWIN, Esquire,
23               Appearing on behalf of the Defendant.

24

25


              JUSTICE REPORTING SERVICES, INC.    523-6114
```

601

```
 1                          I-N-D-E-X

 2   Proceedings                      Pages

 3   August 16h, 1995                 600-604

 4   August 17th, 1995                605-640

 5   SENTENCING
     September 8th, 1995              641-664
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JUSTICE REPORTING SERVICES, INC.      523-6114

```
 1            THE COURT:   What's the enhancement statute
 2       seven what?
 3            MR. PATNER:   775.   Yes, 087 I believe.
 4            THE COURT:   775?
 5            MR. PATNER:   087.
 6            MR. PATNER:   I don't know if that's it or
 7       not.
 8            THE COURT:   Yeah, but you see I think you
 9       also cannot aggravate from a manslaughter because
10       if you look in here 2(A) says any person who was
11       convicted of any murder.   There is a difference
12       between a murder and manslaughter.
13            MR. PATNER:   I agree.
14            THE COURT:   All right.   Look at paragraph
15       one.
16            MR. PATNER:   If you look at paragraph one it
17       appears to apply to any felony accept those
18       felonies which is part - which firearm would be
19       inclusive such as felony possession, and that's
20       what I'm interested in.
21            THE COURT:   Right, right, okay.  Yes, I will
22       have manslaughter with a firearm, and manslaughter
23       without a firearm.   Okay, and on not guilty no
24       variation just not guilty.   Thank you.
25            (Thereupon, the proceedings were concluded.)
```

604

```
 1                        C E R T I F I C A T E
                          - - - -
 2
      STATE OF FLORIDA
 3
      COUNTY OF BROWARD
 4
              I, MICHELLE MEEKER, Shorthand Reporter, Notary
 5    Public, do hereby certify that I was authorized to and
      did stenographically report the foregoing proceedings
 6    and that the transcript is a true and correct
      transcription of my stenotype notes of the proceedings.
 7
              Dated this /0th day of 500        , 1996.
 8

 9              MICHELLE MEEKER

10              Shorthand Reporter

11

12    STATE OF FLORIDA

13    COUNTY OF BROWARD

14            The foregoing certificate was acknowledged
      before me this 15th day of     VN     , 1996, by
15    MICHELLE MEEKER who is personally known to me.

16

17

                Notary Public-State of Florida
18              My Commission No.
                Expires:
19

20

21

22

23

24

25
```

/

JUSTICE REPORTING SERVICES, INC.        523-6114

605

```
 1    State of Florida      )
                            ):ss          Mark A. Speiser
 2    County of Broward     )

 3
                      IN THE CIRCUIT COURT OF THE
 4                   SEVENTEENTH JUDICIAL CIRCUIT,
                   IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6    STATE OF FLORIDA,

 7           Plaintiff,

 8    -vs-                        Case No. 94-10764 CF10A

 9    JEREMY LOCKHART,

10           Defendant.

11    _____/

12

13           Proceedings had and taken before the Honorable

14    Mark A. Speiser, one of the Judges of said Court, fifth

15    floor, Room 5900 Broward County Courthouse, Fort

16    Lauderdale, Broward County, Florida, on the 17th day of

17    August, 1995, commencing at or about the hour of 1:00

18    o'clock p.m., and being a jury trial.

19

20    APPEARANCES:

21           JOSEPH PATNER, Esquire,
             Assistant State Attorney,
22           Appearing on behalf of the Plaintiff.

23           ROBERT GODWIN, Esquire,
             Appearing on behalf of the defendant
24

25
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1           (Thereupon, the proceedings were had outside

2      the presence of the jurors.)

3           THE COURT:   Okay, are we all set?  Do we have

4      the verdict forms?

5           MR. PATNER:  Yes we do I've given a copy to

6      the defense.  I notice what may be a problem so I

7      dictated another one and it should be on the way

8      momentarily unless the Court and defense don't

9      care.  If you notice on A it says as charged in

10     the information.  I notice that this morning.

11          THE COURT:  And B second degree murder you

12     know is a lesser included offense.  It really

13     shouldn't be --

14          MR. PATNER:  I wondered about that because I

15     didn't dictate it like that.

16          THE COURT:  The other way should be A, the

17     defendant guilty of second degree murder.  Then

18     you could have underneath there one, two, with a

19     firearm or without a firearm.  Or you could say

20     defendant is guilty of second degree murder with a

21     firearm as charged in the indictment.  B, the

22     defendant is guilty of second degree murder

23     without a firearm.

24          MR. GODWIN: I don't think that's necessary,

25     Judge, I think you can check with or without a

/

JUSTICE REPORTING SERVICES, INC.     523-6114

1     firearm.

2          THE COURT:   The defendant is a guilty of

3     second degree murder as charged in the indictment

4     then have under there two lines A with a firearm

5     and B without a firearm.

6          MR. GODWIN: Well, you don't have any other

7     sample forms.

·8          THE COURT:  Well, we can have this done real

9     quick.  I mean I can let them start deliberating

10    and give them the verdict form in a second.  This

11    should be indictment.

12         MR. GODWIN: All right, Judge, if you just

13    want to put as charged in the indictment then put

14    it in by hand.  I think the verdict form is

15    otherwise okay.

16         THE COURT:  Well, I'm going to have to

17    explain to them, you know, that A is with a

18    firearm and B is without a firearm.

19         MR. GODWIN: Well, Judge, I object to that

20    it's very clear from the instructions.  I mean,

21    we've already been over that with them.

22         THE COURT:  Okay.  Well, I'm going to delete

23    the lesser included offense - not a lesser

24    included offense.  B, is not a lesser included

25    offense.  All right, so I will - I'll leave it

                              ′

1    like this.  A the defendant is guilty second

2    degree murder with a firearm as charged in the

3    indictment.  B, the defendant is guilty of second

4    degree murder.  C, the defendant is guilty of

5    manslaughter with a firearm a lesser included

6    offense.  D, the defendant is guilty of

7    manslaughter, lesser included offense.  E, the

8    defendant is not guilty.  Okay, is that acceptable

9    to you?

10        MR. GODWIN: Yes.

11        MR. PATNER:  That's fine.

12        MR. GODWIN: I think we need the verdict form

13    before you send the jury back to deliberate.

14        THE COURT:  You actually see a problem if I

15    have them go back and deliberate and give them the

16    verdict form within three minutes?

17        MR. GODWIN: I think you ought to give it to

18    them now.  I think you ought to wait and give it

19    to them now.

20        THE COURT:  Verdict form acceptable to both

21    sides?

22        MR. PATNER:  Yes, it is Your Honor.

23        MR. GODWIN: Yes.

24        (Thereupon, the following proceedings were

25    had in the presence of the jury.)

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1          THE COURT:  Okay.  Record shall reflect we
 2    are back in session other with our Assistant State
 3    Attorney, counsel for the defendant, the
 4    defendant, and our jury panel.  Good morning I'm
 5    sorry for the delay we had to take care of a few
 6    matter here outside of your presence.  And the
 7    delay should not in any way, shape, fashion, or
 8    form, be lodged or held by you against the State
 9    or the defendant.  Everyone was here on time we
10    just had to take care of some legal matters
11    outside of your presence.
12          That being the case anything anybody wants to
13    say to the Court before I ask you to retire to
14    begin your deliberations?  Would anyone like to
15    have any of the exhibits marked into evidence to
16    take back with you into the jury room?  As you
17    know we had a number of exhibits marked into
18    evidence would anyone like to have the exhibits
19    taken back into the jury room?  No one wants any
20    of the exhibits?  Okay, all right.
21          JUROR NUMBER FIVE:  I'd like you to give me
22    some more information on second degree felony and
23    manslaughter.  The difference between both of
24    them.
25          THE COURT:  Would you like me to re-read it
```

JUSTICE REPORTING SERVICES, INC.    523-6114

610

```
 1      to you?

 2            THE COURT:   Okay, okay, that's all you folks

 3      need at this time, is that correct?   All right,

 4      can I see the attorneys up here please?

 5            (Thereupon, the following proceedings were

 6      had at side bar outside the hearing of the

 7      jurors.)

 8            THE COURT:   This is why I should have read

 9      the jury instructions today.   All right.

10            MR. GODWIN: Re-read them, you've got to

11      re-read them.

12            THE COURT:   I don't have to re-read all the

13      instructions that's certainly not the case.  I

14      don't have to read every single instruction.  I'll

15      read the introduction to homicide, I'd read the

16      second degree murder, I'd read the manslaughter,

17      and I'll read excusable and I'll read --

18            MR. GODWIN:   Justifiable homicide.

19            THE COURT:   Yeah.

20            MR. GODWIN: Read the whole thing.

21            THE COURT:   Come on we're going to sit here

22      and read all these instructions again?

23            MR. GODWIN:   They're asking - he is asking to

24      be re-instructed I think you better re-instruct

25      him.
```

JUSTICE REPORTING SERVICES, INC.      523-6114

```
 1              THE COURT:  He's asking to be re-instructed
 2      on second degree he wants to know the difference
 3      between second degree murder and manslaughter he
 4      didn't ask for the instruction on justifiable
 5      homicide or self-defense.  I would be more happy
 6      to read it but I don't think I have to read
 7      reasonable doubt.
 8              MR. GODWIN: Okay.  I think you should read
 9      justifiable homicide again I think - frankly,
10      Judge I want to send the exhibits back myself but
11      that's up to you.
12              THE COURT:  I was kind of encouraging them to
13      ask for it but I'm not going to send them unless
14      they ask me to.  I don't want to shove it down the
15      face.
16              MR. PATNER:  I think they should go back to
17      the jury.
18              THE COURT:  Okay, both re in agreement I'll
19      send them back.  So you're in agreement then that
20      reading second degree murder, manslaughter,
21      self-defense, and excusable, is that correct?
22              MR. GODWIN: Yeah.
23              MR. PATNER:  Well, if the Court feels
24      inclined to read defense he is not asking --
25              THE COURT:  Justifiable use of deadly force.
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1              (Thereupon, the following proceedings were
 2         had in the presence of the jury.)
 3              THE COURT:   Do you had have any questions?
 4         Folks, this is directed to you does somebody have
 5         a question here about the exhibits?
 6              JUROR NUMBER TWO:   The transcript from the
 7         statement that was given?
 8              THE COURT:   There is no transcript in
 9         evidence.   The tape --
10              JUROR NUMBER TWO:   Two tape played.
11              THE COURT:   And I think with the agreement of
12         both attorneys we are going to send back all the
13         exhibits to you.  We are to going to throw in a
14         bonus and give you a tape recorder with the tape
15         all ready.  We are going to send all the exhibits
16         back.  What I'm going to read to you with the
17         consent of the attorneys since you've asked me,
18         one of you has asked me to explain the difference
19         between second degree murder and manslaughter and
20         I'm going to read to you second degree murder, I'm
21         going to read introduction to homicide, read
22         second degree murder, read manslaughter, read
23         justifiable use of deadly force again.  Okay,
24         that's all right, sir, is that with everybody's
25         agreement?  Thank you.  Okay, you're going to have
```

```
 1          to make sure - I'm going to start reading
 2          instructions and it's going to take me about five
 3          minutes so once I start reading the door is going
 4          to be locked and I can't have people in and out so
 5          if anyone wants to leave this is the time to do
 6          so.    In this case the defendant is charged with
 7          murder in the second degree.  Murder in the second
 8          degree includes a lesser crime of manslaughter
 9          both of which are unlawful.  A killing that is
10          excusable or was committed by the use of
11          justifiable deadly force is lawful.  If you find
12          that the - if you find that Patrick Brown was
13          killed by Jeremy Lockhart you will then consider
14          the circumstances surrounding the killing in
15          deciding if the killing was murder in the second
16          degree with a firearm as charged in the
17          indictment, or whether the killing was
18          manslaughter, or whether the killing was excusable
19          or resulted in justifiable use of deadly force.
20              The killing of a human being is justifiable
21          homicide and lawful if necessarily done while
22          resisting an attempt to murder or commit a felony
23          upon the defendant.  Or to commit a felony in any
24          dwelling house in which the defendant was at the
25          time of the killing.  The killing of a human being
```

614

```
1        is excusable and therefore lawful under any one of
2        the following three circumstances.  One, when the
3        killing is committed by accident and misfortune in
4        doing any lawful act by lawful means with usual
5        ordinary caution and without any unlawful intent.
6        Or when the killing occurs by accident and
7        misfortune and in the heat of passion upon any
8        sudden and sufficient provocation.
9               MR. GODWIN: Your Honor, we need to come side
10       bar for one second, may we?
11              (Thereupon, the following proceedings were
12       had at side bar outside the hearing of the
13       jurors.)
14              MR. GODWIN: You said you were going to read
15       the three circumstance --
16              THE COURT:  Two circumstances.
17              MR. GODWIN:  You said three but you only read
18       the two.
19              MR. GODWIN: Okay, fine.
20              THE COURT:  You're right I did say three.  Do
21       you want me to re-read that or --
22              MR. GODWIN: No, no.
23              THE COURT:  I'm not reading the other one.
24              THE COURT:  Okay, thank you.  I will now
25       instruct you on the circumstance that must be
```

```
 1    proved before the defendant may be found guilty of
 2    murder in the second degree with a firearm or any
 3    lesser included crime in this instance.  There is
 4    one lesser included crime that's being submitted
 5    to you, that is manslaughter.  Before you can find
 6    the defendant guilty of second degree murder the
 7    State must prove the following three elements
 8    beyond a reasonable doubt:  Number one, that
 9    Patrick Brown is dead.  Two, that the death was
10    caused by the criminal act or agency of the
11    defendant, Jeremy Lockhart.  And three, there was
12    an unlawful killing of Patrick Brown by an act
13      "imminently dangerous to another evincing a
14    depraved mind regardless of human life".  Now,
15    what does that phrase mean?  An act is imminently
16    dangerous to another and evincing a deprived mind
17    regardless of human life?  Well, an act is one
18    that is imminently dangerous to another and
19    evincing a depraved mind regardless of human life
20    if it is an act or series of acts that one, a
21    person of ordinary judgement would know is
22    reasonable certain to kill or would do serious
23    bodily injury to another.  And is done from ill
24    will, hatred, spite, or evil intent.  And is of
25    such a nature that the act itself indicates an
```

```
 1        indifference to human life.  In order to convict
 2        of second degree murder it is not necessary for
 3        the State to prove the defendant had a
 4        premeditated intent to cause death.  Now, if you
 5        find that the defendant committed murder in the
 6        second degree and you also find that during the
 7        commission of the crime the defendant possessed a
 8        firearm you should find the defendant guilty of
 9        murder in the second degree with a firearm as
10        charged in the indictment which is line A on the
11        verdict form.
12             If in fact you find that the defendant is
13        guilty of murder in the second degree but he did
14        not have a firearm then you would check line B on
15        the verdict form.  Now, I read to you yesterday
16        what the definition of a firearm is and I'm going
17        to read it to you again.
18             Firearm means any weapon including a starter
19        gun which will is designed to, or may readily be
20        converted to expel a projectile by the action of
21        an explosive.  The frame or receiver of any such
22        weapon, any firearm muffler, firearm silencer any
23        destructive device or any machine gun.  The term
24        firearm does not include antique firearm unless
25        the antique firearm was used in the commission of
```

JUSTICE REPORTING SERVICES, INC.      523-6114

617

1        the crime.

2              Now, I'm going to read you law with respect

3        to the lesser included offense that is

4        manslaughter.  Before you can find the defendant

5        guilty of manslaughter the State must prove the

6        following two elements beyond a reasonable doubt:

7        Number one, that Patrick Brown is dead.  And two,

8        that the defendant Jeremy Lockhart intentionally

9        caused the death of Patrick Brown, or the death of

10       Patrick Brown was caused by the culpable

11       negligence of Jeremy Lockhart.  However, the

12       defendant cannot be guilty of manslaughter if the

13       killing was either justifiable or excusable

14       homicide as I previously explained those terms.

15             I will now define culpable negligence to you

16       because remember I said that there are two

17       elements of manslaughter.  One, is Patrick Brown

18       is dead.  And two that the defendant either

19       intentionally caused the death of Patrick Brown or

20       the death of Patrick Brown was caused by a

21       culpable negligence of the defendant, Jeremy

22       Lockhart.  So what is culpable negligence?  Each

23       of us has a duty to act reasonably towards

24       others.  If there was violation of that duty

25       without any conscious intention to harm that's a

618

1    violation of negligence.  But culpable negligence

2    is more then a failure to use ordinary care

3    towards others.  In order for negligence to be

4    culpable negligence it must be gross and

5    flagrante.  Culpable negligence is a course of

6    conduct showing reckless disregard of human life

7    or of the safety of persons exposed to its

8    dangerous effects.  Or such an entire want of care

9    as to raise a presumption of a conscious

10    indifference to consequences.  Or which shows

11    wantonness or recklessness, or, a grossly careless

12    disregard of the safety and welfare of the

13    public.  Or such an indifference to the rights of

14    others as is equivalent to an intentional

15    violation of such rights.

16    The negligent act, ladies and gentlemen, or

17    omission must have been committed with an utter

18    disregard for the safety of others.  Culpable

19    negligence is consciously doing an act or

20    following a course of conduct that the defendant

21    must have known, or reasonably should have known

22    was likely to cause death or great bodily injury.

23    In order to be convicted of manslaughter by

24    an intentional act it is not necessary for the

25    State to prove that the defendant Jeremy Lockhart

JUSTICE REPORTING SERVICES, INC.    523-6114

619

1     had a premeditated intent to cause death.   And
2     again that's with respect to murder in the second
3     degree.   If you find that the defendant committed
4     manslaughter and you also find that during the
5     commission of the crime the defendant possessed a
6     firearm you should find the defendant guilty of
7     manslaughter with a firearm which is line C on the
8     verdict form.

9          If you find the defendant committed
10    manslaughter but did not possess a firearm you
11    should find the defendant guilty only of
12    manslaughter which is line D on the verdict form.

13         All right, I'm now going to read you the last
14    instruction which is on justifiable use of deadly
15    force.   Everyone with me so far?   An issue in this
16    case is whether the defendant acted, Jeremy
17    Lockhart, in self defense.   Is a defense to the
18    offense with which Jeremy Lockhart is charged.   If
19    the death of the Patrick Brown resulted from the
20    justifiable use of force likely to cause death or
21    great bodily injury.   A person is justified in
22    using force likely to cause death or great bodily
23    harm if he reasonably believes that such force is
24    necessary to prevent the imminent death or great
25    bodily harm to himself or another.   Or the

JUSTICE REPORTING SERVICES, INC.     523-6114

1    imminent commission of a forceful felony, in this
2    instance aggravated battery against himself or
3    another.

4         Now what is aggravated battery?  Aggravated
5    battery consists of two elements, and they are as
6    follows:  Number one, as it applies to this
7    particular case that Patrick Brown intentionally
8    touched or struck April Reese against her will.
9    And two, Patrick Brown in committing the battery
10   intentionally or knowingly caused great bodily
11   harm to April Reese.

12        In deciding whether the defendant, Jeremy
13   Lockhart, was justified in the use of force likely
14   to cause death or great bodily harm you must judge
15   him by the circumstances by which he was
16   surrounded at the time the force was used.   The
17   danger facing the defendant need not have been
18   actual, however, to justify the use of force
19   likely to cause death or great bodily harm the
20   appearance of danger must have been so real that a
21   reasonable cautious and prudent person under the
22   same circumstances would have believed that the
23   danger could be avoided only through the use of
24   that force.   Based upon the appearances the
25   defendant, Jeremy Lockhart, must have actually

1    believed that the danger was real.

2         The defendant can not justify the use of

3    force likely to cause death or great bodily harm

4    unless he had, Jeremy Lockhart, used every

5    reasonable means within his power and consistent

6    with his own safety to avoid the danger before

7    resorting to that force.

8         Now, the fact that the defendant Jeremy

9    Lockhart was wrongfully attacked cannot justify

10   his use of force likely to cause death or great

11   bodily harm.  If by retreating he, Jeremy

12   Lockhart, could have avoided the need to use that

13   force.

14        However, if the defendant was placed in the

15   position of imminent danger of death or great

16   bodily harm and it would have increased his own

17   danger to retreat then his use of force likely to

18   cause death or great bodily harm was justifiable.

19        Now, if the defendant, Jeremy Lockhart was

20   attacked in his own home or on his own premises he

21   had no duty to retreat and had the lawful right to

22   stand his ground and meet force with force even to

23   the extent of using force likely to cause death or

24   great bodily harm if it was necessary to prevent

25   death or great bodily harm to himself or another,

622

```
 1        or the commission of a forceful felony, namely
 2        aggravated battery.  If in your consideration of
 3        the issue of self-defense you have a reasonable
 4        doubt on the question of whether or not the
 5        defendant was justified in the use of force likely
 6        to cause death or great bodily harm you should
 7        find the defendant not guilty.
 8             However, if from the evidence you are
 9        convinced that the defendant was not justified in
10        the use of force likely to cause death or great
11        bodily harm you should find him guilty of all the
12        elements of the charge that have been proved.
13             Okay, all right.  What I'm going do at this
14        point in time is I'm going to hand -- and again I
15        should just advise you it's a little different
16        from what we said yesterday the verdict form has
17        five lines A through E.  A says the defendant is
18        guilty of second degree murder with a firearm as
19        charged in the indictment.  B, defendant is guilty
20        of second degree murder.  C, the defendant is
21        guilty of manslaughter with a firearm, lesser
22        included offense.  D, the defendant is guilty of
23        manslaughter a lesser included offense.  And E the
24        defendant is not guilty.
25             Okay, I'm going to hand the indictment,
```

JUSTICE REPORTING SERVICES, INC.    523-6114

```
 1       together with the verdict form, together with the
 2       questionnaire to the court deputy and he
 3       customarily hands it to the person sitting in the
 4       first seat.  That does not mean, ma'am, that you
 5       have to be the foreperson you're just the closest
 6       person to hand the document to to take back into
 7       the jury room.  What we are going to do is have
 8       exhibits brought back to you in just a few
 9       moments.  Anybody have any questions at all?
10            Sir, do you have anything back there at all?
11            (Thereupon, the jury retired to begin their
12       deliberations after which the following
13       proceedings were had outside the hearing of the
14       jurors.)
15            THE COURT:  You gentleman want to come up and
16       look at the exhibits to make sure they are
17       acceptable to both sides?
18            THE COURT:  Okay, you're Mr. Roland would you
19       like to come up please, I am going to have to ask
20       you for your juror badge and in exchange there for
21       I'm going to hand you a certificate of
22       appreciation.  And if you want to take that card
23       back down to the jury room which is on the third
24       floor they'll at the time tell you your check will
25       be in the mail and then if you want to come back
```

```
 1    and await the verdict you can come back through
 2    the front door.  Often times the lawyers try to
 3    speak to the alternate juror to see what their
 4    viewpoints in the case are and if you want to
 5    speak to the lawyers you can bur if you'd rather
 6    not you can say I'd rather not talk with you.
 7    Okay.
 8              THE JUROR:  Okay, thanks, Your Honor.
 9              THE COURT:  Did you look at the exhibits, are
10    they all right for both sides?
11              MR. PATNER:  Yes, sir.
12              MR. GODWIN:  Yes, sir.
13              THE COURT:  Both sides looked over the
14    exhibits and they said they are acceptable.
15              (Thereupon the following proceedings were had
16    outside the presence of the jury.)
17              THE COURT:  Record shall reflect we are
18    present outside the presence of the jury and I
19    have a message here - first I have a question and
20    it says definition in writing of the difference
21    between second degree murder with a firearm and
22    manslaughter with a firearm.  And then what
23    happened after that?
24              THE BAILIFF:  About five, ten minutes later
25    they rang the buzzer and said they had a verdict.
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1        MR. GODWIN:   That's the first I heard there

2    was a message.

3        THE COURT:   First time you heard about it was

4    during the lunch hour, right?

5        THE BAILIFF:   Yes, sir.

6        THE COURT:   What did you tell them when you

7    received this question?

8        THE BAILIFF:   That the judge was in an

9    emergency meeting and as soon as we come back

10   we'll reconvene everybody and we'll answer the

11   question.

12       THE COURT:   All right, and then what

13   happened?

14       THE BAILIFF:   About fifteen minutes later

15   they rang the buzzer.

16       THE COURT:   And said?

17       THE BAILIFF:   We have a verdict.

18       THE COURT:   All right, you want to file that

19   with the  --

20       MR. GODWIN:   I think the question should have

21   been answered, judge.

22       MR. GODWIN:   I think the jury's question

23   should have been answered.

24       THE COURT:   Well I wasn't here to answer it.

25   I mean no one was here.

626

1           MR. GODWIN: I think it would have been
2 proper procedure if they had a question on the law
3 to answer it. They obviously had some kind of
4 question in their mind and because the question
5 wasn't answered they went ahead and reached a
6 verdict.

7           THE COURT: Well, if you want I'll have them
8 come out and I'll ask them if they need to have
9 the question answered.

10           MR. GODWIN: I think it should have been
11 answered, I think should have been answered before
12 they reached a verdict.

13           THE COURT: I don't have a problem with that
14 the jury had a question then on second thought
15 they proceeded without resolve the question. I
16 read them the law on murder in the second degree
17 and manslaughter twice. What do you want to do
18 declare a mistrial and throw the whole case out?

19           MR. GODWIN: Yes, I do.

20           THE COURT: That will be denied. I'll ask
21 them to come back in and ask them if they want the
22 question answered.

23           MR. GODWIN: I think it's to late to answer
24 the question now that we have a verdict, that's my
25 point.

```
 1              THE COURT:  What would you like?
 2              MR. GODWIN:  I'm asking for a mistrial.
 3              THE COURT:  Denied.
 4              MR. GODWIN:  Because of the fact that they
 5         had a question and it wasn't answered and then
 6         they went ahead and deliberated came to a
 7         verdict.  I'm moving for a mistrial.
 8              THE COURT:  Denied.  Okay, bring in the jury.
 9              THE BAILIFF:  Jury coming in.
10              (Thereupon, the following proceedings were
11         had in the presence of the jury.)
12              THE COURT:  Record shall reflect we are back
13         in session.  Everyone required to be present is
14         accountable for.  Mr. Brown, you are the foreman
15         of the jury?  For.
16              MR. BROWN:  Yes, sir.
17              THE COURT:  Have a seat for one second.
18         During the lunch hour apparently you had hit the
19         buzzer and handed a question to the court deputy.
20         And the question was the definition in writing of
21         the difference between A, second degree murder
22         with a firearm.  And C manslaughter with a
23         firearm.  And apparently the bailiff told you that
24         I was involved in an emergency meeting and wasn't
25         available right then and there.  And then it's my
```

628

1    understanding hat approximately fifteen minutes

2    later the buzzer was rang and you said you had a

3    verdict.  Is that correct?

4         THE JUROR:  Yes, sir.

5         THE COURT:  Did you need these questions

6    answered?

7         THE JUROR:  No, sir.

8         THE COURT:  Is that correct?

9         JUROR NUMBER ONE:  Well it wasn't fifteen

10   minutes later it was much longer.  We got into a

11   half hour.

12        THE COURT:  About a half hour later,

13   forty-five minutes later?

14        JUROR NUMBER ONE:  Yeah.

15        THE COURT:  Whatever the time was do you need

16   this question answered now?

17        JUROR NUMBER ONE:  Not anymore.

18        THE COURT:  Okay.  And you were able to

19   answer this question yourselves and satisfy

20   yourselves without me answering your question, is

21   that correct.

22        THE JURORS:  Yes, sir.

23        THE COURT:  Okay.  All right, have you in

24   fact reached a verdict.

25        MR. BROWN:  Yes, sir.

 1          THE COURT:   I'd ask you to hand the paperwork
 2     in your custody to the court deputy who in turn
 3     will hand it to the deputy clerk, who in turn will
 4     hand it to me.   Okay, do you want to pronounce the
 5     verdict please.

 6          THE CLERK:   In the circuit court of the 17th
 7     Judicial Circuit in and for Broward County,
 8     Florida case number 94-10764 CF10A state of
 9     Florida versus Jeremy Lockhart.   We the jury find
10     as follows as to the defendant in this case.   The
11     defendant is guilty of manslaughter with a firearm
12     a lesser included offense.   So say we all this
13     17th day of August, 1995, Fort Lauderdale, Broward
14     County Florida.   Michael Brown is foreperson.

15          THE COURT:   Okay, would either side choose to
16     have the jury polled?

17          MR. GODWIN:   Yes, Your Honor.

18          THE COURT:   Okay, ladies and gentlemen of the
19     jury the verdict pronounced into the record by the
20     deputy clerk reflects your verdict as a group,
21     your verdict as n entity.   In order to ensure this
22     is in fact your true individual verdict it will be
23     necessary when your name is called for you to
24     stand up and respond appropriately to the deputy
25     clerk and thereafter return to your seat.

```
 1              THE CLERK:  Josely Rodriguez, is this your
 2      verdict?
 3              MS. RODRIGUEZ:  From the beginning my
 4      original or my last --
 5              THE COURT:  No.  She is asking you is this
 6      your verdict that has just been pronounced into
 7      the record?
 8              MS. RODRIGUEZ:  Yes.
 9              THE CLERK:  Thomas Burke, is this your
10      verdict?
11              MR. BURKE:  Yes.
12              THE CLERK:  Kathleen Petrone,
13              MS. PETRONE:  Yes, it is.
14              THE COURT:  Freddie Scott is this your
15      verdict?
16              MR. SCOTT:  Yes, it is.
17              THE COURT:  Michael Brown, is this your
18      verdict?
19              MR. BROWN:  Yes, it is.
20              THE CLERK:  Ella Terrell, is this your
21      verdict?
22              MS. TERRELL:  Yes.
23              THE COURT:  Thank you very much.  The jury
24      has been polled.  Ladies and gentlemen I want to
25      thank you very, very much for the time and effort
```

631

1    you've expended in this particular case.
2    Obviously when you received your juror summons
3    initially you probably had no idea, number one,
4    you would be called for a criminal case, number
5    two, that it would be a case of this magnitude
6    murder in the second degree.  Number three, that
7    it would involve your being here for four days.  I
8    want to thank you very much and I hope you found
9    this to be an enlightening and educating process.
10   Does anybody have any questions at all, or any
11   statements they'd like to make about the case?

12       All right, hearing nothing then we'll have to
13   ask you for your juror badges in exchange therefor
14   I'll hand you these certificates of appreciation
15   together with your juror cards and if you want to
16   take these - I'd ask you folks to come up please.
17   If you can take these down to the jury room to let
18   them know you've completed your jury duty and they
19   will tell you the check will be in the mail.

20       Mr. Brown, thank you very much appreciate
21   it.  Mr. Scott, thank you very I much appreciate
22   it.  And Ms. Petrone thank you very much I
23   appreciate it.  Mr. Burke thank you very much,
24   appreciate it.  Ms. Rodriguez, thank you very much
25   appreciate it.  Bye.  You feel okay now?

632

```
 1              MS. TERRELL:  Yeah.

 2              THE COURT:  Headache gone?

 3              MS. TERRELL:  Yeah.

 4              THE COURT:  That's good, thank you.

 5              (Thereupon, the following proceedings were

 6         had outside the hearing of the jurors.)

 7              THE COURT:  Okay, I'd now ask if there is any

 8         legal reason -- well, first of all I will ask the

 9         defendant and his counsel to approach the podium

10         please.

11              Okay.  Mr. Lockhart, six members of this

12         community, representing a cross sector of this

13         community, representing the conscious of this

14         community have listened to the evidence and to the

15         evidence they've applied the law and determined

16         the appropriate verdict should be that of guilty

17         of -- excuse me -- of manslaughter with a firearm

18         a lesser included offense.  I will adjudicate you

19         guilty at this time and now ask is there any legal

20         reason why I cannot pronounce sentence?

21              MR. GODWIN:  Well, he has a prior conviction

22         as Your Honor knows so I suppose you have legal

23         authority to go ahead and sentence him at this

24         point.

25              THE COURT:  Does he have another case
```

633

```
 1      pending?
 2              THE BAILIFF:  Yes, sir.
 3              MR. GODWIN:  Possession of a firearm by a
 4      convicted felon.  It was part of this case and as
 5      Your Honor nose it was severed out.  Actually it
 6      was filed separately then they tried to
 7      consolidate it and then Your Honor granted my
 8      motion to sever.
 9              THE COURT:  In view of what happened here of
10      him taking the stand and admitting he had two
11      prior felonies it could have been done at the same
12      time.  But we wouldn't know that until we got to
13      that point.
14              MR. GODWIN:  That's correct.
15              THE COURT:  All right.  Well, before -- what
16      does he want to do with that other case?
17              MR. GODWIN:  Well, perhaps you could reset
18      this.  We'd like if we can to resolve everything,
19      Judge.
20              THE COURT:  What's the State's position?
21              MR. PATNER:  Judge, my position is I'm going
22      to request as I indicate to the Court, seek to
23      enhance -- he's been previously notified for his
24      qualification for enhancement and I'm going to
25      seek to have the defendant sentenced as a habitual
```

JUSTICE REPORTING SERVICES, INC.     523-6114

```
 1        violent offender as he qualifies at this point.  I
 2        believe it's necessary for the Court to order a
 3        PSI if the Court is inclined to habitualize the
 4        defendant.  Or if he chooses to waive it we could
 5        proceed to sentencing.
 6             THE COURT:  All right, have you filed the
 7        appropriate notice of intent to habitualize?
 8             MR. PATNER:  Yes, sir.
 9             THE COURT:  Okay, are you waiving his right
10        to a PSI pre-sentence investigation?
11             MR. GODWIN:  Well, I am in a difficult
12        position, Judge, I don't want to see him
13        habitualized obviously the Court heard the facts
14        here and knows the mitigating circumstances.
15             THE COURT:  I don't know anything about the
16        other two offenses.
17             MR. GODWIN:  No, I understand that.
18             THE COURT:  What's the prior offenses?
19             MR. GODWIN:  Prior conviction for armed
20        robbery.
21             THE COURT:  Armed robbery.
22             MR. GODWIN:  Prior conviction for escape
23        while the serving time on an armed robbery.  He
24        left for one day and came back.  In other words he
25        was gone a day and he came back and they charged
```

```
1       it as an escape.

2               THE COURT:   Okay, what was the sentence on

3       the armed robbery?

4               THE DEFENDANT:   Three years mandatory.

5               THE COURT:   Three years mandatory?

6               MR. PATNER:   Twenty-six months consecutive on

7       the escape.

8               THE COURT:   He received 26 months consecutive

9       - what judge sentenced you to the armed robbery?

10              THE DEFENDANT:   Charles Greene.

11              MR. GODWIN:   Judge Greene.

12              THE COURT:   Okay.  All right, well, so I

13      guess -- well, the question is are you asking for

14      a PSI knowing that there's a possibility that he

15      could be sentenced as a habitual or are you

16      waiving it?

17              MR. GODWIN:   Well, if you're going to

18      sentence him as a habitual obviously I want a PSI,

19      I'm willing to waive it if you'll go ahead and

20      sentence -- what I'm trying to say --

21              THE COURT:   Where does he fall on the

22      sentencing guidelines?

23              MR. PATNER:   Judge, on the sentencing

24      guidelines on this offense he is - on this

25      offense, and I have also added in as an additional
```

636

```
 1        the possession of a firearm by a convicted felon.

 2        He would fall 6,75 to 11.35 years.

 3             THE COURT:  Okay, does he qualify as a

 4        violent habitual felony offender?

 5             MR. PATNER:  He qualifies as a habitual

 6        violent offender.  Does not qualify as a habitual

 7        offender.

 8             THE COURT:  As a violent habitual felony

 9        offender.  You are seeking to reclassify this as a

10        second degree felony?

11             MR. PATNER:  Second degree felony as the jury

12        returned a verdict of manslaughter with a firearm

13        and now it's a first degree felony.

14             THE COURT:  Okay.

15             MR. GODWIN:  Again, Judge if the Court is

16        inclined to go ahead and sentence him not as a

17        habitual I'm willing to go ahead so we can resolve

18        it.

19             THE COURT:  Okay, in view of the seriousness

20        of the offense here, obviously second degree

21        murder there's only one crime more serious --

22             MR. GODWIN:  Excuse me.

23             THE COURT:  Manslaughter with a firearm.  The

24        point is a life was taken here and I can't rule

25        out at this time that I would not sentence the
```

/

JUSTICE REPORTING SERVICES, INC.      523-6114

637

1    defendant as a violent habitual felony offender.

2    So I will order a PSI and if in fact I were to

3    sentence him as a violent habitual felony offender

4    he would be sentenced to --

5         MR. PATNER:  Sentenced to life in prison with

6    a fifteen year minimum mandatory.

7         THE COURT:  All right, I'll order a

8    pre-sentence investigation.  I'll set down the

9    sentencing - today is August 17th, I'll set down

10   sentencing for September 8th.  He will have to be

11   remanded back to the custody of the sheriff.

12   Let's put it this way before he does so.  Are you

13   willing to plea at this time to the possession of

14   a firearm by a convicted felon?

15        MR. GODWIN:  Well I haven't spoken to him

16   about that, Your Honor, I'd like -- we're willing

17   to go ahead and be sentenced today if the court

18   would be inclined to do that as I said.

19        THE COURT:  No, I'm not - I'm not sure yet to

20   be honest with you.  I'm not certain what I'm

21   going to do.

22        MR. GODWIN:  Well, shall we put the other

23   case over for sentencing on the same day and maybe

24   we can resolve it all at once.

25        THE COURT:  Well, let's just put it this way

JUSTICE REPORTING SERVICES, INC.    523-6114

638

```
 1      before I pronounce sentence - I mean, obviously if
 2      he wants to plea before I pronounce sentence you
 3      know he can do so at that time, but if he pleas
 4      after I pronounce sentence of course he's running
 5      the risk of it being consecutive time.
 6              MR. GODWIN:  Do you want me to speak to him
 7      for a  moment?
 8              THE COURT:  I'll just say prior to - if you
 9      want to do it now or if he wants to do it prior to
10      the time I pronounce sentence whatever he wants to
11      do.  Do you want to speak to him for a second.
12              MR. GODWIN:  Judge, we'll just -- because of
13      the circumstances I will speak to him later and we
14      would like to resolve it later.
15              THE COURT:  Okay.  All right, so I'll set the
16      case the other case on day-to-day now.  I'll set
17      the other case down for trial on September 8th
18      thank you.  Same day as the sentencing.
19              Okay he'll be fingerprinted and remanded back
20      to the custody of the sheriff.
21              MR. GODWIN:  Judge, I will ask you to appoint
22      the Public Defender's Office for purposes of
23      appeal.
24              THE COURT:  Well, when I sentence him yes, I
25      definitely would.  Thank you.
```

639

1          (Thereupon, the proceedings were concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

640

```
 1                    C E R T I F I C A T E

 2                         - - - - -

 3        STATE OF FLORIDA

 4        COUNTY OF BROWARD

 5           I, MICHELLE MEEKER, Shorthand Reporter, Notary
          Public, do hereby certify that I was authorized to
 6        and did stenographically report the foregoing
          proceedings and that the transcript is a true and
 7        correct transcription of my stenotype notes of the
          proceedings.
 8
             Dated this 10th day of  Jan     , 1996.
 9

10                 Michelle Meeker
                   _____
                   MICHELLE MEEKER
11                 Shorthand Reporter

12

13        STATE OF FLORIDA

14        COUNTY OF BROWARD

15           The foregoing certificate was acknowledged
          before me this  day of          , 1996,
16        by MICHELLE MEEKER who is personally known to me.

17                 _____

18
                   Notary Public-State of Florida
19                 My Commission No.
                   Expires:
20

21

22

23

24

25


                            /

          JUSTICE REPORTING SERVICES, INC.      523-6114
```

641

```
 1   State of Florida    )
                         ):ss           Mark A. Speiser
 2   County of Broward   )

 3
                  IN THE CIRCUIT COURT OF THE
 4                 SEVENTEENTH JUDICIAL CIRCUIT,
                  IN AND FOR BROWARD COUNTY, FLORIDA
 5

 6   STATE OF FLORIDA,

 7          Plaintiff,

 8   -vs-                          Case No. 94-10764 CF10A
                                          95-3826 CF
 9
     JEREMY LOCKHART,
10
            Defendant.
11
     _____/
12

13

14

15          Proceedings had and taken before the Honorable

16   Mark A. Speiser, one of the Judges of said Court, fifth

17   floor, Room 5900 Broward County Courthouse, Fort

18   Lauderdale, Broward County, Florida, on the 6th day of

19   September, 1995, commencing at or about the hour of

20   1:00 o'clock p.m., and being a jury trial.

21

22   APPEARANCES:

23          JOSEPH PATNER, Esquire,
            Assistant State Attorney,
24          Appearing on behalf of the Plaintiff.

25          ROBERT GODWIN, Esquire,
            Appearing on behalf of the defendant
```

/

JUSTICE REPORTING SERVICES, INC.      523-6114

```
1              (Thereupon, the following proceedings were
2         had in presence of the jury.)
3              THE COURT:  Okay on Jeremy Lockhart.
4              MR. GODWIN:  Yes.  Good morning Your Honor,
5         Robert Godwin on behalf of Mr. Lockhart.
6              THE COURT:  Okay, Jeremy Lockhart.  Any legal
7         reason why I cannot pronounce sentence?
8              MR. GODWIN:  Well, if Your Honor please I
9         discussed this matter with Mr. Patner and as the
10        Court knows there is a pending case which we would
11        like to go ahead and resolve this morning.  I
12        spoke to Mr. Lockhart and  he's prepared to enter
13        a plea of no contest in that case.
14             THE COURT:  Well, I'll take a plea of guilty
15        in his best interest under Alfred B. North
16        Carolina.
17             MR. GODWIN:  Actually, Judge, I don't want to
18        get in a quibbling about this but the new case law
19        says the Court --
20             THE COURT:  I can't maintain any policies on
21        how to take, this is not really a policy.  I mean
22        he's not reserving any right to take an appeal.
23        Is that correct, on the possession of a firearm by
24        a convicted felon?
25             MR. PATNER:  I'd like to hear a guilty plea
```

643

```
 1        then.  I mean he admitted having the gun.  He
 2        admitted being a convicted felon on the stand so I
 3        don't see any reason why there is not a guilty
 4        plea in this case.
 5             THE COURT:  All right.  If he wants to plea
 6        guilty I will take a plea under Alfred, and I am
 7        kind of striking middle ground here.  I'd like to
 8        have an Alfred plea, plea of guilty in his best
 9        interest.
10   Thereupon,
11                       JEREMY LOCKHART,
12   having been first duly sworn, was examined and
13   testified as follows:
14             THE COURT:  Okay.  Mr. Lockhart, it's my
15        understanding you want to change your plea from
16        not guilty to guilty to the offense of possession
17        of a firearm by a convicted felon.  That's a plea
18        of guilty in his best interest and that's to an
19        offense punishable by a maximum of up to fifteen
20        years in prison.
21             Do you understand by pleading guilty you're
22        giving up the right to go to trial.  Giving up the
23        right to have Mr. Robert Godwin represent you.  At
24        this trial you have the right to remain silent
25        which means no one can force you to testify
```

```
 1        against your will.  You have the right to have

 2        your lawyer question and cross examine all the

 3        State's witnesses to find out if they told the

 4        truth, find out if they have information to help

 5        you rather then just hurt you.

 6             Thirdly by pleading guilty you're giving up

 7        the right to subpoena witnesses to come into

 8        court.  If you have any alibi witnesses, expert

 9        witnesses, eyewitnesses, character witnesses; you

10        could have them all come into the courtroom to

11        testify for you.

12             And lastly by pleading guilty you're giving

13        up the right to take an appeal of your conviction

14        to a higher court.

15             Do you understand these legal rights?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Are you willing to give them up?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Have you had any drugs or alcohol

20        within the last ten days that would effect your

21        ability to understand what's happening here today?

22             THE DEFENDANT:  No, sir.

23             THE COURT:  Are you under the care of a

24        psychiatrist or psychologist?

25             THE DEFENDANT:  No, sir.
```

```
 1              THE COURT:   You're pleading guilty freely and

 2         voluntarily?

 3              THE DEFENDANT:  Yes, sir.

 4              THE COURT:   No one has forced you or

 5         pressured you to plead guilty in your best

 6         interest, have they?

 7              THE DEFENDANT:  No, sir.

 8              THE COURT:   Have you discussed this case with

 9         your lawyer?

10              THE DEFENDANT:  Yes, sir, I have.

11              THE COURT:   Are you satisfied totally with

12         his legal competence, abilities, and

13         representations?

14              THE DEFENDANT:  Yes, sir I am.

15              THE COURT:   Has he answered all of your

16         questions?

17              THE DEFENDANT:  Yes, he has.

18              THE COURT:   Any questions you want to ask

19         your lawyer in private right now about what we are

20         doing and discussing here today?

21              THE DEFENDANT:  No, sir.

22              THE COURT:   Okay.  Would you stipulate the

23         facts set forth in the probable cause affidavit as

24         well as the facts adduced at the trial in case

25         number 94-10764 will constitute a factual basis
```

JUSTICE REPORTING SERVICES, INC.     523-6114

1    for me to accept the plea?

2            MR. GODWIN:  Yes, Your Honor.

3            THE COURT:   State can prove the firearm was

4    operable?

5            MR. PATNER:  Yes, sir.

6            THE COURT:   Court's going to find there is a

7    factual bases for the plea.   Defendant appears to

8    be mentally alert and in full control of his

9    mental faculties and capable of understanding

10   what's transpiring here today.

11           MR. GODWIN:  Your Honor, I just wanted to

12   indicate to the Court, say to the Court that in

13   speaking with Mr. Patner I told him that we would

14   go ahead and enter a plea today and we would

15   contemplate him being sentenced within - that is

16   to say Mr. Patner has prepared a score sheet that

17   contemplated sentencing on in the major case which

18   is the manslaughter matter.

19           In other words, we are asking Your Honor to

20   sentence him on the one score sheet on the

21   manslaughter matter and this case he's pleading

22   guilty to now so that you can sentence him on all

23   cases at the same time.

24           THE COURT:   Well, the score sheets are

25   applicable if I sentence him under the guidelines.

1      MR. PATNER:  That's right I want to make that
2    clear I've at all times indicated to defense
3    counsel I'm seeking to habitualize - I did
4    indicate to the defense counsel if he pled to it I
5    would have no objection to a concurrent guideline
6    sentence because you can not habitualized as to
7    that charge.  I have no objection to a concurrent
8    guideline sentence as felony possession of a
9    firearm.  That's what I indicated.
10      THE COURT:  Where does he fall on the
11    possession of a firearm?
12      MR. PATNER:  Just on felony possession of a
13    firearm alone he would score discretionary 13
14    months Department of Corrections.  I would have no
15    problem with a 13 month sentence as to that charge
16    concurrent with what the Court is going to give.
17      THE COURT:  Okay, all right.  What is the
18    State's position with respect to -- I'm sorry,
19    anything else you want to say?
20      MR. GODWIN:  Not on that point.  I just
21    wanted to make that point.
22      THE COURT:  Anything the State wants to say
23    before I pronounce sentence?
24      MR. PATNER:  No, sir.
25      THE COURT:  First off both sides have had the

JUSTICE REPORTING SERVICES, INC.    523-6114

648

```
 1        PSI, benefit of receiving it and reviewing it, is
 2        that correct?
 3             MR. PATNER:  Yes, sir.
 4             MR. PATNER:  I filed with the clerk at this
 5        time, Your Honor, judgment and sentence in case
 6        number 89-26300 which is a certified judgment of
 7        sentence for an armed robbery which the defendant
 8        was convicted of in 1990 and sentenced to three
 9        years minimum mandatory Department of
10        Corrections.
11             I'd also include with that, case number
12        92-91538 CF, which is an escape that results from
13        that same incident, and that included a lack of
14        clemency or pardon letter from the governor with
15        that judgment and sentence.  And I will provide
16        that to the clerk at this point.
17             What I'd just briefly like to say, Judge, as
18        far as the facts of the case you heard this trial
19        twice and I'm not going to go into that but the
20        fact of the matter is he did kill somebody.  I've
21        seen people indicted on first degree murder on
22        facts that really didn't stray to far from this.
23        That being said I'd like to talk a little bit
24        briefly about the defendant's past.
25             That armed robbery I just filed the judgment
```

1    of sentence on I pulled the records on that and
2    what it involved was a victim sitting in the car
3    at a light and the defendant possessing a short
4    barreled shotgun shot into the car into the
5    driver's side window.  The victim's statement was
6    I could have been killed from that.  He then
7    ordered the victim out of the car at gun point and
8    the victim flagged down a police officer and
9    indicated that's what had happened.  The police
10   set up a perimeter and they apprehended the
11   vehicle and the defendant fled from the police
12   much like we seen in this instance case.  He was
13   apprehended and subsequently convicted of that
14   offense and he was given three years prison which
15   he escaped from the work release program on.

16        What I'd also like to inform the Court about
17   -- so that's two instances that the Court is now
18   aware of where the defendant shot at somebody one
19   of them fatal and one of them not.  What I'd also
20   indicate to the Court is in 1988 a victim Donald
21   Ring (phonetic) in Davie, Florida flagged down a
22   police officer and said that an individual who had
23   owed him $10.00 from a drug deal had just pulled
24   out a gun and shot at him.  That individual was
25   identified as Jeremy Lockhart.  Now Mr. Lockhart

JUSTICE REPORTING SERVICES, INC.    523-6114

1    was found at his apartment and in his pockets were

2    two shells, and in the apartment was a .22

3    automatic gun, excuse me, an automatic caliber

4    weapon as seen in this case, with a fired round in

5    the, a spent round in the chamber.

6        Mr. Ring also indicated that the day before

7    Mr. Lockhart had shot up his apartment and the

8    police responded to his apartment and sure enough

9    they found .22 projectiles in the walls of Mr.

10   Rings' apartment.

11       Now that's two different days now and I will

12   tell the Court the defendant was a juvenile and

13   was never convicted of that offense.  Mr. Ring

14   subsequently became unavailable, however that's

15   documented by Davie Police Department records.

16       What I'd point out to the Court is between

17   1988 and 1984 we have four instances where he has

18   shot at somebody.

19       THE COURT:  1994.

20       MR. PATNER:  1994, excuse me.  Four instances

21   where this individual shot at somebody.  What the

22   state of Florida's position is at this point is he

23   has forfeited his right to live amongst the

24   civilized people.  And if you give him -  score

25   him at the top of the guidelines at

1     eleven-and-a-half years -- we see people everyday
2     come into this courtroom who have been previously
3     sentenced to ten and twelve year sentences and we
4     know what they are going to do on those offenses
5     and I'm completely convinced it will be some
6     period of time less then that.

7          He's twenty-five years old now and under the
8     sentencing guidelines there's no three year
9     minimum mandatory on this offense based upon the
10     nature of the conviction.   That the defendant will
11     still pose an equally significant threat to the
12     community when he gets out.   And I think that is
13     our primary concern here.   As well as punishment
14     for what he has done.

15          However, I think if the Court goes along with
16     what I'm going to recommend given the defendant's
17     history of four prior shootings of someone,
18     including a fatal shooting in this instance.   I
19     know he's termed it as an unavoidable tragedy but
20     the jury has rejected that contention.

21          What I would recommend to the Court is that
22     he be sentenced to 25 years as a habitual violent
23     offender with a required fifteen year minimum
24     mandatory.   What I am hoping will happen, Judge,
25     is that he will do fifteen years and when he gets

1       out at age 40 he will be at least wise and not be
2       at the point where if he's out at age 30 he's such
3       a threat that I believe he still continues to be
4       to the community.

5           He had his chance, he has had programs when
6       he was convicted on the possession of cocaine in
7       juvenile court which I can't score because it's to
8       old.  He's had his chance in programs, he's been
9       given his taste of prison, he had a three year
10      sentence day for day and I think if anyone needs a
11      little time for clean living it's someone who's
12      been to prison for three years who shouldn't even
13      had a firearm.  He's learned nothing.

14          My position would be if he has that 25 year
15      minimum mandatory - fifteen year minimum mandatory
16      at least we can effectuate a real sentence and do
17      something to protect the community.

18          One last thing I'd like to say, Judge, I was
19      talking about this with some friends of mine and
20      we were discussing when we went to high school,
21      which wasn't all that long ago, we were talking
22      about, you know, people getting into fights at
23      parties and there was disputes all the time but I
24      never, I never saw a gun pulled on anyone.  Now a
25      days that's all that happens every time there is a

653

1      dispute, every time there's an argument somebody
2      has got to pull out a gun and shoot somebody.  We
3      see it every day and ten years ago it wasn't like
4      this.  It's people like Mr. Lockhart that have
5      caused this sort of thing.  We can send a message
6      at least to Mr. Lockhart that this is not
7      acceptable behavior in our community.

8          Thank you, Judge.

9          THE COURT:  So the manslaughter with a
10     firearm, manslaughter would normally be a second
11     degree felony.

12         MR. PATNER:  That's correct and it's now a
13     first degree felony because he's habitual violent
14     offender.  The Court can sentence -- I can stand
15     before this Court and ask for life with a fifteen
16     year minimum mandatory and I am giving him some
17     degree of consideration because of the facts of
18     this case and I'm not asking for life.  The Court
19     could impose a life sentence which means habitual
20     violent life and that means he will do every day
21     and die in prison.  I'm giving him some degree of
22     consideration and I'm asking for 25 years with a
23     fifteen year minimum mandatory.

24         THE COURT:  Do you want to say anything, sir,
25     on behalf of the Department of Corrections?

JUSTICE REPORTING SERVICES, INC.    523-6114

654

1       THE PROBATION OFFICER:  No, Your Honor.

2       THE COURT:  I read your report and thank you

3   very much you did a good job.

4       THE PROBATION OFFICER:  Thank you.

5       THE COURT:  Mr. Godwin.

6       MR. GODWIN:  First if Your Honor please I

7   would ask the Court to disregard the comments of

8   the prosecutor about a 1988 case where Mr.

9   Lockhart was suspected of firing a shot that he

10  was never prosecuted for, and never convicted of.

11  I mean to come in here and talk about what a

12  police report says for an individual who's now

13  facing sentencing on serious charges, to bring up

14  other offenses for which he is not convicted, not

15  charged with and not adjudicated of, I'd ask the

16  Court to strike that from its considerations in

17  this case.

18      THE COURT:  Granted.

19      MR. GODWIN:  If Your Honor please, Mr.

20  Lockhart was convicted of a prior armed robbery

21  and no question that was a serious offense, and

22  there were four juveniles involved in that

23  situation, four individuals involved in that

24  situation and Mr. Lockhart pled guilty and was

25  sentenced to a minimum mandatory of three years in

JUSTICE REPORTING SERVICES, INC.     523-6114

1      prison.  He accepted his sentence, he did plead
2      guilty and he paid his debt to society.  It's a
3      serious offense and he's not getting around that
4      but he has been punished for that.

5          While he was in prison he did leave the work
6      release program and reported in the next day, and
7      he didn't go where he was suppose to that night so
8      he was charged with escape and he was sentenced
9      for that.  But it was not as though he ran away
10     and didn't come back.  He turned himself in the
11     next day.  So that's what the escape charge was
12     about.  He was missing from the work release
13     program until the next day.

14         Your Honor, as to this current case Your
15     Honor did hear this case twice and as you well
16     know Mr. Lockhart shot an individual named Patrick
17     Brown.  And it's undisputed that Patrick Brown was
18     assaulting Mr. Lockhart's sister at the time of
19     the shooting.

20         The first jury that heard this case was torn
21     between not guilty and manslaughter.  The second
22     jury that heard this case decided between
23     manslaughter and second degree murder and they did
24     find him of course guilty of manslaughter with a
25     firearm.  But as Your Honor will recall it was

1    undisputed that Mr. Patrick Brown had previously
2    taken a baseball bat and split open the head of
3    April Reese and that's Mr. Lockhart's sister, only
4    six weeks earlier.  Then he was assaulting Ms.
5    Reese and although she started the fight no
6    question about it he was assaulting Ms. Reese at
7    the time Mr. Lockhart used the force in this
8    case.

9        Mr. Lockhart was in his own home, he did have
10   the gun, of course he had no business having a gun
11   and I don't dispute that.  But he was in his own
12   home.  He did tell the detectives when he turned
13   himself in, he told the Court, he told the jury
14   that this was his best friend that he killed.  He
15   said he loved this person.  Your Honor saw the
16   tears in his eyes.  He had remorse and this was
17   not calculated or anything close to a first degree
18   murder.  It was almost a not guilty in one
19   instance and the jury found him guilty of
20   manslaughter at the second trial.

21       I would ask the Court to consider the fact
22   that he was protecting a member of his family and
23   I think any of us in a situation like that would
24   feel the obligation to protect our sister from
25   being assaulted like that.

657

1          The pre-sentence investigation, Your Honor,

2     which is quite thorough asks for a middle of the

3     road sentence which was I think one hundred and

4     two months state prison if I'm not mistaken.  But

5     he scores out -- under the sentencing guidelines

6     he scores out a minimum of 6.8 years and a maximum

7     of 11.4 years if you sentence him under the

8     guidelines.

9          I think under the circumstances in this case,

10    Judge, Mr. Lockhart used force to protect a member

11    of his family, protect his sister who was being

12    assaulted, no question she was being assaulted.

13    And he turned himself into the police and made a

14    full statement about what had happened.  And he

15    told the same thing to the jury.

16         The jury thought it was a manslaughter,

17    overreaction, he used to much force.  And so

18    that's what we have to live with.  But I would ask

19    the Court that you sentence him under the

20    guidelines and sentence him to 6.8 years.  And I

21    think that would be a very severe sentence under

22    these particular circumstances for a young man

23    protecting a member of his family.

24         THE COURT:  Okay, Mr. Lockhart do you want to

25    say anything?

JUSTICE REPORTING SERVICES, INC.    523-6114

1           THE DEFENDANT:  No, sir.

2           THE COURT:  Okay.  All right, you both are

3      correct to one extent in your observations in that

4      this Court had the opportunity and benefit to

5      become very familiar with the facts of this case

6      having presided over this case on two occasions.

7      One which resulted in a mistrial as a result of a

8      hung jury and the other that resulted in the

9      defendant's conviction to a lesser included

10      offense.

11           I have to echo the sentiments of the

12      prosecutor in one respect, that is that I am hard

13      pressed to believe that if in fact this defendant

14      as he claims was best friends with the victim,

15      that under these circumstance there is no

16      justification, no justification whatsoever from

17      the facts adduced at this trial for this defendant

18      to have to taken out a firearm.  Number one, he

19      really had no business possessing a firearm in

20      view of the fact that he's been to prison on a

21      very serious crime involving a firearm.  He was a

22      convicted felon and he had no right to have the

23      firearm for the exact reason which led us here

24      today to sentencing the defendant.  If he had no

25      firearm then he wouldn't have done what he did.

659

1   And if in fact he was trying to protect a relative
2   or family member from severe violent injury he
3   could have used his fists or ran out of the
4   apartment with his sister and called the police
5   but certainly not use a firearm because the
6   firearm led us to where we are today.  There's no
7   reason whatsoever from my humble vantage point
8   that the defendant should have had a firearm.

9       Number two, why he had to take that firearm
10  and shoot the victim under these circumstances,
11  there's absolutely no just cause for that
12  whatsoever.  This so called break does not,
13  certainly does not rise to a level necessary for
14  the victim to pay for this offense with his life.
15  I furthermore would note that the defendant does
16  not come before this Court with no offenses but
17  rather comes before this Court with several prior
18  felony convictions involving very serious facts.
19  More particularly the robbery with a deadly weapon
20  in case number 89-26300.

21      In view of these circumstances the Court
22  finds that it is requisite for the Court to
23  declare the defendant to be a habitual violent
24  felony offender.  I find that he does meet the
25  requisite qualifications to be served, to be

/

JUSTICE REPORTING SERVICES, INC.    523-6114

# OVER 999 Pages
# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

PLEASE REFER TO COURT FILE